# 13-1165-cv

# United States Court of Appeals
## for the
## Second Circuit

SHARI L. DEMBIN,

*Plaintiff,*

BURTON T. FRIED,

*Plaintiff-Appellant,*

– v. –

LVI SERVICES, INC., LVI PARENT CORP., SCOTT E. STATE,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## JOINT APPENDIX
## Volume I of VI (Pages A-1 to A-253)

JACKSON LEWIS LLP
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4006

– and –

LITTLER MENDELSON, P.C.
One Century Tower, Suite 300
265 Church Street
New Haven, Connecticut 06510
(203) 974-8700

*Attorneys for Defendants-Appellees*

THOMPSON WIGDOR LLP
85 Fifth Avenue
New York, New York 10003
(212) 257-6800

– and –

MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capital Avenue, Suite 201
Hartford, Connecticut 06106
(860) 246-2466

*Attorneys for Plaintiff-Appellant*

i

# Table of Contents

**Page**

Lower Court Docket Entries ..................................................... A-1

Motion by Defendants for an Order Granting Summary
 Judgment, Dated April 26, 2012 ........................................... A-13

Defendants' Local Rule 56(a)1 Statement,
 Dated April 26, 2012 ............................................................ A-15

Affirmation of Michael D. Mann, for Defendants, in Support
 of Motion, Dated April 26, 2012 .......................................... A-22

 Exhibit A to Mann Affirmation -
 Email from Brian Simmons to Burton T. Fried,
 Dated September 21, 2010 ................................................... A-28

 Exhibit B to Mann Affirmation -
 Excerpts from Deposition Transcript of Burton T. Fried,
 Dated May 20, 2011 ............................................................. A-30

 Exhibit C to Mann Affirmation -
 Complaint, Dated November 30, 2011................................. A-93

 Exhibit D to Mann Affirmation -
 LVI Services Investment Memorandum,
 Dated October 28, 2005 ....................................................... A-107

 Exhibit E to Mann Affirmation -
 Employment Agreement between Burton T. Fried and
 LVI Services, Inc., Dated November 16, 2005 .................... A-119

 Exhibit F to Mann Affirmation -
 Email from Burton T. Fried to Brian Simmons,
 Dated September 22, 2010 ................................................... A-123

 Exhibit G to Mann Affirmation -
 Email from Burton T. Fried to John Leonard and
 Paul Cutrone, Dated September 21, 2010 ............................ A-125

 Exhibit H to Mann Affirmation -
 Email from Brian Simmons to Scott E. State,
 Dated September 23, 2010 ................................................... A-127

 Exhibit I to Mann Affirmation -
 Email from Scott E. State to Brian Simmons
 and Rajay Bagaria, Dated October 29, 2010 ....................... A-130

ii

**Page**

Exhibit J to Mann Affirmation -
Excerpts from Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................ A-133

Exhibit K to Mann Affirmation -
Email from Burton Fried to Scott E. State,
Dated October 3, 2010 ........................................................ A-151

Exhibit L to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 13, 2010 ...................................................... A-154

Exhibit M to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated October 3, 2010 ........................................................ A-162

Exhibit N to Mann Affirmation -
Email from Robert Hogan to Scott E. State,
Dated October 5, 2010 ........................................................ A-165

Exhibit O to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 ...................................................... A-168

Exhibit P to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 ...................................................... A-170

Exhibit Q to Mann Affirmation -
Email from Scott E. State to Scott Simmons
and Robert Hogan, Dated October 14, 2010 ....................... A-173

Exhibit R to Mann Affirmation -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010 ...................................................... A-176

Exhibit S to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated October 28, 2010 ...................................................... A-179

Exhibit T to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 2, 2010 ..................................................... A-182

Exhibit U to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated June 23, 2006 ........................................................... A-186

iii

**Page**

Exhibit V to Mann Affirmation -
Email from Burton T. Fried to Mike Lane,
Dated June 30, 2005............................................................  A-189

Exhibit W to Mann Affirmation -
Email from Brian Simmons to Scott E. State
and Rajay Bagaria, Dated November 10, 2010....................  A-191

Exhibit X to Mann Affirmation -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011............................................................  A-193

Exhibit Y to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010 ..................................................  A-209

Exhibit Z to Mann Affirmation -
Email from Scott E. State to Brian Simmons and
Rajay Bagaria, Dated November 16, 2010...........................  A-216

Exhibit AA to Mann Affirmation -
Email from Scott E. State to John Leonard,
Dated November 30, 2010 ..................................................  A-223

Exhibit BB to Mann Affirmation -
Complaint in *Fried v. LVI Services, Inc., et al.*, Southern
District Case No. 10-cv-9308, Filed December 13, 2010 ....  A-226

Exhibit CC to Mann Affirmation -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011 ................................................................  A-254

Exhibit DD to Mann Affirmation -
Charge of Discrimination Filed with the State of Connecticut,
Commission on Human Rights and Opportunities on
May 16, 2011 .....................................................................  A-287

Exhibit EE to Mann Affirmation -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Filed October 27, 2011 ...................................  A-303

iv

**Page**

Exhibit FF to Mann Affirmation -
Opinion and Order of the Honorable Jed S. Rakoff
in *Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011......................    A-306

Exhibit GG to Mann Affirmation -
Docket Entries in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308 ..............................    A-342

Exhibit HH to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated September 19, 2010 ...................................................    A-360

Exhibit II to Mann Affirmation -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities .................................................................    A-364

Exhibit JJ to Mann Affirmation -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
November 14, 2011 ............................................................    A-367

Exhibit KK to Mann Affirmation -
Scheduling Order of the United States Court of Appeals
for the Second Circuit, Dated March 1, 2012 .....................    A-370

Declaration of Shaffin A. Datoo, for Plaintiff, in Opposition
to Motion, Dated May 31, 2012 ...........................................    A-372

Exhibit 1 to Datoo Declaration -
Complaint, Dated November 30, 2011
(Reproduced herein at pp. A-93–A-106)

Exhibit 2 to Datoo Declaration -
Answer, Dated February 16, 2011 .......................................    A-377

Exhibit 3 to Datoo Declaration -
Excerpts from Deposition Transcript of Rajay Bagaria,
Dated June 23, 2011 ............................................................    A-392

Exhibit 4 to Datoo Declaration -
Excerpts from Deposition Transcript of Paul Cutrone,
Dated June 1, 2011 ..............................................................    A-405

v

**Page**

Exhibit 5 to Datoo Declaration -
Excerpts from Deposition Transcript of Gerald Girardi,
Dated May 23, 2011 ............................................................. A-431

Exhibit 6 to Datoo Declaration -
Excerpts from Deposition Transcript of Greg DiCarlo,
Dated June 2, 2011 .............................................................. A-449

Exhibit 7 to Datoo Declaration -
Excerpts from Deposition Transcript of John Leonard,
Dated June 3, 2011 .............................................................. A-464

Exhibit 8 to Datoo Declaration -
Excerpts from Deposition Transcript of John Schnabel,
Dated June 1, 2011 .............................................................. A-491

Exhibit 9 to Datoo Declaration -
Email from Scott E. State to David S. Hicks,
Dated November 5, 2010 .................................................... A-507

Exhibit 10 to Datoo Declaration -
Excerpts from Human Resources "The Bible" ................... A-509

Exhibit 11 to Datoo Declaration -
Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................. A-513

Exhibit 12 to Datoo Declaration -
Deposition Transcript of Burton T. Fried,
Dated May 20, 2011 ............................................................. A-620

Exhibit 13 to Datoo Declaration -
Employment Agreement between Burton T. Fried and
LVI Services, Inc., Dated November 16, 2005
(Reproduced herein at pp. A-119–A-122)

Exhibit 14 to Datoo Declaration -
Document Entitled "VI Services Names Robert A.
McNamara as President and CEO," Dated
July 13, 2006 ....................................................................... A-769

Exhibit 15 to Datoo Declaration -
Declaration of Burton T. Fried in *Fried v. LVI Services,
Inc., et al.*, Southern District Case No. 10-cv-9308,
Dated June 20, 2011 ............................................................ A-772

vi

**Page**

Exhibit 16 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated May 12, 2010 ............................................................... A-778

Exhibit 17 to Datoo Declaration -
Document Entitled "AIC Memorandum,"
Dated June 11, 2010 ............................................................... A-780

Exhibit 18 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 14, 2010 ..................................................... A-799

Exhibit 19 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 19, 2010 ..................................................... A-802

Exhibit 20 to Datoo Declaration -
Document Entitled "LVI Services Names Scott E. State
as President and CEO," Dated September 27, 2010 ............ A-806

Exhibit 21 to Datoo Declaration -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010
(Reproduced herein at pp. A-176–A-178)

Exhibit 22 to Datoo Declaration -
Minutes of Meeting of the Boards of Directors
of LVI Parent Corp. ................................................................ A-809

Exhibit 23 to Datoo Declaration -
Excerpts from Deposition Transcript of Jeffrey Smith,
Dated June 8, 2011 ................................................................ A-813

Exhibit 24 to Datoo Declaration -
Letter from Douglas H. Wigdor to Scott E. State,
Dated November 15, 2010 ..................................................... A-826

Exhibit 25 to Datoo Declaration -
Handwritten Notes by Gerald Girardi,
Dated November 15, 2010 ..................................................... A-832

Exhibit 26 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010
(Reproduced herein at pp. A-209–A-215)

vii

**Page**

Exhibit 27 to Datoo Declaration -
Scott E. State's Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 14, 2011 ................................................................. A-834

Exhibit 28 to Datoo Declaration -
Brian Simmons' Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 24, 2011 ................................................................. A-851

Exhibit 29 to Datoo Declaration -
Gerald Girardi's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 .................................... A-866

Exhibit 30 to Datoo Declaration -
Rajay Bagaria's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 .................................... A-881

Exhibit 31 to Datoo Declaration -
Letter from Burton T. Fried to the Board of Directors
of LVI Parent Corp., *et al.*, Dated November 30, 2010 ....... A-896

Exhibit 32 to Datoo Declaration -
Order of the Honorable Jed S. Rakoff in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Dated September 2, 2011 ......................... A-898

Exhibit 33 to Datoo Declaration -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011 ......................................................... A-901

Exhibit 34 to Datoo Declaration -
Email from Scott E. State to Scott Simmons and
Robert Hogan, Dated October 14, 2010
(Reproduced herein at pp. A-173–A-176)

viii

**Page**

Exhibit 35 to Datoo Declaration -
Opinion and Order of the Honorable Jed S. Rakoff in
*Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011
(Reproduced herein at pp. A-306–A-341)

Exhibit 36 to Datoo Declaration -
Email from John Leonard to Scott E. State,
Dated October 14, 2010, with Attachments ......................... A-912

Exhibit 37 to Datoo Declaration -
Email from Burton T. Fried to Brian Simmons,
Dated September 22, 2010
(Reproduced herein at pp. A-123–A-124)

Exhibit 38 to Datoo Declaration -
Email from Burton Fried to John Leonard and Paul
Cutrone, Dated September 23, 2010 ................................... A-918

Exhibit 39 to Datoo Declaration -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011
(Reproduced herein at pp. A-254–A-286)

Exhibit 40 to Datoo Declaration -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Filed October 27, 2011
(Reproduced herein at pp. A-303–A-305)

Exhibit 41 to Datoo Declaration -
Charge of Discrimination Filed with the State of
Connecticut, Commission on Human Rights and
Opportunities on
May 16, 2011
(Reproduced herein at pp. A-287–A-302)

Exhibit 42 to Datoo Declaration -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities
(Reproduced herein at pp. A-364–A-366)

ix

**Page**

Exhibit 43 to Datoo Declaration -
Excerpts from Memorandum of Law in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Dated June 10, 2011................................. A-920

Exhibit 44 to Datoo Declaration -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
November 14, 2011
(Reproduced herein at pp. A-367–A-369)

Exhibit 45 to Datoo Declaration -
Brief of The Equal Opportunity Commission *Amicus
Curiae*, Filed in the United States Court of Appeals
for the Second Circuit on March 5, 2012 ............................ A-922

Plaintiff's Local Rule 56(a)2 Statement,
    Dated May 31, 2012 ............................................................ A-965

Notice of Appeal, Dated March 28, 2013 ................................ A-974

**OTHER RELEVANT DOCUMENTS**

Charge of Discrimination Filed with the Equal Employment
    Opportunity Commission ...................................................... A-976

Answer to Amended Complaint in *Fried v. LVI Services, Inc.,
    et al.*, Southern District Case No. 10-cv-9308, Dated
    April 18, 2011 ...................................................................... A-981

Memorandum of Law by Defendants in Support of Motion in
    *Fried v. LVI Services, Inc., et al.*, Southern District Case
    No. 10-cv-9308, Dated June 10, 2011 ................................. A-1003

Memorandum of Law by Plaintiff, in Opposition to Motion
    in *Fried v. LVI Services, Inc., et al.*, Southern District Case
    No. 10-cv-9308, Dated June 20, 2011 ................................. A-1032

Reply Memorandum of Law, by Defendants, in Further
    Support of Motion in *Fried v. LVI Services, Inc., et al.*,
    Southern District Case No. 10-cv-9308, Dated
    June 27, 2011 ...................................................................... A-1064

Transcript of Oral Argument Proceedings held before the
    Honorable Jed S. Rakoff, Dated July 6, 2011 ..................... A-1078

x

**Page**

Appellant's Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    February 27, 2012 ................................................................ A-1113

Appellees' Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    May 29, 2012 ...................................................................... A-1170

Appellant's Reply Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    June 12, 2012 ..................................................................... A-1228

Transcript of Proceedings in *Fried v. LVI Services, Inc., et
    al.*, Southern District Case No. 10-cv-9308, Dated
    October 5, 2012 ................................................................. A-1260

Mandate in *Fried v. LVI Services, Inc., et al.*, Second Circuit
    Docket No. 11-4791-cv, Dated December 26, 2012 ............ A-1309

A-1

APPEAL,CLOSED,EFILE

# U.S. District Court
## United States District Court for the District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:11-cv-01855-JBA

Dembin et al v. LVI Services, Inc. et al

Assigned to: Judge Janet Bond Arterton

Cause: 28:1332 Diversity-Employment Discrimination

Date Filed: 11/30/2011

Date Terminated: 03/20/2013

Jury Demand: Plaintiff

Nature of Suit: 442 Civil Rights: Jobs

Jurisdiction: Diversity

**Plaintiff**

**Shari L Dembin**
*TERMINATED: 01/10/2012*

represented by **Douglas H. Wigdor**
Thompson Wigdor & Gilly, LLP-NY
85 Fifth Avenue, Fifth Floor
New York, NY 10003
212-257-6800
Fax: 212-257-6845
Email: dwigdor@thompsonwigdor.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shaffin A. Datoo**
Thompson Wigdor LLP
85 Fifth Ave.
New York, NY 10003
212-257-6800
Fax: 212-257-6845
Email: sdatoo@thompsonwigdor.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd D. Steigman**
Madsen, Prestley & Parenteau, LLC-HTFD
44 Capitol Ave., 2nd FL
Suite 201
Hartford, CT 06106
860-246-2466
Fax: 860-246-1794
Email: tsteigman@mppjustice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William G. Madsen**
Madsen, Prestley & Parenteau, LLC-

HTFD
402 Asylum Street
Hartford, CT 06103
860-246-2466
Fax: 860-246-1794
Email: wmadsen@mppjustice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Burton T Fried**                   represented by   **Douglas H. Wigdor**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Shaffin A. Datoo**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Todd D. Steigman**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **William G. Madsen**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**LVI Services, Inc.**               represented by   **Deborah DeHart Cannavino**
                                                      Littler Mendelson, P.C.- NH, CT
                                                      One Century Tower, Suite 300
                                                      265 Church Street
                                                      New Haven, CT 06510
                                                      203-974-8700
                                                      Fax: 203-974-8799
                                                      Email: dcannavino@littler.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Joanne Seltzer**
                                                      Jackson Lewis LLP- NY

666 Third Avenue
New York, NY 10017
212-545-4000
Fax: 212-972-3213
Email:
Joanne.Seltzer@jacksonlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew K. Curtin**
Littler Mendelson, P.C.- NH, CT
One Century Tower, Suite 300
265 Church Street
New Haven, CT 06510
203-974-8700
Fax: 203-974-8799
Email: mcurtin@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Mann**
Sidley Austin, LLP - NY
787 Seventh Avenue
New York, NY 10019-6018
212-839-5300
Fax: 212-839-5599
Email: mdmann@sidley.com
*TERMINATED: 05/08/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas H. De Baun**
Sidley Austin, LLP - NY
787 Seventh Avenue
New York, NY 10019-6018
212-839-5300
Fax: 212-839-5599
Email: ndebaun@sidley.com
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LVI Parent Corp.**                    represented by **Deborah DeHart Cannavino**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Joanne Seltzer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew K. Curtin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Mann**
(See above for address)
*TERMINATED: 05/08/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas H. De Baun**
(See above for address)
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott E State**                    represented by    **Deborah DeHart Cannavino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joanne Seltzer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew K. Curtin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Mann**
(See above for address)
*TERMINATED: 05/08/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*

A-5

*ATTORNEY TO BE NOTICED*

**Nicholas H. De Baun**
(See above for address)
*TERMINATED: 04/04/2012*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2011 | 1 | COMPLAINT against LVI Parent Corp., LVI Services, Inc., Scott E State ( Filing fee $350 receipt number 0205-2320975.), filed by Burton T Fried, Shari L Dembin.(Steigman, Todd) (Entered: 11/30/2011) |
| 11/30/2011 | | Judge Janet Bond Arterton added. (Oliver, T.) (Entered: 11/30/2011) |
| 11/30/2011 | 2 | Order on Pretrial Deadlines: Motions to Dismiss due on 2/29/2012. Amended Pleadings due by 1/29/2012 Discovery due by 5/31/2012 Dispositive Motions due by 6/30/2012. Signed by Judge Janet Bond Arterton on 11/30/2011. (Falcone, K.) (Entered: 11/30/2011) |
| 11/30/2011 | 3 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet Bond Arterton on 11/30/2011. (Falcone, K.) (Entered: 11/30/2011) |
| 11/30/2011 | 4 | Standing PROTECTIVE ORDER. Signed by Judge Janet Bond Arterton on 11/30/2011. (Falcone, K.) (Entered: 11/30/2011) |
| 11/30/2011 | 5 | NOTICE TO COUNSEL: Counsel initiating or removing this action is responsible for serving all parties with attached documents and copies of 3 Electronic Filing Order, 2 Order on Pretrial Deadlines, 1 Complaint filed by Shari L Dembin, Burton T Fried, 4 Protective Order. Signed by Clerk on 11/30/2011. (Falcone, K.) (Entered: 11/30/2011) |
| 12/23/2011 | | Request for Clerk to issue summons as to All Defendants. (Steigman, Todd) (Entered: 12/23/2011) |
| 12/27/2011 | 6 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *LVI Parent Corp., LVI Services, Inc., Scott E State* with answer to complaint due within *21* days. Attorney *Madsen Prestly & Parenteau LLC-HTFD* *44 Capitol Ave. 2nd FL* *Suite 201* *Hartford, CT 06106*. (Falcone, K.) (Entered: 12/27/2011) |
| 12/29/2011 | 7 | NOTICE of Appearance by Deborah DeHart Cannavino on behalf of LVI Parent Corp., LVI Services, Inc., Scott E State (Cannavino, Deborah) (Entered: 12/29/2011) |
| 12/29/2011 | 8 | NOTICE of Appearance by Matthew K. Curtin on behalf of LVI Parent Corp., LVI Services, Inc., Scott E State (Curtin, Matthew) (Entered: 12/29/2011) |
| 12/29/2011 | 9 | MOTION to Appoint Counsel, MOTION for Attorney(s) Joanne Seltzer to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2351651) by |

A-6

| | | LVI Parent Corp., LVI Services, Inc., Scott E State. (Curtin, Matthew) (Entered: 12/29/2011) |
|---|---|---|
| 12/29/2011 | 10 | MOTION for Attorney(s) Michael D. Mann to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2351661) by LVI Parent Corp., LVI Services, Inc., Scott E State. (Curtin, Matthew) (Entered: 12/29/2011) |
| 12/29/2011 | 11 | NOTICE of Appearance by William G. Madsen on behalf of Shari L Dembin, Burton T Fried (Madsen, William) (Entered: 12/29/2011) |
| 12/30/2011 | 12 | ORDER granting 9 MOTION for Attorney(s) Joanne Seltzer to be Admitted Pro Hac Vice by LVI Parent Corp., LVI Services, Inc., Scott E State., granting 10 Motion to Appear pro hac vice Attorney Michael D. Mann for LVI Parent Corp.,Michael D. Mann for LVI Services, Inc.,Michael D. Mann for Scott E State added. Signed by Clerk on 12/30/11. (Torrenti, R.) (Entered: 12/30/2011) |
| 01/04/2012 | 13 | NOTICE of Appearance by Michael D. Mann on behalf of LVI Parent Corp., LVI Services, Inc., Scott E State (Mann, Michael) (Entered: 01/04/2012) |
| 01/04/2012 | 14 | NOTICE of Appearance by Joanne Seltzer on behalf of LVI Parent Corp., LVI Services, Inc., Scott E State (Seltzer, Joanne) (Entered: 01/04/2012) |
| 01/09/2012 | 15 | STIPULATION of Dismissal of Party *with Prejudice* by Shari L Dembin, Burton T Fried, LVI Parent Corp., LVI Services, Inc., Scott E State. (Cannavino, Deborah) (Entered: 01/09/2012) |
| 01/10/2012 | 16 | First MOTION for Extension of Time until February 17, 2012 to investigate Plaintiffs' claims in order to file the appropriate responsive pleading. 1 Complaint by LVI Parent Corp., LVI Services, Inc., Scott E State. (Curtin, Matthew) (Entered: 01/10/2012) |
| 01/11/2012 | 17 | ORDER granting 16 Motion for Extension of Time until 2/17/2012 to respond to complaint. Signed by Clerk on 1/11/2012. (Falcone, K.) (Entered: 01/11/2012) |
| 01/11/2012 | | Answer deadline updated for LVI Parent Corp. to 2/17/2012; LVI Services, Inc. to 2/17/2012; Scott E State to 2/17/2012. (Falcone, K.) (Entered: 01/11/2012) |
| 01/20/2012 | 18 | MOTION for Joanne Seltzer to Withdraw as Attorney by LVI Parent Corp., LVI Services, Inc., Scott E State. (Seltzer, Joanne) (Entered: 01/20/2012) |
| 01/23/2012 | 19 | ORDER granting 18 Motion to Withdraw as Attorney. Attorney Joanne Seltzer terminated. Signed by Judge Janet Bond Arterton on 1/23/12. (Tooker, A.) (Entered: 01/23/2012) |
| 02/02/2012 | 20 | MOTION for Attorney(s) Nicholas H. DeBaun to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2389517) by LVI Parent Corp., LVI Services, Inc., Scott E State. (Curtin, Matthew) (Entered: 02/02/2012) |
| 02/03/2012 | 21 | ORDER granting 20 Motion for Nicholas H. DeBaun to Appear Pro Hac Vice. Signed by Clerk on 2/3/2012. (Falcone, K.) (Entered: 02/03/2012) |
| 02/06/2012 | 22 | MOTION for Attorney(s) Shaffin A. Datoo to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2392917) by Burton T Fried. (Steigman, Todd) (Entered: 02/06/2012) |

| 02/09/2012 | 23 | ORDER granting 22 Motion For Attorney Shaffin A. Datoo to Appear Pro Hac Vice Certificate of Good Standing due by 4/9/2012. Signed by Clerk on 2/9/12. (Malone, P.) (Entered: 02/09/2012) |
|---|---|---|
| 02/14/2012 | 24 | NOTICE TO COUNSEL/PARTIES: Pursuant to D. Conn.L. Civ. R. 26(f), the parties have until 2/24/12 to file their 26(f) Planning Report or this case may be dismissed. This is the only notice the court shall issue., ( Rule 26 Meeting Report due by 2/24/2012). Signed by Clerk on 2/14/12. (Torday, B.) (Entered: 02/14/2012) |
| 02/14/2012 | 25 | NOTICE of Appearance by Shaffin A. Datoo on behalf of Shari L Dembin, Burton T Fried (Datoo, Shaffin) (Entered: 02/14/2012) |
| 02/15/2012 | 26 | Joint REPORT of Rule 26(f) Planning Meeting by all parties. (Cannavino, Deborah) Modified on 2/16/2012 to indicate filers(Falcone, K.). (Entered: 02/15/2012) |
| 02/16/2012 | 27 | ANSWER to 1 Complaint with Affirmative Defenses by LVI Parent Corp., LVI Services, Inc., Scott E State.(Cannavino, Deborah) (Entered: 02/16/2012) |
| 02/16/2012 | 28 | Corporate Disclosure Statement by LVI Parent Corp., LVI Services, Inc., Scott E State. (Cannavino, Deborah) (Entered: 02/16/2012) |
| 02/16/2012 | 29 | MOTION for Attorney(s) Douglas H. Wigdor to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2406130) by Burton T Fried. (Steigman, Todd) (Entered: 02/16/2012) |
| 02/16/2012 | 30 | Corporate Disclosure Statement by LVI Services, Inc. identifying Corporate Parent LVI Parent Corp. for LVI Services, Inc.. (Cannavino, Deborah) (Entered: 02/16/2012) |
| 02/17/2012 | 31 | ORDER granting 29 Motion to Appear Pro Hac Vice Attorney Douglas H. Wigdor for Burton T Fried added. Certificate of Good Standing due by 4/17/2012. Signed by Clerk on 2/17/2012. (Falcone, K.) (Entered: 02/17/2012) |
| 02/23/2012 | 32 | Supplemental REPORT of Rule 26(f) Planning Meeting. (Datoo, Shaffin) (Entered: 02/23/2012) |
| 02/24/2012 | 33 | CERTIFICATE OF GOOD STANDING re 22 MOTION for Attorney(s) Shaffin A. Datoo to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2392917) by Shari L Dembin, Burton T Fried. (Datoo, Shaffin) (Entered: 02/24/2012) |
| 02/24/2012 | 34 | NOTICE of Appearance by Douglas H. Wigdor on behalf of Shari L Dembin, Burton T Fried (Wigdor, Douglas) (Entered: 02/24/2012) |
| 02/24/2012 | 35 | CERTIFICATE OF GOOD STANDING re 29 MOTION for Attorney(s) Douglas H. Wigdor to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2406130) by Shari L Dembin, Burton T Fried. (Wigdor, Douglas) (Entered: 02/24/2012) |
| 02/28/2012 | 36 | CERTIFICATE OF SERVICE by Shari L Dembin, Burton T Fried re 33 Certificate of Good Standing (Datoo, Shaffin) (Entered: 02/28/2012) |
| 02/28/2012 | 37 | |

A-8

| | | CERTIFICATE OF SERVICE by Shari L Dembin, Burton T Fried re 25 Notice of Appearance (Datoo, Shaffin) (Entered: 02/28/2012) |
|---|---|---|
| 02/28/2012 | 38 | CERTIFICATE OF SERVICE by Shari L Dembin, Burton T Fried re 34 Notice of Appearance (Wigdor, Douglas) (Entered: 02/28/2012) |
| 02/28/2012 | 39 | CERTIFICATE OF SERVICE by Shari L Dembin, Burton T Fried re 35 Certificate of Good Standing (Wigdor, Douglas) (Entered: 02/28/2012) |
| 03/07/2012 | 40 | MOTION for Pre-Filing Conference by LVI Parent Corp., LVI Services, Inc., Scott E State. (Cannavino, Deborah) (Entered: 03/07/2012) |
| 03/08/2012 | 41 | ORDER granting 40 Motion for pre filing Conference. Signed by Judge Janet Bond Arterton on 3/7/12. (Torday, B.) (Entered: 03/08/2012) |
| 03/08/2012 | | Set Deadlines/Hearings: Telephone Pre-Filing Conference set for 4/4/2012 04:00 PM before Judge Janet Bond Arterton Defense counsel shall initiate the conference to chambers at 203-773-2456. (Torday, B.) (Entered: 03/08/2012) |
| 03/08/2012 | 42 | SCHEDULING ORDER: Dispositive Motions due by 4/5/2012 Trial Ready Date 10/1/2012 Trial Brief due by 4/15/2012. Signed by Judge Janet Bond Arterton on 3/7/2012. (Falcone, K.) (Entered: 03/09/2012) |
| 04/03/2012 | 43 | MOTION for Nicholas H. DeBaun to Withdraw as Attorney by LVI Parent Corp., LVI Services, Inc., Scott E State. (De Baun, Nicholas) (Entered: 04/03/2012) |
| 04/04/2012 | 44 | ORDER granting 43 Motion to Withdraw as Attorney. Attorney Nicholas H. De Baun terminated. Signed by Judge Janet Bond Arterton on 4/3/12. (Tooker, A.) (Entered: 04/04/2012) |
| 04/04/2012 | 45 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Telephone Pre-Filing Conference held on 4/4/2012. Total Time: 1 hours(Court Reporter S. MONTINI.) (Torday, B.) (Entered: 04/12/2012) |
| 04/19/2012 | 46 | SCHEDULING ORDER: Dispositive Motions due by 4/26/2012. Signed by Judge Janet Bond Arterton on 4/19/2012. (Falcone, K.) (Entered: 04/20/2012) |
| 04/26/2012 | 47 | MOTION for Summary Judgment by LVI Parent Corp., LVI Services, Inc., Scott E State.Responses due by 5/17/2012 (Mann, Michael) (Entered: 04/26/2012) |
| 04/26/2012 | 48 | Memorandum in Support re 47 MOTION for Summary Judgment filed by LVI Parent Corp., LVI Services, Inc., Scott E State. (Mann, Michael) (Entered: 04/26/2012) |
| 04/26/2012 | 49 | Statement of Material Facts re 47 MOTION for Summary Judgment filed by LVI Parent Corp., LVI Services, Inc., Scott E State. (Mann, Michael) (Entered: 04/26/2012) |
| 04/27/2012 | 50 | AFFIDAVIT re: 47 Motion for Summary Judgment Signed By Michael Mann filed by LVI Parent Corp., LVI Services, Inc., Scott E State. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit K, # 11 Exhibit L, # 12 Exhibit M, # 13 Exhibit N, # 14 Exhibit O, # 15 Exhibit P, # 16 |

| | | |
|---|---|---|
| | | Exhibit Q, # 17 Exhibit R, # 18 Exhibit S, # 19 Exhibit T, # 20 Exhibit U, # 21 Exhibit V, # 22 Exhibit W, # 23 Exhibit X, # 24 Exhibit Y, # 25 Exhibit Z, # 26 Exhibit AA, # 27 Exhibit BB, # 28 Exhibit CC, # 29 Appendix DD, # 30 Exhibit EE, # 31 Exhibit FF, # 32 Exhibit GG, # 33 Exhibit HH, # 34 Exhibit II, # 35 Exhibit JJ, # 36 Exhibit KK)(Mann, Michael) Modified on 4/27/2012 to relabel exhibit (Walker, J.). Modified on 4/30/2012 to create link to Motion for Summary Judgment(Falcone, K.). Modified on 4/30/2012 to edit text(Walker, J.). (Entered: 04/27/2012) |
| 04/27/2012 | 51 | EXHIBIT *J to Affirmation re: 47 Motion for Summary Judgment of Michael D. Mann* by LVI Parent Corp., LVI Services, Inc., Scott E State re 50 Affidavit. (Mann, Michael) Modified on 4/30/2012 to create link(Falcone, K.). (Entered: 04/27/2012) |
| 05/07/2012 | 52 | MOTION for Extension of Time until June 15, 2012 for defendant to reply to plaintiff's opposition 47 MOTION for Summary Judgment by LVI Parent Corp., LVI Services, Inc., Scott E State. (Cannavino, Deborah) (Entered: 05/07/2012) |
| 05/08/2012 | 53 | MOTION for Michael D. Mann to Withdraw as Attorney by LVI Parent Corp., LVI Services, Inc., Scott E State. (Curtin, Matthew) (Entered: 05/08/2012) |
| 05/08/2012 | 54 | ORDER granting 52 Motion for Extension of Time to June 15, 2012; granting 53 Motion to Withdraw as Attorney. Attorney Michael D. Mann terminated. Signed by Judge Janet Bond Arterton on 5/8/12. (Tooker, A.) (Entered: 05/08/2012) |
| 05/08/2012 | | reset Deadlines as to 47 MOTION for Summary Judgment. Responses due by 6/15/2012 (Torday, B.) (Entered: 05/09/2012) |
| 05/11/2012 | 55 | MOTION for Leave to Appear by LVI Parent Corp., LVI Services, Inc., Scott E State. (Cannavino, Deborah) (Entered: 05/11/2012) |
| 05/31/2012 | 56 | Memorandum in Opposition re 47 MOTION for Summary Judgment filed by Burton T Fried. (Datoo, Shaffin) (Entered: 05/31/2012) |
| 05/31/2012 | 57 | AFFIDAVIT re 56 Memorandum in Opposition to Motion Signed By Shaffin A. Datoo filed by Burton T Fried. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12 (Part 1), # 13 Exhibit 12 (Part 2), # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45)(Datoo, Shaffin) (Entered: 05/31/2012) |
| 05/31/2012 | 58 | Counter Statement of Material Facts re 47 MOTION for Summary Judgment filed by Burton T Fried. (Datoo, Shaffin) (Entered: 05/31/2012) |
| 05/31/2012 | 59 | |

| | | CERTIFICATE OF SERVICE by Burton T Fried re 58 Statement of Material Facts (Datoo, Shaffin) (Entered: 05/31/2012) |
|---|---|---|
| 06/05/2012 | 60 | ORDER granting, Attorney Seltzer is directed to update her firm information in CMECF, as it reflects Sidley Austin,LLP and not Jackson Lewis LLP 55 Motion to RE-Appear Pro Hac Vice Joanne Seltzer. Signed by Judge Janet Bond Arterton on 6/5/12. (Torday, B.) (Entered: 06/05/2012) |
| 06/15/2012 | 61 | RESPONSE re 47 MOTION for Summary Judgment filed by LVI Parent Corp., LVI Services, Inc., Scott E State. (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B)(Seltzer, Joanne) (Entered: 06/15/2012) |
| 11/26/2012 | 62 | Oral Argument on Motion 47 will be held on 1/28/13 at 10:00 a.m., Courtroom Two, 141 Church Street, New Haven, CT before Judge Janet Bond Arterton. (Tooker, A.) (Entered: 11/26/2012) |
| 01/14/2013 | 63 | MOTION Per D.Conn.Local Rule 83.1(d)(2), local counsel requests to be excused from hearing on 01/28/2013 re 62 Set Deadlines/Hearings, Set Motion and Rcmd Ruling Deadlines/Hearings by Burton T Fried.Responses due by 2/4/2013 (Steigman, Todd) (Entered: 01/14/2013) |
| 01/15/2013 | 64 | ORDER granting 63 Motion to be Excused. Signed by Judge Janet Bond Arterton on 1/15/13. (Tooker, A.) (Entered: 01/15/2013) |
| 01/25/2013 | 65 | MOTION to Excuse Local Counsel from Attendance at Oral Argument re 62 Set Deadlines/Hearings, Set Motion and Rcmd Ruling Deadlines/Hearings by LVI Parent Corp., LVI Services, Inc., Scott E State.Responses due by 2/15/2013 (Curtin, Matthew) (Entered: 01/25/2013) |
| 01/28/2013 | 66 | Minute Entry. Proceedings held before Judge Janet Bond Arterton: taking under advisement 47 Motion for Summary Judgment; granting in part and denying in part 65 Motion excuse local counsel; Motion Hearing held on 1/28/2013 re 47 MOTION for Summary Judgment filed by Scott E State, LVI Services, Inc., LVI Parent Corp., 65 MOTION to Excuse Local Counsel from Attendance at Oral Argument re 62 Set Deadlines/Hearings, Set Motion and Rcmd Ruling Deadlines/Hearings filed by Scott E State, LVI Services, Inc., LVI Parent Corp.. Total Time: 1 hours and 20 minutes(Court Reporter Sharon Montini.) (Torday, B.) (Entered: 01/28/2013) |
| 02/11/2013 | 67 | TRANSCRIPT of Proceedings: Type of Hearing: Transcript of Oral Argument on Defendants' Motion to Dismiss. Held on 1/28/13 before Judge Arterton. Court Reporter: S. Montini. IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS: To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction |

| | | |
|---|---|---|
| | | Request due 3/4/2013. Redacted Transcript Deadline set for 3/14/2013. Release of Transcript Restriction set for 5/12/2013. (Montini, S.) (Entered: 02/11/2013) |
| 03/18/2013 | 68 | ORDER: Defendants; Motion 47 for Summary Judgment is GRANTED. Signed by Judge Janet Bond Arterton on 3/18/2013. (Bonneau, J) (Entered: 03/18/2013) |
| 03/20/2013 | 69 | JUDGMENT entered in favor of LVI Parent Corp., LVI Services, Inc., Scott E State against Burton T Fried.<br><br>For Appeal Forms please go to the following website:<br>http://www.ctd.uscourts.gov/forms.html<br>Signed by Clerk on 3/20/13.(Torday, B.) (Entered: 03/20/2013) |
| 03/20/2013 | | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey<br>(Torday, B.) (Entered: 03/20/2013) |
| 03/28/2013 | 70 | NOTICE OF APPEAL as to 69 Judgment, by Burton T Fried. Filing fee $ 455, receipt number 0205-2825536. (Wigdor, Douglas) (Entered: 03/28/2013) |
| 04/16/2013 | 71 | ENTERED IN ERROR-Index to Record on Appeal by Burton T Fried re 70 Notice of Appeal. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Wigdor, Douglas) Modified on 4/18/2013 (Malone, P.). (Entered: 04/16/2013) |
| 04/17/2013 | 72 | Index to Record on Appeal by Burton T Fried re 70 Notice of Appeal, 48 Memorandum in Support of Motion, 15 Stipulation of Dismissal, 51 Exhibit, 47 MOTION for Summary Judgment, 49 Statement of Material Facts, 66 Order on Motion for Summary Judgment, Order on Motion for Miscellaneous Relief, Motion Hearing,,,,,, 69 Judgment, 58 Statement of Material Facts, 68 Order on Motion for Summary Judgment, 1 Complaint, 61 Response, 57 Affidavit,,,, 56 Memorandum in Opposition to Motion, 50 Affidavit,,, 27 Answer to Complaint. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Wigdor, Douglas) (Entered: 04/17/2013) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 06/14/2013 11:49:00 |

| PACER Login: | at0090 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 3:11-cv-01855-JBA |
| Billable Pages: | 9 | Cost: | 0.90 |

A-13

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHARI L. DEMBIN and BURTON T.
FRIED,                                       :
                                             :
                                             :
            Plaintiffs,                      :      **CIVIL NO.: 3:11-CV-01855-JBA**
                                             :
                                             :
                                             :
      v.                                     :
                                             :
LVI SERVICES, INC., LVI PARENT               :      **APRIL 26, 2012**
CORP., and SCOTT E. STATE,                   :
                                             :
                                             :
            Defendants.                      :
                                             :

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Civil Rule 56 of the United States District Court for the District of Connecticut, defendants LVI Services, Inc. ("LVI"), LVI Parent Corp. ("LVI Parent") and Scott E. State (collectively, the "Defendants") respectfully move for summary judgment on plaintiff Burton T. Fried's ("Plaintiff") Complaint dated November 30, 2011 ("Complaint"). In his Complaint, Plaintiff alleges Defendants violated his rights under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-51, *et seq.* ("CFEPA").

This action follows Plaintiff's unsuccessful pursuit of factually identical allegations in *Fried v. LVI Services, et al.*, 10-cv-9308 (S.D.N.Y.) (JSR), an action formerly pending in the United States District Court for the Southern District of New York, on which summary judgment has been granted, and an appeal is pending. No new facts or issues have come to light, only a new theory of liability under the CFEPA. Plaintiff had a full and fair opportunity to litigate his claims under the CFEPA, and that he chose not to do so precludes this action, in its entirety,

***ORAL ARGUMENT REQUESTED***

under the sound principles of res judicata and collateral estoppel. To the extent Plaintiff's claims

are not legally barred, which they are, Plaintiff cannot set forth a *prima facie* case of

discrimination or retaliation under the CFEPA.

      For all the reasons detailed in Defendants' Memorandum of Law in Support of Summary

Judgment that Defendants file with this Motion, this Court should grant summary judgment in

favor of Defendants, dismissing Plaintiff's Complaint in its entirety.


Dated: April 26, 2012

By: _____

    Michael D. Mann (phv02157)
    (mdmann@sidley.com)
    SIDLEY AUSTIN LLP
    787 Seventh Avenue
    New York, New York 10019
    (212) 839-5300

    Deborah Dehart Cannavino (CT08144)
    (dcannavino@littler.com)
    Matthew K. Curtin (CT27765)
    (mcurtin@littler.com)
    LITTLER MENDELSON, P.C.
    One Century Tower
    265 Church Street, Suite 300
    New Haven, CT 06510
    (203) 974-8700


    *Attorneys for Defendants*
    *LVI Services Inc., LVI Parent Corp.,*
    *and Scott E. State*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARI L. DEMBIN and BURTON T. FRIED, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL NO.: 3:11-CV-01855-JBA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LVI SERVICES INC., LVI PARENT CORP., and SCOTT E. STATE, | : | APRIL 26, 2012 |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

Pursuant to Rule 56(a)1 of the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut, Defendants LVI Services, Inc. ("LVI"), LVI Parent Corp. ("LVI Parent"), and Scott E. State ("State") (collectively referred to as the "Defendants"), hereby set forth material facts as to which they contend there exists no genuine issue to be tried.

1. LVI Services is an environmental remediation company, with its principal place of business in the state of New York. (Complaint dated November 30, 2011 (the "Compl.") ¶¶ 9, 12; Answer to Complaint dated February 16, 2012 (the "Answer") ¶¶ 9, 12.)

2. LVI Parent is the sole shareholder of LVI Services. LVI Parent Corp. is incorporated in Delaware, with its principal place of business in New York. (Compl., ¶ 10; Answer, ¶ 10.)

3. Scott State is a resident of the State of Colorado, currently a member of the Board of Directors of LVI Parent ("Board"), is employed as President and CEO of LVI and was 47 years old during the relevant period of this lawsuit. (Compl., ¶ 11; Answer, ¶ 11.)

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARI L. DEMBIN and BURTON T. FRIED, | : : : | |
| | : | CIVIL NO.: 3:11-CV-01855-JBA |
| Plaintiffs, | : : : | |
| v. | : : | |
| LVI SERVICES, INC., LVI PARENT CORP., and SCOTT E. STATE, | : : : | APRIL 26, 2012 |
| | : : | |
| Defendants. | : : | |

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Civil Rule 56 of the United States District Court for the District of Connecticut, defendants LVI Services, Inc. ("LVI"), LVI Parent Corp. ("LVI Parent") and Scott E. State (collectively, the "Defendants") respectfully move for summary judgment on plaintiff Burton T. Fried's ("Plaintiff") Complaint dated November 30, 2011 ("Complaint"). In his Complaint, Plaintiff alleges Defendants violated his rights under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-51, *et seq.* ("CFEPA").

This action follows Plaintiff's unsuccessful pursuit of factually identical allegations in *Fried v. LVI Services, et al.*, 10-cv-9308 (S.D.N.Y.) (JSR), an action formerly pending in the United States District Court for the Southern District of New York, on which summary judgment has been granted, and an appeal is pending. No new facts or issues have come to light, only a new theory of liability under the CFEPA. Plaintiff had a full and fair opportunity to litigate his claims under the CFEPA, and that he chose not to do so precludes this action, in its entirety,

***ORAL ARGUMENT REQUESTED***

4.      Burton T. Fried was a 71 year-old man, born in February 1940, during the relevant period of this lawsuit. (Compl., ¶ 13; Answer, ¶ 13.)

5.      Fried was employed by LVI from on or about January 1, 1986 through November 30, 2010, and held several positions throughout his employment, including General Counsel, President and CEO, interim President and CEO and Chairman. (Compl., ¶ 13; Answer, ¶ 13.)

6.      Fried worked out of LVI's New York City office for most of his employment, with the exception of his last seven years with LVI, during which he worked out of LVI's satellite office in Westport, Connecticut. (Compl., ¶ 9; Answer, ¶ 9.)

7.      LVI was sold to Code Hennessy Simmons LLC ("CHS") in November 2005. At that time Fried stated his wish to relinquish his day-to-day operational responsibilities and was involved in the search for his replacement as President and CEO. (Compl., ¶ 14; Answer, ¶ 14; Pl. Tr., pp. 74-75, 81; Mann Aff., Exh. D, p. 3.)

8.      LVI and Fried entered into an agreement, dated November 16, 2005, which stated that in Fried's new role as Chairman, he would have primary responsibility for "strategic growth", at the direction of the new CEO. (Compl., ¶ 14; Mann Aff., Exh. E; Pl. Tr., pp. 79-81.)

9.      As an at-will employer, LVI retained at all times the discretion to alter Fried's duties and responsibilities and to terminate Fried's employment without notice or reason. (Mann Aff., Exh. E; Pl. Tr., pp. 83-84.)

10.     In June 2006, Robert McNamara was hired as President and CEO of LVI, and Fried resigned from the position of President and CEO and assumed the position of Chairman. (Compl., ¶ 15; Answer, ¶ 15; Pl. Tr., p. 77.)

11.     When Fried assumed the position of Chairman, he agreed to a reduction of his work schedule and to a 20% reduction in his compensation. (Pl. Tr. p. 109.)

12.    Robert McNamara resigned from his position of President and CEO of LVI in April 2010 and at this time Fried assumed the position of interim President and CEO until the hire of a new President and CEO. (Compl., ¶ 17; Answer, ¶ 17; Pl. Tr., pp. 110-12.)

13.    When Fried resumed the position of interim President and CEO, his compensation returned to its previous level, and he participated in the continued search for a new President and CEO. (Compl., ¶ 17; Answer, ¶ 17; Pl. Tr., p. 111.)

14.    Fried, who had known State for a number of years, identified him as a candidate for the position and introduced State to LVI and the Board. (Compl., ¶ 19; Pl. Tr., pp. 116-17.)

15.    State was one of three finalists for the job and ultimately became the choice of Fried and LVI's management. (Pl Tr., pp. 121-22.)

16.    While LVI was searching for a replacement CEO, Fried participated in negotiations in connection with the restructuring and recapitalization of LVI in 2010. Simmons acknowledged the contribution of several employees, including Fried, in connection with the restructuring and recapitalization of LVI in 2010. (Compl., ¶ 18; Answer, ¶ 18.)

17.    Upon Fried's recommendation, the Board agreed to offer State the position of President and CEO. (Compl., ¶ 23; Pl. Tr., pp. 121-22.)

18.    During the employment negotiations, State requested to speak to Fried to ensure that he would have the authority as CEO to align his team and manage the business without Fried's interference. (Mann Aff., Exh. A.)

19.    Fried emailed Simmons to tell him that he had spoken to State and that State "now ha[d] no concern about [his] support in his role as CEO."  (Mann Aff., Exh. F.)

3

20.    On or about September 23, 2010, State accepted the offer of employment with LVI as President and CEO and Fried returned to the Chairman role. (Compl., ¶ 23; Answer, ¶ 23.)

21.    State assumed the role of President and CEO on October 1, 2010. (Mann Aff., Exh. H; Compl., ¶ 23.)

22.    On or about October 5, 2010, State and Fried agreed to meet on October 19, 2010 to discuss transition issues, including Fried's future duties as Chairman. (Mann Aff., Exh. O.)

23.    On or about October 14, 2010, Fried sent State an unsolicited email listing purported responsibilities he handled as Chairman under McNamara.  (Mann Aff., Exh. P.)

24.    On or about October 19, 2010, State and Fried discussed Fried's proper duties as Chairman and the transition of other duties to members of LVI's management. (Compl., ¶ 24; Answer, ¶ 24; Pl. Tr., pp. 163-64.)

25.    On or about October 28, 2010, at Simmons's request, Fried sent Simmons the list of responsibilities prepared for Fried's meeting with State to distribute to the Board of Directors. (Mann Aff., Exh. S.)

26.    On November 2, 2010, Simmons, on behalf of the Board, responded to Fried's list of responsibilities.  He stated that the list was more expansive than what he had envisioned, and further proposed to replace Fried's existing employment agreement with a consulting agreement. ( Mann Aff., Exh. T.)

27.    On November 4, 2010, a regularly scheduled LVI Board meeting occurred, at which several matters were discussed, including Fried's role at LVI.  (Compl., ¶ 30; Answer, ¶ 30; Pl. Tr., p. 229.)

4

28.     A letter from Fried's counsel was sent to State on or about November 15, 2010. (Compl., ¶ 33; Answer, ¶ 33; Mann Aff., Exh. Z.)

29.     On or about November 16, 2010, Simmons sent Fried a letter proposing that Fried would transition from his role as an employee of LVI to the dual role of non-executive Chairman of the Board and of consultant.  (Mann Aff., Exh. Y, pp. 3-6.)  The agreement proposed that Fried be paid an annual retainer of $150,000, plus $250 per hour for time spent in his consulting role. (Mann Aff., Exh. Y.)

30.     On or about November 30, 2010, Fried submitted to Gregory DiCarlo his resignation of all officer/directors positions for all LVI entities. (Mann Aff., Exh. AA.)

31.     LVI terminated Fried's employment with LVI on November 30, 2010, but continued to offer Fried the consultancy arrangement through counsel. (Compl., ¶ 35; Answer, ¶ 35.)

32.     On December 13, 2010, Fried filed a suit captioned *Fried v. LVI Services, Inc., et al.*, 10-cv-9308 (S.D.N.Y.) (JSR) in the United States District Court for the Southern District of New York ("*Fried I*"). (Mann. Aff., Exh. BB.)

33.     On May 16, 2011, Fried filed a complaint with the State of Connecticut's Commission on Human Rights and Opportunities ("CCHRO") alleging violations of the Connecticut Fair Employment Practices Act.  Fried's allegations were based on the same conduct alleged in *Fried I*.  (Mann Aff., Exh. DD.)

34.     On October 4, 2011, Judge Rakoff granted partial summary judgment for defendants.  (Mann. Aff., Exh. FF.)

35.    On October 17, 2011, the State of Connecticut Commission on Human Rights and Opportunities granted Fried's request for a release of jurisdiction, in accordance with Conn. Gen. Stat. § 46a-101.  (Mann. Aff., Exh. DD.)

36.    On October 19, 2011, the parties stipulated to the dismissal of the *Fried I* action, and on October 27, 2011, the court "so-ordered" the stipulation, dismissing Fried's remaining retaliation claim, with prejudice.  (Mann Aff., Exh. EE.)

Dated: April 26, 2012

By: _____

Michael D. Mann (phv02157)
(mdmann@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Deborah Dehart Cannavino (CT08144)
(dcannavino@littler.com)
Matthew K. Curtin (CT27765)
(mcurtin@littler.com)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
(203) 974-8700

*Attorneys for Defendants*
*LVI Services Inc., LVI Parent Corp.,*
*and Scott E. State*

A-22

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARI L. DEMBIN and BURTON T. FRIED, | : | |
| | : | **CIVIL NO.: 3:11-CV-01855-JBA** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **APRIL 26, 2012** |
| LVI SERVICES, INC., LVI PARENT CORP., and SCOTT E. STATE, | : | |
| | : | |
| Defendants. | : | |

## AFFIRMATION OF MICHAEL D. MANN

MICHAEL D. MANN, an attorney at law duly authorized to practice before the courts of the State of New York, affirms under penalty of perjury:

1.     I am an associate with the law firm of Sidley Austin LLP, counsel for defendants LVI Services, Inc., LVI Parent Corp., and Scott E. State.  I respectfully submit this affirmation in support of Defendants' Motion for Summary Judgment for the sole purpose of providing the Court with true copies of documents relevant to the disposition of that motion.

2.     A true and correct copy of an email dated September 21, 2010 from Brian Simmons to Burton Fried, with the subject "Re: Update," is attached hereto as Exhibit A.

3.     True and correct copies of relevant pages from the transcript of the deposition of Burton Fried, dated May 20, 2011, are attached hereto as Exhibit B.

4.     A true and correct copy of the Complaint in this action, dated November 30, 2011, is attached hereto as Exhibit C.

5.     A true and correct copy of an LVI Services Investment Memorandum, dated October 28, 2005, is attached hereto as Exhibit D.

6.      A true and correct copy of Burton Fried's employment agreement, dated November 16, 2005, is attached hereto as Exhibit E.

7.      A true and correct copy of an email dated September 22, 2010 from Burton Fried to Brian Simmons, copying Robert Hogan, with the subject "Scott State," is attached hereto as Exhibit F.

8.      A true and correct copy of an email dated September 21, 2010 from Burton Fried to John Leonard and Paul Cutrone, with the subject "Scott State," is attached hereto as Exhibit G.

9.      A true and correct copy of an email dated September 23, 2010 from Brian Simmons to Scott State, copying Robert Hogan, Burton Fried, and Laura Lester, with the subject "Re: Updated Offer," is attached hereto as Exhibit H.

10.     A true and correct copy of an email dated October 29, 2010 from Scott State to Brian Simmons and Rajay Bagaria, with the subject "One month review," is attached hereto as Exhibit I.

11.     True and correct copies of relevant pages from the transcript of the deposition of Scott State, dated May 26, 2011, are attached hereto as Exhibit J.

12.     A true and correct copy of an email dated October 3, 2010 from Burton Fried to Scott State, with the subject "Re: Chief Information Officer Position Spec," is attached hereto as Exhibit K.

13.     A true and correct copy of an email dated October 13, 2010 from Burton Fried to Scott State, copying John Leonard, with the subject "Re: Fw: November Meeting," is attached hereto as Exhibit L.

14.     A true and correct copy of an email dated October 3, 2010 from Robert Hogan to Brian Simmons, with the subject "Fw: Fwd: Chief Information Officer Position Spec," is attached hereto as Exhibit M.

15.     A true and correct copy of an email dated October 5, 2010 from Robert Hogan to Scott State, with the subject "RE: Transitional and Participation Matters," is attached hereto as Exhibit N.

16.     A true and correct copy of an email dated October 14, 2010 from Burton Fried to Scott State, with the subject "RE: Schedule," is attached hereto as Exhibit O.

17.     A true and correct copy of an email dated October 14, 2010 from Burton Fried to Scott State, with the subject "Chairman – Areas of Responsibility," is attached hereto as Exhibit P.

18.     A true and correct copy of an email dated October 14, 2010 from Scott State to Brian Simmons and Robert Hogan, with the subject "Chairman Duties," is attached hereto as Exhibit Q.

19.     A true and correct copy of an email dated October 19, 2010 from Scott State to Brian Simmons, copying Robert Hogan, with the subject "Re: Chairman Duties," is attached hereto as Exhibit R.

20.     A true and correct copy of an email dated October 28, 2010 from Burton Fried to Brian Simmons, with the subject "Chairman – Areas of Responsibilities," is attached hereto as Exhibit S.

21.     A true and correct copy of an email dated November 2, 2010 from Brian Simmons to Burton Fried, copying Rajay Bagaria, John Schnabel, Robert Hogan, Daniel Hennessy, Laura

Lester, and Jeffrey Smith, with the subject "RE: Chairman – Areas of Responsibilities," is attached hereto as Exhibit T.

22.    A true and correct copy of an email dated June 23, 2006 from Burton Fried to Brian Simmons, with the subject "RE: McNamara Release," is attached hereto as Exhibit U.

23.    A true and correct copy of an email dated June 30, 2005 from Burton Fried to Mike Lane, with the subject "Re: LUT 1," is attached hereto as Exhibit V.

24.    A true and correct copy of an email dated November 10, 2010 from Brian Simmons to Scott State and Rajay Bagaria, with the subject "Re: Business Opportunities," is attached hereto as Exhibit W.

25.    True and correct copies of relevant pages from the transcript of the deposition of Brian Simmons, dated May 25, 2011, are attached hereto as Exhibit X.

26.    A true and correct copy of an email dated November 16, 2010 from Brian Simmons to Burton Fried, copying Rajay Bagaria, John Schnabel, Gerald Girardi, Teddy Reynolds, Robert Hogan, Richard Ferrucci, Bob Buck, and Jeffrey Smith, with the subject "Transition to Chairman," is attached hereto as Exhibit Y.

27.    A true and correct copy of an email dated November 16, 2010 from Scott State to Brian Simmons and Rajay Bagaria, with the subject "FW:," is attached hereto as Exhibit Z.

28.    A true and correct copy of an email dated November 30, 2010 from Scott State to John Leonard, with the subject "Fw: Burt Fried's Resignation of Officer/Director Positions," is attached hereto as Exhibit AA.

29.    A true and correct copy of the complaint in the action captioned *Burton T. Fried v. LVI Services, Inc., et al.*, 10-cv-9308, formerly pending in the United States District Court for the

Southern District of New York, as filed on December 13, 2010 ("*Fried I*"), is attached hereto as Exhibit BB.

30.    A true and correct copy of the complaint in *Fried I*, as amended on February 3, 2011, is attached hereto as Exhibit CC.

31.    A true and correct copy of Burton Fried's Charge of Discrimination filed with the State of Connecticut, Commission on Human Rights and Opportunities on May 16, 2011, is attached hereto as Exhibit DD.

32.    A true and correct copy of the Stipulation of Dismissal with Prejudice agreed to by the parties in *Fried I*, and subsequently ordered by the court on October 27, 2011, is attached hereto as Exhibit EE.

33.    A true and correct copy of the *Fried I* Opinion and Order, dated October 4, 2011, granting Defendants' motion for summary judgment in part is attached hereto as Exhibit FF.

34.    A true and correct copy of the PACER docket in *Fried I* is attached hereto as Exhibit GG

35.    A true and correct copy of an email dated September 19, 2010 from Robert Hogan to Brian Simmons, with the subject "Fw: Offer," is attached hereto as Exhibit HH.

36.    A true and correct copy of Burton Fried's Release of Jurisdiction, dated October 17, 2011, from the State of Connecticut, Commission on Human Rights and Opportunities, is attached hereto as Exhibit II.

37.    A true and correct copy of Burton Fried's Notice of Appeal, dated November 14, 2011, is attached hereto as Exhibit JJ.

38.    A true and correct copy of a scheduling order of the United States Court of Appeals for the Second Circuit, dated March 1, 2012, is attached hereto as Exhibit KK.

Dated: April 26, 2012

By: _____

Michael D. Mann (phv02157)
(mdmann@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendants*
*LVI Services Inc., LVI Parent Corp.,*
*and Scott E. State*

# EXHIBIT A



A-29

Case 3:11-cv-01855-JBA   Document 50-1    Filed 04/27/12   Page 2 of 2

From:      Simmons, Brian P. <BSimmons@chsonline.com>
Sent:      Tuesday, September 21, 2010 8:55 PM
To:        Fried, Burton <BFried@Notes.lvi.com>
Subject:   Re: Update

Perfect. As I expected. Just wanted you to have the benefit of our observations. I am sure it will all go fine.

------------------------------
Brian P. Simmons
Partner
Code Hennessy & Simmons LLC
10 South Wacker Drive STE 3175
Chicago, IL 60606

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

**From:** BFried@lviservices.com [mailto:BFried@lviservices.com]
**Sent:** Tuesday, September 21, 2010 06:43 PM
**To:** Simmons, Brian P.
**Cc:** Hogan, Robert
**Subject:** Re: Update

Brian:

If your e-mail to me accurately reflects Scott's concern then he is evidencing early insecurity..... Before Bob McNamara accepted the LVI CEO position his only question of me was how long I would continue at LVI. My answer was "a day up to a year subject to your pleasure". He then said he would only accept the position at LVI if I agreed to stay as long as he wanted. I asked how long that would be and he said "until I (Bob) leave".

I will repeat my offer to Scott. I am prepared to remain at LVI until he, the Board or I decide its time for me to leave. .an offer he can't refuse. Ask you to recall that one of the purposes of my working in Westport was to get out of the way of the new CEO at the NY Corporate office.

Trust you have no problem with my planned reply...He will be in charge and get all the room he wants from me.

Burt
------------------------------
Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

... ...   ... ...   ...            .        .   ...         ...

**From:** "Simmons, Brian P." [BSimmons@chsonline.com]
**Sent:** 09/21/2010 05:48 PM EST
**To:** Burton Fried
**Cc:** "Hogan, Robert" <Rhogan@chsonline.com>
**Subject:** FW: Update

Burt - Scott wants to discuss your ongoing role at LVI. I suspect he wants to be assured that he will have authority as CEO to align his team, manage the business, etc. Obviously he will be accountable to the Board for a budget, performance, and various other corporate actions. I think it will be very important for him to hear unambiguously from you that he is in charge and you will give him the room he needs.

.............................................................................   .................................................................................

**From:** Hogan, Robert
**Sent:** Tuesday, September 21, 2010 5:45 PM
**To:** Gerald Girardi (ggirardi@apollolc.com); Rajay Bagaria (bagaria@apollolc.com); Teddy Reynolds; John Schnabel; Rafe Fogel; Bill Gassman; Will Pulman; Burton T. Fried (bfried@lviservices.com); Simmons, Brian P.; Lester, Laure; Kunz, Matthew
**Subject:** Update

A couple of items to update everyone on:

1. It appears we have an agreement with Scott State. He asked me to revise the offer letter to reflect the last deal we discussed as a group. That will be done tonight. Scott also wants to speak with Burt one last time before accepting the offer. That should be done tomorrow I presume.

2. We have two lender holdouts. Allstate and Cypress Tree. Allstate is hung up on the mutual release language, but we have compromise language we believe should work. The last I heard from Rob Warshauer, Cypress Tree was "on the fence." I left CIBC a message asking what the issue is and whether there has been some miscommunication. Once we have Allstate and Cypress signatures in, we will be ready to "pre-close."

Since this is likely to pre-close tomorrow, I would hope to have Scott signed up in advance of releasing our signatures.

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL 60606
(p) 312-876-2679
(f) 312-876-3854

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individ

# EXHIBIT B

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

BURTON T. FRIED,

                    Plaintiff,

        -against-
                        10 Civ. 9308 (JSR)(JCF)

LVI SERVICES, INC.; LVI PARENT CORP.;
CODE HENNESSY SIMMONS LLC d/b/a CHS
PRIVATE EQUITY V LP; APOLLO
INVESTMENT CORP.; SCOTT E. STATE, in
his official and individual capacities;
BRIAN SIMMONS, in his official and
individual capacities; RAJAY BAGARIA,
in his official and individual
capacities; GERALD J. GIRARDI, in his
official and individual capacities,

                    Defendants.

- - - - - - - - - - - - - - - - - - -x

                        May 20, 2011
                        9:56 a.m.

            Videotaped deposition of

BURTON T. FRIED, taken by attorneys for

Defendants, pursuant to notice, held at the

offices of Sidley Austin LLP, 787 Seventh

Avenue, New York, New York, before Nicole

Cannistraci, a Shorthand Reporter and Notary

Public within and for the State of New York.

  Pages 293 - 297 were marked "Highly Confidential".


**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                   Burton T. Fried
 2    employment because of your age?
 3          A.    Yes.
 4          Q.    What facts do you have that the
 5    actions happened because of your age?
 6          A.    At a meeting with Scott State, on
 7    November 4th, to -- at my request, to review the
 8    responsibilities that I would have going forward
 9    as chairman, I delivered a list of
10    responsibilities that I had been performing
11    as -- historically, as chairman, for many years.
12                And at that meeting he advised me
13    that he was going to take away my responsibility
14    for strategic growth, which was the first item
15    and something that was contained in my
16    employment agreement.  And that he would
17    specifically replace me in the development of a
18    relationship with a New England -- with a Great
19    Britain-based company called Squibb Demolition,
20    a company that I met in London, and as a result
21    of meetings, entered into -- drafted, entered
22    into a teaming agreement, with the help of
23    counsel I engaged in Great Britain, and was
24    planning to meet with the principals and the
25    owners in New York for them to reciprocate for
```

                              Burton T. Fried

1

2    my meeting them in Great Britain, and in order

3    to explore the actual development of a business

4    relationship, including a project in the United

5    States at an airport -- airplane facility of

6    Boeing.

7              Q.    Okay.

8              A.    `He told me it was unnecessary for

9    me to attend, notwithstanding my historical

10   frame of reference in the development of this

11   relationship and my meeting and knowing the

12   people, and he would take it from that point.

13                 He then said that with respect to

14   the -- all of my other duties and

15   responsibilities, he would assign that -- those

16   responsibilities to others, other managers, and

17   transition those duties to others.  He would

18   transition those duties to others and that

19   within the next 60 or 90 days, when I had

20   nothing further to do, he would then determine

21   my fate at LVI, which to me meant that he was

22   going to terminate my employment.

23                 I asked him, "Scott, why would you

24   do this?"  His reply was, "Burt, you're 71 years

25   of age.  How long do you expect to work?"

18

```
 1                    Burton T. Fried
 2         Q.    Is there --
 3               MR. WIGDOR:  I don't think he's
 4         done.
 5               MS. SELTZER:  I'm sorry.
 6               MR. WIGDOR:  Yeah.
 7         A.    He then went on to say that "What
 8    if you're hit by a bus," and that the company
 9    has to plan for the future.
10               Clearly, I was in shock and I left
11    the meeting not knowing really what to do but
12    knowing full well that this was wrong, it had to
13    be an illegal act to say that he was taking away
14    my duties and ultimately going to terminate me
15    because of my age.  And returned to my office.
16         Q.    We'll talk more about that meeting
17    a little later in the deposition.
18               Any other facts that you have that
19    lead you to believe that your being stripped of
20    your duties and your being terminated had
21    something to do with your age, other than this
22    meeting with Mr. State?
23               MR. WIGDOR:  Does that question
24               include documents that he was unaware of
25               at the time but that he's now become
```

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

A-35

21

```
 1                      Burton T. Fried
 2    in-person conversation or over the phone?
 3           A.    All telephone conversations.
 4           Q.    And approximately how much after
 5    your conversation with Mr. State did that
 6    happen?
 7           A.    He was the first person I was able
 8    to reach, shortly afterwards.
 9           Q.    Was it the same day?
10           A.    All occurred between October 20th
11    and the beginning of November, but certainly by
12    the end -- I think by the end of October, within
13    a week period or so.
14           Q.    Do you remember anything else
15    Mr. Bagaria said to you during the course of
16    that telephone conversation?
17           A.    No, other than he made his point
18    quite clear as to his support of Mr. State in
19    his actions.
20           Q.    How about Mr. Simmons, was that a
21    telephone conversation as well?
22           A.    He was the second person I
23    reached, and Mr. Simmons in that conversation
24    sort of waffled and said something about "We
25    have to plan for the future and we have to
```

22

```
 1                    Burton T. Fried
 2      support Scott State as new CEO, but I'll get
 3      back to you after I talk to the other
 4      directors."
 5            Q.     Did he get back to you?
 6            A.     He did, with an e-mail on
 7      November 2nd.
 8            Q.     We'll look at that e-mail together
 9      in a little bit.
10                   Anything else that you remember
11      Mr. Simmons saying in that telephone
12      conversation that you had shortly after your
13      meeting with Mr. State?
14            A.     I was left with the impression and
15      belief, based upon his statements, that he
16      supported these discriminatory acts that were
17      being perpetuated by Mr. State against me.
18            Q.     Did Mr. State make any kind of
19      statements to you about your age during the
20      course of that telephone conversation?
21                   I'm sorry, Mr. Simmons, my
22      apologies.
23            A.     I repeated to him the comments
24      that were made by Mr. State.  And
25      notwithstanding that, he said that he has to
```

A-37

23

```
 1                    Burton T. Fried

 2     support -- I repeated the comments as well as

 3     indicating that it was, in my mind,

 4     inappropriate and probably illegal and certainly

 5     discriminatory because of my age.

 6            Q.    Just going back a second, did

 7     Mr. Bagaria say anything that was age-related

 8     during the course of that telephone

 9     conversation?

10            A.    He supported the actions of

11     Mr. State after I described to him that it was

12     discriminatory and it seemed to be

13     discriminatory and illegal.

14            Q.    You said you had also a

15     conversation with Mr. Schnabel?

16            A.    Yes.

17            Q.    Am I pronouncing that correctly?

18            A.    Schnabel.

19            Q.    Why don't you tell me what you

20     remember about that telephone conversation?

21            A.    I related the same conversation to

22     him, and he was shocked.

23            Q.    What did he say that led you to

24     think that?

25            A.    He said that "I can't believe that
```

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

24

```
 1                    Burton T. Fried
 2   Scott State is taking that action and -- nor
 3   that he's relating it to your age, and I oppose
 4   that action under any grounds.  That Falcon made
 5   the investment, recent investment into LVI based
 6   upon your continuous employment and
 7   participation in the business of LVI, and I will
 8   contact the other parties and -- in an effort to
 9   straighten this thing out."
10         Q.    Anything else that you remember
11   Mr. Schnabel saying to you?
12         A.    That was about it.
13         Q.    Did Mr. Schnabel make any comments
14   relating to your age during the course of that
15   telephone conversation?
16         A.    Other than finding the act of
17   discrimination because I was 71 years of age to
18   be repugnant and objectionable, no.
19         Q.    So we've spoken about your meeting
20   with Mr. State and then the subsequent -- any
21   other people, by the way, that you spoke to over
22   the telephone subsequent to the -- or in person,
23   subsequent to the meeting with Mr. State?
24         A.    Yes.
25         Q.    Who is that?
```

**A-39**

25

```
1                    Burton T. Fried
2          A.     Doug Wigdor.
3          Q.     Okay.  Anybody else other than
4    your counsel?
5          A.     Other than family, no.
6          Q.     Other than the meeting with
7    Mr. State and your conversation with these three
8    individuals after the meeting with Mr. State,
9    any other facts that lead you to think that what
10   happened to you at LVI was as a result of your
11   age?
12               MR. WIGDOR:  Well, I think that
13          question doesn't accurately portray
14          his -- his testimony, because he also
15          said based on his prior performance.
16         Q.     Okay.  Anything -- any other facts
17   that you can remember?
18         A.     Yes.  I -- no mention was made of
19   any lack of performance, no criticism by anyone,
20   including those I spoke to by phone, related any
21   reason for the removal of responsibilities or
22   the planned termination by Mr. State.
23               On the contrary, I had been
24   congratulated that very same month, earlier in
25   the month, by Mr. Simmons, as performing in an
```

1                    Burton T. Fried

2       exemplary manner during the company's most

3       difficult times, which was in the period of a

4       year that it took to restructure the equity and

5       debt of the company.

6                    And when the CEO left in May,

7       during this most critical time, he asked me and

8       I accepted the position of interim CEO, and he

9       related that the entire recapitalization and

10      restructuring and the survival of LVI could not

11      have taken place without my personal leadership.

12              Q.    I'm confused.   How is Mr. Simmons'

13      asking you to be an interim CEO and

14      congratulating you with respect to your

15      accomplishment an indication that anything

16      happened as a result of your age?

17              A.    I'm explaining to you there was no

18      reason given by anyone at any time, be it

19      Mr. State or each of the directors who invested

20      the company while I was interim CEO, and made

21      the commitment before even knowing Mr. State

22      existed, it was based upon my being CEO and I

23      was seeking a candidate and being more than

24      pleased with respect to my performance.

25                    After October 19th, I told you I

A-41

27

```
1                       Burton T. Fried

2       contacted Mr. Wigdor.  But I also received a

3       written communication from Mr. Simmons in the

4       beginning -- dated the beginning of November, in

5       which he related that he had discussed my

6       complaint with other members of the board.  He

7       didn't delineate, I don't think, who, but he

8       said "other members of the board," to my best

9       recollection.  And that they -- they supported

10      the termination of my employment from LVI

11      Services and suggested that I become a

12      consultant to LVI Parent Company and perform

13      matters selected by them of a legacy nature.

14                      That was followed by a board

15      meeting on November 4th in which Mr. Simmons

16      suggested that I express my opposition to the

17      treatment that I was being received.  And that

18      took place on November 4th at a meeting of the

19      board.

20          Q.     And we'll talk more about that as

21      we get further in terms of the details of that

22      meeting, but let me just step back a second.

23                      I understand that there was a

24      written communication from Mr. Simmons in which

25      he described a consultancy agreement that --
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

28

```
 1                          Burton T. Fried
 2      that would be offered to you.  How is that an
 3      action that you believe was based on age?
 4              A.    He knew the facts, that Mr. State
 5      indicated that I was 71 years of age and how
 6      long did I expect to work and "What if you get
 7      hit by a bus," to me equating to "how long do
 8      you expect to live."  And notwithstanding that
 9      and that there was no other reason for taking
10      away my responsibilities that was given other
11      than my age, he still pursued and supported
12      Mr. State in that act of discrimination by
13      saying in his e-mail that he supported the
14      termination of my employment and the removal of
15      my health insurance and other benefits.
16              Q.    Any other facts that you can think
17      of at this point that lead you to believe that
18      the decisions that were taken by LVI had
19      something to do with your age?
20              A.    Any other facts that I was aware
21      of at that time?
22              Q.    That's correct?
23              A.    Not with respect to other e-mails
24      that I saw?
25              Q.    That's correct.
```

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

29

```
 1                    Burton T. Fried

 2          A.    My best recollection at the moment

 3   is those were the factors.

 4          Q.    Now, shifting a second to the

 5   individual defendants, you brought a number of

 6   claims against them that they participated in

 7   this discriminatory treatment, and we spoke

 8   about Mr. State briefly in terms of the comment

 9   that he made to you during the course of that

10   meeting.  Any other comments or actions by

11   Mr. State that you believe reflect age

12   discrimination against you?

13          A.    Yes.  He reaffirmed his ageist

14   remark to me at the board meeting on

15   November 4th.

16              I began my presentation by saying

17   to him specifically that I would be making

18   statements about remarks he made to me during an

19   October 19th meeting and that if he felt that

20   any of those statements were untrue, to please

21   stop me, interrupt me, and either deny or

22   correct them or say what you want if in fact

23   they are untrue.  And this was a statement that

24   I made before all of the members of the board,

25   that were 100 percent attendance, and Jeffrey
```

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

Case: 13-1165    Document: 43    Page: 55    07/10/2013    986023    264

A-44

30

```
 1                    Burton T. Fried
 2    Smith, who was counsel to LVI Parent and a
 3    partner in Sidley firm.
 4                    Mr. State looked at me and nodded
 5    his head, and I went into a presentation
 6    concerning my service to LVI over a period of 24
 7    years in its leadership and the most recent
 8    events of the most difficult times of LVI in the
 9    past year, which involved keeping thousands
10    employed without any credit line, which the bank
11    shut down, negotiating -- doing negotiations
12    with the lender, that was CIBC in New York,
13    keeping management intact, especially the
14    corporate staff in New York during this period
15    of time, notwithstanding rumors of the ultimate
16    demise of LVI because of its being in default of
17    indebtedness in an attempt to restructure.  And
18    described major projects that I was either
19    directly or indirectly involved of in New York,
20    that was the most premier projects, certainly in
21    New York City, if not the United States, during
22    the past year, which included the Deutsche Bank
23    building and being deeply involved daily, if not
24    weekly, in the progress of that project, the
25    most regulated project ever in the United States
```

31

```
 1                    Burton T. Fried
 2      because of its unfortunate history with the
 3      death of a few firemen.
 4                    Yankee Stadium project being
 5      performed in a densely populated area, as well
 6      as Deutsche Bank, and yet having -- getting the
 7      community to support our actions and regulatory
 8      authorities to support our -- and with an
 9      incredible safety record as well as LMBC in the
10      Deutsche Bank project.
11                    And then ultimately, the most
12      recent project which I negotiated for LVI, which
13      was the remediation and selective structural
14      demolition project, the Deutsche Bank project,
15      which I negotiated a price with the help of
16      management, provided me the numbers, but the
17      actual contract I negotiated and the award I
18      negotiated with representatives of Cable Vision,
19      Madison Square Garden and Turner Corporation.
20      This was a $27 million contract to be performed
21      over a four-year period, which I'm sure is
22      currently being performed.
23                    And I described to them all these
24      events, including stepping in for Bob McNamara,
25      who left in May, and during these difficult
```

1                    Burton T. Fried

2     times holding 200 million in bonding and keeping

3     it effective notwithstanding the rumors going

4     around, as well as received by the surety about

5     our ultimate demise, which were rumors, but

6     certainly made everybody nervous, including

7     suppliers.  Having to keep the financial

8     stability of the company going, notwithstanding

9     not having resource to a credit line, and

10    therefore millions in payroll going out and

11    relying upon collection of receivables and

12    able -- before the closing able to amass

13    $17 million in cash in the bank.

14                    Performing these human tasks and

15    then to be told that because of my age and

16    related -- looking at Scott, the comment he

17    made, that within two weeks or three weeks of

18    his employment, that I was dead wood, that I was

19    useless, that I was old, that I was 71 years of

20    age and have no value to LVI, and that how long

21    did I expect to work, and by relating about

22    being hit by a bus, meaning -- "and we have to

23    plan for the future" -- that my longevity was of

24    short term.

25                    Scott State did not say a word

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

33

```
1                    Burton T. Fried
2      and -- to object to the credibility or the
3      candor or the accuracy of my remarks.
4                    Subsequently, when the meeting
5      proceeded after my remarks, none of the board
6      members who spoke objected to the remarks,
7      criticized the remarks.  They completely ignored
8      the remarks and rather told me that I had no
9      right to complain, I had no right to object, I
10     had no right to even discuss this matter, and
11     that it was the absolute unalterable right of
12     the corporation, the board of directors,
13     according to Bagaria and Scott State, to do
14     whatever he wished insofar as my continuity in
15     the corporation.
16              Q.    Are you done with your answer?
17              A.    For the moment.  There were
18     further discussions but that's all -- that's all
19     that I think relates to your question.
20              Q.    Before I get to these comments
21     that I want to talk a little more about, but
22     during the course of this meeting did Scott
23     State say or do anything that evidenced to you
24     age discrimination, or was it his not saying
25     something that you believe was discriminatory?
```

```
 1                        Burton T. Fried
 2      you believed to have been a comment with respect
 3      to your age?
 4                        MR. WIGDOR:  And I object to the
 5                 form of the question.
 6           A.     Not that I can recall.
 7           Q.     Let's turn our attention to
 8      Mr. Simmons.
 9                        During the course of your
10      employment with LVI, did Mr. Simmons ever make a
11      comment to you that you believed to have been a
12      reflection of his discriminating against you on
13      account of your age?
14                        MR. WIGDOR:  Objection to the form
15                 of the question.
16           A.     Not until after my conversation
17      with Mr. Simmons concerning the age remark and
18      cause of action because of my age being made by
19      Mr. State.
20           Q.     What did Mr. Simmons say to you
21      that --
22           A.     He had to support the actions
23      of -- of Mr. State and did not attempt to -- and
24      in effect supported -- by his statements to me,
25      supported the position of Mr. State that I was
```

43

```
 1                         Burton T. Fried
 2      too old and how long would I continue to work,
 3      and by saying to me, "We have to plan for the
 4      future."
 5                    I had grown the company for 24
 6      years to be the most successful company in its
 7      field of specialty and the largest in my last
 8      year of CEO.  I achieved the highest earnings,
 9      more than $60 million, and the highest revenue.
10      I created a brand name, LVI.  And I was
11      congratulated by Mr. Simmons on not only I --
12      permitting him to achieve a restructuring of the
13      company and the survival of LVI and his
14      investment just weeks before, as well as telling
15      me that the closing could never have taken place
16      without me, as well as telling me that the hire
17      of Mr. State could not have taken, and
18      congratulating me, and could not have taken
19      place without me, and now was telling me that he
20      supported the comments of Mr. State that I was
21      too old.
22                Q.    Did he say that?
23                A.    Yes.
24                Q.    Did Mr. Simmons state that he
25      supported the statement -- the ageist statement
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

44

                        Burton T. Fried

1

2     that Scott State made to you?

3          A.     Yes.

4          Q.     When did he say that?

5          A.     In the conversation he said, "We

6     have to plan for the future."

7          Q.     How is that supporting the

8     statement?

9          A.     After repeating to him the comment

10    that I was too old to continue, and he was

11    taking away -- my responsibilities would

12    terminate, he gave a reason, an explanation for

13    that comment by saying that the company has to

14    plan for the future, notwithstanding my efforts

15    and notwithstanding his comments of my successes

16    with the company in the previous year.

17         Q.     Is it possible that Mr. Simmons

18    was giving an explanation, perhaps, for the

19    things that were happening to you, like the

20    giving away of your responsibilities to

21    management, as opposed to the comment that

22    Mr. State made?

23                MR. WIGDOR:   Objection.

24         A.     I don't understand the question.

25         Q.     Well, you just stated that

A-51

45

                              Burton T. Fried

1

2     Mr. Simmons saying, "We have to move on" or "we

3     have to plan for the future" was his support of

4     the ageist statement that Scott State made; is

5     that correct?

6            A.    Yes.

7            Q.    Couldn't it be that Mr. Simmons

8     was actually saying that he was supporting

9     Mr. State's actions in moving some of your

10    responsibilities to management as opposed to the

11    statement?

12                 MR. WIGDOR:   Objection.

13                 Go ahead.

14           A.    He was supporting the ageist

15    remark and the actions he was taking because of

16    the ageist remark by saying, "We have to plan

17    for the future."  Planning for the future,

18    because of the ageist remark, is inalterably

19    connected and merged.

20                 In my statement to him, it wasn't

21    two separate conversations.  It was one complete

22    dialogue in which he supported by saying, "We

23    have to plan for the future."  He didn't say, "I

24    don't consider you too old but we have to assign

25    duties for other reasons."  His simple comment

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

                         Burton T. Fried

1
2    was, after I made that one statement about age
3    and assignment of duties, "We have to plan for
4    the future."
5         Q.    Okay.   Other than Mr. Simmons,
6    according to you, supporting Mr. State's
7    statements to you, did Mr. Simmons take any
8    other action against you that you believe was
9    based on your age?
10        A.    Yes.
11        Q.    What is that?
12        A.    At the board meeting he was very
13   vocal in supporting the position of Mr. State
14   and the actions Mr. State was taking, and at no
15   time did he recant or -- or deny or say that he
16   disagreed with the reasons for Mr. State's
17   actions.   And his concluding remarks in which I
18   were present, because there was a part that I
19   wasn't present, in which I was present, was that
20   he would discuss it with the board but as far as
21   he was concerned, whatever Scott State wanted,
22   he supported for the reasons that Scott State
23   gave.
24        Q.    So I'll ask you my question one
25   more time.

```
1                    Burton T. Fried

2                    Other than his support of Scott

3       State and the statement and these actions that

4       Mr. State wanted to take against you, is there

5       anything else that Mr. Simmons did to you that

6       you believe to be discrimination on the basis of

7       age?

8                    MR. WIGDOR:   Objection.

9            A.    Yes.

10           Q.    What is that?

11           A.    On November 16th, I think it was,

12      I could be off a day, but November 16th he sent

13      me a letter.

14           Q.    I think I know the letter, the

15      consultancy letter we spoke about a second ago?

16           A.    No, a letter in which he

17      terminated my employment on behalf of the board.

18           Q.    Okay.

19           A.    My employment with LVI Services, I

20      think, and wrote the letter on Code Hennessy

21      stationery and -- and then offered, after

22      termination of my employment, for me to become

23      employed as a consultant for another company,

24      LVI Acquisition, as a consultant.

25                   MR. WIGDOR:   Are you done with the
```

48

```
 1                    Burton T. Fried
 2          answer?
 3                    THE WITNESS:  Yes.
 4                    MR. WIGDOR:   I would like to take
 5          a break.  We have been going for about
 6          an hour, so --
 7                    MS. SELTZER:  Fine.
 8                    THE VIDEOGRAPHER:  The time is
 9          10:55 a.m.  We're going off the record.
10                    (An off-the-record discussion took
11          place.)
12                    (A recess was taken.)
13                    THE VIDEOGRAPHER:  The time is
14          11:01 a.m. and we're back on the record.
15     BY MS. SELTZER:
16               Q.   Before the break we were talking
17     about Mr. Simmons and the actions that you
18     believe that he took against you as a result of
19     your age, and you talked about his support of
20     Mr. State's decisions with respect to you, and
21     you spoke about this November 16th letter which
22     he sent to you indicating your termination of
23     your employment and the consultancy agreement.
24                    Is that an accurate representation
25     so far?
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

A-55

49

```
 1                    Burton T. Fried

 2          A.    Yes.

 3          Q.    Anything else Mr. Simmons did that

 4     you believe were based on age discrimination?

 5          A.    Yes.

 6          Q.    Okay.

 7          A.    He sent me a letter, as a member

 8     of the board of LVI Parent, terminating my

 9     employment of LVI Services, Inc.  It was not the

10     board of LVI Services, Inc. that terminated my

11     employment but the board of LVI Parent.  I did

12     not have any employment relationship for the

13     services that I was performing for LVI Services

14     with LVI Parent.  I thought that was a -- an

15     illegal act in furtherance of their

16     discriminatory conduct and to take that -- those

17     actions without even caring about the corporate

18     protocol and requirements of law and exceeding

19     the authority that he had.

20                    So individually and as a member of

21     LVI Parent, with the other board members, they

22     were terminating my employment that I had the

23     agreement with another corporation.

24                    Further, he then attached to his

25     letter of termination an offer of employment as
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

50

```
 1                    Burton T. Fried
 2   a consultant, terminable at 30 days' notice.
 3   And yet requiring me, in order to become a
 4   consultant, to waive my age discrimination
 5   claims.  And I thought this was an act of
 6   discrimination.
 7           Q.    Waiving the claims, asking you to
 8   waive the claims?
 9           A.    Asking me to waive the claim.  I
10   also considered that to be an acknowledgment
11   that I had an age discrimination claim.
12           Q.    You had raised a claim by that
13   point, had you not?
14           A.    Yes.  And now he was asking me to
15   waive it.
16           I felt that if there was -- he
17   certainly gave merit to my claim, that's why he
18   was asking for a waiver, or else he wouldn't ask
19   for a waiver.  He was acknowledging the claim
20   and in my mind the authenticity of the claim.
21           Q.    In your mind?
22           A.    Yeah, in my -- it was in my mind
23   as a lawyer for 46 years that you don't ask
24   somebody to waive something if there is no merit
25   to it.  And it was condition of my employment as
```

Case: 13-1165    Document: 43    Page: 68    07/10/2013    986023    264

51

```
 1                        Burton T. Fried
 2    a consultant to LVI Parent.
 3            Q.    Anything else that Mr. Simmons
 4    did, other than this letter and his support of
 5    Mr. State?
 6                  MR. WIGDOR:  I'm just going to
 7            keep on objecting.  Why don't you just
 8            ask anything else, because his prior
 9            testimony speaks for itself.
10                  MS. SELTZER:  Okay, that's fine.
11                  MR. WIGDOR:  You keep on trying to
12            recharacterize his testimony.
13            Q.    Anything else that Mr. Simmons did
14    with respect to your employment that you believe
15    to be based in age discrimination?
16            A.    Yes.  I subsequently discovered
17    that he was planning --
18            Q.    Did you discover that as a course
19    of your discovery in this case?
20            A.    Yes.
21                  Can I finish my answer?
22            Q.    Sure, go ahead.
23            A.    I discovered that he was planning
24    to -- and conspiring with Mr. State to cause my
25    retirement prior to the time that Mr. State was
```

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

52

```
 1                     Burton T. Fried
 2     even hired and while he was being considered for
 3     hire.  And that other correspondence indicated
 4     that that plan of Mr. Simmons and Mr. Hogan and
 5     the other board members was being effectuated
 6     with the ultimate meeting that took place with
 7     Mr. State on October 19th.  And in furtherance
 8     of their ends, they -- he gave me the impression
 9     that this complaint was being considered and he
10     was going to discuss it with the board, when I'm
11     certain that he had already planned to terminate
12     me, force me into retirement or whatever you
13     want to call it.  And that's why he included in
14     the offer of consultancy that -- not only asking
15     me or requiring me to waive my claim but
16     required me to agree not to compete with the
17     company for a period of 12 months without
18     compensation, when the current agreement in
19     effect that I had with the company required me
20     to be paid for noncompetition.  And that also
21     was another act of discrimination in furtherance
22     of his purposes to terminate my employment
23     unlawfully.
24              Q.    What document did you see that led
25     you to believe that there was a plan to retire
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

A-59

54

1                          Burton T. Fried

2      document.  I don't remember the exact words.

3              Q.    Okay.

4              A.    But the whole effect of the

5      document is how do we get rid of Fried, how do

6      we retire him.

7              Q.    Is the word "retirement" used in

8      the document?

9              A.    Yes.

10             Q.    Okay.  Anything else that

11     Mr. Simmons did that made you name him in this

12     lawsuit?

13             A.    Not that I can recall at the

14     moment.

15             Q.    Let's turn to Mr. Bagaria.

16                   In addition to his support of

17     Mr. State's decisions with respect to your

18     employment and his participation in that board

19     meeting, is there anything else that Mr. Bagaria

20     did that you believe to be an action against you

21     because of your age?

22             A.    Yes.

23                   MR. WIGDOR:  Objection.  Again,

24             I'm going to just object and just -- the

25             record speaks for itself as to what this

A-60

55

```
1                    Burton T. Fried
2           witness has testified with respect to
3           Mr. Bagaria, not the way this -- the way
4           counsel is phrasing the question.
5                    MS. SELTZER:  Objection taken.  He
6           can answer the question.
7                    MR. WIGDOR:  I just want to make
8           sure the question is clear, because I
9           know the question is going to appear in
10          some motion down the line.  I just want
11          to make sure when the judge reads the
12          motion he understands that there is
13          prior testimony before this question,
14          which mischaracterizes the evidence.
15                   Q.    You can answer the question if you
16      remember what it is.
17                   A.    I -- I remember -- I related to
18      you the conversation that I had with Mr. Bagaria
19      after October 19th.
20                   Q.    Okay.
21                   A.    In his support for the actions of
22      Mr. State.  I hope I don't have to repeat this.
23                   Q.    No, anything more.  You don't need
24      to repeat anything that you've said already.
25                   A.    He was very vocal at the board of
```

56

```
 1                    Burton T. Fried
 2    director closed session.  And unlike
 3    Mr. State -- sorry, unlike Mr. Simmons in saying
 4    that it was the authority of Mr. State to
 5    determine what my duties were or were not and
 6    how long I would be with the company, it was
 7    Mr. Bagaria's position that -- he vocalized in
 8    front of that entire room that it wasn't any CEO
 9    that had the authority to change my duties or to
10    terminate me, it was the authority of the board,
11    LVI Parent.
12                    And I found that to be
13    discriminatory in that LVI Parent was not my
14    employer but was acting as my employer.  And he
15    was so anxious to terminate me because of my
16    age, and notwithstanding counsel being in the
17    room, was now voicing the fact that it was LVI
18    Parent that would take that action.  And in
19    fact, it did.  With the letter of Mr. Simmons,
20    on behalf of the board of LVI Parent, they were
21    terminating my employment with LVI Services.
22                    So this was a group who in concert
23    determined one way or the other, and without
24    apology, were going to terminate my employment
25    because of age, notwithstanding my comments and
```

57

```
1                         Burton T. Fried
2      objections, and then were going to retaliate
3      against me and -- by termination, and then
4      retaliate against my daughter by terminating her
5      employment within weeks thereafter.
6            Q.     Okay.  We'll get to that.
7                         Anything else Mr. Bagaria did,
8      other than what happened at that meeting on
9      November 4th and anything else that you
10     testified to, anything more that you want to add
11     in terms of what Mr. Bagaria might have done to
12     you with respect to your age?
13           A.     There are -- there is
14     correspondence, e-mails that I have not yet
15     reviewed, that were being produced as of
16     yesterday by your office.  I have not had a
17     chance to review it and I don't know if
18     everything has been produced that was requested,
19     so that there may be other actions in writing
20     that I'm not aware of.
21           Q.     Anything that you remember now?
22           A.     As I know now, based on what I've
23     seen, I don't recall anything else.
24           Q.     And with Mr. Girardi, what actions
25     do you believe he took that were based on your
```

58

```
 1                     Burton T. Fried
 2    age?
 3          A.     He was the other person at the
 4    board meeting of February 4th --
 5          Q.     November 4th?
 6          A.     I'm sorry, I'm sorry,
 7    November 4th.
 8                 -- that became very vocal in
 9    supporting the comments made by his colleague,
10    Mr. Bagaria, on behalf of Apollo and as a board
11    member of LVI Parent, in supporting the
12    discrimination that was being brought upon me,
13    by saying that he as a board member supports the
14    actions of Mr. State and I had no say, and was
15    particularly offensive in his remarks.  Because
16    I remember saying to him, probably too politely,
17    "Please don't talk to me that way."  At which
18    point he didn't say anything further and moved
19    to the other side of the room, away from me.
20          Q.     What had Mr. Girardi said to you
21    that prompted that comment from you?
22          A.     It was offensive remarks
23    concerning the fact that I had no rights and it
24    was -- it was like Mr. Bagaria said, the rights
25    of the board to determine, and Mr. State was a
```

```
 1                    Burton T. Fried
 2      time?
 3            A.    General counsel.  And I have --
 4      maybe I've been called president, but I didn't
 5      perform as such.
 6            Q.    Okay.  So your first position with
 7      LVI was as general counsel?
 8            A.    Yes.
 9            Q.    And what was your position
10      subsequent to that title?
11            A.    A few years later I became
12      president and CEO.
13            Q.    So that would have been around
14      1988, '89?
15            A.    Yes.  '89, I believe.
16            Q.    And -- go ahead.
17            A.    Yeah, correct.
18            Q.    And how long did you hold that
19      position?
20            A.    I held that position for 17 years.
21            Q.    When did you start working out of
22      the Westport office?
23            A.    September of 2003.
24            Q.    And what was the reason for your
25      moving to the Westport office?
```

65

1                          Burton T. Fried

2              A.    I could be more effective in the

3    management of the company through less travel

4    and more effective in the development of and

5    oversight, really, of the New York corporate

6    office and the development of the business in

7    New York and making plans for the fact that at

8    my request we were about to be engaged in the

9    recruitment of the CEO, new CEO, at which point

10   I would become chairman.

11             Q.    Why did you think that being in

12   Connecticut would make you more effective with

13   respect to oversight of what was happening in

14   New York?

15             A.    I no longer had to travel three

16   hours a day, and I showed up for work usually

17   around seven o'clock in the morning, and rather

18   than traveling and first arriving at the office

19   sometime later.

20             Q.    Do you live in Westport?

21             A.    Yes.

22             Q.    Was a consideration for your

23   moving to a Westport office convenience to you

24   with respect to your commute to work?

25             A.    Yes.

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

Case: 13-1165     Document: 43     Page: 77     07/10/2013     986023     264

```
 1                      Burton T. Fried
 2          Q.     Did you have an office in
 3   New York?
 4          A.     Yes.
 5          Q.     Where was that located?
 6          A.     Eighty Broad Street.
 7          Q.     And with respect to a normal week,
 8   how many days did you work in New York as
 9   opposed to the days that you worked in Westport,
10   Connecticut?
11               MR. WIGDOR:  You're talking about
12          physically or what he was doing?
13               MS. SELTZER:  No, physically.
14          A.     I worked in the New York office
15   maybe two, three days a week and Connecticut
16   two, three days a week.  It depended upon
17   business matters as to where I worked, but I
18   also, in addition -- even if I wasn't physically
19   in the New York office, I was having meetings in
20   New York City on securing work and other legal
21   matters and business matters.  So I wasn't
22   limiting it -- if I worked in Connecticut three
23   days, it wouldn't necessarily mean I was only
24   two days in New York.  I could have been there
25   longer than that.
```

74

```
 1                    Burton T. Fried
 2        A.      President and CEO.
 3                MS. SELTZER:  Could you mark this
 4        as Exhibit 2, please.
 5                (Investment memo marked Fried
 6        Exhibit 2 for identification.)
 7        Q.      Exhibit 2 is a document entitled
 8    "Investment Memo," Bates stamped number CHS1 to
 9    11.
10                Have you ever seen this document
11    before, Mr. Fried?
12        A.      I don't recall seeing it, no.
13        Q.      If you turn to page number 3 of
14    this document, it's also called CHS3 on the
15    lower right-hand corner, if you look at the
16    second bullet point from the bottom that begins
17    with "Enhance the strong management team," could
18    you just read that paragraph to yourself?
19        A.      Yes.
20        Q.      This paragraph talks about "The
21    current CEO, Burton Fried, will then transition
22    into an active chairman role focusing on growth
23    initiatives."
24                Do you see that?
25        A.      Yes.
```

```
 1                        Burton T. Fried
 2            Q.      Was that your decision to
 3       transition into a chairman role or was it the
 4       decision of CHS or any entity involved in the
 5       purchase of the company?
 6            A.      It was my decision.
 7            Q.      Why did you decide that you wanted
 8       transitioning to an active chairman role?
 9            A.      We had achieved revenues
10       approaching 300 million.  I felt that the
11       company had the capability of continuing its
12       profitable growth and achieving revenues with
13       profits of a billion.
14                  At that point in time we were
15       dominating -- the dominant force in the nation
16       in the performance of our services.  We had a
17       brand name.  We had 25-plus offices.  We were
18       probably the largest of our kind in the planet.
19       And I believed the company needed the management
20       skill sets to take us to a billion and I didn't
21       know that I had that capability.  And I then
22       recommended to Blue Point that we conduct a
23       search.  And they asked me to retain a
24       recruiter.  They supported the effort to retain
25       a recruiter.
```

                        Burton T. Fried

1     Code Hennessy, and retained the recruiter even

2     before I heard the name Code Hennessey, and

3     suspended this recruitment process even before I

4     ever heard the name Code Hennessey, because we

5     now decided to move forward with a possible sale

6     of the company and I felt that it would be

7     useless to identify a candidate and select one

8     when we couldn't introduce the new owner for

9     whom he would work.  So we suspended that

10    process.

11         Q.    So at the time that Code Hennessey

12    bought LVI, they knew that you had intended to

13    step from the position of CEO to the position of

14    chairman and to hire a CEO to take your place in

15    that position; is that correct?

16         A.    There was no intention.  They knew

17    I would.  And that was the plan before and they

18    bought the company with that understanding.

19         Q.    Was there ever a chairman before

20    you in that position?

21         A.    No.  I was the most senior officer

22    for the period of time from 19 -- certainly

23    performing the function from 1989 through this

24    date, which was 2005.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Case: 13-1165    Document: 43    Page: 81    07/10/2013    986023    264

79

                              Burton T. Fried

1

2    with his consent and clearly with the

3    understanding and consent of the board of both

4    LVI Services and LVI Acquisition, the then

5    parent of LVI Services.

6                    And was requested by the board,

7    which included Mr. Simmons, Mr. Hogan,

8    Mr. Hennessy from CHS, to actively pursue a

9    variety of matters on behalf of the company,

10   including collection of approximately

11   $10 million of receivables that were owed as a

12   result of Hurricane Katrina.

13             Q.    We'll get to the responsibilities

14   under Mr. McNamara in a second.  I just want to

15   focus back to your understanding of the role of

16   active chairman at the time that this company

17   was sold to CHS.

18             A.    Okay.

19             Q.    And you mentioned a second ago

20   that you believed -- was it your understanding

21   that the strategic initiatives that you were

22   going to be asked to do were determined by the

23   board of directors and the CEO that would be

24   taking your position?

25             A.    I don't think the board of

80

```
 1                    Burton T. Fried
 2    directors ever got involved in the operations of
 3    the business.  They were there simply to listen
 4    quarterly, if that frequent, to results of
 5    operations and the plans for the future and to
 6    make recommendations to management of what steps
 7    to take and who to use and how to get there.
 8         Q.    So who would you believe would
 9    have been responsible for determining the types
10    of growth initiatives that you would be focused
11    on as chairman of LVI?
12         A.    That would be the CEO, and that
13    would be with the support of the board.
14         Q.    Did you view the chairman role as
15    an opportunity to remove yourself from the
16    day-to-day management of the firm?
17         A.    Yes.
18         Q.    Why did you want to remove
19    yourself from the day-to-day management?
20         A.    Simply because the CEO role, by
21    its title, as chief executive officer, should
22    have the day-to-day and final decision in the
23    operations of the business.  And the chairman
24    should be a person who supports the actions of
25    the CEO and in any way that the CEO seeks that
```

                          Burton T. Fried

1

2     advice and counsel.

3         Q.     Did you play a role in recruiting

4     the new CEO, the very first CEO after you --

5     after the sale or during the sale of CHS -- of

6     LVI to CHS?

7         A.     We commenced -- we started up

8     again the recruitment process under the original

9     retainer agreement that we had signed with

10    Heidrick & Struggles, and only this time it was

11    like Blue Point.  Mr. Simmons, on behalf of Code

12    Hennessy, asked that I select the candidate,

13    find the candidate, select the candidate and

14    present the candidate for the approval of Code

15    Hennessey.

16        Q.     So am I to understand that you

17    were in charge of the recruiting process for the

18    CEO position?

19        A.     I was the sole person who -- who

20    was engaged to -- with that task and worked with

21    Hunter --

22        Q.     Was Mr. McNamara the only person

23    that presented as a CEO candidate?

24        A.     No.  There were others, but for --

25    for consideration and review, but it was

83

```
 1                    Burton T. Fried

 2          BF03.

 3          Q.    Do you recognize this document,

 4    Mr. Fried?

 5          A.    I don't have it.

 6          Q.    Oh, I'm sorry.

 7                Now do you recognize it?

 8          A.    Yes.

 9          Q.    Was this the agreement that you

10    were referring to before?

11          A.    Yes.

12          Q.    And on page BF03, is that your

13    signature on the bottom?

14          A.    It is.

15          Q.    Was it your understanding that

16    this contract -- let me strike that.

17                Do you know the concept of at will

18    employment, Mr. Fried?

19          A.    Yes.

20          Q.    Was this contract -- did this

21    contract leave you the freedom to leave whenever

22    you wanted and give LVI the ability to terminate

23    you whenever they wanted?

24          A.    It gave me the freedom of not

25    having a specific term of employment, and that
```

```
 1                     Burton T. Fried
 2    went both ways with respect to both of us.
 3    There was no specific term.  There's no
 4    termination provision.  So it would appear that
 5    we each had a right to terminate the agreement.
 6              Q.    And could you have had -- could
 7    you have negotiated a term employment agreement
 8    if you wanted to?
 9              A.    I don't know, I don't remember.
10              Q.    Did you ask for one?
11              A.    I don't recall.
12              Q.    Did you feel that you needed some
13    kind of guarantee to stay with the company?
14              A.    There is no term agreement, so it
15    appears that I didn't need any, feel I needed
16    any guarantees.
17                    This is -- in a way, this was
18    similar to the terms of employment that I held
19    every other employee and officer and senior
20    manager accountable to, that as long as you
21    perform, you have no worry about being
22    terminated.  That resulted in all of my senior
23    managers with a longevity of 20 to 24 years in
24    the employment of LVI without a term agreement.
25    So I held myself to the same standard as
```

109

                          Burton T. Fried

2    do?

3        A.    I've served LVI and I -- they had

4    a need, and it wasn't a position that I wanted,

5    but was by necessity.  There was no one else

6    that could handle the position, especially in

7    the trying times of restructuring and the

8    economy.

9        Q.    When you were working as chairman,

10   were you working full-time?

11       A.    Yes.

12       Q.    Was there ever an agreement that

13   you would be working part-time while you were

14   working as chairman?

15       A.    No.  After Mr. McNamara took over,

16   he discussed with me a reduction in my

17   compensation in connection with now that I was

18   no longer CEO but chairman.  And I agreed to a

19   reduction of 20 percent, down to 600,000,

20   provided that the amount of time that I had to

21   devote was no more than 20 percent less than a

22   full week, which was four days.

23       Q.    I don't mean to interrupt you, but

24   is it your testimony then that you did go to a

25   more part-time schedule, less than a full-time

110

                    1                        Burton T. Fried

                    2         schedule?

                    3                A.    For one week.

                    4                Q.    For one week?

                    5                A.    And then I went back to a

                    6         full-time schedule at the same compensation that

                    7         I agreed to, which was the reduced amount.

                    8                Q.    Why did you go back to full-time?

                    9                A.    My services were necessary.

                   10                Q.    Did Mr. McNamara ask you to go

                   11         back full-time?

                   12                A.    No.

                   13                Q.    Did the board?

                   14                A.    No.  The demands of the business

                   15         required it, and as everyone in the company

                   16         knew, including people at the Westport office, I

                   17         worked from 7 in the morning straight until 5 or

                   18         5:30, sometimes 6.

                   19                Q.    When Mr. McNamara resigned, did

                   20         you ever think about taking over the role of CEO

                   21         again?

                   22                A.    No.

                   23                Q.    Why?

                   24                A.    I felt the company had the need to

                   25         have somebody in there that could grow the

111

```
 1                    Burton T. Fried
 2    company.
 3            Q.    So is the reasoning that you
 4    decided not to step back in full time is the
 5    same reasoning which you originally thought a
 6    CEO was needed; is that correct?
 7            A.    I was working full time.  I didn't
 8    want to take over the CEO role for the same
 9    reason we searched and found Mr. McNamara.  And
10    that was for the growth of the company to be far
11    larger and a more dominant force in the
12    marketplace.
13            Q.    Did the board have to approve your
14    assuming the interim role of CEO?
15            A.    The board did.
16            Q.    The board did?
17            A.    Yes.
18            Q.    And did the board agree to giving
19    you an increase in your salary when you became
20    the interim head and the CEO?
21            A.    Yes.  I asked that of Mr. Simmons,
22    who then confirmed it to me in writing.
23            Q.    Did Mr. Simmons discuss with you
24    his reasoning for wanting you to become interim
25    president and CEO?
```

112

```
 1                    Burton T. Fried

 2          A.    Yes.

 3          Q.    What did he say that you remember?

 4          A.    I was the only qualified person to

 5   continue the stable path of the company, retain

 6   management, motivate management, continue

 7   profitable operations, and as the face of the

 8   company with respect to the surety relationships

 9   and other relationships, and understanding that

10   as part of my duties I would conduct a search

11   for a permanent CEO.

12          Q.    Did Mr. Simmons say that he felt

13   that you were the only person who would be able

14   to function in this interim capacity until a new

15   CEO was found?

16          A.    Yes.

17          Q.    How old were you at the time,

18   Mr. Fried?

19          A.    That occurred in May of '10.   I

20   was 70 years old.

21          Q.    At that time did Mr. Simmons

22   express any kind of reservation of you assuming

23   that role because of your age?

24          A.    Not on an interim basis.   He was

25   without options at the time.   A search would
```

Case: 13-1165   Document: 43   Page: 90   07/10/2013   986023   264

A-79

113

```
 1                    Burton T. Fried
 2      take, you know, a considerable period of time
 3      and the ship would be rudderless, so it was a
 4      matter of necessity.
 5               Q.    Did you take control of searching
 6      for a new CEO?
 7               A.    Yes.
 8               Q.    Did anybody else take control with
 9      you or was it solely you?
10               A.    Solely me.
11               Q.    Did Mr. Simmons participate at all
12      in the recruitment?
13               A.    No.
14               Q.    Did you retain a search firm?
15               A.    Mr. Simmons recommended one, which
16      was Russell Reynolds.
17               Q.    Did you agree with that
18      recommendation?
19               A.    No.
20               Q.    Why?
21               A.    I felt they didn't have the
22      specialist that was necessary to produce a
23      candidate or candidates with the proper
24      qualifications.
25               Q.    Did you then move forward with
```

A-80

116

```
 1                    Burton T. Fried
 2     was earlier -- it was the only one I presented,
 3     frankly, to Mr. Simmons.  And Mr. Hopkins then
 4     did some research and withdrew.
 5            Q.    Why did he withdraw?
 6            A.    I can only tell you what I
 7     believe, not what the fact is, so I prefer not
 8     to say.
 9            Q.    Did Mr. Hopkins have any
10     conversations with you about why he was
11     withdrawing from the position?
12            A.    No.
13            Q.    Did he have any conversations with
14     Mr. Simmons about it?
15            A.    I don't know.
16            Q.    Did Mr. Simmons ever speak to you
17     about it, about any conversations with Mr.
18     Hopkins?
19            A.    I don't recall.
20            Q.    Was Mr. State also being
21     interviewed at the same time Mr. Hopkins was?
22            A.    No.  He was not a candidate for
23     this position, nor was he an individual that was
24     discovered by Russell Reynolds, nor was he a
25     person with whom Code Hennessy, Apollo or Falcon
```

117

```
 1                    Burton T. Fried
 2    ever heard of before.
 3            Q.    In fact, you knew Mr. State, is
 4    that correct, prior to this search?
 5            A.    I had known Mr. State and he was
 6    sort of introduced to be considered for the
 7    position by one or more managers of LVI.
 8            Q.    When did you meet Mr. State?
 9            A.    I met him in around '99 or 2000.
10            Q.    And what was the circumstances
11    around which you met Mr. State?
12            A.    We were in bankruptcy court for a
13    competitor of LVI.
14            Q.    What was your understanding of
15    Mr. State's reputation at the time that you met
16    him and subsequent to that?
17            A.    I didn't really know Mr. State
18    prior to my first meeting with him.
19            Q.    Did you recommend to Mr. State
20    that he should apply for the position of CEO at
21    LVI?
22            A.    I suggested that after being
23    requested to do that by other managers.
24            Q.    What other managers?
25            A.    I don't -- I believe it was
```

Case: 13-1165    Document: 43    Page: 93    07/10/2013    986023    264

A-82

121

```
 1                    Burton T. Fried
 2     Falcon and Apollo and then the senior managers
 3     of the company.
 4              Q.    Did you have some reservations
 5     with respect to Mr. State's management
 6     experience?
 7              A.    He wasn't in the profile that I
 8     was hoping to secure, but clearly it appeared
 9     that he had certainly the same or similar
10     experience or as much experience as the other
11     two candidates.  So I had no objection and in
12     fact supported his hiring upon the
13     recommendation of the senior managers.
14              Q.    So would you say that Mr. State
15     was your and the management's choice for the
16     position?
17              A.    He was as a result of my adopting
18     the recommendation of the senior managers.  He
19     wasn't the choice of Mr. Simmons but then he
20     became his choice.
21              Q.    Did you have any conversations
22     with Mr. Simmons or any other CHS person about
23     the possibility of Scott State being hired?
24              A.    It was simply we were proposing --
25     I proposed him as the choice of management and
```

122

1                       Burton T. Fried

2      they went through the interview process, as I

3      mentioned, with the three equity owners and then

4      I had the senior managers and they came back and

5      said, "Okay, we'll go along with what senior

6      managers want."

7              Q.    Was there ever consideration given

8      to offering Mr. State the position of chairman

9      and CEO?

10             A.    I think there was one e-mail that

11     Simmons wrote about that and asked me if he

12     should take over as chairman and CEO or

13     something like that.  And I didn't understand

14     where that was coming at, where that was coming

15     from, but I think I indicated, you know, he

16     could do whatever he wants.  He -- he makes the

17     decisions.

18             MS. SELTZER:  Can you mark this,

19             please, as number 8.

20             (E-mail dated September 3, 2010

21             marked Fried Exhibit 8 for

22             identification.)

23             MS. SELTZER:  Let the record show

24             that Exhibit 8 is an e-mail from Burton

25             Fried to John Leonard and Paul Cutrone,

163

1                    Burton T. Fried

2    e-mail of October 13th, he's with the company

3    two weeks.

4                    MS. SELTZER:  Can you mark this,

5            please.

6                    (E-mail dated October 14, 2010

7            marked Fried Exhibit 13 for

8            identification.)

9                    MS. SELTZER:  Let the record show

10            that Exhibit 13 is an e-mail from Burt

11            Fried to Scott State dated October 14th,

12            2010 and Bates stamped LVI 449 to 450.

13            Q.    Would you familiarize yourself

14    with this document.

15            A.    I'm familiar with it.

16            Q.    What prompted you to send this to

17    Mr. State?

18            A.    Well, I've always believed,

19    especially after working with Bob McNamara, that

20    the best way to have an effective meeting is to

21    outline an agenda and the issues that you'd like

22    to talk about rather than have a loose

23    conversation, and it's more efficient, more

24    effective and a better result.

25                    So I called him and I asked for a

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

164

```
 1                     Burton T. Fried
 2    meeting, and he scheduled it for the 19th and I
 3    told him that I would be sending him a list of
 4    the agenda as well as the responsibilities that
 5    I had performed historically so that we have
 6    some basis upon which to have a discussion.  And
 7    then he could decide what he would like me to do
 8    and what not to do.
 9           Q.    Was it your initiative to send
10    this or did he actually request you to put
11    together a list of what he thought -- you
12    thought your responsibilities should be under
13    his tenure?
14           A.    My initiative.
15           Q.    Was he responsive to receiving
16    this document?
17           A.    He didn't object.
18           Q.    If you look at the areas of
19    responsibility -- I know we had looked at what
20    you listed in the complaint and there's a few
21    more here than there were there -- were all of
22    these responsibilities responsibilities that you
23    had while you were working with Mr. McNamara or
24    are there some extra ones in here that you threw
25    in?
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

180

                              Burton T. Fried

1

2        Q.    Okay.  Tell me what you remember

3   about the meeting in as much detail as you

4   remember.  I know we talked a little about it

5   before, but...

6        A.    The first item was the area of

7   responsibility, and so I handed him a copy of

8   the -- of that attached list.

9        Q.    That's the one that's attached

10  here, right?

11       A.    Yes.

12       Q.    So it's a little different from

13  the one that you had sent him; is that correct?

14       A.    Well, the date is different.  I

15  dated it the same day, but other than that, it

16  was pretty much the same.

17       Q.    There is a couple of more

18  responsibilities on it.

19       A.    Okay.  It could have been.

20       Q.    Anyway, go ahead.

21       A.    On reflection, I could have added

22  something and I've forgotten.  But in any event,

23  I handed him the list and I said, "Why don't we

24  go through this, and this is what I performed

25  under Bob McNamara, and why don't we determine

181

1                    Burton T. Fried

2      what you want me to do in going forward so I

3      have some direction."

4                    And he said, "Well, the first

5      item, I'm going to take that over.   New business

6      initiatives."

7                    I said, "Fine."   I said, "Well,

8      what about the meeting that we're planning to

9      have with Squibb in New York?

10                   "Oh, I'll attend that meeting, you

11     don't have to go there.   But if I change my

12     mind, I'll let you know."

13            Q.     Okay.

14            A.     I said -- and I said, "Well, the

15     owner of Squibb Demolition is going to be there,

16     he couldn't make the meeting in Great Britain

17     because he was ill.   I would think he would

18     expect me to be there, so you might want to

19     consider that."

20                   He said, "No, I could take care of

21     that, but if I change my mind, I'll let you

22     know.   I said, "Fine.   You want to go to the

23     next item?"

24            Q.     Yeah.   Tell me what -- what his

25     response was.   I assume you went one-on-one.

182

```
 1                        Burton T. Fried
 2              A.     That's what I said.  I was giving
 3      you my answer.
 4              Q.     Okay.
 5              A.     I said, "You want to go to the
 6      next item."
 7              Q.     Okay.  I thought you were talking
 8      to me.  Go ahead.
 9              A.     To State?
10              Q.     Yeah.
11              A.     And he said -- looked at the list
12      and he said.  "I'm going to be reassigning all
13      your responsibilities to other managers and I'm
14      going to do that in the next 60 to 90 days, and
15      when that's completed, I can let you know if
16      there is anything else for you to do."
17                     I didn't immediately respond
18      because I was in a state of shock.  And my only
19      response was, "Scott, why would you do that?"
20                     His response was, "Burt, you're 71
21      years of age, how long do you expect to work.
22      And what if you get hit by a truck" -- a bus,
23      rather -- "what if you get hit by a bus, and we
24      have to plan for the future."
25                     My response to that, since this
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2       discrimination.
 3             Q.    So he could have been referring to
 4       any one of those things, correct?
 5             A.    He was referring to all of them.
 6             Q.    How do you know that?
 7             A.    Because you had to be there to
 8       understand it.
 9             Q.    And he said "problem," right?
10             A.    Yeah.
11             Q.    Let's talk about the meeting with
12       the board of directors on November 4th.
13             A.    Again?
14             Q.    Yup, again.
15                   Was this a regularly scheduled
16       board meeting?
17             A.    Yes.  It was the first board
18       meeting.
19             Q.    Of the year?
20             A.    No, of LVI Parent.
21             Q.    So this was the first time that
22       Mr. Bagaria and Mr. Girardi were voting members
23       of the board?
24             A.    Yes.
25             Q.    Who attended that meeting, if you
```

231

                          Burton T. Fried

1

2          Q.    Were -- was the -- when you state

3    that the -- your statement was during part of

4    the closed board meeting, what do you mean by

5    that?

6          A.    Well, at the end of the agenda of

7    business items, those that were not board

8    members were asked to leave, with the exception

9    of Jeffrey Smith.  Although all board members

10   were asked do leave, Jeffrey Smith remained as

11   secretary because it was still a meeting of the

12   board, and that was at my request because I felt

13   it would be inflammatory to have John Leonard

14   and Cutrone there to listen to this dialogue,

15   when in fact it could have been or I had hoped

16   it would be resolved and there was no reason for

17   that to then be repeated out among the managers

18   and so forth.  And Simmons asked me if I wanted

19   it closed and I said I preferred it because of

20   that reason and he said fine.

21         Q.    What was your purpose in the

22   statement that you made to the board of

23   directors?  What did you intend to do with that

24   statement?

25         A.    If his actions had the approval of

232

```
 1                    Burton T. Fried
 2      the board.
 3            Q.    So you wanted to find out if his
 4      actions had the approval of the board?
 5            A.    I wanted to find out if it had the
 6      actions, I wanted them to be aware of what was
 7      going on and whether they supported it.
 8                    They had just invested tens of
 9      millions of dollars into the company.  I had
10      been with the company for 24 years, I had been
11      with it in this past year, I had rescued it,
12      helped rescue it in the past six months so they
13      could do a restructuring and make the
14      investment.  It was my obligation to present to
15      them these facts and for them to determine if in
16      fact they supported the actions of Scott State.
17            Q.    Which members of the board of
18      directors were in this closed meeting?
19            A.    All.
20            Q.    So that would have been
21      Mr. Bagaria, Mr. Girardi, Mr. Schnabel,
22      Mr. Simmons?
23            A.    Yes.
24            Q.    You, Mr. State were there?
25            A.    Yes, Mr. Farucci, Mr. Buck.
```

Case: 13-1165   Document: 43   Page: 103   07/10/2013   986023   264

A-92

252

```
 1                    Burton T. Fried
 2          Q.    Did you at some point during the
 3   course of the meeting step out of the conference
 4   room with Mr. State?
 5          A.    Yes.
 6          Q.    Was that after your speech?
 7          A.    Yes.
 8          Q.    Do you remember why you were asked
 9   to step outside?
10          A.    Mr. Simmons said that the board
11   wanted to discuss this alone.  In camera?
12          Q.    I don't know if that's used in a
13   board meeting.  Possibly.
14                Tell me, about how long were you
15   and Scott outside of the conference room?
16          A.    10-15 minutes.
17          Q.    Did you speak at all?
18          A.    It seems everything is 10-15
19   minutes.
20                He came over to me and said,
21   "Burt, I just want to tell you that I never told
22   anyone not to speak to you," and because during
23   the presentation I made reference to the fact
24   that I was told by two officers that they were
25   not to speak to me, one at all, the other one
```

# EXHIBIT C

Case: 13-1165    Document: 43    Page: 105    07/10/2013    986023    264

**A-94**

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 2 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 1 of 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
-------------------------------------------------------- x

SHARI L. DEMBIN and BURTON T. FRIED,         :
                                             :
                         Plaintiffs,         :    Civil Action No.:
                                             :
            v.                               :
                                             :    **COMPLAINT**
LVI SERVICES INC., LVI PARENT CORP., and:
SCOTT E. STATE,                              :
                                             :    **JURY TRIAL DEMANDED**
                         Defendants.         :
                                             :
-------------------------------------------------------- x

Plaintiffs Shari L. Dembin ("Dembin") and Burton T. Fried ("Fried") (together, "Plaintiffs"), by and through their undersigned counsel, Madsen, Prestley & Parenteau LLC, as and for their Complaint in this action against Defendants LVI Services Inc. ("LVI"), LVI Parent Corp. (the "Parent") (together, the "LVI Defendants") and Scott E. State ("State") (all together, "Defendants"), hereby allege as follows:

### NATURE OF THE CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful discrimination and/or retaliation against Plaintiffs in violation of the Connecticut Fair Employment Practices Act, Connecticut General Statute §§ 46a-51 *et seq.* ("CFEPA").

### JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, as there is complete diversity of citizenship between Plaintiffs, residents of Connecticut, and all Defendants, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.

1

Case: 13-1165    Document: 43    Page: 106    07/10/2013    986023    264

A-95

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 3 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 2 of 13

3.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because LVI is a corporation doing business in the State of Connecticut and is subject to personal jurisdiction in this district, and a substantial part of the events giving rise to the claims herein occurred in the State of Connecticut.

### PROCEDURAL REQUIREMENTS

4.     Ms. Dembin and Mr. Fried filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging violations of the CFEPA on or about March 10, 2011 and May 16, 2011, respectively.

5.     On or about October 17, 2011, Plaintiffs received notices that the CHRO had released jurisdiction over their complaints.  This Complaint has been filed within 90 days of Plaintiffs' receipt of their release of jurisdiction.

6.     Pursuant to Conn. Gen. Stat. §46a-103, Plaintiffs will serve a copy of this Complaint upon the CHRO at the same time the Complaint is served on Defendants.

### PARTIES

7.     Plaintiff Burton T. Fried, a former employee of LVI and Chairman of the Board of Directors of Parent (the "Board"), was born on February 26, 1940 and is currently 71 years of age.  Mr. Fried is a resident of the State of Connecticut.  At all relevant times, Mr. Fried met the definition of an "employee" under the CFEPA throughout his employment with LVI.

8.     Plaintiff Shari L. Dembin, a former employee of LVI, is a resident of the State of Connecticut.  At all relevant times, Ms. Dembin met the definition of an "employee" under the CFEPA throughout her employment with LVI.

9.     Defendant LVI Services Inc., a Delaware corporation, maintains its principal place of business in the State of New York.  At all relevant times, both Mr. Fried and Ms.

Case: 13-1165    Document: 43    Page: 107    07/10/2013    986023    264

A-96

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 4 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 3 of 13

Dembin worked in LVI's Westport, Connecticut office and LVI met the definition of an "employer" under the CFEPA.

10.     Defendant LVI Parent Corp., a Delaware corporation and the sole shareholder of LVI, maintains its principal place of business in the State of New York.  At all relevant times, Parent met the definition of an "employer" and/or "agent thereof" under the CFEPA.

11.     Defendant Scott E. State, who is approximately 48 years of age, is a resident of the State of Colorado.  At all relevant times, he is, and has been, a member of the Board, as well as employed by LVI as its President and CEO, in which capacity he participated directly and/or aided and abetted in the unlawful retaliation against Ms. Dembin as alleged herein.

## FACTUAL ALLEGATIONS

### Plaintiff Burton T. Fried

12.     LVI is an environmental remediation company which, along with all of its subsidiaries and related companies, is comprised of thousands of employees across approximately 20 offices throughout the United States.

13.     Mr. Fried, who has been referred to as the "founder" of LVI, was born on February 26, 1940.   Hired by LVI in July 1986, he was the General Counsel of LVI until he became its President and Chief Executive Officer in 1989.

14.     Because LVI became the dominant leader in its industry while he was President and CEO, Mr. Fried, in 2005, recommended to the then current owner of LVI that it find a President and CEO with experience managing a billion-dollar company.  However, Mr. Fried had no intention of retiring once a new President and CEO was hired and he intended to continue working for LVI as an employee with the job title of Chairman, while also continuing to serve as Chairman of the Board.

3

Case: 13-1165    Document: 43    Page: 108    07/10/2013    986023    264

**A-97**

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 5 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 4 of 13

15.     In or around July 2006, Robert McNamara was hired by LVI as its President and CEO and Mr. Fried became Chairman of LVI.

16.     As Chairman of LVI under Mr. McNamara, Mr. Fried was responsible for, among other things, strategic growth, legal matters and sales.   As Chairman, Mr. Fried's work performance was excellent.

17.     In early 2010, Mr. McNamara resigned and Mr. Fried was asked by Brian Simmons ("Simmons"), a member of the Board, to be the interim President and CEO of LVI until Mr. McNamara's replacement could be found.  Not only did Mr. Fried agree to serve in this capacity, but he also continued to serve as Chairman of LVI and he intended to continue as Chairman of LVI once a new President and CEO was hired.

18.     While interim President and CEO, Mr. Fried's work performance was excellent. In fact, he was specifically told by Simmons that he was "earning every penny" of his salary and Rajay Bagaria ("Bagaria") and Gerald J. Girardi ("Girardi"), two other Board members, commended Mr. Fried's performance by writing that "we are fortunate to have Burt Fried as interim CEO who has done a good job stabilizing the situation."

19.     In or around August 2010, State, who was 47 years old at the time, was introduced to Mr. Fried as a candidate for President and CEO of LVI.

20.     On September 14, 2010, before State was even hired, he inquired about how Mr. Fried could be removed as Chairman of the Board.

21.     Again, before he was hired, State asked John Leonard, the Chief Operating Officer of LVI, if Mr. Fried, who was 70 years old at the time, was going to retire.  Mr. Leonard told State that Mr. Fried was not going to retire.  In fact, Mr. Fried had often told Mr. Leonard that he intended to die in his chair.

4

22.     On September 19, 2010, despite already being told by Mr. Leonard that Mr. Fried

had no intention of retiring, State wrote the following in the body of a lengthier email to Robert

Hogan, a member of the Board:

> In the best-case scenario Burt will decide to retire at some date
> certain from LVI upon a new CEO being named and offer to
> support the business under a consulting agreement in any way the
> new CEO sees fit.  Several members of the senior team have told
> me that Burt will never retire because he has no other interests and
> nothing else to do.  That is not a healthy situation for Burt or LVI.

23.     On approximately September 28, 2010, State was hired by LVI as its President

and CEO.  Upon State's hire, Mr. Fried assumed his prior title and job duties of Chairman of

LVI.  As Chairman, Mr. Fried's work performance was excellent.

24.     On October 19, 2010, State, for the first time since he was hired, met with Mr.

Fried to discuss Mr. Fried's job duties.

25.     During this meeting, State told Mr. Fried that he was going to take away all of his

job duties and give them to other employees (who were younger than Mr. Fried by decades).

When Mr. Fried asked State why he was doing this, State admitted asking Mr. Fried:  "Burt,

you're 71 years of age, how much longer do you expect to work?"

26.     State made this age-based discriminatory comment despite knowing that Mr.

Fried wanted to "remain active forever."

27.     In response to State's discriminatory decision and remark, Mr. Fried told State

that he was 70 years old and that he intended to work for LVI for many years to come.  Despite

Mr. Fried's response, State continued with his discriminatory plan to reassign Mr. Fried's job

duties to younger LVI employees.

28.     After he met with Mr. Fried, State emailed Simmons that same day and wrote the

following sentence in reference to Mr. Fried:

Case: 13-1165    Document: 43    Page: 110    07/10/2013    986023    264

A-99

Case 3:11-cv-01855-JBA   Document 50-3    Filed 04/27/12   Page 7 of 14
Case 3:11-cv-01855-JBA   Document 1    Filed 11/30/11   Page 6 of 13

> I was clear with him that it was my objective to have him truly
> retire and be just an on call resource.

29.     After his meeting with State, as early as October 19, 2010, Mr. Fried complained

to Bagaria, Simmons, and John Schnabel ("Schnabel"), who is another Board member, about

State's discriminatory decision to reassign all of his duties and told them that the comment State

made about his age was discriminatory.

30.     On November 4, 2010, the Board held a quarterly meeting which Mr. Fried

attended.

31.     During this meeting, Mr. Fried complained to the entire Board about State's

discriminatory decision to reassign all of his duties and told them that the comment State made

about his age was discriminatory.  However, the Board decided not to investigate Mr. Fried's

complaint of age discrimination, even though an attorney who is LVI's outside counsel was

present at the Board meeting.

32.     On November 5, 2010, State emailed his personal friend, who he was

communicating with about LVI business, and wrote the following sentence in reference to Mr.

Fried:

> In a battle with founder about his need to retire but Board gets it
> and is working to exit him with some respect.

33.     On November 15, 2010, Mr. Fried's attorneys hand delivered a letter to State's

attention at LVI's New York City office to address the discriminatory conduct that Mr. Fried

previously complained about.

34.     On November 16, 2010, a majority of the Board members (Girardi, Simmons,

Hogan, Schnabel and State) discussed the November 15 letter.  Their discussion, which was

Case: 13-1165    Document: 43    Page: 111    07/10/2013    986023    264

A-100

Case 3:11-cv-01855-JBA    Document 50-3    Filed 04/27/12    Page 8 of 14
Case 3:11-cv-01855-JBA    Document 1    Filed 11/30/11    Page 7 of 13

memorialized in writing, reflected the Board's intention to ignore the issues raised in the November 15 letter and instead, to send a letter to Mr. Fried.

35.    The letter the Board sent to Mr. Fried, which was sent to him on November 16, 2010, informed Mr. Fried that after 24 years at LVI, his employment with LVI would be terminated effective November 30, 2010.

36.    Mr. Fried's job duties were reassigned to employees who were between 13 to 35 years younger than him.

**Plaintiff Shari L. Dembin**

37.    Plaintiff Shari Dembin, who is Mr. Fried's daughter, graduated from Ithaca College in 1995 with a B.A. in Sociology.  She began working for LVI in April 1996 as an Administrative Assistant.

38.    In 1998, Ms. Dembin was promoted to Insurance and Bonding Administrator.  In her new position, she assumed responsibility for administering insurance and bonding for all of LVI and reported to Joseph Annarumma, LVI's Treasurer and Secretary, who was previously responsible for handling insurance and bonding.  In addition, Ms. Dembin was later given responsibility for risk management, LVI's travel program, and LVI's meetings and promotions.

39.    Throughout her tenure, Ms. Dembin's work performance was excellent and she regularly received raises.

40.    Approximately one month after Mr. Fried first complained to Bagaria, Simmons and Schnabel about being discriminated against, and little over one week after he complained to the Board about the same thing, on November 13, 2010, LVI's senior management met in Denver, Colorado to discuss, among other things, potential layoffs.

Case: 13-1165    Document: 43    Page: 112    07/10/2013    986023    264

**A-101**

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 9 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 8 of 13

41.    At or some time shortly after this meeting, out of the thousands of people employed within the LVI organization that were eligible for layoff, State decided to terminate Ms. Dembin, along with approximately 10 others, effective January 2011.  At the time of his decision, State was aware that Ms. Dembin was Mr. Fried's daughter.

42.    This decision to include Ms. Dembin in the layoff was in retaliation for Mr. Fried's prior complaints of discrimination.

43.    Ms. Dembin's job duties were reassigned to two employees with far less experience than her.

44.    Significantly, prior to Mr. Fried's complaints of discrimination, LVI conducted several rounds of layoffs in which every LVI employee was considered for layoff.  However, Ms. Dembin was neither identified as a candidate for layoff, nor selected for layoff in those prior rounds.

45.    After Ms. Dembin was notified of her termination, she met with Mr. Annarumma and asked him, "Why are they doing this to me?"  In response, Mr. Annarumma, her supervisor, said "I don't know."  When Ms. Dembin asked Mr. Annarumma if she was being terminated because of her father, he again said "I do not know."

**The LVI Defendants**

46.    At all relevant times, the LVI Defendants operated as a single, integrated enterprise, a single employer, or as joint employers.

47.    Parent operates from the same offices as LVI.  All the corporate officers of Parent, except Hogan, are employed by LVI.  Additionally, three of the four officers of Parent maintain offices at the New York office of the LVI Defendants.

8

Case: 13-1165   Document: 43   Page: 113   07/10/2013   986023   264

A-102

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 10 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 9 of 13

48.     Parent is a holding company that maintains no payroll and conducts no business outside of signing documents.

49.     Further, the Board exercises authority over the terms and conditions of employees of LVI.  In particular, the Board altered the terms of Mr. Fried's employment with LVI by stripping him of his job duties and unilaterally terminating his employment.

50.     Additionally, Parent is the sole shareholder and owner of LVI.  The only assets of Parent are the shares it holds of LVI.

51.     Due to the foregoing, the LVI Defendants have an interrelation of operations, centralized control over labor relations, common management and common ownership.  As such, they are jointly and severably liable for the unlawful conduct alleged herein.

### AS AND FOR A FIRST CLAIM FOR RELIEF
#### (Discrimination in Violation of the CFEPA)

52.     Mr. Fried hereby repeats and realleges each and every allegation in paragraphs 1 through 51, inclusive, as if fully set forth herein.

53.     The LVI Defendants discriminated against Mr. Fried on the basis of his age in violation of the CFEPA by subjecting him to disparate treatment, including, but not limited to, stripping him of his job responsibilities and terminating his employment.

54.     As a direct and proximate result of the unlawful discriminatory conduct in violation of the CFEPA, Mr. Fried has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

55.     As a direct and proximate result of the unlawful discriminatory conduct in violation of the CFEPA, Mr. Fried has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment,

Case: 13-1165    Document: 43    Page: 114    07/10/2013    986023    264

A-103

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 11 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 10 of 13

emotional pain and suffering, as well as loss of enjoyment, for which he is entitled to an award of monetary damages and other relief.

56.    The LVI Defendants' unlawful discriminatory conduct constitutes a willful, wanton, reckless and/or malicious violation of the CFEPA entitling Mr. Fried to an award of punitive damages.

<u>**AS AND FOR A SECOND CLAIM FOR RELIEF**</u>
**(Retaliation in Violation of the CFEPA)**

57.    Mr. Fried hereby repeats and realleges each and every allegation in paragraphs 1 through 56, inclusive, as if fully set forth herein.

58.    Defendants retaliated against Mr. Fried in violation of the CFEPA by terminating his employment with LVI, and by terminating Ms. Dembin's employment, after he engaged in protected activity by opposing Defendants' discriminatory conduct.

59.    As a direct and proximate result of the unlawful retaliatory conduct in violation of the CFEPA, Mr. Fried  has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

60.    As a direct and proximate result of the unlawful retaliatory conduct in violation of the CFEPA, Mr. Fried  has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, emotional pain and suffering, as well as loss of enjoyment, for which he is entitled to an award of monetary damages and other relief.

61.    The Defendants' unlawful retaliatory conduct constitutes a willful, wanton, reckless and/or malicious violation of the CFEPA entitling Mr. Fried to an award of punitive damages.

Case: 13-1165    Document: 43    Page: 115    07/10/2013    986023    264

A-104

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 12 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 11 of 13

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Retaliation in Violation of the CFEPA)

62.     Ms. Dembin hereby repeats and realleges each and every allegation in paragraphs 1 through 61, inclusive, as if fully set forth herein.

63.     Defendants retaliated against Ms. Dembin in violation of the CFEPA by terminating her employment, after Mr. Fried, her father, engaged in protected activity by opposing Defendants' discriminatory conduct.

64.     As a direct and proximate result of the unlawful retaliatory conduct in violation of the CFEPA, Ms. Dembin has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

65.     As a direct and proximate result of the unlawful retaliatory conduct in violation of the CFEPA, Ms. Dembin has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, emotional pain and suffering, as well as loss of enjoyment, for which she is entitled to an award of monetary damages and other relief.

66.     Defendants' unlawful retaliatory conduct constitutes a willful, wanton, reckless and/or malicious violation of the CFEPA entitling Ms. Dembin to an award of punitive damages.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Violations of the CFEPA)

67.     Ms. Dembin hereby repeats and realleges each and every allegation in paragraphs 1 through 66, inclusive, as if fully set forth herein.

68.     State knowingly and/or recklessly aided and abetted in the unlawful retaliation against Ms. Dembin in violation of the CFEPA.

11

Case: 13-1165   Document: 43   Page: 116   07/10/2013   986023   264

**A-105**

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 13 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 12 of 13

69.     As a direct and proximate result of the unlawful retaliatory conduct, Ms. Dembin has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

70.     As a direct and proximate result of the unlawful retaliatory conduct, Ms. Dembin has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, emotional pain and suffering, as well as loss of enjoyment, for which she is entitled to an award of monetary damages and other relief.

71.     State's unlawful retaliatory conduct constitutes a willful, wanton, reckless and/or malicious violation of the CFEPA entitling Ms. Dembin to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of Connecticut;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their mental anguish and emotional distress, including, but

12

Case: 13-1165    Document: 43    Page: 117    07/10/2013    986023    264

A-106

Case 3:11-cv-01855-JBA   Document 50-3   Filed 04/27/12   Page 14 of 14
Case 3:11-cv-01855-JBA   Document 1   Filed 11/30/11   Page 13 of 13

not limited to, humiliation, demoralization, embarrassment, emotional pain and suffering, as well as loss of enjoyment, and any other physical or mental injuries;

   E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputation and loss of career fulfillment;

   F.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

   G.    An award of punitive damages;

   H.    An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

   I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

   Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: Hartford, Connecticut
        November 30, 2011

                        Respectfully submitted,

                        **MADSEN, PRESTLEY & PARENTEAU**


                        By:    _____/s/Todd Steigman_____
                               William Madsen (ct 09853)
                               Todd Steigman (ct26875)
                               Madsen, Prestley & Parenteau, LLC
                               44 Capitol Ave.
                               Suite 201
                               Hartford, CT 06106
                               Telephone: (860) 246-2466
                               Facsimile:  (860) 246-1794
                               tsteigman@mppjustice.com

                               *Attorneys for Plaintiffs*

13

A-107

# EXHIBIT D

A-108

**LVI Services Inc.**
**New York, New York**

**Investment Memo**

| |
|---|
| Date: October 28, 2005 |
| Stage of Deal: Pre-Close |
| CHS Team: BPS, SRB, RGH, CJK, CDN |
| Mgmt Presentation: August 14, 2005 |
| (HPS, SRB, EML, RGH, CDN) |

## INVESTMENT OVERVIEW

**Business Overview**

LVI Services Inc. ("LVI" or the "Company") is the country's largest provider of asbestos and mold remediation, demolition, restoration, and emergency response services. Through 27 locations in 19 states, the staff of 2,600 employees (415 full-time employees and 2,200 hourly laborers) provides the following services: asbestos abatement (44% of TTM-Oct'05E revenue), soft and structural demolition (22%), emergency response services (20%), mold remediation (4%), fireproofing (4%), decontamination and decommissioning (3%), lead-based paint abatement (2%), infection control (1%), and other (1%). The Company's broad capabilities make it the only national provider of a complete array of facility-based services. These services are complementary in nature and there is a strong linkage between asbestos abatement services (LVI's original line of business) and the Company's demolition, emergency response, mold remediation, fireproofing, and other services. In addition, the reputation earned by LVI in the highly regulated asbestos abatement segment has served the Company well in its efforts to broaden its service offerings. LVI serves a variety of end markets, including commercial, industrial, government, healthcare, education, and multi-family residential facilities. The Company completed over 4,800 distinct projects in 2004, with an average project size of $55,000. The top client represented 4.9% of revenue in 2004, with the top 20 clients representing 40.9% of revenues. High profile projects in the historical period include the Pentagon, the 9/11 cleanup at the World Trade Center, the Bellagio Hotel, Bank One Plaza, the Aladdin Hotel, Cedar Sinai Medical Center, and the NASA Kennedy Space Center.

As shown in the table below, the Company has presented strong growth, posting a sales CAGR from '00-'04 of 14.9%, increasing gross margins from 21.9% to 23.8%, and growing Adjusted EBITDA margins from 7.6% to 12.4%.

### LVI Services - Financial Summary

| | Fiscal Year Ending December 31, | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | | | | | Base Case | | | | | |
| ($ in 000s) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| Total Net Sales | $152,180 | $151,676 | $148,150 | $171,513 | $263,470 | $347,562 | $441,791 | $331,736 | $343,113 | $359,310 | $373,537 |
| % Growth | na | 0.3% | -2.3% | 15.8% | 51.6% | 11.9% | 27.1% | -24.9% | 3.4% | 4.7% | 4.0% |
| Adjusted Gross Profit | 33,139 | 34,911 | 35,546 | 41,349 | 62,933 | 89,377 | 118,844 | 81,175 | 83,554 | 87,617 | 91,191 |
| % of Sales | 21.9% | 23.0% | 24.0% | 24.1% | 23.8% | 25.7% | 26.9% | 24.5% | 24.4% | 24.4% | 24.4% |
| PF EBITDA | 11,543 | 11,918 | 12,854 | 14,659 | 32,750 | 50,189 | 76,903 | 41,108 | 41,378 | 43,335 | 45,059 |
| % of Sales | 7.6% | 7.9% | 8.7% | 8.5% | 12.4% | 14.4% | 17.4% | 12.4% | 12.1% | 12.1% | 12.1% |
| Capex | (3,794) | (1,954) | (1,924) | (2,457) | (3,284) | (5,500) | (6,595) | (4,952) | (5,132) | (5,364) | (5,576) |

## TRANSACTION OVERVIEW

In mid-2005, LVI's owner, Blue Point Capital Partners ("Blue Point"), hired Edgeview Partners to sell the Company. CHS was able to meet with LVI management ahead of the formal sale process. Our experience and track record with branch businesses and construction services positioned CHS as management's choice as an equity partner. We signed a contract on October 19th to purchase LVI. The purchase price of $250.0 million represents 5.74x TTM adjusted EBITDA of $43.5 million as of October. In the TTM period, the Company has experienced a significant ramp-up of revenue associated with the four 2004 Florida hurricanes as well as the three hurricanes of 2005 (Katrina, Rita, and Wilma). For fiscal 2005, CHS estimates that a more normalized storm season would result in EBITDA of approximately $33.7 million. The implied purchase price multiple assuming $33.7 million of adjusted 2005 EBITDA is 7.43x.

The acquisition will be financed with a $140 million Term B Loan and a $45 million unfunded revolver from a syndicate of investors led by CIBC, as well as $43 million of Senior Subordinated Notes from Apollo Investment Corporation. CHS, management investors, and Apollo will contribute $78.0 million of equity. The senior credit facilities led by CIBC have been rated B1 by Moody's and B+ by Standard & Poor's. This investment is expected to close during the second week of November. The following table presents a sources and uses of funds for this investment:

1

CHS 000001

## LVI Services Inc.
### New York, New York

| ($ in thousands) | | % of | Cum. EBITDA Multiple[1] | Uses of Funds | $ | % of |
|---|---|---|---|---|---|---|
| Sources of Funds[2] | $ | Sources | TTM 10/31/05 | | | Uses |
| Revolver[2] | $0 | 0.0% | 0.00x | Purchase Price | $250,000 | 95.8% |
| Term B | 140,000 | 53.6% | 3.22x | Fees & Expenses | 11,000 | 4.2% |
| Sr. Sub Debt | 43,000 | 16.5% | 4.20x | | | |
| Preferred Equity | 58,500 | 22.4% | | | | |
| Common Equity | 19,500 | 7.5% | | | | |
| Total Sources | $261,000 | 100.0% | | Total Uses | $261,000 | 100.0% |

Notes:

1  Based on actual TTM 10/31/05 EBITDA of $43,537

2  $45 million Revolver unfunded at close

3  Excludes fees and expenses

4  Excludes fees and expenses. Reflects CHS adjusted EBITDA for a normal level of hurricane activities.

| | |
|---|---|
| TTM Purchase Multiple[3] | 5.74x |
| TTM Purchase Multiple[4] | 7.43x |

### INVESTMENT THESIS

We believe LVI is an attractive investment opportunity for Fund V due to multiple opportunities to grow the business, a leading market position within fragmented industry segments, and diversification across the U.S. through a large number of short term projects. Our investment strategy will be focused on the following initiatives:

➢ **Pursue multiple avenues of growth for the business** – CHS will assist the Company with capital and other resources in pursuit of growth in five distinct areas:

  o  New Offices—LVI has successfully opened seven new offices since 2000, and the Company has identified four new markets for expansion (Indianapolis, Atlanta, Jacksonville, and Milwaukee). In addition to targeting new customers in these markets, the Company has completed work for customers with facilities in these targeted locations. As a result, LVI would be well positioned to perform additional work in these locations if they had a presence.

  o  Acquisitions– The Company has acquired five businesses since 2000 with minimal cash investment. The Company is currently in active pursuit of nine targets with over $200 million in combined revenue. LVI has targeted strong management teams that are looking to remain with the acquired business and capitalize on the added service capabilities that a combination with LVI can offer. Acquired companies will provide added service lines and/or access to new geographic areas for the Company.

  o  New Service Offerings—While LVI developed its reputation as an asbestos abatement company, management recognized early on that LVI's role could easily be expanded to involve the other service offerings often done in conjunction with asbestos abatement. For example, with the renovation of a commercial facility, asbestos abatement represented one component of a project that could include lead-based paint abatement, soft demolition, mold remediation, and fireproofing. Rather than leave these services to other parties, the Company integrated these services in order to provide general contractors with a broad solution, a single point of accountability, and a compressed timeline. In the future, the Company is interested in expanding its emergency services to include drying and dehumidification and its facility-based services to include premise wiring, drywall, and other "put back" services as well as other pro-active hazardous material prevention offerings. Security services will also be considered.

  o  Master Service Agreements—The Company has worked with clients to develop a relationship for ongoing jobs, whether through a preferred vendor program or a pre-arranged pricing agreement for services. In early 2005, LVI signed a national service agreement for emergency response services with Washington Mutual for its nationwide network of 2,200 facilities. In addition, LVI has pre-negotiated service agreements and prequalification stats with 27 national clients and hundreds of others on a local or regional basis. Through its new offices, acquisitions, and expanded services, the Company will continue to target master service arrangements. Finally, the Company is currently working with counties across Florida to secure pre-qualification agreements and pre-negotiated rates in anticipation of future hurricane work.

2

CONFIDENTIAL

LVI Services Inc.
New York, New York

- o  Targeted Market Opportunities—LVI's management team is pursuing several unique opportunities that they believe the Company is uniquely qualified to win:

  - Department of Defense work: Asbestos removal at the Pentagon and asbestos and lead-based paint abatement and structural demolition at 33 domestic bases to be closed.

  - Power plant upgrades and demolition: Demolition tied to EPA-required scrubber upgrades at coal fired plants and the asbestos abatement and demolition requirements at 300-400 inactive power plants.

- ➤ Leverage the strong internal systems and controls to improve margins while the business grows – The Company boasts a fully integrated and centralized information system that allows for continuous job cost monitoring. In addition, Ernst & Young has confirmed that the Company's systems are scalable, with the ability to manage a much larger business within current operations. The Company is currently installing biometric time clocks (finger prints) to manage a large, rapidly growing labor force efficiently. This will also eliminate leakage and significantly reduce manual entry of payroll data, enabling the Company to manage a much larger work force.

- ➤ Enhance the strong management team and enlist a top-notch Board – The Company has assembled a strong management team that will be enhanced with the recruitment of a CEO to run the day-to-day operations of the business. The current CEO, Burton Fried, will then transition into an active chairman role focusing on growth initiatives. This transition was planned and announced prior to initiating the sale process. CHS would look to put the new CEO in place as soon as possible after closing. We would also hope to populate the board of directors with individuals experienced in the construction or environmental remediation industries.

- ➤ Position LVI for exit – Through continued growth in its broad array of services, the Company can be positioned as a facility services provider with a full array of services not concentrated in any one service offering. During our ownership, CHS intends to take the necessary steps to prepare the business for a potential exit through the public markets.

3

CONFIDENTIAL

CHS 000003

LVI Services Inc.
New York, New York

### INVESTMENT STRENGTHS AND ISSUES

The Company's investment strengths and issues are summarized below.

| INVESTMENT STRENGTHS | INVESTMENT ISSUES |
|---|---|
| + Services multiple industries and customers via a large number of projects, with 4,700 projects completed with average revenue of $55,000 | − Bonding requirements for government work (needed $43.7 mm in bonds in 2004, with an average of $13.6 mm outstanding at any time) |
| + No customer accounts for more than 5% of revenues | − Large labor force of both unionized and non-union laborers to be recruited, trained and managed (most laborers don't work for the Company full time) |
| + Large number of customers enlisting LVI each year to perform work across multiple locations | − Valuation is complicated by $69.5 million worth of revenue associated with the 2004 and 2005 hurricanes |
| + Multiple opportunities to grow the business: new offices, acquisitions, new services/service extensions, national service agreements and pre-negotiated rates, and targeted market opportunities (Pentagon, DoD base closings, power plant renovations, etc.) | − The CEO who has run the business for 15 years will likely move to an active Chairman role during our investment horizon, and a new CEO will need to be recruited |
| + Huge revenue opportunity from Hurricanes Katrina, Rita, and Wilma | − The organizational structure is unusual with two COOs that allocate responsibilities by geography and service offerings and act more like regional vice presidents |
| + As the only nationwide player in both remediation and demolition, the Company generally competes against small firms with minimal depth in service offerings | − Several industries that represent large sources of revenue are not growing (asbestos and lead paint abatement, and decontamination and decommissioning) |
| + Proven ability to open new offices and complete acquisitions (seven new offices and six acquisitions since 1999) | − Majority of non-emergency response contracts are fixed price, leaving the Company exposed to cost overruns |
| + Actual and potential backlog at near record levels for the Company at $125 million. | |
| + Due to the strong reputation established by the Company through it asbestos abatement work, the Company is well positioned to grow in other business segments that require expertise in handling toxic or contaminated material | |
| + Strong management information systems to manage geographically diverse, multi-site operations (biometric time-clock) | |
| + LVI has never produced, sold or installed an asbestos containing product and has never been a party to an asbestos claim | |
| + Environmental legislation is likely to tighten, providing more opportunities for remediation | |

-4-

CONFIDENTIAL

CHS 000004

LVI Services Inc.
New York, New York

## COMPANY OVERVIEW

### Company History / Current Ownership

LVI was founded in 1986 as a subsidiary of The LVI Group Inc., a public holding company. The Company was originally formed for the acquisition and ownership of subsidiaries engaged in the asbestos abatement contracting industry. In 1993, the Company was spun-off from the public company to management and a group of outside investors, including Apollo, T. Rowe Price, and Merrill Lynch. The Company then entered the high-margin, lead-based paint abatement business through internal expansion of its related asbestos abatement practice. In 1994, LVI entered the toxic mold remediation industry. In 1997, Generation Partners and management recapitalized the business. Through the acquisition of several regional asbestos abatement companies, LVI broadened its national network of offices not previously served by the Company. In 2002, LVI was acquired by Blue Point Capital Partners and management.

Over its 19-year history, the Company has completed more than 30,000 projects and has grown both organically and through acquisitions. Since 1995, LVI has completed 12 acquisitions, including eight asbestos abatement companies. Acquisitions made by the Company since 1995 are listed in the table below.

#### Historical Acquisitions Since 1995
($ in Thousands)

| Acquisition Date | Company / Management Team Acquired | Primary Business | Cash Investment (1) |
|---|---|---|---|
| August 2003 | Cooper Inc. (2) | Asbestos Abatement | $250 |
| November 1999 | NSC Corp. | Asbestos Abatement | 100 |
| April 1999 | Abatement Services Inc. | Asbestos Abatement | 400 |
| December 1997 | TEG, The Environmental Group | Asbestos Abatement | 1,700 |
| October 1997 | Certified Abatement Systems, Inc. | Asbestos Abatement | 800 |
| June 1996 | Burdco Group Inc. | Asbestos Abatement | 3,000 |
| December 1995 | Windstorm | Asbestos Abatement | 300 |
| November 1995 | Watkins | Asbestos Abatement | 600 |

| Acquisition Date | Company / Management Team Acquired | Primary Business | Cash Investment (1) |
|---|---|---|---|
| July 2005 | Icenon (3) (4) | Structural Demolition | $1,000 |
| March 2005 | Hired core management team of Asset Recovery Contracting LLC (going out of business) (4) - Midwest | Structural Demolition | 5¢ |
| November 2004 | Eastern States Specialty Dismantlement (4) - East Coast | Structural Demolition | 25 |
| June 2004 | Hired core management team from New York Interior demolition Inc. | Self Demolition | 0 |
| April 1996 | Major Safety | Structural Demolition | 400 |

Footnotes:
(1) Exclusive investment in working capital.
(2) Represents initial cash investment and does not reflect contingent payments expected to be made in 2006.
(3) Represents initial cash investment and does not reflect future contingent payments.
(4) As part of these three demolition acquisitions, LVI obtained approximately $5.3 million worth of structural demolition equipment, which the Company finances through operating leases.

These small acquisitions have provided LVI with a national footprint, management talent, and specialized equipment. LVI benefits from its competitive positioning given the high degree of industry fragmentation and limited competition the Company faces when pursuing acquisitions

In addition to acquisitions, the Company has opened seven new offices since 2000—Connecticut, Rochester (NY), Gaithersburg (MD), Cincinnati, Kansas City, and Fort Lauderdale. As mentioned earlier, the Company is considering five additional offices.

### Labor Force

LVI has a flexible and cross-trained workforce of over 2,200 hourly, skilled laborers that have been cross-trained in the relevant abatement and demolition specialties. This labor force can be deployed rapidly to serve clients' needs anywhere in the United States. These laborers typically work for the Company between 35 and 45 weeks per year. Furthermore, the Company has access to an additional pool of approximately 5,000 skilled laborers as needed on short notice. Certain LVI branches utilize non-union, hourly field labor, while other branches utilize only union hourly employees or a combination of

5

CHS 000005

**LVI Services Inc.**
New York, New York

union and non-union employees. LVI's unionized hourly laborers are represented by various unions under 23 separate collective bargaining agreements. Also, the Company has an agreement with the Laborers' International Union of North America (LIUNA) which gives LVI access to LIUNA laborers trained in abatement and remediation, but does not require union laborers for every project. In addition, LVI non-union employees are offered free training at a LIUNA facility. LVI does not offer health benefits to its hourly workforce, although health benefits are available to union members through the union programs. All hourly employees are eligible for performance bonuses.

The mobility and rapid deployment of its labor force was evident in the emergency response services that the Company provided in the aftermath of the 2004 Florida hurricanes. Within days of the first hurricane, LVI was able to mobilize a large labor force. In total, the Company had 1,200 laborers that participated in the 2004 hurricane cleanup efforts. No other emergency response firm amassed as large of a labor force as quickly as LVI. As a result of this outstanding performance, the Company attracted skilled laborers from several competitors and built meaningful relationships with new clients that are now generating additional revenue. The Company's response to the 2005 Gulf Coast hurricanes further cemented its outstanding reputation in rapid labor mobilization. Within days of Hurricane Katrina's landfall, more than 1,000 LVI workers were in Mississippi and Louisiana providing cleanup services.

In addition to its hourly labor force, LVI employs over 400 full-time professionals.

Key Management

The current management team is led by Burton Fried who has been with the Company for 19 years. Mr. Fried has expressed his desire to separate from the day-to-day management of the Company and assume an "active chairman" role focused on growth. Mr. Fried has indicated that the entire LVI management team is supportive of an external candidate taking over the day-to-day CEO role. CHS has confirmed this sentiment in numerous meetings with management. The Company employs two COOs who oversee the 26 branch offices. Neither COO is interested in the CEO role, with both preferring field management roles.

**Key Management Personnel**

| Name | Title | Industry Experience | Company Tenure |
|------|-------|---------------------|----------------|
| Burton T. Fried | President and CEO | 19 | 19 |
| Paul S. Cutrone | Vice President and CFO | 16 | 16 |
| John M. Leonard | Vice President and Co-COO | 18 | 18 |
| Mike D. Lane | Vice President and Co-COO | 20 | 6 |
| Joseph M. Annunumma | Treasurer | 17 | 17 |
| Gary Thibodeaux | Director of Health and Safety | 20 | 5 |
| Mark Canezza | Western United States and Pacific Regional Manager | 19 | 8 |
| David P. Pearson | Northeast Regional Manager | 17 | 15 |
| William F. Wallace, III | Southern Regional Manager | 20 | 8 |
| Thomas W. Gilmore | Vice President of Nuclear Decontamination and Decommissioning | 31 | 3 |
| Richard McManus | Vice President of Industrial Demolition | 30 | 1 |

6

CONFIDENTIAL

CHS 000006

LVI Services Inc.
New York, New York

Memorandum

| | |
|---|---|
| Date: September 12, 2005 | |
| Stage of Deal: Pre-Bid | |
| CHS Team: BPS, SRB, RGH, CJK, CDN | |
| Mgmt Presentation: 8/14/05 | |
| (BPS, SRB, EML, RGH, CDN) | |
| Mgmt Mtg: 9/9/05 (BPS, RGH, CJK) | |

**DUE DILIGENCE AND PROCESS UPDATE**

The purpose of this memorandum is to provide an update on LVI Services, Inc. ("LVI" or the "Company"), and the CHS team's due diligence efforts to date.

On Wednesday, September 7th, we sent E&Y to the Company's New York headquarters to perform a two-day pre-transaction assessment of LVIs accounting policies, systems, controls, and the quality of the Company's earnings. E&Y worked with both the senior finance team from LVI (including the CFO) and the auditors from Deloitte & Touche.

On Thursday, September 8th, the Company provided an update on business related to Hurricane Katrina as well as other large projects yet to be awarded.

On Friday, September 9th, Brian, Rob, and Colton flew to Mobile, Alabama to meet with four members of the company's senior management team, including the two co-COOs and two regional managers. The purpose of the meeting was to (i) assess generally the strengths and weaknesses of the management team (keeping in mind that CEO Burton Fried hopes to transition to an active Chairman role), (ii) receive an update on the Company's business in the Gulf Coast region, and (iii) gain a better understanding of the health and growth potential for the company's non-emergency base business.

What follows is a summary of findings for each of the above developments:

Accounting Diligence

Overall, E&Y reported positive findings. The Company's financial reporting capabilities were more than adequate to meet E&Y's various information requests, the CFO and his team seemed highly competent, and E&Y ultimately reported back to CHS with historical EBITDA estimates greater than what the Company reported for both the 2004 fiscal year and the TTM period through July of 2005. The attached Exhibit A provides an assessment of storm and non-storm financial results for 2004, the TTM period, and 2005.

Mobile Meeting

The visit to Mobile was successful. The two co-COOs seem to be highly capable and motivated operations professionals. They exhibited a determined approach to landing new business and driving their branch offices to improved financial performance, and a sound understanding of strategy execution and value creation. They repeatedly highlighted their "lessons learned" from the 2004 hurricanes and their determination to eliminate the missteps taken in 2004. We also confirmed that retiring CEO Burton Fried is much less involved in day-to-day operational and marketing aspects of the business than previously thought. The management team also recognizes the need to bring in an outside CEO, and expressed a strong interest in participating in finding the leader who can take them to $1 billion in sales.

Highlights from our meeting in Mobile included the following:

Gulf Coast Katrina Update

- Seven days after arriving in the area, 1,000 EEs are currently working for LVI in emergency Katrina-related projects. About 200 of these employees came off of other LVI jobs, and the balance of 800 were brought in as additions, with the vast majority of this group having done a previous "tour" with the owner. Prior to Katrina, about 2,500 were working on LVI jobs across the country.

- All emergency response work is billed as time and material. Within the first week of hurricane relief, the Company was billing at a rate of at least $500,000 per day, with approximately 75% of the work being done in Mississippi right now. The Company is expecting to be at a billing rate of $1.0 mm per day shortly. They are currently working 6 days a week.

- LVI is having no trouble finding laborers to enhance their labor force. They have developed a strong database of previous employees who are interested in being "re-engaged" by LVI, and they have strong connections into key labor pools in Florida and Texas. Their only current difficulty in surging to handle the workload is housing limitations. They are working to build a camp to house many of their employees.

- So far they are not using union labor but are constantly under pressure from organized labor reps (and may decide to use union labor on a major project like the Superdome for strategic, political, and labor relations reasons).

- LVI management walked through the Superdome Friday with elected city officials (no other parties were invited). Whether the Superdome is renovated or demolished, the work load is immense, with a significant amount of asbestos

1

CONFIDENTIAL

**LVI Services Inc.**
**New York, New York**

throughout. If the Superdome is demolished, the work would involve an estimated 1,000 men for a 90 day period. This project would be in the $75 - 95mm revenue range. The Plaza Tower is another project in the $40-50mm range that they are expecting to be awarded shortly. In total, management estimates Katrina will generate $75mm of revenue in fiscal 2005 and up to $200mm in 2006. In comparison, the CHS base case model expected to earn $173 million in hurricane revenue over the 5-year projected period.

- Biometric time clocks were being tested on site on Friday with a plan to go live on Monday, significantly enhancing the ability to manage new employees and employee time and attendance..
- The team also talked extensively about a 3-day offsite meeting that was held last year to generate a list of lessons learned from the 2004 hurricanes. This list identified over 100 key items (many communication related), which were enumerated and then addressed. As a result, they appear to have appropriately addressed challenges with communications (new mobile command center) and food and supplies (7 loaded semi-trailers were delivering all needed equipment and supplies to the Company's staging area east of New Orleans within days of the disaster). Importantly, one key lesson learned involved the need to limit the impact on other offices to enable them to continue the base business. This was accomplished by tapping less than 10% of the existing workforce to respond to the hurricane.
- They are working in close collaboration with CMB, a drying and dehumidification business, whereby CMB or LVI will sell their services individually, but relying on each other for their respective capabilities. We learned that IHG is in the late stages of acquiring this business. Management discussed the need to develop this capability quickly in-house as another service offering.
- The sales team has been instructed to turn down any work that is not at least 100 people per day. As a company policy, LVI will only work for 24 hours without a signed contract.

Asbestos Business Outlook

- Management agrees that this business should represent a decreasing share of overall revenue, but they are very content to build share in the industry. They expect $130mm of asbestos work annually for the next ten years, and they believe they will generate well in excess of $130 million in 2005.


Business Update from CEO

CEO Burton Fried provided the following update on LVI's response to Hurricane Katrina and LVI's competitive position in key contracts.

1. HURRICANE KATRINA RESPONSE

It has been one week since LVI first responded to Hurricane Katrina. LVI's Emergency Response Command Center in Gulfport, MS is fully functional with telephone, fax and computer access through our mobile satellite communications system. This has permitted on-site coordination of LVI activities. Biometric clocks, which are being loaded with the names of local LVI workers, are functioning and should be operational at our Command Center for use with our next pay period which begins on Monday, September 12.

Total labor being utilized by LVI in MS and LA is now approaching 1,000. Work consists of disaster cleanup services (debris removal, drying and dehumidification, interior demolition and mold remediation) in various buildings, including one or more casinos, high-rise office buildings and hospitals. We expect work at hotels and other high-rise office building structures to begin as soon as the water recedes in New Orleans. The amount of work currently appears limitless and may extend for years. It will be months before a full assessment of the work required in all buildings is completed.

LVI is performing work for local clients and national accounts such as Equity Office, JC Penney, Hard Rock Casino and MedAssets. Negotiations are in progress with other LVI accounts such as Hyatt and Hilton Hotels as well as with the Newhouse Family, a potential new client that owns the New Orleans Times Picayune.

Revenues and earnings in the last four months of 2005 from Hurricane Katrina are projected to exceed those realized in the last 4 ½ months of 2004 from the four Florida hurricanes. The duration of the work from Hurricane Katrina is expected to extend for years at high levels of revenue and earnings. LVI's next goal is to bring its labor force in MS and LA up to 2,000 workers. The work will be available but we need the support infrastructure in place before we secure the additional business. We are currently negotiating the lease of a 37,000 square foot facility in New Orleans for the permanent Branch Office of LVI to service LA, MS and AL which will be large enough to accommodate a full inventory of demolition equipment. We have also begun the process of recruiting a permanent staff for that office. Last night we hired an

2

LVI Services Inc.
New York, New York

operational staff from a competitor of LVI in TX to supplement our forces in MS and to initially work from our new NO Branch Office before moving them back to TX.

2. STATUS OF RECENT LARGE PROJECT WINS

Deutsche Bank Building (NYC) – We have been informally advised that LVI will be awarded both the structural demolition and the remediation of the building for our bid price of $55 million. LVI's proposal will be presented to the Board of the Lower Manhattan Development Corporation today. If awarded, LVI would subcontract the structural demolition to another firm with which LVI has done business for years, and we will receive a surety bond from the subcontractor for its performance of the demolition. Arch Surety has agreed to provide LVI with a Payment and Performance Bond for the project. The project is scheduled to begin within 60 days and would be completed within 18 months.

Mosaic Building (Dallas) – We have been informed that LVI won the bid, and we are awaiting formal award by the City of Dallas for this $12 million project consisting of remediation and soft demolition. The project is expected to be awarded within 60 days and would be completed within one year.

Hall of Justice (Los Angeles) – Remediation and soft demolition work awarded to TEG/LVI for $9 million. We expect work to commence next month (October) and be completed within six months.

3. STATUS OF OUTSTANDING BIDS / PENDING NEGOTIATED PROJECTS

Utopia Studios (Connecticut) – We have been advised that this remediation and structural demolition project will occur. In addition, developer has acquired 6,000 acres in the area for development which will require remediation and demolition of several former paper mills. Total project value is projected to exceed $20 million with a start date in the first quarter of 2006. This project will be negotiated with the developer. We expect an award in the first quarter of 2006. The schedule for completion of the Utopia Studios project will be one year and the additional work is not clearly defined at this time.

Four Government Projects (D.C.) – LVI has bid on and is awaiting the award announcement of up to 4 remediation and soft demolition projects by general contractors in Washington, DC that total approximately $15 million in revenues. All of these projects have a one year schedule for completion.

Hotel San Diego – LVI was prequalified to bid this project by the GSA for the remediation and demolition of the structure. Price bid was $4 million, and subsequent to the bid submission, LVI was interviewed for the project by GSA. We are awaiting a decision on the project award.

The Farley Main Post Office Building (NYC) – This project is to commence in the last quarter of 2005. The Main Post Office Building will be the subject of a major renovation to become the new Pennsylvania Station. It will entail remediation, soft demolition and structural demolition. The scope of work that would be provided by LVI is estimated at $75 million. Preliminary discussions about the work have begun between LVI and Vornado, the developer. This should be considered a large bid opportunity that may be negotiated before award.

Blockbox (Seattle) – We expect the remediation and soft demolition of this project to be awarded to LVI by the Hines Organization, a long term client of LVI. This multi-year, high-rise project will represent revenues for LVI of between $15 million and $20 million. The first phase of this three-year project is expected to begin in the first quarter of 2006.

4. STATUS OF OTHER LARGE NEAR-TERM PROJECT OPPORTUNITIES

IBM Building (Chicago) – The first phase of about 20 floors of this 50-story building will be bid before the end of this month. LVI will price the asbestos removal, soft demolition and the re-fireproofing of the building. The work in the entire building will be phased over two years with a project cost for the entire building of about $30 million.

Chicago Post Office – Preliminary discussions with LVI have begun on the planned renovation of this 4-million-square-foot facility. Scope of work includes remediation, soft and structural demolition with an estimated cost of $150 million. This project will be bid though the opportunity to negotiate exists. It will be a multi-year project that will be bid sometime in 2006.

3

CONFIDENTIAL

CHS 000009

**LVI Services Inc.**
**New York, New York**

Byberry State Hospital (Philadelphia) – Project for the remediation and structural demolition of the buildings on this site will be bid this month. The estimated project value is $10 million. The project is expected to start in the last quarter of 2005 and be completed within a year.

Developers Diversified (Ukiah, CA) – The remediation and structural demolition of this $5 million project is awaiting local governmental approvals for items requested by the new owner. This is a low rise structure formerly utilized by International Paper. The project would be completed within one year.

International Paper (Oakland) – IP is a long-term client of Iconco Demolition Services. Iconco/LVI will be bidding on a $4 million to $5 million project within the next few weeks. This project will be bid shortly and should commence in the last quarter of 2005 and be completed within a year.

Conclusion

The CHS team remains excited about this investment opportunity, and we are working to submit a bid today at ▓▓▓▓▓▓▓.

4

CONFIDENTIAL

CHS 000010

LVI Services - *Exhibit A: E&Y Due Diligence*

($ in '000s)

| | Consolidated | Base Business | Storm |
|---|---|---|---|
| **Sales** | | | |
| FY 2004 | 263,469 | 199,614 | 63,855 |
| TTM - July'05 | 308,822 | 236,174 | 72,648 |
| YTD'04 (Jul) | 112,163 | 112,163 | 0 |
| YTD'05 (Jul) | 157,516 | 148,723 | 8,793 |
| FY 2005 (1) | 349,537 | 265,744 | 83,793 |
| CHS FY'05 (Valuation Basis) | 300,171 | 263,802 | 36,370 |
| | | | |
| **E&Y Adjusted EBITDA** | | | |
| FY 2004 | 33,200 | 15,751 | 17,449 |
| *as % of sales* | *12.6%* | *7.9%* | *27.3%* |
| TTM - July'05 | 39,918 | 17,571 | 22,347 |
| *as % of sales* | *12.9%* | *7.4%* | *30.8%* |
| YTD'04 (Jul) | 9,664 | 9,664 | 0 |
| *as % of sales* | *8.6%* | *8.6%* | *na* |
| YTD'05 (Jul) | 16,382 | 11,484 | 4,898 |
| *as % of sales* | *10.4%* | *7.7%* | *55.7%* |
| FY 2005 (1) | 47,812 | 20,489 | 27,323 |
| *as % of sales* | *13.7%* | *7.7%* | *32.6%* |
| CHS FY'05 (Valuation Basis) | 33,626 | 22,821 | 10,805 |
| *as % of sales* | *11.2%* | *8.7%* | *29.7%* |

*(1) FY 2005 utilizes actual results through July and LVI's bank plan through the remainder of the year, with the exception of an additional $50 million in revenues associated with Katrina. Through July, the Company has exceeded its bank plan revenue by 17.8%, with demolition 55% ahead of plan and asbestos abatement 8% ahead of plan.*

| FY 2005 Storm | | |
|---|---|---|
| **Storm Sales:** | | |
| 1H 2005 Actual | | 8,793 |
| 2H 2005 Sales Original Forecast | | 25,000 |
| Additional Sales from Katrina | | 50,000 |
| Total Storm Sales | | 83,793 |
| | | |
| **Storm EBITDA:** | *Margins:* | |
| 1H 2005 Actual | | 4,898 |
| 2H 2005 Original Forecast | 29.7% | 7,425 |
| Katrina | 30.0% | 15,000 |
| Total Storm EBITDA | | 27,323 |

| Forecast - 1 Storm | |
|---|---|
| Sales | 18,162 |
| EBITDA | 5,587 |
| *as % of sales* | *30.8%* |

CONFIDENTIAL

CHS 000011

# EXHIBIT E

**LVI SERVICES, INC.**
80 Broad Street
New York, NY 10004

Date: November 16, 2005

Mr. Burton T. Fried
149 Roseville Road
Westport, CT 06880

*Re: Terms of Employment with LVI Services, Inc. and LVI Acquisition Corporation*

Dear Burt:

This letter memorializes our discussions as to the material terms of your employment arrangement with LVI Services, Inc. (the "Company") and LVI Acquisition Corporation ("Buyer") following the acquisition (the "Acquisition") of LVI Parent Corp. by Buyer:

| | |
|---|---|
| Job Title/Responsibilities: | You will continue to serve as President and Chief Executive Officer of the Company and Buyer until a replacement President and Chief Executive Officer is hired to oversee and conduct the day to day business of the Company and Buyer. You will be expected to perform such services as are customary for such positions, including such duties and responsibilities as are assigned from time to time by the board of directors (the "Board") of the Company and Buyer. After a new President and Chief Executive Offer is hired, you will serve as the Chairman of the Company and Buyer with primary responsibility for strategic growth. |
| Compensation: | You will receive a base salary of $750,000 per year, which may be altered to a mutually agreed level following the hiring of a new President and Chief Executive Officer. Your base salary shall be payable in regular installments in accordance with the Company's general payroll practices and shall be subject to customary withholdings. |
| | You will be entitled to receive an annual bonus as determined by the Board in its sole discretion based upon the Company's achievement of budgetary and other objectives set by the Board. |
| Benefits: | You will be entitled to the same benefits as all other senior executives and that you currently enjoy. The Company will, subject to insurability and commercially reasonable cost, maintain (i) a long-term disability insurance policy for you with payout terms comparable to those in the disability policy currently maintained by the Company for you and (ii) a $1,000,000 life insurance policy for you for which you may designate the beneficiary. You understand and acknowledge that the Company will not maintain the $5,000,000 key-man life insurance policy that was in place prior to the Acquisition. |
| | You will be entitled to 20 days paid vacation annually; in addition to public holidays upon which the Company is officially closed for business. |
| | The Company shall provide you with an automobile comparable to the Mercedes |

BF_01

|  | S500 currently leased for you by the Company and reimburse you for expenses related to such automobile including insurance, tolls, parking, maintenance, repairs and gas. |
|---|---|
| Reimbursement of Expenses: | The Company will reimburse you for all reasonable expenses incurred by you in the course of performing your duties, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses. |
| Repurchase of Equity | As will be provided in your Executive Securities Agreement, in the event of your death, at the election of your legal representative, Buyer will repurchase for cash the common and preferred stock of Buyer you acquire at the time of the Acquisition at fair market value subject to any restrictions in the Company's credit agreements. |
| Office | You will work in the Company's New York city office two days a week and three days a week in an office maintained by the Company in Westport, Connecticut.

After your transition from President and Chief Executive Officer to Chairman, you will work five days a week in Westport, Connecticut. The Company will maintain the current office in Westport, Connecticut or an office with similar facilities at substantially the same rent reasonably acceptable to you in Westport, Connecticut. |

We look forward to your continued relationship with the Company. If these terms and conditions are acceptable to you, please sign below to confirm and return this letter to us at your earliest convenience.

Very truly yours,

LVI SERVICES, INC.

BY: Steven R. Brown
Name: Steven R. Brown
Title: Vice President

ACCEPTED AND AGREED
THIS ___ DAY OF NOVEMBER 2005:

Burton T. Fried

CNT\43853334

BF_02

$500 currently leased for you by the Company and reimburse you for expenses related to such automobile including insurance, tolls, parking, maintenance, repairs and gas.

**Reimbursement of Expenses:** The Company will reimburse you for all reasonable expenses incurred by you in the course of performing your duties, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

**Repurchase of Equity** As will be provided in your Executive Securities Agreement, in the event of your death, at the election of your legal representative, Buyer will repurchase for cash the common and preferred stock of Buyer you acquire at the time of the Acquisition at fair market value subject to any restrictions in the Company's credit agreements.

**Office** You will work in the Company's New York city office two days a week and three days a week in an office maintained by the Company in Westport, Connecticut.

After your transition from President and Chief Executive Officer to Chairman, you will work five days a week in Westport, Connecticut. The Company will maintain the current office in Westport, Connecticut or an office with similar facilities at substantially the same rent reasonably acceptable to you in Westport, Connecticut.

We look forward to your continued relationship with the Company. If these terms and conditions are acceptable to you, please sign below to confirm and return this letter to us at your earliest convenience.

Very truly yours,

LVI SERVICES, INC.

BY: _____
Name: _____
Title: _____

ACCEPTED AND AGREED
THIS _11_ DAY OF NOVEMBER 2005.

Burton T. Fried

CHI-OBIB24

# EXHIBIT F

| | |
|---|---|
| **From:** | Fried, Burton <bfried@lvi.com> |
| **Sent:** | Wednesday, September 22, 2010 4:00 PM |
| **To:** | Brian Simmons <BSimmons@chsonline.com> |
| **Cc:** | Robert Hogan <RHogan@chsonline.com> |
| **Subject:** | Scott State |

Brian:  Spoke with Scott. He now has no concern about my support in his role as CEO. He does have a few remaining issues relating to the EBITDA language ("as adjusted") and other items which are not major. Recommend that you be personally on the call with Rob when he calls Scott this afternoon. Otherwise, at best discussions will be protracted without resolution with Scott or at worst he may end up totally frustrated and withdraw himself from further consideration.........Burt

Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

LVI 002635

# EXHIBIT G

| | |
|---|---|
| **From:** | Fried, Burton <bfried@lvi.com> |
| **Sent:** | Tuesday, September 21, 2010 6:57 PM |
| **To:** | Leonard, John <JohnLeonard@lviservices.com>; Cutrone, Paul <PCutrone@Notes.lvi.com> |
| **Subject:** | Scott State |

Scott accepted the offer of employment.

According to Brian, Scott wants to speak to me tomorrow to be assured that I will not get in his way to manage the business, align his team and be in charge. "If" that is the reason for Scott's call to me tomorrow will tell him that I will remain at LVI until he, the Board or I decide it's time to leave.  Hard to believe he would have that conversation with me. It would be a sign of insecurity. But, we will know tomorrow.

_____

Burton T. Fried

Chairman/CEO

LVI Services Inc.

877 Post Road East

Suite # 4

Westport, CT 06880

Phone: (203) 222-0584

Fax: (203) 222-2227

bfried@lviservices.com

CONFIDENTIAL

LVI 000732

A-127

# EXHIBIT H

| | |
|---|---|
| **From:** | Simmons, Brian P. <BSimmons@chsonline.com> |
| **Sent:** | Thursday, September 23, 2010 2:15 PM |
| **To:** | Scott State Gmail <Scott.State@gmail.com> |
| **Cc:** | Hogan, Robert <Rhogan@chsonline.com>; Fried, Burton <BFried@Notes.lvi.com>; Lester, Laura <LLester@chsonline.com> |
| **Subject:** | Re: Updated Offer |

---

Great news. Welcome aboard. We will get all the logistics started.

------------------------
Brian P. Simmons
Partner
Code Hennessy & Simmons LLC
10 South Wacker Drive STE 3175
Chicago, IL. 60606

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Scott State [mailto:scott.state@gmail.com]
**Sent:** Thursday, September 23, 2010 01:43 PM
**To:** Simmons, Brian P.
**Cc:** Hogan, Robert; BFried@lviservices.com <BFried@lviservices.com>; Lester, Laura
**Subject:** Re: Updated Offer

Brian

Thank you for your call and response to my concerns. The offer reflects the terms we had discussed on Tuesday and is acceptable to me. I attach a signed copy. Please obtain remaining signatures and return a fully executed copy at your convenience.

I would like to begin employment on Monday the 27th and will plan to be in the NY office at some point that week. If there is necessary paperwork needed to effect this start date please have someone contact me.

Thanks for your confidence in my ability to add value to LVI. I look forward to getting started on the rebuilding process of the business.

Best Regards,

Scott

On Thu, Sep 23, 2010 at 11:51 AM, Simmons, Brian P. <BSimmons@chsonline.com> wrote:

Scott, I apologize for all the miscommunication. Things are moving very quickly - still no excuse. Thanks for the time on the phone this morning. Below are the equity terms of the deal that I agreed to several days ago, the deal that Apollo and Falcon have agreed to and is hopefully still acceptable to you. Please call me directly if you have any questions or concerns.

- LVI would grant you options to acquire 3% of the equity at closing, all coming out of the 8% management option pool. The first 20% of these options vest upon grant and the next four tranches

CONFIDENTIAL

LVI 002444

of 20% each vest each year based on performance in 2011-2014.

- LVI would grant you options to acquire 2% of the equity in the form of "Incremental Incentive Equity." These options are granted at closing but do not vest until exit if TTM EBITDA at exit is at least $35 million.

- If the 2% Incremental Incentive Equity is triggered at exit, the Company would grant you an exit bonus that would cover 50% of the exercise price of all vested options (presumably 5% if you vest into both the 3% grant and the incremental 2%).

- As for your bonus for 2010, we would propose to award you a $100k bonus as a bonus for both 2010 and as a signing bonus. This is dependent upon your start date being on or before September 30, 2010 [Scott - is this date still practical? We want you ASAP but no problem pushing a bit given circumstances.]. To receive this bonus, you will need to be employed by the Company at the completion of the audit for 2010.

- We would also like to see you invest at least $100k into the Company by the completion of the audit for 2010. This may come from the 2010 bonus or from other funds.

- As Rob indicated, we will also create an additional 2% pool of Incremental Incentive Equity to be shared with other managers. These options will vest under the same circumstances as your Incremental Incentive Equity—an exit at or above $35 million of EBITDA. It is our assumption that you will recommend to the Board the appropriate recipients within six to twelve months of the start of your tenure at LVI.

I have attached a revised offer letter reflecting our conversation this morning. We have resolved all open issues with lenders and are moving forward to close the new investment and restructuring. With that behind us, we are ready to turn all our resources to supporting your efforts to grow the company. We look forward to working with you.


*Brian P. Simmons*
*Managing Partner*
*Code Hennessy & Simmons LLC*
*10 South Wacker Drive, Suite 3175*
*Chicago, IL  60606*
*www.chsonline.com*

*312-876-1980 (phone)*
*312-876-3854 (fax)*
*bsimmons@chsonline.com*

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

CONFIDENTIAL

# EXHIBIT I


A-131

| | |
|---|---|
| **From:** | Scott State <scott.state@gmail.com> |
| **Sent:** | Friday, October 29, 2010 4:49 PM |
| **To:** | Brian Simmons <bsimmons@chsonline.com>; Rajay Bagaria <RBagaria@apolloic.com> |
| **Subject:** | One month review |

Brian / Rajay :

You both expressed an interest in getting a one month assessment of LVI. Provided below is a very brief report. I will have a substantial number of charts and discussion items that address where the business is at and the strategic focus next week. Some of the commentary below would probably be inflammatory in an open meeting.

Burt has inserted himself uninvited in several areas since the blow up earlier this week. Most troublesome is that he is just stepping all over our new General Counsel Greg DiCarlo which tends to marginalize Greg at a time when I need him to step up. I think we will need Burt to just pack up and go home or this is going to be a constant struggle. If he remains involved as a Board member I would like it to be just as a Director and not Chairman. He tends to throw the Chairman title around to get his way.

Scott

I have had the opportunity to meet most of the key management of the firm and make site visits to many of the offices. My general observation is that there are a number of good employees in the business that have suffered from a lack of leadership and any clear direction relative to stabilizing and growing the business. There is a pent up dissatisfaction with prior management approaches. I think this group will ultimately be very responsive to the changes we will employ that require team members to take ownership and responsibility for their actions in an open and honest process.

Past experience for the group has been largely driven by a setting of expectations that might not be consistent with reality and a totalitarian leadership approach that stymied any innovation or measured risk taking. This has led to a poorly conceived business development process with a low degree of accountability for actual performance but with many instances of "ass chewing" related to lack of success. Success has not been well defined or measured at the employee level nor has inadequate results been well addressed. There are many sacred cows and examples of a business approach that is dictated but what has been done for 20 plus years. The Company is very reactive versus proactive and lacks innovation and a clear strategy, relying more on tactical brute force in an attempt to succeed.

Management has not historically been measured by true performance but rather compliance which causes dissatisfaction at the management and worker level. This cycle needs to be broken and the staff must see an approach that will reward them for figuring out the best way to succeed and not punish an occasional mistake. We will embrace a "customer first" culture at the field level and empower operations management to manage, business development staff to win good business (or seek other employment), and get the corporate functions to view their role as support to the field.

CONFIDENTIAL

BAGARIA 000197

I have spent considerable time on beginning development of strategies for new revenue generation. We are close to locking in roughly $15MM of work in DC, are getting short listed on some bigger projects, and NorthStar has landed an $8MM+ response opportunity with Samsung. Timing has been fortunate on these opportunities as the business was in a bad decline. We will be rebuilding the business development function, terminating about one half of the national account managers and bringing in some new people and a new attitude. With these changes we should also be able to start positioning on significant new projects in 2011. I have put a challenge out to NorthStar management to greatly increase our market access. That business is growing over 100% per year and should do over $30MM in 2010 from $14MM in 2009 with no major natural disasters contributing to results. I think this business could be larger than the traditional LVI business in five years. We are also going to vertically integrate service offerings in some markets where we support general contractors on major renovation projects. We currently provide abatement and demo and then exit big projects. Follow on work doing "putback" is an area ripe for expansion. Services include re-insulation and millwright scopes. These services have been provided by small players that are under great pressure and dropping away due to liquidity and bonding issues. The GC's are looking for larger players that they know and trust to fill the gaps and we have a good opportunity to trade on the good LVI name to expand into these services with existing customers.

We also have some good opportunity to make moves on cost inefficiencies. Moving the corporate office in 2011 should cut about $500K / yr. Downsizing the satellite office in Westport to a minor footprint and reducing staff would save another $1MM plus per year. We also need to put some focus on the bonding line and the $10MM LC we have posted which I have discussed with Richard. All in, I would like to eliminate at least $2.0MM of cost that is providing no ROI in 2011.

CONFIDENTIAL

# EXHIBIT J

Page 1

```
1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    No. 10 Civ. 9308(JSR)

5    ---------------------------------------x

6    BURTON T. FRIED,

7                              Plaintiff,

8           - against -

9    LVI SERVICES, INC., LVI PARENT CORP., CODE

10   HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11   EQUITY V LP; APOLLO INVESTMENT CORP.,

12   SCOTT E. STATE, in his official and

13   individual capacities; BRIAN SIMMONS, in

14   his official and individual capacities;

15   RAJAY BAGARIA, in his official and

16   individual capacities; GERALD J. GIRARDI,

17   in his official and individual capacities,

18                              Defendants.

19   ---------------------------------------x

20                              May 26, 2011
                                10:03 a.m.

21

22

23

24

25
```

Page 2

1

2

3

4          VIDEOTAPE DEPOSITION of SCOTT

5    STATE, taken by the Plaintiff, pursuant to

6    Notice, held at the offices of Thompson

7    Wigdor & Gilly, LLP, 85 Fifth Avenue, New

8    York, New York, before Debbie Zaromatidis,

9    a Shorthand Reporter and Notary Public of

10   the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 213

```
 1            STATE
 2   Squibb.  There were I believe -- I know we   03:08:47
 3   were involved in the acquisition of some     03:08:56
 4   assets from a company in Washington, D.C.     03:08:59
 5   We were negotiating contract terms with       03:09:03
 6   that particular company for a project at a    03:09:06
 7   federal building in Washington, D.C.          03:09:09
 8   I -- you're asking about specifics of six     03:09:15
 9   months ago.  I -- I can't off the top of      03:09:23
10   my head tell you what those were.             03:09:26
11        Q.   And these two things that Mr.       03:09:28
12   Fried was working on, were these two          03:09:35
13   things that were not transitioned to you?     03:09:38
14        A.   They were things that I felt        03:09:40
15   like probably should have been quickly        03:09:43
16   transitioned.  They weren't complex           03:09:45
17   matters, but there was a resistance to        03:09:47
18   moving them over I guess.                      03:09:51
19        Q.   A resistance from whom?             03:09:53
20        A.   From Burt.                          03:09:56
21        Q.   And what gave you that             03:09:57
22   impression?                                   03:09:58
23        A.   Because they weren't just           03:09:58
24   transitioned to me.                           03:10:00
25        Q.   Were there a lot of things that     03:10:01
```

Page 214

1                    STATE
2    needed to be transitioned to you?           03:10:02
3        A.    There were I think at lot --      03:10:04
4        Q.    Were there a lot of items that    03:10:06
5    needed to be transitioned to you?           03:10:07
6        A.    Not particularly, no.             03:10:09
7        Q.    Okay.  And why do you feel these  03:10:10
8    weren't transitioned to you?                03:10:17
9        A.    I don't know.                     03:10:18
10       Q.    In the next sentence you wrote    03:10:19
11   "Like most of my discussions with Burt on   03:10:31
12   his continuing role, he agreed."            03:10:34
13             What did Mr. Fried agree with?    03:10:35
14       A.    I think there was a general       03:10:37
15   agreement every time we spoke that the      03:10:38
16   day-to-day operations will be transferred   03:10:40
17   to you, but subsequent to that I think      03:10:42
18   somewhere in here I say -- then I got this  03:10:48
19   list, and there is all these duties that    03:10:50
20   didn't make any sense to me.                03:10:53
21       Q.    Let's -- let's go to that list.   03:10:55
22       A.    This is the October 14th version  03:11:09
23   or the October 19 version?                  03:11:11
24       Q.    This is the October 14 version.   03:11:26
25             (Plaintiff's Exhibit 30 marked    03:11:29

Page 215

|    |                                                          |           |
|----|----------------------------------------------------------|-----------|
| 1  | STATE                                                    |           |
| 2  | for identification.)                                     | 03:11:31  |
| 3  | (Document handed to witness.)                            | 03:11:31  |
| 4  | Q.    Mr. State, you have a document                     | 03:11:32  |
| 5  | in front of you marked as Plaintiff's                    | 03:11:34  |
| 6  | Exhibit 30.                                              | 03:11:36  |
| 7  | Please review the document and                           | 03:11:36  |
| 8  | let me know if you have seen it before.                  | 03:11:37  |
| 9  | A.    I believe I have seen this, yes.                   | 03:11:39  |
| 10 | Q.    Okay.  Is this the list that you                   | 03:11:41  |
| 11 | were referring to in Plaintiff's Exhibit                 | 03:11:43  |
| 12 | 29?                                                      | 03:11:45  |
| 13 | A.    I think so, yes.  Yes.                             | 03:11:45  |
| 14 | Q.    Did you ask Mr. Fried to provide                   | 03:11:47  |
| 15 | you with this list?                                      | 03:11:48  |
| 16 | A.    I don't believe I did.                             | 03:11:49  |
| 17 | Q.    Okay.  So he did it of his own                     | 03:11:51  |
| 18 | accord?                                                  | 03:11:53  |
| 19 | A.    I believe so.                                      | 03:11:54  |
| 20 | Q.    Do you know why he did that?                       | 03:11:55  |
| 21 | A.    I think it was in anticipation                     | 03:11:57  |
| 22 | of this meeting we were going to have on                 | 03:12:04  |
| 23 | the 19th.  He prepared an agenda for that                | 03:12:06  |
| 24 | meeting as well, which I don't believe I                 | 03:12:09  |
| 25 | got in advance, but I think I got it at                  | 03:12:10  |

Case: 13-1165   Document: 43   Page: 150   07/10/2013   986023   264
A-139

Page 216

```
 1                 STATE
 2    that meeting.                          03:12:14
 3        Q.    Well, with respect to the --  03:12:15
 4    these duties that you referred to,     03:12:18
 5    what -- what was your reaction when you 03:12:22
 6    saw this document?                      03:12:24
 7        A.    I was frankly pretty surprised 03:12:25
 8    that -- I was surprised.               03:12:32
 9        Q.    Why were you surprised?      03:12:34
10        A.    That is a pretty extensive list 03:12:35
11    of things that are mostly operational in 03:12:37
12    nature that surprised me.              03:12:41
13        Q.    Why exactly did it surprise you, 03:12:44
14    the fact that they are operational in  03:12:48
15    nature?                                03:12:50
16        A.    Because my expectation from the 03:12:51
17    prior discussion I had had about duties 03:12:56
18    and the discussion I had had no more than 03:12:59
19    two hours prior to this was that all   03:13:03
20    operational things would -- day-to-day 03:13:05
21    activities would come to me, and there is 03:13:08
22    many things in here that are day-to-day 03:13:10
23    activities.                            03:13:12
24        Q.    And were these things that    03:13:13
25    Mr. Fried was holding on to or that he was 03:13:16
```

**A-140**

```
                                         Page 217
 1                    STATE
 2  transitioning to you?                      03:13:19
 3       A.    No, these are all things that he   03:13:20
 4  anticipated holding on to.                 03:13:22
 5       Q.    Okay.  And which one -- did you    03:13:24
 6  consider all of these duties day to day?   03:13:32
 7       A.    No.  There was -- let me look.    03:13:32
 8            (Pause.)                          03:13:47
 9       Q.    You can number the points to      03:13:48
10  make it easier.                            03:13:50
11       A.    No.  There is just one point in   03:13:51
12  here that I considered to be truly         03:13:53
13  relevant to what I had hoped to have Burt   03:13:55
14  really help me with, and that was being a   03:13:58
15  resource for all of the historical LVI     03:14:00
16  business, employee and legal matters, and   03:14:04
17  there were many of those, and he was an     03:14:07
18  absolute resource for all of them,         03:14:09
19  and -- and that is what I really needed     03:14:12
20  help with.                                 03:14:14
21       Q.    And are there -- why would you    03:14:16
22  consider the remainder of these duties     03:14:21
23  day-to-day duties that he would transition  03:14:24
24  to you?                                    03:14:26
25       A.    Because everything in here is a   03:14:27
```

Page 218

```
 1              STATE
 2   staff level function that as the CEO I        03:14:29
 3   would determine who did all of these          03:14:34
 4   things.  These are all operating              03:14:37
 5   day-to-day things that companies do, and      03:14:38
 6   the CEO of the company should have the        03:14:42
 7   discretion to decide how they get done.       03:14:45
 8      Q.     And was there a problem if Mr.      03:14:47
 9   Fried performed these duties?                 03:14:50
10            MS. SELTZER:    Objection to the     03:14:55
11   form, but you can answer.                     03:14:56
12      A.     I don't -- I wouldn't say there     03:14:57
13   was a problem with anybody doing these        03:15:01
14   duties.  It is just my decision to decide     03:15:02
15   who does them.                                03:15:05
16      Q.     And is there -- was there           03:15:09
17   anything preventing you from having Mr.       03:15:10
18   Fried do these duties?                        03:15:12
19      A.     No, I just made a decision that     03:15:14
20   I thought that it would fit better to have    03:15:16
21   these things assigned, and I told Mr.         03:15:18
22   Fried that.                                   03:15:22
23      Q.     Why is that?                        03:15:22
24      A.     Because they fit in typical         03:15:23
25   staff level functions in the company, and     03:15:26
```

Page 261

```
 1              STATE
 2    which -- it had -- there were many items    03:53:54
 3    on the agenda.                              03:54:00
 4        Q.    Was every topic on the agenda    03:54:02
 5    covered?                                    03:54:05
 6        A.    I believe -- I believe we did    03:54:06
 7    cover every topic because there were        03:54:08
 8    topics -- I'm trying to think.  There were  03:54:09
 9    topics related to a CIO search that had     03:54:12
10    been initiated that I decided not to        03:54:15
11    conduct or to continue.  There was a topic  03:54:17
12    related to a VP of HR search that           03:54:20
13    was -- had been initiated that I decided I  03:54:24
14    didn't want to continue that I was putting  03:54:25
15    on hold.  There was the office issue.       03:54:28
16    What else did we talk about.  I -- there    03:54:33
17    was a lot of items on the agenda.           03:54:36
18        Q.    Okay.  Now, during that          03:54:38
19    discussion, that meeting, did you make any  03:54:40
20    comments regarding Mr. Fried's age?         03:54:42
21        A.    I made one comment where I       03:54:44
22    said -- when Burt and I were talking about  03:54:47
23    the duties that he had or desired to have.  03:54:49
24    At one point I said, Burt, you told me      03:54:54
25    you're 71 years old, and you don't want to  03:54:57
```

Page 262

```
 1                 STATE
 2   be doing this any more.  I don't            03:55:00
 3   understand.  And he kind of chuckled and    03:55:02
 4   corrected me and said I am only 70, and I   03:55:05
 5   said oh.  Okay.  Sorry.  But that was the   03:55:08
 6   only item that came up like that at all.    03:55:12
 7       Q.    Why did his age even come up?     03:55:16
 8       A.    Because he had told me not more   03:55:18
 9   than two or three weeks before when I       03:55:21
10   discussed with him on the phone prior to    03:55:24
11   taking the job that the duties he liked to  03:55:26
12   have would be strategic support and, you    03:55:29
13   know, these few items and -- and that       03:55:33
14   he -- he was 70 -- well apparently he told  03:55:35
15   me he was 70.  I thought he had said 71,    03:55:38
16   and he didn't want to be doing this any     03:55:41
17   more, and that is -- you know, that is why  03:55:43
18   he wanted to essentially back away, and     03:55:45
19   that is what I understood.                  03:55:47
20       Q.    Is that what he was talking       03:55:48
21   about at this meeting, backing away from    03:55:50
22   the duties?                                 03:55:52
23       A.    At what meeting?                  03:55:53
24       Q.    At the October 19 meeting.        03:55:53
25       A.    No, he was talking about that     03:55:55
```

Page 263

```
 1              STATE
 2   when I spoke to him on the phone prior to   03:55:57
 3   joining the company.                        03:56:00
 4       Q.    But at the actual meeting why     03:56:01
 5   did his age come up?                        03:56:03
 6       A.    Oh, I don't know.  I -- there     03:56:05
 7   was kind of banter going back and forth.    03:56:07
 8       Q.    What was the banter?              03:56:09
 9       A.    I don't -- I don't think there    03:56:11
10   was anything serious about it.              03:56:12
11       Q.    Well, apparently Mr. Fried        03:56:13
12   thinks so.  But what was the banter?        03:56:16
13       A.    I think it was about the          03:56:19
14   specific duties that he thought he should   03:56:21
15   have and that I thought a number of them    03:56:23
16   were staff level types of duties.  I        03:56:28
17   believe that we had options to do a lot of  03:56:31
18   those things and that, you                  03:56:36
19   know -- that -- I didn't see why he as      03:56:38
20   chairman of the company would want to do    03:56:40
21   any of those things.  It just -- it         03:56:42
22   literally did not make sense to me, and I   03:56:45
23   told him that, and his retort to me was,    03:56:48
24   look, it doesn't matter who you give these  03:56:51
25   to.  I am the best there is at all of       03:56:54
```

Page 264

```
 1              STATE
 2    these things, and you would be          03:56:56
 3    shortsighted to have anyone else do these   03:56:57
 4    things.  That is what was said.          03:57:00
 5         Q.    So in connection with his job   03:57:02
 6    duties, you made a comment about his age?   03:57:04
 7         A.    No.                           03:57:08
 8         Q.    So then when did this age     03:57:08
 9    comment come up during this conversation?   03:57:12
10         A.    It came up as we were talking   03:57:14
11    about -- back and forth about discussions   03:57:16
12    that we had associated with what he wanted   03:57:17
13    to do, my hiring into the company, and I   03:57:21
14    simply repeated to him this is what you   03:57:24
15    said to me.  I didn't say it to him.  I   03:57:26
16    said this is what you said to me.        03:57:29
17         Q.    And what -- do you remember   03:57:31
18    exactly what you said about Mr. Fried's   03:57:32
19    age?                                     03:57:34
20         A.    What I said was:  Burt, you told   03:57:35
21    me you're 71 years old, and you don't want   03:57:37
22    to be doing this, meaning this kind of   03:57:40
23    stuff any more.  I don't understand this   03:57:42
24    list.                                    03:57:45
25         Q.    And then what did Mr. --      03:57:46
```

```
                                            Page 265
 1                  STATE
 2     A.    And he had said -- and he      03:57:48
 3   laughed and said, look, I am only 70.  And   03:57:50
 4   that is the end of it.  It wasn't a stare    03:57:53
 5   down.  There was nothing.  It was just  03:57:58
 6   passed along.                          03:58:00
 7     Q.    Was that the end of the meeting?    03:58:01
 8     A.    You know, there was probably an 03:58:03
 9   hour plus of additional discussion at the   03:58:05
10   meeting.  This discussion of duties was 03:58:08
11   item one on the list.                  03:58:09
12     Q.    Did you ask Mr. Fried at this  03:58:11
13   meeting how long he expected work for?  03:58:13
14     A.    No, I don't think I did.       03:58:16
15     Q.    And did you ask Mr. Fried at   03:58:17
16   this meeting what if he got hit by a bus?    03:58:19
17     A.    I -- I don't recall asking him 03:58:22
18   that.                                  03:58:24
19     Q.    Now, after this meeting, did you    03:58:25
20   send an e-mail to Mr. Simmons and Mr.  03:58:30
21   Hogan?                                 03:58:32
22     A.    I may have.                    03:58:33
23          MR. DATOO:  I think it          03:58:39
24   is -- why don't we take a break.       03:58:41
25          THE VIDEOGRAPHER:  Going off    03:58:42
```

A-147

Page 371

```
 1              STATE
 2         MS. SELTZER:   That is what I    06:02:03
 3    meant.  Yes.                          06:02:03
 4         A.    I -- as I recall, I received   06:02:05
 5    this, and this -- this letter came into   06:02:07
 6    the New York office, and I recall an    06:02:09
 7    exchange back and forth that my assistant   06:02:14
 8    in New York indicated a letter had come in   06:02:17
 9    for me, and I think I asked her who it was   06:02:19
10    from, and she said who it was from,    06:02:24
11    and --                                  06:02:27
12         Q.    Mr. State, I don't mean to cut   06:02:28
13    you off.                                06:02:30
14         A.    Yes.                         06:02:30
15         Q.    I just want to try to get    06:02:31
16    everyone out of here, but after you    06:02:32
17    received this letter did you have any   06:02:34
18    conversations about it?                 06:02:35
19         A.    I am trying to piece it together   06:02:36
20    in my mind for you.                     06:02:37
21         Q.    Okay.                        06:02:39
22         A.    So I know there was a back and   06:02:39
23    forth, and then eventually that was -- I   06:02:41
24    think this was delivered on the 15th,   06:02:44
25    which you could probably attest to.  It is   06:02:47
```

Page 372

1            STATE

2    dated the 15th.  On the 16th I spoke to        06:02:49

3    Paul Cutrone, and I was traveling, and he      06:02:52

4    said there is this letter from a firm, and     06:02:56

5    I said go ahead and open it because it was     06:03:00

6    addressed as confidential -- yes,              06:03:02

7    confidential.  And so I got it on the          06:03:05

8    16th, and I believe I forwarded it to          06:03:09

9    Simmons and Bagaria, and I -- it seems         06:03:12

10   like I had a conversation from an airport.     06:03:15

11   I think it was San Francisco with one or       06:03:19

12   both of those gentlemen that I received        06:03:22

13   this letter, and I was forwarding it to        06:03:24

14   them.                                          06:03:26

15       Q.    And what did you discuss with        06:03:26

16   these gentlemen?                               06:03:30

17       A.    I -- I don't -- I think they         06:03:31

18   just said we got this letter, and, you         06:03:36

19   know, we will have to see what to do with      06:03:38

20   it.  I don't recall even reading this          06:03:40

21   letter until I was able to open it,            06:03:42

22   download it and review it.                     06:03:45

23       Q.    Did you have multiple                06:03:46

24   conversations with Bagaria or Simmons?         06:03:48

25       A.    I don't think so.  It was -- it      06:03:54

Page 373

1              STATE

2    would have been primarily with Simmons.      06:03:58

3    Simmons had been directed I believe by the   06:04:00

4    group to kind of represent Apollo and Code    06:04:04

5    in this.                                       06:04:08

6       Q.    And did you say that you had         06:04:08

7    this conversation on the 16th of November?    06:04:10

8       A.    Yes, I believe it was on the         06:04:13

9    16th.  If you notice I -- I got this at 3     06:04:15

10   in the afternoon, which would have been on    06:04:20

11   the west coast I think, and -- or I sent      06:04:22

12   it at 3 in the afternoon, so it would have    06:04:26

13   been late afternoon, and -- and then a        06:04:29

14   discussion would have taken place I am         06:04:33

15   sure after that.                               06:04:34

16      Q.    Okay.  Now, did there come a         06:04:35

17   time when Mr. Fried was notified that he      06:04:37

18   was being terminated as an employee?          06:04:40

19      A.    Yes, I believe so.                    06:04:42

20      Q.    Do you recall when that was?         06:04:46

21      A.    No.                                   06:04:48

22      Q.    Handing you a document that has      06:04:50

23   been previously marked as Plaintiff's         06:05:04

24   Exhibit 11, take a look at the document       06:05:06

25   and let me know if you've seen it before.     06:05:08

Page 374

```
  1                    STATE
  2            (Document handed to witness.)    06:05:08
  3            (Pause.)                         06:05:11
  4     A.    I -- I am familiar with the text  06:05:19
  5   of this.  I think I may have seen a draft. 06:05:21
  6   I don't know if I saw that letter.        06:05:23
  7     Q.    Okay.  Do you know when this       06:05:25
  8   letter was sent to Mr. Fried?             06:05:26
  9     A.    I am assuming the 16th of          06:05:28
 10   November, but I'm not certain about that. 06:05:31
 11     Q.    And do you know if this was        06:05:32
 12   before or after you had that conversation 06:05:34
 13   with Mr. Bagaria or Mr. Simmons?          06:05:36
 14     A.    I -- I believe this letter was     06:05:41
 15   drafted on the 14th or 15th.  I couldn't  06:05:43
 16   know when it went out on the 16th.  I -- I 06:05:48
 17   didn't send it, so I don't know.          06:05:50
 18     Q.    And when was it decided that Mr.   06:05:52
 19   Fried's employment would terminate?       06:05:54
 20     A.    You have to ask Simmons.           06:05:56
 21   I -- that was not a decision I was        06:06:02
 22   directly involved with.                   06:06:04
 23     Q.    You didn't make the decision to    06:06:05
 24   terminate Mr. Freed?                      06:06:07
 25     A.    No.                                06:06:08
```

# EXHIBIT K


| | |
|---|---|
| **From:** | Fried, Burton <bfried@lvi.com> |
| **Sent:** | Sunday, October 3, 2010 7:58 PM |
| **To:** | State, Scott <SState@lviservices.com> |
| **Subject:** | Re: Chief Information Officer Position Spec |

Scott:

Appreciate your sharing with me the reasons you have suspended the search for a CIO. I initiated the recruitment.  Believe it appropriate that you receive my views on all CEO transitional issues including a HR and CIO position before you reach a decision to suspend recruitment efforts that I initiated. It was not Paul's decision to recruit a CIO...it was mine and partially because he failed to upgrade the position held by our current IT Director notwithstanding complaints about his performance from me and other senior managers. Yet you talk to him and terminate the process I began without even listening to my views on the subject.  An act incomprehensible to me.

Your decision without the benefit of all my views on Greg Meyer before reaching a decision on the replacement of Greg Meyer is an another example of a CEO transitional issue. We began the process
of replacing Greg's efforts with Scott LeBuy who has been writing LVI proposals for DOE work under the direction of Tom Gilmore.   Scott is in the process of being replaced as PM on our Y12 project to handle this additional role; will cost us 40% less than Greg for these services; and his work product is excellent.

Bob McNamara sought my input during his CEO transition on all matters of historical significance.  LVI benefited from our communications which in each instance resulted in Bob making the ultimate and final decision but after the benefit of my views based upon my LVI history as CEO.....Whether I agreed with it or not I supported all of his decisions. Bob valued my input and I expected the same working relationship with you.

Important to me that I understand your views and ask that you share them with me so I can understand your management philosophy and technique going forward.

Burt
--------------------------------
Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

........................................................................................................................................................................

**From:** Scott State [sstate@lviservices.com]
**Sent:** 10/03/2010 06:02 PM CST
**To:** Justin Cerilli <Justin.Cerilli@russellreynolds.com>
**Cc:** Burton Fried; Paul Cutrone; Shawn Banerji <Shawn.Banerji@russellreynolds.com>; Marcus Brauer <Marcus.Brauer@russellreynolds.com>
**Subject:** Re: Chief Information Officer Position Spec

Justin
Thanks for the email. I was in New York last week and had the opportunitiy to disucss this position with Paul. I will be evaluating the needs of the organization for the nextfew weeks and deciding on the

CONFIDENTIAL

Case 3:11-cv-01855-JBA   Document 50-10   Filed 04/27/12   Page 3 of 3

correct path forward. At this stage I would like to suspend any activty on a CIO search. I will advise you when we are prepared to discuss this further.
Thanks
Scott

On Sun, Oct 3, 2010 at 5:45 PM, Justin Cerilli <Justin.Cerilli@russellreynolds.com> wrote:
Hi Scott,
We are looking forward to working with you on the Chief Information Officer search. As requested from Burt, attached is the position specification for your review.
It would be great to get your insights on the role and your reaction to the position specification. Do you have availability this week to discuss? We can also discuss during our call on Thursday.
Regards,
Justin
Justin Cerilli
**Russell Reynolds Associates**
200 Park Avenue | 23rd floor | New York, NY 10166
P: 212-351-2519 | F: 212.351.2146 | www.russellreynolds.com
jcerilli@russellreynolds.com | http://www.russellreynolds.com/justin-cerilli
This e-mail may contain confidential information. If you are not the intended recipient, you should notify the sender and delete the e-mail and any attachments. All e-mails sent and received by members of Russell Reynolds Associates are scanned for viruses and may be monitored centrally.

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

# EXHIBIT L

| | |
|---|---|
| **From:** | BFried@lviservices.com |
| **Sent:** | Wednesday, October 13, 2010 12:02 PM |
| **To:** | State, Scott <SState@lviservices.com> |
| **Cc:** | Leonard, John <JohnLeonard@lviservices.com> |
| **Subject:** | Re: Fw: November Meeting |

Tedd has not been involved with Vision and Squibb. His only involvement has been to coordinate with Rob Syms the development of a marketing plan for the Alliance at my request. All serious communications with and concerning Vision has been between Les Squibb and me. Guaranty that Tedd will not have "any take" on Vision vs Squibb because his only involvement has been to receive a few sound bites from John Bell who is the BDM for Samir Ayoub, Vision's principal owner. John L. has even less involvement..... limited to and ended after our visit with Squibb in London.

LVI paid its own air fares on the trip to London. Vision paid for our hotel room for two nights and one dinner. Trust that Squibb will pay for its own travel. Given the history further delay in meeting with Squibb will deconstruct our relationship and opportunities with Squibb. An Agenda can be developed in a day or two.

To refuse my advice, knowledge and input as architect of this relationship and Alliance Agreement and to terminate my continued involvement with Squibb will undermine the LVI/Squibb relationship that has been developing between Les and me........very sensitive since the damage caused by Bob McNamara. Also, very strange that you seek advice from Tedd but none from me. But, it's your decision.


Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com


| | |
|---|---|
| From: | Scott State <scott.state@gmail.com> |
| To: | BFried@lviservices.com |
| Cc: | "Leonard, John" <jleonard@lviservices.com> |
| Date: | 10/13/2010 10:21 AM |
| Subject: | Re: Fw: November Meeting |


No meeting scheduled. I want a better idea on the agenda before we burn a

CONFIDENTIAL

bunch of time and money flying people to NY to meet them. John and I are
also trying to get Tedd to explain his take on Vision vs Squibb. Planning
a joint call from John and I to Squibb Friday morning when he and I are in
Denver office together.

On Wed, Oct 13, 2010 at 8:13 AM, <BFried@lviservices.com> wrote:
  Scott:

  Have you spoken with Les Squibb and scheduled the meeting?

  Burt

  Burton T. Fried
  Chairman
  LVI Services Inc.
  877 Post Road East
  Suite # 4
  Westport, CT 06880
  Phone: (203) 222-0584
  Fax: (203) 222-2227
  bfried@lviservices.com

| | |
|---|---|
| From: | Scott State <scott.state@gmail.com> |
| To: | BFried@lviservices.com |
| Date: | 10/13/2010 10:03 AM |
| Subject: | Re: Fw: November Meeting |

  Burt

  Believe this is in order. The email from Squibb is from last week, Tedd
  apparently just responded to it today with questions about BOEING. I
  will
  ask Tedd to make sure he copies me on anything that is an issue.

  Scott

  2010/10/13 <BFried@lviservices.com>

  FYI.. See below. You were not copied. Appears that Squibb is getting
  anxious about the scheduling of a meeting in NYC with
  LVI.......According
  to Squibb and unknown to me, Bob McNamara cancelled a number of
  scheduled
  initial meetings. During the period of time when Bob was planning to
  leave
  LVI. When I tried to revive with Squibb after Bob's departure Squibb
  initially was not interested in doing so. Hence, this may be the reason
  for

their current concern.

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

----- Forwarded by Burton Fried/New York/Lviservices on 10/13/2010 09:32 AM
----

From:     Tedd Southern/Philadelphia/Lviservices
To:       Robert Syms <robert@pgcspartnership.com>
Cc:       "BFried@lviservices.com" <BFried@lviservices.com>, 'Les Squibb'
          <les@squibbdemolition.co.uk>
Date:     10/13/2010 09:02 AM
Subject:  RE: November Meeting

Robert, good morning. I am continuing to work on the issues we had discuss
and was interested to know if you have made any progress on the same. Also
I realized you had requested some pre-qualification information from LVI
for the Boeing opportunity. I don't think I have seen any messages from you
regarding the type of information you require. If I have missed the request
can you please forward it to me once again.
Look forward to your reply

Tedd Southern
Vice President - Power Services Sector
LVI Environmental Services Inc.
1408 Juniper Street
Pottstown, Pa 19464
Cell Phone 610-310-1608
E-mail Address tsouthern@lviservices.com

LVI Services offer turnkey environmental contracting solutions including
Complete and Partial Facility Decommissioning and Demolition - Catastrophic
and Disaster Response - Asbestos and Lead Abatement -- Mold, Biological and
Chemical Decontamination - Fire and Water Restoration - Infection Control
for Healthcare - Nationwide 24-hour Emergency Response - Contact us

CONFIDENTIAL

about
pre-registered RAPID RESPONSE

From:      Robert Syms <robert@pgcspartnership.com>

To:        "'TSouthern@lviservices.com'" <TSouthern@lviservices.com>

Cc:        "BFried@lviservices.com" <BFried@lviservices.com>, 'Les
Squibb'
           <les@squibbdemolition.co.uk>

Date:      10/08/2010 08:08 AM

Subject:   RE: November Meeting

Good Morning Tedd

Further to my e-mail earlier in the week regarding our meeting in
November.
I would be much obliged if you could confirm, as soon as possible,
whether
or not 22nd and 23rd November is convenient for you and your team. My
aim
is to travel with the senior management of Squibb Demolition and to this
end I need to co-ordinate their diaries to ensure their attendance. To
clarify, those attending from our side are as follows:

Les Squibb - Chairman
Leslie Squibb - Managing Director
John Symons - Financial Director
Robert Syms - International Development Director

I look forward to hearing from you in due course.

Thanks and regards

Robert Syms B.Eng(Hons), MSc, FRSA
Managing Director

Tel:    0844 915 5000
Mob:    07912 733085
Email:     robert@pgcspartnership.com
Web:    www.pgcspartnership.co.uk/

CONFIDENTIAL

PLEASE NOTE THAT FROM 25th JANUARY OUR NEW ADDRESS IS:
62a RIVER ROAD
BARKING,
ESSEX.
IG11 0DS
This email, its content and any files transmitted with it are intended
solely for the addressee(s) and may be legally privileged and/or
confidential.
Access by any other party is unauthorised without the express written
permission of the sender. If you are not an addressee, you must not
disclose, copy, circulate or in another way.
If you have received this email in error, please destroy it and contact
the
sender via e-mail return. This email has been prepared using information
believed by the author to be reliable and accurate.
PGCS Partnership makes no warranty as to accuracy or completeness.
It is the recipient's responsibility to ensure that this e-mail and any
attachments are free of viruses. PGCS Partnership takes no
responsibility
for any computer virus that might be transferred by way of this e-mail.
☐ Please consider your environmental responsibility - think before you
print!!


-----Original Message-----
From: Robert Syms
Sent: 06 October 2010 14:12
To: 'TSouthern@lviservices.com'
Subject: RE: October meeting


Hi Tedd


Les Squibb recently spoke to Burt regarding an opportunity with Boeing
in
the US. Burt was happy for Squibb to lead the pre-qualification process
but
in order for us to fully complete the required information we will need
information about LVI. To this end can you please let me have the name
of
the person we should liaise with to obtain such information.


Many thanks


Robert Syms B.Eng(Hons), MSc, FRSA
Managing Director



Tel:      0844 915 5000
Mob:    07912 733085
Email:      robert@pgcspartnership.com
Web:      www.pgcspartnership.co.uk/

CONFIDENTIAL

LVI 000455

PLEASE NOTE THAT FROM 25th JANUARY OUR NEW ADDRESS IS:
62a RIVER ROAD
BARKING,
ESSEX.
IG11 0DS
This email, its content and any files transmitted with it are intended
solely for the addressee(s) and may be legally privileged and/or
confidential.
Access by any other party is unauthorised without the express written
permission of the sender. If you are not an addressee, you must not
disclose, copy, circulate or in another way.
If you have received this email in error, please destroy it and contact
the
sender via e-mail return. This email has been prepared using information
believed by the author to be reliable and accurate.
PGCS Partnership makes no warranty as to accuracy or completeness.
It is the recipient's responsibility to ensure that this e-mail and any
attachments are free of viruses. PGCS Partnership takes no
responsibility
for any computer virus that might be transferred by way of this e-mail.
□ Please consider your environmental responsibility - think before you
print!


-----Original Message-----
From: TSouthern@lviservices.com [mailto:TSouthern@lviservices.com]
Sent: 05 October 2010 02:37
To: robert@pgcspartnership.comamcgahan
Cc: SState@lviservices.com
Subject: October meeting


Folks,
I have informed our Senior Management of the scheduled dates of October
18,
and 19 for our meeting in Westport Connecticut, and the consensus is
that
this date is not accommodating for most due to corporate obligations. I
suggest that at this juncture , mid November might be the best
timeframe.
We will keep in touch as to the more appropriate date for the meeting. I
would however, like to continue the effort in developing the strategies
we
have discuss during the conference call today. Those ideas would include
key selling points for the team, target markets, service line
identification and a list of clients for examination as common clients.
Thanks for everyone's understanding and we will remain in close
communication.

Tedd Southern
Vice President - Power Services Sector
LVI Environmental Services Inc.
1408 Juniper Street

CONFIDENTIAL

Pottstown, Pa 19464
Cell Phone 610-310-1608
E-mail Address tsouthern@lviservices.com

LVI Services offer turnkey environmental contracting solutions including
Complete and Partial Facility Decommissioning and Demolition -
Catastrophic
and Disaster Response - Asbestos and Lead Abatement -- Mold, Biological
and
Chemical Decontamination - Fire and Water Restoration - Infection
Control
for Healthcare - Nationwide 24-hour Emergency Response - Contact us
about
pre-registered RAPID RESPONSE

Confidentiality Note: This e-mail, and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this
e-mail
is not the intended recipient, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that
reading it is strictly prohibited. If you have received this e-mail in
error, please immediately return it to the sender and delete it from
your
system. Thank you.

Confidentiality Note: This e-mail, and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this
e-mail
is not the intended recipient, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that
reading it is strictly prohibited. If you have received this e-mail in
error, please immediately return it to the sender and delete it from
your
system. Thank you.

Confidentiality Note: This e-mail, and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this e-mail
is not the intended recipient, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that
reading it is strictly prohibited. If you have received this e-mail in
error, please immediately return it to the sender and delete it from your
system. Thank you.

CONFIDENTIAL

LVI 000457

# EXHIBIT M

**A-163**

Case 3:11-cv-01855-JBA   Document 50-12   Filed 04/27/12   Page 2 of 3

| | |
|---|---|
| From: | Hogan, Robert <rhogan@code, hennessy & simmons inc..com> |
| Sent: | Sunday, October 3, 2010 9:01 PM |
| To: | Simmons, Brian P. <BSimmons@chsonline.com> |
| Subject: | Fw: Fwd: Chief Information Officer Position Spec |

---

Robert Hogan
Principal
CHS | Capital LLC
10 South Wacker Drive
Suite 3175
Chicago, IL 60606
312.876.2679 (work)
312.876.3854 (fax)
630.235.5338 (cell)

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

From: Scott State [mailto:sstate@lviservices.com]
Sent: Sunday, October 03, 2010 08:55 PM
To: Hogan, Robert
Subject: Fwd: Chief Information Officer Position Spec

Rob

Didn't take long for Burt to weigh in. I expect this to happen everytime I make a move without consulting him, exactly the issue I had prior to accepting the job.

While Burt would have liked me to ask his opinion, I already knew it from all of the people I spoke to. Note that I merely told the recruiter to suspend the search, not terminate it. In any event, Burt seems to make the issue of needing a CIO due to Paul's lack of management skill. I would obviously prefer to address the root cause rather than spend money to work around it.

The relationship that Burt had with Bob is not one he will have with me. I will let Burt know tomorrow in a very nice way that I need to evaluate the business with input from all relevant
parties and to make my own decisions. Will see where that goes.

Not planning to give you the blow by blow of company operations, just sensitive to the nature of this needed leadership transition.

Scott

---------- Forwarded message ----------
From: <BFried@lviservices.com>
Date: Sun, Oct 3, 2010 at 6:57 PM
Subject: Re: Chief Information Officer Position Spec
To: SState@lviservices.com

Scott

Appreciate your sharing with me the reasons you have suspended the search for a CIO. I initiated the recruitment. Believe it appropriate that you receive my views on all CEO transitional issues including a HR and CIO position before you reach a decision to suspend recruitment efforts that I initiated. It was not Paul's decision to recruit a CIO...it was mine and partially because he failed to upgrade the position held by our current IT Director notwithstanding complaints about his performance from me and other senior managers. Yet you talk to him and terminate the process I began without even listening to my views on the subject. An act incomprehensible to me.

Your decision without the benefit of all my views on Greg Meyer before reaching a decision on the replacement of Greg Meyer is another example of a CEO transitional issue. We began the process of replacing Greg's efforts with Scott LeBuy who has been writing LVI proposals for DOE work under the direction of Tom Gilmore. Scott is in the process of being replaced as PM on our Y12 project to handle this additional role; will cost us 40% less than Greg for these services; and his work product is excellent.

Bob McNamara sought my input during his CEO transition on all matters of historical significance. LVI benefited from our communications which in each instance resulted in Bob making the ultimate and final decision but after the benefit of my views based upon my LVI history as CEO....Whether I agreed with it or not I supported all of his decisions. Bob valued my input and I expected the same working relationship with you.

Important to me that I understand your views and ask that you share them with me so I can understand your management philosophy and technique going forward.

Burt

Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

.................................................................................................................................................................

From: Scott State [sstate@lviservices.com]
Sent: 10/03/2010 06:02 PM CST
To: Justin Cerilli <Justin.Cerilli@russellreynolds.com>
Cc: Burton Fried; Paul Cutrone; Shawn Banerji <Shawn.Banerji@russellreynolds.com>; Marcus Brauer <Marcus.Brauer@russellreynolds.com>

Subject: Re: Chief Information Officer Position Spec

Justin

Thanks for the email. I was in New York last week and had the opportunity to discuss this position with Paul. I will be evaluating the needs of the organization for the next few weeks and deciding on the correct path forward. At this stage I would like to suspend any activity on a CIO search. I will advise you when we are prepared to discuss this further.

Thanks

LVIP 000672

Scott



On Sun, Oct 3, 2010 at 5:45 PM, Justin Cerilli <Justin.Cerilli@russellreynolds.com> wrote:

Hi Scott,

We are looking forward to working with you on the Chief Information Officer search. As requested from Burt, attached is the position specification for your review.

It would be great to get your insights on the role and your reaction to the position specification. Do you have availability this week to discuss? We can also discuss during our call on Thursday.

Regards,
Justin

Justin Cerilli
Russell Reynolds Associates
200 Park Avenue | 23rd floor | New York, NY 10166
P: 212-351-2519 | F: 212.351.2148 | www.russellreynolds.com
jcerilli@russellreynolds.com | http://www.russellreynolds.com/justin-cerilli

This e-mail may contain confidential information. If you are not the intended recipient, you should notify the sender and delete the e-mail and any

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the indiv

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individ

CONFIDENTIAL

# EXHIBIT N

| | |
|---|---|
| **From:** | Hogan, Robert <rhogan@code, hennessy & simmons inc..com> |
| **Sent:** | Tuesday, October 5, 2010 9:35 AM |
| **To:** | 'Scott State' <sstate@lviservices.com> |
| **Subject:** | RE: Transitional and Participation Matters |

By the way, I am working on your employment agreement and I should have that to you in the next day or two. I don't want anything in here to be a surprise, so I wanted to run two issues by you— (i) the severance, non-compete, and non-solicit, and (ii) the safety bonus.

In my experience at CHS, we have found common ground with CEO's on a severance package that matches the non-compete and non-solicit. We start the severance package at 12 months, but give the option to the Board/Company to add an additional 12 months. If an additional 12 months is added, the individual is paid for an additional 12 months and the non-compete and non-solicit are extended 12 months. I know you have had experience in this area, so I wanted to run it by you now to avoid any surprises when you get the document. Let me know what you think.

One other topic to highlight: the safety adjustment to the bonus. Rather than have the bonus adjustment be a cliff, where the bonus is adjusted 15% based on being minutely above or below the target, I thought it best to create a 10% "band" around the safety target. If you are at 95% to 105% of safety targets, there is no adjustment. If you are outside the band, there is an adjustment. I thought this was more reasonable, but I wanted to ask your opinion.

Let me know on these two points and I will get this document to you as soon as possible.

**Robert G. Hogan | Principal**
**CHS Capital LLC**
**10 South Wacker Drive, Suite 3175**
**Chicago, Illinois 60606**
**Phone 312.876.2679 | Fax 312.876.3854 | Cell 630.235.5338**
**rhogan@chsonline.com**

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient.
Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited.
If you are not the intended recipient, please contact the sender and delete all copies.

---

**From:** scott.state@gmail.com [mailto:scott.state@gmail.com] **On Behalf Of** Scott State
**Sent:** Tuesday, October 05, 2010 8:14 AM
**To:** Hogan, Robert
**Subject:** Fwd: Transitional and Participation Matters

Making progress with Burt.

Didn't you and/or Brian tell me that Burt was part time when Bob was around? I heard that from someone but apparently not the case. I will lay the ground work for an orderly transition with Burt and intend to have him available as needed for consultation or special assignments.

---------- Forwarded message ----------

CONFIDENTIAL

Case 3:11-cv-01855-JBA    Document 50-13    Filed 04/27/12    Page 3 of 3

From: <BFried@lviservices.com>
Date: Mon, Oct 4, 2010 at 3:01 PM
Subject: Transitional and Participation Matters
To: "Scott E. State" <sstate@lviservices.com>


Scott:

I have not been part time at LVI at anytime during the past 24 years. You
said earlier that CHS told you I was working part time. Surprised at their
comment and definitely not true.

But, I need to know what participation you would like from me going
forward. Let's discuss by phone or in a meeting before the Board meeting
next month.

Burt
---------------------------
Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information
intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the
intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are
hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately
return it to the sender and delete it from your system. Thank you.

CONFIDENTIAL

A-168

# EXHIBIT O

| | |
|---|---|
| **From:** | Fried, Burton <bfried@lvi.com> |
| **Sent:** | Thursday, October 14, 2010 10:01 AM |
| **To:** | State, Scott <SState@lviservices.com> |
| **Subject:** | RE: Schedule |

Okay. Expect it to end before 12 Noon (EDT).

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

From:  "State, Scott" <SState@lviservices.com>

To:   "Fried, Burton" <BFried@Notes.lvi.com>

Date:  10/14/2010 10:52 AM

Subject:    RE: Schedule

yes.  Can call you when your conf call wraps up if that works.

From: BFried@lviservices.com [BFried@lviservices.com]
Sent: Thursday, October 14, 2010 8:48 AM
To: sstate@
Subject: Schedule

You planned to speak with me today by phone and to meet with me at 1 PM on
Tuesday. Are both still on scheduled?

 Have a 11 AM conference call today but otherwise available.

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

CONFIDENTIAL



LVI 001435

# EXHIBIT P

**From:**     Fried, Burton <bfried@lvi.com>
**Sent:**     Thursday, October 14, 2010 12:56 PM
**To:**       State, Scott <SState@lviservices.com>
**Subject:**  Chairman - Areas of Responsibility
**Attach:**   CHAIRMAN.doc

Attached for your review and discussion on Tues 10/19.

<<...>>

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

CONFIDENTIAL

CHAIRMAN - AREAS OF RESPONSIBILITY

- Development and implementation of new business initiatives – Domestic and International – UK, Middle East, U.S., Latin America.......Squibb, Emcor Middle East, Harsco, LendLease
- Major Client /Major Project/Competitor Relationships – Turner, Tishman Construction, Yale, duel relationships with other LVI managers etc.
- LVI relationship manager with Surety (Arch) and Surety Agent (Ferrucci)
- Review all Requests for Bid Bond/Payment and Performance Bond Requests; Bonded Contracts and large Unbonded Contracts – Risk Assessment of scope, schedule, and difficulty.
- Select all outside counsel to represent LVI on legal matters.
- Manage at a senior level all LVI litigation and legal matters......contracts, corporate compliance ie: minutes, qualification to do business, corporate name changes, construction claims, collection matters, employment related claims and litigation, employment terminations, internal corporate investigations of violations of Business Code and Theft, regulatory compliance/environmental violation support, etc., supervise public agency/quasi-public agency review during prequalification process ie: NYS SCA, NYC Vendex Listings, Debarment etc.
- Resource for all historical LVI business, employee and legal matters.
- Review and approve of all LVI Offers of Employment.
- Negotiate all company acquisitions....both conventional and unconventional ie: Hudak.
- Monitor all employee air travel.
- Secure approvals from Surety of Bonding for Mentor/Protégé and Teaming Surety Bond Requirements.
- Review and approve all planned submissions of Prequalification submissions nationwide prepared at Westport office.
- Prepare, review and/or approve all LVI contracts and/or terms of agreements not in the ordinary course of business ie: non disclosure agreements, office/warehouse leases, mentor/protégé, teaming, alliance agreements, master service agreements.
- Prepare all LVI consulting agreements ie: sales, services etc.
- Coordinate all corporate public relations communications and website updates with LVI public relations firm.

10/14/10

LVI 001434

# EXHIBIT Q


| From: | Scott State <scott.state@gmail.com> |
|---|---|
| Sent: | Thursday, October 14, 2010 3:36 PM |
| To: | Simmons, Brian P. <bsimmons@chsonline.com>; Hogan, Robert <rhogan@chsonline.com> |
| Subject: | Chairman Duties |
| Attach: | CHAIRMAN.doc |

Gentlemen
☐
I have been going back and forth with Burt on who does what at LVI.☐ He has been pretty unhappy that I do not seek his counsel on almost everything and has expressed that view to me and a number of other members of senior management, all whom seem to be looking for new leadership and a new direction.☐ This morning I initiated a phone call to Burt to start a process that completely defines his future role with LVI.☐ My position was very clear that I would like his support in dealing with legacy issues such as litigation and claims and that other support would be as needed and requested by me.☐ I was clear to indicate that I expected no direct involvement in the day to day activities of LVI or business on ago forward basis.☐ Like most of my discussions with Burt on his continuing role he agreed.☐ We then slated a meeting to discuss this again next week in person while I am in NYC.☐ Burt said he had a list of what he believed his ongoing duties were already prepared and would send it to me.☐ Attached is that list.
☐
Here is my dilemma, after review of this list there is really only one bullet that pertains to the discussion I had with him 10 minutes earlier yet he somehow believes his view of his duties is consistent with my view.☐ I can't be more clear than I have been and I don't see spending $1MM / yr to have Burt reviewing air travel and BS administrative items.☐ My inclination is to go through this list with him and tell him that there is no reason that the Chairman of a Company would do any of these things.☐ That discussion will not go well.☐ It seems that Burt has a goal to remain active forever and these tasks he has latched on to were apparently supported by McNamera.☐
☐
I am OK making moves on a number of senior people that don't pull their weight and not looking to involve the investors in those decisions or actions.☐ With Burt I feel I must be more careful and seek your thoughts and counsel.
☐
Scott

CONFIDENTIAL

Case 3:11-cv-01855-JBA    Document 50-16    Filed 04/27/12    Page 3 of 3

CHAIRMAN - AREAS OF RESPONSIBILITY

- Development and implementation of new business initiatives – Domestic and International – UK, Middle East, U.S., Latin America.......Squibb, Emcor Middle East, Harsco, LendLease
- Major Client /Major Project/Competitor Relationships – Turner, Tishman Construction, Yale, duel relationships with other LVI managers etc.
- LVI relationship manager with Surety (Arch) and Surety Agent (Ferrucci)
- Review all Requests for Bid Bond/Payment and Performance Bond Requests; Bonded Contracts and large Unbonded Contracts – Risk Assessment of scope, schedule, and difficulty.
- Select all outside counsel to represent LVI on legal matters.
- Manage at a senior level all LVI litigation and legal matters......contracts, corporate compliance ie: minutes, qualification to do business, corporate name changes, construction claims, collection matters, employment related claims and litigation, employment terminations, internal corporate investigations of violations of Business Code and Theft, regulatory compliance/environmental violation support, etc., supervise public agency/quasi-public agency review during prequalification process ie: NYS SCA, NYC Vendex Listings, Debarment etc.
- Resource for all historical LVI business, employee and legal matters.
- Review and approve of all LVI Offers of Employment.
- Negotiate all company acquisitions....both conventional and unconventional ie: Hudak.
- Monitor all employee air travel.
- Secure approvals from Surety of Bonding for Mentor/Protégé and Teaming Surety Bond Requirements.
- Review and approve all planned submissions of Prequalification submissions nationwide prepared at Westport office.
- Prepare, review and/or approve all LVI contracts and/or terms of agreements not in the ordinary course of business ie: non disclosure agreements, office/warehouse leases, mentor/protégé, teaming, alliance agreements, master service agreements.
- Prepare all LVI consulting agreements ie: sales, services etc.
- Coordinate all corporate public relations communications and website updates with LVI public relations firm.

10/14/10

CONFIDENTIAL

# EXHIBIT R


A-177

| | |
|---|---|
| **From:** | Scott State <scott.state@gmail.com> |
| **Sent:** | Tuesday, October 19, 2010 5:00 PM |
| **To:** | Simmons, Brian P. <BSimmons@chsonline.com> |
| **Cc:** | Hogan, Robert <Rhogan@chsonline.com> |
| **Subject:** | Re: Chairman Duties |

Brian

Spent 3 hours with Burt today. He came to me with an expanded list of duties and proceeded to explain how he is uniquely qualified to do each task. He told me that he would like to work for LVI as long as he is able, be paid $600K / yr to work 4 days a week, and that it would be a great loss to the Company if he were not involved. I was clear with him that it was my objective to have him truly retire and be just an on call resource. He countered that that would be a huge mistake, the business would suffer, and he would apply his skills elsewhere (not sure if he was suggesting he would compete). He also said the Board, other than CHS, would not support such a decision. He continues to claim that Apollo and Falcon are in his pocket.

It is clear that Burt believes that he is irreplaceable and he would like to be involved forever. The management team is growing weary of his constant meddling in every aspect of the business and continued interference. The world is very different than Burt views it. My interactions have all been very professional and I sense no animosity toward me from Burt. He just simply wants to stay involved "the way Bob allowed him to" so he can make everything work better. It is a view that, in my opinion, is not conducive to success. He and I are already diverging on long term strategy and opportunities for growth as well as how to run marketing, HR, accounting, and IT.

We should probably talk about how to handle this. His involvement is technically as a Board member so I am not sure what my say is in terms of his continued role at LVI. If he is asked by me to depart he will not go out without a fight and some broken glass although he did say at one point that if I were so short sighted to request that he would comply.

Scott

On Tue, Oct 19, 2010 at 1:58 PM, Simmons, Brian P. <BSimmons@chsonline.com> wrote:

> Scott - obviously this is unworkable. How would you like to use Burt? Legal? Collections? I am happy to bear the brunt of the noise on this I would like to be specific with him as to what works for the Board - i.e what works for you. Let me know.
>
> **Brian P. Simmons | Managing Partner**
> **CHS Capital LLC**
> **10 South Wacker Drive, Suite 3175**
> **Chicago, Illinois 60606**
> **Phone 312.876.1980 | Fax 312.876.3854**
> **Cell 312.804.0138**
> **bsimmons@chsonline.com**
> **www.chsonline.com**

**From:** Scott State [mailto:scott.state@gmail.com]
**Sent:** Thursday, October 14, 2010 3:36 PM

**To:** Simmons, Brian P.; Hogan, Robert
**Subject:** Chairman Duties

CONFIDENTIAL

Gentlemen

I have been going back and forth with Burt on who does what at LVI. He has been pretty unhappy that I do not seek his counsel on almost everything and has expressed that view to me and a number of other members of senior management, all whom seem to be looking for new leadership and a new direction. This morning I initiated a phone call to Burt to start a process that completely defines his future role with LVI. My position was very clear that I would like his support in dealing with legacy issues such as litigation and claims and that other support would be as needed and requested by me. I was clear to indicate that I expected no direct involvement in the day to day activities of LVI or business on ago forward basis. Like most of my discussions with Burt on his continuing role he agreed. We then slated a meeting to discuss this again next week in person while I am in NYC. Burt said he had a list of what he believed his ongoing duties were already prepared and would send it to me. Attached is that list.

Here is my dilemma, after review of this list there is really only one bullet that pertains to the discussion I had with him 10 minutes earlier yet he somehow believes his view of his duties is consistent with my view. I can't be more clear than I have been and I don't see spending $1MM / yr to have Burt reviewing air travel and BS administrative items. My inclination is to go through this list with him and tell him that there is no reason that the Chairman of a Company would do any of these things. That discussion will not go well. It seems that Burt has a goal to remain active forever and these tasks he has latched on to were apparently supported by McNamera.

I am OK making moves on a number of senior people that don't pull their weight and not looking to involve the investors in those decisions or actions. With Burt I feel I must be more careful and seek your thoughts and counsel.

Scott

CONFIDENTIAL

# EXHIBIT S

| | |
|---|---|
| **From:** | Fried, Burton <bfried@lvi.com> |
| **Sent:** | Thursday, October 28, 2010 5:26 AM |
| **To:** | Brian Simmons <BSimmons@chsonline.com> |
| **Subject:** | Chairman -Areas of Responsibilities |
| **Attach:** | CHAIRMAN.doc |

Brian:   List I developed and delivered to Scott at our meeting on Tuesday 10/19 is attached...........Burt

<<...>>

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

CONFIDENTIAL

LVI 001424

A-181

CHAIRMAN - AREAS OF RESPONSIBILITY

- Development and implementation of new business initiatives – Domestic and International – UK, Middle East, U.S., Latin America.......Squibb, Emcor Middle East, Harsco, LendLease
- Major Client /Major Project/Competitor Relationships – Turner, Tishman Construction, Yale, duel relationships with other LVI managers etc.
- LVI relationship manager with Surety (Arch) and Surety Agent (Ferrucci)
- Review all Requests for Bid Bond/Payment and Performance Bond Requests; Bonded Contracts and large Unbonded Contracts – Risk Assessment of scope, schedule, and difficulty.
- Select all outside counsel to represent LVI on legal matters.
- Manage at a senior level all LVI litigation and legal matters......contracts, corporate compliance ie: minutes, qualification to do business, corporate name changes, construction claims, collection matters, employment related claims and litigation, employment terminations, internal corporate investigations of violations of Business Code and Theft, regulatory compliance/environmental violation support, etc., supervise public agency/quasi-public agency review during prequalification process ie: NYS SCA, NYC Vendex Listings, Debarment etc.
- Resource to Greg DiCarlo for legal consultation on all unusual LVI legal matters or difficult project contract provisions.
- Resource for all historical LVI business, employee and legal matters.
- Review and approve of all LVI Offers of Employment.
- Negotiate all company acquisitions....both conventional and unconventional ie: Hudak.
- Monitor all employee air travel for compliance with LVI policies.
- Secure approvals from Surety of Bonding for Mentor/Protégé and Teaming Surety Bond Requirements.
- Review and approve all planned submissions of Prequalification submissions nationwide prepared at Westport office.
- Prepare, review and/or approve all LVI contracts and/or terms of agreements not in the ordinary course of business ie: non disclosure agreements, office/warehouse leases, mentor/protégé, teaming, alliance agreements, master service agreements.
- Prepare all LVI consulting agreements ie: sales, services etc.
- Coordinate all corporate public relations communications and website updates with LVI public relations firm.
- Daily review, selection and distribution of nationwide non-federal public bid opportunities.

10/19/10

LVI 001425

# EXHIBIT T

| From: | Simmons, Brian P. <bsimmons@code, hennessy & simmons inc..com> |
|---|---|
| Sent: | Tuesday, November 2, 2010 2:05 PM |
| To: | 'BFried@lviservices.com' |
| Cc: | Rajay Bagaria <RBagaria@apolloic.com>; John Schnabel <JSchnabel@falconinvestments.com>; Hogan, Robert <Rhogan@chsonline.com>; Hennessy, Daniel J. <djhennessy@chsonline.com>; Lester, Laura <LLester@chsonline.com>; jnsmith@sidley.com |
| Bcc: | Scott State <sstate@lviservices.com> |
| Subject: | RE: Chairman -Areas of Responsibilities |
| Attach: | CHAIRMAN.doc |

Burt - I have read this a couple of times and given it a fair amount of thought; I have also spoken briefly with Falcon and Apollo, I keep coming back to the same conclusion: Your list is much more expansive that what I envisioned for your duties as Chairman after we hired a new CEO. The outline you provided for Chairman's duties does not seem consistent with the sentiments you have expressed to me over several years regarding your intent when we hired Bob and now Scott to be CEO. I think everyone on the Board expected a typical transition of leadership and responsibility to Scott as he assumed the CEO position. He was not hired as COO with a reporting arrangement to you. I expect that we will discuss all this in person but felt I owed you a candid message as my thoughts on all this became clear to me.

I have had the opportunity to get a few updates from Scott on the CEO transition and his plans for moving LVI forward. It seems that he has settled in well and is making the rounds to all of the offices. It appears that your recommendation to hire Scott was spot on. I am of the opinion that we need to transition all of your day-to-day activities to Scott and other members of the management team. It is my hope that you continue as Chairman of the board in a non-executive capacity and act as on call resource for Scott. I think that everyone on the Board believes that for the long term success of the organization we need our managers to step up and take on added responsibility. I do not believe that there should be any required interaction by Scott's direct reports with you. If there are areas of the business or specific situations where Scot wants your direct involvement then that is fine with me - but it should be up to Scott. I do hope that you will continue to be involved on the Board. Your perspective and history with the company is of obvious value and I would prefer not to loose you as a resource.

We can discuss this in a closed session at the upcoming Board meeting if you wish. You should hear from everyone how they envision your role going forward. It is my objective to complete this transition of duties as soon as practical. I have told Scott this is my desire and he believes that the management team will embrace this decision. Scott has committed to work to create a seamless transition. I would like to replace your existing employment arrangement with a consulting agreement that compensates you for the services you will continue to provide and also as Chairman of the Board.

While I realize that this may not be the most desirable future role for you to have with LVI, I believe it is the most appropriate and in the best interests of the management team, company, and shareholders. Based on my discussions, I believe the Board feels that we need to empower the entire management group. While the team has relied on you for advice and counsel for many years, they must now take on true ownership of daily challenges, be asked to produce results on their own, and be evaluated based upon the outcome.

Please give me a call if you want to discuss and let me know if you desire a closed Board session on November 4th.


Brian


Brian P. Simmons | Managing Partner
CHS Capital LLC

10 South Wacker Drive, Suite 3175

Chicago, Illinois 60606

Phone 312.876.1980 | Fax 312.876.3854

CONFIDENTIAL

Cell 312.804.0138

bsimmons@chsonline.com

www.chsonline.com

-----Original Message-----
From: BFried@lviservices.com [mailto:BFried@lviservices.com]
Sent: Thursday, October 28, 2010 5:26 AM
To: Simmons, Brian P.
Subject: Chairman -Areas of Responsibilities

Brian:   List I developed and delivered to Scott at our meeting on Tuesday
10/19 is attached...........Burt

(See attached file: CHAIRMAN.doc)

Burton T. Fried
Chairman
L VI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use
of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received
this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

CHAIRMAN - AREAS OF RESPONSIBILITY

- Development and implementation of new business initiatives – Domestic and International – UK, Middle East, U.S., Latin America.......Squibb, Emcor Middle East, Harsco, LendLease
- Major Client /Major Project/Competitor Relationships – Turner, Tishman Construction, Yale, duel relationships with other LVI managers etc.
- LVI relationship manager with Surety (Arch) and Surety Agent (Ferrucci)
- Review all Requests for Bid Bond/Payment and Performance Bond Requests; Bonded Contracts and large Unbonded Contracts – Risk Assessment of scope, schedule, and difficulty.
- Select all outside counsel to represent LVI on legal matters.
- Manage at a senior level all LVI litigation and legal matters......contracts, corporate compliance ie: minutes, qualification to do business, corporate name changes, construction claims, collection matters, employment related claims and litigation, employment terminations, internal corporate investigations of violations of Business Code and Theft, regulatory compliance/environmental violation support, etc., supervise public agency/quasi-public agency review during prequalification process ie: NYS SCA, NYC Vendex Listings, Debarment etc.
- Resource to Greg DiCarlo for legal consultation on all unusual LVI legal matters or difficult project contract provisions.
- Resource for all historical LVI business, employee and legal matters.
- Review and approve of all LVI Offers of Employment.
- Negotiate all company acquisitions....both conventional and unconventional ie: Hudak.
- Monitor all employee air travel for compliance with LVI policies.
- Secure approvals from Surety of Bonding for Mentor/Protégé and Teaming Surety Bond Requirements.
- Review and approve all planned submissions of Prequalification submissions nationwide prepared at Westport office.
- Prepare, review and/or approve all LVI contracts and/or terms of agreements not in the ordinary course of business ie: non disclosure agreements, office/warehouse leases, mentor/protégé, teaming, alliance agreements, master service agreements.
- Prepare all LVI consulting agreements ie: sales, services etc.
- Coordinate all corporate public relations communications and website updates with LVI public relations firm.
- Daily review, selection and distribution of nationwide non-federal public bid opportunities.

10/19/10

CONFIDENTIAL

# EXHIBIT U

| | |
|---|---|
| **From:** | Burton Fried |
| **Sent:** | Friday, June 23, 2006 10:22 AM |
| **To:** | Simmons, Brian P. <BSimmons@chsonline.com> |
| **Subject:** | RE: McNamara Release |
| **Attach:** | McNamara Announcement (5).doc |

I may look 67......but I am really a young 66.


Burton T. Fried
President
LVI Services Inc.
80 Broad Street
3rd Floor
New York, NY 10004
Phone: (212) 951-3661
Fax: (212) 951-8920
bfried@lviservices.com


"Simmons, Brian P." <BSimmons@chsonline.com>
06/23/2006 09:57 AM

To: <bfried@lviservices.com>
cc: "Brown, Steven R." <SBrown@chsonline.com>, "Hogan, Robert"
<Rhogan@chsonline.com>
Subject: RE: McNamara Release

See my comments. Use as you wish. FYI, I didn't realize you were only
66 - I thought it was 67. Had I known we would not have allowed you to
"retire".

-----Original Message-----
From: bfried@lviservices.com [mailto:bfried@lviservices.com]
Sent: Thursday, June 22, 2006 2:15 PM
To: Simmons, Brian P.
Cc: Brown, Steven R.; Hogan, Robert
Subject: McNamara Release


Attached is a Press Release drafted to announce Bob McNamara joining LVI
as it's President and CEO. Please advise if okay with you. I will then
deliver it to Bob for his approval.


Burton T. Fried


CONFIDENTIAL                                                    LVI 001928

President
LVI Services Inc.
80 Broad Street
3rd Floor
New York, NY 10004
Phone: (212) 951-3661
Fax: (212) 951-8920
bfried@lviservices.com

_____(See attached file: McNamara Announcement (5).doc)

_____

Scanned by IBM Email Security Management Services powered by
MessageLabs. For more information please visit http://www.ers.ibm.com

_____

Scanned by IBM Email Security Management Services powered by MessageLabs. For
more information please visit http://www.ers.ibm.com

CONFIDENTIAL

LVI 001929

A-189

# EXHIBIT V

| From: | Burton Fried |
|---|---|
| Sent: | Thursday, June 30, 2005 6:57 AM |
| To: | Mike D Lane |
| Subject: | Re: LUT 1 |

With you on vacation how can an old man like me sleep. Have a wonderful time with your family and try not to think about me.

---------------------------

Sent from my BlackBerry Wireless Handheld

   From: Mike D Lane
   Sent: 06/30/2005 06:34 AM
   To: Burton Fried/New York/Lviservices@Lviservices
   Subject: Re: LUT 1

You up early this morning.  A man of your age needs his sleep.  Getting ready to leave for New Mexico call me if you need anything.

Mike D. Lane
Chief Operating Officer
LVI Services Inc.
12720 South Highway 475
Ocala, FL 34480
Phone:   (352) 307-5800
Cell:      (352) 572-8789
Fax:      (212) 951-8928

CONFIDENTIAL

A-191

# EXHIBIT W



---

From: Simmons, Brian P. <BSimmons@chsonline.com>
Sent: Wednesday, November 10, 2010 3:27 PM
To: State, Scott <SState@lviservices.com>; 'RBagaria@apolloic.com'
Subject: Re: Business Opportunities

I spoke to Schnabel yesterday. We are all on the same page. He was going to follow up and get back to me. I will let you know as soon as I hear anything and we will go from there.

Brian P. Simmons
Managing Partner
CHS | Capital LLC
10 South Wacker Drive
STE 3175
Chicago, IL 60606
312.876.1980

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

From: State, Scott [mailto:SState@lviservices.com]
Sent: Wednesday, November 10, 2010 02:08 PM
To: Simmons, Brian P.; RBagaria@apolloic.com <RBagaria@apolloic.com>
Subject: FW: Business Opportunities

Any movement?  Just got email below, all opportunities either in negotiation, not a good fit, or we are going with someone other than Boris based on conclusion they can't win.

From: Fried, Burton
Sent: Wednesday, November 10, 2010 12:51 PM
To: Leonard, John; State, Scott
Subject: Business Opportunities

You have not been utilizing me for the past several weeks to secure work for LVI through my relationships which have been developed over many years. One of my roles during my career at LVI has been to help secure business. Whether it's a $3 million Change Order from Balfour Beatty or helping to be offered and to secure the $27 million Madison Square Garden project with Turner even though we were not the low bidder. Following are multi-million project opportunities that you have not or will not use me as a complement to your efforts and thereby fail to increase the opportunity for project awards for LVI.

- Bid for the Jet Blue project with Turner. Negotiation was between Peter D., our NJ branch manager, and a buyer at Turner. No help was requested of me. If it was, I would be speaking with Vince Massucci, who is head of purchasing at Turner with whom I have a relationship to advocate our position and bid. Since the project has been bid it may be too late.
- Bid to Boris next week to demo Macy's at the King of Prussia Mall. Who at LVI has a closer relationship with Bob McNamara (who told me about the project many weeks ago) and is the ultimate decision maker?
- Delta Terminal at JFK - Significant demo work (over $70 million) in a number of projects to be bid and awarded within the next few months. Expect the CM contract will be awarded shortly. I enjoy a very close relationship with the decision maker of the company that expects the award.

Account management relationships differentiates us from others. Without that LVI is just another commodity where price decides a win or loss. Everyone has names in their rolodex. But, who has the relationship with the decision maker with the best chance of securing the award for LVI?

If you know about the next item better to learn about it twice than not at all. Louisiana State University Medical Center in New Orleans plans to demo two square blocks for new construction. The total project cost which includes new construction will be $1 billion and it is fully funded. Glenn Smith could be a great deal of help in securing the demo project for LVI.

I am relegated to writing to you for reasons that are obvious.

But

Burton T. Fried
Chairman
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone. (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individ

A-193

# EXHIBIT X

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  No. 10 Civ. 9308(JSR)

5  ----------------------------------------x

6  BURTON T. FRIED,

7                           Plaintiff,

8           - against -

9  LVI SERVICES, INC., LVI PARENT CORP., CODE

10  HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11  EQUITY V LP; APOLLO INVESTMENT CORP.,

12  SCOTT E. STATE, in his official and

13  individual capacities; BRIAN SIMMONS, in

14  his official and individual capacities;

15  RAJAY BAGARIA, in his official and

16  individual capacities; GERALD J. GIRARDI,

17  in his official and individual capacities,

18                           Defendants.

19  ----------------------------------------x

20                           May 25, 2011
                             11:10 a.m.

21

22

23

24

25

Page 2

1

2

3

4             VIDEOTAPE DEPOSITION of BRIAN

5     SIMMONS, taken by the Plaintiff, pursuant

6     to Notice, held at the offices of Thompson

7     Wigdor & Gilly, LLP, 85 Fifth Avenue, New

8     York, New York, before Debbie Zaromatidis,

9     a Shorthand Reporter and Notary Public of

10    the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                Page 89
 1                    SIMMONS
 2    your attention to Plaintiff's Exhibit 4.    12:47:07
 3         A.    Okay.                            12:47:09
 4         Q.    Did you ever have any            12:47:14
 5    conversations with Mr. State about the      12:47:15
 6    content of this e-mail?                     12:47:17
 7         A.    Specifically about the content   12:47:21
 8    of this e-mail, I don't remember.           12:47:22
 9         Q.    Did you ever have any            12:47:24
10    conversations with Mr. State about Mr.      12:47:25
11    Fried's -- about Mr. Fried?                 12:47:26
12         A.    Yes.                             12:47:29
13         Q.    And did you have a conversation  12:47:29
14    with Mr. State about Burt Fried -- about    12:47:36
15    their ability to work with each other?      12:47:42
16         A.    Yes.                             12:47:43
17         Q.    Okay.  And can you tell me about 12:47:44
18    those discussions?                          12:47:46
19         A.    Mr. State expressed his -- his   12:47:47
20    concern regarding Mr. Fried's actions       12:47:52
21    interfering with his role as chief          12:47:57
22    executive officer.                          12:47:59
23         Q.    And what actions were those?     12:48:01
24         A.    Retaining or attempting to       12:48:03
25    retain decision-making authority for        12:48:09
```

```
                                          Page 90
 1                    SIMMONS
 2   various aspects of company business and     12:48:12
 3   conducting discussions with employees that  12:48:17
 4   either countermanded or confused the        12:48:22
 5   direction and decisions which Mr. State     12:48:28
 6   wished to implement.                        12:48:31
 7        Q.    Now, can you give me an example  12:48:32
 8   of instances that Mr. Fried attempted to    12:48:40
 9   retain decision making authority?           12:48:43
10        A.    In general, Mr. State was not    12:48:45
11   specific, and the details were not          12:48:55
12   relevant to the decisions we had to make    12:48:56
13   as a board of directors.  The issue was     12:49:00
14   that Mr. State needed to be in a position   12:49:02
15   to organize the affairs of the company and  12:49:05
16   the management team in the way he chose      12:49:07
17   and that Mr. Fried was interfering with     12:49:12
18   that function.  It didn't really matter     12:49:14
19   all that much on -- on what basis he was    12:49:16
20   interfering.                                12:49:20
21        Q.    It didn't matter to you?         12:49:20
22        A.    It didn't matter to the board.   12:49:22
23   What matters is that Mr. State be in a      12:49:24
24   position to lead the company               12:49:26
25   unambiguously.                              12:49:30
```

Page 91

1                    SIMMONS

2       Q.    And can you give me an example    12:49:31

3   of discussions Mr. Fried had with any      12:49:32

4   employees that countermanded Mr. State's   12:49:35

5   directions?                                 12:49:37

6       A.    You would have to ask Mr. State. 12:49:38

7   He would be a much better source of those  12:49:42

8   details.  I am unable to --                 12:49:44

9       Q.    Did you have a discussion with    12:49:46

10  him about this?                             12:49:48

11      A.    We had nonspecific discussions    12:49:48

12  about -- about Mr. Fried interfering in     12:49:50

13  Mr. State's activities as chief executive   12:49:51

14  officer.                                    12:49:55

15      Q.    And did you ever have a           12:49:55

16  discussion with Mr. Fried about these       12:49:56

17  issues?                                     12:49:58

18      A.    Yes.                              12:49:58

19      Q.    How many times?                   12:49:59

20      A.    I don't recall but at least       12:49:59

21  once.                                       12:50:03

22      Q.    When?                             12:50:03

23      A.    I don't recall, but it would      12:50:04

24  have been between the time Mr. State        12:50:06

25  joined the company and the final board      12:50:08

Page 92

```
 1              , SIMMONS
 2   meeting Mr. Fried attended.              12:50:09
 3       Q.    And what did you and Mr. Fried 12:50:11
 4   discuss?                                 12:50:12
 5       A.    I told Mr. Fried that his      12:50:13
 6   interference with Mr. State's activities 12:50:15
 7   as chief executive officer had to be     12:50:19
 8   resolved and whether the board would be  12:50:20
 9   authorized to make a choice between Mr.  12:50:23
10   Fried and Mr. State, and I told Mr. Fried 12:50:25
11   unambiguously that the board would support 12:50:27
12   Mr. State.                               12:50:30
13       Q.    And did you ever ask Mr. Fried 12:50:31
14   if anything Mr. State was saying was true? 12:50:32
15       A.    I don't recall.               12:50:34
16       Q.    So you just took Mr. State's   12:50:37
17   word for it?                             12:50:39
18            MS. SELTZER:   Objection.       12:50:41
19       A.    Mr. Fried never expressed      12:50:41
20   any -- any concern that Mr. State's      12:50:43
21   statements were inaccurate.  They simply 12:50:46
22   had a disagreement over how the company  12:50:53
23   should be managed.                       12:50:55
24       Q.    How do you know that?          12:50:57
25       A.    Because Mr. Fried told me so,  12:50:58
```

```
                                        Page 107
 1                  SIMMONS
 2   inflammatory.  So in my estimation that      01:05:24
 3   qualifies as an outburst.                    01:05:26
 4        Q.    Now, did anyone else say          01:05:27
 5   anything about Mr. Fried's job duties or     01:05:29
 6   his role at LVI at this meeting in Mr.       01:05:31
 7   Fried -- Mr. State's presence?              01:05:38
 8             MS. SELTZER:   In Mr. State's or   01:05:41
 9   Mr. Fried's?                                01:05:42
10             MR. DATOO:   Both.                01:05:44
11        A.    I don't remember who was in the   01:05:44
12   -- which one of them was in the room when    01:05:46
13   these conversations took place.            01:05:49
14        Q.    Now, you mentioned that after    01:05:50
15   Mr. Fried spoke the board then had a        01:05:51
16   discussion, correct?                        01:05:56
17        A.    Correct.                         01:05:56
18        Q.    And what was discussed?          01:05:57
19        A.    Mr. Fried's outburst and the     01:05:59
20   appropriate response was discussed.         01:06:01
21        Q.    And what response was discussed?  01:06:04
22        A.    I think there was a general      01:06:06
23   acknowledgement among all board members     01:06:11
24   that it would be very difficult to          01:06:14
25   reconcile these two individuals given       01:06:16
```

```
                                          Page 108

 1              SIMMONS

 2   their significant difference of opinion    01:06:20

 3   over the appropriate roles for the         01:06:23

 4   chairman of the board and the chief        01:06:25

 5   executive officer.  We discussed ways in   01:06:28

 6   which we might try to deescalate this      01:06:32

 7   conflict and avoid putting the board in a  01:06:37

 8   situation of having to choose one or the   01:06:39

 9   other of these two executives to leave the 01:06:42

10   company.                                   01:06:44

11       Q.    And what did -- was there a      01:06:45

12   census at the end of the meeting?          01:06:51

13       A.    Regarding what?                  01:06:54

14       Q.    Regarding what to do with Mr.    01:06:55

15   Fried, how -- how to resolve everything    01:06:57

16   you've just mentioned.                     01:07:00

17       A.    Yes.                             01:07:01

18       Q.    And what was that?               01:07:01

19       A.    The consensus was that Mr.       01:07:02

20   Schnabel would reach out to Mr. Fried and  01:07:06

21   try and determine whether these issues     01:07:09

22   could be mediated and whether a solution   01:07:13

23   acceptable to Mr. State and                01:07:16

24   Mr. -- acceptable to Mr. State and to the  01:07:20

25   board could be reached, and that if -- if  01:07:22
```

Page 109

```
1                    SIMMONS
2    not there was a general consensus that the    01:07:26
3    board would back Mr. State as chief           01:07:29
4    executive officer of the company.             01:07:32
5         Q.    And during this discussion, what    01:07:35
6    did Mr. Bagaria say?                          01:07:37
7         A.    I don't recall.  You would have     01:07:38
8    to ask Mr. Bagaria.                           01:07:40
9         Q.    Well, he doesn't recall either,     01:07:41
10   so I am asking you.                           01:07:43
11        A.    I don't recall.                     01:07:44
12        Q.    And what did Mr. Girardi say at     01:07:45
13   this meeting?                                 01:07:48
14        A.    I don't recall.                     01:07:49
15        Q.    How about Mr. Schnabel?             01:07:49
16        A.    Mr. Schnabel expressed             01:07:51
17   some -- some almost sadness that it had       01:07:58
18   come to this, and he acknowledged that he     01:08:01
19   had -- he had misunderstood Burt's           01:08:03
20   perspectives on these issues, and that he     01:08:08
21   was far more inclined to agree with Mr.       01:08:10
22   State.                                        01:08:15
23        Q.    What did Mr. Fiorucci say at       01:08:17
24   this meeting?                                 01:08:21
25        A.    Mr. Fiorucci expressed disbelief    01:08:21
```

Case: 13-1165   Document: 43   Page: 214   07/10/2013   986023   264

```
                                          Page 122
 1                    SIMMONS
 2    employees?                           02:21:22
 3              MS. SELTZER:   I object to the    02:21:25
 4    form.                                02:21:26
 5       A.    What about issues with      02:21:26
 6    employees?                           02:21:28
 7       Q.    Do you think it is appropriate    02:21:28
 8    -- for any issues discussed about    02:21:29
 9    employees at board meetings, do you think   02:21:31
10    it is okay for that to be shared with    02:21:33
11    people outside of LVI?               02:21:35
12       A.    In some case yes.  In some cases   02:21:37
13    no.  You would have to provide specific    02:21:39
14    examples.                            02:21:41
15       Q.    Okay.                       02:21:41
16              MR. DATOO:   That is 21.    02:22:01
17              (Plaintiff's Exhibit 21 marked    02:22:04
18    for identification.)                 02:22:05
19              (Document handed to witness.)    02:22:06
20       Q.    Mr. Simmons, you have in front    02:22:11
21    of you a document marked as Plaintiff's    02:22:13
22    Exhibit 21.  Please take a look at the    02:22:15
23    document and let me know if you've seen it   02:22:17
24    before.                              02:22:19
25              (Pause.)                   02:22:20
```

Page 123

1             SIMMONS

2      A.    I don't recall the e-mail, but        02:22:56

3   obviously I am a sender in part of the        02:22:58

4   e-mail chain.                                  02:23:00

5      Q.    Okay.  Can you flip to the            02:23:00

6   second page of the document, and near the     02:23:03

7   upper half there is an e-mail from you to     02:23:07

8   Mr. State dated November 12, 2010.            02:23:10

9           Do you see that?                      02:23:14

10     A.    I do.                                  02:23:14

11     Q.    And you wrote in the second           02:23:15

12   sentence -- sorry, in the first sentence     02:23:18

13   "John is on the same page as we are."        02:23:21

14           Who are you referring to?            02:23:24

15     A.    You mean who is John?                  02:23:25

16     Q.    Who is John?                           02:23:27

17     A.    John would have been John             02:23:28

18   Schnabel.                                     02:23:29

19     Q.    And when you say "we," who are        02:23:30

20   you referring to?                             02:23:32

21     A.    That would have been Scott and        02:23:32

22   me.                                           02:23:34

23     Q.    Okay.  And the next sentence          02:23:34

24   says, "I spoke to him last night."           02:23:36

25   Does -- is that referring to a               02:23:40

```
                                              Page 124
 1                    SIMMONS
 2   conversation had you with John Schnabel?    02:23:41
 3        A.    It seems to suggest I spoke to   02:23:43
 4   John Schnabel the night before the e-mail   02:23:45
 5   was written, yes.                           02:23:47
 6        Q.    Okay.  And do you recall what    02:23:48
 7   you discussed  with Mr. Schnabel?           02:23:50
 8        A.    I don't.                         02:23:51
 9        Q.    If you look at the first page at 02:23:51
10   the top, you wrote:  "John seems pragmatic  02:24:08
11   and aligned with our opinion."              02:24:11
12             Is that that Mr. Schnabel you     02:24:14
13   are referring to in that first sentence?    02:24:15
14        A.    I believe so, yes.               02:24:17
15        Q.    What did you mean by "John       02:24:18
16   seems" -- by writing "John seems pragmatic  02:24:21
17   and aligned with our opinion"?              02:24:24
18        A.    I was confirming to Scott that   02:24:27
19   John was resigned to the likely            02:24:33
20   eventuality that no -- no mediation was     02:24:35
21   going to prove successful between Burt and  02:24:40
22   Scott, and that John was taking a           02:24:43
23   professional approach as a director of the  02:24:46
24   company and understood the decisions that   02:24:48
25   had to be made and implications for the     02:24:51
```

```
                                        Page 125
 1                SIMMONS
 2   company.                             02:24:54
 3       Q.    And you wrote in the last  02:24:54
 4   sentence of that e-mail "Remember, Burt  02:24:57
 5   has made a ton of money for these guys  02:25:00
 6   over the years."                      02:25:02
 7            What did you mean by that?   02:25:03
 8       A.    Well, Burt has had a variety of  02:25:04
 9   business relationships with Falcon, the  02:25:07
10   details of which are not known to me, but  02:25:10
11   I do know that they had been successful  02:25:13
12   investors either alongside him or in  02:25:17
13   companies in which he has played some  02:25:20
14   management role, and -- and I know that  02:25:22
15   they have been pleased with the investment  02:25:24
16   results.  That of course was not the case  02:25:26
17   with us or with our group where well over  02:25:29
18   a 150 million dollars was lost during the  02:25:33
19   period of time we were working with Burt.  02:25:36
20            (Document handed to witness.)  02:26:00
21       Q.    Mr. Simmons, you have in front  02:26:00
22   of you a document previously identified as  02:26:01
23   Plaintiff's Exhibit 8.                 02:26:03
24            Can you review the document and  02:26:05
25   let me know if you've seen it before?  02:26:06
```

Page 149

| | | |
|---|---|---|
| 1 | SIMMONS | |
| 2 | work; is that correct? | 02:49:56 |
| 3 | A.   The details are outlined in the | 02:49:57 |
| 4 | letter. | 02:50:00 |
| 5 | Q.   I am not concerned about the | 02:50:00 |
| 6 | letter right now.  I am asking you. | 02:50:01 |
| 7 | A.   Well, the letter says that we | 02:50:04 |
| 8 | wanted Burt to remain as non-executive | 02:50:05 |
| 9 | chairman, that we wanted to pay him an | 02:50:08 |
| 10 | annual retainer of 150,000 dollars plus | 02:50:10 |
| 11 | 250 dollars per hour for each hour spent | 02:50:12 |
| 12 | in -- on LVI issues.  In addition we | 02:50:15 |
| 13 | agreed to reimburse him for business | 02:50:21 |
| 14 | expenses and -- and, you know, and other | 02:50:23 |
| 15 | normal -- executive office, whatever. | 02:50:27 |
| 16 | Q.   So is your knowledge of any | 02:50:30 |
| 17 | compensation arrangement limited to the | 02:50:33 |
| 18 | letter? | 02:50:35 |
| 19 | A.   Any compensation arrangement | 02:50:37 |
| 20 | relating to what? | 02:50:38 |
| 21 | Q.   To Mr. Fried being able to -- | 02:50:39 |
| 22 | A.   This was the compensation | 02:50:41 |
| 23 | arrangement under which Mr. Fried was able | 02:50:42 |
| 24 | to re -- remain at the company.  Had he | 02:50:44 |
| 25 | worked -- had he worked full time, he | 02:50:47 |

```
                                            Page 150

  1                 SIMMONS

  2   would have earned the same amount of        02:50:49

  3   money.                                      02:50:50

  4       Q.    Okay.                             02:50:50

  5       A.    2000 hours at 250 dollars an      02:50:52

  6   hour is 500,000 dollars plus 150 is 650.    02:50:54

  7   That was the same salary he was being paid  02:51:00

  8   in his role as chairman of the board.       02:51:02

  9       Q.    And what types of job             02:51:04

 10   duties -- what type of work would Mr.       02:51:06

 11   Fried be doing?                             02:51:08

 12       A.    Whatever was requested by Mr.     02:51:12

 13   State.  In addition, the board asked Mr.    02:51:14

 14   Fried to serve as chair of the board's      02:51:17

 15   audit committee.                            02:51:19

 16            (Document handed to witness.)      02:51:20

 17       Q.    Okay.  Mr. Simmons, you have in   02:51:20

 18   front of you a document previously          02:51:23

 19   identified as Plaintiff's Exhibit 12.       02:51:28

 20       A.    Right.                            02:51:29

 21       Q.    And do you -- can you take a      02:51:30

 22   moment to look at the document and let me   02:51:32

 23   know if you've seen it before?             02:51:34

 24       A.    Yes.  I've seen it before.        02:51:35

 25       Q.    Okay.  And does this              02:51:37
```

# EXHIBIT Y

| | |
|---|---|
| **From:** | Simmons, Brian P. <bsimmons@code, hennessy & simmons inc..com> |
| **Sent:** | Tuesday, November 16, 2010 4:08 PM |
| **To:** | 'BFried@lviservices.com' |
| **Cc:** | 'Rajay Bagaria' <RBagaria@apolloic.com>; 'John Schnabel' <JSchnabel@falconinvestments.com>; Gerald J. Girardi <GGirardi@ApollolC.com>; Teddy Reynolds <reynolds@apolloic.com>; Hogan, Robert <Rhogan@chsonline.com>; Richard F. Ferrucci (mknipfing@rffassociates.com); 'Buck, Bob' <BBuck@beaconroofingsupply.com>; 'jnsmith@sidley.com' |
| **Subject:** | Transition to Chairman |
| **Attach:** | Fried (1).pdf; Fried (2).pdf |

Burt - attached is a letter from me and an agreement reflecting the discussions we have had regarding your role as Chairman of the Board.  Please review - we look forward to hearing from you.

# chs|capital

**Brian P. Simmons | Managing Partner**
**10 South Wacker Drive, Suite 3175**
**Chicago, Illinois 60606**
**Phone 312.876.1980 | Fax 312.876.3854**
**Cell 312.804.0138**
**bsimmons@chsonline.com**
**www.chsonline.com**

**Assistant:**
**Michelle Karlin**
**312.876.9410**
**mkarlin@chsonline.com**

This email may contain material that is confidential and/or privileged and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

CONFIDENTIAL



chs|capital

Brian P. Simmons, Managing Partner

November 16, 2010

Burton Fried
Chairman of the Board
LVI Parent Corp.
877 Post Road East, Suite #4
Westport, CT 06880

Dear Burt:

Following our meeting November 4, and our subsequent discussions with you, management and among board members, I have been asked to finalize the scope of your responsibilities, compensation and benefits as you transition to non-executive chairman and consultant.

Effective 11/30/10 your employment with LVI Services Inc. will terminate. You will continue your relationship with LVI as non-executive Chairman of the Board of LVI Parent Corp. In addition, we are offering you the position of consultant to LVI Services on the terms set forth in the attached letter agreement.

As Chairman of the Board of LVI Parent Corp. we expect that you will participate in all board meetings, work with LVI CEO, Scott State, to establish meeting agendas and coordinate the presentations. In addition, we ask that you serve on the Audit Committee.

As a consultant to LVI Services, your consulting assignment would initially consist of providing continued support in the Keesler Federal Credit Union litigation, the litigation by the Estate of Daniel Sitomer and the Duane Morris LLP litigation. In addition, you would be asked to provide assistance and support from time to time on various projects as requested by Scott State based upon the challenges and opportunities facing LVI and your ability to provide assistance. You would be paid an annual retainer of $150,000 plus $250 per hour for time spent in your consulting role. You would also be entitled to reimbursement of all reasonable business expenses incurred by you as a result of your activities as a consultant. The offer of the consulting assignment is contingent on your agreement to the terms and conditions set forth in the attached letter agreement.

Burt, the board would like for this transition to be as smooth as possible. Please review the attached consulting agreement and execute and return it to my attention no later than December 7th 2010.

Sincerely,

Brian P. Simmons
On behalf of the Board of Directors of
LVI Parent Corp.

CONFIDENTIAL

Case 3:11-cv-01855-JBA   Document 50-24   Filed 04/27/12   Page 4 of 7

LVI Services Inc.
80 Broad Street
New York, NY 10004

November 16, 2010

Burton T. Fried
149 Roseville Road
Westport, Connecticut 06880

Dear Burt:

This letter sets forth our agreement with respect to your changing role with LVI Services Inc. ("LVI"). Effective November 30, 2010, your employment with LVI will terminate and you will be offered the opportunity to continue your relationship with LVI as a consultant, providing the services set forth in this agreement, subject to the terms and conditions set forth herein.

Your consulting assignment will begin on December 1, 2010 and will consist of: (1) providing continued support in the Kessler Federal Credit Union litigation, the litigation by the Estate of Daniel Sitomer, and the Duane Morris LLP litigation and (2) providing assistance and support from time to time on projects as requested by Scott State (the "Consulting Services"). The scope of the Consulting Services may be amended at LVI's sole discretion. This agreement and the Consulting Services may be terminated by you or by LVI at any time by providing thirty (30) days' written notice to the other party.

You will receive a retainer of $150,000 per year, payable in regular advance quarterly installments of $37,500 for the Consulting Services. Additionally, you will be paid at the rate of $250.00 per hour for actual hours worked on the Consulting Services within thirty (30) days of your submission of an invoice to LVI. Should LVI decide to terminate the Consulting Services on or before February 28, 2011, you will be allowed to retain the first retainer installment of $37,500 paid in advance for your services. You will be solely responsible for payment on your behalf of any federal, state and local income tax withholding, social security taxes, workers' compensation coverage, unemployment insurance, liability insurance, health and/or disability insurance, retirement benefits or other welfare or pension benefits, and/or other payments and expenses. As a consultant, you will not be eligible to receive any compensation or benefits other than as set forth in this agreement. You shall, however, be entitled to payment or reimbursement of all reasonable business expenses incurred by you as a result of your performing the Consulting Services with the prior consent of LVI.

In consideration of this offer of a consulting agreement and for other good and valuable consideration, receipt of which is hereby acknowledged:

(i)      You knowingly and voluntarily release and forever discharge LVI Parent Corp., LVI and its affiliates (together with all their other direct and indirect subsidiaries, and their successors, past, current or future shareholders, directors, officers, and employees, and any one else connected with them, collectively referred to herein as the "LVI Releasees") to the extent permitted by law, of and from any and all claims, known and unknown, asserted or unasserted, you have or may have against the LVI Releasees as of the date of execution of this

CONFIDENTIAL

BSIMMONS 000038

agreement, arising out of or in any way connected to your employment with LVI or the termination of your employment with LVI, including, but not limited to, any alleged violation of any federal, state or local civil or human rights law, regulation or ordinance, and you further release and waive any other claim or cause of action recognized in law or in equity, which you had or now have against the Company.

(ii)    You expressly recognize and agree that, by entering this agreement, you are waiving any and all rights or claims that you may have arising under the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act of 1990, which have arisen on or before the date of the execution of this agreement. By your signature below, you warrant and represent that (1) in return for this agreement, you will receive benefits beyond those to which you were already entitled before entering this agreement; (2) you were advised (by this Agreement) to consult with an attorney before signing this agreement; (3) you have been given twenty-one (21) days to review this ADEA release and waiver and seven (7) days to revoke it and, (4) you have voluntarily elected to execute this agreement. Moreover, should you wish to revoke this agreement, you must provide written notice of revocation to Scott State by no later than the seventh day after you have signed this agreement.

While you are providing the Consulting Services, you will have access to documents or information that are confidential and proprietary to LVI. Except in the performance of services to LVI, or with the prior written consent of LVI, you agree that you will not, at any time, while providing the Consulting Services or thereafter, disclose to any person or entity or use for your benefit or the benefit of others, any such document or information obtained by you.

You further understand and agree that LVI has legitimate interests in protecting its goodwill, its relationships with major customers, contractors and subcontractors, employees and other business partners, and in maintaining its trade secrets, and hereby agree that the following restrictions are appropriate to protect such interests and are narrowly construed to meet such goals. Accordingly, at all times you are providing the Consulting Services to LVI and at all times during the period of twelve (12) months following the date of the termination of the Consulting Services (the "Restricted Period"):

(i)    You will not, directly or indirectly, without the prior written permission of LVI, solicit, attempt to solicit or assist anyone else in soliciting, any person or entity who is or has been a customer, supplier, contractor, subcontractor or any other business relation of LVI, or any of its subsidiaries (collectively, "Business Relationships") to (A) cease doing business with LVI or any of its subsidiaries, (B) alter or limit its business relationship with LVI or any of its subsidiaries, or (C) purchase, other than from LVI or any of its subsidiaries, any service or product which compete with any of the services or products offered by LVI or its subsidiaries. For purposes of this paragraph, Business Relationships is defined as persons or entities that have engaged LVI or any of its subsidiaries or for which LVI had an outstanding bid for work during the three years immediately prior to the termination of the Consulting Services and (a) with whom you have had contact during your association with LVI or any of its subsidiaries or (b) of whom you learned though your association with LVI or any of its subsidiaries; and

(ii)    You will not, directly or indirectly, without the prior written permission of LVI, (A) solicit, attempt to solicit or assist anyone else to solicit any director,

2.

BSIMMONS 000039

member, officer or employee to terminate his or her association with LVI or any of its subsidiaries or (B) solicit, attempt to solicit, hire or otherwise retain the services of any director, member, officer or employee (whether on a full-time basis, part-time basis or otherwise and whether as an employee, independent contractor, consultant, agent, advisor or in another capacity), in each case, except pursuant to general advertising not specifically targeted at employees of the company or any of its subsidiaries.

You further agree that you will not, directly or indirectly, make (or cause to be made) to any person or entity any knowingly disparaging, derogatory or other negative statement about LVI Parent Corp., LVI, any of their subsidiaries or affiliates, or any of their officers, directors, employees, partners, shareholders or agents (or any of their services or products).

As you will not be engaged by LVI on a full-time, exclusive basis, you will retain the right to provide services to the general public during your engagement with LVI. During the time that you are providing the Consulting Services, you will disclose to LVI the identity of any entity or individual for which you intend to provide services prior to your providing such services. You will exercise your best judgment as to the amount of time to be devoted to and the location of the Consulting Services, provided that you will agree to make yourself available at reasonable times and for reasonable periods to fulfill your obligations under this agreement. LVI intends to close its offices in Westport, Connecticut. If the nature of the Consulting Services requires that such services be performed at LVI's premises, LVI will provide you with office space at one of its facilities to allow you to perform the Consulting Services.

Other than your providing the Consulting Services, you will not have authority to act on behalf of, or otherwise bind LVI or its affiliates. Accordingly, you may not enter into any agreement on behalf of, or purport to bind LVI or its affiliates, or represent to any person that you have the power to create any obligation, express or implied, on behalf of LVI or its affiliates without LVI's express prior written consent. The parties intend to create by this agreement the relationship of an independent contractor and not an employer-employee relationship. Nothing in this agreement is intended or shall be deemed to create any partnership, agency or joint venture relationship between or among the parties.

This agreement will be governed by the laws of the State of New York, without regard to its conflict of laws provisions. Any dispute or action under or relating to this agreement may be brought in any state or federal court located in the State of New York. You hereby consent to and confer personal jurisdiction over you by any such court.

3

CONFIDENTIAL

BSIMMONS 000040

If you agree to the terms and conditions set forth in this agreement, please sign on the line provided below and return the agreement to Scott State on or before December, 7th 2010.

Very truly yours,

Scott E. State

CEO, LVI Services Inc.

Accepted and agreed to:

_____    _____
Burton T. Fried                        Date

4

BSIMMONS 000041

# EXHIBIT Z

| | |
|---|---|
| **From:** | State, Scott <SState@lviservices.com> |
| **Sent:** | Tuesday, November 16, 2010 3:05 PM |
| **To:** | Simmons, Brian P. <BSimmons@chsonline.com>; RBagaria@apolloic.com |
| **Subject:** | FW: |
| **Attach:** | Document.pdf |

From: Cutrone, Paul
Sent: Tuesday, November 16, 2010 1:03 PM
To: State, Scott
Subject:

As discussed. Paul
Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**T W G**

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

85 Fifth Avenue
New York, NY 10003
tel 212.257.6800
fax 212.257.6845
www.twglaw.com

Douglas H. Wigdor
dwigdor@twglaw.com

November 15, 2010

CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY

**VIA HAND DELIVERY**

Mr. Scott E. State
President and Chief Executive Officer
LVI Services, Inc.
80 Broad Street
New York, NY 10004

          Re:   Burton T. Fried

Dear Mr. State:

We represent Burton T. Fried, the highly dedicated and long-standing Chairman and former Chief Executive Officer ("CEO") of LVI Services, Inc. ("LVI" or the "Company"), in connection with his employment with the Company. Specifically, Mr. Fried has retained our Firm in connection with recent attempts by the Company to unlawfully strip Mr. Fried of all his substantive job duties, including those services he has historically been performing as Chairman since 2006, and drastically reduce his role in the Company on account of his age and in breach of Mr. Fried's employment contract, the terms of which are memorialized in a November 16, 2005 contract with Mr. Fried (the "Contract").

As you are well aware, Mr. Fried is a long-tenured and exceedingly valuable employee of LVI, having served as the Company's CEO for two distinct periods totaling over 20 years. During Mr. Fried's tenure as CEO, he built LVI into the multi-million dollar company it is today and contributed immeasurably to the Company's years of success. Now, despite Mr. Fried's long track record of success and strong desire to continue as Chairman, the Company abruptly and unlawfully seeks to relegate Mr. Fried to the role of a mere figurehead on account of the fact he is seventy years of age. Because of his steadfast commitment to the Company and desire to remain with the Company that he has worked hard to build, this letter seeks to provide you with an opportunity to resolve this matter without commencing litigation against LVI.

Throughout his tenure with LVI, Mr. Fried has been indispensable to the Company's annual growth in both profits and revenue, presiding over the sale of the Company multiple times to

                                         BSIMMONS 000045

Thompson Wigdor & Gilly LLP ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                    **CONFIDENTIAL COMMUNICATION**
11/15/2010                            **FOR SETTLEMENT PURPOSES ONLY**
Page 2

new investors. As a result of Mr. Fried's efforts engineering these sales, LVI management has benefited greatly by reinvesting capital from these sales. The latest of these sales occurred on November 16, 2005, when Code Hennessy Simmons ("CHS") purchased a majority equity interest in LVI. On that same date, Mr. Fried entered into an employment contract with the Company where Mr. Fried agreed to remain as Company President and CEO until a replacement could be found. In recognition of Mr. Fried's expertise in the area and the respect he was formerly accorded, Mr. Fried was entrusted with the task of finding his own replacement. After Mr. Fried conducted interviews of all the candidates for the position and selected the finalists, both Mr. Fried and CHS agreed that Bob McNamara should replace Mr. Fried as CEO.

In June 2006, Mr. McNamara officially replaced Mr. Fried as CEO. In recognition of Mr. Fried's indispensability to the Company, Mr. McNamara conditioned his acceptance of the position on Mr. Fried continuing with the Company in the position of Chairman. Mr. Fried indeed stayed on as the Company's Chairman, accepting a pay cut to $600,000 a year and agreeing to work four days a week. That arrangement lasted only a week, however, as Mr. Fried quickly returned to full-time duty, albeit while continuing to honor his prior agreement to accept a reduced salary. Mr. Fried worked five days a week as the Chairman of LVI until Mr. McNamara resigned, effective April 2010. During that time, the Company's Earnings Before Interest, Taxes, Depreciation and Amortization fell from $65 million in Mr. Fried's last full year as CEO to only $20 million in 2009. Upon Mr. McNamara's resignation, the Company again looked to Mr. Fried's expertise and leadership by asking him to step in as interim CEO and conduct the search for his replacement. At that time, the Company increased Mr. Fried's salary to its former $750,000 level, with Brian Simmons, Managing Partner of CHS Capital LLC and member of the LVI Board of Directors, telling Mr. Fried in a May 12, 2010 email that "you are earning every penny of [your salary]."

Mr. Fried continued his invaluable service to the Company throughout his term as interim CEO by leading the Company through the period of negotiation of a recapitalization and restructuring to eliminate $100 million in debt. After the restructuring and recapitalization closed, CHS specifically applauded Mr. Fried's work during that process and informed Mr. Fried that the Company survived only because of his leadership during the negotiation period. The positive sentiment expressed by CHS and Mr. Simmons dissipated in mere months as the Company, and you, as its new CEO, in addition to individual directors, came to believe that Mr. Fried's age necessitated removal of all his day-to-day responsibilities.

As he had done in the previous search for a CEO, Mr. Fried spearheaded the efforts earlier this year to find someone to take over for him on a permanent basis. After he interviewed about ten candidates, Mr. Fried provided your resume to Russell Reynolds, the firm retained by LVI as the recruiter for the CEO position, as well as Brian Simmons. From there, your resume was passed on to Apollo and Falcon, the two private equity firms poised to come on as equity partners with CHS. As a result of Mr. Fried's introductions, you became the first choice to fill the CEO position. Mr. Fried's efforts on your behalf did not stop after putting your name forward as an

Thompson Wigdor & Gilly LLP ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                    CONFIDENTIAL COMMUNICATION
11/15/2010                            FOR SETTLEMENT PURPOSES ONLY
Page 5

interested candidate. Indeed, both you and the Company sought Mr. Fried's advice during the
contract negotiation process as CHS became concerned that you would not accept the position
due to your worries that Mr. Fried would play too big of a role in the Company. Mr. Fried
allayed the concerns of both you and CHS, convincing you that you would operate as CEO and
that Mr. Fried would support you fully in the role of Chairman. Due to Mr. Fried's tireless
efforts, you accepted the position as CEO and began work on or about October 1, 2010.

On October 19, 2010, just shortly after you commenced employment with LVI, Mr. Fried met
with you to present you with a list of the responsibilities Mr. Fried had as Chairman under Mr.
McNamara. Instead of discussing these responsibilities with Mr. Fried, you informed him that
his duties would be transitioned to other LVI managers and that, effective immediately, he would
cease working on various projects that he had been effectively managing prior to your hiring.
After Mr. Fried sought a reason for this drastic and unnecessary step, you told Mr. Fried, "You
are 71 years old. How long do you expect to continue working?" Mr. Fried immediately left the
meeting due to this shocking and obviously discriminatory conduct. Although Mr. Fried hoped
that this discriminatory animus was not shared by others at LVI and gave you every opportunity
to repudiate your discriminatory comment, the discriminatory and demeaning treatment of Mr.
Fried has continued to this day. To Mr. Fried's disappointment, you took further action to
humiliate Mr. Fried and minimize his role at the Company by directing senior managers not to
call Mr. Fried and to route all inquiries to Mr. Fried through you.

While you may have been the only one to outwardly express your belief that Mr. Fried's age
necessitates removal of all his job duties, others at LVI obviously harbor the same animus. For
instance, an email from Mr. Simmons to Mr. Fried on November 2, 2010 expressed his opinion
that Mr. Fried should be phased out of the Company due to his age. Indeed, at the same time that
Mr. Simmons commended Mr. Fried for selecting you as CEO, he told Mr. Fried that all of his
responsibilities should be distributed to other LVI managers. Mr. Simmons concludes his email
by revealing his true motivations behind reducing Mr. Fried's responsibilities, telling him that
"while the team has relied on you for advice and counsel for many years, they must now take on
true ownership of daily challenges, be asked to produce results on their own, and be evaluated
based upon the outcome." Mr. Simmons clearly shares your belief that Mr. Fried's age
necessitates pushing him to the background and giving away his responsibilities to younger
employees.

Most recently, at a closed session of the LVI Board of Directors, Mr. Fried gave an impassioned
speech detailing his years of outstanding service to the Company and expressing his desire to
continue as LVI Chairman with substantive responsibilities. As a courtesy, Mr. Fried again gave
you a chance to repudiate your discriminatory comment, yet, you did not take the olive branch
offered by Mr. Fried. Instead, you squandered this chance to begin the process of rectifying the
situation by refusing to deny that you had indeed told Mr. Fried that his age required his
constructive ouster from the Company.

CONFIDENTIAL                                              BSIMMONS 000047

Thompson Wigdor & Gilly LLP ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                        **CONFIDENTIAL COMMUNICATION**
11/15/2010                                **FOR SETTLEMENT PURPOSES ONLY**
Page 4

Although Mr. Fried has devoted a substantial portion of his life to LVI, the Company now evinces a total lack of respect for Mr. Fried's years of steadfast and exemplary service. At his present age, Mr. Fried has shown no signs of slowing down and has expressed only an unwavering commitment to staying with the Company in more than the "advisory" capacity LVI now envisions him in. In spite of Mr. Fried's vitality, the Company seeks merely to exploit Mr. Fried's relationship with Richard Ferrucci and Arch Surety ("Arch" or the "Surety") in order to ensure that the $200 million surety line remains open to LVI. Now, the Company attempts to have it both ways by distributing all of Mr. Fried's substantive responsibilities to younger employees but still leaving Mr. Fried at LVI with the ceremonial title of Chairman in order to take advantage of his ten year relationship with the Surety. Mr. Fried will not lend his name and reputation to any effort to represent to the Surety that he is anything less than a vibrant and active executive involved in approval of projects before a bond request is made to Arch; nor, will Mr. Fried stand by idly as LVI promotes his active participation in the Company in its press releases while behind the scenes the Company seeks only to relieve him of any meaningful role.

As the Company is no doubt aware, stripping Mr. Fried of his responsibilities, including those additionally assigned duties and responsibilities he has performed since Mr. McNamara joined the Company in June 2006, would also be in breach of the Contract he signed with LVI on November 16, 2005. As per the terms of this agreement, Mr. Fried is entitled to maintain the position of Chairman, with "primary responsibility for strategic growth." Contrary to this promise, the Company now seeks to make Mr. Fried merely your "on call resource" and to give you full discretion to decide "if there are areas of the business or specific situations where [you] want[] [Mr. Fried's] direct involvement." Providing you with such unlimited discretion is directly contrary to Mr. Fried's employment agreement, a point realized by Mr. Simmons as he tells Mr. Fried in his November 2 email that he wishes "to replace [his] existing employment arrangement with a consulting agreement." Mr. Simmons clearly realizes the illegality of the proposed changes in Mr. Fried's employment and is unsubtly attempting to make an end run around the clearly defined parameters of Mr. Fried's employment contract.

Based on our knowledge of LVI's callous and discriminatory conduct to date, it is abundantly clear that the Company is pursuing a course of conduct which constitutes unlawful age discrimination and violates Mr. Fried's employment contract. Although Mr. Fried's devotion to the Company is unwavering and he would prefer to remain with LVI in his present, undiminished capacity, he remains committed to pursuing any and all legal remedies in order to ensure that he is fully made whole as a result of the Company's illegal and discriminatory action. As noted above, I am writing to provide the Company with the opportunity to avoid a costly legal action that will result in substantial liability for LVI. To this end, I ask that you contact me to discuss the possible resolution of this matter as soon as possible, but by no later than November 22, 2010.

Finally, I trust that you will treat this letter with the appropriate degree of discretion so that Mr. Fried's professional relationships are not harmed in any way by disclosure of his decision to seek

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                    **CONFIDENTIAL COMMUNICATION**
11/15/2010                            **FOR SETTLEMENT PURPOSES ONLY**
Page 5

legal representation. In addition, I remind you of your legal obligation to preserve all documents that may be relevant to this matter, including but not limited to all relevant emails, voicemails, telephone recordings, video surveillance recordings, and other communications that may be relevant to this matter. If you have not done so already, please take immediate steps to preserve any material related to this matter, whether in electronic or paper form, including immediately implementing the following:

- Hold in abeyance any existing document retention and/or destruction policies or practices, or any other actions that would result in the deletion of any material;

- Stop the automatic deletion of emails and other electronic data;

- Stop the recycling or reuse of computer backup tapes;

- Secure and preserve all recorded telephone conversations and email correspondence of yourself and other decision-makers responsible for the circumstances of my client's employment;

- Maintain all electronic data in reasonably accessible form, including ceasing any automatic archiving to backup tapes; and

- Secure and preserve all computer or electronic hardware, including all hard drives, laptops, PDA's, Blackberry's or any other similar equipment and devices.

I await your response.

Sincerely,

*[signature]*

Douglas H. Wigdor

BSIMMONS 000049

# EXHIBIT AA

| | |
|---|---|
| **From:** | State, Scott <SState@lviservices.com> |
| **Sent:** | Tuesday, November 30, 2010 3:22 PM |
| **To:** | Leonard, John <JohnLeonard@lviservices.com> |
| **Subject:** | Fw: Burt Fried's Resignation of Officer/Director Positions |
| **Attach:** | Document.pdf |

Fyi.

Sent via BlackBerry from T-Mobile

---

**From:** "DiCarlo, Gregory" <GDiCarlo@lviservices.com>
**Date:** Tue, 30 Nov 2010 19:57:36 +0000
**To:** Smith, Jeffrey N.<jnsmith@sidley.com>; State, Scott<SState@lviservices.com>
**Subject:** Burt Fried's Resignation of Officer/Director Positions

Jeffrey and Scott - Burt just handed me the attached resignation from all officer/director positions for all LVI entities, FYI.

Greg

Gregory G. DiCarlo
General Counsel
LVI Services Inc.
877 Post Road East, Suite 4
Westport, CT 06880
Tel: (203) 222-0584, Ext. 662
E-Fax (Preferred): (203) 823-4578
Fax: (203) 222-0574
gdicarlo@lviservices.com

LVI 001029

November 30, 2010

To: The Board of Directors of LVI Parent Corp., LVI Services Inc. and all of it's Subsidiaries
and Affiliated Companies

Effective immediately, because of the termination of my employment as Chairman of
LVI Services Inc., I hereby resign all of my positions as Director and/or Officer of LVI
Parent Corp., LVI Services Inc. and all of it's subsidiaries and affiliated companies.

Dated: November 30, 2010

Burton T. Fried

CONFIDENTIAL

LVI 001030

# EXHIBIT BB

## JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK     **10 CV 9308**

----------------------------------------------X

BURTON T. FRIED,                      :

                 Plaintiff,    :    No. 10 Civ._____

                            :

      v.                     :    **COMPLAINT**

LVI SERVICES, INC.; LVI PARENT CORP.,  :
CODE HENNESSY SIMMONS LLC d/b/a CHS    :    **JURY TRIAL DEMANDED**
PRIVATE EQUITY V LP; APOLLO           :
INVESTMENT CORP.; SCOTT E. STATE, in his :
official and individual capacities; BRIAN :
SIMMONS, in his official and individual capacities; :
RAJAY BAGARIA, in his official and individual :
capacities; GERALD J. GIRARDI, in his official :
and individual capacities,             :

              Defendants.    :

                            :

----------------------------------------------X

FILED
U.S. DISTRICT COURT
2010 DEC 13 PM 4:20
S.D. OF N.Y.

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Burton T. Fried ("Plaintiff" or "Mr. Fried"), by and through his

undersigned counsel, Thompson Wigdor & Gilly LLP, as and for his Complaint in this

action against Defendants LVI Services, Inc. (the "Company"), LVI Parent Corp., Inc.

(the "Parent") (together "LVI Defendants"), Code Hennessy Simmons LLC d/b/a CHS

Private Equity V LP ("CHS"), Apollo Investment Corp. ("Apollo") (collectively with the

LVI Defendants, the "Corporate Defendants"), Scott E. State ("State"), Brian Simmons

("Simmons"), Rajay Bagaria ("Bagaria"), and Gerald J. Girardi ("Girardi"), all in their

official and individual capacities (collectively, the "Individual Defendants") (all together,

"Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and retaliation against Plaintiff, including discriminatory treatment of Plaintiff due to his Age, in violation of the New York City Human Rights Law, New York Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

2.     In addition, this action seeks relief for Corporate Defendants' common law breach of contract and breach of the implied covenant of good faith and fair dealing, as well as tortious interference with Plaintiff's employment relationship by Defendants Parent, CHS, Apollo, and the Individual Defendants.

## PRELIMINARY STATEMENT

3.     At the age of 70 years old, Plaintiff Burton T. Fried fully expected to be working at LVI into his ninth decade of life.  Tireless and dedicated to the Company even after 24 years of service, Mr. Fried worked rigorously to ensure that the Company continued down the trail of success he blazed as a pioneer in his field.  It was this work ethic that allowed Mr. Fried, through his leadership as Company President and Chief Executive Officer ("CEO"), to transform the Company from a solely regional entity into the country's largest, and only, fully integrated national provider of self-performed diverse environmental remediation, demolition, and other facility management services.

4.     Throughout his tenure, Mr. Fried garnered the respect of clients and competitors alike, investors, lenders, sureties, vendors, and all who worked with him, including Company managers, many of whom had long worked side-by-side with him to build the Company into what it is today.

2

5.       In October 2010, a new President and CEO, Defendant Scott E. State, began his employment at the Company.  This regime change ushered in a new era at the Company, in which Mr. Fried was viewed as "dead wood" and someone who, despite his history and commitment to the Company, should retire.

6.       On October 19, 2010, Defendant State told Mr. Fried that his duties would be transitioned to other Company managers because of his age and in breach of his employment contract.  From that day forward, Defendants worked to isolate Mr. Fried from any substantive involvement in the Company, all while endeavoring to retain Mr. Fried as titular Chairman of the LVI Defendants to exploit long-standing business relationships that he had developed and cultivated, as well as to utilize Mr. Fried's knowledge of historical business matters being litigated with third parties.

7.       As Mr. Fried was reduced to the status of a mere figurehead on account of his age, he became increasingly disheartened by Defendants' discriminatory conduct that served only to demean and debase his years of valuable service to the Company.

8.       On November 16, 2010, the Company callously dealt its final blow by sending a letter informing Mr. Fried that, effective November 30, 2010, his almost quarter century of service to the Company would be coming abruptly to an end.

9.       Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff's rights, warranting an award of punitive damages.  Such conduct has caused, and continues to cause, Plaintiff to suffer substantial monetary damages, permanent harm to his professional and personal reputation, and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff, a resident

of Connecticut, and all Defendants, and this action involves an amount in controversy in

excess of $75,000, exclusive of interest and costs.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because

the LVI Defendants are corporations doing business in the State of New York and are

subject to personal jurisdiction in this district, and a substantial portion of the unlawful

conduct alleged herein occurred in this district.

## PROCEDURAL REQUIREMENTS

12.    Simultaneous with the filing of the Complaint, Plaintiff filed a charge of

discrimination against the Corporate Defendants with the Equal Employment

Opportunity Commission ("EEOC"), alleging violations of the Age Discrimination in

Employment Act ("ADEA").

13.    When the EEOC completes its investigation of the charge and issues

Plaintiff notice of his right to sue, Plaintiff will be seeking leave to amend this Complaint

to add claims that the Corporate Defendants violated the ADEA as well.

14.    Prior to the commencement of this action, a copy of the Complaint was

served on the New York City Commission on Human Rights and the Office of the

Corporation Counsel of the City of New York, thereby satisfying the notice requirements

of § 8-502 of the New York City Administrative Code.

15.    Any and all other prerequisites to the filing of this suit have been met.

4

## PARTIES

16.    Plaintiff Burton T. Fried, a former employee of the Company, was born on February 26, 1940, and is a resident of the State of Connecticut, Fairfield County. At all relevant times, Mr. Fried met the definition of an "employee" under all applicable statutes throughout his employment with the Company.

17.    LVI Services, Inc. is an environmental remediation company that offers a variety of services, such as asbestos abatement and complete demolition, to clients primarily in the continental United States, its territories and Hawaii, including in the City of New York. At all relevant times, the Company met the definition of an "employer" under all applicable statutes, and has maintained a principal place of business located at 80 Broad Street, New York, New York 10004.

18.    Defendant Parent is a Delaware corporation and the sole shareholder of the Company. Defendant Parent is a corporate entity with no active business operations or officers, existing only to sign documents. At all relevant times, Defendant Parent met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a principal place of business located at 80 Broad Street, New York, New York 10004.

19.    Defendant CHS is a private equity firm headquartered in Illinois. Defendant CHS owns a minority equity interest in Parent and has two seats on the Board of Directors of Parent (the "Board"). At all relevant times, CHS met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a principal place of business located at 10 South Wacker Drive, Suite 3175, Chicago, Illinois, 60606.

20.    Defendant Apollo is a publicly traded investment management company that specializes in providing subordinated debt and equity capital to middle-market companies.  Defendant Apollo is incorporated in Maryland and also owns a minority equity interest in Parent with two seats on the Board.  At all relevant times, Apollo met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a principal place of business located at 9 West 57th Street, New York, New York 10019.

21.    Upon information and belief, Defendant State is a resident of the State of Colorado.  At all relevant times, he is and has been a member of the Board, as well as employed as President and CEO for Defendant LVI, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein.  Defendant State is approximately 47 years of age.

22.    Upon information and belief, Defendant Simmons is a resident of the State of Illinois.  At all relevant times, he is and has been a member of the Board, as well as a managing partner of CHS, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein.  Defendant Simmons is approximately 47 years of age.

23.    Upon information and belief, Defendant Bagaria is a resident of the State of New York.  At all relevant times, he is and has been a member of the Board, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein.  Defendant Bagaria is approximately 33 years of age.

24.    Upon information and belief, Defendant Girardi is a resident of the State of New York.  At all relevant times, he is and has been a member of the Board, in which

capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein. Defendant Girardi is approximately 51 years of age.

## FACTUAL ALLEGATIONS

### Mr. Fried's Employment at LVI

25.    Mr. Fried, who is currently 70 years old, was the long tenured and highly respected Chairman of the LVI Defendants and former President and CEO of the Company.

26.    Mr. Fried had been employed by the Company for over 24 years. He spent his first three years as an officer and General Counsel, the next 17 years as the Company's President and CEO, and his last four years as the Company's Chairman.

27.    Until his last seven years of employment with the Company, Mr. Fried performed his services while working out of the Company's New York City corporate office. After that time, Mr. Fried worked from the Company's corporate Connecticut satellite office.

28.    During his period of employment, he grew the Company into one of the country's foremost, and only national, provider of environmental remediation and facilities management services.

29.    Under Mr. Fried's tireless leadership, the Company expanded to over 25 offices throughout the United States and has been relied on to do everything from accomplishing the safe demolition of buildings in Las Vegas and New York City to assisting in the emergency disaster response clean up of the Gulf Coast region after Hurricane Katrina.

30.    Throughout his tenure at the Company, Mr. Fried presided over the sale of the Company on multiple occasions – one taking place effective November 16, 2005, when CHS purchased a majority equity stake in the Company.  Mr. Fried had been actively looking for his successor as President and CEO prior to the equity stake purchase by CHS and, upon purchase by CHS, Defendant Simmons asked Mr. Fried to continue the search.  Mr. Fried agreed to remain as President and CEO and continue searching for a replacement until a suitable one could be found.

31.    Mr. Fried's agreement to remain as President and CEO was memorialized, along with other terms of employment, in a November 16, 2005 contract from the Company to Mr. Fried (the "Employment Contract").  Among the terms of Mr. Fried's Employment Contract was a promise that after he found a replacement President and CEO, Mr. Fried would serve as Chairman of the Company "with primary responsibility for strategic growth."

32.    In June 2006, Robert McNamara succeeded Mr. Fried as President and CEO of the Company.  In recognition of Mr. Fried's indispensability and tremendous worth to the Company, Mr. McNamara expressed his strong desire that Mr. Fried remain as Chairman of the Company.  As provided by Mr. Fried's Employment Contract, he indeed remained at the Company as its Chairman.

33.    After assuming the position of Chairman, Mr. Fried agreed to reduce his compensation by 20% and begin working four days per week.   This reduced work schedule did not suit Mr. Fried's assiduous nature as only a week later he returned to working full-time, albeit while continuing to honor his agreement to accept reduced compensation.

8

34.    As Chairman under Mr. McNamara, Mr. Fried continued to play a large and vital role in the Company's operation and development.  Indeed, although no longer involved in all of the day-to-day duties required of a President and CEO, Mr. Fried remained engaged in myriad different areas of the Company's operation, including:

    a.    Developing and implementing new business initiatives;

    b.    Overseeing all Company litigation and legal matters;

    c.    Participating in the negotiation of Company acquisitions;

    d.    Performing risk assessments of large Company projects which did not require surety bonds, as well as large projects requiring bid and/or payment and performance bonds; and

    e.    Preparing, reviewing, and/or approving from a legal perspective all Company contracts and/or terms of agreement not in the ordinary course of business.

35.    Additionally, Mr. Fried cultivated a relationship with Arch Surety (the "Surety") that resulted in a $200 million surety line being opened up to the Company. The relationship with the Surety was built on Mr. Fried's integrity, honesty and hard-work and is an immensely valuable resource to the Company.

36.    As part of his duties as Chairman, Mr. Fried had been responsible for daily management of the relationship with the Surety and ensuring that the $200 million line stayed open to the Company.

**Mr. Fried's Unlawful Termination Based on His Age and in Breach of His Contract**

37.    Mr. McNamara resigned from his position as President and CEO effective in April 2010.  Once again, CHS looked to Mr. Fried's experience and expertise to guide

the Company through a period of transition, and asked him to step in as interim President and CEO and again conduct the search for his replacement.

38.     As he re-assumed the position, Mr. Fried's compensation returned to its previous level, and Defendant Simmons complimented Mr. Fried that he "was earning every penny of it." As interim President and CEO, Mr. Fried again spearheaded efforts to find a permanent replacement, interviewing approximately ten different candidates for the position.

39.     During Mr. Fried's search for a permanent replacement, Defendant State asked Mr. Fried to have him considered for the position and provided Mr. Fried with his resume. After a perfect candidate withdrew, Mr. Fried introduced Defendant State to Russell Reynolds, the executive search firm hired by the Company, and Russell Reynolds introduced Defendant State to CHS and two investment firms that were poised to become new equity partners of the Company, Apollo and Falcon Strategic Partners III, LP ("Falcon").

40.     While Mr. Fried was engaged in the search for a permanent replacement, he was simultaneously leading the Company through a period of renegotiation and recapitalization during the worst economic climate in decades. During Mr. Fried's leadership, the Company was able to eliminate approximately $100 million in debt and put itself on firm financial ground. At a Board meeting held just prior to the closing of the transaction, Defendant Simmons expressed to the Board that the restructuring of the Company loan and recapitalization could not have taken place without Mr. Fried's efforts.

10

41.     When the recapitalization and restructuring closed on or about October 8, 2010, Falcon and Apollo became minority equity shareholders in the Parent and gained, respectively, one and two seats on the Parent's Board.  Apollo's seats on the Board were subsequently filled by Defendants Bagaria and Girardi.

42.     After his introduction, Mr. Fried arranged for Defendant State to be interviewed by the Company's most senior managers and Defendant State became their top choice to fill the position of President and CEO.  Mr. Fried continued vouching for Defendant State and recommended to CHS, Apollo and Falcon (together, the "Equity Partners") that Defendant State indeed take on the role of President and CEO of the Company.  Thanks to the support of Mr. Fried, the Equity Partners agreed.

43.     On or about October 1, 2010, Defendant State commenced employment with the Company as President and CEO.  At that time, Mr. Fried returned to his role as Chairman of the Company.

44.     Although Mr. Fried previously had informed Defendant State of the continuing role he would play as Chairman, he met with Defendant State on or about October 19, 2010, at the Company's corporate office in New York City, to discuss the duties that he had been performing in his previous stint as Chairman.

45.     During this meeting, Mr. Fried presented Defendant State with a list of the duties that Mr. Fried had been performing for almost four years under Mr. McNamara.  Defendant State ignored Mr. Fried's attempt to discuss his responsibilities and instead informed Mr. Fried that all his responsibilities would be transitioned to the Company's managers.  Further, Defendant State ordered Mr. Fried to cease working on numerous projects that he had been managing effectively prior to Defendant State's arrival.

11

46.      When prompted to explain the reason for stripping Mr. Fried of all his responsibilities, in a blatant ageist remark, Defendant State ridiculed Mr. Fried by asking him, "You are 71 years old.  How long do you expect to continue working?"

47.      Mr. Fried left the meeting shocked by the discriminatory animus harbored by Defendant State and the blatant manner in which Defendant State effectuated a breach in Mr. Fried's Employment Contract.

48.      Defendant State was not the only member of the Board who harbored such discriminatory beliefs about Mr. Fried due to his age.

49.      On or about November 2, 2010, Defendant Simmons informed Mr. Fried that, after consulting with other Board members, including those from Apollo, he would like to replace Mr. Fried's Employment Contract with a consulting agreement and transition all of Mr. Fried's day-to-day responsibilities to Defendant State and other members of the Company's management team.

50.      Both Defendants Simmons and State clearly expressed their desire to strip Mr. Fried of his substantive and executive responsibilities on account of his age and in violation of his Employment Contract.

51.      On or about November 4, 2010, the entire Board met in a closed session at Apollo's New York City offices to discuss Mr. Fried's employment status with the Company.  At this meeting, Mr. Fried expressed his opposition to the discriminatory treatment at the hands of Defendant State and even offered Defendant State a chance to repudiate his ageist comments in front of the Board.  Instead of accepting this olive branch, Defendant State affirmed his comments and, ratifying this clear discriminatory

12

intent, the Board members from CHS and Apollo informed Mr. Fried that they were stripping him of his duties.

52.     Prior to this Board meeting, Mr. Fried had reached out to the Board members from CHS and Apollo to tell them of Defendant State's discriminatory treatment, all of whom told Mr. Fried in no uncertain terms that they supported Defendant State and whatever decision he made regarding Mr. Fried's employment status.

**Mr. Fried's Isolation and Termination**

53.     From the time Mr. Fried left his meeting with Defendant State on or about October 19, 2010, he was isolated at the Company.

54.     In fact, after he met with Defendant State, Company managers told Mr. Fried that they had been instructed by Defendant State not to contact Mr. Fried, or to speak with him about new Company matters, and that all their needs should be conveyed to Defendant State.

55.     Defendant State actively worked to exclude Mr. Fried from multiple facets of the Company's operation, including:

      a.    Ordering Mr. Fried to turn over responsibility for securing new corporate office space, a project Mr. Fried had initially been working on for Defendant State;

      b.    Taking over responsibility for expanding the Company's business into the United Kingdom and banning Mr. Fried from future meetings that Mr. Fried was arranging;

   c.  Preventing Mr. Fried from working on a demolition project that was

      being bid that Mr. Fried had been informed of and was attempting to

      secure on behalf of the Company, even though Mr. Fried had

      routinely performed such work under Mr. McNamara; and

   d.  Causing LVI personnel to cease all communications and day-to-day

      involvement with Mr. Fried on business matters.

  56.  On or about November 10, 2010, Mr. Fried was notified that it was the wishes of the Board, including Defendants Simmons, Bagaria and Girardi, that he have no day-to-day involvement in the Company and that Defendant State should have sole discretion to determine the level of Mr. Fried's involvement in the operation of the Company.

  57.  On or about November 15, 2010, Mr. Fried sent, through his counsel by hand delivery, a letter to Defendant State opposing the discriminatory conduct to which he was being subjected.

  58.  The following day, on November 16, 2010, Defendant Simmons, on behalf of the Board, notified Mr. Fried in a written letter that effective November 30, 2010, his employment with the Company would terminate.  After more than 24 years of service, Mr. Fried was given two weeks of notice that his employment would terminate.

  59.  Although Mr. Fried was notified of his termination, Defendants endeavored to exploit Mr. Fried's years of valuable experience and relationship with the Surety by keeping him as a consultant in a "non-executive" capacity.  In exchange for this "new position," Mr. Fried would be required to release Defendants from his age discrimination, as well as other, claims.

60.    Mr. Fried's termination by the Company, including his positions as a director and officer of the LVI Defendants and all subsidiaries and affiliated companies, was effected on November 30, 2010.

61.    Defendants have expressed clearly that Mr. Fried's isolation at the Company, and his termination, related solely to his age.  It is equally clear that his termination was in retaliation for Mr. Fried's protected opposition to Defendants' discrimination toward him.

**A Single/Joint Employer Relationship Exists Between the Company and Parent**

62.    At all relevant times, the LVI Defendants operated as a single, integrated enterprise, a single employer, or as joint employers.

63.    Parent operates from the same offices as the Company.  All the corporate officers of Parent, except Robert G. Hogan who is Assistant Secretary for the purpose of signing documents, are employed by the Company.  Additionally, three of the four officers of Parent maintain offices at the New York corporate office of the LVI Defendants.

64.    Parent is a holding company that maintains no payroll and conducts no business outside of signing documents.

65.    Further, the Board exercises authority over the terms and conditions of employees of the Company.  In particular, the Board altered the terms of Mr. Fried's employment with the Company by stripping him of his job duties and unilaterally terminating his employment.

66.    Additionally, Parent is the sole shareholder and owner of the Company.

67.    The only assets of Parent are the shares it holds of the Company.

15


68.    Due to the foregoing, the LVI Defendants have an interrelation of operations, centralized control over labor relations, common management and common ownership.  As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

### A Single/Joint Employer Relationship Exists Between the Company and CHS

69.    At all relevant times, the Company and CHS operated as a single, integrated enterprise, a single employer, or as joint employers.

70.    CHS is a minority shareholder of Parent, the sole owner of the Company, and has two seats on the Board of Directors of Parent.

71.    With its seats on the Board, CHS participates in the hiring of officers of both the LVI Defendants and operates with the authority to change the terms of employment for employees of the Company, including terminating their employment.

72.    Defendant Simmons, managing partner of CHS, was involved with the hiring of Defendant State, the change in Mr. Fried's terms of employment with the Company, and finally, the termination of Mr. Fried's employment.  Defendant Simmons communicated to Mr. Fried how his employment relationship with the Company would be altered, spoke on behalf of the Board at a meeting of the Board, and ultimately wrote Mr. Fried's letter of termination, speaking on behalf of the Board.

73.    The votes of representatives of two minority shareholders, CHS and Apollo, along with the vote of Defendant State, control the decision-making process of the Board and all of its decisions, including the termination of employment of Mr. Fried.

74.    Due to the foregoing, the Company and CHS have an interrelation of operations, centralized control over labor relations, common management and common

ownership. As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

**A Single/Joint Employer Relationship Exists Between the Company and Apollo**

75.    At all relevant times, the Company and Apollo operated as a single, integrated enterprise, a single employer, or as joint employers.

76.    Apollo is a minority shareholder of Parent, the sole owner of the Company, and has two seats on the Board.

77.    With its seats on the Board, Apollo participates in the hiring of officers of both the LVI Defendants and operates with the authority to change the terms of employment for employees of the Company, including terminating their employment.

78.    The votes of representatives of two minority shareholders, CHS and Apollo, along with the vote of Defendant State, control the decision-making process of the Board and all of its decisions, including the termination of employment of Mr. Fried.

79.    Due to the foregoing, the Company and Apollo have an interrelation of operations, centralized control over labor relations, common management and common ownership. As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

**Damages as a Result of Defendants' Age Discrimination, Retaliation and Breach of Contract**

80.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried is left feeling humiliated, demoralized and demeaned at this complete disregard for his years of exemplary service to the Company resulting from Defendants' discriminatory and retaliatory motivations for terminating him.

81.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered, and will continue to suffer, substantial monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits to which he would otherwise be entitled.

82.     As a further direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered, and will continue to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering.

83.     As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered damage to his reputation and his career.

84.     Defendants' discriminatory, retaliatory, and otherwise unlawful conduct against Mr. Fried was intentional and malicious and/or showed a deliberate, willful, wanton and reckless disregard for Mr. Fried's rights, including his rights under New York City Human Rights Laws.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
**(Discrimination in Violation of New York City Human Rights Law)**

85.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 84, inclusive, as if fully set forth herein.

86.     Defendants have discriminated against Plaintiff on the basis of his age in violation of the New York City Human Rights Law by subjecting Plaintiff to disparate treatment based upon his age, including, but not limited to, by stripping Plaintiff of his responsibilities and terminating Plaintiff because of his age.

87.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and

18

continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

88.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering.

89.    Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of New York City Human Rights Law)

90.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 89, inclusive, as if fully set forth herein.

91.    Defendants have retaliated against Plaintiff in violation of the New York City Human Rights Law by terminating his employment with the Company after Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct.

92.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

93.    As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not

19

limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

94.    Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Aiding and Abetting Violations of New York City Human Rights Law)

95.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 94, inclusive, as if fully set forth herein.

96.    Defendants Parent, CHS, and Apollo, as well as the Individual Defendants, knowingly or recklessly aided and abetted the unlawful, discriminatory employment practices, including retaliation, against Plaintiff in violation of the New York City Human Rights Law.

97.    As a direct and proximate result of these aider and abettor Defendants' unlawful and discriminatory conduct, including retaliation, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

98.    As a direct and proximate result of these aider and abettor Defendants' unlawful discriminatory conduct, including retaliation, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

99.    The aider and abettor Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Breach of Contract)**

100.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 99, inclusive, as set forth herein.

101.    Plaintiff and the LVI Defendants are parties to an enforceable Employment Contract that includes an obligation by the LVI Defendants to employ Plaintiff as Chairman with "primary responsibility for strategic growth."

102.    The LVI Defendants willfully and wantonly breached the Employment Contract by stripping Plaintiff of his substantive responsibilities and terminating his employment.

103.    As a direct and proximate result of the LVI Defendants' breach of contract, Plaintiff has suffered and continues to suffer, substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

104.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 103, inclusive, as set forth herein.

105.    Plaintiff and the LVI Defendants are parties to an enforceable Employment Contract.

21

106.    The Employment Contract between Plaintiff and the LVI Defendants contained an implied covenant of good faith and fair dealing.

107.    The LVI Defendants willfully and wantonly breached the implied covenant of good faith and fair dealing by, among other wrongful conduct, stripping Plaintiff of his substantive responsibilities, undermining his authority as Chairman of LVI, directing LVI employees to cease contacting Plaintiff, endeavoring to exploit Plaintiff's business relationships and industry experience, and terminating Plaintiff's employment in retaliation for engaging in protected activity.

108.    As a direct and proximate result of the LVI Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer, substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Tortious Interference with Employment and/or Contractual Relations)

109.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 though 108, inclusive, as set forth herein.

110.    To the extent that it could be concluded that any of the Corporate Defendants were not single or joint employers with the Company, those entities, and the Individual Defendants acting on their behalf, tortiously interfered with Plaintiff's employment with the Company by conspiring to strip Plaintiff of his job duties, transition his duties to members of the Company management team, and terminate his employment.

111.    The tortiously interfering Defendants acted willfully, wrongfully, maliciously and/or violated a duty owed to Plaintiff by conspiring to strip Plaintiff of his

job duties, transition his duties to members of the Company management team, and terminate his employment.

112.    The tortiously interfering Defendants were motivated solely by malice and/or a desire to inflict injury on Plaintiff by unlawful means.

113.    As a direct and proximate result of these tortiously interfering Defendants' tortious interference with Plaintiff's employment and/or contractual relations at the Company, Plaintiff has suffered and continues to suffer substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

114.    The tortiously interfering Defendants' unlawful conduct, including tortiously interfering with Plaintiff's employment and/or contractual relations, constitutes a willful and wanton violation of the New York common law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the City and State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory and/or otherwise unlawful treatment of him, as well as to take such affirmative action, including but not limited to reinstatement,

23

as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

      D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

      E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damage, including, but not limited to, compensation for his severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering and any other physical or mental injuries;

      F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

      G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

      H.      An award of punitive damages;

      I.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

      J.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated

herein.

Dated:  New York, New York
          December 13, 2010          Respectfully submitted,


                                     **THOMPSON WIGDOR & GILLY LLP**

                                     By: _____
                                            Douglas H. Wigdor
                                            Scott B. Gilly

                                     85 Fifth Avenue
                                     New York, New York 10118
                                     Telephone:  (212) 257-6800
                                     Facsimile:  (212) 257-6845
                                     dwigdor@twglaw.com

                                     *Attorneys for Plaintiff Burton T. Fried*

Case 3:11-cv-01855-JBA   Document 50-27   Filed 04/27/12   Page 27 of 28

JS 44C/SDNY
REV. 1/2008

**JUDGE RAKOFF**   CIVIL COVER SHEET   **10 CV 9308**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

*13 2010*

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Burton T. Fried | LVI SERVICES, INC.; LVI PARENT CORP.; CODE HENNESSY SIMMONS LLC d/b/a CHS PRIVATE EQUITY V LP; APOLLO INVESTMENT CORP.; SCOTT E. STATE; BRIAN SIMMONS, RAJAY BAGARIA; GERALD J. GIRARDI |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Douglas H. Wigdor, Esq., Thompson Wigdor & Gilly LLP 85 Fifth Avenue, New York, NY 10003 (212) 257-6800 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C.§1332: Breach of contract and age discrimination in violation of NYC Human Rights Law, NYC Administration Code §§8-101 et seq.

Has this or a similar case been previously filed in SDNY at any time? No? ☒ Yes? ☐   Judge Previously Assigned _____

If yes, was this case  Vol.☐  Invol. ☐   Dismissed.  No ☐  Yes ☐   If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*   NATURE OF SUIT

**TORTS**   **ACTIONS UNDER STATUTES**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110  INSURANCE | [ ] 310  AIRPLANE | [ ] 362  PERSONAL INJURY - MED MALPRACTICE | [ ] 610  AGRICULTURE | [ ] 422  APPEAL 28 USC 158 | [ ] 400  STATE REAPPORTIONMENT |
| [ ] 120  MARINE | [ ] 315  AIRPLANE PRODUCT LIABILITY | [ ] 365  PERSONAL INJURY | [ ] 620  OTHER FOOD & DRUG | [ ] 423  WITHDRAWAL 28 USC 157 | [ ] 410  ANTITRUST |
| [ ] 130  MILLER ACT | [ ] 320  ASSAULT, LIBEL & SLANDER | [ ] 368  ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625  DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430  BANKS & BANKING |
| [ ] 140  NEGOTIABLE INSTRUMENT | [ ] 330  FEDERAL EMPLOYERS' LIABILITY | | | | [ ] 450  COMMERCE |
| [ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340  MARINE | | | **PROPERTY RIGHTS** | [ ] 460  DEPORTATION |
| | [ ] 345  MARINE PRODUCT LIABILITY | **PERSONAL PROPERTY** | [ ] 630  LIQUOR LAWS | [ ] 820  COPYRIGHTS | [ ] 470  RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151  MEDICARE ACT | | [ ] 370  OTHER FRAUD | [ ] 640  RR & TRUCK | [ ] 830  PATENT | |
| [ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL. VETERANS) | [ ] 350  MOTOR VEHICLE | [ ] 371  TRUTH IN LENDING | [ ] 650  AIRLINE REGS | [ ] 840  TRADEMARK | [ ] 480  CONSUMER CREDIT |
| | [ ] 355  MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380  OTHER PERSONAL PROPERTY DAMAGE | [ ] 660  OCCUPATIONAL SAFETY/HEALTH | | [ ] 490  CABLE/SATELLITE TV |
| [ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360  OTHER PERSONAL INJURY | [ ] 385  PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 690  OTHER | **SOCIAL SECURITY** | [ ] 810  SELECTIVE SERVICE |
| | | | | [ ] 861  HIA (1395ff) | [ ] 850  SECURITIES/COMMODITIES/EXCHANGE |
| [ ] 160  STOCKHOLDERS SUITS | | | **LABOR** | [ ] 862  BLACK LUNG (923) | [ ] 875  CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 190  OTHER CONTRACT | | | [ ] 710  FAIR LABOR STANDARDS ACT | [ ] 863  DIWC/DIWW (405(g)) | |
| [ ] 195  CONTRACT PRODUCT LIABILITY | | | [ ] 720  LABOR/MGMT RELATIONS | [ ] 864  SSID TITLE XVI | [ ] 890  OTHER STATUTORY ACTIONS |
| | | | [ ] 730  LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 865  RSI (405(g)) | [ ] 891  AGRICULTURAL ACTS |
| [ ] 196  FRANCHISE | **ACTIONS UNDER STATUTES** | | [ ] 740  RAILWAY LABOR ACT | **FEDERAL TAX SUITS** | [ ] 892  ECONOMIC STABILIZATION ACT |
| | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790  OTHER LABOR LITIGATION | [ ] 870  TAXES (U.S. Plaintiff or Defendant) | [ ] 893  ENVIRONMENTAL MATTERS |
| **REAL PROPERTY** | [ ] 441  VOTING | [ ] 510  MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 791  EMPL RET INC SECURITY ACT | [ ] 871  IRS-THIRD PARTY 28 USC 7609 | [ ] 894  ENERGY ALLOCATION ACT |
| | [x] 442  EMPLOYMENT | | | | [ ] 895  FREEDOM OF INFORMATION ACT |
| [ ] 210  LAND CONDEMNATION | [ ] 443  HOUSING/ACCOMMODATIONS | [ ] 530  HABEAS CORPUS | **IMMIGRATION** | | [ ] 900  APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 220  FORECLOSURE | [ ] 444  WELFARE | [ ] 535  DEATH PENALTY | | | |
| [ ] 230  RENT LEASE & EJECTMENT | [ ] 445  AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540  MANDAMUS & OTHER | [ ] 462  NATURALIZATION APPLICATION | | |
| [ ] 240  TORTS TO LAND | [ ] 446  AMERICANS WITH DISABILITIES -OTHER | [ ] 550  CIVIL RIGHTS | [ ] 463  HABEAS CORPUS-ALIEN DETAINEE | | [ ] 950  CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 245  TORT PRODUCT LIABILITY | [ ] 440  OTHER CIVIL RIGHTS | [ ] 555  PRISON CONDITION | [ ] 465  OTHER IMMIGRATION ACTIONS | | |
| [ ] 290  ALL OTHER REAL PROPERTY | | | | | |

*923487*

_Check if demanded in complaint:_

☐ CHECK IF THIS IS A CLASS ACTION
    UNDER F.R.C.P. 23

DEMAND $_____   OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

_Check YES only if demanded in complaint_
JURY DEMAND: ☐ YES ☐ NO

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

· · . ·

| (PLACE AN *x* IN ONE BOX ONLY) | | | ORIGIN | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2a. Removed from State Court ☐ 2b.Removed from State Court AND at least one party is pro se. | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment |

| (PLACE AN *x* IN ONE BOX ONLY) | | BASIS OF JURISDICTION | | IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441) |
|---|---|---|---|---|
| ☐ 1 U.S. PLAINTIFF | ☐ 2 U.S. DEFENDANT | ☐ 3 FEDERAL QUESTION (U.S. NOT A PARTY) | ☒ 4 DIVERSITY | |

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 | [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 | [ ]5 |
| CITIZEN OF ANOTHER STATE | ☒2 | [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 | ☒4 | FOREIGN NATION | [ ]6 | [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

    Mr. Burton T. Fried
    149 Roseville Road
    Westport , CT 06880
    c/o Thompson Wigdor Gilly LLP
      85 Fifth Ave
    New York, NY 10003 (New York County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

    LVI Services Inc., 80 Broad Street, New York, NY, 10004 (New York County);
    LVI Parent Corp, 80 Broad Street, New York, NY, 10004 (New York County);
    Apollo Investment Corporation, 9 West 57th Street, New York, NY, 10019 (New York County);
    Code Hennessy Simmons LLC, 10 South Wacker Drive, Suite 3175, Chicago, IL 60606 (Cook County)

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:
    Scott E. State;
    Rajay Bagaria;
    Gerald J. Girardi; and
    Brian Simmons

| Check one: | THIS ACTION SHOULD BE ASSIGNED TO: (DO NOT check either box if this a PRISONER PETITION.) | ☐ WHITE PLAINS | ☒ MANHATTAN |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|---|
| | *Scott Gilly* | [ ] NO ☒ YES (DATE ADMITTED Mo. **01** Yr. **2000** ) |
| RECEIPT # | | Attorney Bar Code # **SG-6861** |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED **MAG JUDGE FRANCIS**

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)