# 13-1165-cv

# United States Court of Appeals
## for the
## Second Circuit

———◆❉◆———

SHARI L. DEMBIN,

*Plaintiff,*

BURTON T. FRIED,

*Plaintiff-Appellant,*

– v. –

LVI SERVICES, INC., LVI PARENT CORP., SCOTT E. STATE,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## JOINT APPENDIX
## Volume IV of VI (Pages A-768.1 to A-825)

JACKSON LEWIS LLP
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4006

– and –

LITTLER MENDELSON, P.C.
One Century Tower, Suite 300
265 Church Street
New Haven, Connecticut 06510
(203) 974-8700

*Attorneys for Defendants-Appellees*

THOMPSON WIGDOR LLP
85 Fifth Avenue
New York, New York 10003
(212) 257-6800

– and –

MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capital Avenue, Suite 201
Hartford, Connecticut 06106
(860) 246-2466

*Attorneys for Plaintiff-Appellant*

i

# Table of Contents

**Page**

Lower Court Docket Entries ...................................................... A-1

Motion by Defendants for an Order Granting Summary
    Judgment, Dated April 26, 2012 ........................................... A-13

Defendants' Local Rule 56(a)1 Statement,
    Dated April 26, 2012 ............................................................. A-15

Affirmation of Michael D. Mann, for Defendants, in Support
    of Motion, Dated April 26, 2012 ......................................... A-22

Exhibit A to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
    Dated September 21, 2010 .................................................... A-28

Exhibit B to Mann Affirmation -
Excerpts from Deposition Transcript of Burton T. Fried,
    Dated May 20, 2011 .............................................................. A-30

Exhibit C to Mann Affirmation -
Complaint, Dated November 30, 2011.................................. A-93

Exhibit D to Mann Affirmation -
LVI Services Investment Memorandum,
    Dated October 28, 2005 ....................................................... A-107

Exhibit E to Mann Affirmation -
Employment Agreement between Burton T. Fried and
    LVI Services, Inc., Dated November 16, 2005 .................... A-119

Exhibit F to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
    Dated September 22, 2010 .................................................... A-123

Exhibit G to Mann Affirmation -
Email from Burton T. Fried to John Leonard and
    Paul Cutrone, Dated September 21, 2010 ............................ A-125

Exhibit H to Mann Affirmation -
Email from Brian Simmons to Scott E. State,
    Dated September 23, 2010 .................................................... A-127

Exhibit I to Mann Affirmation -
Email from Scott E. State to Brian Simmons
    and Rajay Bagaria, Dated October 29, 2010 ....................... A-130

ii

**Page**

Exhibit J to Mann Affirmation -
Excerpts from Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................  A-133

Exhibit K to Mann Affirmation -
Email from Burton Fried to Scott E. State,
Dated October 3, 2010 .......................................................  A-151

Exhibit L to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 13, 2010 .....................................................  A-154

Exhibit M to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated October 3, 2010 .......................................................  A-162

Exhibit N to Mann Affirmation -
Email from Robert Hogan to Scott E. State,
Dated October 5, 2010 .......................................................  A-165

Exhibit O to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 .....................................................  A-168

Exhibit P to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 .....................................................  A-170

Exhibit Q to Mann Affirmation -
Email from Scott E. State to Scott Simmons
and Robert Hogan, Dated October 14, 2010 ......................  A-173

Exhibit R to Mann Affirmation -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010 .....................................................  A-176

Exhibit S to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated October 28, 2010 .....................................................  A-179

Exhibit T to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 2, 2010 ....................................................  A-182

Exhibit U to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated June 23, 2006 ...........................................................  A-186

iii

**Page**

Exhibit V to Mann Affirmation -
Email from Burton T. Fried to Mike Lane,
Dated June 30, 2005............................................................ A-189

Exhibit W to Mann Affirmation -
Email from Brian Simmons to Scott E. State
and Rajay Bagaria, Dated November 10, 2010.................... A-191

Exhibit X to Mann Affirmation -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011 ............................................................ A-193

Exhibit Y to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010 ................................................... A-209

Exhibit Z to Mann Affirmation -
Email from Scott E. State to Brian Simmons and
Rajay Bagaria, Dated November 16, 2010.......................... A-216

Exhibit AA to Mann Affirmation -
Email from Scott E. State to John Leonard,
Dated November 30, 2010 ................................................... A-223

Exhibit BB to Mann Affirmation -
Complaint in *Fried v. LVI Services, Inc., et al.*, Southern
District Case No. 10-cv-9308, Filed December 13, 2010 .... A-226

Exhibit CC to Mann Affirmation -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011 ................................................................. A-254

Exhibit DD to Mann Affirmation -
Charge of Discrimination Filed with the State of Connecticut,
Commission on Human Rights and Opportunities on
May 16, 2011 ...................................................................... A-287

Exhibit EE to Mann Affirmation -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Filed October 27, 2011 ................................... A-303

iv

**Page**

Exhibit FF to Mann Affirmation -
Opinion and Order of the Honorable Jed S. Rakoff
in *Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011 ...................... A-306

Exhibit GG to Mann Affirmation -
Docket Entries in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308 .............................. A-342

Exhibit HH to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated September 19, 2010 .................................................... A-360

Exhibit II to Mann Affirmation -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities ................................................................ A-364

Exhibit JJ to Mann Affirmation -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
November 14, 2011 ............................................................. A-367

Exhibit KK to Mann Affirmation -
Scheduling Order of the United States Court of Appeals
for the Second Circuit, Dated March 1, 2012 ..................... A-370

Declaration of Shaffin A. Datoo, for Plaintiff, in Opposition
to Motion, Dated May 31, 2012 .......................................... A-372

Exhibit 1 to Datoo Declaration -
Complaint, Dated November 30, 2011
(Reproduced herein at pp. A-93–A-106)

Exhibit 2 to Datoo Declaration -
Answer, Dated February 16, 2011 ....................................... A-377

Exhibit 3 to Datoo Declaration -
Excerpts from Deposition Transcript of Rajay Bagaria,
Dated June 23, 2011 ............................................................ A-392

Exhibit 4 to Datoo Declaration -
Excerpts from Deposition Transcript of Paul Cutrone,
Dated June 1, 2011 .............................................................. A-405

v

**Page**

Exhibit 5 to Datoo Declaration -
Excerpts from Deposition Transcript of Gerald Girardi,
Dated May 23, 2011 ............................................................ A-431

Exhibit 6 to Datoo Declaration -
Excerpts from Deposition Transcript of Greg DiCarlo,
Dated June 2, 2011 ............................................................ A-449

Exhibit 7 to Datoo Declaration -
Excerpts from Deposition Transcript of John Leonard,
Dated June 3, 2011 ............................................................ A-464

Exhibit 8 to Datoo Declaration -
Excerpts from Deposition Transcript of John Schnabel,
Dated June 1, 2011 ............................................................ A-491

Exhibit 9 to Datoo Declaration -
Email from Scott E. State to David S. Hicks,
Dated November 5, 2010 .................................................... A-507

Exhibit 10 to Datoo Declaration -
Excerpts from Human Resources "The Bible" ................... A-509

Exhibit 11 to Datoo Declaration -
Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................ A-513

Exhibit 12 to Datoo Declaration -
Deposition Transcript of Burton T. Fried,
Dated May 20, 2011 ............................................................ A-620

Exhibit 13 to Datoo Declaration -
Employment Agreement between Burton T. Fried and
LVI Services, Inc., Dated November 16, 2005
(Reproduced herein at pp. A-119–A-122)

Exhibit 14 to Datoo Declaration -
Document Entitled "VI Services Names Robert A.
McNamara as President and CEO," Dated
July 13, 2006 ...................................................................... A-769

Exhibit 15 to Datoo Declaration -
Declaration of Burton T. Fried in *Fried v. LVI Services,
Inc., et al.*, Southern District Case No. 10-cv-9308,
Dated June 20, 2011 ............................................................ A-772

vi

**Page**

Exhibit 16 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated May 12, 2010 ............................................................. A-778

Exhibit 17 to Datoo Declaration -
Document Entitled "AIC Memorandum,"
Dated June 11, 2010 ............................................................. A-780

Exhibit 18 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 14, 2010 .................................................... A-799

Exhibit 19 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 19, 2010 .................................................... A-802

Exhibit 20 to Datoo Declaration -
Document Entitled "LVI Services Names Scott E. State
as President and CEO," Dated September 27, 2010 ............ A-806

Exhibit 21 to Datoo Declaration -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010
(Reproduced herein at pp. A-176–A-178)

Exhibit 22 to Datoo Declaration -
Minutes of Meeting of the Boards of Directors
of LVI Parent Corp. ............................................................. A-809

Exhibit 23 to Datoo Declaration -
Excerpts from Deposition Transcript of Jeffrey Smith,
Dated June 8, 2011 .............................................................. A-813

Exhibit 24 to Datoo Declaration -
Letter from Douglas H. Wigdor to Scott E. State,
Dated November 15, 2010 .................................................... A-826

Exhibit 25 to Datoo Declaration -
Handwritten Notes by Gerald Girardi,
Dated November 15, 2010 .................................................... A-832

Exhibit 26 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010
(Reproduced herein at pp. A-209–A-215)

**Page**

Exhibit 27 to Datoo Declaration -
Scott E. State's Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 14, 2011 .................................................................... A-834

Exhibit 28 to Datoo Declaration -
Brian Simmons' Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 24, 2011 .................................................................... A-851

Exhibit 29 to Datoo Declaration -
Gerald Girardi's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 ..................................... A-866

Exhibit 30 to Datoo Declaration -
Rajay Bagaria's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 ..................................... A-881

Exhibit 31 to Datoo Declaration -
Letter from Burton T. Fried to the Board of Directors
of LVI Parent Corp., *et al.*, Dated November 30, 2010 ....... A-896

Exhibit 32 to Datoo Declaration -
Order of the Honorable Jed S. Rakoff in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Dated September 2, 2011 .......................... A-898

Exhibit 33 to Datoo Declaration -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011 ............................................................ A-901

Exhibit 34 to Datoo Declaration -
Email from Scott E. State to Scott Simmons and
Robert Hogan, Dated October 14, 2010
(Reproduced herein at pp. A-173–A-176)

viii

**Page**

Exhibit 35 to Datoo Declaration -
Opinion and Order of the Honorable Jed S. Rakoff in
*Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011
(Reproduced herein at pp. A-306–A-341)

Exhibit 36 to Datoo Declaration -
Email from John Leonard to Scott E. State,
Dated October 14, 2010, with Attachments ......................... A-912

Exhibit 37 to Datoo Declaration -
Email from Burton T. Fried to Brian Simmons,
Dated September 22, 2010
(Reproduced herein at pp. A-123–A-124)

Exhibit 38 to Datoo Declaration -
Email from Burton Fried to John Leonard and Paul
Cutrone, Dated September 23, 2010 ................................... A-918

Exhibit 39 to Datoo Declaration -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011
(Reproduced herein at pp. A-254–A-286)

Exhibit 40 to Datoo Declaration -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Filed October 27, 2011
(Reproduced herein at pp. A-303–A-305)

Exhibit 41 to Datoo Declaration -
Charge of Discrimination Filed with the State of
Connecticut, Commission on Human Rights and
Opportunities on
May 16, 2011
(Reproduced herein at pp. A-287–A-302)

Exhibit 42 to Datoo Declaration -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities
(Reproduced herein at pp. A-364–A-366)

ix

**Page**

Exhibit 43 to Datoo Declaration -
Excerpts from Memorandum of Law in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated June 10, 2011 ................................. A-920

Exhibit 44 to Datoo Declaration -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated November 14, 2011
(Reproduced herein at pp. A-367–A-369)

Exhibit 45 to Datoo Declaration -
Brief of The Equal Opportunity Commission *Amicus Curiae*, Filed in the United States Court of Appeals for the Second Circuit on March 5, 2012 ............................ A-922

Plaintiff's Local Rule 56(a)2 Statement,
Dated May 31, 2012 ............................................................. A-965

Notice of Appeal, Dated March 28, 2013 ................................ A-974

**OTHER RELEVANT DOCUMENTS**

Charge of Discrimination Filed with the Equal Employment Opportunity Commission ...................................................... A-976

Answer to Amended Complaint in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated April 18, 2011 ...................................................................... A-981

Memorandum of Law by Defendants in Support of Motion in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated June 10, 2011 ................................. A-1003

Memorandum of Law by Plaintiff, in Opposition to Motion in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated June 20, 2011 ................................. A-1032

Reply Memorandum of Law, by Defendants, in Further Support of Motion in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated June 27, 2011 ...................................................................... A-1064

Transcript of Oral Argument Proceedings held before the Honorable Jed S. Rakoff, Dated July 6, 2011 ...................... A-1078

x

**Page**

Appellant's Brief in *Fried v. LVI Services, Inc., et al.*,
  Second Circuit Docket No. 11-4791-cv, Dated
  February 27, 2012 ................................................................. A-1113

Appellees' Brief in *Fried v. LVI Services, Inc., et al.*,
  Second Circuit Docket No. 11-4791-cv, Dated
  May 29, 2012 ....................................................................... A-1170

Appellant's Reply Brief in *Fried v. LVI Services, Inc., et al.*,
  Second Circuit Docket No. 11-4791-cv, Dated
  June 12, 2012 ....................................................................... A-1228

Transcript of Proceedings in *Fried v. LVI Services, Inc., et
  al.*, Southern District Case No. 10-cv-9308, Dated
  October 5, 2012 .................................................................... A-1260

Mandate in *Fried v. LVI Services, Inc., et al.*, Second Circuit
  Docket No. 11-4791-cv, Dated December 26, 2012 ............ A-1309

149

1                    Burton T. Fried

2    who did that, in your opinion?

3           A.    He didn't do it in these two

4    instances.

5           Q.    Did he do it in any other

6    instances?

7           A.    I wouldn't know.  These are the

8    only ones that I was involved in.  There were no

9    instances in which I asked him to check with me

10   historical information.

11              For example, if -- if I was suing

12   someone for $1.6 million and an offer of

13   settlement was given to settle the case for

14   400,000, I would expect that he would -- and I

15   was handling the case and I knew the merits --

16   you're a lawyer so I can relate this to you --

17   and he would decide to settle a case for 400,

18   without knowing anything about the case or the

19   historical reference, you wouldn't think that

20   was an appropriate decision, would you?

21          Q.    Would you?

22          A.    Absolutely not, nor would any

23   other sensible and intelligent person.

24          Q.    Do you still -- when we first

25   started this section of the deposition, I asked

150

1                    Burton T. Fried

2  you if you experienced any problems in

3  transitioning your responsibilities with

4  Mr. State.  Wouldn't you consider this to be a

5  problem in transition?

6          A.    No.  Just alerting him at -- to

7  the sensitivity of doing something, which I'm

8  sure he knew he should have done and should do

9  going forward.

10         Q.    Did Mr. State ever get back to you

11 about this e-mail that you sent him?

12         A.    Well, I did have a discussion with

13 him about the CIO.

14         Q.    What was the discussion about?

15         A.    I explained to him everything I

16 just explained to you in the previous answer as

17 to what had occurred with the department, all of

18 the senior management supporting the hiring of a

19 CIO and the reason for the hiring of a CIO or at

20 least the search for one.

21         Q.    Right, and what was Mr. State's

22 response to you?

23         A.    He said that he was smarter than

24 any CIO and that he was an expert in computers

25 and he was an expert in selection and

151

1                    Burton T. Fried

2    transferring of software systems and, if

3    necessary, he knew a consultant that could

4    advise him.

5         Q.    Do you know whether Mr. State was

6    an expert in computers?

7         A.    I had no idea.

8         Q.    If he had been an expert in

9    computers, would that have been a reasonable

10   point of view not to hire a CIO?

11        A.    No.

12        Q.    Why?

13        A.    Well, you know, you can be an

14   expert in computers but Mr. State was unaware of

15   the amount of time it would take, and devotion,

16   both in the review, investigation and

17   determination of what the available software is,

18   and once selected, the entire process of

19   transitioning one software into the other could

20   take up to a year where the failure rate of

21   interruption is more than 50 percent.

22              I don't think that's the proper

23   amount of effort that a CEO should be directed

24   to, but really should be with someone else, over

25   his control and his direction, but certainly

152

```
 1                Burton T. Fried
 2  shouldn't devote his time and effort to that.
 3        Q.    Did the CIO position -- was that
 4  suspended and never picked up again, to your
 5  knowledge?
 6        A.    I know it was suspended.  To my
 7  knowledge, it was suspended.  I don't know if it
 8  resumed.
 9              MS. SELTZER:  Can you mark this as
10              Exhibit 12, please.
11              (E-mail string, first one dated
12              October 13, 2010 marked Fried Exhibit 12
13              for identification.)
14        Q.    Were you -- after this
15  conversation that you had with Mr. State about
16  the CIO position being on hold, were you
17  beginning to understand that Mr. State was --
18  intended to run the business the way he wanted
19  to run it on his terms?
20        A.    I always believed he would run it
21  on his terms.  Nothing changed.
22        Q.    Exhibit Number 12 is an e-mail
23  from Burton Fried to Scott State dated
24  October 13th, 2010.  If you would just
25  familiarize yourself with this e-mail.
```

A-768.5

                                                      153

1                    Burton T. Fried

2          A.     Yes.

3          Q.     Who is Ted Southern?

4          A.     He is a national marketing person

5    focusing on the power industry.

6          Q.     And what was the Boeing

7    opportunity?

8          A.     It was an opportunity that Squibb

9    Demolition called me about from Great Britain,

10   in that they were prequalified to submit a bid

11   for the structural demolition and remediation of

12   a facility in the State of Washington.  LVI had

13   not received such an invitation.  Nevertheless,

14   Squibb said that they would like to discuss with

15   me the teaming of that project pursuant to a

16   teaming agreement that we had entered into.

17         Q.     Had Mr. Southern been involved in

18   any of these negotiations with Squibb?

19         A.     No.

20         Q.     These e-mails between Mr. Southern

21   and LES and Robert Simms, it looks like, from

22   Squibb, were these an indication that Mr. Ted

23   actually had had some involvement in this deal

24   requiring this conversation that you had with

25   Mr. State -- in this deal?

              Elisa Dreier Reporting Corp. (212) 557-5558
                 950 Third Avenue, New York, NY 10022

154

1                    Burton T. Fried

2          A.    Ted had no substantive involvement

3    in either the creation of the transaction, the

4    negotiation of the transaction, the negotiation

5    of the terms of the agreement that went back and

6    forth or the ultimate agreement of the parties

7    to the transaction.  I did that solely and

8    unilaterally.  I designated Ted as our point of

9    contact for communications with respect to if

10   they couldn't get me, get Ted and he'll get me.

11   Or any -- oh.

12                    Specifically -- actually, I did

13   ask him to do something.  I asked him to develop

14   a prequalification book, joint prequalification

15   book, between Squibb and LVI that we could

16   jointly deliver in Great Britain or Europe and

17   as well as the United States.  And I asked Ted

18   to do that because he was in the marketing area

19   and that he could use the resources that --

20   people in the Westport office.  But asked him to

21   do that kind of detail rather than do the detail

22   himself or ask me to do the detail as CEO.

23                    So to that extent, when I went to

24   Great Britain, I took John Leonard with me and I

25   took Ted with me, and so that they were familiar

155

1                    Burton T. Fried

2    with the people on the other side if in fact we

3    reached an agreement and there was a

4    follow-through then by Ted.

5            Q.    And what Mr. State is

6    communicating to you is that he wants to have a

7    meeting with him and Ted, correct, to explain

8    his take on the Vision versus Squibb situation;

9    is that right?

10           This is the e-mail from Scott

11   dated 10/30/2010, so he's proposing that he go

12   forward with -- with Ted to look into this deal?

13           A.    Into what?  I don't quite

14   understand what you mean by --

15           Q.    It says here, "No meeting

16   scheduled.  I want a better idea on the agenda

17   before we burn a bunch of money" -- "of time and

18   money flying people to New York.  John and I are

19   also trying to get Ted to explain his take on

20   the Vision versus Squibb.  Planning a point call

21   from John and I to Squibb when he and I are in

22   the Denver office together."

23           So he's basically, at least from

24   what I'm reading on this, going to be taking

25   your part in the ongoing negotiations with

156

1                    Burton T. Fried

2    Squibb; is that right?

3           A.    Well, yes.  And he didn't bring

4    that clearly to my attention until the 19th of

5    October, the following week.

6           Q.    What do you think he was saying

7    here?

8           A.    No, he was just getting involved

9    to understand it, but it was on the 19th that he

10   said he didn't want me at a meeting with Squibb

11   in New York and that he would be responsible for

12   acquisitions, and I said fine.

13                In this particular -- he had no

14   idea anything historical about Squibb.  He had

15   no idea who the people involved were, what the

16   entire thought process was in entering into the

17   transaction.  He even went off on thinking that

18   we were paying for their air travel coming in,

19   which was not the case.  And all of that fog of

20   what he thought could have been cleared up if he

21   had a simple conversation with me, again, with

22   respect to the historical reference of how this

23   transaction went and where it was as of this

24   date, and then he could proceed with

25   intelligence and knowledge.

A-768.9

1                    Burton T. Fried

2          Q.     Did you try to reach out to him?

3          A.     To whom?

4          Q.     To Scott, to describe these things

5    to him by telephone?

6          A.     No.  I didn't even know what he

7    was doing with -- I think I did speak to him

8    with respect to it.

9                 No, I wrote him an e-mail back and

10   I explained to him, and it was the first

11   instance I knew what his thoughts were and where

12   his head was, in that he was going to speak to

13   John when he got to Denver.  So I frankly never

14   had an experience working with a senior

15   executive in the manner in which he was

16   approaching the business, but certainly I felt

17   it was my duty, especially as a shareholder, to

18   explain to him that he ought to have the

19   historical reference before making a decision.

20         Q.     Couldn't John have given him the

21   historical reference?

22         A.     John didn't deal with Squibb in

23   the negotiations and all the other numerous

24   conversations with their representatives as I

25   did, nor did John have the conversation with

A-768.10

1              Burton T. Fried

2   Squibb with respect to their coming to visit us,

3   so he didn't know what arrangements were being

4   made or why they were coming to visit us.

5          Q.    You write in your response back to

6   Mr. State, "Very strange you seek advice from

7   Ted but none from me, but it's your decision."

8              Did it bother you that Mr. State

9   was seeking Ted's advice and not yours?

10         A.    You know, he was the final

11  decision-maker.  As I indicated, "it's your

12  decision," but it was strange that he wouldn't

13  come to me.  Since I was the architect of the

14  deal in handling it personally, as opposed to

15  Ted, that he wouldn't seek just my historical

16  reference to it before proceeding.

17             My sole interest was not Scott

18  State.  My sole interest was the success of LVI,

19  and that was my endeavor for 24 years.  To the

20  extent he was proceeding in a way that I thought

21  was not the best way, I was bringing it to his

22  attention but telling him, as I did in the

23  e-mail, "it's your decision."

24         Q.    Do you feel that your input as it

25  not being the right way was being ignored?

A-768.11

159

1                    Burton T. Fried

2          A.    I don't know.  He might have been

3    preoccupied because of his travel.  But, you

4    know, no different than the IT situation, we did

5    speak and I explained to him, he gave his -- his

6    point of view and I said, "Fine.  I only want

7    you to know the history, it's your decision."

8          Q.    Did you ever speak to Brian

9    Simmons about these issues that were arising

10   with respect to his not listening to your

11   advice?

12         A.    I didn't think it rose to the

13   level of speaking to Brian Simmons over a couple

14   of different issues while he's acclimating

15   himself to the company, no.  I didn't think it

16   was critical.  I didn't think it was ultra

17   important and I thought that it was just a

18   couple of items that he should talk to me about.

19   That's all.

20         Q.    Any other items that he didn't

21   talk to you about that you thought he should

22   have during this initial period of his

23   employment?

24         A.    Not that I can recall.

25         Q.    Did you suspect that the

        Elisa Dreier Reporting Corp. (212) 557-5558
            950 Third Avenue, New York, NY 10022

A-768.12

1                   Burton T. Fried

2    difficulties at this point in time that you were

3    having with Mr. State were due to your age?

4          A.    That was what?

5          Q.    Did you suspect that the time that

6    these issues were arising with Mr. State that

7    these issues were arising because of your age?

8          A.    No.

9          Q.    What did you think was happening?

10         A.    I did think he was just trying to

11   handle too much at one time and wasn't thinking

12   it through, and I was trying to give him some

13   guidance.

14         Q.    Was Mr. State getting guidance

15   from your management team?

16         A.    I'm sure they were giving him

17   guidance on issues that they were familiar with.

18         Q.    Did you ever speak to John Leonard

19   about your concerns that Mr. State wasn't paying

20   attention to your advice?

21         A.    I don't recall.  And certainly one

22   or two matters like this in the life of a CEO or

23   a chairman don't rise to the level of talking to

24   others, necessarily, complaining or anything

25   like that.  We have too much else to do.

161

```
 1              Burton T. Fried
 2        Q.    How about Mr. Cutrone, did you
 3   ever talk to him?
 4        A.    I don't recall ever doing that,
 5   but if it came up during a subject, we discussed
 6   it for a couple of milliseconds, but it's not
 7   something that we have the time to spend on.  We
 8   were too busy trying to do business.
 9        Q.    Was Mr. State ever under the
10   impression that you worked part-time as a
11   chairman?
12        A.    Who?
13        Q.    Mr. State?
14        A.    Was he under the impression?  He
15   may have mentioned it to me, or Simmons, I
16   think, may have said it to him or somebody at
17   Code Hennessy may have mentioned to him they
18   thought I was working part-time, but they knew
19   better than that.
20        Q.    Did Mr. State -- did Mr. State
21   ever take that up with you, to ask you whether
22   you worked part-time or full-time?
23        A.    I don't recall.  Again, it's such
24   a silly item.  Everybody in the company who had
25   any knowledge of operations in the business knew
```

162

1                  Burton T. Fried

2  I didn't work part-time.  You could ask, as you

3  pointed out, anybody in the field if Burt Fried

4  worked part-time.  On the contrary, I worked

5  seven days a week for this company.

6          Q.    Did Mr. State ever raise that with

7  you in your conversations with him, whether you

8  were a full-time or part-time employee?

9          A.    I don't know.  He may have made a

10 remark at one point about, "Gee, you know, don't

11 you work part-time?"  And my answer would have

12 been, "No, I've been working full part-time for

13 24 years."

14            Or a comment he made to me on

15 October 19th.  I said, "Scott, do you know how

16 much money I earn here?"  And he said, "Oh,

17 750."  And I said, "No, I earn 600."  I said,

18 "Why do you think I earn 750?"  He says, "Oh, I

19 think somebody -- I looked at some schedule or

20 something."  I said, "Well, when you took over

21 as CEO, I went back to 600.

22            "Oh, okay."

23            So I think it's just learning,

24 finding his way.  He's only been with the

25 company a couple of weeks, especially on this

A-768.15

163

```
 1                    Burton T. Fried
 2    e-mail of October 13th, he's with the company
 3    two weeks.
 4                    MS. SELTZER:  Can you mark this,
 5            please.
 6                    (E-mail dated October 14, 2010
 7            marked Fried Exhibit 13 for
 8            identification.)
 9                    MS. SELTZER:  Let the record show
10            that Exhibit 13 is an e-mail from Burt
11            Fried to Scott State dated October 14th,
12            2010 and Bates stamped LVI 449 to 450.
13            Q.    Would you familiarize yourself
14    with this document.
15            A.    I'm familiar with it.
16            Q.    What prompted you to send this to
17    Mr. State?
18            A.    Well, I've always believed,
19    especially after working with Bob McNamara, that
20    the best way to have an effective meeting is to
21    outline an agenda and the issues that you'd like
22    to talk about rather than have a loose
23    conversation, and it's more efficient, more
24    effective and a better result.
25                    So I called him and I asked for a
```

164

1                    Burton T. Fried

2    meeting, and he scheduled it for the 19th and I

3    told him that I would be sending him a list of

4    the agenda as well as the responsibilities that

5    I had performed historically so that we have

6    some basis upon which to have a discussion.  And

7    then he could decide what he would like me to do

8    and what not to do.

9              Q.    Was it your initiative to send

10   this or did he actually request you to put

11   together a list of what he thought -- you

12   thought your responsibilities should be under

13   his tenure?

14             A.    My initiative.

15             Q.    Was he responsive to receiving

16   this document?

17             A.    He didn't object.

18             Q.    If you look at the areas of

19   responsibility -- I know we had looked at what

20   you listed in the complaint and there's a few

21   more here than there were there -- were all of

22   these responsibilities responsibilities that you

23   had while you were working with Mr. McNamara or

24   are there some extra ones in here that you threw

25   in?

            Elisa Dreier Reporting Corp. (212) 557-5558
               950 Third Avenue, New York, NY 10022

A-768.17

                    Burton T. Fried

1

2                    MR. WIGDOR:  Objection.

3                    You can answer.

4          A.       Under Mr. McNamara I wasn't

5    working on the Middle East, US and Latin America

6    initiatives there.

7          Q.       Were you reviewing all requests --

8                    MR. WIGDOR:  Were you done?

9                    MS. SELTZER:  I'm sorry.

10         A.       I'm still looking at the list.

11         Q.       Okay.

12         A.       With Mr. McNamara I assisted in

13   the negotiations on acquisitions.  I didn't do

14   it on my own.  Some of them he asked me to

15   follow through, others he handled.  That was the

16   basis of this comment about negotiating company

17   acquisitions.

18                   And basically I handled all these

19   functions.

20         Q.       So had you -- during the time that

21   you were performing these functions under

22   Mr. McNamara, was Mr. DiCarlo employed by the

23   company?

24         A.       Yes.

25         Q.       Did he have any involvement at all

A-768.18

166

1                    Burton T. Fried

2    in the selection of outside counsel?

3            A.    Yes.  We spoke to each other about

4    it.

5            Q.    Did you think that he was capable

6    of performing that function?

7            A.    We worked on it together, so

8    certainly capable.  In fact, he, on matters

9    would do research and make recommendations.

10           Q.    And do you think that he was

11   capable of managing senior level -- at a senior

12   level all LVI litigation and legal matters?

13           A.    Well, you know, as an attorney,

14   you know there are different levels of counsel.

15   He was a very talented attorney, but he didn't

16   have 46 years of experience, nor 24 years of

17   experience in construction law.

18                So certainly while he is -- I

19   could say that he could handle it, he -- we

20   worked together and he used me as a resource for

21   making decisions inured to the benefit of LVI.

22                And at no time during our working

23   relationship, which I considered excellent, did

24   he ever complain nor did I step on his toes.

25                In fact, I confined myself to my

A-768.19

1              Burton T. Fried

2   office and he used to come to me and sit and

3   we'd discuss matters.  I think that's an

4   intelligent and proper way, when you have legal

5   matters, rather than to look opposite at a wall

6   and look at a white wall, for somebody to bounce

7   things off of.

8              So we did -- pretty regularly he

9   would come in and we would discuss matters and

10  we would both agree on a course of action.

11         Q.    What did you mean by "monitor all

12  employee air travel"?

13         A.    We -- Shari, my daughter, one of

14  her responsibilities was to -- she initiated a

15  program with Garber Travel to use their software

16  so we could make -- have use of their software

17  for picking the cheapest travel available any

18  time somebody wanted to travel, rather than

19  calling a travel agency or an airline.  It came

20  up on a screen.  So he was -- she was in

21  charge -- assisting in the negotiation of

22  agreement, with charges and everything else that

23  Garber Travel did for us, and also in training

24  of travel coordinators throughout the nation.

25         Q.    What was your involvement in that?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.20

168

```
 1                 Burton T. Fried
 2        A.    I'm going to get to that.
 3        Q.    Okay.
 4        A.    You have to understand the
 5   background.
 6              MR. WIGDOR:  History, history.
 7              MS. SELTZER:  If we had three days
 8        I would take all the history in the
 9        world, I promise you.
10        A.    We may need three days.
11        Q.    I'm just trying to avoid having to
12   drag you back here again.
13        A.    If you want to know the answer, I
14   need to be complete.
15        Q.    By all means.
16        A.    She then -- it was a very detailed
17   system in which our travelers were prequalified,
18   our travelers were -- either worked through
19   travel coordinators for travel or, because if
20   they were frequent travelers, they could do so
21   at home, using the system.  But we needed a
22   check and balance on who was doing the
23   travelings because we spent 600, 700,000 a year
24   in travel.  So you had to know who was traveling
25   and why it was on company business --whether it
```

```
 1              Burton T. Fried
 2   was on company business.
 3              So the way we did it was that we
 4   couldn't preapprove travel but we approved it
 5   the day after.  After the travel reservation was
 6   made and booked, Shari would get a travel form
 7   that was filled out by the employee or by a
 8   coordinator for the employee.  And there would
 9   be a name, it would be the reason for the
10   travel, where they were going to, what the
11   course of the travel was and so forth.
12              I found that to be a very handy
13   and effective system of becoming aware of who
14   was going, what manager was going where and what
15   for.  And on occasion I found people going to
16   places like South America that they were not
17   authorized to do so.
18              And so I learned this, by the way,
19   many years before I joined LVI, in learning that
20   the best way to determine what's going on in an
21   office or a business, in this case it was a
22   consulting engineering firm which I knew nothing
23   about, it was a small business and I wanted to
24   learn about it, I went into the office and I sat
25   at a desk and I asked for all mail to be brought
```

                        Burton T. Fried

1

2   to me.  I read all incoming business mail.

3           Q.      Of other people?

4           A.      Of companies communicating with

5   this consulting engineering firm.

6           Q.      But I mean, e-mail --

7           A.      Business, not personal.

8           Q.      Letters that were addressed to

9   other people?

10          A.      No, to the company.

11          Q.      Okay.

12          A.      And I quickly learned what was

13  going on and how the business functioned.

14                  Well, in this way with travel I

15  quickly learned that this was a -- an effective

16  way not only to be sure that it was -- the

17  protocol was being complied with, but where

18  everybody was going, what was happening out in

19  the United States, with 30 offices and maybe on

20  any given day, you know, 15 or 30 people

21  traveling.

22          Q.      Do you think this was an

23  appropriate role for the chairman of a company?

24          A.      I found this to be so effective.

25  I can't expect you would know that before you

1                    Burton T. Fried

2    never operated a company, but as a --

3            Q.    You don't know that, do you?

4            A.    Well, I'm going to assume so.

5                  MR. WIGDOR:  She has a little HR

6            background, Burt, don't sell her short.

7            A.    If you ran a company then you

8    would know, that in our company our success was

9    based on micromanagement, and I micromanaged.  I

10   wanted to know where everybody was, without them

11   speaking to me, it was a task that only took a

12   few minutes a day, to look at 15 travel forms to

13   see where everybody was going.  I didn't spend

14   an hour on it.  It was a few minutes.  I found

15   it very effective and rewarding as far as a

16   manager's use of time.

17                  Now, others might disagree.

18           Q.    Did Mr. State disagree that that

19   was an effective --

20           A.    Well, I --

21           Q.    Let me finish the question.

22                  -- that that was an effective use

23   of your time as chairman of the company?

24           A.    Mr. State never expressed to me

25   that he thought that it was not an effective use

172

1                    Burton T. Fried
2    of my time, but he did write an e-mail to --
3    that I noticed in discovery, writing to
4    Mr. Simmons, one of several e-mails that he
5    wrote to Mr. Simmons about me, that --
6    commenting that "Why do we have to pay -- we
7    shouldn't be paying Fried $1 million a year for
8    him to -- to review travel request forms and
9    other bullshit administrative items."  It
10   clearly showed to me that, in answer to your
11   question, that he didn't think it was an
12   effective use of my time.  But he clearly had no
13   idea of what service I performed to the company
14   for the past 24 years, and clearly through the
15   last year, when I was both chairman and then
16   interim CEO.
17                    So his -- his understanding of the
18   business was critically faulty, and the
19   functioning of the business and what made it
20   successful.  But I didn't see that e-mail, by
21   the way, until recently.
22           Q.    If Mr. State had thought that this
23   was a function that was better handled by
24   Mr. Cutrone or by even your daughter on her own,
25   would you have found that to have been a bad

A-768.25

173

1                    Burton T. Fried

2    business decision?

3         A.    I would have -- irrespective of my

4    feeling, I would have supported it.  I didn't

5    always agree with Bob McNamara and his

6    decisions, but as far as the world was

7    concerned, and first with Bob McNamara, he was

8    the ultimate decision-maker and I supported it.

9    As far as the rest of the world was concerned, I

10   never had a disagreement over a decision with

11   Bob McNamara.

12        Q.    And Mr. McNamara was in agreement

13   with you that you should be spending your time

14   monitoring where people were any one part of the

15   day in the country?

16        A.    Mr. McNamara had a great deal of

17   respect for my accomplishments in building a

18   company of this size, and so successfully in

19   remote locations, and being a leader in the

20   industry.  He never discussed with me minutia

21   such as that, as to my reviewing travel request

22   forms.

23        Q.    Before your meeting on the 19th

24   with Mr. State, did you have a telephone

25   conversation with him?  Do you recall that?

174

                    Burton T. Fried

1

2          A.      One, one.

3          Q.      Do you remember -- were you in

4    Connecticut at the time, or were you in

5    New York?

6          A.      I was in Connecticut.

7          Q.      What was the purpose, why did you

8    decide to have a telephone conversation?

9          A.      It lasted a few minutes.  It was

10   to schedule a date for a meeting.

11         Q.      And what -- what was the purpose

12   of the meeting that you were scheduling?

13         A.      To go over my responsibilities.

14         Q.      Had he received that e-mail at the

15   time that you had this meeting?

16         A.      What e-mail?

17         Q.      The e-mail that this --

18   responsibilities is attached to.

19         A.      I sent it to him after our

20   conversation.

21         Q.      After the telephone?

22         A.      That's right.

23         Q.      What else do you remember him

24   saying in the course of that telephone

25   conversation?

A-768.27

1                    Burton T. Fried

2          A.     "Good-bye."

3          Q.     Did you say anything other than

4    that?

5          A.     "Good-bye."

6          Q.     Do you remember telling Scott in

7    that telephone conversation or remarking to

8    Scott, "I'm 70 years old; I don't want to do

9    this anymore"?

10          A.     Absolutely, unequivocally no.

11          Q.     Anything that might have been

12    similar to that in the conversation that you had

13    with Mr. State?

14          A.     Never happened.

15          Q.     Did you ever mention your age to

16    Mr. State in that conversation?

17          A.     It was simply let's meet on

18    October 19th and we set the time, and I said to

19    him I would send him an agenda and list of

20    responsibilities and he said fine.

21          Q.     Did you ever make a statement like

22    that, "I'm 70 years old; I don't want to do this

23    anymore," to Mr. State at any other time during

24    your employment with LVI?

25          A.     Absolutely no.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          Q.      Anything in sum and substance that

3   was like that?

4          A.      Absolutely no.

5                  In fact, Mr. State thought I was

6   71 and when he made a statement to me on the

7   19th, his remark was after I said, "Why are you

8   taking away all of my responsibilities," he said

9   to me, "Burt, you're 71 years of age, how long

10  do you expect to work?"  And my response to him

11  was, "Scott, I'm only 70 years of age."

12                 We never had that -- that

13  conversation, and had we had the conversation,

14  he wouldn't say I was 71.

15                 MS. SELTZER:  Could you mark this,

16         please, as Exhibit 14.

17                 (Discussion items marked Fried

18         Exhibit 14 for identification.)

19         Q.      Did you meet with Mr. State on

20  October 19th?

21         A.      I did.

22         Q.      Did you meet with him in New York?

23         A.      Yes.

24         Q.      Was it in the offices of LVI?

25         A.      Yes.

A-768.29

1              Burton T. Fried

2         Q.    Do you know what time the meeting

3    began with him?

4         A.    No.

5         Q.    Do you remember how long it

6    lasted?

7         A.    Fifteen minutes.

8         Q.    In total?

9         A.    Yes.

10         Q.    Were you two the only people in

11    that meeting?

12         A.    Yes.

13         Q.    Was there -- was the meeting

14    inside Mr. State's office?

15              MR. WIGDOR:  This is F14, right?

16              MS. SELTZER:  Yes.

17              MR. WIGDOR:  Is this something you

18         produced to us or --

19              MS. SELTZER:  No, you produced it

20         yesterday.

21              MR. WIGDOR:  We produced it

22         yesterday without a Bates stamp number?

23              MS. SELTZER:  That's correct.

24         Q.    I'm sorry, the question was, was

25    it in Mr. State's office, there was nobody else

A-768.30

178

```
 1                    Burton T. Fried

 2   in the office.  Was it a closed-door meeting?

 3           A.    Yes.

 4           Q.    So nobody that you knew heard this

 5   conversation?

 6           A.    Not that I'm aware of.

 7                 THE VIDEOGRAPHER:  Excuse me,

 8           Counsel, we need to go off the record a

 9           second.

10                 MR. WIGDOR:  Are we changing the

11           tape?

12                 THE VIDEOGRAPHER:  The time is

13           2:35 p.m.  We're going off the record.

14                 (A recess was taken.)

15                 THE VIDEOGRAPHER:  The time is

16           2:53 p.m., May 20th, 2011.  This is tape

17           number three in the videotaped

18           deposition of Mr. Burton T. Fried.

19   BY MS. SELTZER:

20           Q.    Looking at Exhibit No. 14 again,

21   Mr. Fried, is this a document that you prepared

22   in preparation for this meeting you had with

23   Mr. State?

24           A.    Yes.

25           Q.    And it was your intention to
```

179

                        Burton T. Fried

1
2   discuss all these different topics during the
3   course of that meeting?
4          A.     Yes.
5          Q.     Had you discussed with Mr. State
6   any of these topics prior to this meeting?
7          A.     I don't recall.  I may have, I
8   don't recall.  I may have written e-mails about
9   the CIO and HR.  I don't know at that point
10  whether we had any resolution.
11               Like the CIO, he said he would be
12  checking it out.  So I was bringing it up to ask
13  him what the status was.
14               I guess I discussed earlier there
15  was a corporate lodging proposal, I was asking
16  what the status was.
17         Q.     Okay.  You don't have to go
18  through all of them.  I was just wondering if
19  these were all topics that had previously been
20  discussed.
21         A.     Not all, no.
22         Q.     So the meeting -- you said it
23  started in the morning?
24         A.     I didn't -- I don't recall, but
25  you have my calendar.

A-768.32

180

1                    Burton T. Fried

2          Q.    Okay.  Tell me what you remember

3    about the meeting in as much detail as you

4    remember.  I know we talked a little about it

5    before, but...

6          A.    The first item was the area of

7    responsibility, and so I handed him a copy of

8    the -- of that attached list.

9          Q.    That's the one that's attached

10   here, right?

11         A.    Yes.

12         Q.    So it's a little different from

13   the one that you had sent him; is that correct?

14         A.    Well, the date is different.  I

15   dated it the same day, but other than that, it

16   was pretty much the same.

17         Q.    There is a couple of more

18   responsibilities on it.

19         A.    Okay.  It could have been.

20         Q.    Anyway, go ahead.

21         A.    On reflection, I could have added

22   something and I've forgotten.  But in any event,

23   I handed him the list and I said, "Why don't we

24   go through this, and this is what I performed

25   under Bob McNamara, and why don't we determine

181

```
 1                Burton T. Fried
 2   what you want me to do in going forward so I
 3   have some direction."
 4                And he said, "Well, the first
 5   item, I'm going to take that over.  New business
 6   initiatives."
 7                I said, "Fine."  I said, "Well,
 8   what about the meeting that we're planning to
 9   have with Squibb in New York?
10                "Oh, I'll attend that meeting, you
11   don't have to go there.  But if I change my
12   mind, I'll let you know."
13         Q.    Okay.
14         A.    I said -- and I said, "Well, the
15   owner of Squibb Demolition is going to be there,
16   he couldn't make the meeting in Great Britain
17   because he was ill.  I would think he would
18   expect me to be there, so you might want to
19   consider that."
20                He said, "No, I could take care of
21   that, but if I change my mind, I'll let you
22   know.  I said, "Fine.  You want to go to the
23   next item?"
24         Q.    Yeah.  Tell me what -- what his
25   response was.  I assume you went one-on-one.
```

                                                              182

 1                    Burton T. Fried

 2          A.     That's what I said.  I was giving

 3    you my answer.

 4          Q.     Okay.

 5          A.     I said, "You want to go to the

 6    next item."

 7          Q.     Okay.  I thought you were talking

 8    to me.  Go ahead.

 9          A.     To State?

10          Q.     Yeah.

11          A.     And he said -- looked at the list

12    and he said.  "I'm going to be reassigning all

13    your responsibilities to other managers and I'm

14    going to do that in the next 60 to 90 days, and

15    when that's completed, I can let you know if

16    there is anything else for you to do."

17                 I didn't immediately respond

18    because I was in a state of shock.  And my only

19    response was, "Scott, why would you do that?"

20                 His response was, "Burt, you're 71

21    years of age, how long do you expect to work.

22    And what if you get hit by a truck" -- a bus,

23    rather -- "what if you get hit by a bus, and we

24    have to plan for the future."

25                 My response to that, since this

183

1              Burton T. Fried

2    was the first time that there was any indication

3    that -- of what his -- what he was going to do

4    with my responsibilities -- so I said, "Scott,

5    number one, I'm 70 years of age, not 71.  Number

6    two, the things that I perform for the company

7    is not -- there is no one here that performs

8    that, there is no duplicity, and based upon my

9    experience, I think I am performing it in a

10   manner in which I think can best serve the

11   interests of LVI Services.  I don't plan to be

12   hit by a bus; I'm in good health and I expect to

13   work for a long period of time.  I am healthy,

14   and by the way, there aren't many buses in

15   Westport, Connecticut."

16              And his response was, "Well,

17   that's the way I'm going to proceed."

18              I was in shock.  I -- frankly, I

19   had no warning, no indication, and I said to

20   him, "Well, is there anything you want me to

21   do?"  And he said, "Not that I can think of."

22   And I said, "Well, I'm in the midst of working

23   with Studley, who I retained to find corporate

24   office space, the lease expires next August, do

25   you want me to handle that?"  He said, "Oh,

1                    Burton T. Fried

2    yeah, you can continue handling that."

3                    I said, "Fine."  And I said,

4    "There is a lender meeting on CIBC on the 2nd,

5    do you want me to be present with that?"  He

6    said, "No, we won't need you there."

7                    And basically that was the end of

8    the meeting, which took place, I don't know, 15

9    minutes, 20 minutes, for that limited

10   discussion, and I left.

11        Q.    Before we talk about what happened

12   after the meeting, did you during the course of

13   that meeting talk about other employees of LVI

14   who were doing their work or who were not doing

15   their work?

16        A.    Not that I recall.

17        Q.    Do you recall talking with him

18   about the business development staff

19   specifically?

20        A.    Not that I recall.

21        Q.    Do you remember talking about

22   functions within the company that required

23   upgrading?

24        A.    Not that I recall.

25        Q.    Do you remember talking about Matt

185

1                     Burton T. Fried

2     Dembin during the course of that meeting?

3          A.     Not that I recall.

4          Q.     So it's your testimony here that

5     the entire meeting was around the concept of

6     these responsibilities and where he was going to

7     allocate them?

8          A.     Yes.  I don't recall it and I

9     don't believe it happened, because he sought no

10    counsel of me on any matter since he joined us

11    on September 27th, and on the 19th he was

12    getting rid of my responsibilities and felt that

13    others should -- should be transitioned to other

14    managers.

15              So it wasn't shocking to me that

16    he wasn't seeking my advice on any of the

17    matters that you just mentioned.

18         Q.     The list -- this list, the

19    chairman areas of responsibilities, would you

20    not consider these day-to-day responsibilities?

21         A.     They are day-to-day

22    responsibilities that I perform, yes, not

23    operational responsibilities, more in a legal

24    nature.

25         Q.     So at the beginning of the

1              Burton T. Fried

2    deposition we were talking about the role of a

3    chairman.  I specifically asked you whether you

4    wanted the role of chairman to get away from the

5    day-to-day responsibilities of the firm.  Why

6    did you want to continue to be involved in these

7    highly specific day-to-day work?

8          A.    The day-to-day responsibilities of

9    a company of our nature has nothing to do with

10   the responsibilities that are on this list.

11   We're engaged in structural demolition,

12   remediation, emergency response and other

13   similar activities nationwide.  The day-to-day

14   responsibilities involves bidding, bid reviews,

15   marshaling of forces when awards are made,

16   discussions on projects and performance of

17   projects, discussions of -- of productivity,

18   change orders, discussions on collections.

19   They're operational day-to-day responsibilities

20   rather than the kinds of stuff that are on this

21   list, which are -- which are more of a corporate

22   office executive rather than a field, a

23   day-to-day operational.

24          Q.    So reviewing requests for bid bond

25   payments and performance bond requests, that's

1                Burton T. Fried

2   not a day-to-day responsibility of a demolition

3   company?

4        A.    You're confusing my definition of

5   day-to-day with the task.  These functions you

6   do day to day but it bears no relationship to

7   the day-to-day responsibilities of a CEO in the

8   management of a self-performed abatement and

9   structural demolition company.

10               The activity of risk review is not

11  a -- what I consider a day-to-day responsibility

12  of a CEO.  That is more of an oversight after --

13  before a CEO approves an estimate and approves

14  the bidding and submission of a bid of a

15  project, he should have someone, if not himself,

16  but someone performing -- in the case of LVI, it

17  was the chairman under Bob McNamara --

18  overseeing or looking at the projects that were

19  being considered for bid, to determine the

20  difficulty factor, whether the schedule of

21  performance could be made, whether there was

22  sufficient labor force out there and whether the

23  contract terms were such that would expose us to

24  liability, whether there were contract terms

25  that had consequential damage, liquidated

1                   Burton T. Fried

2     damages, indemnification provisions that were

3     onerous.  Those were an overview, not the

4     day-to-day performance.

5                   That kind of advice is what I used

6     to give Bob McNamara even before the people made

7     the effort of putting a detailed estimate

8     together to tell them, boom, here's an e-mail.

9     And I never even notified Bob McNamara, because

10    it didn't get to his level, by telling him, "By

11    the way, did you consider the fact that we have

12    liquidator damages of 25,000 a day, have you

13    considered the fact that this schedule has to be

14    finished in -- it's a million dollars to be

15    finished in two weeks, have you considered the

16    fact that it doesn't appear to be a clearly

17    defined scope of work."

18                  Q.    That sounds to me like the job of

19    a general counsel, to look at a contract and try

20    to determine whether there's any liabilities for

21    the company on that; isn't that the case?

22                  A.    Not necessarily.  A general

23    counsel is familiar with legal until he becomes

24    familiar with the actual work that you

25    performed, the actual nature of the work.

189

```
 1                    Burton T. Fried
 2   General counsel wouldn't necessarily be familiar
 3   with productivity of a labor force, availability
 4   of a labor force, of whether we have a schedule,
 5   a schedule, whether -- those kinds of decisions
 6   are made with somebody who not only knows the
 7   business but is also familiar with legal.
 8              So I was a cross-section.  Now if
 9   you want to question whether a counsel can do
10   that, yes.  Can a counsel do it as effectively
11   as I can, a counsel may say yes.  I say no, but
12   that -- you're questioning me as to who can do
13   it.  I can have a project manager do the same
14   thing, but he's not going to do it as
15   effectively as me.
16         Q.    I guess the better question is --
17         A.    So you're not questioning whether
18   I should -- I'm not questioning whether I should
19   do it or not.  This was presented by saying I
20   did it, and I did it at the request of Bob
21   McNamara.  If you're suggesting that I shouldn't
22   do it, then that was the prerogative of Scott
23   State to say, "Don't do it."
24         Q.    That's right, and you took that
25   prerogative, right?
```

190

1                    Burton T. Fried

2          A.    That would be his decision.

3          Q.    That's right.

4          A.    I was presenting to him what I
5     did.  Anyone can do any of these things.
6     Whether they could do it as well as I, I have my
7     opinion, other people have their opinion.

8                 But the bottom line is that we
9     were the most successful company in America in
10    what we did and the most profitable.  And it was
11    performing --

12         Q.    Mr. --

13         A.    I'm sorry, please don't interrupt
14    me.

15         Q.    Well, I understand --

16         A.    No, I don't want you to interrupt
17    me if I'm finishing -- if I'm answering your
18    question.

19         Q.    Well, then finish, because I have
20    a lot more questions for you.

21         A.    Yeah, but I want to answer your
22    question.

23         Q.    Answer.  Go ahead.

24         A.    The point is we were successful at
25    LVI in following a certain culture and

1                    Burton T. Fried

2    performing certain tasks.  If Mr. State wanted

3    to perform it, that was his prerogative.  I

4    wasn't telling him that I must perform these

5    tasks.  I'm telling him that historically I did

6    perform these tasks, "which do you want me to

7    perform and which do you not."  His response

8    was, "Because of your age, I'm firing you."

9    That's an act of age discrimination having

10   nothing to do with who's more qualified.

11              In fact, he chose not to do these.

12   He ultimately determined that other people

13   throughout the company were to do these and he

14   in fact didn't make the selection.  He asked

15   other people to tell him who was qualified to do

16   these.

17              So he was making a decision that

18   he wanted me out because of my age, having no

19   frame of reference to my qualifications of who

20   could best do it for LVI, but simply he didn't

21   want me to do it and he wanted me out because of

22   his age -- my age.

23         Q.    So Mr. State delegated those to

24   other people; is that correct?

25         A.    I'm told, and I have noticed in

1                    Burton T. Fried

2    other e-mails that he asked John Leonard, even

3    before he met with me, before he met with me,

4    who can handle these responsibilities.

5            Q.    Who under management?

6            A.    John Leonard then wrote him and

7    said who can handle it.

8            Q.    Right.  And was that not within

9    his province as CEO to do?

10           A.    Absolutely.

11           Q.    Why would it have anything to do

12   with age discrimination?

13           A.    Because he was -- told me he's

14   taking it away from me because of my age.

15           Q.    He didn't say that.  What did he

16   say?

17           A.    Well, you weren't there.

18           MR. WIGDOR:  Objection, objection,

19           argumentative.

20           Q.    Tell me -- tell me.

21           MR. WIGDOR:  He already said three

22           times what he said.

23           Q.    All right.  And from what I

24   understand, that's not what he said according to

25   your testimony of what his statement was.  I

193

1                Burton T. Fried

2    mean, tell me again.  Maybe I misunderstood what

3    it is that he told you, but you said it three

4    times here, and that is not what you said that

5    he said to you.

6                MR. WIGDOR:  Objection.

7         Q.    You said, "I'm 70 years old, how

8    much longer do you want to do this."  That

9    doesn't say, "You're old, I'm getting -- I'm,

10   you know, getting rid of you."

11               A.    Counselor, you're paraphrasing

12   what I said.  You're not stating accurately what

13   he said and the record speaks for itself.  And

14   the repetition of that, without objection by

15   every single member of the board on telephone

16   and in front of him, without objection, without

17   denial, without denial by Mr. State that "That's

18   not what I said" -- you're saying he didn't say

19   it.  I'm saying he said it, and I repeated that

20   in front of him before a large boardroom, in

21   front of Jeffrey Smith, who was there as

22   secretary so maybe he has the notes, saying that

23   that's what he said to me, and he didn't say --

24   he didn't deny it.

25               So you can deny what he said but

194

1                    Burton T. Fried

2    nobody has, to this date, but you.

3         Q.     Tell me again one more time the

4    sentence he said to you.  I just want to make

5    sure we have it 100 percent clear on the record.

6         A.     After he told me that he's

7    reassigning all the responsibilities, my

8    responsibilities to others, and within 60 to 90

9    days he'll determine what, if anything else, I

10   have to do, there is for me to do, and related

11   the conversation about "We have to plan for the

12   future and what if you get hit by a bus," I

13   asked him, "Why are you doing this?"  His answer

14   was, "Burt, you're 71 years of age, how much

15   longer do you expect to work?"

16        Q.     That was the sum of the statement?

17        A.     Quote-unquote.

18        Q.     Okay.  Let's talk a little bit

19   about those telephone conversations you say that

20   you had subsequent to this meeting.  You say the

21   first one, I believe, was with Mr. Simmons?

22        A.     No.  The first one was calling

23   counsel for advice.

24        Q.     Okay.  Barring that one, what was

25   the first one that we can talk about?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

195

```
 1                 Burton T. Fried
 2        A.    Mr. Bagaria.
 3        Q.    So the first person you thought to
 4   call was Mr. Bagaria?
 5        A.    Yes.
 6        Q.    Okay.  And how long was the
 7   telephone conversation?
 8        A.    I don't remember, 10-15 minutes.
 9        Q.    And did you speak with him about
10   the background of what the conversation was
11   between you and Mr. State, the areas of
12   responsibility?
13        A.    I didn't detail the
14   responsibilities but I described the nature of
15   the meeting.
16        Q.    And did you describe to him
17   Scott's intent to transfer those
18   responsibilities to other people?
19        A.    Yes.
20        Q.    Did you explain to him the comment
21   that you've just told me?
22        A.    Yes.
23        Q.    And what was Mr. Bagaria's
24   reaction?
25        A.    "Scott State is the CEO and I
```

1                    Burton T. Fried

2    support whatever he does."

3          Q.    Did you tell Mr. Bagaria that you

4    believed that statement was in violation of age

5    discrimination statutes?

6          A.    I said there was something illegal

7    about that insofar as using age as a reason for

8    the assignment.

9          Q.    What did Mr. Bagaria say to that?

10         A.    He said, "I continue to support

11   Scott State in whatever he does."

12         Q.    Did you say anything else to

13   Mr. Bagaria?

14         A.    Not that I recall.

15         Q.    And the second conversation was

16   with whom?

17         A.    With Brian Simmons.

18         Q.    And how much after the

19   conversation with Mr. Bagaria did you speak to

20   Mr. Simmons?

21         A.    It might have been a day or two.

22         Q.    And what did you tell

23   Mr. Bagaria -- I mean Mr. Simmons, sorry.

24         A.    I related the same conversation

25   that I had related to Mr. Bagaria.

197

1                    Burton T. Fried

2          Q.    Word for word?

3          A.    Absolutely.

4          Q.    So you told him about the

5    responsibilities, you told him about Mr. State's

6    response to those, about the statement that

7    Mr. State made?

8          A.    Yes.

9          Q.    And that you felt that this was in

10   some way discriminatory on the basis of age?

11         A.    Yes.

12         Q.    And what was Mr. Simmons' response

13   to you?

14         A.    At first he said -- he sounded as

15   if he was surprised and he'll somehow figure out

16   a solution to this, but then he said, "You know,

17   Scott State is the CEO and we have to support

18   whatever he wants to do."

19         Q.    Did you say anything to him back

20   when he said that?

21         A.    No.  He said to me that he would

22   speak to other directors and get back to me.

23         Q.    Did you ask him to forward your

24   list of chairman responsibilities to the rest of

25   the board?

                Elisa Dreier Reporting Corp. (212) 557-5558
                  950 Third Avenue, New York, NY 10022

A-768.50

198

1                    Burton T. Fried

2          A.    Yes.

3          Q.    Did you ask him to address this

4    issue at the board of directors meeting on

5    November 4th?

6          A.    No.  I said to him I would forward

7    him the list.  He asked is it okay to send it to

8    the other directors.  I said absolutely.

9          Q.    Anything else that you remember

10   about the conversation with Mr. Simmons?

11         A.    No.

12         Q.    Was there anybody, by the way, in

13   the room with you when you were making these

14   telephone conversations that we're going to talk

15   about?

16         A.    Intentionally not.

17         Q.    Anybody within earshot?

18         A.    Could be, but I mean, I wasn't in

19   a soundproof room but I didn't have anyone there

20   as a witness as to what I was telling to anyone,

21   because at the moment there was no final

22   decision in this matter and, you know, stuff

23   like this goes out like wild fire and causes

24   distraction and unrest, and there was no reason

25   for that.

A-768.51

199

1                    Burton T. Fried

2          Q.    And was this in your office in

3    Westport?

4          A.    Yes.

5          Q.    Were all these calls on the same

6    day?

7          A.    No.

8          Q.    Anything else that you remember

9    about the communication with Simmons?

10         A.    Not necessarily.  I mean, he could

11   have been calling me back.  I mean, you know, it

12   wasn't as if I called him -- in fact, it was a

13   case that I called him and he wasn't there and

14   he did call me back.  So, you know, not

15   necessarily the call I made to him and he picked

16   up the phone, but that was essentially what

17   occurred.

18              And then it was a few days later

19   that I got a call or John Schnabel sent me an

20   e-mail and asked me to call him.  I don't recall

21   which way it went.

22         Q.    Did Mr. Schnabel ask you to call

23   him or did you ask Mr. Schnabel to call you, do

24   you remember?

25         A.    I spoke to him.  He wasn't there

```
 1                    Burton T. Fried

 2    the first time that I reached out to him and

 3    left a message.

 4           Q.     What do you remember about your

 5    conversation with Mr. Schnabel?

 6           A.     It was identical.

 7           Q.     Same exact thing?

 8           A.     Same exact thing.

 9           Q.     What was Mr. Schnabel's reaction?

10           A.     Shock.

11           Q.     Tell me, how do you express shock

12    over the telephone?

13           A.     He expressed that's unbelievable.

14    In so many words, these people are a bunch of

15    idiots.  I don't know if he used the word

16    "idiots," but something similar.

17                  "The whole purpose of making this

18    investment, a critical element in my making this

19    investment, was your continuity in the

20    management of the business and your presence.

21    I'm going to straighten this out.  I oppose this

22    and I'll get back to you."

23           Q.     And then you may have testified to

24    this already, but refresh my recollection, did

25    he get back to you?
```

201

1                    Burton T. Fried

2          A.    He -- I don't know that he did.    I

3    think the next time I saw him might have been at

4    a -- next time I saw him was probably at the

5    board meeting.    I may have even not been able to

6    reach him and might have sent him an e-mail

7    describing what happened and what I wanted to

8    talk to him about, but he was the last one.    He

9    might have been the first one I called because I

10   couldn't understand how he could support that,

11   since before he made the decision to make the

12   investment to buy debt of the company he called

13   me and said I was the last item on his due

14   diligence and wanted to get my opinion.    And we

15   had a longstanding relationship of success, so I

16   couldn't understand how he would be involved in

17   that.

18         Q.    Did you send him an e-mail that

19   you know of?

20         A.    I don't remember.

21         Q.    Did you find it in any of your

22   e-mails at home?

23         A.    I haven't yet seen it, but I'm not

24   certain.

25               But in any event, the next contact

A-768.54

1                    Burton T. Fried

2   I received, it was from Brian Simmons.

3           Q.     Okay.  This was still before the

4   board of directors meeting?

5           A.     Yeah.

6           Q.     Okay.  What was that contact?

7           A.     He sent me an e-mail saying he had

8   spoken to the board members and it was best for

9   the company that I be terminated, best for the

10  company, best for the company that I be

11  terminated and that "We would offer you a

12  consulting agreement but you'll no longer be an

13  employee of Services and you'll be a consultant

14  for LVI Parent."

15          Q.     I'm sorry?

16          A.     LVI Parent.  "You'll be a

17  consultant," and that we should discuss it at a

18  board meeting that was to take place in a couple

19  of days.

20          Q.     Anything else Mr. Simmons said to

21  you in that phone conversation?

22          A.     That was in an e-mail.

23          Q.     Okay.  Did you follow up with a

24  phone conversation?

25          A.     No.

         Elisa Dreier Reporting Corp. (212) 557-5558
            950 Third Avenue, New York, NY 10022

A-768.55

203

1                    Burton T. Fried

2              MS. SELTZER:  Can you mark this,

3         please.

4              (E-mail string, first one dated

5         November 3, 2010, marked Fried Exhibit

6         15 for identification.)

7              MS. SELTZER:  Let the record

8         reflect that Exhibit 15 is an e-mail

9         from Brian Simmons to Burton Fried,

10        November 3rd, 2010, LVI 1375 to 77.

11        Q.    Do you remember this e-mail?

12        A.    Yes.

13        Q.    Is that e-mail that begins in the

14   second half of the first page and bridges into

15   the second page the e-mail that you were

16   referring to?

17        A.    Yes.

18        Q.    And this came on November 2nd,

19   2010.  Does that clarify for when you might have

20   had the telephone conversation with Mr. Simmons?

21        A.    I had the conversation preceding

22   November 2nd.

23        Q.    So somewhere between November 2nd

24   and the meeting of October 19th?

25        A.    Yeah.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.56

1                    Burton T. Fried

2           Q.    Do you have any record of that

3    conversation?  Did you write it on your

4    calendar, did you put it in your Outlook?

5           A.    No.

6           Q.    Did you have any record of any of

7    the conversations that you had with Mr. Bagaria

8    or Mr. Schnabel?

9           A.    I didn't maintain the telephone

10   log.

11          Q.    When you spoke to Mr. Simmons, did

12   you call him in his office?

13          A.    I would only call him in his

14   office and leave him a message if he wasn't

15   there.

16          Q.    And Mr. Bagaria, did you call him

17   over at the Apollo offices?

18          A.    Absolutely, that's where he

19   worked.

20          Q.    And Mr. Schnabel?

21          A.    At his office at Falcon.

22          Q.    Now, in this e-mail Mr. Simmons

23   says to you at the tail end of that e-mail,

24   "Please give me a call if you want to discuss

25   and let me know if you desire a closed board

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

205

1                    Burton T. Fried

2    session on November 4th."

3                    Do you see that it's in the second

4    page, the last sentence in Mr. Simmons' e-mail?

5           A.    Yeah.

6           Q.    And you respond, "Brian, I'm

7    prepared to discuss this matter at tomorrow's

8    board meeting."

9           A.    Yes.

10          Q.    You didn't want to talk to

11   Mr. Simmons before the board meeting about this?

12          A.    No.

13          Q.    Why?

14          A.    There's no point.

15          Q.    Why?

16          A.    He already knew the facts and then

17   sent me an e-mail with a bunch of nonsense as

18   the reason for taking his action, and I saw no

19   point in discussing his nonsense.

20          Q.    Can you tell me which part of

21   Mr. Simmons' e-mail is nonsense to you?

22          A.    "Your list is much more expansive

23   than what I envisioned for your duties as

24   chairman after we hired a new CEO."

25          Q.    How is that nonsense?

1                    Burton T. Fried

2         A.    Because these are all the duties I

3   performed under Bob McNamara for four years at

4   his -- with his support.

5         Q.    Did Mr. Simmons know the duties

6   that you were performing under Mr. McNamara?

7         A.    Sure.  It was discussed at the --

8   at board meetings the things I was doing, not

9   necessarily that I was looking at travel

10  requests, but he knew I was involved in the

11  litigation aspect of the company.  He knew I was

12  involved in the preparation of teaming

13  agreements.  Major items he knew I was involved

14  in.  Now he's telling me it's much more

15  expansive.  I never -- he never discussed my

16  duties with me.

17        Q.    Is it possible he didn't know what

18  your duties were?

19        A.    Oh, he knew.  He used to

20  congratulate me for a great job.  He used to ask

21  me to help in difficult situations, like

22  supporting your firm in the Mazoki matter in

23  which the Mazokis were seeking $8 million, when

24  I discovered that he was acting as an informer

25  for the FBI.

A-768.59

                    Burton T. Fried

1

2          Q.    Did you ever send a list like the

3     one that you gave to Mr. State to Mr. Simmons

4     prior to Mr. State becoming CEO?

5          A.    No.

6          Q.    Had there ever been a discussion

7     in the board of directors about the proper role

8     of the chairman?

9          A.    No.

10          Q.    Had you ever spoken at all about

11     the types of responsibilities that you were

12     doing under Mr. McNamara?

13          A.    Yes, at board meetings.  There

14     were board meetings four times a year over a

15     period of five years.  Mr. Simmons was there

16     amongst God knows how many other directors, with

17     Code Hennessy and outside directors.  I used to

18     report on a variety of activities that I was

19     engaged in.  They used to ask me for a report.

20          Q.    Were the activities that you would

21     present to the board more having to do with

22     projects as opposed to things like selecting

23     outside counsel and negotiating acquisitions and

24     monitoring air travel?  Was it more the

25     achievements that you had done as -- during the

A-768.60

208

1                    Burton T. Fried

2   period of time?

3          A.     They involved matters of

4   significance and importance to the board.  They

5   didn't deal with minutia.  Reviewing travel

6   request forms was my three-minute-a-day task

7   that I determined was important.  They wouldn't

8   be interested whether I did it or not.  And for

9   that matter, I don't know if Bob McNamara was

10  interested.

11             But matters of importance like the

12  Mazoki matter and working with counsel who you

13  had in your office earlier, major matters like

14  defense of employment liability cases that I

15  reported on, they were familiar with that.  They

16  were familiar with Squibb Demolition and my

17  negotiation and execution of a teaming

18  agreement.  I mean, I can go on and on.

19         Q.     No, I know.  But the issue is, is

20  it possible that Mr. Simmons had absolutely no

21  idea that these were the responsibilities that

22  you were -- that you were having under

23  Mr. McNamara?

24         A.     No.

25         Q.     What else do you find of

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.61

209

```
 1              Burton T. Fried
 2  Mr. Simmons' e-mail that's nonsense?
 3         A.    "The outline you provided for
 4  chairman's duties" -- starting with that
 5  sentence -- "does not seem consistent with
 6  sentiments you have expressed to me over several
 7  years regarding your intent when we hired Bob
 8  and now Scott to be CEO."  Nonsense.
 9         Q.    Why is that nonsense?
10         A.    He is just congratulating me for
11  taking over the interim CEO position and saying
12  that I'm worth every penny at $750,000 and
13  knowing what my responsibilities I did as
14  chairman, and now paying me more and saying,
15  "You're worth every penny," knowing he was
16  paying me 600,000 a year, did he think I was
17  looking at travel request forms for 600,000 a
18  year?  Or did he know that I collected
19  $8 million that he thought was unrecoverable
20  from clients of LVI that we performed work for
21  at Katrina, and was congratulating me that an
22  unbelievable job in collecting that money and
23  now I was in pursuit of the remaining
24  $2 million.
25              He knew exactly all the major
```

A-768.62

1              Burton T. Fried

2    events I was handling or else he wouldn't have

3    asked me to become interim CEO.  He knew my

4    capabilities, he knew the work I was doing, he

5    knew the successes that I had effected, and then

6    at the end, when this deal was finally going

7    through, congratulated me for doing an exemplary

8    job as interim CEO because the closing could

9    never have taken place but for my efforts.

10            Q.    Did Mr. Simmons believe that you

11   were in earnest when you said that you wanted to

12   let go of the day-to-day responsibilities and

13   just focus on strategic projects?

14            A.    I don't understand the question.

15            Q.    At the beginning of the deposition

16   we were talking about, when I showed you the

17   purchase -- the acquisition memorandum and it

18   showed that your intention was to move away from

19   the day-to-day responsibilities and assume more

20   of a strategic role in the organization, is it

21   possible that Mr. Simmons did not see this list

22   of responsibilities as strategic at all but more

23   as the day-to-day runnings that could be

24   delegated to the managers of a company and

25   should be delegated to the managers of a

1                    Burton T. Fried

2    company?

3         A.    He'd be lying if he said that.

4         Q.    Did Mr. State ever say that he

5    thought these were responsibilities that should

6    be delegated to people who are managers of the

7    company?

8         A.    No.  He said they should be

9    delegated because I was 71 years of age and how

10   long did I expect to work and what if I get hit

11   by a bus and they have to plan for the future.

12   That's the reason he was giving it away.

13        Q.    During the course of your

14   conversation with him on October 19th, did he

15   give you any explanation as to why, for example,

16   he wanted to take on the development

17   implementation of the new business initiatives?

18        A.    Yeah.  He felt that would be a

19   responsibility that he wanted to perform, and I

20   said fine.

21        Q.    And how about transferring some of

22   the outside counsel responsibilities and the

23   litigation responsibilities to Mr. DiCarlo, who

24   is the general counsel of the company?  Did he

25   explain why he wanted to do that?

```
1                    Burton T. Fried

2         A.    He didn't say that to me.

3         Q.    What did he say?

4         A.    He didn't say that he wanted to

5    assign that to Mr. DiCarlo.  He said he wanted

6    to assign it to other managers.

7         Q.    Did he say why he wanted to assign

8    it to other managers?

9         A.    Because of my age, I was 71 years

10   of age and how long did I have to live.

11        Q.    Is that the direct response he

12   gave you in terms -- in response to why he

13   wanted to transfer these responsibilities?

14        A.    That is my interpretation of a

15   remark of "What if you get hit by a bus, we have

16   to plan for the future."

17        Q.    It's your interpretation of the

18   remark.

19        A.    My interpretation.

20             MR. WIGDOR:  Objection.  There is

21             no question.  That's what you call

22             echoing the witness.

23             (E-mail dated October 28, 2010

24             marked Fried Exhibit 16 for

25             identification.)
```

A-768.65

213

1                    Burton T. Fried

2              MS. SELTZER:  Let the record show

3         that Exhibit 16 is an e-mail from Burton

4         Fried to Brian Simmons, Rajay Bagaria

5         and John Schnabel, dated October 28th,

6         2010.

7         Q.    Do you recall this e-mail?

8         A.    I do, and it states what I said to

9    you earlier in my testimony without the benefit

10   of recollection of this e-mail.

11        Q.    Tell me your purpose in sending

12   this e-mail to Mr. Simmons, Bagaria and

13   Mr. Schnabel.

14        A.    My preparation of the list

15   attached as responsibilities of the chairman was

16   not prepared for litigation.  It was prepared

17   for discussion with a new CEO at LVI.  I wanted

18   those who received this to understand the

19   protocol that was used with Bob McNamara in that

20   these responsibilities, many of which were

21   performed before Bob McNamara had the

22   opportunity to be involved in the review of a

23   project and was in the nature of risk

24   assessment, which is -- I felt that I was

25   particularly qualified to perform, as did Bob

214

```
 1              Burton T. Fried
 2   McNamara, and that it was the best way to
 3   maximize the time of the CEO and keep us clear
 4   of legal problems.
 5         Q.    Is it possible that Mr. State
 6   didn't care what you did under Mr. McNamara?
 7         A.    It was his prerogative.
 8         Q.    Is it possible he wanted to decide
 9   on his own what your role should be at LVI?
10         A.    I gave him the opportunity on
11   October 19th.
12         Q.    Is it possible that he felt it was
13   necessary to pass these responsibilities to
14   managers of LVI so they could grow into their
15   roles?
16         A.    It was his prerogative to do it,
17   but not because of my age.
18         Q.    Is it possible that that was the
19   motivation behind his wanting to shift your
20   responsibility to other people and it had
21   absolutely nothing to do with age, but it had to
22   do with his wanting to transition his
23   responsibilities the way he had already
24   discussed with you that he would like to do?
25              MR. WIGDOR:  Objection.
```

A-768.67

215

1                    Burton T. Fried

2              You can answer.

3         A.     It had to do only with age, and

4    other e-mails exchanged with Simmons and Hogan

5    prior to this meeting now support that.

6         Q.     Is it possible that part of

7    Mr. State's motivation in transferring your

8    responsibilities to other people was to allow

9    his managers to do the jobs, the day-to-day

10   running of the company that you had been

11   performing?

12              MR. WIGDOR:  Objection.

13        A.     I did not perform the day-to-day

14   running of the company.

15        Q.     Is it possible that he wanted them

16   to perform the roles that you have here as

17   chairman areas of responsibility?

18              MR. WIGDOR:  Objection.

19        A.     He clearly wanted me to do it, but

20   he -- the reason he was assigning it to them

21   because he felt that I was dead wood.

22        Q.     Did he say that?

23        A.     Yes.

24        Q.     He said the term "dead wood"?

25        A.     In my -- what I heard him say was

216

1                    Burton T. Fried

2    equivalent to "dead wood" -- "how long do you

3    have to live."

4          Q.    And he said neither of those

5    things directly, did he?

6                    MR. WIGDOR:  Objection.  We've

7          been through it five times.

8                    MS. SELTZER:  Exactly, so that's

9          why I want to make sure.

10                   MR. WIGDOR:  I think it's for a

11         fact finder to interpret what he said.

12         You have one thing what he said, we have

13         another thing what he said, and that's

14         why we have juries.

15                   MS. SELTZER:  No.  This is exactly

16         the point.

17         Q.    Did Mr. State ever use the term

18   "dead wood"?

19                   MR. WIGDOR:  No, he's already said

20         no.

21         A.    I said no.

22                   MS. SELTZER:  Exactly.

23         Q.    I mean, I understand your

24   interpretation.  I just want to know factually

25   what he said to you.

A-768.69

217

1                    Burton T. Fried

2               MR. WIGDOR:  It's his

3          interpretation.  It's also a reasonable

4          interpretation.

5               MS. SELTZER:  And we're not here

6          to talk legal theories.

7               MR. WIGDOR:  You keep asking the

8          same question four times.

9               MS. SELTZER:  I have to ask the

10          same question because he keeps bringing

11          it up as something that was actually

12          said when it's his interpretation, but

13          let's not waste --

14               MR. WIGDOR:  It is an age

15          discrimination case last I checked, and

16          it's important, when somebody makes a

17          comment about age --

18          Q.    Mr. Fried --

19               MR. WIGDOR:  -- to know what the

20          interpretation is.

21          Q.    Mr. Fried, let's talk a little bit

22     about your use of age comments.  You have made a

23     statement a while back that you did use your age

24     sometimes as a source of humor or joking with

25     other people; is that correct?

A-768.70

218

```
 1                Burton T. Fried

 2        A.    Yes, yes.

 3              MS. SELTZER:  Can you give me

 4        Exhibit 29?

 5              (E-mail dated June 30th, 2005

 6        marked Fried Exhibit 17 for

 7        identification.)

 8              MS. SELTZER:  Let the record show

 9        that Exhibit 17 is an e-mail from Burton

10        Fried to Mike Lane, dated June 30th,

11        2005, Bates stamped LVI 1898.

12        Q.    Do you remember this e-mail,

13   Mr. Fried?

14        A.    No.

15        Q.    Do you know who Mike Lane is?

16        A.    Yes.

17        Q.    Who is he?

18        A.    On the date of this e-mail it was

19   pre-Katrina and he was co-chief operating

20   officer.

21        Q.    So he was a member of LVI

22   management?

23        A.    Not just management.  He was -- he

24   reported directly to me.

25        Q.    Do you know how old Mr. Lane is?
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.71

```
 1                  Burton T. Fried

 2          A.     Actually, he reported directly to

 3  Bob McNamara at this point but we had a very

 4  close relationship.

 5          Q.     Do you know how old Mr. Lane is?

 6          A.     He was probably at that time in

 7  his late 40's, just like Mr. State now is about

 8  47.  I think he was about that age.

 9          Q.     So about the same age as

10  Mr. State?

11          A.     He was that age then as Mr. State

12  is currently.

13          Q.     And he says to you, writes to you,

14  "You're up early this morning.  A man of your

15  age needs his sleep."

16                 Do you consider that to be a

17  comment about your age?

18          A.     No.  It was a joke.

19          Q.     And you responded back to him,

20  "With you on vacation how can an old man like me

21  sleep?"

22                 That was a joke?

23          A.     We had a very close relationship.

24  We worked together for years.  We went through

25  thick and thin together and we used to extend a
```

A-768.72

1                    Burton T. Fried

2    lot of levity between each other.

3          Q.      Is there any possible way that

4    Mr. State's comment to you was tongue-in-cheek?

5          A.      No.

6          Q.      Why?

7          A.      He was serious, and he was serious

8    when he made this statement to me and he didn't

9    retract it and nor did anyone after that, any of

10   the three board members retract it, nor did he

11   retract it on the February 4th board meeting,

12   and he had every opportunity to say, "I didn't

13   mean it that way, it was a tongue-in-cheek."

14   And all the board members that I mentioned got

15   up and never retracted it or criticized it.  And

16   outside the boardroom, when I was with State

17   alone, he never retracted it and never

18   apologized, never said it was a mistake, never

19   said anything of the nature, and so it was never

20   a tongue-in-cheek.

21                    (E-mail string, first one dated

22              June 23, 2006, marked Fried Exhibit 18

23              for identification.)

24                    MS. SELTZER:  Let the record show

25              that Exhibit 18 is an e-mail from Burton

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2           Fried to Brian Simmons dated June 23rd,

3           2006, Bates stamped LVI 1928 through 31.

4           Q.    Look at the attachment, Mr. Fried.

5    I want to ask you a question about that.

6           A.    Yes.

7           Q.    Did you approve the press release

8    that went out?

9           A.    Yes.

10          Q.    What is the reason for including

11   your age on this press release, and

12   Mr. McNamara's age?

13          A.    That would have been a public

14   relations firm.

15          Q.    Did they explain to you why they

16   wanted to put your ages in a press release?

17          A.    I never asked them.

18          Q.    Did it bother you that they put

19   your age in the press release?

20          A.    I have nothing to be embarrassed

21   about.  I'm a senior citizen.

22          Q.    If you look at the e-mail itself,

23   Mr. Simmons writes to you on June 23rd, 2006, he

24   says, "Use as you wish.  FYI, I didn't realize

25   you were only 66.  I thought it was 67.  Had I

222

1                    Burton T. Fried

2    known, we would not have allowed you to retire."

3                    And you respond, "I may look 67

4    but I'm really a young 66."

5                    Did you know Mr. Simmons for years

6    and years and had a close relationship with him?

7            A.    I had known Mr. Simmons for about

8    a year.

9            Q.    Did you have the kind of

10   relationship you had with Mr. Lane, where you

11   wouldn't have taken offense at his using your

12   age in this --

13           A.    In the context of which he was

14   making this comment, which is referring to a

15   press release and referring to Bob McNamara

16   taking over the day-to-day responsibilities and

17   his reference to my retiring being no longer

18   CEO, it was a joke.  You have to have a sense of

19   humor when somebody says that in the context of

20   which it was mentioned.

21           Q.    Did you believe that Mr. Simmons

22   was implying here that if you were 67, you

23   should have -- if you were 66, you wouldn't have

24   been retired, but 67 you would have?

25           A.    I couldn't read his mind.

1                    Burton T. Fried

2          Q.    Did you think this was an ageist

3    comment from Mr. Simmons?

4          A.    It might have been, but I

5    didn't -- I wasn't offended.

6          Q.    And yet you were offended by

7    Mr. State's comment, which is somewhat similar

8    to this action?

9               MR. WIGDOR:  Objection.  Come on.

10          You want to ask a real question?

11               MS. SELTZER:  Yeah, that is a real

12          question.

13          Q.    You were offended by Mr. State's

14    comment?

15               MR. WIGDOR:  That's not what you

16          asked.  You interject.  It's an opinion.

17               MS. SELTZER:  Which is similar to

18          this, because he's talking about --

19               MR. WIGDOR:  Why don't you reask

20          the question.  What's the question?

21               MS. SELTZER:  I don't need to.

22               Reread it back.

23               MR. WIGDOR:  Well, the

24          second-to-last question you are

25          withdrawing and you're going to stick

A-768.76

1                    Burton T. Fried

2          with the last question?

3               MS. SELTZER:  No, I'm going to

4          stick with the last question.

5               MR. WIGDOR:  The last question is

6          okay because you rephrased it.

7               MS. SELTZER:  Okay.

8               MR. WIGDOR:  Can you read back the

9          last question, second-to-last question,

10          just so I make sure -- it was the

11          second-to-last question I had a problem.

12               (Record read.)

13               MR. WIGDOR:  Yeah.  I'm objecting

14          to the form of the question.

15          Q.    You can still answer.

16               MR. WIGDOR:  If you can answer

17          that question.

18          A.    It was not the same remark.  It

19    was not in the same context and it was in

20    relation to taking away all my duties, and so,

21    yes, I was offended.

22          Q.    Did you think Mr. Simmons here was

23    implying that at 67 you ought to retire?

24          A.    No, but he was making an ageist

25    remark that I let go by.

A-768.77

225

1                    Burton T. Fried

2          Q.    Did you report this ageist remark

3    to anybody?

4          A.    I didn't feel offended, as I said

5    to you, so I didn't, I didn't report it to

6    anyone.  It had no impact on me.  It related to

7    my taking over as chairman duties, and I think

8    it was more of a compliment because he was

9    indicating that maybe I should have stayed on as

10   CEO and now I had the duties of chairman.

11              I think he had a great deal of

12   respect for my duties at the time, and my

13   accomplishments.  He had just bought the

14   company.  He was basing his purchase based upon

15   my accomplishments.  So I don't think he was

16   making a derogatory remark at the time.

17         Q.    Was there an HR director or

18   manager at this time?

19         A.    We had one for a period of time, a

20   very short period of time.  We never really had

21   one.

22         Q.    Do you have one now?

23         A.    No, unless Mr. State decided to

24   hire one.

25         Q.    And so you didn't think that this

                Elisa Dreier Reporting Corp. (212) 557-5558
                950 Third Avenue, New York, NY 10022

226

```
 1                  Burton T. Fried
 2   was serious enough to take to the attention of
 3   anybody in the company?
 4        A.    No.  I wasn't injured.
 5        Q.    Does an ageist remark have to
 6   injure in order to be ageist?
 7              MR. WIGDOR:  Objection.
 8        A.    You're the attorney, Counselor.
 9   Don't ask me for a legal opinion.
10        Q.    You're an attorney, too,
11   Mr. Fried.
12        A.    But you're an employment
13   specialist.
14        Q.    Okay.  Let's not -- the time that
15   you sent -- that Mr. Simmons circulated your
16   chairman responsibilities to the board, did
17   anything -- between that point in time and the
18   time of the board meeting on November 4th, were
19   there any further conversations that you had
20   with anyone who was, you know, in LVI or the
21   board of directors about the upcoming board
22   meeting?
23        A.    At some point in time, and I
24   really can't tell you when.  The only other time
25   that I met a managing director of Falcon that
```

1                    Burton T. Fried

2   relates to this matter was at a -- at a dinner

3   relating to the closing.  He came to see me at

4   the dinner, before it started, to -- just to say

5   hello and to tell me that John Schnabel couldn't

6   attend because it was weather conditions and his

7   flight was delayed.  And just wanted to tell me

8   that this would all be straightened out and that

9   they -- they absolutely were opposed to what was

10  going on and not to be concerned about it.

11          Q.    I'm sorry, who was this again that

12  said this to you?

13          A.    Ray Fogel.

14          Q.    What was Mr. Fogel's position?

15          A.    He was a managing director of

16  Falcon and one of the active participants in the

17  negotiations for the restructuring of this

18  transaction on behalf of Falcon.

19          Q.    What did you think Mr. Fogel was

20  referring to when he was talking about things

21  working their way out?

22          A.    In that -- about stripping my

23  duties and terminating my employment.

24          Q.    Did he give you any indication of

25  how he had found out about this?

Case: 13-1165   Document: 46   Page: 91   07/10/2013   986046   252

A-768.80

1                  Burton T. Fried

2          A.     I assumed he did from John

3    Schnabel.  They're partners.

4          Q.     Did he tell you about any

5    conversations that he had with Mr. Schnabel?

6          A.     Other than that he felt confident

7    that John Schnabel would take care of it.

8          Q.     Did you tell Mr. Fogel anything

9    further about your conversation with Mr. State

10   on October 19th?

11         A.     No.

12         Q.     Did you tell him about Mr. State's

13   comment to you?

14         A.     No.  He was already aware of what

15   was going on.

16         Q.     Did he tell you he was aware of

17   the comment?

18         A.     He told me he was aware of the

19   problem that has arisen and that John Schnabel

20   would take care of it.

21         Q.     And by "problem" you're assuming

22   he meant the ageist remark?

23         A.     That's the only thing he was

24   talking about, was the ageist remark and the

25   removal of my duties and the act of age

229

1                    Burton T. Fried

2    discrimination.

3            Q.      So he could have been referring to

4    any one of those things, correct?

5            A.      He was referring to all of them.

6            Q.      How do you know that?

7            A.      Because you had to be there to

8    understand it.

9            Q.      And he said "problem," right?

10           A.      Yeah.

11           Q.      Let's talk about the meeting with

12   the board of directors on November 4th.

13           A.      Again?

14           Q.      Yup, again.

15                   Was this a regularly scheduled

16   board meeting?

17           A.      Yes.  It was the first board

18   meeting.

19           Q.      Of the year?

20           A.      No, of LVI Parent.

21           Q.      So this was the first time that

22   Mr. Bagaria and Mr. Girardi were voting members

23   of the board?

24           A.      Yes.

25           Q.      Who attended that meeting, if you

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.82

230

1                    Burton T. Fried

2   remember?

3          A.     All of the directors.

4          Q.     And who would that have been at

5   that time?

6          A.     Mr. Simmons, Mr. State,

7   Mr. Bagaria, Mr. Girardi, Mr. Farucci,

8   Mr. Schnabel, Mr. Buck and myself, and other

9   people like the secretary of the meeting,

10  Jeffrey Smith, and some of the representatives

11  of Code Hennessy I think were there, and Paul

12  Cutrone and John Leonard.  I think that does it.

13         Q.     Were there various items that were

14  discussed prior to your presentation at the end

15  of the meeting?

16         A.     Yes.

17         Q.     Do you know how long the meeting

18  was held for?

19         A.     It had gone on for maybe an hour

20  and a half, two hours.

21         Q.     Did you present on anything other

22  than your responsibilities and duties at the end

23  of the board meeting?

24         A.     I may have been asked a question

25  about some matter, but I don't recall.

A-768.83

231

1                   Burton T. Fried

2          Q.    Were -- was the -- when you state

3    that the -- your statement was during part of

4    the closed board meeting, what do you mean by

5    that?

6          A.    Well, at the end of the agenda of

7    business items, those that were not board

8    members were asked to leave, with the exception

9    of Jeffrey Smith.  Although all board members

10   were asked do leave, Jeffrey Smith remained as

11   secretary because it was still a meeting of the

12   board, and that was at my request because I felt

13   it would be inflammatory to have John Leonard

14   and Cutrone there to listen to this dialogue,

15   when in fact it could have been or I had hoped

16   it would be resolved and there was no reason for

17   that to then be repeated out among the managers

18   and so forth.  And Simmons asked me if I wanted

19   it closed and I said I preferred it because of

20   that reason and he said fine.

21         Q.    What was your purpose in the

22   statement that you made to the board of

23   directors?  What did you intend to do with that

24   statement?

25         A.    If his actions had the approval of

232

1                    Burton T. Fried

2    the board.

3            Q.    So you wanted to find out if his

4    actions had the approval of the board?

5            A.    I wanted to find out if it had the

6    actions, I wanted them to be aware of what was

7    going on and whether they supported it.

8                    They had just invested tens of

9    millions of dollars into the company.  I had

10   been with the company for 24 years, I had been

11   with it in this past year, I had rescued it,

12   helped rescue it in the past six months so they

13   could do a restructuring and make the

14   investment.  It was my obligation to present to

15   them these facts and for them to determine if in

16   fact they supported the actions of Scott State.

17           Q.    Which members of the board of

18   directors were in this closed meeting?

19           A.    All.

20           Q.    So that would have been

21   Mr. Bagaria, Mr. Girardi, Mr. Schnabel,

22   Mr. Simmons?

23           A.    Yes.

24           Q.    You, Mr. State were there?

25           A.    Yes, Mr. Farucci, Mr. Buck.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.85

233

1                    Burton T. Fried

2          Q.    Had you, by the way, reached out

3    to Mr. Farucci or Mr. Buck after the meeting but

4    before the board of directors -- after your

5    meeting with Scott State but before the board of

6    directors meeting on November 14?

7          A.    I don't remember speaking to

8    Mr. Buck.  I don't think I did.

9                I may have spoken to Mr. Farucci.

10   I don't recall that I did, frankly.  I think I

11   limited it to those people.  I don't -- I don't

12   think I spoke -- I had spoken to Mr. Farucci

13   about other matters.  I don't think in this

14   period of time I spoke to him about this matter.

15         Q.    By the way, other than the members

16   of the board of directors, did you call any

17   members of LVI management with respect to the

18   comment made by Mr. State?

19         A.    I don't believe I did, and the

20   only person that I know I did speak to was John

21   Leonard, and I believe that was after the board

22   meeting.

23         Q.    I just want to focus on before the

24   board meeting.

25         A.    I'm trying to focus on it and then

        Elisa Dreier Reporting Corp. (212) 557-5558
          950 Third Avenue, New York, NY 10022

234

1                    Burton T. Fried

2    eliminate him from someone who I spoke to before

3    the board meeting.  I don't believe I did.

4          Q.    So you didn't speak to Paul

5    Cutrone about it?

6          A.    No.

7          Q.    You didn't speak to your general

8    counsel about it?

9          A.    I don't believe I did.

10         Q.    Any reason why you didn't approach

11   anyone within the company with respect to an

12   ageist comment that was made to you by the CEO?

13         A.    I believed that he was unstable.

14         Q.    Who was unstable?

15         A.    Scott State, and it would serve no

16   purpose for me to let other members of

17   management know what was going on and what he

18   was doing within a couple of weeks in his

19   current state, after just taking over the CEO

20   position, and if it could be resolved quietly

21   and without any further complaint by me, it was

22   best for LVI that it be put to bed by the board

23   meeting, which was a short period of time after

24   my conversation with him.

25         Q.    What led you to think Mr. State

235

1                     Burton T. Fried

2    was unstable?

3           A.    I don't believe that any new

4    executive CEO, within weeks of coming aboard,

5    would make an ageist remark to a -- an executive

6    who had been the founder of the company and had

7    built it to a preeminent position and along the

8    way sold it three times to private equity funds

9    who enjoyed the benefits and applauded my

10   efforts, and then would not only seek to take

11   away my responsibilities and terminate me, but

12   use an ageist remark.

13          A senior executive who is

14   experienced doesn't do things like that, and I

15   couldn't figure out why he did it.  And clearly

16   my interest, since I invested a million dollars

17   into the company and I was owed $1.6 million,

18   was to get this resolved so the company goes on,

19   in a most difficult period of time in the worst

20   economy it was working on since the depression.

21          So I had no personal vendetta or

22   interest to make more of this than it was, in

23   the hope that it could be resolved.

24          Q.    If you were to separate the

25   transfer of your responsibilities from the

           Elisa Dreier Reporting Corp. (212) 557-5558
              950 Third Avenue, New York, NY 10022

236

1                   Burton T. Fried

2    remark that he made, did you think that his

3    decision to transfer your responsibilities to

4    other members of management to be an unstable

5    act?

6                   MR. WIGDOR:   Objection.

7         A.    It's not something an intelligent

8    CEO, an experienced CEO, would do two weeks

9    after he came aboard without going over item by

10   item to determine and evaluate the value added

11   that the executive -- or the lack of value that

12   an executive was contributing to each and every

13   single item on the list, as opposed to making an

14   ageist remark and saying, "How long do you have

15   to work."

16        Q.    Let me ask you again, because from

17   what I'm hearing from you, we obviously don't

18   agree with the decision, but you did make a

19   statement that you thought him to be unstable.

20             Is that -- is his opting to

21   transfer your job responsibilities to another

22   member of his management, do you consider that

23   an unstable act of a person who just becomes a

24   CEO of a company?

25        A.    I think it's his prerogative but I

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1              Burton T. Fried

2    think it's after careful review and

3    consideration of the individual items of

4    performance that I had on the list.

5              No one -- Scott State, who was

6    then 47 years old, not Brian Simmons, who was

7    then probably around 50, nothing, not Rajay

8    Bagaria, who was 34, not Girardi, who was

9    probably around 50, none of them, I believe,

10   would have performed such a -- none of them,

11   other than what State was doing, would have gone

12   about in -- being in a similar situation, gone

13   about in performing that.

14             And their support of State was a

15   cause of consternation for me and cause of

16   suffering ever since it occurred.  And I think

17   about it, frankly, every single day, the very

18   issue that you're raising as to how can somebody

19   who is stable do something like that.  And I

20   haven't, since November 4th, figured out, or

21   October 9th -- 19th, figured out how someone in

22   his position, that we just hired, who came to me

23   and asked me to put his name in, who I worked

24   with most recently on two -- trying to secure

25   two $20 million projects, and I secured the

A-768.90

238

1            Burton T. Fried

2   bonds for him, could turn around, without

3   comment, within a couple of weeks and not only

4   perform that, say that he's doing that, but

5   doing it because of my age.

6            You know what?  I have suffered

7   terribly since then, both personally and

8   professionally, but the worst of it, I think, is

9   not my damage, which I think is permanent and

10  irrevocable, I will always have the scars of

11  what he's done and the effect that's out in the

12  community with my family and friends, but what I

13  have tried to analyze countless mornings, at two

14  and three in the morning when I'm up and I can't

15  sleep thinking about this, is why would a person

16  who's stable ever do something like this.  And I

17  have not come up with a solution.

18       Q.    You mentioned a second ago that

19  you didn't think that any of the individuals,

20  the other board members, would have made a

21  decision like that.  How do you know that?

22       A.    I don't think anybody stable

23  would, and I have to assume they're stable.

24       Q.    So you don't think -- so you think

25  in order for a CEO to transfer responsibilities

        Elisa Dreier Reporting Corp. (212) 557-5558
          950 Third Avenue, New York, NY 10022

239

<pre>
 1                    Burton T. Fried
 2   from one manager, from one person to other
 3   people, is an unstable act?
 4               MR. WIGDOR:  Objection, objection.
 5          You want to hear the entire testimony
 6          again?  That's not what he said.
 7               MS. SELTZER:  No, I'm just asking.
 8          A.    You're taking my comment in
 9   piecemeal to suit your own purposes.
10   Fortunately -- fortunately, the jury will hear
11   my entire answer.
12          Q.    So tell me why you believe that --
13   and once again putting aside the statement, just
14   focusing on the action, which is the transfer of
15   these responsibilities from you to other members
16   of management, do you think that that is out of
17   the realm of a CEO's job duties --
18          A.    No.
19          Q.    -- to transfer others --
20          A.    No, not out of his job duties.
21   Taking it as a whole, his entire statement to
22   me, together with the ageist remark, after three
23   weeks on the job, talking to an executive who
24   has been with the company for 24 years and built
25   it to where it is, including the wars of the
</pre>

240

1                    Burton T. Fried

2  last six months, knowing what -- that there is

3  no other company in the nation like ours and it

4  happened under my leadership, and there isn't

5  any question -- nobody throughout this entire

6  period of time questioned my leadership or my

7  accomplishments or my results as a result of

8  being president, CEO, then chairman, then

9  interim CEO and then chairman again.  Nobody

10 questioned or criticized one single act on my

11 part, one single event, one single performance.

12 Nobody, no board of director, nobody at the

13 board of directors meeting, nothing before the

14 meeting, nothing after the meeting, nothing in

15 any correspondence as to why this even was

16 happening and why I was being terminated.

17 Nobody criticized or gave any other explanation

18 for the termination of -- because of

19 non-performance.

20            The only thing that remained and

21 the only thing that was repeated over and over

22 and over and over again was the connection of

23 the ageist remark with respect to the

24 reassignment of my duties.

25            So, Counselor, if you want to

241

1                   Burton T. Fried

2    separate, you may, the assignment of duties.  Is

3    that a proper purview of a CEO, absolutely.  But

4    taken in the context of the situation, I don't

5    believe that's a stable act.

6          Q.    You just mentioned a second ago

7    non-performance.  Do you think that anything

8    happened with respect to the transfer of these

9    responsibilities had anything to do with your

10   ability to perform?

11                MR. WIGDOR:  Objection.

12         Q.    Do you think that Mr. State --

13         A.    I don't understand your question.

14         Q.    Let me rephrase it.

15                Do you believe that Mr. State

16   believed that you were incapable of performing

17   these responsibilities?

18         A.    I don't know what he thought.  He

19   never expressed anything to me and never

20   discussed any single issue other than taking

21   over the acquisition responsibility.

22                THE VIDEOGRAPHER:  The time is

23                4:05 p.m.  We're going off the record.

24                (An off-the-record discussion took

25                place.)

A-768.94

242

1                    Burton T. Fried

2               (A recess was taken.)

3               THE VIDEOGRAPHER:  The time is

4          4:15 p.m., May 20th, 2011.  This is tape

5          number four in the videotaped deposition

6          of Mr. Burton T. Fried.

7   BY MS. SELTZER:

8          Q.    Just a couple of more questions

9   about the board meeting.

10              Did Mr. State make any statements

11  prior to your making a statement?

12         A.    No.

13         Q.    Did anybody make a statement prior

14  to your making a statement in that closed-door

15  meeting?

16         A.    Mr. Simmons might have introduced

17  the subject.

18         Q.    Do you remember what Mr. Simmons

19  said?

20         A.    No.

21         Q.    And nobody else said anything

22  prior to your beginning to speak?

23         A.    No.

24         Q.    Do you know approximately how long

25  your speech was?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

243

1                    Burton T. Fried

2          A.     No.  I have no idea.  Certainly

3    within a half an hour.

4          Q.     And did people talk while you were

5    talking?  Did they interrupt or did they make

6    comments during the course of your speech?

7          A.     Complete silence.

8          Q.     After you were concluded with your

9    speech, did anybody say anything?

10         A.     Yes.

11         Q.     What do you remember?

12         A.     There were comments, first

13   Mr. Bagaria and then Mr. -- let's see,

14   Mr. Girardi, then Mr. Simmons, then Mr. Farucci,

15   in between there might have been a statement by

16   Mr. Hogan, and that was it.

17         Q.     We'll get to these in one second,

18   but let me ask you one question more about your

19   statement.

20                Did you ever make any statement

21   during the course of your speech that you were

22   going to contact the sureties to ruin the

23   relationship with the sureties and LVI Services?

24         A.     Can you repeat the question,

25   please.

          Elisa Dreier Reporting Corp. (212) 557-5558
             950 Third Avenue, New York, NY 10022

244

                    Burton T. Fried

1

2          Q.    Sure.  During the course of your

3    speech, did you make any statement that you were

4    going to contact the sureties to make sure they

5    wouldn't do business with LVI anymore or that

6    would ruin the relationship between the sureties

7    and LVI?

8          A.    No.

9          Q.    Anything in sum and substance like

10   that?

11         A.    No.

12         Q.    Any mention of the sureties at

13   all?

14         A.    Yes.

15         Q.    Tell me what you remember saying

16   about the sureties.

17         A.    I mentioned that I enjoyed and

18   maintained the relationship with the surety for

19   the past ten years, which was, I believe, a

20   significant reason for the maintenance of a

21   $200 million line of credit with LVI.  And that

22   I had no interest to be a figurehead, as

23   proposed, of a company.

24         Q.    Is that the only thing you

25   remember saying about the surety?

1              Burton T. Fried

2              MR. WIGDOR:  I don't think he was

3         done.

4              MS. SELTZER:  I'm sorry, there was

5         a pause.

6              MR. WIGDOR:  If you just look, you

7         can see he's still speaking.  You've

8         done it a number of time.

9              But just continue.  You're looking

10        down, that's why.

11        Q.   Go ahead.

12        A.   I had -- I'm sorry, I lost my

13   train of thought.

14             MR. WIGDOR:  You were going

15        through the conversation about the

16        surety.

17        A.   I indicated that the 200 million

18   line was critical to the success of the

19   business.  It had been maintained with Arch,

20   A-r-c-h, and that the relationship with Arch is

21   a period of ten years with whom I had that

22   relationship, Arch and its predecessor, and that

23   I had no interest in being a figurehead, simply

24   to act in a way to give them a false impression

25   that I was involved in the risk management of

A-768.98

246

                              Burton T. Fried

1    the business, which was a critical factor for

2    them, and that I would absolutely, of necessity,

3    have to tell them so as not to commit fraud,

4    that if in fact they proceeded in taking away

5    those responsibilities, to advise them that I

6    was no longer handling that responsibility.

7         Q.    Which responsibility is that?

8         A.    Risk management that's listed in

9    the responsibilities listing that's in the

10   exhibit.

11        Q.    Did you believe that by telling

12   Arch that, that would have prompted them to back

13   away from LVI in terms of doing business?

14        A.    Not necessarily, no.  And in fact,

15   they asked Richard Farucci that question and his

16   response was I -- "You have to understand that

17   Burt Fried is the grandfather -- is considered

18   the grandfather of the industry and there

19   certainly has to be a reaction from the surety

20   to that, but that I feel confident that I could

21   hold everything in place."

22        Q.    Did you feel that using --

23   Mr. Farucci using the term "grandfather of the

24   industry" to be an ageist comment?

1                    Burton T. Fried

2          A.    No.  I have been involved in the

3    business for 24 years, from the time that the

4    industry really began.  It began something prior

5    to that, but regulation really in '86, and I

6    consider that to be a statement -- I never heard

7    anybody say that before but I wasn't offended.

8    And that it was Mr. Hogan --

9          Q.    Before -- I'm sorry, I just want

10   to put that in context.

11               So Mr. Farucci's comment about you

12   being the grandfather of the industry was the

13   comment that he made after your speech?  Is that

14   what he said?

15         A.    In response to a question from

16   Mr. Simmons whether it would affect the surety

17   relationship.

18         Q.    And this was after your speech?

19         A.    Yes.

20         Q.    Was Mr. Simmons saying that

21   because you had made some statement that you

22   were going to tell them that you were no longer

23   handling the risk?

24         A.    I said it was my obligation, so as

25   they were not misled and defrauded, to tell

A-768.100

248

1                    Burton T. Fried

2      them, and that was his comment.

3                    And then Mr. Hogan made one

4      comment, and he said, "I'm sure when that

5      occurred" -- this was his statement.  "I'm sure

6      when that occurred, Mr. Fried would introduce

7      Mr. State as the person who would be

8      responsible, a new CEO," because while Mr. State

9      visited offices, he never had yet thought it

10     important enough to visit the surety.  And I

11     said, "By all means, I would be happy to

12     introduce Mr. State."  Not happy, but I would --

13     I think I said I would introduce Mr. State as

14     the new CEO.

15              Q.    Do you remember what Mr. Bagaria's

16     comments were after your speech?

17              A.    Highly offensive.

18              Q.    What did he say?

19              A.    He made comments that were so

20     offensive and he did it where -- while sitting

21     as close to me as -- as Mr. Wigdor is, that I

22     turned to him and said, "Please don't talk to me

23     that way."

24              Q.    What did he say?

25              A.    I don't remember what he said as

249

1                    Burton T. Fried

2    much as I remember him getting out of his seat

3    and walking to the other side of the room.

4              Q.    So you don't remember what this

5    very offensive thing he said was?

6              A.    It was along the lines of being

7    supportive of my removal, the elimination of my

8    duties, I had no right to comment or complain or

9    object to the ageist remark or to anything that

10   they were doing.  It was up to the board of

11   directors to determine my responsibilities and

12   if the board decided to strip me of my

13   responsibilities, that was final.  And some

14   other crude remarks, all of which I really can't

15   remember, except I remember it was so offensive

16   that I asked him not to talk to me that way.

17             Q.    Did he use obscenities or what do

18   you mean by "crude"?

19             A.    No, not obscenities.  Just very

20   critical remarks about who do I think I am.

21             Q.    You said a second ago that

22   Mr. Bagaria said -- correct me if I

23   misunderstood you -- that Mr. Bagaria said that

24   you had no right to complain about the

25   discriminatory remark.  Did he say that?

250

1                    Burton T. Fried

2          A.    No.  I said that was Girardi.

3          Q.    Okay.  So did Mr. Bagaria say

4     anything to you with respect to the

5     discriminatory remark?

6          A.    No.

7          Q.    Okay.

8          A.    And actually, I don't think

9     Mr. Girardi directly specifically referred to

10    the discriminatory remarks, although said I had

11    no right to object to anything that was said to

12    me by Mr. State.  And clearly that meant to me

13    the discriminatory remarks.  But he didn't use

14    the word "discriminatory remarks."

15         Q.    So neither Mr. Bagaria nor

16    Mr. Girardi said you had no right to complain

17    about the discriminatory remark; is that

18    correct?

19         A.    No.  Their only comment was they

20    had the right to do whatever they wanted to do,

21    and they made those statements with the

22    knowledge that an act of discrimination was

23    being effected upon me.

24         Q.    Did anybody comment on the comment

25    that you related to them?

```
 1                    Burton T. Fried

 2         A.    Not a word.

 3         Q.    Did Mr. -- what did Mr. Simmons

 4  say after the speech was over?

 5         A.    He said that it was the decision

 6  of Mr. State to determine what my duties were,

 7  so I clearly was a little confused because they

 8  weren't all consistent.  It was either the

 9  board -- some saying the board, the others

10  saying Mr. State.

11              He, too, didn't make any reference

12  to the discriminatory remarks other than to say

13  it was up to Mr. State and it was his duties and

14  responsibilities, he would support that, and

15  that the board would meet and then let me know

16  what their decision was.

17         Q.    Did -- you said that Mr. Schnabel

18  didn't say anything; is that correct?

19         A.    No.  Nor did Mr. Buck.

20         Q.    Nor did Mr. State?

21         A.    Nor Mr. State, nor Jeffrey Smith.

22         Q.    Anybody else say anything after

23  your speech that you remember?

24         A.    No.  Mr. Simmons then said that

25  the meeting therefore is ended.
```

1                    Burton T. Fried

2          Q.    Did you at some point during the

3    course of the meeting step out of the conference

4    room with Mr. State?

5          A.    Yes.

6          Q.    Was that after your speech?

7          A.    Yes.

8          Q.    Do you remember why you were asked

9    to step outside?

10         A.    Mr. Simmons said that the board

11   wanted to discuss this alone.  In camera?

12         Q.    I don't know if that's used in a

13   board meeting.  Possibly.

14               Tell me, about how long were you

15   and Scott outside of the conference room?

16         A.    10-15 minutes.

17         Q.    Did you speak at all?

18         A.    It seems everything is 10-15

19   minutes.

20               He came over to me and said,

21   "Burt, I just want to tell you that I never told

22   anyone not to speak to you," and because during

23   the presentation I made reference to the fact

24   that I was told by two officers that they were

25   not to speak to me, one at all, the other one

1                    Burton T. Fried

2    about new matters.

3                    My reply was, "Then you ought to

4    speak to two of your most senior officers who

5    volunteered that to me."

6            Q.    Who were the two?

7            A.    John Leonard and Paul Cutrone.

8            Q.    Did Mr. State say anything back to

9    you after you said that?

10           A.    No, nor did he deny or apologize

11   for the ageist remarks.

12           Q.    Did you say anything to him about

13   the ageist remarks when you were out there?

14           A.    I had no further conversation

15   about it.

16           Q.    So that was it?

17           A.    That was it.

18           Q.    What did Mr. Leonard tell you

19   about Mr. Scott -- Mr. State telling you?

20           A.    That I was not to -- he was not to

21   talk to me at all, and that and if there were

22   any items he felt necessary to talk to me, he

23   was to speak to Mr. State and Mr. State would

24   then speak to me and get an answer.

25           Q.    When did Mr. Leonard say Mr. State

                                                    254

1                   Burton T. Fried

2    said that to him?

3           A.     Prior to the board meeting.

4           Q.     Did Mr. Leonard tell you that he

5    commented on that?

6           A.     That was the end of the

7    discussion.

8           Q.     How about Mr. Cutrone, what did

9    Mr. Cutrone tell you?

10          A.     He volunteered -- they were

11   volunteering this in response to my inquiry as

12   to why they were not calling me on the phone,

13   and the same question of Paul Cutrone.  He

14   answered, "I was told by Scott not to talk to

15   you about any new matters but that it was okay

16   to talk to you about legacy matters."

17          Q.     Did you ever go back to Scott and

18   ask him why he had instructed Mr. Leonard and

19   Mr. Cutrone not to talk to you about certain

20   topics?

21          A.     I had not spoken to Scott between

22   October 18th and the board meeting except for

23   some conversations that we may have had

24   concerning the matters that were expressed in

25   the e-mails.  But, no, I never -- I never had

```
 1                    Burton T. Fried
 2   any conversation.  Clearly his course of conduct
 3   and his objective and his goal was very clear.
 4          Q.    Were you, during the period
 5   between the meeting with Scott, which was
 6   October 18th or 19th --
 7          A.    19th.
 8          Q.    -- 19th, and the time of the board
 9   meeting, were you the whole time in your
10   Westport office as opposed to New York?
11          A.    I was in New York.
12                MR. WIGDOR:  Objection.
13                You can answer the question.
14          A.    I was in New York.  I think I
15   attended meetings on business matters but,
16   clearly, yes.
17          Q.    So you were in the offices in
18   New York?
19          A.    Not necessarily the office.  I
20   could have been in the office, I could have been
21   at meetings in New York on LVI matters.  I mean,
22   we had active projects going on of which I was
23   concerned about and -- and including Madison
24   Square Garden, which I was personally involved.
25          Q.    So you were --
```

256

```
 1                    Burton T. Fried
 2          A.    You have to understand something,
 3     that I -- New York itself, New York City itself,
 4     generally New York State, but clearly New York
 5     City, LVI was the largest employer of -- of
 6     labor from the union in New York City and
 7     probably the largest employer of labor of this
 8     specialty, New York City and New York State, of
 9     any other contractor.  If not the largest at any
10     point in time, close to the largest.  And we had
11     big projects and we performed the most
12     high-profile projects.
13               So my involvement was -- whether I
14     was in the office, as you pointed out -- asked
15     me -- in the office at 80 Broad, and I was many
16     times, or I was at clients' offices or on --
17     on -- related to the business matters.  I mean,
18     we had heavy involvement with a big structural
19     demolition company performing work there, like
20     Hudson Yards or these other projects.  And so my
21     contact in New York was significant.
22          Q.    So at the time that the --
23     between -- after the meeting with Scott State on
24     October 19th, were you working on some major
25     projects yourself?  Were you involved in
```

1                     Burton T. Fried

2    projects?

3           A.    I was involved in matters that

4    affected projects, that, you know, we were

5    trying to beat a deadline for the Deutsche Bank

6    project because there was liquidated damages.

7                 I was working on a claim against

8    the -- in getting information on a claim that --

9    a possible claim against the Crane Company for

10   the number of days that we were down due to

11   mechanical failures.

12          Q.    Any other projects that you were

13   working on?

14          A.    We had a problem, I don't know if

15   it's before or after that date, was clearly

16   within that period of time, we had a big problem

17   with an incident in Madison Square Garden.

18          Q.    Any other projects?

19          A.    That was the $27 million project.

20          Q.    I'm just trying to find out what

21   else you were working on during that period of

22   time.

23          A.    So I don't have a current

24   recollection on what days I was there, what

25   matters I -- we had the Mazoki matter at which I

258

1                    Burton T. Fried

2    was at your offices here in this building, and

3    not only personal presence but telephone calls

4    relating to the business, not only in New York

5    but the nation, but clearly a lot in New York

6    that was going on.

7          Q.    Did Mr. State ever tell you to

8    stop working on those projects?

9          A.    No.

10         Q.    So you actually were continuing to

11   do work as chairman during this period of time?

12         A.    To the extent that I received any

13   inquiries from branches, I did, yes.

14         Q.    Would you consider these projects

15   to be strategic projects?

16         A.    Strategic?  Yeah, they are very

17   important projects, sure.

18         Q.    So these were a province of what

19   you had said that you would be doing as chairman

20   of the board of LVI; is that correct?

21         A.    It was ill-defined.  No, it was

22   strategic growth.  Not strategic.  He took away

23   strategic growth.  Those were projects that I --

24   that he referred to as bullshit work.

25         Q.    This was bullshit work?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          A.     Oh, yeah.  He has an e-mail

3    claiming I'm getting a million dollars a year.

4    In looking at the list, I was only performing

5    review of travel requests and bullshit

6    administrative duties.

7          Q.     And he was referring to these

8    projects, the MSG incident --

9          A.     Well, he said that was the only

10   things I was doing.

11         Q.     -- the Deutsche Bank project, the

12   Mazoki litigation?  These were the bullshit

13   projects?

14         A.     Well, we're going to find out,

15   aren't we, when we take his deposition.

16         Q.     Well, why don't you answer my

17   question?

18         A.     I can't read his mind.  That's all

19   he said I was doing for LVI.

20         Q.     Did you believe that that's what

21   he was referring to when he said "these bullshit

22   projects," that he was referring to these, you

23   know, initiatives that you were involved with?

24         A.     It was part of his effort to

25   embarrass, demean, demoralize and take away my

260

1                    Burton T. Fried

2    self-respect.

3         Q.    He didn't pass any of these

4    projects to anyone else, did he?  Did he put

5    anyone else on the Mazoki litigation?

6         A.    I don't know what he did.  He

7    never spoke to me.

8         Q.    You continued to work on the

9    Mazoki --

10        A.    Only if I was called on.

11        Q.    And as far as the Deutsche Bank

12   project, did you continue to work on that?

13        A.    Only to the extent I was called on

14   with inquiries.  But the main direct people who

15   I worked with were told not to talk to me.

16   Eventually that filtered down to the people on

17   projects that I was involved in.

18        Q.    So that would have been

19   Mr. Leonard and Mr. Cutrone?

20        A.    That filtered from them down to

21   regional managers, branch managers.  And that

22   was part of his campaign and part of the damages

23   that he brought upon me.

24             MS. SELTZER:  Could you mark this,

25             please.

261

```
 1              Burton T. Fried

 2              (E-mail dated November 16, 2010

 3          marked Fried Exhibit 19 for

 4          identification.)

 5              MS. SELTZER:  Let the record show

 6          that Exhibit 19 is an e-mail from Brian

 7          Simmons to Burton Fried, dated

 8          November 16th, 2010, Bates stamped BF8

 9          through 12 and BF153.

10      Q.    Do you recognize this?

11      A.    Yes.

12      Q.    If you would just turn first to

13  the last page, which is the letter dated

14  November 16, 2010 and signed by Brian Simmons on

15  behalf of the board of directors of LVI Parent

16  Corporation, if you look at the fourth paragraph

17  down, it talks about some of the projects that

18  you would be working on as a consultant,

19  including the Kessler Federal Credit Union

20  litigation, the litigation on the estate of

21  Daniel Sitomer, and Dwayne Morris LLP

22  litigation.

23              Were these litigations that you

24  were currently working on?

25      A.    Well, I can't say it was just me.
```

A-768.114

262

```
 1                    Burton T. Fried
 2    This was also being worked on by Mr. DiCarlo.
 3           Q.     But these were projects that you
 4    were -- litigations that you were working on
 5    that you were involved with prior to this being
 6    sent to you?
 7           A.     There was only some of them.
 8           Q.     Okay.
 9           A.     Mr. Simmons wasn't aware of all of
10    them or else he would have listed others with
11    higher value that I was intimately involved in.
12           Q.     But these were -- these were
13    ongoing litigations?
14           A.     Yes.
15           Q.     And then he says, "In addition you
16    would be asked to provide assistance and support
17    from time to time on various projects as
18    requested by Scott State."
19           A.     Yes.
20           Q.     Did you find these
21    responsibilities to be outside of your scope of
22    experience?
23           A.     No.
24           Q.     Did you find them objectionable in
25    some way?
```

1                    Burton T. Fried

2          A.     No.

3          Q.     Why did you decide not to take the

4    consulting agreement?

5          A.     Because it contained a

6    discriminatory provision.

7          Q.     Do you mean release?

8          A.     Release.  And a release of

9    liability of my rights under the Civil Rights

10   Act, and it contains a provision for

11   non-competition for 12 months without payment,

12   and the conditions under which these items -- in

13   exchange for these items there was an offer to

14   pay me 375 per quarter, and it could be

15   terminated at any time after the inception, and

16   if so, under the terms of the agreement, my only

17   rights was to keep the 375 and then I would be

18   bound to the other provisions, in effect giving

19   up my right under the Civil Rights Act for

20   37,500, and be precluded from competing for 12

21   months, when currently, as you pointed out under

22   the other provision, executive securities

23   agreement, I would have to be paid up to 18

24   months if in fact they enforced it, and that was

25   at the rate of 600,000 a year.

A-768.116

```
 1                    Burton T. Fried
 2          Q.    Did you respond to Mr. Simmons
 3   with respect to this proposal or was it at that
 4   point Mr. Wigdor negotiating for you?
 5          A.    No.  At that point it wasn't
 6   worthy of a response.
 7          Q.    So you choose not to respond to
 8   it?
 9          A.    Correct.
10          Q.    Did you turn it down?  You just
11   didn't answer?
12          A.    I didn't acknowledge it within the
13   time period that...
14          Q.    Did you understand at this time if
15   you didn't take this consultancy, that your
16   employment would be terminated as of
17   November 30th?
18                 MR. WIGDOR:  Objection.  The
19            letter speaks for itself.
20                 MS. SELTZER:  Yeah.  I'm just
21            asking if he understood it.
22                 MR. WIGDOR:  No, no, no, you
23            misinterpreted what the letter says.
24            The letter terminates his employment.
25            Okay?
```

265

1                    Burton T. Fried

2               MS. SELTZER:  Right.

3          Q.    Did you understand that if you

4     didn't accept --

5               MR. WIGDOR:  That's not what he --

6          my objection is that you're insinuating

7          that a consulting agreement is --

8               MS. SELTZER:  My objection is that

9          you're making speaking objections on the

10         record.

11              MR. WIGDOR:  No.  You're asking a

12         misleading question because a consulting

13         agreement -- a consulting agreement --

14              I was in the middle of speaking

15         when I was interrupted.

16              MS. SELTZER:  You're not supposed

17         to be speaking, this is my deposition.

18              MR. WIGDOR:  Well, a consulting

19         agreement does not extend his

20         employment.  This very clearly

21         terminated his employment.  No matter

22         what happened, his employment was

23         terminated.

24              MS. SELTZER:  Fine.  Then let's

25         talk -- let me rephrase it.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

266

1                    Burton T. Fried

2          Q.    Did you understand that your

3    employment would be terminated on November 30th

4    and that if you didn't accept the consultancy

5    agreement, that you would have no further

6    relationship with LVI Services?

7          A.    And I also understood that this

8    was in response to a letter that was sent by my

9    counsel on my behalf asserting the fact that I

10   have been subjected to an act of age

11   discrimination, and the response to that was the

12   termination of my employment as employee of LVI

13   after 24 years.

14         Q.    When did your counsel send a

15   letter?

16         A.    On the 15th of November.

17         Q.    And this was sent to you on the

18   16th of November?

19         A.    That's correct.  Therefore, there

20   are two acts of discrimination.

21         Q.    Let me stop you.

22                So you believe that -- it's your

23   belief that this letter and this agreement were

24   drafted in the one day between your attorney's

25   letter and -- in one day?

          Elisa Dreier Reporting Corp. (212) 557-5558
            950 Third Avenue, New York, NY 10022

1              Burton T. Fried

2              MR. WIGDOR:  I don't think that's

3         his testimony, because he was just about

4         to explain other reasons for

5         termination.

6         Q.    Go ahead, then explain.

7         A.    The -- the letter -- I mean, I am

8    sorry but, you know, I have difficulty being

9    asked a question and then you interrupt me

10   before I can finish the --

11        Q.    I didn't interrupt you, I just

12   asked you the question.

13             MR. WIGDOR:  Yeah, you did.

14        A.    You did and now I don't even

15   remember the question.

16             MS. SELTZER:  Maybe we'll read it

17        back.

18             (Record read.)

19             MR. WIGDOR:  So that was the

20        question?

21             MS. SELTZER:  I'm sorry.

22             MR. WIGDOR:  Just ask a question.

23             MS. SELTZER:  Then I ask my

24        question -- it's your -- let me go back

25        to that question then, because I don't

1                    Burton T. Fried

2            know if you answered it.

3            Q.    So you believe that this agreement

4    and this letter were both drafted after the time

5    that your counsel sent a letter to Mr. State; is

6    that your testimony?

7            A.    No.

8            Q.    Okay.  Why don't you tell me

9    what --

10           A.    My testimony is my letter dated or

11   my e-mail dated November 2nd, Mr. Simmons said

12   that the company would terminate my employment

13   and then offer me a consulting agreement.  This

14   document could have been drafted at any time

15   after November 2nd.  It was delivered to me the

16   day after my attorney delivered to LVI a letter

17   complaining of an act of discrimination.

18                This letter is retaliation in more

19   than one aspect.  Number one, it's retaliation

20   of a complaint of discrimination and asking that

21   it be resolved and settled, and the retaliation

22   is the termination of my employment.  The second

23   act of retaliation is asking me to waive my

24   rights under the Civil Rights Act.

25           Q.    Under the Age Discrimination

269

1                    Burton T. Fried

2    Employment Act?

3            A.    That's right.

4                    MR. WIGDOR:  Well, Civil Rights

5            Act was referred to in the New York

6            City --

7                    MS. SELTZER:  I'm clarifying.

8                    MR. WIGDOR:  But it was

9            gratuitous.  Why would you have to

10           clarify?  What was your point?

11                   MS. SELTZER:  Why don't we just

12           stop the comments.

13                   MR. WIGDOR:  What was your point?

14           What was your point?

15                   MS. SELTZER:  I was clarifying for

16           him that it's also the ADEA, is what

17           he's got here.

18                   MR. WIGDOR:  Okay.  So just ask a

19           question.

20                   MS. SELTZER:  Fine.  And stop

21           interrupting and we can get done with

22           this by 7:30.

23                   MR. WIGDOR:  If you would stop

24           interrupting the witness in his answers

25           and providing gratuitous information, we

270

```
 1                    Burton T. Fried

 2          would.

 3                    So go.

 4          Q.     Mr. Simmons had mentioned the

 5   concept of a consultancy agreement on

 6   November 2nd, as you said, right?

 7          A.     In an e-mail.

 8          Q.     So the letter that was sent by

 9   Mr. Wigdor on the 15th, your testimony isn't

10   that they -- that letter was in retaliation

11   because Mr. Simmons had already spoken about

12   those terms back on November 1st -- 2nd, right?

13                  MR. WIGDOR:  Objection.

14                  You can answer.

15          A.     He suggested that that was what

16   the board wanted to do, but he did not do it

17   until the day after a complaint by my attorney

18   of age discrimination was delivered.

19          Q.     You resigned from the board of

20   directors on November 30th, 2010; is that

21   correct?

22          A.     Yes.

23          Q.     Why did you resign?

24          A.     That was the last day of my

25   employment with LVI Services.  And my election
```

271

```
 1                  Burton T. Fried
 2    to the other boards and responsibilities on
 3    other boards of both LVI Services, LVI Parent
 4    and -- and other subsidiary boards was only
 5    because of my employment at LVI Services.  So I
 6    sought to extinguish that legal connection.
 7           Q.     Could you have stayed on the board
 8    of LVI Parent and not been an employee of LVI
 9    Services?
10           A.     It's possible, I guess.
11           Q.     Did you want to do that?
12           A.     I chose not to have responsibility
13    being on that board when my employment was
14    terminated.
15           Q.     What parts of the LVI business
16    were housed in the Westport office?
17           A.     Very important aspects of the
18    business.
19           Q.     Okay.  Tell me what they were.
20           A.     My services were performed there.
21    Services of Greg DiCarlo, which provided legal
22    services to all offices throughout the nation
23    and corporate.  His other counsel, who also
24    provided legal services in support of
25    Mr. DiCarlo, paralegal who supported their
```

272

1                    Burton T. Fried

2    services, three marketing coordinators that

3    provided a complete A to Z marketing support

4    services for all offices throughout the nation

5    and national marketing effort for all marketing

6    people, total maybe 20-25 people, as well as the

7    office requests and also completion of

8    prequalification materials and presentations.

9    And newsletters that went out quarterly.

10            Q.    Can I just interrupt one second,

11   just to clarify?

12                 I'm not interested, really, in the

13   functions, meaning what they did.  Just tell me

14   what groups or what departments were housed at

15   the Westport office.  You told me the legal

16   department and the marketing coordinators.  What

17   other functions were -- were --

18            A.    I'm trying to tell you what the

19   functions were.  First you say departments, then

20   you say departments.

21            Q.    Then why don't we say groups.

22   What other groups were housed there?

23            A.    I'm finished explaining it -- and

24   then also the receptionist.

25            Q.    Okay.

273

1                    Burton T. Fried

2          A.     And also Shari Dembin, my

3   daughter, who performed bonding, surety bonding,

4   insurance certificates, travel, management

5   meetings, special events and special projects.

6          Q.     Anybody -- any other groups housed

7   in the Westport office?

8          A.     Not at that time.

9          Q.     When did you first find out that

10  the Westport office was being closed?

11         A.     When I received a communication

12  from Mr. State -- Mr. Simmons, rather.

13         Q.     Do you remember what was on that

14  communication?

15         A.     It was a communication, I guess,

16  it could have been the November 2nd

17  communication.

18                THE VIDEOGRAPHER:  The time is

19         4:52 p.m.  We are going off the record.

20                (An off-the-record discussion took

21         place.)

22                (A recess was taken.)

23                THE VIDEOGRAPHER:  The time is

24         4:57 p.m.  We're back on the record.

25  BY MS. SELTZER:

            Elisa Dreier Reporting Corp. (212) 557-5558
               950 Third Avenue, New York, NY 10022

A-768.126

1                    Burton T. Fried

2           Q.    I think we were talking about the

3     closing of the Westport office, and forgive me

4     if I asked you this before but when did you

5     first learn that the Westport office was going

6     to be closed?

7           A.    I believe it was in a

8     communication from Brian Simmons to me which

9     alluded to the fact they planned to close the

10    Westport office.

11          Q.    You said that communication was

12    somewhere in November?

13          A.    I believe it was the letter they

14    sent me two days before the board meeting, or

15    the e-mail.

16          Q.    Do you know why the Westport

17    office was closed?

18          A.    No.

19          Q.    Did anybody tell you why the

20    Westport office was closed?

21          A.    No.

22          Q.    Do you know who decided that the

23    Westport office should be closed?

24          A.    No.

25          Q.    Do you know when that decision was

A-768.127

1                    Burton T. Fried

2    taken?

3         A.    No.

4         Q.    Is it your belief that the office

5    was closed because you complained about

6    discrimination?

7         A.    I believe that it was a factor

8    in -- in closing the office and dismissing my

9    daughter and using the closing of the Westport

10   office as an excuse for the retaliation against

11   her because of the acts of my complaints of age

12   discrimination.

13        Q.    Was your daughter -- your daughter

14   was selected for the reduction of force; is that

15   correct?

16             MR. WIGDOR:  Objection.

17        Q.    Your daughter was selected for

18   termination?

19        A.    I don't know what that means

20   except that I know that her employment was

21   terminated on January 6th.

22        Q.    Was she the only employee

23   selected?

24        A.    There were four other employees

25   that were terminated.

A-768.128

276

1              Burton T. Fried

2         Q.    Are you aware of the fact that

3    there were eleven employees terminated during

4    the course of that reduction in force?

5              MR. WIGDOR:   Objection.

6         A.    There were four other employees

7    terminated from the Westport office.

8         Q.    But were you aware that there were

9    other employees terminated in other parts of the

10   organization?

11        A.    You know, termination of -- no, I

12   wasn't aware of it.

13        Q.    Okay.   Were you aware that Matt

14   Dembin was terminated as part of that reduction

15   of force?

16        A.    I know that he was terminated but

17   I didn't know that he was terminated in

18   connection with the closing of the Westport

19   office.

20        Q.    Do you ever recall discussing your

21   daughter with Mr. State?

22        A.    No.

23        Q.    Are you -- would you even know

24   that Mr. State knew that Ms. Dembin was your

25   daughter?

1                    Burton T. Fried

2          A.     Oh, yes.

3          Q.     How would he know that?

4          A.     I'm sure it came up in

5    conversations.

6          Q.     Conversations with who?

7          A.     With me.

8          Q.     So do you remember discussing your

9    daughter with Mr. State?

10         A.     If you would ask me a specific

11   instance and when, I don't remember, but clearly

12   he would know it.  He knew that my son-in-law

13   was Matt Dembin.  If it came up -- it may have

14   come up in conversations with me over a period

15   of time that I've known him, especially in the

16   months preceding his hiring at LVI, his visit to

17   the LVI Westport office, where my daughter was

18   at the time of his visit.  He may have been

19   introduced to her at the time and also being

20   told by other senior officers of LVI.

21         Q.     But you, yourself, don't have a

22   specific instance that you remember telling him?

23         A.     I know I told him.  I can't tell

24   you when.

25         Q.     Do you know if anyone was hired to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2    replace your daughter?
 3                    MR. WIGDOR:  Objection.
 4         A.    No.
 5         Q.    Were there -- did your daughter
 6    ever complain to you about any instances of
 7    retaliation against her prior to her
 8    termination?
 9         A.    Yes.
10         Q.    What did she explain to you?
11         A.    She complained that Scott was not
12    speaking to her concerning her duties.  She
13    didn't know, now that I was leaving the company,
14    who she should be forwarding material to that I
15    was receiving from her historically.  And
16    although he asked her to set up a meeting with
17    the travel agent, he and -- she asked if she
18    should attend the meeting, he said he would get
19    back and never got back.  And then when he got
20    back, he assumed -- on the day of the meeting,
21    he assumed and believed he told her to attend,
22    but realized he didn't and said he would handle
23    it.
24         Q.    So he asked her to attend and she
25    wasn't available?
```

A-768.131

279

                                    Burton T. Fried

1

2          A.    He never asked her to attend.  He

3    assumed he did and realized he never did.

4          Q.    Was she not available to attend?

5          A.    She was always available to

6    attend.

7          Q.    So why didn't she attend?

8          A.    She was never asked to.  I said it

9    three times.

10         Q.    I'm sorry, I misunderstood you.  I

11   thought what you had said was he thought he

12   asked her and it turned out that he didn't.

13         A.    Correct, so she didn't attend.

14         Q.    So -- so he never went back and

15   said to her, "Oh, I meant to invite you"?

16         A.    Well, he couldn't because it was

17   the day of the meeting.

18         Q.    Any other instances of retaliation

19   that your daughter communicated to you?

20               MR. WIGDOR:  Prior to her

21         termination?

22               MS. SELTZER:  That's correct.

23         A.    Prior to her termination, no,

24   other than her termination.

25         Q.    Do you believe that your complaint

280

```
 1                Burton T. Fried

 2   of discrimination had anything to do with the

 3   termination of the ten other employees during

 4   that same period?

 5        A.    I can't hear you.

 6        Q.    I said do you believe that your

 7   complaint of discrimination had anything to do

 8   with the terminations of the ten -- of the

 9   eleven other employees at the same time?

10        A.    I can't answer you.  I can't read

11   his mind.

12        Q.    Okay.

13        A.    And he didn't confer with me.

14             MS. SELTZER:  Mark this one.

15             (E-mail dated January 10, 2011

16             marked Fried Exhibit 20 for

17             identification.)

18             MS. SELTZER:  Let the record show

19             that Exhibit 20 is an e-mail from Shari

20             Dembin to Burt Fried at his Hotmail

21             account.  The subject line is "Travel

22             Form."  It's Bates stamped LVI 3291 to

23             92.

24        Q.    Do you remember this e-mail,

25   Mr. Fried?
```

281

1                    Burton T. Fried

2          A.    This is the first time I'm seeing

3    it.

4          Q.    Do you check your Hotmail account?

5          A.    Not often, and many items somehow

6    get into junk mail, et cetera, but I'm familiar

7    with the attachment.

8          Q.    Did you ask Ms. Dembin to send you

9    the attachment?

10          A.    No.  She had described to me what

11    it contained and I never realized she sent it to

12    me.

13          Q.    What did Ms. Dembin tell you about

14    the attachment?

15          A.    It was a travel request by Scott

16    State, who was traveling between Denver and

17    New York, and next to the request form for

18    "approved by" -- to her it was amusing -- he put

19    the word "None, I am the CEO."  She thought it

20    was very amusing and told me on the phone about

21    it and I thought it was amusing as well.

22          Q.    Did Ms. Dembin send you any other

23    company documents after you left LVI?

24          A.    No.  And in fact, I never really

25    saw this one.

A-768.134

282

1                    Burton T. Fried

2          Q.    Well, it obviously, though, was

3    sent; is that correct?

4          A.    I never saw this one.  That's my

5    answer.

6          Q.    I understand, but it's attached to

7    something that went into your Gmail account or

8    your Hotmail?

9          A.    Is that a question?

10          Q.    I'm asking you, do you have an

11    account at bfried26@hotmail.com?

12          A.    I do, but I've never seen this.

13          Q.    Okay.  Are there any other

14    documents that Ms. Dembin sent you that belong

15    to LVI?

16          A.    No.

17          Q.    Did you believe that it was proper

18    for Ms. Dembin to send you an e-mail that was

19    obviously a document that belonged to LVI?

20          A.    It's -- it's -- my function in

21    reviewing travel requests is a lot more

22    important than her sending this, and you

23    belittled my looking at travel requests.

24          Q.    That's not my question.  You want

25    me to have it read to you again?

A-768.135

283

1                    Burton T. Fried

2          A.    You've indicated to me, in your

3    opinion, looking at travel requests is an

4    administerial act not worthy of a chairman.  So

5    why do you attach such importance to this as a

6    business document?

7          Q.    Were you performing that function

8    on January 10th, 2011?

9          A.    No.  I never saw this.  So you'd

10   have to ask her as to whether -- whether she

11   thought that it was a violation of anything in

12   sending it to me.  Don't ask me.

13         Q.    So you think there was a

14   legitimate business purpose to sending this

15   company document to you after you had been

16   terminated?

17         A.    It was done sheerly by amusement,

18   because normally what you have in there is the

19   person, name of the person who approved it, and

20   if you're a senior officer and you don't need

21   anybody else's approval, you put your name in.

22   But he's putting in something, "I am the CEO,"

23   as if he's standing on the top of a mountain

24   with a big badge and braids on his shoulders, "I

25   am the CEO."  I thought it was amusing, too.

```
 1                    Burton T. Fried
 2          Q.    Did he -- did she ever send you
 3   any other documents that belonged to LVI?
 4          A.    No.
 5          Q.    Did you -- strike that.
 6                When is the last time you've gone
 7   into your Hotmail account?
 8          A.    Yesterday.
 9          Q.    Did you search your Hotmail
10   account to make sure there were no responsive
11   documents in there?
12          A.    Yes.
13          Q.    You didn't see this document in
14   there?
15          A.    No.
16          Q.    Did you check your -- your junk
17   mail to see if there were any responsive
18   documents?
19          A.    Not yesterday, but I have.  From
20   time to time I check.  I have not seen any.
21          Q.    Have you checked it with respect
22   to this litigation, the junk mail folder?
23          A.    I check junk mail and if it's
24   anything appropriate I look at it, but it didn't
25   seem to be anything appropriate.
```

285

1                        Burton T. Fried

2            Q.    So you have checked it to make

3    sure there was nothing responsive in it?

4            A.    There's nothing there.

5            Q.    I asked you if you checked that,

6    there was nothing there?

7            A.    I checked.  There is nothing

8    there.

9                  (Plaintiff's Rule 26(a) initial

10                 disclosures marked Fried Exhibit 21 for

11                 identification.)

12           Q.    Would you take a look at the

13    document?

14           A.    What specifically?

15           Q.    Just give an overall look.

16                 MR. WIGDOR:  No, no --

17                 MS. SELTZER:  I just want him to

18                 take a look at it.  Usually we get

19                 complaints if we don't let them look at

20                 it.

21                 MR. WIGDOR:  I know, but you know

22                 what?  I'm not trying to stall like a

23                 lot of plaintiff's attorneys might have

24                 their witnesses look at documents.  He

25                 knows what it is.  Just ask questions.

A-768.138

286

                              Burton T. Fried

1

2          Q.    Have you seen this document

3    before?

4          A.    Yes.

5          Q.    Have you had a chance -- did you

6    review it before it was filed in this action?

7          A.    Yes.

8          Q.    Could you turn to page 11?

9          A.    Yes.

10         Q.    On page 11 you have a listing of

11   various damages that you believe you've suffered

12   as a result of the actions or inactions of the

13   defendants?

14         A.    Yes.

15         Q.    I'd like to discuss some of these

16   with you.

17               You've listed that you believe you

18   deserve to collect $12 million in front pay

19   through your expected retirement, and this isn't

20   including benefits and et cetera.

21               How did you calculate $12 million?

22         A.    First of all, it's -- it's not

23   including benefits, bonus salary increases or

24   interest.  I think I'm entitled to more than

25   $12 million.

               Elisa Dreier Reporting Corp. (212) 557-5558
                  950 Third Avenue, New York, NY 10022

1              Burton T. Fried

2        Q.    Why don't you just tell me how you

3    calculated the 12 million?

4              MR. WIGDOR:  I'm going to object

5         but let him answer.

6        A.    This is an error, really, because

7    this is based on 600,000 a year for twenty

8    years, and that comes to $12 million but it

9    should be pointed out it doesn't include -- it's

10   an error and misleading because it doesn't

11   include bonus of about 400,000 a year, which is

12   another $8 million, salary increases, interest

13   and all the lost benefits, health insurance that

14   they canceled on me.

15       Q.    And this figure is based on your

16   working twenty years, from this point?

17       A.    Sure.  So the figure I think is

18   more appropriate is north of $20 million.

19       Q.    What do you consider -- you have

20   the next level of damages as called

21   consequential damages.  Do you see that, to the

22   tune of $1.6 million?

23       A.    Yes.

24       Q.    What is consequential damages?

25       A.    I'm owed, as you pointed out

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

288

1                   Burton T. Fried

2    before, $1.6 million in incentive bonus and I

3    agreed to the terms under that incentive bonus

4    based upon what I believe was continued

5    employment with the company, or else I would

6    have demanded that $1.6 million be paid at the

7    closing.

8          Q.     Okay.  So --

9          A.     If I can finish my answer, please.

10         Q.     I'm sorry, I thought you were.

11         A.     But they perpetuated an act of

12   discrimination on me and a breach I consider of

13   fairness as far as my continued employment,

14   having nothing to do with my performance, and

15   therefore have removed me from participation in

16   the operation of the business which I can

17   believe I would contribute significantly to the

18   achievement of the goals in order for me to be

19   paid $1.6 million.

20              The acts of -- of discrimination,

21   as you know, go way back, as I've testified, to

22   October 19th and repeated by conversations I've

23   had with directors, and then again and on -- and

24   then by a letter I've gotten, or an e-mail

25   rather, from Simmons on November 2nd, and then

289

1                    Burton T. Fried

2    by a board meeting on November 4th, and then the

3    retaliation that I suffered took place on the

4    16th as a result of those acts of discrimination

5    and to punish me for making a charge of

6    discrimination.

7                    So the retaliation took place by

8    the termination of my employment, by asking me

9    to waive my ADA right or my rights under the

10   Civil Rights Act, New York City, et cetera, and

11   also the retaliation of -- of this provision of

12   termination of my daughter on -- on the 8th or

13   6th.

14                   So this 1.6 consequential is

15   another act, damage that I've incurred as a

16   result of their violation of my rights.

17        Q.    Are you done?

18        A.    Yes.

19        Q.    I hadn't wanted you to go back to

20   the discrimination retaliatory acts.  All I was

21   trying to figure out is what the basis for these

22   consequential damages were.  So is it your

23   testimony this is an amount you would have

24   earned in bonus, in success bonus, had you

25   continued to be employed with the company?

1                    Burton T. Fried

2          A.     The success -- it's not a success

3    bonus.

4          Q.     What kind of bonus?

5          A.     It's an entitlement.  They called

6    it a bonus.  We were paying ordinary income on

7    this even though we should be paying capital

8    gains tax on the purchase price.  So we agreed

9    to take less.  We succumbed to their request.

10   We agreed to pay ordinary income taxes and then

11   they made part of it contingent.

12                And I had no problem with that

13   provided that I was going to be there in charge

14   of the debt, in the sense participating in the

15   success of the company, and what they did, their

16   plan was to get me to agree to that format of --

17   of contingent payment while they were planning

18   to get rid of me as a result of the retaliation

19   for the act of discrimination, and therefore

20   that results in the consequential damage.

21         Q.     Is there a document that reflects

22   this agreement to forgo this payment or forgo

23   the tax consequence?  This is new to me.  What

24   bonus was this that you're talking about?

25         A.     We discussed this already.  You

1                    Burton T. Fried

2    showed me a document.

3          Q.    So the award is that?

4          A.    Yeah.    That really is a

5    nomenclature problem that they wanted to use to

6    show it for tax purposes so they can take a

7    deduction and us to pay income taxes rather than

8    for us to have capital gains treatment and they

9    wouldn't have a deduction.    So it was financial

10   engineering on their part, but even with that

11   and accepting it, I am now -- my 1.6 million is

12   in severe jeopardy.

13         Q.    This is the award we talked about

14   that has the three different tranches, right?

15         A.    Yeah.

16         Q.    You were paid the first tranche

17   and the two still haven't been paid; is that

18   correct?

19         A.    Right.

20         Q.    Is it your belief you're not going

21   to get paid those tranches?

22         A.    I believe that's in serious

23   jeopardy and I have no faith or confidence,

24   but --

25         Q.    Okay.

292

1                    Burton T. Fried

2            A.    -- but we're now in May, halfway

3    through 2011.  I guess by the time of trial

4    we'll know whether the tranche is going to be

5    met or not and I have every reason to believe

6    that it will not.

7            Q.    You have a right to your beliefs.

8            A.    But I hope it is because I'd be

9    very happy to receive the money.

10           Q.    You have a certain number of

11   damages listed for compensatory damages and one

12   of them is for emotional distress in the amount

13   of $1.5 million.

14           A.    Yes.

15           Q.    How did you arrive at this amount?

16                 MR. WIGDOR:  Objection.  First of

17           all, it's no less than 1.5.  So what we

18           will request at trial might be a lot

19           higher than that.  But it was done by

20           counsel, so next question.

21           A.    And I don't agree with a minimum

22   or a 1.5.  I think it should be substantially

23   higher.

24                 (Continued in highly confidential

25           section.)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

298

1                    Burton T. Fried

2    BY MS. SELTZER:

3         Q.    Did you do that on your own or did

4    you bring in some outside help for that?

5         A.    I did it with consultation of your

6    law firm, Jeffrey Smith, with consultation with

7    Brian Simmons and with consultation of

8    employment counsel at Jackson Lewis and a

9    partner of Boston, Joan Ackerstein, and another

10   partner in that office whose name I forgot.

11        Q.    What was the outcome of the

12   investigation?

13        A.    The allegations were false and

14   fraudulent.

15        Q.    What happened to the person who

16   was -- I'm assuming it's a woman?

17        A.    Yeah.

18        Q.    What happened to the woman who --

19   who alleged sexual harassment against

20   Mr. McNamara?

21        A.    She left our employ.

22        Q.    Was she fired?

23        A.    She was laid off.

24        Q.    Was she laid off because of the

25   complaint?

A-768.146

1                    Burton T. Fried

2          A.    No.

3          Q.    What happened to Mr. McNamara?

4          A.    He continued in the service of the

5    company until at some point in time he resigned

6    and joined another company.

7          Q.    Was it found that Mr. McNamara was

8    having a sexual relationship with this woman?

9          A.    I don't really know.  I do know

10   that she admitted in writing that after being

11   paid a settlement amount of 75,000, which

12   included her attorneys' fees, she admitted that

13   it was all false, and I considered suing her for

14   the return of the money and decided against it,

15   figuring that she was a sick person.

16         Q.    So the case settled, the

17   allegation was settled?

18         A.    It was settled and with an

19   admission of -- of a false accusation.

20         Q.    So she admitted that she never had

21   a sexual relationship with Mr. McNamara?

22         A.    She admitted that she was never

23   sexually harassed.

24         Q.    Did Mr. McNamara ever admit to

25   having had a sexual relationship with this

1                    Burton T. Fried

2    woman?

3            A.    I don't recall.

4            Q.    Under your compensatory damages,

5    you have harm for career progression in the

6    amount of not less than $500,000.  What do you

7    mean by "career progression"?

8            A.    I'm now 71 years of age.  I've

9    been terminated from an employer that I held

10   this position of chairman and presidency prior

11   to that, and with a stigma of being fired and

12   trying to explain why I'm no longer associated

13   with the company and trying to be truthful.

14            And to be truthful, I have to

15   explain that I am the subject of age

16   discrimination and people somehow question

17   whether -- and can't avoid the question of

18   whether that's the real reason for my

19   termination and -- and wonder whether -- whether

20   I'm litigious in employment matters, coupled

21   with the fact that I'm 71 years of age in this

22   economy is quite difficult.  And that relates to

23   the harming career progression.

24            Q.    What about, how was your

25   reputation damaged to -- in the amount of not

                    Burton T. Fried

1

2   less than $1.5 million?

3        A.    Having a surety bond line of 200

4   million with no collateral or de minimis

5   collateral or -- except when Code Hennessy took

6   over a letter of credit because of the high

7   leverage, is unheard of in the industry.  That

8   was secured as a result of my reputation for

9   honesty, integrity and success in the running of

10  a business, living up to my promises and being

11  very candid and working very hard and being very

12  fair with all of the employees of the company.

13            I now have a stigma of being

14  fired.  It has completely destroyed my

15  reputation of -- and frankly, an example of the

16  reputation is our securing the $27 million

17  Madison Square Garden job even though we were

18  not low bidder, and I was told by

19  representatives of Cable Vision that the only

20  reason that we received the job was because of

21  our reputation and my reputation for honesty and

22  integrity, because the recommendation for us

23  getting the job came from the integrity monitor

24  that knows us very well.

25            I no longer have that same

1                     Burton T. Fried

2    reputation.

3            Q.    How do you know that?

4            A.    Well, I -- I have made human

5    efforts to secure work, and these people I've

6    dealt with for years, and I don't get return

7    phone calls.  So --

8            Q.    Go ahead.

9            A.    That's okay.

10           Q.    Has anybody ever said to you, you

11   know, "We're not going to hire you or we're not

12   going to give you a contract because we believe

13   you to be -- to have been terminated from your

14   prior employment"?

15           A.    No.

16           Q.    Has anyone ever -- has anyone ever

17   raised the issue of you being terminated, a

18   potential employer or a potential person that

19   you'd be doing business with?

20           A.    Everyone wants to know why I'm no

21   longer with LVI.  It is unnatural.  I've been

22   with them for so many years and I'm only

23   truthful, so I explain.

24           Q.    And you explain --

25           A.    That I have a lawsuit pending that

1                    Burton T. Fried

2     relates to age discrimination, and that's

3     usually the end of the conversation.

4          Q.    Is it necessary -- why do you find

5     it necessary to tell them you have a lawsuit

6     pending?

7          A.    Because that's the fact in

8     explaining that I'm not there, and if I left and

9     I was subjected to age discrimination, why

10    wouldn't I seek recovery for it.  Then there

11    would be a question of whether I really had an

12    age discrimination claim.

13         Q.    Did you ever consider just saying

14    that you left the company?

15         A.    It wouldn't be truthful.  It would

16    be like saying I resigned, and that would be a

17    lie and that would be deceit and that's not my

18    reputation.

19         Q.    Have you ever been hospitalized as

20    a result of any of the manifestations of your

21    emotional distress damages?

22         A.    No.

23         Q.    During the period since the

24    termination of your employment with LVI, have

25    there been any other contributing factors to

1              Burton T. Fried

2    your emotional distress, such as family issues,

3    financial problems, drug problems, anything?

4         A.    Yes.  I feel permanently scarred

5    as a result of the termination of my daughter,

6    who has an act of retaliation for my complaints

7    of discrimination, and she's a single mother of

8    two young children, 4 and a half and 7, and

9    there was absolutely, in my mind, absolutely no

10   reason for her termination, after 15 years of

11   service and the only person qualified to handle

12   all of the responsibilities and with the

13   experience of handling those responsibilities

14   for a very modest compensation.  She was not a

15   big wager in there.  It was modest compensation.

16              It had nothing to do with the

17   closing of the Westport office.  Legal

18   department is still surviving and still working

19   for the company notwithstanding the expiration

20   of the Westport lease and they'll be moved to

21   another location.  She was never offered the

22   opportunity to move to New York and work there,

23   never offered the opportunity to work in

24   Milford, never offered the opportunity to stay

25   on until the office closed and then to determine

```
 1                Burton T. Fried

 2   where she would work.  She was singled out.

 3        Q.     Other than the legal department,

 4   were any of the other individuals who were let

 5   go at the Westport office given an additional

 6   relocation or another job?

 7        A.     No.  But their responsibilities

 8   were eliminated because national marketing

 9   people, who they primary supported, were

10   diminished or were let go and the

11   responsibilities that the national market people

12   were given to the regional offices.  So there

13   was a correlation between them being let go,

14   national marketing.  Even though I wouldn't

15   necessarily agree with that decision and time

16   will tell whether that was the right one, I

17   think all these decisions time will tell whether

18   it was the right one, but -- but there is a

19   correlation between letting go of national

20   marketing people and these marketing

21   coordinators, absolutely no correlation for or

22   reason to let her go, as experienced she was and

23   singled out.  While as you mentioned, other

24   people may have been let go on or about the same

25   time, I'm sure there is new hires out there and
```

1                        Burton T. Fried

2    new consultants.

3            Q.     In the Westport office?

4            A.     No, in the nation.   There weren't

5    11 people let go in the Westport office.   You

6    mentioned 11 people were let go.

7            Q.     Actually, 12 with Ms. Dembin.

8            A.     Nationwide, but yeah, there is

9    higher -- we'll find out ultimately what the

10   census is and who was hired, and consultants or

11   otherwise, because there was marketing people --

12   marketing person let go but another marketing

13   people -- person hired in Denver, and I'm sure

14   there are other people hired.   I mean, it's a

15   natural thing, but not to single out an

16   experienced, long-term employee who happened to

17   be my daughter.

18               And so that injury I have is --

19   and the injury she has, and I have that injury

20   because they picked on someone helpless at the

21   same time he knew that he was getting rid of her

22   husband.   He's just absolutely disgusting.

23           Q.     I thought you said she was a

24   single mom.

25           A.     Her former husband upon which she

```
 1                    Burton T. Fried
 2    receives support.  Her children receive support.
 3    It is an absolutely disgusting act, and I guess
 4    at some point in time we'll find justice.
 5            Q.    Is your daughter working right
 6    now?
 7            A.    For me.
 8            Q.    What is she earning?
 9            A.    Excuse me?
10            Q.    What is she earning from you?
11                  MR. WIGDOR:  Do you think that's
12            relevant to his action?
13                  MS. SELTZER:  Yes.
14                  MR. WIGDOR:  How?
15                  MS. SELTZER:  I don't think that
16            we're arguing relevance and you're not
17            allowed to object on relevance.
18                  MR. WIGDOR:  Then I'm going to
19            object on harassing the witness.  Why is
20            his daughter's salary relevant to this
21            case?  Just give me a proffer.
22                  MS. SELTZER:  Because if there is
23            a cost to his business on his daughter's
24            salary, I would like to know that for
25            the mitigation of his damages.
```

1                  Burton T. Fried
2               MR. WIGDOR:  Why don't you ask him
3         how much he's making?
4               MS. SELTZER:  I'm going to get to
5         that.
6               MR. WIGDOR:  So that's all you
7         need to know.
8               How much are you making?
9               THE WITNESS:  How much?
10              MS. SELTZER:  Are you asking the
11        questions now?
12  _____DIR
13              MR. WIGDOR:  You don't need to
14        answer the question about what your
15        daughter is making.
16              THE WITNESS:  I don't need to
17        answer it.
18              MR. WIGDOR:  She can ask her that
19        when she takes her deposition.
20              MS. SELTZER:  Are you instructing
21        him not to answer that question?
22              MR. WIGDOR:  I am.  Yup.  And it's
23        also quarter to 6.  How much more time
24        are you going to need?
25              MS. SELTZER:  At least an hour and

A-768.156

1                    Burton T. Fried

2          a half.

3                    MR. WIGDOR:  Well, your seven

4          hours is up at 6 o'clock.

5                    MS. SELTZER:  If we are going to

6          play this game, we'll get the Court on

7          the line right now, because this has

8          been taking a while, you agreed to the

9          fact that we were going to squeeze it

10         all in one day.  If you want to make it

11         less time, I can bring him back another

12         time.

13                   MR. WIGDOR:  No, we are going to

14         do the seven hours.

15                   MS. SELTZER:  No, we're going to

16         do more than the seven hours.

17                   MR. WIGDOR:  We'll see what

18         happens at seven hours.

19    BY MS. SELTZER:

20         Q.    You also have some costs for your

21    attorneys' fees; is that correct?

22         A.    Yes.

23                   MR. WIGDOR:  You don't need to

24         answer the next question.  Go.

25                   MS. SELTZER:  He is allowed to ask

            Elisa Dreier Reporting Corp. (212) 557-5558
              950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried

 2           what your fee arrangement is.

 3                    MR. WIGDOR:  No, no, no.  Next

 4           question.

 5                    MS. SELTZER:  Are you instructing

 6           him not to answer?

 7  _____RUL

 8                    MR. WIGDOR:  I'm instructing him

 9           not to answer, yes.  When he wins the

10           case and we make our fee application,

11           then can you find out what our

12           arrangement is.

13                    MS. SELTZER:  Okay.

14                    MR. WIGDOR:  Okay?

15           Q.    Is Thompson Wigdor the only

16  attorney you've seen with respect to these

17  claims?

18           A.    Yes.

19           Q.    Are there any other attorneys

20  involved in this other than Thompson Wigdor &

21  Gilly?

22           A.    I'm sorry.

23           Q.    Are there any other law firms

24  involved in this claim other than Thompson

25  Wigdor & Gilly?
```

A-768.158

311

1                    Burton T. Fried

2          A.     Not that I'm aware of.

3          Q.     You were terminated on

4   November 30th, 2010.  Can you tell me if you've

5   gone on any interviews for other jobs?

6          A.     I have not -- not for employment.

7   I've sent out resumes.

8          Q.     How many, approximately?

9          A.     Four recruiters.

10          Q.     Who were the recruiters?

11          A.     I don't remember the last one,

12   but -- or the third one, but going backwards,

13   Lucas Group, Russell Reynolds and Heidrick &

14   Struggles.

15          Q.     Did they send you on any

16   interviews?

17          A.     No.

18          Q.     None of them?

19          A.     No.

20          Q.     Did you discuss a possible deal

21   with -- is it P-A-L or PAL Environmental?

22          A.     Yes.

23          Q.     What type of business concept were

24   you discussing with PAL Environmental?

25          A.     Management consulting.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-768.159

1                    Burton T. Fried

2          Q.    Who did you speak to at PAL

3    Environmental with respect to this business that

4    you were entering into with them?

5          A.    I was proposing a business

6    transaction and that was with Sal DeLorenzo.

7    He's the owner.

8          Q.    How were Brian Messisco and Mike

9    Lane involved in that deal?

10          A.    They brought in Bristol

11    Environmental, Ernie DeCaro, and they were

12    interested in, considering -- or our

13    conversation related to the joint effort of PAL

14    and Bristol Environmental in joining forces

15    under a team year agreement to expand their

16    markets in the northeast.

17          Q.    Were Brian Messisco and Mike Lane

18    employed by LVI?

19          A.    They were former employees.

20          Q.    So they're no longer employed by

21    LVI?

22          A.    No.    Brian Messisco -- Mike Lane

23    was the former COO and Mike Lane -- rather,

24    Brian Messisco was a former national business

25    development manager.

A-768.160

313

1                    Burton T. Fried

2          Q.     And their employment with LVI

3    terminated before yours, to your knowledge?

4          A.     Mike Lane was.  I don't remember

5    about Brian.

6          Q.     How about Brian Messisco?

7          A.     I don't recall.

8          Q.     Did you ever approach Robert

9    McNamara for a position?

10         A.     Yes.

11         Q.     When was that?

12         A.     He knows about what occurred and

13   I've seen him within the last few weeks.

14         Q.     What company does he work for now?

15         A.     He is the CEO of -- of Lend Lease

16   Americas, which is -- includes Latin America,

17   North America and Canada, or US and Canada.

18         Q.     Did LVI do business with Lend

19   Lease during your employment?

20         A.     No.  They did business with one of

21   their New York companies.

22         Q.     Do you remember which one?

23         A.     Yeah.  Bovis.

24         Q.     Did you approach Mr. McNamara or

25   did he approach you?

A-768.161

314

```
 1                    Burton T. Fried

 2          A.    No, I approached him.

 3          Q.    When LVI was doing business with

 4   Bovis, was that with Mr. McNamara as well?

 5          A.    Excuse me?

 6          Q.    I know that was fast.

 7                When LVI was doing business with a

 8   subsidiary called Bovis, was that also through

 9   Mr. McNamara?  Was the contact --

10          A.    They were doing business with

11   Bovis before McNamara joined them.

12          Q.    Subsequently, did Mr. McNamara get

13   involved with that?

14          A.    Yes.

15          Q.    And you entered into a contract

16   with Road Safe Traffic Systems; is that correct?

17          A.    Yes, yes.

18          Q.    How did you come to learn about

19   this opportunity?

20          A.    I had been on their board of

21   directors for several years.

22          Q.    And what kind of services are you

23   providing for Road Safe?

24          A.    Business management consulting

25   services.
```

315

```
1                    Burton T. Fried
2           Q.     Are you on staff or consultancy or
3    how --
4           A.     I'm a consultant.
5           Q.     What is your compensation?
6           A.     I receive $6,000 a week.
7           Q.     Is that based on hours worked or
8    is that a flat amount you get every week?
9           A.     It's assuming that I'm working for
10   them about two days a week.
11          Q.     Okay.  Have you been working for
12   them consistently or off and on?
13          A.     Pretty much consistently.
14          Q.     To date, how much have you earned
15   from your work at Road Safe?
16          A.     I can best tell you that the work
17   from Road Safe and the work from Nuprecon, which
18   is the other consultancy agreement, I'm earning
19   approximately $15,000 a month.  I've earned
20   roughly -- between February and April roughly
21   15,000 a month, and my expenses for those three
22   months are 15,000 a month without my drawing out
23   a single nickel of income.
24          Q.     Is Nuprecon the same as NCM
25   Contracting Group?
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

316

```
 1                   Burton T. Fried
 2          A.    Yes, it is.
 3          Q.    And what kind of work are you
 4    doing for them?
 5          A.    I'm giving them, again, management
 6    consulting on their attempt to consolidate
 7    three -- three businesses that are located in
 8    Maryland, Seattle, Washington primarily, and
 9    California.  And they're also interested in
10    expanding their operations, their penetration,
11    business penetration.
12          Q.    Who is your contact there?
13          A.    John Hennessey.
14          Q.    Was Mr. Hennessey -- did
15    Mr. Hennessey ever do business with LVI during
16    your tenure?
17          A.    No, no.
18          Q.    Who is the business contact of
19    Road Safe there?
20          A.    That would be at Falcon, Eric
21    Rogoff.
22                MS. SELTZER:  We have to change
23          the tape.
24                THE VIDEOGRAPHER:  The time is
25          5:49 p.m., May 20th, 2011.  This
```

```
 1                    Burton T. Fried

 2           completes tape number four of the

 3           videotaped deposition of Mr. Burton T.

 4           Fried.

 5                    (A recess was taken.)

 6                    THE VIDEOGRAPHER:  The time is

 7           5:55 p.m., May 20th, 2011.  This is tape

 8           number five in the videotaped deposition

 9           of Mr. Burton T. Fried.

10  BY MS. SELTZER:

11           Q.    When did you launch BTF Strategic

12  Services?

13           A.    On or about February 1st.

14           Q.    Is it an LLC, a corporation?  What

15  kind of form is it?

16           A.    LLC.

17           Q.    And which state is it registered

18  to do business in?

19           A.    Connecticut.

20           Q.    Have you filed any kind of tax

21  returns for the business?

22           A.    No, other than payroll tax

23  returns.

24           Q.    What is the nature of the

25  business?
```

Burton T. Fried

2       A.       Management consulting.

3       Q.       Do you have any offices?

4       A.       Yes.

5       Q.       Do you lease office space?

6       A.       Yes.

7       Q.       Is it a furnished office, did you
8  have to furnish it yourself?

9       A.       Furnished.

10      Q.       Do you lease your business
11 equipment?

12      A.       I purchased phones, I purchased
13 the computers, I lease a copier.

14      Q.       In bold strokes, what have been
15 the costs in setting up that business to you?

16      A.       I put in $51,000 to set up the
17 business for working capital.

18      Q.       Any other capital of your own that
19 you've invested in that?

20      A.       No.

21      Q.       Do you have any other investors
22 that are involved in that business?

23      A.       No.

24      Q.       And other than Ms. Dembin, do you
25 have any other employees that work for the

1                  Burton T. Fried

2    company?

3          A.     No.

4          Q.     What is Ms. Dembin's function for

5    you?

6          A.     Administrative assistant.

7          Q.     And just basically doing

8    administrative responsibilities for you?

9          A.     Answering phones, copying, filing.

10         Q.     Does she work full-time for you?

11         A.     Yes.

12         Q.     Do you have benefits as part of

13   BTF Strategic Services?

14         A.     I pay for health insurance.

15         Q.     And you don't have any business

16   partners in this business, right?

17         A.     No.

18         Q.     So far how many clients have you

19   had in that business?

20         A.     Two.

21         Q.     Is that the two that we've

22   discussed, Road Safe and NCM?

23         A.     Yes, yes.

24         Q.     Is there any other stream of

25   revenue that's coming in for that business,

```
 1                   Burton T. Fried
 2  other than these two clients?
 3          A.     No.
 4          Q.     Do you draw a salary from --
 5          A.     No.
 6          Q.     Do you have a car that's charged
 7  to the company?
 8          A.     No.
 9          Q.     Have you earned any other form of
10  compensation other than what you've earned
11  through BTF Strategic Services?
12          A.     No.
13          Q.     Have you collected unemployment?
14          A.     No.  I mean, I'm now on Social
15  Security.
16          Q.     Do you own another business with
17  your son?
18          A.     No.
19          Q.     Do you have a financial interest
20  in any other businesses?
21          A.     No.
22          Q.     Do you serve as a member of the
23  board of directors for any other companies?
24          A.     Yes.
25          Q.     Who do you serve for?
```

```
 1                   Burton T. Fried

 2          A.    Road Safe and Packers Sanitation.

 3          Q.    Do you receive any compensation

 4   for your participation on the board of Road

 5   Safe?  In addition to the contract, obviously.

 6          A.    Yes.

 7          Q.    What do you earn?

 8          A.    It's -- I think it's 6250 a

 9   quarter.

10          Q.    $6,250?

11          A.    Yeah, a quarter.

12          Q.    What about with Packers Sanitation

13   Systems?

14          A.    That is -- I think it's something

15   like -- I'm not exactly certain, somewhere

16   around 5,000 a meeting, which is -- oh, no, no.

17   It might be around 6,000 a meeting.  That's

18   ending now because their company is being sold.

19          Q.    When did it begin?

20          A.    Years ago.

21          Q.    So you were on this board even

22   when you were employed with --

23          A.    Yeah, same -- as well as Road

24   Safe.

25          Q.    And Road Safe, you're still on the
```

A-768.169

1                    Burton T. Fried

2    board, right?

3            A.    Yes.

4            Q.    And those are the only two

5    companies that you sit on the board of?

6            A.    Yes.

7            MS. SELTZER:  This might be the

8            last one, thank goodness.

9            (Plaintiff's objections and

10           responses to defendant LVI Services,

11           Inc. first set of interrogatories marked

12           Fried Exhibit 22 for identification.)

13           MS. SELTZER:  Exhibit 22 is

14           plaintiff's objections and responses to

15           defendant LVI Services, Inc.'s first set

16           of interrogatories.

17           Q.    Do you recognize this document?

18           A.    Yes.

19           Q.    Is that your verification on the

20   last page of this document?

21           A.    Yes.

22           Q.    You reviewed the answers to this

23   document, found them to be correct?

24           A.    Yes.

25           Q.    In response to interrogatory

323

                              Burton T. Fried

1

2       number nine, which was the -- page 9 -- bear

3       with me one second.

4                    The interrogatory asks to identify

5       employees, former employees, blah, blah, blah,

6       whom you contacted for purposes of seeking

7       employment?

8              A.    Yes.

9              Q.    And you list a number of people.

10                   When did you contact John Schnabel

11      to seek employment?

12             A.    I think at all times during the

13      period of -- of these events, the subject of

14      this action, he has indicated to me that he

15      will -- Falcon will have opportunities for me.

16             Q.    Have there been any opportunities

17      that have come from Falcon at this point?

18             A.    No.

19             Q.    Are there any prospective ones

20      that you're waiting for them to come to

21      fruition?

22             A.    No.

23             Q.    If you look at interrogatory

24      number four, it asks you to identify individuals

25      whom you or your representatives contacted,

1                    Burton T. Fried

2    interviewed or communicated with about this

3    matter.  Do you see that?

4         A.    Yes.

5         Q.    When did you -- now, when you list

6    Scott State in this --

7         A.    Yes.

8         Q.    -- are you -- are you stating

9    that you communicated with him during your

10   employment about this matter?

11        A.    Yes.

12        Q.    Did you communicate with him at

13   all since your employment about this matter?

14        A.    No.

15        Q.    Is that the same with Mr. Simmons?

16        A.    Yes.

17        Q.    Same with Bagaria?

18        A.    Yes.

19        Q.    And Mr. Girardi?

20        A.    Yes.

21        Q.    How about Mr. Leonard, have you

22   spoken with him after your employment ended?

23        A.    Yes.

24        Q.    Okay.  When did you speak with

25   Mr. Leonard?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          A.     Months ago.

3          Q.     Can you just give me an overview

4    of what the conversation was about?

5          A.     Yeah.  He had spoken with me

6    sometime in December and -- and said that, you

7    know, he would be in touch with me after --

8    before the new year, and we never spoke, and so

9    this must have been January or February.  I had

10   heard that he was in an accident, skiing

11   accident or snow boarding accident, and so I

12   called him and asked him how he was and he

13   related he had some serious injuries to his legs

14   and that he expected to have some operations.

15         Q.     Did you talk about the case at

16   all?

17         A.     I don't know so much about my

18   case, but I complained to him that I don't know

19   how he permitted retaliation against Shari.

20         Q.     What did he say?

21         A.     And he didn't respond.

22         Q.     Anything else about the case or

23   Ms. Dembin's case that you discussed with him?

24         A.     I don't recall, except to say that

25   he didn't call me anymore and he didn't call my

326

1                  Burton T. Fried

2    daughter anymore.

3            Q.    Did you talk with Mr. Leonard at

4    all about your deposition or his deposition in

5    this matter?

6            A.    No.

7            Q.    As far as Mr. Cutrone is

8    concerned, have you spoken to him since the

9    termination of your employment?

10           A.    No.

11           Q.    How about Mr. Annarumma?

12           A.    No.

13           Q.    Mr. Farucci?

14           A.    No.

15           Q.    Mr. Hogan?

16           A.    No.

17           Q.    Mr. Buck?

18           A.    No.

19           Q.    You said you have spoken to

20   Mr. Schnabel; is that correct?

21           A.    I spoke to him on or about the

22   time of these events, but I have not spoken to

23   him since.

24           Q.    How about Mr. Sucrom?

25           A.    I think we exchanged e-mails

327

                        Burton T. Fried

1                        Burton T. Fried

2    concerning COBRA, but I -- no.  I don't believe

3    I've spoken to him, just exchange of e-mails

4    concerning health insurance, COBRA.

5           Q.    Nothing having to do with the

6    case?

7           A.    No.

8           Q.    How about Mr. DiCarlo, have you

9    spoken to him -- except today, of course --

10   since the termination of your employment?

11          A.    Yes.

12          Q.    When did you speak with

13   Mr. DiCarlo?

14          A.    At the federal mediation.

15          Q.    Other than that?

16          A.    No.

17          Q.    Let's see.  If you turn to

18   interrogatory number six, the interrogatory asks

19   you to identify persons who you contend made

20   admissions against interest on behalf of

21   defendants.

22                Do you know what that term means,

23   Mr. Fried?

24          A.    Yes.

25          Q.    Can you tell me what admissions

```
 1                    Burton T. Fried
 2   against interest Mr. State made?
 3            A.    His admission against interest was
 4   his --
 5               MR. WIGDOR:  I mean, could we
 6            short circuit the whole thing and ask
 7            him if there is anything other than he's
 8            already testified --
 9               MS. SELTZER:  Okay.
10               MR. WIGDOR:  -- that would be
11            admission against interest for
12            interrogatory number six.
13               MS. SELTZER:  No.  Let me just ask
14            him one by one, if you don't mind.
15               MR. WIGDOR:  Okay.
16            Q.    Other than what you testified to,
17   are there any other admissions by Scott State
18   that you believe to be against interest?
19            A.    No.
20            Q.    Other than what we've spoken about
21   with Mr. Simmons, is there any admissions
22   against interest that he has made?
23            A.    No.
24            Q.    Mr. Bagaria?
25            A.    No.
```

```
 1                    Burton T. Fried
 2          Q.    Mr. Girardi?
 3          A.    No.
 4          Q.    Mr. Farucci?
 5          A.    No.
 6          Q.    And Mr. Schnabel?
 7          A.    No.
 8                I believe that there are, if
 9     that's considered admission against interest,
10     e-mails that preceded my October -- October 19th
11     meeting with him, which I was not aware of, and
12     nor copied, which makes reference to termination
13     because of age, and those are in documents you
14     have produced to my counsel.
15          Q.    Termination because of age, you
16     said?
17          A.    Yes.
18          Q.    And I'm sorry, was this about
19     Mr. Schnabel or --
20          A.    No, Mr. State, I'm saying, and
21     Mr. Simmons and Mr. Hogan.
22          Q.    Anything else from Mr. Schnabel
23     other than what we've already spoken about?
24          A.    No.
25          Q.    Other than what we've already
```

1                    Burton T. Fried

2      spoken about, are there any other comments made

3      by any management-level people at LVI or by

4      anybody on the board of directors that you

5      believe to be ageist?

6            A.    Not that I recall.

7            Q.    And other than what we've spoken

8      about, are there any actions that were ever

9      taken by anyone at LVI or on the board of

10     directors that you consider to be

11     discriminatory?

12           A.    Not that I recall.

13           Q.    And other than what we've already

14     spoken about, are there any other actions that

15     you have -- taken by LVI or the board of

16     directors that you consider to be retaliatory?

17           A.    Not that I recall.

18                 MS. SELTZER:  All right, if you

19                 give me five minutes, I'm just going to

20                 regroup and then hopefully we'll be

21                 done.

22                 MR. WIGDOR:  Okay.

23                 THE VIDEOGRAPHER:  The time is

24                 6:11 p.m.  We're going off the record.

25                 (A recess was taken.)

A-768.178

1                    Burton T. Fried

2                    THE VIDEOGRAPHER:  The time is

3         6:19 p.m.  We are back on the record.

4    BY MS. SELTZER:

5         Q.    We spoke about three telephone

6    conversations that you had that occurred in

7    between the meeting with Mr. State on

8    October 19th and the November 14th board of

9    directors meeting?

10             A.    November 4.

11             Q.    I'm sorry.

12             A.    I thought it was November --

13             Q.    Four?

14             A.    Yeah.

15             Q.    There was one to Mr. Bagaria and

16   one to Mr. Simmons and one to Mr. Schnabel, I

17   believe; is that correct?

18             A.    Yes.

19             Q.    Do you know which phone you used

20   to make those calls?

21             A.    I think I used my office phone.

22             Q.    In Westport?

23             A.    Yes.

24             Q.    Do you keep a desk calendar?

25             A.    No.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          Q.     Do you keep a paper calendar of

3    any kind?

4          A.     No.

5          Q.     How do you keep track of your

6    appointments?

7          A.     I use the Lotus Notes calendar,

8    but that's not exclusive.  I'm not religious

9    that way, I'm old-fashioned.  So I don't always

10   record where I am or what I'm doing.

11         Q.     So you have no other way of

12   keeping track of your appointments other than

13   Lotus Notes?

14         A.     That and I have it just in my

15   head.

16         Q.     How do you normally travel to New

17   York from Westport?

18         A.     Usually by train.

19         Q.     During the time that you were

20   employed by LVI, did you put in your train

21   tickets on your expense reports?

22         A.     Never.

23         Q.     How did you pay for your train

24   tickets?

25         A.     Personally.

1                    Burton T. Fried

2          Q.    I mean did you pay cash, did you

3    pay with credit card?

4          A.    Credit cards.

5    _____REQ

6               MS. SELTZER:  We're going to ask

7          for the production of Mr. Fried's --

8               MR. WIGDOR:  Yeah, I get where

9          you're going.  We'll wait until the

10         deposition is over.

11              MS. SELTZER:  So you know on the

12         record.

13              MR. WIGDOR:  You give me a letter,

14         I can check the phone records.  I can

15         maybe check the credit card records.

16         We'll talk about it.

17              MS. SELTZER:  Yeah.  Sounds good.

18         Q.    And when you come to the New York

19    office, how do you gain entry into the building?

20         A.    How do I what?

21         Q.    How do you gain entry into the

22    building?

23         A.    Into the building?  They have a

24    security pass.

25         Q.    Do you have a key fob or some kind

334

1                    Burton T. Fried

2    of --

3          A.     Key fob, I used to have it.

4          Q.     And you turned that in when you

5    terminated?

6          A.     Yeah.  And coming into New York, I

7    also on occasion drive.  So it isn't exclusive

8    by train.

9          Q.     Do you usually park in a garage?

10         A.     Yes.

11         Q.     Do you usually charge that or pay

12    in cash?

13         A.     I usually pay in cash.

14         Q.     Do you ever put that into your

15    expense reports?

16         A.     Not religiously, no.  I'm poor in

17    doing that.

18                MS. SELTZER:  That's all I have of

19         the witness.

20                THE VIDEOGRAPHER:  The time is

21         6:23 p.m., May 20th, 2011.  This

22         completes the videotaped deposition of

23         Mr. Burton T. Fried.

24                (Time noted:  6:23 p.m.)

25

A-768.182

```
1                    Burton T. Fried

2                 ACKNOWLEDGMENT

3        I, BURTON T. FRIED, hereby certify that

4   I have read the transcript of my testimony taken

5   under oath in my deposition of May 20, 2011,

6   that the transcript is a true, complete and

7   correct record of my testimony, and that the

8   answers on the record as given by me are true

9   and correct.

10

11              _____
                        BURTON T. FRIED
12

13      Subscribed and sworn to before me

14      this_____ day of _____, 2011.

15      _____, Notary Public

16

17

18

19

20

21

22

23

24

25
```

336

```
 1                   Burton T. Fried
 2                     CERTIFICATE
 3   STATE OF NEW YORK      )
 4                          )    Ss.
 5   COUNTY OF QUEENS       )
 6              I, NICOLE CANNISTRACI, a Shorthand
 7   Reporter and Notary Public within and for the
 8   State of New York, do hereby certify:
 9              That I reported the proceedings in the
10   within entitled matter, and that the within
11   transcript is a true record of such proceedings.
12              I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16              IN WITNESS WHEREOF, I have hereunto
17   set my hand this 20th day of May, 2011.
18
19                  NICOLE CANNISTRACI
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Exhibit 14



**Contact:**          Amy McGahan                    Burton T. Fried
                      Dix & Eaton                    LVI Services
                      216-241-3027                   212-951-3661
                      amcgahan@dix-eaton.com          bfried@lviservices.com

**FOR IMMEDIATE RELEASE**

### LVI SERVICES NAMES ROBERT A. McNAMARA AS PRESIDENT AND CEO

*Executive to lead LVI through continued growth into new markets and geographies;*
*Burton T. Fried to play active role as Chairman to support company's expansion*

**NEW YORK – July 13, 2006 –** LVI Services Inc., the nation's largest remediation and facility services firm with more than 30 offices across the country, announced today that Robert A. McNamara has joined the company as President and Chief Executive Officer. Burton T. Fried, 66, who has held these positions since 1989, has become Chairman and will continue to play an active role in supporting the company's growth in its current markets, the acquisition of complementary businesses and its expansion into new geographic areas.

"Bob has outstanding business acumen and experience in operating billion-dollar-plus businesses, as well as a track record of successful leadership involving projects of tremendous magnitude," Fried said. "His client focus and team orientation will help stimulate the continued profitable growth of LVI. I look forward to working closely with him to take LVI to the next level."

McNamara, 52, held senior positions with Fluor Corporation for the past decade, including responsibility for major businesses serving the industrial and chemical markets. Fluor, a *Fortune* 500 company with annual revenues of $13.2 billion in 2005, provides services on a global basis in the fields of engineering, procurement, construction, operations, maintenance and project management.

Brian P. Simmons, a Partner with the private equity firm Code Hennessy Simmons LLC, which has a major investment in LVI, said, "Bob McNamara brings distinct perspectives, management strengths and significant experience that will complement those of Burt Fried, who has been the driving force behind LVI's rapid growth. Burt has positioned LVI well for future growth through internal expansion and key acquisitions. They will make an outstanding team for the future."

A-771

McNamara most recently served Fluor as a Senior Group President responsible for Fluor China and for overseeing strategic planning and global project execution systems for all business lines.  In previous positions as a Group President, he was responsible for various engineering, procurement and construction groups with annual revenues up to $2.6 billion.  The groups' worldwide market focus included chemicals, manufacturing, mining, highways, roads, bridges, tunnels, rail, microelectronics, pharmaceutical, biologics, consumer products, automotive and metals.

Earlier in his career, McNamara spent 18 years with Marshall Contractors Inc., including serving as its President and Chief Operating Officer.  The privately held construction management business grew from $3 million in annual revenues in 1977 to more than $700 million in 1996, when it was acquired by Fluor.

McNamara, a board member of Asyst Technology (Nasdaq: ASYT), earned a bachelor's degree in economics from Brown University, Providence, R.I.

### About LVI Services

LVI Services Inc. is the United States' leading provider of a wide array of integrated facility services, including environmental remediation, demolition and related services for commercial, industrial, multi-family residential and governmental facilities. LVI focuses on projects involving asbestos, lead paint, mold, infection control, hazardous materials, emergency and disaster services, and demolition. Founded in 1986, LVI has more than 30 offices across the United States, is licensed in every state, and is experienced in responding to natural and manmade disasters around the world. The company's annual revenues exceed $380 million. For more information, visit www.lviservices.com.

### # #

CONFIDENTIAL

A-772

# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
BURTON T. FRIED,                                    :
                                                    :
                    Plaintiff,                      :
                                                    :          10-CV-9308 (JSR)(JCF)
            v.                                      :
                                                    :          **DECLARATION OF**
LVI SERVICES, INC.; LVI PARENT CORP.; CODE          :          **BURTON T. FRIED**
HENNESSY SIMMONS LLC d/b/a CHS PRIVATE              :
EQUITY V LP; APOLLO INVESTMENT CORP.;               :
SCOTT E. STATE, in his official and individual      :
capacities; BRIAN SIMMONS, in his official and      :
individual capacities; RAJAY BAGARIA, in his        :
official and individual capacities; GERALD J.       :
GIRARDI, in his official and individual capacities, :
                                                    :
                    Defendants.                     :
---------------------------------------------------------------- x

I, Burton T. Fried, pursuant to 28 U.S.C. §1746, declare and state as follows:

1.      I am the Plaintiff in the above-captioned action.   I am the former General

Counsel, President and Chief Executive Officer, and Chairman of Defendant LVI Services, Inc.

("LVI").  I was admitted to practice law in the State of New York in 1964.  I have personal

knowledge of the facts set forth herein and submit this declaration in opposition to Defendants'

motion for summary judgment.

2.      I began working for LVI in 1986 and worked for the company until I was fired in

November 2010.  From approximately 1989 through November 2010, I was the President and

CEO and/or Chairman of LVI.

3.      While Robert McNamara was President and CEO of LVI from approximately

July 2006 through approximately April/May 2010, I was Chairman of LVI.  During this time, I

worked on behalf of LVI and its subsidiaries in New York City and to the best of my

recollection, my work included, but was not limited to, the following:

1

A-774

(a)    A meeting in New York City with counsel to the City of New York to secure approval by the City of New York to a Vendex Listing sought by an LVI subsidiary. As a result of my efforts, the subsidiary secured a Vendex Listing and was able to bid on the Hudson Yards project in New York City, and was subsequently awarded the project.

(b)    A meeting in New York City with Defendant Scott State to discuss entering into an agreement in which an LVI subsidiary would serve as the subcontractor on two large projects which Mr. State's client sought to bid involving the U.S. Department of Energy. As a result of my efforts at this meeting, the subsidiary entered into the agreement and two projects were bid by Mr. State's client with the subsidiary as the subcontractor.

(c)    A meeting in New York City with Mr. McNamara and a company called DEMCO to discuss the role of an LVI subsidiary as a subcontractor of DEMCO in connection with a project involving the remediation and demolition of Yankee Stadium. The subsidiary became a subcontractor to DEMCO for the remediation and demolition of Yankee Stadium.

(d)    A meeting in New York City with Mr. McNamara to discuss outstanding monies owed to an LVI subsidiary from DEMCO involving the remediation at Yankee Stadium. During that meeting, a payment schedule with DEMCO was negotiated for payment of arrears due and the terms for the performance of demolition at the site were agreed upon.

(e)    A meeting in New York City with an attorney from Arent Fox LLP to discuss potential ERISA violations allegedly caused by the work performed by LVI's outside administrator.

(f)    A meeting in New York City with an attorney from the office of the Inspector General of the New York City School Construction Authority to approve the pre-qualification of an LVI subsidiary to bid on projects involving New York City schools. As a result of my efforts, the pre-qualification was ultimately approved and the subsidiary was able to bid on these projects.

(g)    Multiple meetings in New York City with representatives from the New York County District Attorney's Office and the U.S. Attorney for the Southern District of New York to assist them in the investigation of the events surrounding the bidding which led to a contract with another contractor for the performance of work at 130 Liberty Street, and the deaths of two fireman during the course of that work. An LVI subsidiary had bid that work, was awarded the contract, but withdrew from the project. After the deaths of the two firemen, the subsidiary was awarded a contract to complete the work.

(h)    A meeting in New York City with the CEO of Charys Holding Company, Inc. to negotiate a payment schedule for approximately $12 million owed to LVI subsidiaries. As a result, a payment schedule was agreed upon at the meeting.

(i)    A meeting in New York City with Asset Recovery Group, Inc. to negotiate a $5 million remediation contract for a project involving a Pratt & Whitney facility.

(j)    A meeting in New York City to interview a candidate for a Regional Manager position within the LVI organization.

(k)    A meeting in New York City to interview a candidate for a senior management position within the LVI organization.

(l)    A meeting in New York City with New Mountain Capital, LLC, a private equity fund, to discuss its interest in purchasing LVI to accomplish a recapitalization and loan restructuring.

(m)    A meeting in New York City with Apollo Investment Corporation to discuss issues in connection with the restructuring of LVI.

4.    During the same time frame, I also, on almost a daily basis, called and/or emailed personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters.

5.    During the same time frame, I also worked on matters for several LVI-related projects in New York City. For example, I reviewed the contracts for projects involving Yankee Stadium, 130 Liberty Street, and was involved in the resolution of a jurisdictional dispute initiated by the Iron Workers union at the 130 Liberty Street project.

6.    After Mr. McNamara resigned as President and CEO in May 2010, I assumed his former role and became interim President and CEO of LVI. From approximately May 2010 through approximately September 2010, I continued to work on behalf of LVI and its subsidiaries in New York City and to the best of my recollection, my work included, but was not limited to, the following:

3

(a)     A meeting in New York City with Turner Construction Company ("Turner"), Madison Square Garden officials and their consultants in connection with a project involving the renovation of Madison Square Garden ("MSG Project") to discuss scope of work and contract issues.

(b)     A meeting in New York City with Turner, MSG Project officials and their consultants to discuss pricing of the MSG Project.

(c)     A meeting in New York City in connection with the MSG Project with Turner, MSG Project officials and their consultants to answer questions regarding the historical integrity and current business practices of LVI and its subsidiaries.

(d)     A meeting in New York City with Turner in connection with the MSG Project to sign the contract for the project.  As a result of my efforts, LVI and/or its subsidiaries employ up to approximately 700 workers in connection with the MSG Project.

(e)     A meeting in New York City with attorneys from Sidley Austin LLP, and other parties with their attorney, regarding a dispute about the obligation of LVI to pay the balance of a purchase price for a company that an LVI subsidiary purchased.

(f)     A meeting in New York City with Russell Reynolds Associates to discuss the search for a President and CEO for LVI.

(g)     A meeting in New York City with American International Group to discuss with its insurance and surety executives the status of the recapitalization and loan restructuring, and current financial results of LVI.

(h)     Multiple meetings in New York City with Avisco, Inc. to negotiate a strategic alliance between LVI and Avisco, Inc. in order to secure projects.

(i)     A meeting in New York City with Helix Enterprises to negotiate a strategic alliance between LVI and Helix Enterprises in order to secure projects.

(j)     A meeting in New York City with a consultant to discuss how LVI could secure projects in Haiti.

(k)     A meeting in New York City with a New York based building owner to secure a multi-million dollar project for an LVI subsidiary.    The subsidiary was subsequently awarded the project.

(l)     Multiple meetings in New York City to interview candidates for the LVI President and CEO position.

(m)     A meeting in New York City with an owner of an environmental management firm to discuss potential business opportunities for LVI.

4

(n)     A meeting in New York City with representatives of DEME to discuss a potential strategic alliance in order to secure projects.

(o)     A meeting in New York City with candidates for New York City based management positions within the LVI organization.

7.      During the same time frame, I also, on almost a daily basis, continued to call and/or email personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters.  Moreover, I worked with Studley, a commercial real estate broker in New York City, by telephone and email in efforts to secure new office space for the New York City office of LVI.  In addition, I had weekly conference calls with the on-site management of the 130 Liberty Street project to discuss project-related issues.

8.      While Chairman, and interim President and CEO, I also met with representatives of Arch Surety in New York City on an annual basis.

9.      Other than me, no other member of senior management was fired by LVI.

10.     I was paid by the New York City office from its New York City controlled bank account.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2011

BURTON T. FRIED

5

Exhibit 16

**Fw: BT Fried Compensation**
Burton Fried   to: Kamal Sookram                                    05/13/2010 06:45 AM

| History: | This message has been replied to. |
|---|---|

Kamal:

*(# 300 0026)*

Please increase my annual compensation to rate of $750,000 per year commencing May 15th. Print copy of this e-mail with below approval for your records.

*$ 600 K → $ 750 K*

Burt

*Eff- 05/16/10*

Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

----- Forwarded by Burton Fried/New York/Lviservices on 05/13/2010 06:43 AM -----

| From: | "Simmons, Brian P." <BSimmons@chsonline.com> |
|---|---|
| To: | <BFried@lviservices.com> |
| Cc: | "Hogan, Robert" <Rhogan@chsonline.com>, "George, Marcus J." <MGeorge@chsonline.com>, "Lester, Laura" <LLester@chsonline.com>, "Hennessy, Daniel J." <djhennessy@chsonline.com>, "Smith, Jeffrey N." <jnsmith@sidley.com> |
| Date: | 05/12/2010 05:05 PM |
| Subject: | RE: Comp |

Confirmed.  You are earning every penny of it.

**From:** BFried@lviservices.com [mailto:BFried@lviservices.com]
**Sent:** Wednesday, May 12, 2010 4:05 PM
**To:** Simmons, Brian P.
**Cc:** Hogan, Robert; George, Marcus J.; Lester, Laura; Hennessy, Daniel J.; Smith, Jeffrey N.
**Subject:** Re: Comp

Thanks, Brian.  Compensation would return to $750,000

------------------------------
Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

BF_04

# Exhibit 17

**ATTORNEY CLIENT PRIVILEGE**
**AIC MEMORANDUM**

| | |
|---|---|
| **To:** | Interested Parties |
| **From:** | Rajay Bagaria, Jerry Girardi, Teddy Reynolds |
| **Cc:** | Emil Buchman, Joseph Glatt |
| **Date:** | June 11, 2010 |
| **Re:** | LVI Services, Inc. |
| | Proposed Restructuring Overview |

## I – Situation Overview

In November 2005, AIC invested $43.0 million of senior subordinated notes and $2.5 million of equity to support the buyout of LVI Services, Inc. ("LVI" or the "Company") by Code Hennessy & Simmons ("CHS" or the "Sponsor"). LVI is a leading provider of building facility services including asbestos abatement, lead abatement, mold remediation, emergency disaster response, interior and structural demolition and other specialty contracting services to a broad range of commercial, industrial and institutional clients located throughout the United States. The Company operates through 25 regional branch locations nationwide with more than 3,000 employees, a large portion of which are hourly workers. While LVI experienced challenges almost immediately following our initial investment (discussed in more detail below), the Company was still able to generate $34-$35 million of EBITDA in both 2007 and 2008. However, the current economic downturn and its impact on the Company's core commercial end markets has materially impacted 2009 and YTD 2010 financial results. For the LTM period ended April 30, 2010, LVI generated revenue and EBITDA of $237.6 million and $18.7 million (7.9% margin), respectively.

Despite financial underperformance, the qualities that initially attracted us to invest in LVI are still largely intact. Over a two decade period, the Company has proven its ability to profitably grow both organically and through acquisitions. Furthermore, the Company's safety record is amongst the best in the industry, enabling it to obtain work on many high profile projects including the Pentagon, 9/11 clean-up, NASA Kennedy Space Center, 130 Liberty Street (Deutsche Bank building in lower Manhattan) and, a more recent award, Madison Square Garden. In its Emergency Response business segment, LVI is able to mobilize quickly and provide meaningful man-hours which it bills at attractive margins. For example, when hurricanes Katrina and Rita struck the Gulf in 2005, LVI nearly doubled its workforce to capitalize on the clean-up opportunity, which created over $70 million of incremental EBITDA over a two year time period. This business line contributes insignificant earnings in the LTM period, but provides a valuable option on the upside. We believe LVI also possesses high quality managers, which is particularly important in contract estimation. Regional branch management largely remains intact from the initial investment. With the addition of Bob McNamara as CEO, the Company increased its focus on improving its safety record which allowed LVI to diversify away from commercial construction / remediation projects and penetrate the energy, environmental and industrial industries. For all these reasons, we continue to believe the Company has reason to exist and that earnings will improve with economic growth.

Despite being a clear industry leader with a demonstrated track record, LVI has been a challenging investment for CHS since the initial LBO. When LVI was purchased in late 2005, the Company was benefitting from a massive amount of Katrina/Rita hurricane related clean-up. By the end of 2005, LVI was billing $1 million of clean-up related revenue a day in Louisiana and Texas (at 30-35% margins), enabling it to produce $66 million of EBITDA that year. Based on the widespread destruction in the region, management projected clean-up related work to take months if not years to complete and forecasted 2006 and 2007 EBITDA of $104 million and $76 million, respectively. For a variety of

1

Confidential

reasons, most notably anticipated FEMA clean-up related funds not being released and Louisiana political bureaucracy, this projected revenue and earnings growth never materialized for LVI.

The Company's capital structure and covenants from the initial 2005 LBO were predicated on a meaningful level of near term debt paydown from the projected hurricane clean up work. When this level of work did not materialize, the Company breached covenants in late 2006 and was forced to amend its debt agreements to provide for higher interest rates in exchange for covenant headroom. Since this time, the Company has performed relatively well and won high profile projects including the remediation and demolition of the Deutsche Bank building which allowed LVI to maintain earnings in 2008 despite the dramatic drop off in its core commercial end markets. However, beginning in 2009 the economic downturn has begun to more materially impact earnings and has not been able to be offset by other similarly large projects. As such, in late 2009 the Company commenced discussions with its lenders and other key constituent groups around a more comprehensive balance sheet restructuring.

Based on current LTM EBITDA of $18.7 million, which we view as near "trough" levels, the Company is levered 6.4x through $119 million of funded net senior debt, with our subordinated notes financing through 9.1x. Given the number of constituents that must be dealt with, the LVI restructuring is complex and further complicated by our inability to use bankruptcy as a resolution mechanism. One of our challenges has been dealing with a roughly $40 million working capital claim (amount under dispute) owed to the prior owners of the business (including current management) related to the receivables delivered on the closing date of the initial LBO for hurricane clean up work. As LVI began to underperform in 2006 and sought covenant relief, the Company's lenders restricted any further payments on this claim[1]. Additionally, there is an $8.5 million seller note issued to the prior owners of an existing subsidiary of LVI, the Mazzochis, related to the acquisition of the Mazzochi demolition business by LVI in 2007. This claim has a guarantee from the LVI operating company and as such, even though it is expressly subordinated to AIC's claim, makes an out-of-court restructuring even more difficult.

After months of intense discussions, and the untimely resignation of CEO Bob McNamara, it appears we are close to a broad restructuring solution which we highlight in greater detail in this memo. In summary, this restructuring involves a debt-to-equity conversion of AIC's existing $52 million subordinated debt position, a $25 million injection of new money ($15 million from CHS; $10 million from AIC) and the conversion of $15 million of senior debt to common equity from a large senior lender (Falcon Investments) who purchased the debt at distressed levels over the past year. The combination of these actions, along with other payments and amendments as outlined in this memo, provide for a restructured entity levered to 4.6x (through the senior debt) and creates the Company at 6.8x - 7.2x (depending on how we settle certain claims). The ownership structure of this restructured entity will be 37.5% CHS, 37.5% AIC and 25.0% Falcon (prior to dilution from management options).

In summary, we believe the new money investment is attractive in its own right and critical to obtaining any recovery on our mezzanine. The amount of ownership provided to AIC creates an opportunity to make $50-$60 million of proceeds in 3-4 years (assuming EBITDA reverts to $35-$40 million). Should EBITDA only rebound to $25 million, a level we would view as a reasonably conservative case, our recovery would still be $30 million, which is attractive compared to the alternatives.

---

[1] The initial working capital claim was for ~ $50 million. LVI paid $25 million of this claim up until the time it was restricted from paying any more by its lenders. With interest, the remaining $25 million portion of the claim has accreted to ~ $40 million.

2

Confidential                                                                                    AIC 00000114

Case 3:11-cv-01855-JBA   Document 57-18   Filed 05/31/12   Page 4 of 19

## II – Restructuring Overview

### Sources and Uses
The table below details the sources and uses for the proposed LVI restructuring. The restructuring for LVI importantly contemplates: $25 million of new cash equity ($15 million from CHS; $10 million from Apollo), $15 million of senior debt (to equity) conversion by Falcon, $52 million of subordinated debt conversion by Apollo, and the use of $17 million of balance sheet cash to repay the revolver and various other expenses. The new equity will be used to repay senior debt through a dutch tender. The charts below show the senior debt retired at par, however we expect to take out loans in the 85-90 context (the term loan is currently quoted in the low 70s though there has been little trading activity).

($ in millions)

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| New Equity (net of 5% Equity Fee) | $25.0 | Paydown Revolver | $9.5 |
| Balance Sheet Cash | 17.0 | Reduction of Senior Term Loan - Cash Paydown | 25.0 |
| Conversion of Falcon Senior Debt Claim | 15.0 | Reduction of Senior Term Loan - Falcon Conversion | 15.0 |
| | | Payments to Key Management (W/Cap Claim Related) | 4.0 |
| | | Senior Debt Amendment Fee | 0.9 |
| | | Fees & Expenses (Legal, Financial Advisor, Etc.) | 2.6 |
| **Total Sources** | **$57.0** | **Total Uses** | **$57.0** |

### Existing and Pro Forma Capitalization
LVI's restructured balance sheet will have total debt reduced by approximately $100 million, thereby providing a permanent solution to its capital structure problems. Cash-pay debt will be reduced to 4.6x, which implies a relatively healthy interest coverage ratio of 2.0x. While we show the full amount of the Mazzochi claim – to be conservative – we expect this claim to be eliminated for some lesser amount for reasons discussed later in this memo. Pro forma liquidity stands at $19 million, which combined with FCF is enough to support working capital as the business rebounds.

| ($ in millions) | Estimated at Closing | | | Pro Forma for Restructuring | | | |
|---|---|---|---|---|---|---|---|
| | At Closing | x LTM EBITDA (net) | x LTM EBITDA - CapEx (net) | Pro Forma Adjustments | Pro Forma | x LTM EBITDA (net) | x LTM EBITD - CapEx (net |
| Cash | $18.0 | | | ($17.0) | $1.0 | | |
| Revolver | $9.5 | | | ($9.5) | $0.0 | | |
| Term Loan | 115.9 | | | (40.0) | 75.9 | | |
| Equipment Loans / Cap. Leases | 11.5 | | | | 11.5 | | |
| Total Senior Debt | $136.9 | 6.4x | 7.3x | | $87.4 | 4.6x | 5.4x |
| Apollo Sub. Debt | 51.6 | 9.1x | 11.3x | (51.6) | 0.0 | | |
| Mazzochi Seller Note | 8.5 | | | | 8.5 | | |
| Total Debt | $197.0 | 9.6x | 11.6x | | $95.9 | 5.1x | 6.2x |
| Accrued Working Capital Claim due to Sellers | 18.0 | | | (18.0) | 0.0 | | |
| Aggregate Contributed Equity to Date | 86.0 | | | (86.0) | 0.0 | | |
| New Contributed Equity | 40.0 | | | 40.0 | 40.0 | | |
| Total Capitalization | $321.0 | 16.2x | 16.7x | | $135.9 | 7.2x | 8.8x |

| | | | | |
|---|---|---|---|---|
| LTM 4/30/10 EBITDA | $18.7 | | | |
| LTM 4/30/10 CapEx | 3.3 | | | |
| Renacted PF Interest Expense | 9.3 | | | |
| Pro Forma Coverage Ratio | | Pro Forma Available Liquidity | | |
| EBITDA / Interest | 2.0x | Cash | $1.0 | |
| EBITDA - CapEx / Interest | 1.7x | R/C Availability | 18.0 | |
| | | Total PF Liquidity | $19.0 | |

Confidential

AIC 00000116

A-784

**Ownership**
The following chart outlines the ownership split of LVI post-restructuring. Ownership is based on a recapitalized value of 6.8x - 7.2x depending on the final amount of the Mazzochi claim. At present, our notes finance from 6.4x to 9.1x (net leverage). Our view has been that we are the fulcrum but multiples are stretched particularly when factoring in the $7.5 million of payments required to compensate management for prior claims, the Mazzochi claim of up to $8.5 million, which while contractually junior is structurally senior and therefore cannot be flushed out-of-court, and other restructuring costs. Consistent with this thinking – and our desire not to provide the entire $25 million of new money required – we obtain modest value for our mezzanine conversion but our recovery is primarily driven by the new money investment. Given that we have had to take a significant haircut in order to facilitate an out-of-court consensual restructuring, we required that Falcon also convert its existing senior debt into equity at a 33% discount, which they argued strongly against. To illustrate the difference - while CHS's $15 million equity investment provides 37.5% ownership, Falcon's $15 million conversion only provides 25% ownership. This is what AIC achieves through its $10 million investment. We believe the ownership percentages below are fair and provide AIC a chance for a full recovery, which is discussed later in this memo.

| Owner | Amount | Common Consideration | Common Value | Pre-Mgmt Options | Post-Mgmt Options |
|---|---|---|---|---|---|
| AIC Mezz | 51.6 | 10% | 5.0 | 12.5% | 11.3% |
| AIC New Money | 10.0 | 100% | 10.0 | 25.0% | 22.5% |
| AIC TOTAL | 61.6 | | 15.0 | 37.5% | 33.8% |
| CHS New Common | 15.0 | 100% | 15.0 | 37.5% | 33.8% |
| Falcon | 15.0 | 67% | 10.0 | 25.0% | 22.5% |
| Mgmt Options | | | | 0.0% | 10.0% |
| Total | | | 40.0 | 100.0% | 100.0% |

**Board Composition**
LVI's Board will consists of: Burt Fried, Chairman / former CEO, 2 seats for each Apollo and CHS, 1 seat for Falcon and 2 independent seats, which will be nominated by majority shareholders. We expect the independent seats to remain held by the existing directors who are Richard Ferrucci (owns an insurance brokerage firm, secured the Arch bonding relationship) and Robert Buck (Chairman/CEO of Beacon Roofing, a former CHS portfolio company). The shareholders agreement is fairly straightforward and provides for certain veto rights (which each owner maintains) and almost all major decisions to be made by majority vote.

| Owner | Board Seats |
|---|---|
| Apollo | 2 |
| CHS | 2 |
| Falcon | 1 |
| Independents | 2 |
| CEO | 1 |
| Burt Fried | 1 |
| | 9 |

4

AIC 00000116

III -- Key Constituents

Excluding Apollo and CHS, four primary constituent are critical to achieving the contemplated restructuring. These are:

1. Falcon Investments, who owns $37 million (or 23%) of the first lien
2. Management, who importantly are owed $8 million from the disputed "working capital" claim
3. Nick Mazzochi, who has an $8.5 million note (at an opco, but subordinated to AIC's mezzanine)
4. The senior lenders – we need 100% to vote in favor given maturity extension

Below is a more detailed discussion of where we stand with each key constituent.

**1. Falcon Investments**

Falcon Investments was formed as a private equity fund in 2000 by Sandeep Alva and William Kennedy who worked previously together in the mezzanine group of John Hancock Life Insurance Company. Falcon is currently investing its third fund, has $1 billion of assets under management, is based in New York and targets $10-$75 million sub debt and equity investments. Throughout the LVI process, Falcon has been very difficult to deal with and oftentimes unreasonable. Rafael Fogel is the partner responsible for the investment. Prior to joining Falcon, "Rafe" was a high yield manager at SunAmerica Investments.

Falcon is highly familiar with LVI, having held a minority position in the Company under the previous ownership (Blue Point). Through secondary purchases, Falcon today holds $37 million of the first lien which constitutes 32% of the term loan (but its vote is only 23% when including the revolver). Reaching a deal with Falcon was therefore a first step and took extensive discussions over months. The deal with Falcon, which has it converting $15 million, will leave them owning 19% of the senior facility post restructuring. This assumes Falcon does not tender any of its position in the dutch auction.

While most aspects of our deal with Falcon have been negotiated, we are concerned that Falcon may seek to revisit its economics if a deal with the senior lenders materially changes or the settlement with Mazzochi takes a turn for the worse. At present, this does not seem like it will be the case.

**2. Management / Working Capital Claim**

The acquisition consideration for LVI contained a deferred payment, which would be made upon cash receipt of certain accounts receivable. The Company made $25 million of the estimated $50 million of payments in connection with this working capital adjustment, but as the business underperformed (and creditors prohibited further cash distributions), LVI reached an agreement with the previous owners to defer payment indefinitely. That amount has since accrued to almost $40 million and sits at LVI Acquisition Corp, a holding company.

We've included a schedule of the amounts owed to different constituents under the working capital adjustment on the next page. Blue Point (seller of LVI to CHS) is the largest holder with $22.8 million exposure. To date, we have not had any discussions about this claim with Blue Point. Though structurally and contractually junior to the new equity, this claim is disclosed in LVI's audited financials and therefore attracts attention with sureties. To clean it up, we would be prepared to offer a small amount of out-of-the-money warrants struck at a value after which CHS and Apollo achieve a full recovery. The claim with management is more difficult as it extends throughout the organization and encompasses all key employees including branch managers. Management, and in particular Burt Fried, has expressed a strong desire to be able to obtain this value over time.

5

A-786

We cannot provide compensation to one party of a claim and not the others. However, we do not want to risk jeopardizing employee morale or risk defections over this issue. As such, we plan to make a $4 million payment to the management at closing in connection with achieving a successful restructuring. Management will be able to obtain an additional $4 million (paid equally over 2 years) if it can grow EBITDA to certain agreed upon targets – these earn-outs would be permitted "restricted payments" under the credit agreement. We believe we are close to a deal with management however tax considerations still need to be vetted.

| Summary | |
|---|---|
| Blue Point | $ 22,834,193.71 |
| DuPont/Wilton/Surchling | 2,779,230.65 |
| Falcon | 4,410,517.92 |
| Ed Pleasants | 217,504.97 |
| Mgmt Employees – current | 8,869,313.24 |
| Mgmt Employees - former (*) | 883,857.54 |
| | $ 39,994,618.03 |

## 3. Mazzochi Claim

In 2007, LVI acquired Mazzochi Wrecking, Inc. a NJ based provider of structural demolition services (fifth largest in the U.S.). The acquisition consideration consisted of approximately $12 million of cash, $5.4 million of assumed debt and $10 million in deferred consideration in the form of a note that sits at LVI Mazzochi Wrecking, a subsidiary of LVI Services, the borrower. The obligation is at an operating company and therefore is structurally senior to the term loans and mezzanine. It is also guaranteed by LVI Services and therefore derives credit support from all the other operating companies. However, the note is expressly subordinated to debt at LVI Services and therefore would be treated as a junior claim in bankruptcy. The note amount is approximately $8.5 million.

Prior to its sale to LVI, Mazzochi was engaged in an FBI undercover investigation aimed at rooting out a corrupt Newark city official. Effectively the official was awarding business to Mazzochi in exchange for Mazzochi subcontracting with firms that would provide the official with compensation. We've been told that Mazzochi came under FBI investigation after having conspired with the official (a criminal offense). In exchange for leniency, Mazzochi agreed to cooperate. However in the process of setting up the official, he won several jobs that effectively inflated earnings. No disclosure was made of this during the sale process, which is a clear breach of certain representations and warranties in the purchase agreement. The investigation was made public only recently and LVI is seeking to cancel the remaining note.

Mazzochi believes he is entitled to the full amount of the claim. Even if he ultimately agrees to the breach, there is a question of how to quantify the damages. We have some thoughts but in short believe this could take some time to resolve, particularly if Mazzochi chooses to litigate versus settle. The Company has a strong position and will attack all consideration paid to Mazzochi. The next step however is for LVI and Mazzochi's lawyers to see if they can make any progress on a settlement. Given how long this will likely take to resolve, we plan to close with the $8.5 million liability remaining on the balance sheet.

## 4. The Senior Lenders

There are effectively two groups of senior lenders – one with revolver commitments and the other with funded term loan exposure. There is little crossover holdings which has been problematic because each group has a different motivation. The revolver lenders currently have $25.5 million outstanding in the form of funded loans and letters of credit under a $45 million committed facility. This group recognizes the need to continue extending revolver availability, but their goal is to reduce exposure to the maximum

Confidential

AIC 00000119

extent possible.  Complicating matters, Dymas/Cerberus is the second largest holder under the revolver with $17.5 million.  Dymas has been outspoken about their intent to limit future exposure and can hold-up the deal.  Other revolver lenders including M&T and CIBC appear more commercially minded.  Despite these dynamics, we are actually very close to agreement.

The term loan is held by 13 institutions with Falcon holding the largest amount at 23% and Highland the second largest holder at 10%.  Confirmed through our own checkings, outside of these two groups, all investors in the first lien seem highly motivated to complete a restructuring as quickly as possible and the deal we have proposed is attractive to them.  The following chart contains a summary of key terms.  At this point, we have had several rounds of comments with the first lien, and while a handful of points remain outstanding (capex covenant, additional covenant in the future, minor economic adjustments), we believe we can arrive at a deal materially similar to what is outlined below.  To note, the primary risk to a deal with the first lien is that a 100% vote is required given the maturity extension.  This gives smaller holders significant hold-up value.  Bankruptcy is not a good option to flush these accounts, as we believe it will impede LVI's ability to obtain bonding and compete for new business.  We provide an option for these accounts to sell their loan through the dutch tender and would use this pressure to drive consensus.

One other item to note, we are contemplating LVI paying a $400,000 per year management fee.  Apollo's share of this would be $150,000.

| Term | Current Credit Agreement | Company Proposal (8/7) |
|---|---|---|
| Revolving Credit Commitment | $45MM | • $36MM as of the Closing Date, with a reduction to $35MM anytime LTM does not exceed $17MM |
| Maturity | • Revolver: November 16, 2010<br>• Term Loan: November 16, 2011 | • Revolver: September 30, 2013<br>• Term Loan: March 31, 2014 |
| Amortization | • Quarterly amortization of $360K through 12/31/10; balloon payments for subsequent quarters | • Quarterly amortization payments of $150K beginning on March 30, 2011 |
| Term Loan Call Protection | • N/A | • Year 1 - 102; Year 2 - 101 (if paydown is made with proceeds from a debt or equity issuance) |
| Covenants | • Min FCCR (currently at 1.15x); total leverage (currently at 5.00x w/step-down to 4.90x at 9/30/2010); CapEx not to exceed $7.5MM | • Min FCCR of 1.00x thru 12/31/2011, 1.15x thereafter; CapEx set at the greater of 120% of projections and $7.5MM |
| Pricing | • Based on a leverage grid, currently at P + 4.00% (not including default interest) | • LIBOR + 7.50% if Total Leverage > 3.25x<br>• LIBOR + 4.75% if Total Leverage ≤ 3.25x<br>• 1.75% LIBOR Floor |
| Sponsor Guaranty | • No longer in effect | • Subject to the conversion of not less than $15 million of Term Loans to equity on the Closing Date, among other things, no guaranty of the Sponsor of Revolving Loans and Letter of Credit Usage shall be required. |
| Management Fees | • Up to $1MM per year, payable in cash | • Up to $400k per year, payable in cash (so long as FCCR ≥ 1.00x, otherwise shall accrue) |
| Excess Cash Flow Sweep | • 75% of excess cash flow | • 75% of excess cash flow |
| Other | • N/A | • Payment of an amendment fee to lenders of 0.75% on the pro forma facility<br>• Payment to certain members of the management team of $4MM at closing, with the opportunity to earn two additional payments of $2MM each<br>• Ability to conduct a reverse Dutch auction for a period of no longer than fifteen (15) days after close<br>• Conversion of $15MM of term loans into equity<br>• Equity contribution of at least $25MM<br>• Potential consideration given to holders of the Working Capital Adjustment in the form of warrants for common equity |

7

## IV – Company and Financial Overview

LVI is the nation's largest environmental remediation, demolition and facility services provider and the only national provider of turnkey remediation and demolition services in the U.S. LVI serves facility owners and construction firms in large and growing end markets including energy, power and industrial, infrastructure, government and institutional – along with its core retail and commercial end markets. The Company leverages its national footprint comprised of 25 regional offices to deliver asbestos abatement, soft and structural demolition, mold remediation, decontamination and decommissioning, fireproofing and on-demand emergency response services to customers across the country. In 2009, LVI completed work on over 4,000 projects with an average contract size of $66,000.

Along with its bonding capacity (discussed in more detail later in this memo), a key differentiator for LVI is its world-class safety record – which sets it apart from its peers and provides the Company with the opportunity to access a broader range of industrial and other non-commercial customers, including government (federal, state and municipal), leading power utility providers and major oil and gas companies. During 2009, LVI experienced a recordable incident rate of 1.2 cases per 100 full time workers compared to the industry average of 5.1 cases. Furthermore, LVI had a lost time injury rate of 0.2 cases per 100 full time workers as compared to the industry average of 2.7 cases. These safety metrics have been improving over the past several years – driven by a heightened safety focus implemented under prior CEO Bob McNamara. Within the construction services sector, safety metrics are critical to maintain particularly as it relates to workers comp insurance, bonding and public projects.




LVI groups its service offerings into 3 business segments: Remediation, Demolition, and Emergency Response. Each of these three segments are discussed in greater detail in the following pages.

### Remediation Segment (45% of 2010E Revenue)
LVI's remediation segment primarily consists of jobs related to the remediation of asbestos, lead and mold as well as specialized services including fireproofing and infection control. LVI has an extensive history of successful abatement projects, with almost 18,000 asbestos abatement projects completed since 2000 and over 50 million recorded man hours related to asbestos and mold removal in the past 20 years. The Company is capable of performing remediation tasks in either non- or partially-occupied buildings and caters to a wide variety of clients, including government buildings, schools, hospitals, hotels, industrial facilities and more. LVI has a proven track record with exceptionally low incident rates and employs the most up-to-date abatement solutions with quality standards exceeding national and industry standards. According to *Engineering News-Record*, LVI is the largest asbestos abatement contractor in the U.S. at almost four times the size of its closest competitor.

8

Confidential                                                                                    AIC 00000120

A-789

As illustrated below, LVI's Remediation segment has been severely negatively impacted by the recent economic downturn, with total segment revenue for 2010 projected at $125-$130 million (roughly equal to 2002 total remediation revenue and down from a peak of $245 million in 2008). It should be noted that the true downturn over the past two years and the impact on the Remediation segment has been somewhat masked by the large 130 Liberty Street abatement project (Deutsche Bank building in lower Manhattan), which contributed $54 million of remediation revenue in 2008 and $37 million in 2009. Excluding this one project, "adjusted" revenue for the Remediation segment declined by 15% and 28% in 2008 and 2009, respectively, and is projected to decline by another 8% in 2010. In management's forecast as illustrated in the following pages, total Remediation segment revenue is projected to return to 2003-2005 levels by 2012-2014 due to expected improvement in the core commercial environment.

**Remediation Segment**

| ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| ACM | $112.6 | $97.0 | $110.8 | $122.7 | $126.3 | $138.4 | $159.8 | $182.2 | $201.1 | $145.4 | $91.1 |
| Lead | 6.1 | 7.4 | 5.2 | 4.2 | 4.2 | 6.3 | 10.0 | 11.5 | 8.4 | 4.3 | 6.6 |
| Mold/Hazmat | 0.3 | 4.5 | 8.8 | 18.1 | 23.8 | 20.2 | 19.4 | 13.7 | 12.1 | 8.3 | 12.8 |
| FP | 4.6 | 5.0 | 6.4 | 6.5 | 9.7 | 12.1 | 13.3 | 16.5 | 23.0 | 16.1 | 15.1 |
| **Total Remediation** | $123.6 | $113.9 | $131.2 | $151.5 | $164.0 | $177.0 | $202.5 | $223.9 | $244.6 | $174.1 | $125.6 |
| *% Growth* | – | -7.8% | 15.2% | 15.5% | 8.3% | 7.9% | 14.4% | 10.6% | 9.2% | -28.8% | -27.9% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| ACM | $30.5 | $26.1 | $28.4 | $32.0 | $29.4 | $30.8 | $41.3 | $43.6 | $45.6 | $32.2 | $23.1 |
| *% Margin* | 27.1% | 26.9% | 25.6% | 26.1% | 23.3% | 22.3% | 25.8% | 23.9% | 22.7% | 22.1% | 25.4% |
| Lead | 1.8 | 1.6 | 1.3 | 1.3 | 1.3 | 1.9 | 3.0 | 3.4 | 2.7 | 1.3 | 1.7 |
| *% Margin* | 29.5% | 21.6% | 25.0% | 31.0% | 31.0% | 30.2% | 30.0% | 29.6% | 32.1% | 30.2% | 25.8% |
| Mold/Hazmat | 0.1 | 1.6 | 3.3 | 7.2 | (1.3) | 8.1 | 6.3 | 4.1 | 4.0 | 2.9 | 3.6 |
| *% Margin* | 33.3% | 35.6% | 37.5% | 39.6% | -5.5% | 40.1% | 32.5% | 29.9% | 33.1% | 34.9% | 28.1% |
| FP | 1.3 | 1.3 | 1.5 | 1.4 | 2.3 | 2.9 | 3.1 | 5.8 | 6.0 | 3.4 | 4.1 |
| *% Margin* | 28.3% | 26.0% | 23.4% | 21.5% | 23.7% | 24.0% | 23.3% | 23.0% | 26.1% | 21.1% | 27.2% |
| **Total Remediation** | $33.7 | $30.6 | $34.5 | $41.9 | $31.7 | $43.7 | $53.7 | $54.9 | $58.3 | $39.8 | $32.5 |
| *% Margin* | 27.3% | 26.9% | 26.3% | 27.6% | 19.3% | 24.7% | 26.5% | 24.5% | 23.8% | 22.9% | 25.9% |

**Remediation Segment (Excluding 130 Liberty St. Project)**

| ($ in millions) | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|
| Total Remediation Revenue | $223.9 | $244.6 | $174.1 | $125.6 |
| Less: 130 Liberty ACM Revenue | 0.0 | (54.3) | (37.4) | 0.0 |
| "Adjusted" Remediation Revenue | $223.9 | $190.3 | $136.7 | $125.6 |
| *% Growth* | | -15.0% | -28.2% | -8.1% |

9

Confidential

AIC 00000121

<u>Demolition Segment (47% of 2010E Revenue)</u>

Through its Demolition segment, LVI executes both structural and non-structural demolition projects, ranging from selective interior / exterior demolition to large-scale building implosions. In addition, LVI's total turnkey demolition services provide a key competitive advantage as the Company can also perform any required remediation services in advance of demolition (as they did for the 130 Liberty Street Deutsche Bank project and are doing for the Madison Square Garden project). The Company has performed major demolition projects for industrial manufacturing and chemical plants, power plants, retail and commercial facilities, resorts and movie sets and prides itself on its reputation for world class performance, safety and efficiency.

LVI has been expanding its Demolition focus over the past 5+ years as it sought to add a key complimentary product offering to its core abatement and remediation services. The Company accomplished this primarily through acquisitions, including the 2007 acquisition of Mazzochi Wrecking, the premier provider of surgical demolition services in the New York / New Jersey metro area. As such, over the past 10 years LVI has grown its annual demolition related revenue from $15-$20 million to over $100 million.

| Demolition Segment | | | | | | | | | | INITIAL BANK PLAN |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (\$ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **REVENUE** | | | | | | | | | | | |
| Demolition | $27.3 | $26.4 | $14.9 | $19.0 | $44.6 | $81.4 | $99.9 | $129.5 | $108.5 | $76.4 | $131.5 |
| % Growth | -- | -3.3% | -43.6% | 27.5% | 134.7% | 82.5% | 22.7% | 29.6% | -16.2% | -29.5% | 72.0% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Demolition | 3.1 | 3.5 | 2.9 | 3.3 | 9.1 | 14.7 | 21.2 | 26.7 | 24.1 | 18.9 | 31.1 |
| % Margin | 11.4% | 13.3% | 19.5% | 17.4% | 20.4% | 18.1% | 21.2% | 20.6% | 22.3% | 24.7% | 23.7% |

A primary driver of recent and projected demolition revenue growth relates to LVI's increased focus on and successful penetration of industrial, oil & gas and power utility projects. A major area of upside for the Company relates to these areas – primarily the projected deconstruction and decommission of older coal-fired power plants in the U.S., an initiative well documented and driven by EPA and other air emission regulations being implemented by the current Obama administration. Related to this, LVI recently signed a five year strategic alliance contract with NRG Energy, one of the nation's largest power generators. Under this agreement, LVI will serve as NRG's preferred provider of environmental services and demolition work at its power-generating facilities nationwide. In the very near term, LVI expects to receive a release of a $10.4 million project for NRG's El Segundo, CA plant related to this initiative, and other facility awards are expected to follow in the near to intermediate term. The total revenue opportunity related to NRG alone is projected by management to be $40-$60 million. Besides NRG, LVI has also been in discussions with other large utility companies for similar such work and management believes they are well positioned to secure projects from utilities such as Progress Energy, Duke Energy and AEP. Management estimates that each power plant job is a $5-$20 million revenue opportunity.

10

Confidential

## Emergency Response Segment (8% of 2010E Revenue)

The Company's Emergency Response segment now operates under the NorthStar brand. NorthStar offers professional emergency response and recovery services to customers facing damage and disruption left in the wake of any size disaster. NorthStar leverages LVI's national network of 25 regional offices and more than 3,000 employees to rapidly dispatch teams ready to assist customers in restoring their business safely, cost effectively and on schedule. The self-performing and cross-trained labor force has decades of unmatched experience with all types of industries and challenges and works with the best equipment and technology.

With over 900 million square feet contracted under MSAs, NorthStar is a preferred provider to approximately 50 large customers with holders of significant real estate portfolios, such as retailers and hospitality companies (e.g. Target, Holiday Inn). In addition to the day-to-day non-emergency work (leaks, water damage due to faulty sprinklers, etc.), the MSAs create significant upside opportunity for NorthStar in the event of hurricanes or other significant catastrophes and has allowed LVI to compete with large disaster recovery firms across the nation. For example, the Company generated over $150 million of aggregate clean-up related revenue related to 2004-2005 hurricanes, and more recently is expected to earn $5-$15 million of revenue from the recent flooding in Nashville and Rhode Island. LVI currently has people working in the Gulf on the BP oil spill, and believes this could be material to near-term earnings.

| Emergency Response Segment | | | | | | | | | | | INITIAL BANK PLAN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (*$ in millions*) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **REVENUE** | | | | | | | | | | | |
| Emergency Response | 0.3 | 11.4 | 2.1 | 1.0 | 54.9 | 121.2 | 22.8 | 8.1 | 23.6 | 14.8 | 22.8 |
| *% Growth* | -- | *3700.0%* | *-81.6%* | *-52.4%* | *5390.0%* | *120.8%* | *-81.2%* | *-64.5%* | *191.4%* | *-37.1%* | *53.6%* |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Emergency Response | 0.1 | 3.7 | 0.9 | 0.0 | 27.7 | 55.0 | 8.3 | 3.2 | 7.7 | 5.4 | 7.2 |
| *% Margin* | *33.3%* | *32.5%* | *42.9%* | *4.0%* | *50.5%* | *45.4%* | *36.4%* | *39.5%* | *32.6%* | *36.4%* | *31.6%* |

In Management's forecast, Emergency Response is projected to contribute $15-$20 million of annual revenue – primarily driven by non-emergency, recurring clean up work under its nationwide MSAs. A major disaster such as a hurricane (or the BP oil cleanup) represents upside to management's projections, but not something we are underwriting for purposes of evaluating the proposed new money investment in LVI. To note, LVI currently has 35 workers involved with the oil spill clean-up and many more on standby. In general it charges $24 per worker/hour and achieves a 30% contribution margin. The clean-up will eventually involve substantial amounts of additional labor. We estimate that if LVI can ultimately have 500 workers involved with the clean up, clean-up work will provide $13 million of revenue (over six months) and $4 million of profit. This provides some idea of the potential upside.

11

Confidential

AIC 00000123

## V – Bonding Discussion

LVI must post bonds for all public projects, which represents about 25% of LVI's total business (private projects rarely require bonds). The following chart shows the amounts of bonds issued over the past four years and the amount outstanding as of 3/31/2010. As shown, the average bond is $700,000 and the related work is generally completed within a few months – as such, this is generally low risk business for sureties. LVI does however obtain bonds for larger projects (e.g., the work at 130 Liberty required a $14 million bond).

| YEAR ISSUED | TOTAL BONDS ISSUED | OUTSTANDING BONDS AS OF 3/31/2010 | # OF BONDS ISSUED | AVG. VALUE OF BONDS ISSUED |
|---|---|---|---|---|
| 2010 | $ 4,649,573 | $ 2,236,721 | 17 | 273,504 |
| 2009 | 44,488,145 | 17,777,838 | 85 | 523,390 |
| 2008 | 96,255,598 | 22,931,326 | 84 | 1,145,900 |
| 2007 | 86,123,075 | 4,544,179 | 122 | 705,927 |
| 2006 | 69,254,390 | 35,577 | 122 | 567,659 |
| TOTALS | $ 300,770,780 | $ 47,525,640 | 430 | $ 699,467 |

A bond is issued by a surety to effectively protect taxpayer dollars. To use an example, when LVI is awarded a project for $10 million, Arch (LVI's primary bonding provider) provides the municipality with a $10 million "performance and payment" bond in LVI's favor. This ensures that if anything were to happen to LVI, the surety would step-in to complete the work. While this rarely occurs, the surety in this situation would hire other contractors to finish the job. Knowing that LVI has built in a 20% margin, the surety has some room to find contractors that might be more expensive. The way bonding exposure is tracked then (shown in the chart above) is based on the remaining value of the contract (as progress is made, bonding exposure is reduced).

LVI today uses primarily Arch Capital (ticker: ACGL) and AIG (Chartis) for surety bonds. Though there is no written contract to this effect, which in practicality would not have much meaning as each bond are not drawn like a revolver but based on the merits of each project, Arch has generally allocated $200 million of exposure to LVI. While LVI never needs this much in bonding, the size is an important differentiator in the market (show of strength). Arch has been working with LVI for 7-8 years; the relationship was sourced and still managed by Richard Ferrucci, who sits on LVI's board (and owns and insurance brokerage company). AIG has been working with LVI for 20 years; because their commitment to the surety business has wavered, LVI prefers to do more business with Arch.

Surety economics are seemingly low – Arch makes approximately 1% on outstanding bonds –this is because the risk and capital requirements are low. A surety has never lost money with LVI in its operating history. What sureties like to see from companies like LVI are a consistent track record in completing projects profitably, ideally the work is related to shorter-term projects and the contractor must have balance sheet strength. Arch wants comfort that LVI can withstand losses from an occasional unprofitable contract or the economic downturn. When LVI was acquired by CHS, Arch had concern over the amount of leverage and asked that LVI post a $10 million letter of credit in its favor. That LC still is in place today (we would hope to have this credit support removed following the close of this transaction, which would free up revolver capacity). Part of the impetus to get a deal done soon is that Arch has not yet received LVI's audit (we can't deliver with a clean opinion) and accordingly has expressed concern about the situation. They are aware of the financial restructuring taking place and are acting patiently. It's not in their interest to do anything that would precipitate a downturn, but if this situation persists Arch's underwriting will likely change to narrow exposure and over time we will likely lose them.

12

We have reviewed public information on Arch and believe they are in solid financial shape, well capitalized and committed to the surety business. Notably, Arch recently hired a senior person from Liberty Mutual to head the surety business and in press releases described this as a growth business. LVI is arranging for us to speak to Arch directly next week. Given the importance of bonding and dependency on Arch, upon closing we intend source additional providers as quickly as possible. Because LVI deals with hazardous materials, obtaining bonding is not as straightforward as it might be for a general contractor. However management has begun discussions with Safeco (owned by Liberty Mutual) and believes it can obtain a line once the financial restructuring has taken place.

## VI – CEO Search

In March 2010, in the midst of restructuring, Bob McNamara resigned to take become CEO of the Americas for Bovis Lend Lease. This is a big position and hopefully he will be helpful to LVI in this capacity. Fortunately, Burt Fried, Chairman and former CEO, was able to step-in as interim CEO and provide time for an orderly transition. CHS has taken the lead on the CEO search and, along with Burt Fried, has narrowed the list to four potential candidates through Heidrick & Struggles. We will meet with these candidates in the coming weeks. Our feeling though is that we will be able to recruit a talented CEO once the restructuring is completed. At present though, we are fortunate to have Burt Fried as interim CEO who has done a good job stabilizing the situation.

| Name/Title/Company | Prior Experience/Education | Compensation |
|---|---|---|
| Adrian W. Jackman<br>*Executive Vice President – International Operations*<br>EMCOR Group, Inc. | 1980 – MA– Cambridge University<br>1977 – BA – Cambridge University | Base: $300K<br>Bonus: 100% |
| Daniel K. Mazany<br>*SVP Principal in Charge Healthcare Group*<br>Bovis Land Lease | 1987 – MBA – University of New Haven | Base: $325K<br>Bonus: 50% |
| John L. Hopkins<br>*Group Executive, Fluor Environmental & Nuclear Operating Company* | 1980 – BBA –University of Texas | Base: $550K<br>Bonus: 100% |
| Jim Bollweg<br>*President CBI Services, Inc.* | 1974 – BS – Western Michigan University | Base: $400K<br>Bonus: 40% |

13

AIC 00000125

## VII – Consolidated Historical Financial Summary and Management Projections

The chart below summarizes LVI's 2007-2009 historical financial performance as well as management's 5-year forecast. Remediation segment revenue is projected to improve (and return to 2003-2005 levels) due to economic improvement and a return to normalcy in commercial end markets. Demolition related revenue is projected to increase given the Company's recent penetration and focus on industrial, oil & gas and utility end markets and related decommissioning / deconstruction work. As of April 2010, the Company has a $105 million backlog – a significant majority of which relates to demolition work and including $27 million for the recently awarded abatement / demolition project for Madison Square Garden. Backlog trends have been improving and management feels confident that the Company has stabilized. To note, we have engaged a market consulting firm (FMI) to interview customers and competitors and provide a better sense of where we are in the cycle. We expect to have this report in the coming days.

The projected FCF below assumes $3.75 million of earnout/other payments in each of 2011 and 2012 relating to payouts to management (relating to their pre-restructuring working capital claims - $2 million assumed paid in 2011 and $2 million assumed paid in 2012) and Mazzocchi-related payments (model assumes $1.75 million each in both 2011 and 2012). For conservatism, we show credit stats assuming the $8.5 million Mazzocchi seller note remains on LVI's balance sheet as debt.

SUMMARY HISTORICAL AND PROJECTED FINANCIALS

| ($ in millions) | 2007A | 2008A | 2009A | 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|---|---|---|
| **Revenue Build** | | | | | | | | |
| Remediation | $223.8 | $244.6 | $174.1 | $127.5 | $139.8 | $148.8 | $171.2 | $186.8 |
| Demolition | 129.5 | 108.5 | 76.4 | 126.6 | 144.7 | 159.1 | 175.0 | 192.5 |
| Emergency Response | 8.2 | 23.6 | 14.8 | 14.1 | 13.6 | 17.1 | 18.8 | 20.7 |
| **Total Revenue** | **$361.5** | **$376.7** | **$265.3** | **$268.2** | **$300.1** | **$325.0** | **$365.0** | **$400.0** |
| *% Growth* | *10.9%* | *4.2%* | *-29.6%* | *1.1%* | *11.9%* | *8.3%* | *12.3%* | *9.6%* |
| | | | | | | | | |
| Gross Profit (incl. D&A) | 71.7 | 75.4 | 54.5 | 59.8 | 66.0 | 71.5 | 80.3 | 88.0 |
| *% Margin* | *19.8%* | *20.0%* | *20.5%* | *22.3%* | *22.0%* | *22.0%* | *22.0%* | *22.0%* |
| | | | | | | | | |
| SG&A | 51.6 | 50.6 | 44.4 | 44.6 | 45.9 | 48.4 | 52.4 | 55.4 |
| *% of Total Revenue* | *14.3%* | *13.4%* | *16.7%* | *16.6%* | *15.3%* | *14.9%* | *14.4%* | *13.9%* |
| | | | | | | | | |
| **Adj. EBITDA** | **$34.3** | **$35.1** | **$20.4** | **$24.0** | **$26.1** | **$28.5** | **$35.8** | **$38.1** |
| *% Margin* | *9.5%* | *9.3%* | *7.7%* | *8.9%* | *8.7%* | *8.8%* | *9.3%* | *9.5%* |
| | | | | | | | | |
| CapEx | 4.4 | 4.2 | 4.1 | 4.1 | 3.8 | 5.8 | 4.6 | 5.0 |
| *% of Total Revenue* | | | | | | | | |
| | | | | | | | | |
| Note - Total Backlog | $138.5 | $120.1 | $89.3 | | | | | |

PROJECTED FCF AND CREDIT STATS (PF FOR RESTRUCTURING)

| | 6 mos. 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Free Cash Flow** | | | | | |
| EBITDA | $18.5 | $26.1 | $28.5 | $35.8 | $38.1 |
| Earnout / Other Payments | 0.0 | (3.8) | (3.8) | 0.0 | 0.0 |
| Maintenance CapEx | (2.9) | (3.8) | (4.1) | (4.6) | (5.0) |
| Operating Lease Buyout | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 |
| Taxes | (2.9) | (4.8) | (6.7) | (8.8) | (10.8) |
| Change in Working Capital | (0.3) | (1.3) | (3.7) | (5.4) | (5.2) |
| **Subtotal - FCF** | **$9.5** | **$12.6** | **$8.6** | **$16.0** | **$17.1** |
| Management Fee | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) |
| Cap. Lease Payments | (1.4) | (2.7) | (2.8) | (2.6) | (1.6) |
| Cash Interest | (4.6) | (7.4) | (6.6) | (6.4) | (6.2) |
| **FCF for Debt Repayment** | **$3.3** | **$2.1** | **($1.2)** | **$5.7** | **$9.0** |
| | | | | | |
| Net Senior Debt | $81.3 | $76.5 | $74.9 | $66.7 | $56.2 |
| Net Senior Debt / EBITDA | 3.4x | 2.9x | 2.6x | 2.0x | 1.5x |
| | | | | | |
| Net Total Debt | $89.8 | $85.0 | $83.4 | $75.2 | $64.7 |
| Net Total Debt / EBITDA | 3.7x | 3.1x | 2.9x | 2.2x | 1.7x |

14

**Quarterly Analysis and 2010 "Likely Case" Projection**

Management believes that they have good momentum heading into H2 2010 -- including a $105 million backlog as of April 30th which should drive near term earnings – and is reluctant to revise downward the 2010 EBITDA estimate of $24 million (although they acknowledge this will be difficult to achieve). This H2 forecast projects Q3 and Q4 revenue of $80 million and $75 million, respectively.  Given our discussions with management of the assumptions contained in these quarterly forecasts, we believe a $10 million revenue reduction in each of these two remaining quarters is warranted for a more "base case" estimate – particularly given the underperformance vs. plan thus far in 2010 (our adjustment is effectively a run-rate of the underperformance).  At approximately 20% gross margin and SG&A relatively fixed at $11 million a quarter, this $20 million cumulative revenue reduction through year end equates to a $4 million reduction to 2010 EBITDA.  At $20 million of earnings, total leverage at year end (including the Mazzochi note) is estimated at 4.5x vs. management's plan of 3.7x and down from 5.1x estimated at closing.  If we are successful in eliminating the Mazzochi note, total leverage would be approximately 4x.

It's important to note that LVI experiences some seasonality (primarily due to weather) with H2 stronger than H1.  The business therefore faces relatively favorable comps in the back half of the year.  We would be disappointed if we did not see EBITDA growth from June levels.

**Quarterly EBITDA Analysis**

|  | | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|---|
|  | 2008A | 4.3 | 9.5 | 11.1 | 10.2 | $35.1 |
|  | 2009A | .5.5 | 6.0 | 4.1 | 4.8 | $20.4 |
|  | 2010E | 3.7 | 4.8 | 8.2 | 7.4 | $24.0 |
| **Mgmt Case 2010 LTM EBITDA** | | $18.6 | $17.4 | $21.5 | $24.0 | |
| Projected Leverage at Year End | | | | | 3.7x | |
| | | | | | | |
| **AIC Base Case Assumptions** | | | | | | |
| Revenue "Risk" to 2010 Quarterly Periods | | | $0.0 | $10.0 | $10.0 | |
| EBITDA Impact (1) | | | 0.0 | 2.0 | 2.0 | |
| **AIC Base Case 2010 LTM EBITDA** | | $18.6 | $17.4 | $19.5 | $20.0 | |
| Projected Leverage at Year End | | | | | 4.5x | |

(1) Assumes 20% Gross Margin business; SG&A assumed relatively fixed (as per management guidance).

15.

**Confidential**

## VIII – Recovery Analysis

For purposes of projecting returns / recoveries to the various constituents, we have assumed an exit in 3 years (June 2013). The tables below illustrate returns assuming 3 different LTM EBITDA assumptions at exit ($25 million, $30 million, and $35 million) and furthermore assume an exit multiple of 6.5-7.0x. As a reminder, LVI generated EBITDA of $34-$35 million in both 2007 and 2008, and upside certainly exists for EBITDA meaningfully greater than $35 million in 3 years. However, for underwriting purposes we have focused on the three cases illustrated below. Additionally, for conservatism we again assume that the Mazzochi seller note remains an $8.5 million debt obligation of LVI.

To bookend reasonable outcomes -- we believe an exit EBITDA of $25 million represents a conservative case and $35 million of EBITDA represents a reasonable growth case. At a 6.5x exit multiple on $25 million of EBITDA, the new money generates a 1.9x MOIC and a 3-year IRR of 23.6%. Given the equity stake received from our mezzanine conversion, total proceeds to AIC would be $28 million under this scenario. In a $35 million and 7x exit, the new money generates an MOIC of 3.7x and a 3-year IRR of 55.2%. Total proceeds to AIC in this scenario is $56 million.

To note, for purposes of the Falcon IRR shown below we assume their contribution is valued at $15 million (face amount of senior term loan being converted). In reality, their cost basis for their term loan investment is closer to 50 cents on the dollar and their internal IRRs would be much greater (and a reason they were ultimately willing to convert at a higher valuation than the new money investment proposed by CHS and AIC).

### Assumed 3-year Exit with LTM EBITDA of $25 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $25mm Case | | AIC $25mm Case |
| | 6.5x | | 7.0x |
| ($ in millions) | 3-Year Exit | ($ in millions) | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $9.4 | Mezz Conversion Equity | $10.9 |
| New Money Equity | 18.9 | New Money Equity | 21.7 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| **CHS** | | **CHS** | |
| New Money Equity | 28.3 | New Money Equity | 32.6 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| MOIC on New Money | 1.9x | MOIC on New Money | 2.2x |
| 3-Year IRR on New Money | 23.6% | 3-Year IRR on New Money | 30.4% |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 18.9 | Common Equity from Conversion | 21.7 |
| Subtotal | $18.9 | Subtotal | $21.7 |
| Falcon 3-Year IRR | 8.0% | Falcon 3-Year IRR | 13.1% |
| Mgmt Options | $4.0 | Mgmt Options | $5.2 |

Confidential

AIC 00000128

### Assumed 3-year Exit with LTM EBITDA of $30 million

| Exit Multiple of 6.5x | | | Exit Multiple of 7.0x | | |
|---|---|---|---|---|---|
| | AIC $30mm Case | | | AIC $30mm Case | |
| | 6.5x | | | 7.0x | |
| ($ in millions) | 3-Year Exit | | ($ in millions) | 3-Year Exit | |
| **Apollo** | | | **Apollo** | | |
| Mezz Conversion Equity | $13.1 | | Mezz Conversion Equity | $14.8 | |
| New Money Equity | 26.2 | | New Money Equity | 29.6 | |
| Subtotal | $39.3 | | Subtotal | $44.4 | |
| **CHS** | | | **CHS** | | |
| New Money Equity | 39.3 | | New Money Equity | 44.4 | |
| Subtotal | $39.3 | | Subtotal | $44.4 | |
| MOIC on New Money | 2.6x | | MOIC on New Money | 3.0x | |
| 3-Year IRR on New Money | 37.5% | | 3-Year IRR on New Money | 43.5% | |
| **Falcon** | | | **Falcon** | | |
| Common Equity from Conversion | 26.2 | | Common Equity from Conversion | 29.6 | |
| Subtotal | $26.2 | | Subtotal | $29.6 | |
| Falcon 3-Year IRR | 20.4% | | Falcon 3-Year IRR | 25.4% | |
| Mgmt Options | $7.2 | | Mgmt Options | $8.7 | |

### Assumed 3-year Exit with LTM EBITDA of $35 million

| Exit Multiple of 6.5x | | | Exit Multiple of 7.0x | | |
|---|---|---|---|---|---|
| | AIC $35mm Case | | | AIC $35mm Case | |
| | 6.5x | | | 7.0x | |
| ($ in millions) | 3-Year Exit | | ($ in millions) | 3-Year Exit | |
| **Apollo** | | | **Apollo** | | |
| Mezz Conversion Equity | $16.8 | | Mezz Conversion Equity | $18.7 | |
| New Money Equity | 33.5 | | New Money Equity | 37.5 | |
| Subtotal | $50.3 | | Subtotal | $56.2 | |
| **CHS** | | | **CHS** | | |
| New Money Equity | 50.3 | | New Money Equity | 56.2 | |
| Subtotal | $50.3 | | Subtotal | $56.2 | |
| MOIC on New Money | 3.4x | | MOIC on New Money | 3.7x | |
| 3-Year IRR on New Money | 49.6% | | 3-Year IRR on New Money | 55.3% | |
| **Falcon** | | | **Falcon** | | |
| Common Equity from Conversion | 33.5 | | Common Equity from Conversion | 37.5 | |
| Subtotal | $33.5 | | Subtotal | $37.5 | |
| Falcon 3-Year IRR | 30.7% | | Falcon 3-Year IRR | 35.6% | |
| Mgmt Options | $10.5 | | Mgmt Options | $12.2 | |

## IX – Summary Remarks

This is a challenging situation given the number of constituents involved, pressure we are experiencing with Arch (given LVI's inability to deliver a clean audit) and lack of visibility on the cycle. If we can't reach a capital structure solution in the near-term the business will likely come under significant pressure. We are hopeful that the FMI report, which we expect to receive in the coming days, will confirm what we are seeing and hearing from management – that the business has flat-lined, its industry positioning remains strong and the market outlook is improved.

17

The restructuring we've taken a lead in developing requires unanimous support and therefore almost by definition cannot be ideal for any group. Ultimately, we believe a $10 million investment is warranted because it's in connection with implementing a permanent solution and provides AIC with a good shot at recouping a meaningful amount, if not all, of our total investment. The valuation we are investing at is reasonable, the debt load manageable and the new money economics are potentially 3-4x.

LVI has a long operating history and through this downturn we are effectively at revenue levels experienced 10 years ago. But today, LVI is a more diverse and professional business than it was then and has major opportunities in the energy market that it previously could not pursue (lacked relationships/expertise). As such, we expect it to recover to higher levels in the coming years. As this occurs, we will likely have opportunities to refinance the debt at less expensive rates. Improved performance will also enable an exit, which we believe might occur with a large strategic seeking a U.S. footprint or a niche remediation company with a solid reputation and track record. It could also occur with a private equity group, which could grow LVI both organically and through acquisitions – effectively the strategy LVI has been pursuing for two decades. The market is still highly fragmented and will consolidate over time.

This memo was intended to provide an overview of the situation and new money investment. We will keep the team posted on the restructuring process, performance and key findings from the FMI report. Please call any of us with questions.

18

AIC 00000130

# Exhibit 18

| | |
|---|---|
| **From:** | Scott State <scott.state@gmail.com> |
| **Sent:** | Tuesday, September 14, 2010 4:09 PM |
| **To:** | Hogan, Robert <Rhogan@chsonline.com> |
| **Cc:** | Simmons, Brian P. <BSimmons@chsonline.com> |
| **Subject:** | Re: Burt/LVI Board |

I think we can assume that Burt is essentially another Falcon vote on the Board. Long term, very close relationship there from what I have gathered.

The whole surety question is an interesting one. The LVI surety (Arch) is one of the smaller players in the market and not real active. Have done alot of surety work dealing with claims and litigation for third parties and not seen them in the game too much. They recently changed out their management and the new leader (David Finkelstein) came over from Liberty Mutual. I believe Burt has had a call with him to introduce himself. We will have to get on this quickly since Liberty is not really a player at all in the construction surety market and Finkelstein will be looking at what business he wants to keep. If Arch were to pull away I do feel confident we could put a new line in place with a number of other parties I have worked with.

On Tue, Sep 14, 2010 at 2:39 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
> You are correct. I missed that in my earlier email. This was added by Falcon late in the negotiation process. They were concerned that the lack of a CEO and the future departure of Burt would be damaging to the business--in particular its relationship with the sureties. In addition, Falcon did not want the Chairmanship in the hands of one of the three key shareholders. Burt made sense as a "neutral" Chairman.
>
> As long as the three key shareholders own at least 50% of what they owned immediately post-restructuring, we would need the unanimous vote of the three shareholders to replace Burt as Chairman.
>
> In the end, you will run the business and report to the entire Board, not solely the Chairman.

> _____
> Robert Hogan
> Principal
> Code Hennessy & Simmons LLC
> 10 S. Wacker Drive, Suite 3175
> Chicago, IL 60606
> (p) 312-876-2679
> (f) 312-876-3854

> ..........................................................................................................................
> **From:** Scott State [mailto:scott.state@gmail.com]
> **Sent:** Tuesday, September 14, 2010 3:16 PM
> **To:** Hogan, Robert
> **Cc:** Simmons, Brian P.
>
> **Subject:** Re: Burt/LVI Board
>
> That is in 4.1 (a) (ii) I believe. In the Covenants section 5.1 (a) (v), I think it requires unanimous consent of the investors to remove him as Chairman of the Board. Am I missing something?

CONFIDENTIAL

A-801

On Tue, Sep 14, 2010 at 2:05 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
The current Investor Securities Agreement stipulates that Burt will be on the board so long as he is underlined employed by the Company. If he is no longer employed by the Company, he may remain on the Board or someone else may be elected to take his place with the vote of two of the three major shareholders.

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f)  312-876-3854

CONFIDENTIAL

LVIP 001873

# Exhibit 19


| | |
|---|---|
| **From:** | Scott State <scott.state@gmail.com> |
| **Sent:** | Sunday, September 19, 2010 8:48 PM |
| **To:** | Hogan, Robert <Rhogan@chsonline.com> |
| **Subject:** | Re: Offer |

Rob

I offer the following proposal for modified terms to the offer of employment:

### Salary / Bonus

The salary of $400K is fine, bonus should be set with a 120% of plan threshold to achieve 100% bonus. I would like a simple set of objectives for 2010 tied to a "signing" bonus payable at year-end.

### Safety Incentive

Concept is fine. Targets for 2011 need to be based on improvement from current performance. After 2011 the targets can be as stated in the original offer.

### Equity / Options

I am not comfortable making an investment in the business at this point. In our discussion on Tuesday you had indicated that August performance appeared to be such that TTM EBITDA would bounce back towards $18MM. On Friday it seems that may have been revised down to a roughly $300K improvement in August 2010 vs. 2009 EBITDA. The August 2009 performance was about $840K so a $300K improvement on that would still be very low. I think the business continues to be under pressure and determination of FMV is difficult.

I would like to have a meaningful share of the upside created in the business. For me, that amounts to roughly 5% of the gain in value. We went over a concept that would provide a transaction bonus on sale that would reflect a drop in option strike price from the current value which is based on implied equity value. I think the approach is simple and meets my desire to have the ability to get my starting equity value to be reflective of what may be FMV at this point. I would like to make this simple and fair to all parties and would prefer to have just a typical option award mechanism as opposed to the multiple option / equity purchase provisions in the current offer.

### Other

I believe that all other provisions of the offer are acceptable.

In addition to coming to terms on the financial parameters I would like to also get fully satisfied that the operational objectives of the business can be optimized. My view of LVI is that the business needs to be brought back to life and then some serious repositioning must take place. The old markets and ways of doing business will not put the Company where it needs to be a few years from now. We will need to make changes to the operating culture, find new markets, and develop a franchise that has attractive prospects if we are to exit this with a good outcome.

To be successful and move beyond what "has been" to what "can be" starts with leadership and a single vision. I have expressed my concern about having that singular focus and avoiding confusion within the team about who is in charge. I need to get to a meeting of the minds with Burt before making the leap on this opportunity. Burt has told me he plans to continue part-time with LVI pursuing opportunities in Dubai on over-water oil platform remediation. He is also actively pursuing hiring a CIO for the Company. These are two plans I would

CONFIDENTIAL                                                                                          LVIP 001802

not anticipate pursuing upon joining the team as being unrealistic and unnecessary respectively. I would like Burt's commitment not to challenge those decisions if they are made as this would likely result in an immediate division in the management team.

In the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit. Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do. That is not a healthy situation for Burt or LVI. If Burt wants to keep his oar in the water due to the additional $4MM owed under the working capital adjustment from the prior deal then it will complicate matters.

I am optimistic that this is a business that can be positioned for long-term success. I am also willing to do the heavy lifting to achieve that goal. However, I prefer to enter into this commitment with a clear vision of goals and leadership. Upon agreement on the business terms of the offer I would like to have a meeting with Burt to establish our working relationship and then move to a conclusion.

I look forward to our upcoming discussion.

Best Regards,

Scott

On Fri, Sep 17, 2010 at 3:36 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
    Haven't gotten final August numbers, but they expect to beat last year's EBITDA by at least $300k.

---

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f)  312-876-3854

From: Scott State [mailto:scott.state@gmail.com]
Sent: Friday, September 17, 2010 4:33 PM
To: Hogan, Robert
Subject: Re: Offer

Rob

Will get something off this weekend.

Have you received the August #'s yet?

Scott

On Fri, Sep 17, 2010 at 1:35 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
    Scott,

    I received your message.  I am confident we can come to an agreement on a compensation

CONFIDENTIAL

LVIP 001803

package for you that works for everyone and has you excited about leading LVI.

With that in mind, I think it will work best if you provide a specific counterproposal on the key topics.

We want to reach agreement with you as soon as possible. If we have the proposal from you this weekend, we can get on the phone with you this weekend or early Monday and hammer out a solution.

We look forward to hearing from you.

Have a good weekend.

Rob

_____

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f)  312-876-3854

CONFIDENTIAL

# Exhibit 20



**Contact:**
Burton T. Fried                     Amy McGahan
LVI Services                        Dix & Eaton
203-222-0584                        216-241-3027
bfried@lviservices.com              amcgahan@dix-eaton.com

**FOR IMMEDIATE RELEASE**

### LVI SERVICES NAMES SCOTT E. STATE AS PRESIDENT AND CEO

*Experienced executive with environmental background to drive
continued growth in new markets and geographies*

NEW YORK – September 27, 2010 – LVI Services Inc., the nation's largest remediation and facility services firm with more than 25 offices across the country, announced today that Scott E. State, P.E., has joined the company as President and Chief Executive Officer, effective immediately. Burton T. Fried, who was serving as interim CEO since earlier this year, will return to his primary role as Chairman and will continue to play an active role in supporting the company's expansion into new services areas and geographies.

"Scott State has extensive experience in leading and growing environmental- and construction-oriented companies," Fried said. "As a professional engineer, Scott has outstanding technical skills as well as an executive management background with large, complex organizations. His experience in development and financial advisory projects for the military, nuclear and private industry will enable Scott to make a significant contribution to the profitable growth of LVI."

Brian P. Simmons, a Partner with the private equity firm Code Hennessy & Simmons LLC, which has a major investment in LVI, said, "Scott State is a valuable addition to the LVI executive team. His combination of technical skills and executive experience will provide an immediate and lasting impact on LVI's client service, growth and financial strength. Burt, Scott and the overall management team are well positioned to take this company to the next level of performance."

As a consultant since 2002, State, 47, has led several development and financial advisory projects with clients seeking to buy or sell major assets or to re-capitalize their businesses. Engagements have included a $120 million remediation of a 9,000-acre former military facility, technical program management consulting, and executive level support focused on cleaning up

CONFIDENTIAL                                                          LVI 000781

former nuclear weapons and nuclear power plant sites. He has successfully completed projects in the U.S., Europe, Asia and Australia.

"The opportunity to serve LVI as its new CEO is an assignment that I am very excited about," State said. "My relationship with LVI goes back more than a decade and I have had a close working relationship with Burt Fried. I look forward to continued success in the traditional markets the Company has pursued and expansion in both new service areas and geographies."

State served as Chairman and CEO of MACTEC, Inc., a leader in engineering, environmental and construction services worldwide with 80 locations, from 1996 to 2002, directing and leading annual revenue growth from $45 million to more than $500 million. During his tenure, State executed a leveraged buyout of MACTEC from the company's ESOP, completed a second re-capitalization as the firm expanded, and successfully integrated nine acquisitions.

State holds bachelor's and master's degrees in Nuclear Engineering and a master's degree in Engineering Management, and is a licensed Nuclear Engineer. He formerly held an NRC Reactor Operators license, DOE "Q" clearance, and DoD Top Secret clearance.

State, a native of Iowa, is operating out of LVI's Denver and New York offices.

### About LVI Services
LVI Services Inc. is the United States' leading provider of a wide array of integrated facility services, including environmental remediation, demolition, fireproofing and related services for commercial, industrial, multi-family residential and governmental facilities. LVI focuses on projects involving asbestos, lead paint, mold, infection control, hazardous materials, fireproofing, emergency and disaster services, and demolition. Founded in 1986, LVI has more than 25 offices across the United States, is licensed in every state, and is experienced in responding to natural and manmade disasters around the world. The company's annual revenues exceed $250 million. For more information, visit www.lviservices.com.

CONFIDENTIAL

# Exhibit 22

A-810

**MINUTES OF A MEETING OF**
**THE BOARDS OF DIRECTORS**
**OF**
**LVI PARENT CORP.**
**A Delaware corporation**


**Held on**
**November 4, 2010**

A meeting of the Board of Directors of LVI Parent Corp., a Delaware corporation ("LVI" or the "Company"), was held at the offices of Apollo Investment Corp. in New York City on Thursday, November 4, 2010.

The following directors of the Company were present at said meeting: Rajay Bagaria, Robert Buck, Richard Ferrucci, Burton Fried, Gerald Girardi, Robert Hogan, John Schnabel, Brian Simmons and Scott State (collectively, the "Board"). Also present at the meeting were John Leonard, Vice President of LVI, Paul Cutrone, Vice President and Chief Financial Officer of LVI, Theodore Reynolds, of Apollo Investment Management, Matt Kunz, of CHS Capital, and Jeffrey Smith, legal counsel to the Company.

Burton Fried acted as chairman of the meeting. Jeffrey Smith acted as secretary of the meeting and kept the minutes thereof.

Mr. Fried called the meeting to order at approximately 8:40 a.m., local time. Mr. Fried welcomed the directors and guests to the meeting. Mr. Fried confirmed that the directors had received due notice of the meeting which was issued and sent to the directors in accordance with the by-laws of LVI.

The members of the board of directors of LVI Invest Corp. (F/K/A LVI Acquisition Corporation) present at the meeting approved the minutes of the meeting of the LVI Acquisition Corporation board held on August 17, 2010.

Mr. Leonard then reviewed LVI's safety performance and presented charts comparing LVI's recordable incident rate and lost time injury rate for the third quarter of 2010 to prior periods and industry averages. Mr. Leonard also updated the Board on the Field Safety Incentive Program that the Company had implemented on August 1, 2010.

Mr. Cutrone provided a review of LVI's third quarter 2010 financial performance. The review included a discussion of revenue, EBITDA and margins relative to plan and prior year performance and analysis of G&A and working capital and a review of LVI's balance sheets and income statements. The review also included analysis of the annual debt service and availability under the Company's revolver and a review of the Company's financial covenant obligations and compliance. Mr. Cutrone discussed the reasons for variances from plan and prior year results. Mr. Cutrone also provided a report on LVI's working capital and updated the Board on the status of LVI's backlog.

Mr. Cutrone and Mr. Leonard then reviewed reports detailing accounts receivable aging and retention as of September 30, 2010.

CHI 5676039

CONFIDENTIAL                                                                                    LVI 000298

The financial report was concluded with a review of General and Administrative expenses through September 2010.

Mr. State then reviewed the status of a number of key projects currently being performed by the Company, as well as projects on which LVI was bidding. As part of this review Mr. Leonard addressed the status of the 130 Liberty project.

Mr. State updated the Board on current conditions in the markets for demolition and abatement services and emergency response services. The updated included a review of performance at the Company's Northstar Recovery Services business.

Mr. State then provided the Board with an overview of trends affecting the Company's businesses and discussed the key components and issues related to the Company's strategy for 2011. The discussion included an update on various strategic relationships that the Company was considering.

Mr. State addressed a number of specific items aimed at keeping the Board apprised of developments and issues that have impacted or will impact the Company, including the move of the corporate offices to Midtown in 2011, increases in the cost of health insurance, letter of credit usage, and the need to make the Company's business development efforts more strategic, among others.

Mr. Cutrone then discussed the Company's current information technology and the development of an IT plan to address the Company's information systems requirements. The Board will be updated on these matters following further analysis.

Mr. Cutrone then explained the business purpose associated with a dividend from LVI Environmental Services of New Orleans, Inc. to LVI Services Inc. in the amount of $15 million and that the Company's proposed governance documents would require that such a dividend be approved by the Board in addition to the approval by the board of directors of LVI Environmental Services of New Orleans, Inc. Following discussion the Board unanimously granted its approval of such dividend.

Mr. Cutrone then sought the Board's approval of the retention of Deloitte & Touche to serve as the Company's auditors of the 2010 financial statements. Following Mr. Cutrone's review of the terms of the engagement and discussion of such terms, the Board unanimously approved the retention of Deloitte & Touche.

Mr. Cutrone then reviewed the Management Liability Policy handout included in the Board presentation that summarized the principal terms of the company's D&O, EPL and fiduciary coverage; discussed the upcoming lender meeting scheduled for December 2, 2010; and the status of the Company's debt rating update with S&P and Moody's.

Mr. Hogan then presented the Board with updated drafts of the Corporate Governance Guidelines and amended and restated Audit Committee and Compensation Committee Charters. After a brief discussion, it was decided that the Board would schedule a follow-up call to discuss and finalize the governance guidelines and charters.

The Board then excused the management participants in the meeting other than those that are members of the Board. At the request of Mr. Fried the Board then discussed Mr. Fried's role at the Company and its subsidiaries.

CONFIDENTIAL

LVI 000299

There being no further business, the meeting was adjourned at approximately 2:15 p.m., local time.

Jeffry N. Smith, Secretary of Meeting

CONFIDENTIAL

LVI 000300

# Exhibit 23

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   No. 10 Civ. 9308(JSR)
 5   -------------------------------------------x
 6   BURTON T. FRIED,
 7                              Plaintiff,
 8          - against -
 9   LVI SERVICES, INC., LVI PARENT CORP., CODE
10   HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE
11   EQUITY V LP; APOLLO INVESTMENT CORP.,
12   SCOTT E. STATE, in his official and
13   individual capacities; BRIAN SIMMONS, in
14   his official and individual capacities;
15   RAJAY BAGARIA, in his official and
16   individual capacities; GERALD J. GIRARDI,
17   in his official and individual capacities,
18                              Defendants.
19   -------------------------------------------x
20                              June 8, 2011
                                2:10  p.m.
21
22
23
24
25
```

A-815

Page 2

1

2

3

4          DEPOSITION of JEFFREY SMITH via

5    teleconference, taken by the Plaintiff,

6    pursuant to Order, held at the offices of

7    Thompson Wigdor & Gilly, LLP, 85 Fifth

8    Avenue, New York, New York, before Debbie

9    Zaromatidis, a Shorthand Reporter and

10   Notary Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2    A P P E A R A N C E S :
 3
 4        THOMPSON WIGDOR & GILLY, LLP
 5        Attorneys for Plaintiff
 6            85 Fifth Avenue
 7            New York, New York 10003
 8        BY:   SHAFFIN A. DATOO, ESQ.
 9
10
11        SIDLEY AUSTIN, LLP
12        Attorneys for Defendants
13            787 Seventh Avenue
14            New York, New York 10019
15        BY:   NICHOLAS DEBAUN, ESQ.
16
17
18    ALSO PRESENT:
19        BURTON FRIED
20
21
22
23
24
25
```

```
                                        Page 10
 1                 SMITH
 2    counsel for LVI.
 3         Q.    How long have you known him?
 4         A.    I first met Burt in I believe
 5    November or December of 2005.  I believe
 6    it was December actually it was.  It was
 7    at the LVI holiday party in December of
 8    2005.
 9         Q.    And do you know how old Mr.
10    Fried is?
11         A.    I am not certain.
12         Q.    Okay.  How old do you think he
13    is?
14         A.    I understand from the various
15    pleadings, et cetera, that he is 71 or 72
16    years old.
17         Q.    Okay.  And are you currently
18    employed?
19         A.    Yes.
20         Q.    And where do you work?
21         A.    Sidley Austin.
22         Q.    And how long have you worked
23    there?
24         A.    Since April 1, 2008.
25         Q.    And where were you before Sidley
```

Page 12

1                        SMITH

2        A.       I've served as counsel of LVI

3   since the time that it was acquired by the

4   Code Hennessy Simmons Capital Group.

5        Q.       And do you also have a role on

6   LVI's board?

7        A.       Not an official role, no.

8        Q.       Do you have a nonofficial role?

9        A.       No.

10        Q.       Do you serve as

11   secretary -- secretary to the board?

12        A.       Generally I go to the board

13   meetings, and when I am at the board

14   meetings I -- I serve as secretary and

15   take the minutes.  Yes.

16        Q.       Okay.  Do you have any other

17   affiliation with LVI other than being its

18   counsel and its secretary when you go to

19   the board meetings?

20        A.       No.

21        Q.       How long have you is -- sorry.

22   When you are not present at the board

23   meetings, do you know who serves as

24   secretary?

25                 MR. DEBAUN:   Objection.

Page 25

1                    SMITH
2    in your opinion he did not do a good job
3    advocating or discussing his point?
4              MR. DEBAUN:    Objection.
5         A.    I don't recall any incidents.
6         Q.    Now, I think I already asked you
7    a question that assumed this, but did you
8    attend a board meeting on November 4,
9    2010?
10        A.    I did.
11        Q.    And prior to the meeting and in
12   your capacity as secretary, did you have
13   any communications with other board
14   members leading up to the November 4
15   meeting?
16        A.    No.
17        Q.    And how about in your capacity
18   as counsel?
19        A.    Yes.
20        Q.    Okay.  How many communications
21   did you have?
22        A.    I have no idea.
23        Q.    Okay.  Was it more than five?
24        A.    I have no idea.  I mean
25   I -- the -- let me just understand.  You

```
                                                 Page 41
 1                      SMITH
 2      A.      I do not.
 3      Q.      Okay.  And do you recall during
 4  this first segment what viewpoints any
 5  board members expressed?
 6              MR. DEBAUN:    Objection.
 7      A.      During the first segment?
 8      Q.      Yes.
 9      A.      I don't recall during the first
10  segment what was expressed.
11      Q.      Okay.  And during this first
12  segment -- sorry.
13      A.      No, I just don't recall, you
14  know, the -- during the first segment
15  specifically what was expressed.
16      Q.      Okay.  During the first
17  segment, how would you describe Mr.
18  Fried's demeanor?
19              MR. DEBAUN:    Could you repeat
20  the question, please?
21              MR. DATOO:   Sure.
22      Q.      During the first segment, how
23  would you describe Mr. Fried's demeanor?
24      A.      Calm, maybe a little impassioned
25  at times but generally calm.
```

```
                                              Page 43
 1                      SMITH
 2   both.
 3        Q.    Okay.  And --
 4              MR. DEBAUN:   Mr. Smith, I
 5   caution you to let Mr. Datoo finish his
 6   questions before you respond to that.
 7              THE WITNESS:  Yes.
 8        Q.    During this first session, did
 9   Mr. Fried say anything about age
10   discrimination?
11              MR. DEBAUN:   Objection.
12        A.    I don't recall.
13        Q.    Do you recall during any segment
14   if Mr. Fried said anything about age
15   discrimination?
16        A.    Yes, he did.
17        Q.    Okay.  And do you recall what he
18   said about that?
19        A.    He described a conversation he
20   had with Mr. State at that meeting in
21   October and Mr. Fried at the end of that
22   description of the -- of a comment made
23   that he -- he said was made by Mr. State.
24   After describing that he said something
25   like that is -- that is age discrimination
```

Page 44

1                    SMITH
2    or something like that.
3        Q.    And did Mr. Fried tell you what
4    comment he said Mr. State made?
5        A.    Yes.  He told the board that
6    he -- during the course of this
7    conversation with Mr. State when Mr. State
8    had advised that a number of
9    responsibilities that Mr. Fried had said
10   that he had previously handled that Mr.
11   State thought were more appropriately
12   handled by other people within the
13   organization because their roles were more
14   appropriate to the particular task, that
15   when Mr. Fried objected to that Mr. -- he
16   said Mr. State made a comment something
17   like:  Burt, you're 72 years old.  How
18   long do you want do this stuff or
19   something like that.  How long do you want
20   do this? And that is when Mr. Fried said
21   that is age discrimination.
22       Q.    And was Mr. --
23       A.    Something like that.
24       Q.    Was Mr. State present when Mr.
25   Fried made that statement to the board?

Page 81

1                    SMITH

2    lines.  I don't remember -- I just don't

3    have a recollection, you know,

4    specifically, but, you know, there was

5    discussion around, you know, different

6    things he could do, you know, I think

7    generally with the view, you know, subject

8    to being something that Mr. State wanted

9    him to, you know, be doing and involved

10   in, but I don't remember specifics.

11       Q.    Okay.  Now, other than what you

12   just testified to, do you recall any other

13   comments that were made at the board

14   meeting about Mr. Fried?

15       A.    It is seven months ago.  No, I

16   don't have any specific recollections.

17       Q.    Okay.  Was there an

18   investigation conducted into Mr. Fried's

19   allegation or mention of age

20   discrimination?

21       A.    An investigation?

22       Q.    Yes.

23       A.    Could I ask counsel a question?

24       Q.    Probably you should answer my

25   question first.  I am sure he will cut you

```
                                             Page 82
 1                    SMITH
 2  off --
 3           MR. DEBAUN:    Are you able to
 4  answer --
 5      Q.    I am sure he will cut you off if
 6  you start discussing any attorney-client
 7  information if that is a concern.
 8           MR. DEBAUN:    Well, it is a yes
 9  or no question.   Are you able to answer it
10  that way?
11      A.    Repeat the question.
12      Q.    Was an investigation conducted
13  into Mr. Fried's allegation or mention of
14  age discrimination?
15      A.    No.
16      Q.    Okay.   Why not?
17           MR. DEBAUN:    Objection.
18           THE WITNESS:   Should I answer
19  it?
20           MR. DEBAUN:    Are you able to
21  answer that question without revealing
22  attorney-client communications or work
23  product?
24      A.    I mean I don't think anyone felt
25  there was a basis for the claim for age
```

Page 99

```
 1                    SMITH
 2          C E R T I F I C A T I O N
 3
 4
 5
 6      I, DEBBIE ZAROMATIDIS, a Shorthand
 7   Reporter and a Notary Public, do hereby
 8   certify that the foregoing witness,
 9   JEFFREY SMITH, was duly sworn on the date
10   indicated, and that the foregoing is a
11   true and accurate transcription of my
12   stenographic notes.
13      I further certify that I am not
14   employed by nor related to any party to
15   this action.
16
17
18
19
20
21
22
                 --------------------------
23                 DEBBIE ZAROMATIDIS
24
25
```