# 13-1165-cv

# United States Court of Appeals

## for the

## Second Circuit

———◆❘◆———

SHARI L. DEMBIN,

*Plaintiff,*

BURTON T. FRIED,

*Plaintiff-Appellant,*

– v. –

LVI SERVICES, INC., LVI PARENT CORP., SCOTT E. STATE,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## JOINT APPENDIX
## Volume VI of VI (Pages A-1064 to A-1315)

JACKSON LEWIS LLP
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4006

  – and –

LITTLER MENDELSON, P.C.
One Century Tower, Suite 300
265 Church Street
New Haven, Connecticut 06510
(203) 974-8700

*Attorneys for Defendants-Appellees*

THOMPSON WIGDOR LLP
85 Fifth Avenue
New York, New York 10003
(212) 257-6800

  – and –

MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capital Avenue, Suite 201
Hartford, Connecticut 06106
(860) 246-2466

*Attorneys for Plaintiff-Appellant*

i

# Table of Contents

**Page**

Lower Court Docket Entries .................................................... A-1

Motion by Defendants for an Order Granting Summary
    Judgment, Dated April 26, 2012 ........................................... A-13

Defendants' Local Rule 56(a)1 Statement,
    Dated April 26, 2012 ............................................................. A-15

Affirmation of Michael D. Mann, for Defendants, in Support
    of Motion, Dated April 26, 2012 ......................................... A-22

Exhibit A to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated September 21, 2010 .................................................... A-28

Exhibit B to Mann Affirmation -
Excerpts from Deposition Transcript of Burton T. Fried,
Dated May 20, 2011 ............................................................. A-30

Exhibit C to Mann Affirmation -
Complaint, Dated November 30, 2011................................. A-93

Exhibit D to Mann Affirmation -
LVI Services Investment Memorandum,
Dated October 28, 2005 ....................................................... A-107

Exhibit E to Mann Affirmation -
Employment Agreement between Burton T. Fried and
LVI Services, Inc., Dated November 16, 2005 .................... A-119

Exhibit F to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated September 22, 2010 .................................................... A-123

Exhibit G to Mann Affirmation -
Email from Burton T. Fried to John Leonard and
Paul Cutrone, Dated September 21, 2010 ............................ A-125

Exhibit H to Mann Affirmation -
Email from Brian Simmons to Scott E. State,
Dated September 23, 2010 .................................................... A-127

Exhibit I to Mann Affirmation -
Email from Scott E. State to Brian Simmons
and Rajay Bagaria, Dated October 29, 2010 ....................... A-130

ii

**Page**

Exhibit J to Mann Affirmation -
Excerpts from Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................ A-133

Exhibit K to Mann Affirmation -
Email from Burton Fried to Scott E. State,
Dated October 3, 2010 ........................................................ A-151

Exhibit L to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 13, 2010 ...................................................... A-154

Exhibit M to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated October 3, 2010 ........................................................ A-162

Exhibit N to Mann Affirmation -
Email from Robert Hogan to Scott E. State,
Dated October 5, 2010 ........................................................ A-165

Exhibit O to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 ...................................................... A-168

Exhibit P to Mann Affirmation -
Email from Burton T. Fried to Scott E. State,
Dated October 14, 2010 ...................................................... A-170

Exhibit Q to Mann Affirmation -
Email from Scott E. State to Scott Simmons
and Robert Hogan, Dated October 14, 2010 ....................... A-173

Exhibit R to Mann Affirmation -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010 ...................................................... A-176

Exhibit S to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated October 28, 2010 ...................................................... A-179

Exhibit T to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 2, 2010 ..................................................... A-182

Exhibit U to Mann Affirmation -
Email from Burton T. Fried to Brian Simmons,
Dated June 23, 2006 ............................................................ A-186

iii

**Page**

Exhibit V to Mann Affirmation -
Email from Burton T. Fried to Mike Lane,
Dated June 30, 2005 ............................................................  A-189

Exhibit W to Mann Affirmation -
Email from Brian Simmons to Scott E. State
and Rajay Bagaria, Dated November 10, 2010 ...................  A-191

Exhibit X to Mann Affirmation -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011 ............................................................  A-193

Exhibit Y to Mann Affirmation -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010 ...................................................  A-209

Exhibit Z to Mann Affirmation -
Email from Scott E. State to Brian Simmons and
Rajay Bagaria, Dated November 16, 2010 ..........................  A-216

Exhibit AA to Mann Affirmation -
Email from Scott E. State to John Leonard,
Dated November 30, 2010 ...................................................  A-223

Exhibit BB to Mann Affirmation -
Complaint in *Fried v. LVI Services, Inc., et al.*, Southern
District Case No. 10-cv-9308, Filed December 13, 2010 ....  A-226

Exhibit CC to Mann Affirmation -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011 .................................................................  A-254

Exhibit DD to Mann Affirmation -
Charge of Discrimination Filed with the State of Connecticut,
Commission on Human Rights and Opportunities on
May 16, 2011 ......................................................................  A-287

Exhibit EE to Mann Affirmation -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Filed October 27, 2011 ...................................  A-303

iv

**Page**

Exhibit FF to Mann Affirmation -
Opinion and Order of the Honorable Jed S. Rakoff
in *Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011......................   A-306

Exhibit GG to Mann Affirmation -
Docket Entries in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308 ..............................   A-342

Exhibit HH to Mann Affirmation -
Email from Robert Hogan to Brian Simmons,
Dated September 19, 2010 ...................................................   A-360

Exhibit II to Mann Affirmation -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities ................................................................   A-364

Exhibit JJ to Mann Affirmation -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
November 14, 2011 .............................................................   A-367

Exhibit KK to Mann Affirmation -
Scheduling Order of the United States Court of Appeals
for the Second Circuit, Dated March 1, 2012 .....................   A-370

Declaration of Shaffin A. Datoo, for Plaintiff, in Opposition
to Motion, Dated May 31, 2012 ...........................................   A-372

Exhibit 1 to Datoo Declaration -
Complaint, Dated November 30, 2011
(Reproduced herein at pp. A-93–A-106)

Exhibit 2 to Datoo Declaration -
Answer, Dated February 16, 2011 .......................................   A-377

Exhibit 3 to Datoo Declaration -
Excerpts from Deposition Transcript of Rajay Bagaria,
Dated June 23, 2011 ............................................................   A-392

Exhibit 4 to Datoo Declaration -
Excerpts from Deposition Transcript of Paul Cutrone,
Dated June 1, 2011 ..............................................................   A-405

v

**Page**

Exhibit 5 to Datoo Declaration -
Excerpts from Deposition Transcript of Gerald Girardi,
Dated May 23, 2011 ............................................................  A-431

Exhibit 6 to Datoo Declaration -
Excerpts from Deposition Transcript of Greg DiCarlo,
Dated June 2, 2011 ............................................................  A-449

Exhibit 7 to Datoo Declaration -
Excerpts from Deposition Transcript of John Leonard,
Dated June 3, 2011 ............................................................  A-464

Exhibit 8 to Datoo Declaration -
Excerpts from Deposition Transcript of John Schnabel,
Dated June 1, 2011 ............................................................  A-491

Exhibit 9 to Datoo Declaration -
Email from Scott E. State to David S. Hicks,
Dated November 5, 2010 ....................................................  A-507

Exhibit 10 to Datoo Declaration -
Excerpts from Human Resources "The Bible" ....................  A-509

Exhibit 11 to Datoo Declaration -
Deposition Transcript of Scott E. State,
Dated May 26, 2011 ............................................................  A-513

Exhibit 12 to Datoo Declaration -
Deposition Transcript of Burton T. Fried,
Dated May 20, 2011 ............................................................  A-620

Exhibit 13 to Datoo Declaration -
Employment Agreement between Burton T. Fried and
LVI Services, Inc., Dated November 16, 2005
(Reproduced herein at pp. A-119–A-122)

Exhibit 14 to Datoo Declaration -
Document Entitled "VI Services Names Robert A.
McNamara as President and CEO," Dated
July 13, 2006 ......................................................................  A-769

Exhibit 15 to Datoo Declaration -
Declaration of Burton T. Fried in *Fried v. LVI Services,
Inc., et al.*, Southern District Case No. 10-cv-9308,
Dated June 20, 2011 ............................................................  A-772

vi

**Page**

Exhibit 16 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated May 12, 2010 ............................................................. A-778

Exhibit 17 to Datoo Declaration -
Document Entitled "AIC Memorandum,"
Dated June 11, 2010 ............................................................. A-780

Exhibit 18 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 14, 2010 .................................................... A-799

Exhibit 19 to Datoo Declaration -
Email from Scott E. State to Robert Hogan,
Dated September 19, 2010 .................................................... A-802

Exhibit 20 to Datoo Declaration -
Document Entitled "LVI Services Names Scott E. State
as President and CEO," Dated September 27, 2010 ............ A-806

Exhibit 21 to Datoo Declaration -
Email from Scott E. State to Scott Simmons,
Dated October 19, 2010
(Reproduced herein at pp. A-176–A-178)

Exhibit 22 to Datoo Declaration -
Minutes of Meeting of the Boards of Directors
of LVI Parent Corp............................................................... A-809

Exhibit 23 to Datoo Declaration -
Excerpts from Deposition Transcript of Jeffrey Smith,
Dated June 8, 2011 ............................................................... A-813

Exhibit 24 to Datoo Declaration -
Letter from Douglas H. Wigdor to Scott E. State,
Dated November 15, 2010 .................................................... A-826

Exhibit 25 to Datoo Declaration -
Handwritten Notes by Gerald Girardi,
Dated November 15, 2010 .................................................... A-832

Exhibit 26 to Datoo Declaration -
Email from Brian Simmons to Burton T. Fried,
Dated November 16, 2010
(Reproduced herein at pp. A-209–A-215)

vii

**Page**

Exhibit 27 to Datoo Declaration -
Scott E. State's Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 14, 2011 .................................................................... A-834

Exhibit 28 to Datoo Declaration -
Brian Simmons' Objections and Answer to Plaintiff's First
Set of Interrogatories in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
March 24, 2011 .................................................................... A-851

Exhibit 29 to Datoo Declaration -
Gerald Girardi's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 ..................................... A-866

Exhibit 30 to Datoo Declaration -
Rajay Bagaria's Revised Objections and Answers
to Plaintiff's First Set of Interrogatories in *Fried v.
LVI Services, Inc., et al.*, Southern District Case No.
10-cv-9308, Dated March 24, 2011 ..................................... A-881

Exhibit 31 to Datoo Declaration -
Letter from Burton T. Fried to the Board of Directors
of LVI Parent Corp., *et al.*, Dated November 30, 2010 ....... A-896

Exhibit 32 to Datoo Declaration -
Order of the Honorable Jed S. Rakoff in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Dated September 2, 2011 .......................... A-898

Exhibit 33 to Datoo Declaration -
Excerpts from Deposition Transcript of Brian Simmons,
Dated May 25, 2011 ............................................................ A-901

Exhibit 34 to Datoo Declaration -
Email from Scott E. State to Scott Simmons and
Robert Hogan, Dated October 14, 2010
(Reproduced herein at pp. A-173–A-176)

viii

**Page**

Exhibit 35 to Datoo Declaration -
Opinion and Order of the Honorable Jed S. Rakoff in
*Fried v. LVI Services, Inc., et al.*, Southern District
Case No. 10-cv-9308, Filed October 3, 2011
(Reproduced herein at pp. A-306–A-341)

Exhibit 36 to Datoo Declaration -
Email from John Leonard to Scott E. State,
Dated October 14, 2010, with Attachments ......................... A-912

Exhibit 37 to Datoo Declaration -
Email from Burton T. Fried to Brian Simmons,
Dated September 22, 2010
(Reproduced herein at pp. A-123–A-124)

Exhibit 38 to Datoo Declaration -
Email from Burton Fried to John Leonard and Paul
Cutrone, Dated September 23, 2010 ................................... A-918

Exhibit 39 to Datoo Declaration -
Amended Complaint in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Filed
February 3, 2011
(Reproduced herein at pp. A-254–A-286)

Exhibit 40 to Datoo Declaration -
Stipulation of Dismissal with Prejudice in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Filed October 27, 2011
(Reproduced herein at pp. A-303–A-305)

Exhibit 41 to Datoo Declaration -
Charge of Discrimination Filed with the State of
Connecticut, Commission on Human Rights and
Opportunities on
May 16, 2011
(Reproduced herein at pp. A-287–A-302)

Exhibit 42 to Datoo Declaration -
Release of Jurisdiction, Dated October 17, 2011, from the
State of Connecticut, Commission on Human Rights
and Opportunities
(Reproduced herein at pp. A-364–A-366)

ix

**Page**

Exhibit 43 to Datoo Declaration -
Excerpts from Memorandum of Law in *Fried v.
LVI Services, Inc., et al.*, Southern District Case
No. 10-cv-9308, Dated June 10, 2011.................................  A-920

Exhibit 44 to Datoo Declaration -
Notice of Appeal in *Fried v. LVI Services, Inc., et al.*,
Southern District Case No. 10-cv-9308, Dated
November 14, 2011
(Reproduced herein at pp. A-367–A-369)

Exhibit 45 to Datoo Declaration -
Brief of The Equal Opportunity Commission *Amicus
Curiae*, Filed in the United States Court of Appeals
for the Second Circuit on March 5, 2012 ............................  A-922

Plaintiff's Local Rule 56(a)2 Statement,
    Dated May 31, 2012 ............................................................  A-965

Notice of Appeal, Dated March 28, 2013 ...............................  A-974

## OTHER RELEVANT DOCUMENTS

Charge of Discrimination Filed with the Equal Employment
    Opportunity Commission ....................................................  A-976

Answer to Amended Complaint in *Fried v. LVI Services, Inc.,
    et al.*, Southern District Case No. 10-cv-9308, Dated
    April 18, 2011 .....................................................................  A-981

Memorandum of Law by Defendants in Support of Motion in
    *Fried v. LVI Services, Inc., et al.*, Southern District Case
    No. 10-cv-9308, Dated June 10, 2011.................................  A-1003

Memorandum of Law by Plaintiff, in Opposition to Motion
    in *Fried v. LVI Services, Inc., et al.*, Southern District Case
    No. 10-cv-9308, Dated June 20, 2011.................................  A-1032

Reply Memorandum of Law, by Defendants, in Further
    Support of Motion in *Fried v. LVI Services, Inc., et al.*,
    Southern District Case No. 10-cv-9308, Dated
    June 27, 2011 .....................................................................  A-1064

Transcript of Oral Argument Proceedings held before the
    Honorable Jed S. Rakoff, Dated July 6, 2011 .....................  A-1078

x

**Page**

Appellant's Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    February 27, 2012 ............................................................... A-1113

Appellees' Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    May 29, 2012 ...................................................................... A-1170

Appellant's Reply Brief in *Fried v. LVI Services, Inc., et al.*,
    Second Circuit Docket No. 11-4791-cv, Dated
    June 12, 2012 ...................................................................... A-1228

Transcript of Proceedings in *Fried v. LVI Services, Inc., et al.*, Southern District Case No. 10-cv-9308, Dated
    October 5, 2012 ................................................................... A-1260

Mandate in *Fried v. LVI Services, Inc., et al.*, Second Circuit
    Docket No. 11-4791-cv, Dated December 26, 2012 ............ A-1309

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                              :
BURTON T. FRIED,                                              :
                                                              :   10 Civ. 9308 (JSR) (JCF)
                              Plaintiff,                       :
                                                              :
              - against -                                     :
                                                              :
LVI SERVICES, INC.; LVI PARENT CORP.,                         :
CODE HENNESSY SIMMONS LLC d/b/a/ CHS                          :
PRIVATE EQUITY V LP; APOLLO                                   :
INVESTMENT CORP.; SCOTT E. STATE, in his                      :
official and individual capacities; BRIAN                      :
SIMMONS, in his official and individual capacities;  :
RAJAY BAGARIA, in his official and individual                 :
capacities; GERALD J. GIRARDI, in his official                :
and individual capacities,                                     :
                                                              :
                              Defendants.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


SIDLEY AUSTIN LLP

ATTORNEYS FOR Defendants
            LVI Services, Inc., LVI Parent Corp., Scott E. State,
            Brian Simmons, Rajay Bagaria and Gerald J.
            Girardi.


787 SEVENTH AVENUE
NEW YORK, NEW YORK  10019
(212) 839-5300

**THIS PAGE INTENTIONALLY LEFT BLANK**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT .............................................................................1

I.    FRIED'S ADEA CLAIMS SHOULD BE DISMISSED ........................1

    A.    Fried Fails to Adduce Any Competent Evidence That Age Was the
        "But For" Cause of His Termination............................................1

        1.    Fried Tried to Interfere with State's Management of LVI .............3

        2.    State's Remark Alone Cannot Defeat Summary Judgment.............3

        3.    The Allocation of Fried's Proposed List of Responsibilities
            to Other Managers Is Irrelevant.......................................................5

II.   FRIED'S AGE DISCRIMINATION CLAIMS UNDER THE NYCHRL
    SHOULD BE DISMISSED WITH PREJUDICE ...................................6

III.  FRIED'S RETALIATION CLAIMS SHOULD BE DISMISSED .......................7

    A.    Fried Fails to Rebut the Legitimate Business Reason for His
        Termination .................................................................................7

    B.    Defendants Have Articulated Legitimate Business Reasons for
        Closing The Westport Office and Eliminating Shari Dembin's
        Position ........................................................................................9

CONCLUSION .....................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Deebs v. ALSTOM Transp., Inc.,
   346 Fed. Appx. 654 (2d Cir. 2009)...............................................................9

Deebs v. ALSTOM Transp., Inc.,
   550 F. Supp. 2d 385 (W.D.N.Y. 2008).........................................................5

Giarratano v. Edison Hotel,
   No. 08 Civ. 1849, 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009)..................4

Hird-Moorhouse v. Belgian Mission to the U.N.,
   No. 03 Civ. 9688, 2010 WL 3910742 (S.D.N.Y. Oct. 5, 2010) ...............10

Hoffman v. Parade Publ'ns.,
   15 N.Y.3d 285 (2010).............................................................................6, 7

Hoffman v. Parade Publ'ns.,
   878 N.Y.S. 2d 320 (1st Dep't. 2009)...........................................................6

Hofmann v. Dist. Council 37,
   No. 99 Civ. 8636, 2004 WL 1936242 (S.D.N.Y. Aug. 31, 2004).............4

Hunter v. St. Francis Hosp.,
   281 F. Supp. 2d. 534 (E.D.N.Y. 2003) ........................................................9

Lightfoot v. Union Carbide Corp.,
   No. 92 Civ. 6411, 1994 WL 184670 (S.D.N.Y. May 12, 1994) ................7

Morris v. N.Y.C. Dep't. of Sanitation,
   No. 99 Civ. 4376, 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003)................4

O'Reilly v. Marina Dodge, Inc.,
   No. 10-2977-cv, 2011 WL 1897489 (2d Cir. May 19, 2011).................4, 5

Saenger v. Montefiore Med. Ctr.,
   706 F. Supp. 2d 494 (S.D.N.Y. 2010) .........................................................1

Schreiber v. Worldco LLC,
   324 F. Supp. 2d 512 (S.D.N.Y. 2004)..........................................................4

Sciola v. Quattro Piu, Inc.,
   361 F. Supp. 2d 61 (E.D.N.Y. 2005) ...........................................................4

Shapiro v. N.Y.C. Dep't. of Educ.,
    561 F. Supp 2d 413 (S.D.N.Y. 2008) ........................................................................ 4

Silver v. N. Shore Univ. Hosp.,
    490 F. Supp. 2d 354 (S.D.N.Y. 2007) ................................................................... 8, 9

Slattery v. Swiss Reinsurance Am. Corp,
    248 F.3d 87 (2d Cir. 2001) .................................................................................... 9

Suttell v. Mfrs. Hanover Trust Co.,
    793 F. Supp. 70 (S.D.N.Y. 1992) ........................................................................... 5

## PRELIMINARY STATEMENT

"It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age . . . . [T]he ADEA was prompted by the concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." <u>Saenger v. Montefiore Med. Ctr.</u>, 706 F. Supp. 2d 494, 510 (S.D.N.Y. 2010) (citation omitted).  Here, it is undisputed that Burton Fried had the ability to perform a valuable role for LVI.  It was not his age but his refusal to relinquish control of the reins of management to Scott State, LVI's new President and CEO, that caused his dismissal.

As set forth more fully below, the documents and testimony Fried presents as evidence of discrimination is the very evidence that supports Defendants' decision to create a role for Fried that would not interfere with State's ability to run LVI as he saw fit.  In his opposing brief (the "Opp."), Fried has failed to set forth any evidence, other than his own conjecture, that Defendants' reasons for terminating his employment and that of his daughter are pretextual and mask an intent to discriminate against him on the basis of his age or retaliate against him because of his complaint.  As such, Fried's Amended Complaint should be dismissed in its entirety.

I.    <u>FRIED'S ADEA CLAIMS SHOULD BE DISMISSED</u>

   A.    <u>Fried Fails to Adduce Any Competent Evidence That Age Was the "But For" Cause of His Termination</u>

In the Opposition, Fried fails to set forth evidence that Defendants' decision to restructure his role was anything but a legitimate business decision made after careful consideration, and fails to sustain his burden of showing that age was the "but for" reason for his termination.

Fried's "evidence" to support this final burden consists of: (1) an email in which State asks about a contractual provision that required unanimous Board consent to remove Fried as Chairman; (2) State's email setting forth the conditions for his acceptance of the position of

1

President and CEO, including his understanding that Fried would retire from the day-to-day

running of LVI and assume a consultant role, as Fried had previously promised; (3) State's

receipt of assurances from Fried that he would give State the independence to run LVI without

interference; (4) Defendants' supposed failure to allege that Fried interfered with State; (5) no

other LVI senior managers were fired; (6) the redistribution of Fried's responsibilities to

"younger" employees and (7) State's statement during the course of a conversation about Fried's

role: "Burt, you are 71 years of age, how much longer do you expect to work? What if you get

hit by a bus?" (Opp., 12-13 & 17; Seltzer Aff., Exh. B, 18-19.)  Other than the incorrect

statement that Defendants failed to allege that Fried interfered with State, which is addressed

below, the other evidence is fully supportive of Defendants' position that Fried's employment

was terminated because of his stubborn refusal to fully turn the reins of governance over to State

and to accept the role he had agreed to assume.[1]

    The undisputed facts that put Fried's purported "evidence" in context are entirely ignored

in the Opposition.  Fried agreed in writing that he would step away from the day-to-day running

of the Company when State expressed his concern that he would not have the autonomy he

needed to run LVI.[2]  Unambiguously, Fried wrote "I will repeat my offer to Scott.  I am prepared

to remain at LVI until he, the Board or I decide its time for me to leave . . . an offer he can't

refuse."  (Seltzer Aff., Exh. E.)  These reassurances justly led Defendants to assume that Fried

was indeed ready to "retire" from his management obligations and assume an advisory role at the

pleasure of the new CEO.  State's pre-hire inquiries, his request for reassurance that Fried would

---

[1] Fried's "evidence" that no other senior managers were terminated along with Fried is a red
herring. Fried's discharge was not the result of a reduction in force, but, rather, was the
consequence of his rejection of the consultancy offer made by the Board.
[2] Fried's agreement to step down from the day-to-day running of LVI had been a condition of the
sale to CHS in 2005. (Seltzer Aff., Exh. B, 77; see also Main Brief at pp. 2-3.)

keep his word and his baffled question "Burt, you are 71 years of age, how much longer do you expect to work? What if you get hit by a bus?" in response to Fried's extensive list of managerial responsibilities he proposed to perform, are readily explained by Fried's dramatic reversal of position. (Seltzer Aff., Exhs. E, F, G, J, K, L, O & V.)

### 1.    Fried Tried to Interfere with State's Management of LVI

Contrary to Fried's unfounded contention that "Defendants do not even allege that Mr. Fried actually interfered with State" (Opp., 13), the record is replete with undisputed evidence that, in fact, Fried began a campaign of interference from State's earliest days at LVI. Specifically, during the transition period, Fried demanded that State confer with him prior to making decisions, leading State to protest to the Board that this was "exactly the issue I had prior to accepting the job." (Seltzer Aff., Exhs. J, K, L & M.) Moreover, Fried communicated his intent to continue to involve himself with LVI's management by presenting State with a list of responsibilities he expected to perform, ranging from the development and implementation of business initiatives to tasks as mundane as the monitoring of all employee air travel. (Seltzer Aff., Exh. O.) It was precisely Fried's blind refusal to accept a role as envisioned by the CEO and Board that led to the decision to terminate his employment with LVI and offer him a consultancy. This decision was communicated to Fried by Brian Simmons in an email that preceded the Board Meeting in which Fried complained of discrimination. (Seltzer Aff., Exh. S.) Defendants, therefore, have set forth sufficient evidence of Fried's interference with State's management of LVI in contravention of the promises he repeatedly made to Defendants.

### 2.    State's Remark Alone Cannot Defeat Summary Judgment

Realizing that all of his "evidence" of pretext can be readily explained when put into context, Fried focuses the large part of his ADEA argument on State's statement of October 19, 2010. Initially, Fried contends that Defendants' explanation that the statement was an inquiry

into Fried's future plans must be false because State "admittedly knew that [Fried] had no

intention of retiring." Fried supports this proposition with two emails. (Opp., 13.) The first is an

email from State, dated September 19, 2010, prior to his acceptance of the position, indicating

that State had been told by members of the senior team that Fried would never retire. (Datoo

Aff., Exh. 19.) Because of these representations, however, State asked to have a conversation

with Fried to obtain reassurance from him that he was indeed ready to relinquish responsibility

for the management of LVI – a reassurance Fried gave him on September 22, 2010. (Seltzer

Aff., Exh. F.) The second email that purportedly shows that State knew that Fried "had no

intention of retiring" is, in fact, an email from State shortly after his receipt of the list of Fried's

proposed duties, in which State expresses frustration at Fried's ever-shifting position relating to

his role. (Datoo Aff., Exh. 34.) Neither email is supportive of Fried's proposition. These emails,

in fact, amply prove that State was blind-sided by Fried's change of position, from his

reassurances of September 22, 2010 that he would accept any role proposed by State or the

Board, to his sudden demand for pivotal responsibilities on October 14, 2010.[3]

Tellingly, the only case cited by Fried that was decided after the Supreme Court's Gross

decision, O'Reilly v. Marina Dodge, Inc., No. 10-2977-cv, 2011 WL 1897489 (2d Cir. May 19,

2011), gives a good indication of a plaintiff's burden in proving that age was the "but for" reason

---

[3] The cases cited by Fried are inapposite because they all deal with situations involving evidence
well beyond a single comment by a decision-maker. See Giarratano v. Edison Hotel, No. 08 Civ.
1849, 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009) (in addition to purportedly ageist comment,
the plaintiff set forth evidence that the defendant's legitimate business reason for the adverse
action was pretextual); Sciola v. Quattro Piu, Inc., 361 F. Supp. 2d 61 (E.D.N.Y. 2005) (same);
Morris v. N.Y.C. Dep't. of Sanitation, No. 99 Civ. 4376, 2003 WL 1739009 (S.D.N.Y. Apr. 2,
2003) (same); Schreiber v. Worldco LLC, 324 F. Supp. 2d 512 (S.D.N.Y. 2004) (plaintiff alleged
multiple statements from numerous management members directly denigrating his age);
Hofmann v. Dist. Council 37, No. 99 Civ. 8636, 2004 WL 1936242 (S.D.N.Y. Aug. 31, 2004)
(same); Shapiro v. N.Y.C. Dep't. of Educ., 561 F. Supp 2d 413 (S.D.N.Y. 2008) (defendant was
unable to articulate legitimate business reasons for the adverse actions).

for an adverse employment action. In a case involving the termination of a plaintiff's employment due to poor performance, the court denied summary judgment where, in addition to the evidence of numerous derogatory ageist remarks, the defendant failed to provide evidence of alleged performance deficiencies, including discipline or negative performance evaluations, and the plaintiff provided abundant evidence of good work performance. Id. at *2-3. In stark contrast to O'Reilly, Fried fails to adduce evidence, other than the single comment by State, to support his contention that the reason for Defendants' actions was pretextual and based on age.[4]

### 3.  The Allocation of Fried's Proposed List of Responsibilities to Other Managers Is Irrelevant

Finally, Fried alleges that the reassignment of "his duties" to "younger" managers is evidence of discrimination. (Opp., 17.) Initially, with the exception of one manager, the job duties on the list proposed to State by Fried were ultimately assumed by individuals over the age of 40, including State, who was 47 at the time. (Opp., 8.) Moreover, the reassignment of a terminated employee's duties to younger employees is not itself indicative of age discrimination. See Deebs v. ALSTOM Transp., Inc., 550 F. Supp. 2d 385, 390-91 (W.D.N.Y. 2008) ("reassignment of [the plaintiff's] duties to other, younger employees does not dictate a finding that other employees were hired into the [plaintiff's] position, or that the position was effectively reinstated at any relevant time following [the plaintiff's] discharge"); Suttell v. Mfrs. Hanover Trust Co., 793 F. Supp. 70, 73 (S.D.N.Y. 1992) (reassigning the plaintiff's duties to younger employees after his job was eliminated did not mean that the plaintiff was "replaced" by a younger employee for purposes of his age discrimination claim).

---

[4] Plaintiff's proclamations about his "exceptional" performance prior to State's hire are irrelevant. (Opp., 16.) Defendants never stated that the reason for their decision relating to Fried's employment was based on performance, and, in fact members of the Board of Directors praised his performance as interim CEO. Id. His prior performance, therefore, is of no consequence. The favorable comments by the Board members do, however, support the same actor inference, as set forth in the Main Brief at page 19.

II.    **FRIED'S AGE DISCRIMINATION CLAIMS UNDER THE NYCHRL SHOULD
BE DISMISSED WITH PREJUDICE**

Although Plaintiff states in the Opposition that he worked out of the New York City

office "on occasion," attended meetings in New York City, and called and/or emailed personnel

in the New York City Office (Opp., 3), he cannot escape (nor does he really deny) the undisputed

fact that at the time of the purported discrimination, Fried both lived and worked in Westport,

Connecticut. (Compl., ¶¶ 15, 27.)  Despite this concession, Fried argues, without benefit of any

supporting law, that he was "impacted" by the adverse decision in New York City because his

termination prevented him from working on projects, traveling to meet with clients and

overseeing employees in New York City. (Opp., 19.)  This is a misinterpretation of the law.

As set forth in the Main Brief, New York courts have consistently held that the "impact"

of an adverse decision when determining the application of the NYCHRL is the impact of the

decision on the plaintiff's employment. (Main Br., 16-17.)  Regardless of Fried's unsupported

interpretation, Fried's job was based in Connecticut and was eliminated, thus impacting Fried, in

Connecticut, not in New York City.

Plaintiff's reliance on Hoffman v. Parade Publ'ns., 15 N.Y.3d 285 (2010) is puzzling, as

it is not even minimally supportive of his claim. (Opp., 18.)  Hoffman, a resident of Georgia,

who worked in Atlanta, alleged that he had "frequent in-person meetings" in New York City,

attended quarterly meetings in New York City, and he was managed from and the decision to

terminate him was made and executed in New York City.  Hoffman v. Parade Publ'ns., 878

N.Y.S. 2d 320, 322 (1st Dep't. 2009).  The Court of Appeals rejected Hoffman's claim, holding

that the NYCHRL protects only those who felt the impact of an adverse decision in the city,

namely those "who work in the city." 15 N.Y.3d at 291.  The Court explained: "the impact

requirement is relatively simple for courts to apply and litigants to follow, leads to predictable

6

results, and confines the protections of the NYCHRL to those who are meant to be protected –

those who work in the City."[5] Id.  Because, Fried was employed in LVI's Connecticut office, the

impact of his termination occurred in Connecticut, and his NYCHRL claim must be dismissed.

## III.    FRIED'S RETALIATION CLAIMS SHOULD BE DISMISSED

### A.    Fried Fails to Rebut the Legitimate Business Reason for His Termination

In the Opposition, Fried contends that he has set forth "direct evidence" of retaliation,

thereby relieving him of the requirement of proving that the legitimate business reason

articulated by Defendants is pretext for retaliation.  (Opp., 21.)  The testimony and documents

cited by Plaintiff are, however, not evidence of discrimination at all, let alone "direct evidence."

Gerald Girardi's testimony and contemporaneous notes, state: "Burt sent preemption letter.

Ignore. Good faith letter offer to Burt Fried.  Next step send out letter to Burt."  (Datoo Aff.,

Exh. 5, 82-92, Exh. 25.)  This evidence indicates only that, despite receipt of the letter from

Fried's counsel on November 15, 2010, the Board was prepared to move forward with presenting

the offer of consultancy to Fried as had been planned even before Fried's complaint at the

November 4, 2010 Board meeting.  The offer of consultancy had been made by Simmons to

Fried on November 2, 2010 and a draft of the offer letter had been circulated for comment by

November 11, 2010, four days prior to the receipt of Fried's demand letter.  (Seltzer Aff., Exh. S;

Affirmation of Joanne Seltzer in Support of Defendants' Reply Memorandum of Law ("Seltzer

Reply Aff."), Exh. A.)  The cited portions of the testimony of another Board member, John

Schnabel, similarly fail to lend support to Fried's claim.  In the cited pages, Schnabel merely

testifies about a telephone conference with the Board relating to the receipt of Fried's demand

---

[5] Plaintiff's suggestion that Hoffman rendered Lightfoot v. Union Carbide Corp., No. 92 Civ. 6411, 1994 WL 184670 (S.D.N.Y. May 12, 1994), bad law is entirely inaccurate. (Opp., 20 n 2.) Not only is Lightfoot good law, but it is in accord with the Hoffman ruling that the protections of the NYCHRL should be given to individuals who have been impacted in the city by discriminatory decisions. See id. at *5.

letter (Datoo Aff., Exh. 8, 138-39) and that he "assumes" that Fried's *demand letter* was in response to Simmons's letter offering Fried the consulting agreement. Schnabel's testimony is, therefore, a total reversal of Fried's contention. (Datoo Aff. Exh., 8, 145-48.)[6] This evidence, far from proving that the offer of the consultancy was triggered by Fried's demand letter of November 15, 2010, instead shows the Board's intent to ignore Fried's litigation threat and proceed with the offer of a consultant role with LVI.

Fried's Opposition to Defendants' motion to dismiss his retaliation claim boils down to the temporal proximity between his Complaint and Simmons's proposal of November 16, 2011, which terminated his employment as an LVI employee and offered him, instead, a consultancy agreement. In addition to the insufficiency of this temporal proximity alone to defeat Defendants' motion, the proximity is totally undermined by the fact that the discussions about the decision to ask Fried to assume a consultant role were considered by State and members of the Board even before State accepted the position of CEO and President. (Datoo Aff., Exh. 19.)

The single case cited by Fried in opposition to Defendants' proposition that the decisions made with respect to Fried's employment were made prior to his complaints of discrimination, Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354 (S.D.N.Y. 2007), is distinguishable. In Silver, a pre-Gross mixed-motive case, the Court found the temporal proximity between the plaintiff's filing of an EEOC charge and the decision to terminate him to be enough to show causation – a necessary element of a *prima facie* claim. Id. at 364. In its ultimate determination to deny the defendant's motion for summary judgment, however, the Court considered all of the evidence in the case, not just the temporal proximity, including direct evidence of the manager's

---

[6] This is only one of the many "facts" in Plaintiff's response to Defendants' Rule 56.1 Statement of Material Facts that are not supported by the record. Defendants are prepared to submit a summary of these unsupported "facts" and what the record really reflects at the Court's request.

testimony that the plaintiff's age was linked to his decision-making process. Id. at 360-61.  As

there is no similar direct evidence in Fried's case, this case can be easily distinguished from his.

Fried's single case stands in stark contrast to the numerous decisions that have found that if an

employer's conduct before and after the employee complaint is consistent, the post-complaint

conduct is not retaliatory.  See e.g., Slattery v. Swiss Reinsurance Am. Corp, 248 F.3d 87, 94-95

(2d Cir. 2001); Hunter v. St. Francis Hosp., 281 F. Supp. 2d. 534, 547 (E.D.N.Y. 2003).

**B.    Defendants Have Articulated Legitimate Business Reasons for Closing The
        Westport Office and Eliminating Shari Dembin's Position**

It is well settled that "claims arising from the results of a firm's force reduction will

generally not lie where the record 'demonstrate[s] that the reorganization was a business decision

made on a rational basis.'"  Deebs v. ALSTOM Transp., Inc., 346 Fed. Appx. 654, 657 (2d Cir.

2009) (citation omitted).  Defendants have adduced unrebutted evidence of a legitimate business

reason for closing LVI's Westport office – one of many necessary measures taken by LVI to cut

costs in 2011.  (Seltzer Aff. Exhs., AA, BB & CC.)  Fried challenges this reason by stating that,

even though the closing of the Westport office was contemplated as early as October 29, 2010,

Dembin's name was not raised until November 13, 2010; that State was the same actor in the

decision to terminate both Fried and Dembin and that she had not been selected in a prior

reduction in force.  (Opp., 24.)

Initially, it makes absolute sense that, as every employee in the Westport office other than

the legal personnel would be terminated, none of the individual employees, including Dembin

would have been brought up for individual discussion.  Second, the fact that the President and

CEO of LVI was involved in both termination decisions is not surprising and hardly evidence of

pretext.  Finally, the fact that Dembin had not been selected for a reduction prior to the closing of

9

the Westport office is irrelevant and likely attributable, in part, to her being Fried's daughter.[7]

Fried's unfounded supposition regarding the selection of Dembin for the reduction cannot overcome the undisputed fact that Dembin was one of 12 employees included in the RIF and that all the employees in the Westport Office, except the three-person legal department of LVI, were included in the RIF.[8]  In sum, Fried fails to allege anything more than Dembin is his daughter and that she was included in a 12-person reduction two months after Fried complained of discrimination.  This, without more, does not present an issue of material fact for a jury.

## CONCLUSION

For the reasons set forth above, and in Defendants' Memorandum of Law in Support of Summary Judgment, Defendants respectfully requests that the Court enter summary judgment dismissing the Complaint in its entirety, with prejudice.

Dated: June 27, 2011          SIDLEY AUSTIN LLP
       New York, New York

                              By:  _Joanne Seltzer_____
                                  Nicholas H. De Baun
                                  ndebaun@sidley.com
                                  Joanne Seltzer
                                  jseltzer@sidley.com
                                  Michael D. Mann
                                  mdmann@sidley.com
                                  787 Seventh Avenue
                                  New York, New York 10019
                                  (212) 839-5300

                                  Attorneys for Defendants

---

[7] The case cited by Fried involved a reduction impacting only one employee, rather than multiple employees as here.  See Hird-Moorhouse v. Belgian Mission to the UN, No. 03 Civ. 9688, 2010 WL 3910742, at *5 (S.D.N.Y. Oct. 5, 2010).

[8] The Westport Office remains open only until its lease expires this summer, at which point LVI's legal department will be transferred to other LVI offices.  State Tr., pp. 75-76.  Copies of the pages of the transcript of the deposition of Scott State cited in this Brief are attached to the Seltzer Reply Aff. as Exhibit B.

NY1 7715054v.2

```
                                                        1
     176JFROM                     Motions
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    BURTON T. FRIED,
3
4                 Defendant,
4
5          v.                            10 Civ. 9308 JSR
5
6    LVI SERVICES, et al.,
6
7                 Defendants.
7
8    ------------------------------x
8
9
10
11                                       July 6, 2011
11                                       6:45 p.m.
12
13
14
15
16   Before:
16
17                      HON. JED S. RAKOFF,
17
18                                       District Judge
18
19
20
21
22
23
24
25
        SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

176JFROM                    Motions
1                (In open court)
2                (Case called)
3                THE COURT:  Please be seated.
4                All right.  So we're here for oral argument on summary
5      judgment in Fried versus LVI Services which, unlike the
6      previous case, was sufficiently concise that I was able to
7      actually read the papers.  So for a different reason than
8      previously, I would still urge counsel -- I don't want to put
9      any time limits -- I urge counsel to really to address things
10     that you think maybe were not as fully developed in your papers
11     as you would have liked or for one reason or another you want
12     to particularly emphasize because I do have familiarity with
13     the papers.  So let me start with counsel for the defendants.
14               MS. SELTZER:  Yes, your Honor.
15               We're here today obviously to ask the court to grant
16     our motion for summary judgment because there is no evidence on
17     the record that our defendants discharged Mr. Fried because of
18     his age and there is no evidence that the discharge of
19     Mr. Fried or his daughter was in retaliation for the complaint.
20               THE COURT:  What about the statement, "Burt, you're 71
21     years' of age.  How much longer do you expect to work?"
22               MS. SELTZER:  That is the one piece of evidence put
23     forth by the plaintiffs.  I think what needs to be analyzed in
24     terms of that, the court is allowed to look at the context
25     within which that statement is made.  The context here is that

176JFROM                    Motions
1   you have a person, Mr. Fried, who as far back as 2005 agreed to
2   relinquish his day-to-day responsibilities for the management
3   of the company.  He made that same reassurance to Mr. Scott, to
4   Mr. Scott State, when Mr. Scott State took over the president
5   and reigns of president and CEO.
6          Mr. State, who knew Mr. Fried for a while, had doubts
7   Mr. Fried was going to relinquish and ask for reassurance he
8   would do so, and Mr. Fried sent a letter to Mr. Simmons, one of
9   the board members, that says, "I will repeat my offer to Scott.
10  I am prepared to remain at LVI until he, the board or I decide
11  it is time for me to leave, an offer he can't refuse.  He will
12  be in charge and get all of the room he wants from me."
13         On the basis of that statement, Mr. State accepted the
14  position of president and CEO.  Within dates of his acceptance,
15  Mr. Fried began to interfere with day-to-day running of the
16  company as set forth with e-mails that chide Mr. State for
17  making decisions without Mr. Fried's consent.  At that point
18  Mr. State, obviously baffled by this change, bait and switch
19  put on him by Mr. Fried, called a meeting for October 19th,
20  which is the meeting where that statement was purportedly made.
21         Taken in that context, Mr. State's statement to
22  Mr. Fried was purely hey, you told me that you were going to
23  let go of these responsibilities.  You have now given me a list
24  of about 20 responsibilities that are very, very much
25  managerial and supervisory.  When are you planning on packing
          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

4

176JFROM                    Motions
1    this in?  Now is the time.  You told me you were going to do it
2    and you should do it.  The law in this circuit actually allows
3    those kinds of dialogues between supervisors and employees with
4    respect to retirement plans.
5              Now, plaintiff's counsel is going to say well,
6    Mr. Fried had no intention to retire, but it is certainly clear
7    from the record and in front of the court Mr. Fried had
8    intention to relinquish every one of his day-to-day managerial
9    and operational responsibilities to Mr. State and changed his
10   mind about it.
11             If the court looks at that one piece of evidence in
12   that context, I think it will side with the cases that were
13   cited by defendants in their brief, that even a comment like
14   that, even when made by a decision-maker, if it is related to
15   retirement and transition planning, does not constitute
16   evidence of discrimination especially where a plaintiff has
17   raised that issue before, as Mr. Fried had numerous times prior
18   to that.
19             Other than that, there is nothing on the record.  The
20   most important thing that is missing from the record is any
21   kind of evidence that either the board of directors or
22   Mr. State considered Mr. Fried to be too old to perform a role
23   at LVI.
24             As the Southern District clarified in Sanger versus
25   Montefiore Medical Center which we cited in our brief, it is

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

176JFROM                    Motions

1   the very essence of age discrimination for an older worker to
2   be fired because the employer believes that productivity and
3   competence decline with age, and every piece of evidence that
4   the court is going to see in the record show exactly the
5   opposite.
6          Number one, the board of directors gave Mr. Fried the
7   interim position of president and CEO when he was already 70
8   years of age.  So the same actors of the same age gave him the
9   responsibilities, clearly not an indication they felt he was
10  too old to function in that role.
11         Number two, the accolades about his performance that
12  plaintiffs pointed to again indicate there was no body on that
13  board that thought Mr. Fried could not perform a role at LVI.
14         Lastly is Mr. State's own concern that Mr. Fried had
15  enough clout and power to get in the way of his independence,
16  being able to run the company  Those are not indications of a
17  company that thinks somebody is too old.  It is purely an
18  indication of a company that is concerned that a person is
19  going to interfere with a new president and CEO.
20         THE COURT:  What about on the retaliation claim, the
21  argument that I should draw or a reasonable fact-finder could
22  draw an inference of retaliation just from what Fried claims is
23  the month or so time-frame between the complaint and the act of
24  retaliation?
25         MS. SELTZER:  There are two parts for that analysis.


A-1083

176JFROM                    Motions

1  Number one is the first part, the prima facie case
2  where the inference does come in.  After the defendant comes
3  forward with a legitimate business reason, then is the time
4  obviously --
5           THE COURT:  It not only becomes a presumption, but it
6  doesn't mean an inference can't be drawn.
7           MS. SELTZER:  Let me address that particular point.
8           The record will show or shows Seltzer Exhibit S is a
9  November 2nd e-mail from Simmons to Mr. Fried.  Mr. Simmons was
10 a board member in which she suggests and asks for please do a
11 role as consultant and let go a response as an employee.
12          The second, November 11, which is four days before the
13 arrival of the demand letter, is an actual draft of the
14 consultancy agreement circulated to the board of directors.  It
15 is clear from the record the decision to offer Mr. Fried a
16 consultancy and to terminate his employment as employee of LVI
17 was made even well before the November 5th board of directors
18 meeting where he complained of discrimination.
19          I think what plaintiff is trying to say here is well,
20 you know, the plans were in place, but they weren't implemented
21 until after I complained.  That would take just about every
22 case, right?  All of a sudden a plaintiff is told we're
23 planning on terminating you because of performance reasons and
24 then just before the termination the plaintiff comes out with a
25 complaint and has a viable claim of retaliation.  That is not

```
                                                                 7
          176JFROM                  Motions
  1    how the law interprets this.
  2              If the adverse employment action had been begun and
  3    considered and processed prior to the complaint, it can't raise
  4    an inference of discrimination when it is actually implemented
  5    even subsequent to the complaint.
  6              THE COURT:  All right.  I know there are other issues,
  7    but let me hear at this point from plaintiff's counsel.  We'll
  8    come back to defense counsel.
  9              MR. WIGDOR:  Thank you.  There are many, many direct
 10    pieces of evidence in this case that go right towards proving
 11    either but for age discrimination under the age act or under
 12    the motivating factors standards set forth in the New York City
 13    Human Rights Law.
 14              THE COURT:  Before you get to that, why is the New
 15    York City Human Rights Law applicable here when the defendant
 16    is a resident of Connecticut and worked in Connecticut?
 17              MR. WIGDOR:  Because under the standard now under the
 18    Court of Appeals, your Honor had written a decision in the
 19    Rooney case which basically said you did not have to show
 20    impact so long as the termination decision was made in New
 21    York.
 22              The New York Court of Appeals ultimately said it had
 23    to have an impact in New York.  There is a significant impact
 24    of this case in New York.  Mr. Fried, first of all, worked in
 25    New York for many years.  He, after working in New York for
              SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

8

176JFROM                        Motions
1   many years, from September 2003 he worked exclusively in New
2   York City until July 2006.  At that point, he split his time
3   between New York City and Westport.
4           Thereafter, while Westport, Connecticut was his base,
5   he continued to work in New York City for LVI generating
6   business in New York, overseeing projects and attending
7   meetings in New York, and all of these things obviously have
8   had a direct impact to what goes on in New York on a day-to-day
9   basis because he has now been terminated.
10          The complaint of his age discrimination in New York at
11  a board meeting, that took place in New York.  LVI is based in
12  New York.  He made daily calls to New York City offices
13  regarding projects in New York City or the operations in New
14  York City.
15          He secured some of the largest contracts in New York
16  City.  He was paid from the New York City office out of LVI's
17  New York City bank account, and it is not like he was a
18  low-level employee who had no contacts with New York; this was
19  a very senior level person who had continuous contacts with New
20  York.
21          If your Honor looks at Mr. Fried's affidavit, which is
22  Exhibit 15 of our opposition motion, I'll see he lays out all
23  of the interactions that he had with New York, at Paragraphs 6,
24  7, 8, 9 and 10 specifically.
25          Due to his termination, New York is now feeling the
          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

A-1086

176JFROM                    Motions

1   effects that he's no longer there running the company or help
2   running the company, so there is a significant impact that New
3   York has had.
4           I think it is interesting, your Honor, that when
5   Mr. Fried was terminated, they wanted him to sign a release in
6   this case, and that is at Exhibit 26 to our opposition.  In
7   that release that was drafted by LVI, LVI in its release, at --
8   no paragraph number, but it is at Page 3, says this agreement
9   will be governed by the laws of the State of New York.
10          Obviously, LVI felt that New York law was important
11  when they wanted Mr. Fried to enter into a release upon
12  termination of his employment.  Now they're arguing before your
13  Honor well, hold on a second, your Honor, really New York law
14  shouldn't apply at all.
15          THE COURT:  I think that is an apples and oranges
16  argument at least or maybe I am not understanding it.
17          Two parties who enter into a contract could agree that
18  the governing law of their contract is a jurisdiction they want
19  to pick.  They could pick a jurisdiction that had nothing to do
20  with the contract.  They could say really like the law down in
21  Florida, Florida law will govern this or for that matter we
22  really like the law of Timbuktu.
23          Here the question is whether there has been actual, as
24  a factual matter, an impact that is sufficient under -- to
25  bring into play the statutory protections of New York law that

```
                                                              10
        176JFROM                    Motions
1       in effect governs torts.
2               So I really don't see the --
3               MR. WIGDOR:  That is why I left it for last.  It is
4       not the linchpin of our argument why I left it in.  I laid out
5       the contacts with Mr. Fried's employment with New York, and as
6       a result of him being terminated, that, all of those things
7       that he did on a daily basis in New York that are set forth in
8       this affidavit, that is the argument.  That is the argument.
9               I only raise the issue because they were the ones who
10      drafted that release.  It wasn't a negotiated contract because
11      they proposed it to Mr. Fried.  Mr. Fried didn't sign it, but
12      LVI proposed it and chose New York.
13              I understand your argument, your Honor, they could
14      have chose Delaware or California or they could have chose
15      Florida, but they chose New York.
16              THE COURT:  Okay.  Go ahead.
17              MR. WIGDOR:  Your Honor, I'd like to talk a bit about,
18      though, now about the age discrimination unless your Honor has
19      more questions --
20              THE COURT:  Go ahead.
21              MR. WIGDOR:  -- more questions about the impact.
22              Mr. Fried is currently 71 years of age and he worked
23      at LVI for 24 years, from approximately 1986 until he was fired
24      on November 16th, 2010.  He held positions as general counsel,
25      president and CEO, and he helped LVI grow into one of the
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

176JFROM                    Motions
1    largest environmental remediation firms in the country.
2          What is interesting is that when Robert McNamara was
3    hired, he was hired as the president and CEO for a period of
4    time.  This was before Mr. State became the president and CEO.
5    Mr. McNamara and Mr. Fried got along fine.  There were
6    absolutely no issues at all, and Mr. Fried took secondary role
7    to Mr. McNamara and worked as the chairman.  There were no
8    issues.
9          Then Mr. McNamara resigned.  Mr. Fried then took on
10   the position of president and CEO, and this is probably one of
11   the only cases, employment cases your Honor will ever see that
12   there is no attack about the plaintiff's work, he was an
13   excellent executive.  Even their briefs say that plaintiff had
14   the abilities to perform the roles at LVI.  That is not an
15   issue here.
16         If your Honor looks at Exhibit 16 which was just a few
17   months before the termination, one of the board members, Brian
18   Simmons, says to Mr. Fried, confirmed you're earning every
19   penny of it, referring to his salary.  This is months before
20   his termination.
21         Mr. State was hired.  He is 47 years' old, decades
22   younger, and what is interesting, they keep on saying the only
23   piece of evidence in this case of direct age discrimination is
24   the comment that your Honor asked about, but there are lots of
25   other documents and testimony.
          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

176JFROM                    Motions

1           For example, in Exhibit 19 to our opposition paper,
2    there is an e-mail from Scott State to Robert Hogan, who is a
3    board member, and this is before Mr. State was even hired, and
4    in that e-mail he says in the best-case scenario, Burt will
5    decide to retire at some date certain from LVI upon a new CEO
6    being named.
7           Now, I don't have the OED memorized, but the
8    definition of "retired" is tied to age.  That is when you leave
9    work because of your age.  You're no longer going to continue
10   to working, that is an ageist remark.  If Mr. Fried was not 71
11   years of age, he if he was my age, if he was my age, your
12   Honor --
13          THE COURT:  Let's for the heck of it, I don't have the
14   OED, but I do have Webster's New Collegiate Dictionary which I
15   have kept since college.
16          MR. WIGDOR:  I know your Honor spent some time at
17   Oxford.
18          THE COURT:  I know, but I have overcome that.  Let's
19   see what "retire," what the Webster Dictionary says.  Retire,
20   verb in transit:
21          1.  To withdraw from action or danger, to retreat;
22          2.  To withdraw for the sake of privacy, seclusion,
23   protection or the like;
24          3.  To recede or appear to do so as the shore retires
25   in bays;

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

176JFROM                    Motions

1           4.  To withdraw from office of public station,
2  business or the like;
3           5.  To go to bed.
4           No. 4 presumably is the one applicable here and I
5  don't see where there is a suggestion that this perfectly good
6  word is an ageist insinuation.
7           MR. WIGDOR:  With all due respect, I have looked at
8  the definition of retire, albeit not the definition you just
9  read, and I have seen many definitions of retire which include
10  in it the definition of being, having finished one's working
11  life.  Your Honor, my point, what I was going to say prior to
12  your Honor reading the dictionary is that --
13           THE COURT:  That, of course, applies to many of my
14  children.
15           MR. WIGDOR:  -- my point was, your Honor, I believe --
16  and I believe a jury could reasonably believe that when
17  Mr. State was talking about Mr. Fried at age 71, that in the
18  best case scenario, Burt will decide to retire.  What he meant
19  was to no longer work, not just leave LVI, but to stop working
20  because of his age.
21           THE COURT:  I guess my question for you is, I agree
22  with you that context is important, but here the context
23  presumably is one of I want to replace him and not that he is
24  too old.  At least I don't see anything on the face of that
25  document that refers to age.

14
176JFROM                    Motions

1        For example, all the time when people are fired, what
2   is announced publicly is that they chose to retire.  The head
3   of the Sex Crimes Unit of the D.A.'s Office.
4            MR. WIGDOR:  Lisa Friel.
5            THE COURT:  Do you have any idea what age she is?
6            MR. WIGDOR:  She is 50.
7            THE COURT:  You're a man who really knows the facts.
8   She announced she was taking retirement.
9            MR. WIGDOR:  That was --
10           THE COURT:  I doubt very much whatever the context
11  was, and the papers are full of speculation about it, very much
12  don't have the slightest thing to do with age.
13           MR. WIGDOR:  Your Honor, with all due respect, your
14  Honor, as an employment lawyer who deals with people separating
15  from employment all the time and reading in the papers like
16  Lisa Friel and other things and taking notes of that and having
17  pretext age was the but for or the motivating factor, I think
18  it is a jury question, and there will be other e-mails I will
19  bring to your attention in a moment that a jury could
20  reasonably infer that the use of the word "retire" in this
21  sentence would not have been used but for Mr. Fried's age, that
22  if Mr. Fried had been 35 or 40, that Mr. State would have said
23  he should be separated, which is a very common word or that he
24  should be terminated or that he should leave.
25           The word retire in my mind and probably I think in
         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

A-1092

176JFROM                    Motions

1  maybe every juror's mind will have a connotation that you leave
2  work and you are not to go to another job, but to retire, to
3  stop working.
4        THE COURT:  I hear you, but it is not self-evident to
5  me that in this context -- I mean I like Webster's New
6  Collegiate Dictionary because it gives everyday meanings in
7  plain language, which cannot really said for the OED.  The ones
8  I just read, none of them suggested an ageist interpretation.
9        Now, I may change my mind, but I think I would like
10  to, I guess I would like to hear your other e-mails.
11        MR. WIGDOR:  Fine, your Honor.  And so when you see
12  other e-mails, also in the context of Mr. State with his
13  comment you're 71 years' old, how long do you expect to
14  continue working, I think you have a greater idea of what was
15  in his mind in terms of the word retirement.
16        Now, Exhibit 21 is an exhibit from Mr. State to Mr.
17  Seth Simmons, and again I understand your Honor's view, but it
18  says --
19        THE COURT:  I don't have a view.  I am just asking
20  questions.
21        MR. WIGDOR:  Your Honor, Exhibit 21, it says in the
22  first paragraph, Mr. State says to Mr. Simmons, "I was clear
23  with him it was my objective to have him truly retire."
24        Now, maybe that is different.  Truly retire or retire?
25  Does that mean to really leave or to really stop working?  I

        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

```
                                                           16
         176JFROM                   Motions
1    would argue --
2               THE COURT:  Of course, we have to take every
3    reasonable inference favorable to you.
4               MR. WIGDOR:  Correct.
5               THE COURT:  The word "truly," if anything, would seem
6    to suggest nothing having to do with age, but we want his hands
7    out of here.  We don't want him to be quote retired but still
8    having a say in what is going on.  We want him out of here.
9               If that were the meaning, that would have nothing to
10   do with age.
11              MR. WIGDOR:  Your Honor, again I would argue that it
12   is a question for a jury to interpret what that means.  If he
13   meant we want him out of here and not to have a hand in the
14   ongoing of the business, I believe HE would have said that he
15   should leave or have no involvement in the company or he should
16   be terminated or we should separate ways.
17              I believe the continued use --
18              THE COURT:  What do you take to be the meaning?
19              What is added in this?  And since you were just
20   describing before the word truly, what do you take to be the
21   import of truly?
22              MR. WIGDOR:  I take it to mean that he is going to
23   totally go off into the sunset and not have a role in the
24   company, no longer continue to work.
25              THE COURT:  Well, no longer have a role in the
         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300
```

```
      176JFROM                    Motions
 1    company?
 2              MR. WIGDOR:  And no longer work, period.  I believe
 3    that Mr. State would never in a million years --
 4              THE COURT:  I don't see how you draw -- you, of
 5    course, are correct, every reasonable inference has to be drawn
 6    in your favor.  But, on the other hand, speculation is
 7    permitted.  It seems from just the e-mails you have read me so
 8    far -- and none of this is -- I am just speculating myself, but
 9    it suggests his object is to get the guy out of there for real.
10              That is why he puts the word, "truly".  I don't want a
11    phoney retirement, I want him out of here not because I think
12    he is too old to do any other kind of work, I don't want him
13    here because I want to run this company, not him.
14              MR. WIGDOR:  I agree with the first part of what you
15    said.  I agree he didn't want him there.  I agree he didn't
16    want him there because of his age and I believe that the
17    repeated use of "retire," that a reasonable jury could, with
18    all of the other evidence that I am going to share with your
19    Honor, and looking at these e-mails, could infer that his use
20    of "retire" was because of Mr. Fried's age, and that phrase
21    would not be used if it were to me.
22              If it was somebody who was 43 years' old, Mr. State
23    would not say I want Mr. Wigdor to truly retire, he wouldn't
24    have.  I believe that argument would resonate with the jury,
25    and drawing all reasonable inferences in the favor of the
```

A-1095

176JFROM                    Motions

1   non-moving party, I believe that is evidence with the other
2   things of age discrimination.
3           THE COURT:  I think, of course, context is everything.
4       When someone says it's time for Jorge Posada to
5   retire, they are definitely making an ageist comment even
6   though he is only 38 or something like that, and not even
7   within the protection of the law, not under protection of the
8   law for other reasons as well, but what they are saying is we
9   don't think that he's capable, his body is capable of doing the
10  job any more.  He is hitting 250 or lower, it is time for him
11  to go.
12          That is use of the word retire as to a young person,
13  but with a clear age aspect, maybe not an ageist, but certainly
14  an age aspect.  So I think context is very important.
15          MR. WIGDOR:  Your Honor, I think your analogy is good,
16  but the difference is Jorge Posada, with age it becomes more
17  difficult to play the game of baseball especially as a catcher.
18  He is batting 233.
19          THE COURT:  That is only recently.
20          MR. WIGDOR:  There are legitimate reasons why somebody
21  could say in fairness he should retire.  When they say Mr.
22  Posada should retire, they're not saying he should play with
23  the Mets or Dodgers, they're saying he should leave the game of
24  baseball.  That is the same thing that happening with
25  Mr. Fried.  When Mr. State says Mr. Fried you should refire, he

A-1096

176JFROM                    Motions
1    is saying you should stop working.
2            THE COURT:  I agree with your analysis what it means
3    in the context of someone like Jorge Posada, but I think where
4    I am not yet persuaded is that it is the same thing in the case
5    of Mr. Fried.
6            What I was trying to illustrate at least is that the
7    word retirement can have many meanings.  It doesn't have an
8    inherently ageist aspect.  It can have an ageist aspect even to
9    someone very young if age is -- age is the wrong word -- if age
10   is directly correlated with performance.  There is nothing
11   inherent about that, and no one would say that if, instead of
12   saying Jorge Posada should retire, someone said it's time for
13   this Assistant U.S. Attorney to retire because he should go out
14   and make some money.
15           MR. WIGDOR:  I don't think anyone would ever say that,
16   no one ever use that term retire with one of the young
17   Assistants trying your case which I was watching before, a
18   young 35-year old.  I don't believe that the U.S. Attorney
19   would say you know what, you've gotten a lot of trial
20   experience, it is time for you to retire from the Southern
21   District.  That would be unheard of.
22           THE COURT:  No.  It would be his mother who wonders
23   how he is going to support his kid.
24           MR. WIGDOR:  That isn't how people speak.  They're
25   saying it is time to go on to your next journey.
         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

A-1097

176JFROM                    Motions
1              THE COURT:  I understand the argument you're making.
2              MR. WIGDOR:  Your Honor, the same would hold true
3       then, your Honor, for Exhibit 9.  Again Mr. State in this
4       e-mail to a friend, somebody who is not affiliated with LVI in
5       any way, shape or capacity, says that "In a battle with
6       founder" -- referring to Mr. Fried -- "about his need to
7       retire, but board gets it and is working to exit him with some
8       respect."
9              So his need to retire --
10             THE COURT:  Okay.
11             MR. WIGDOR:  Your Honor, in terms of what happened
12      after that, your Honor, we sent a letter to LVI Services.  It
13      was dated November the 15th.
14             THE COURT:  You're talking about the retaliation?
15             MR. WIGDOR:  Correct, I have moved to the retaliation.
16             Let me just say also on the age discrimination parts
17      before the retaliation, in addition to his excellent work
18      performance, his age, Mr. State's age, which was well below in
19      decades, when he was terminated, his jobs were taken over by
20      people who were also much younger than him as well.  That goes
21      towards proving the age discrimination.
22             On retaliation, our letter was sent to LVI on November
23      15th.  In Exhibit 25, you have handwritten notes of one of the
24      board members, and in those handwritten notes it says -- which
25      is the day after November 16th -- it says ignore letter,
              SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

176JFROM                    Motions

1   referring to our letter, and send good faith letter.
2          The good faith letter, your Honor, was terminating his
3   employment.  It was the letter that is at Exhibit 26, and that
4   letter says effective November 30th, 2010, your employment with
5   LVI service, Inc will terminate.
6          In addition, your Honor, at Exhibit 5 is Mr. Gerardy's
7   deposition, and in Mr. Gerardy's deposition, at Page 90, he was
8   asked the following questions and gave the following answers,
9   at Line 17:
10  "Q  Okay.  Why did you, why did the board ignore the letter?"
11  referring to our letter.
12  "A  We wanted to keep Burt on, Burt on as chairman, so we sent
13  him our offer to enter into a consultancy agreement, I believe,
14  shortly after this call."
15         That was the letter that terminated his employment,
16  and the next question was:
17  "Q  And that was in response to the letter you received,
18  Plaintiff's Exhibit 8, referring to our letter, saying
19  discrimination against because of his age?
20  "A  I believe so, yes."
21         So he admits in his deposition that the letter that
22  they sent was in response to our letter, and the letter they
23  sent terminated his employment.
24         THE COURT:  Well, read me that again because I am not
25  sure I agree with that.

A-1099

176JFROM                    Motions

1    MR. WIGDOR:  It says:
2    "Q  Okay.  And why did you, why did the board ignore the
3    letter?
4    "A  We wanted to keep Burt on, Burt on as chairman and so we
5    went him our offer to enter into a consultancy agreement, I
6    believe, shortly after this call."
7        Part of their letter, your Honor, they said we are
8    terminating your employment, but we are going to let you enter
9    into this consultancy agreement, but you've got to waive all
10   your age claims, and if you're terminated, you're only going to
11   get $37,000.
12       So he was waiving all of his claims, he could be a
13   consultant for a few days, they could terminate him and he
14   would get $37,000 for 20-plus years of service.  The next
15   question is:
16   "Q  And that was in response," referring to the letter, "and
17   that was in response to the letter you received, Plaintiff's
18   Exhibit 8?
19   "A  I believe so, yes."
20       So he says there that the letter was in response to
21   our letter, and the letter that they sent terminated his
22   employment.
23       THE COURT:  I guess maybe, and I think your argument
24   here has some potential weight, and I want to hear what your
25   adversary says about it.  Her point essentially was that what

176JFROM                    Motions

1   she believes is the undisputed evidence shows the decision to
2   terminate was made before the complaint was -- before your
3   letter was sent; and, therefore, whatever happened after that
4   is neither here nor there.
5           MR. WIGDOR:  A couple of things.  There is no document
6   that says that, first of all.
7           Second of all, Mr. Fried himself complained many times
8   prior to us sending the letter on his behalf of age
9   discrimination.  He complained of age discrimination.
10          After Mr. State made the comment to him about you're
11  71 years of age, how long do you expect to continue working, he
12  complained right after that to numerous board members, and
13  because he complained, he started to become isolated at the
14  company.
15          This is back in October.  So I'm unaware of any
16  document that would substantiate the decision to terminate
17  Mr. Fried's employment was made prior to him engaging in
18  protected activity.
19          Your Honor, the other factor to consider as well in
20  both the retaliation claim as well as in the underlying age
21  claim is that everyone's running away from who made the
22  decision to terminate.  If your Honor looks at Exhibit 27,
23  which is Mr. State's objections and answers to our
24  interrogatories, Interrogatory No. 4 says -- sorry -- the
25  question to Interrogatory No. 4 was:  Identify all directors,

```
176JFROM                    Motions
1   officers, partners, managers and/or employees of any of the
2   corporate defendants who participated in or otherwise have
3   information or knowledge concerning the reasons for and the
4   process leading to the decision to terminate plaintiff's
5   employment.
6            Mr. State swore in the interrogatory, said the LVI
7   employee responsible for the decision to terminate plaintiff's
8   employment with LVI is Scott State, okay?
9            Then -- and he verified that under oath -- then at his
10  deposition, and his deposition is Exhibit I to Ms. Seltzer's,
11  the defendant's motion, at his deposition, your Honor, he
12  testified, at Page 374, he was asked the following question and
13  gave the following answer, question at Line 23:
14  "Q  You didn't make the decision to terminate Mr. Fried?
15  "A  No."
16           THE COURT:  To what is the follow-up question?
17           MR. WIGDOR:  We used their deposition transcript as
18  the record.  I don't have it.  I could supply it to the court
19  if the court wants to know.
20           THE COURT:  I was just curious, the obvious follow-up
21  question would be who was?
22           MR. WIGDOR:  I didn't take the deposition.  I will
23  look after oral argument.
24           THE COURT:  All right.  Not that anything you have
25  said has not been well said and interesting, but I think in the
```

176JFROM                    Motions
1    interests of fairness, we need to hear from your adversary.
2            Let's hear from defense counsel and come back to
3    plaintiff's counsel.
4            MS. SELTZER:  Thank you, your Honor.  I have three
5    very quick points.
6            First of all, your Honor is absolutely right, the use
7    of the term retirement in all of these communications was the
8    understanding that came from Mr. Fried he was ready to let go
9    of the managerial and operational responsibilities of running
10   the company.  That was the retirement.
11           They didn't want to put him out to pasture.  They
12   wanted to offer him a role, which they did offer him, the
13   record shows it was a consultancy role as well as continuing
14   his role as chairman of the board of directors.  It wasn't they
15   felt this man was not capable of doing the job or contributing,
16   it was only his continuing to work in a managerial and
17   operational capacity was getting in the way of Mr. State's
18   ability to run the company.  That was it.
19           Plaintiff's counsel said there is no evidence that
20   they decided to terminate him prior.  There is.  Exhibit S,
21   which is Seltzer's Exhibit S, where three days before the board
22   meeting where he complained and well two weeks before the
23   arrival of the demand letter they were talking about his
24   consultancy, about his giving up his executive position with
25   LVI and becoming a consultant.

26
176JFROM                    Motions
1           The second point I wanted to make, going back a second
2    to the New York City Human Rights Law issue --
3           THE COURT:  Let me stop you on that before you get
4    there.  So it is one thing to have been having discussions
5    about entering into a consultancy.  It is another thing to say
6    you're fired and, by the way, if you would like, we will offer
7    you this fairly modest consultancy, paying even less than what
8    federal judges are being paid, very few jobs I can say that of,
9    and that comes right on the heels of counsel's letter, yes?
10          I understand your interpretation, but why couldn't a
11   reasonable juror say well, they may have had in mind working
12   out something with him and it was going on like a log and
13   nothing definitive had been presented.
14          Then he writes this nasty letter, and the reaction is
15   well, screw him, he's out of here, but we'll cover ourselves
16   with a nominal consultancy arrangement.  That is not by any
17   means the only possible interpretation, but why isn't that a
18   more than possible reasonable interpretation?
19          MS. SELTZER:  The reason is that when both the board
20   and Mr. State were talking about Mr. Fried's retirement, they
21   were talking about the termination of his employment as LVI's
22   chairman.
23          If you look at the letter that was sent which was not
24   read fully, "Your employment with LVI Services will terminate.
25   You will continue your relationship with LVI as non-executive
          SOUTHERN DISTRICT REPORTERS, P.C.       (212) 805-0300

27

176JFROM                    Motions

1   chairman of the board, LVI parent corporation and, in addition,
2   we are offering you the position of consultant." That was
3   always contemplated.
4           One other minor point, your Honor. The consultancy
5   was for retirement at $150,000 a year plus $250.00 per hour for
6   actual hours worked. That is a bit above what the court's
7   salaries are these days.
8           There is no evidence on the record they were going to
9   fire him the moment he released his rights. Obviously, all of
10  these conversations that had started back in 2005 involved his
11  continuing in a viable and vibrant role in the company. They
12  had no intention of firing him completely from LVI. They
13  wanted to put him in a role more conducive to what needed to
14  happen here, which was the turning around of a company with
15  financial problems with a new president and with a new CEO.
16          THE COURT: You wanted to say something about New
17  York?
18          MS. SELTZER: Quickly in terms of interpretation.
19  Hoffman is very clear. What plaintiff has said here is that
20  Mr. Fried, the termination of Mr. Fried had an impact on New
21  York City, on his ability to do work. That is not what the law
22  says. What the law says is the impact on the employee, not on
23  the city that he works in. The impact on the employee was in
24  Connecticut because Mr. Fried worked in Connecticut.
25          If you look at the declaration --

A-1105

176JFROM                    Motions

```
 1              THE COURT:  I want to hear from plaintiff on this, but
 2      I must say at first read, that was my interpretation, and part
 3      of that is they even made the point about the simple test to
 4      apply.  If it is the test plaintiffs argue, it is a
 5      complicated, difficult test to apply.  If the point was if you
 6      fire someone while he's on a plane over Paris, but the entire
 7      impact will be felt by him in his place of business which is
 8      New York, the New York law is going to apply.
 9              Let me hear from plaintiff on that because he may
10      disagree.
11              MR. WIGDOR:  Yes.  I mean if your Honor looks at the
12      Hoffman decision itself, it is actually very unclear.  There
13      really is no controlling authority about what the word "impact"
14      means.
15              THE COURT:  You think the New York Court of Appeals
16      has issued an unclear decision?
17              I am, I am truly shocked.
18              MR. WIGDOR:  That never has happened before, has it?
19              If they only followed your well-reasoned analysis in
20      the Rooney case which said impact wasn't even required, where
21      your Honor said if the decision was made in New York --
22              THE COURT:  My wife doesn't listen to me.  Why should
23      the Court of Appeals?
24              MR. WIGDOR:  The decision says, the relevant parts
25      here are that it says other courts have taken the view that the
```

176JFROM                    Motions
1    nonresident plaintiff must demonstrate that the alleged
2    discriminatory conduct had an impact within the city.  They
3    then subscribe to those sets of cases.
4            If you look at everything I have said and what
5    Mr. Fried's affidavit sets forth, I believe it is irrefutable
6    that the discriminatory conduct has had an impact within the
7    city.  He is not the low-level employee in Hoffman who had
8    virtually no contact with New York other than the decision
9    being made in New York which, by the way, is something that
10   your Honor can still consider, that Mr. Fried complained of the
11   age discrimination in New York, that Mr. State made the ageist
12   remark in the City of New York, and then the impact, the effect
13   of Mr. Fried's termination to the State of New York is all the
14   things that Mr. Fried was doing on a day-to-day basis in New
15   York, affecting all the employees who work in New York has now
16   stopped because he has been fired unlawfully.
17           I believe that the New York City Human Rights Law, and
18   even with the Hoffman decision and all the other decisions that
19   might have cited it, would certainly cover this situation where
20   you have a whole host of reasons of a high level employee's
21   contact, and prior to that he worked in New York for many,
22   many, many years and split his time for many years.
23           THE COURT:  As I say, nothing I am saying here tonight
24   should be taken as a reflection on where I stand on any issue.
25   This has been a very well-argued motion, but I need to go back

A-1107

176JFROM                          Motions
1   now in light of this and review it.  I will give each counsel
2   two minutes more to say if you feel there is something that you
3   didn't have a chance to respond to, now is your opportunity.
4                Anything from defense counsel?
5                MS. SELTZER:  No, your Honor, except in Hoffman's
6   defense, the court was actually a bit clearer than what was
7   stated here.  Basically the court said that this interpretation
8   of impact expands the protections to nonresidents who work in
9   the city.  That is what the court said, not who come in and do
10  13 meetings between 2006 and 2010, which is all he did during
11  this period.
12               I think that the court is clear.  I think what it
13  meant to say was even a nonresident is protected under this if
14  the discriminatory act has an impact on his employment in the
15  city, not in Connecticut.
16               THE COURT:  Anything more?
17               MR. WIGDOR:  Just very briefly, your Honor.
18               In Hoffman, the court in its holding said that
19  according to the complaint, Hoffman was neither a resident of
20  nor employed in the City or State of New York.  We would agree
21  that is the situation here, although LVI is a New York company.
22               This is the important part, nor does Hoffman state a
23  claim the alleged discriminatory conduct had any impact in
24  either of those locations.  We do.  We laid it out for your
25  Honor in the summary judgment motion.  They didn't move to
         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

A-1108

176JFROM                    Motions
1    dismiss the complaint.  They waited till summary judgment.  At
2    most Hoffman pleaded his employments had a tangential
3    connection.  We have a lot more.
4              The other case --
5              THE COURT:  I don't think I can draw any inference
6    from the fact they waited till summary judgment.
7              MR. WIGDOR:  It is a question of subject matter
8    jurisdiction, so your Honor could look at this at any point in
9    time.  I raise it.  They're represented by very capable
10   counsel, your Honor.
11             The other point is the Eastern District case of
12   Steelola v. Quadrotrone, at 361 F. Supp. 2d 61, and in that
13   case, your Honor, you'll see Judge Platt, District Court Judge
14   Platt in the Eastern District, the allegations of age
15   discrimination there and him denying the motion for summary
16   judgment were things using, "I would retire if I was you,"
17   using the word "retire."
18             Then finally, your Honor, the last point, to say that
19   this consultancy agreement was somehow a very generous
20   agreement is really preposterous because if they didn't ask him
21   to waive his age claim, perhaps they would have a point, but
22   they knew that he had already complained of age discrimination.
23   They knew he had already retained counsel who had already
24   threatened them to file an age discrimination claim, and in
25   order for him to pursue this consultancy agreement, he had to
          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

176JFROM                    Motions

1   waive his right to claim age discrimination on the termination.
2           THE COURT:  Well, I hear what you're saying.
3           Actually, I am going to ask defense counsel to
4   respond, but I am not clear.  If, in fact, assume for the sake
5   of argument the decision is made to fire someone -- my
6   hypothetical -- and just before it is about to be executed,
7   whoever the person is has his or her lawyer write a letter
8   saying we are suffering from X discrimination.  I need to put
9   it into the hypothetical.
10          The decision was made to have a consultancy or offer a
11  consultancy again back before anything else happened -- again
12  just my hypothetical.  Wouldn't it be malpractice not to
13  include in the final letter we are terminating you but we are
14  offering you a consultancy contingent on your waiving the claim
15  that you made yesterday.  Why is that ipso facto an act of
16  retaliation?
17          MR. WIGDOR:  I am not suggesting that asking him to
18  waive his claim was an act of retaliation.  What I am only
19  responding to is their argument that this was just this great
20  offer waiting for him to be had to work for many more years
21  down the road.
22          All I am suggesting, your Honor, is that, in fact, he
23  would have had to waive his age claim, enter into a consulting
24  agreement that provided absolutely no protections, he could
25  have been terminated the day after he signed it and only

176JFROM                    Motions
1    received a very small amount of money.  That is the only point
2    I raise it.
3              THE COURT:  Now I understand it.  Let me nevertheless
4    hear on that last point.  I need to look, actually, at which
5    exhibit is it.
6              MR. WIGDOR:  Exhibit 26, your Honor.  I have an extra
7    copy if your Honor wants.
8              THE COURT:  Here we go.  We have it.
9              MR. WIGDOR:  If I may comment on the letter, your
10   Honor?
11             THE COURT:  Hold on just a minute.
12             (Pause)
13             THE COURT:  So let me ask defense counsel, this
14   proposed agreement attached to the letter of November 16th
15   includes both what you might call standard form release of any
16   and all claims, and if you look at the first page of the
17   agreement itself, at the bottom of page Bates stamped 1948,
18   there is under (i), you have a standard form release and then
19   you have second (i) that is a specific release of the ADEA
20   potential claim.
21             Now, part of that may have been motivated by the
22   21-day requirement that has to be given, so it is different
23   from a general release.  On the other hand, it is clearly a
24   recognition, it is a clear response, is it not, in the sense of
25   plaintiff's counsel is arguing not itself an act of

176JFROM                    Motions

1  retaliation, but certainly shows that this whole thing was
2  crafted at least in part in response to the letter from the
3  lawyer.
4          MS. SELTZER:  You will find, your Honor, that in just
5  about every release these days that is written, there is a
6  carve-out for the ADA precisely for the reason your Honor
7  mentioned.
8          Under the Older Workers Protection Act, yes, there are
9  specific things that have to be appear in the release that make
10 them viable under the act, on top of which you have to
11 specifically refer to the ADA in order to make the waiver
12 applicable.  That is the reason for this carve-out in this
13 letter.  It has nothing to do with the fact --
14         THE COURT:  I hear what you're saying and it makes a
15 certain sense.  Is there any evidence of that in this record?
16         MS. SELTZER:  No, other than the form itself, your
17 Honor.
18         THE COURT:  All right.  So again let me thank both
19 counsel for what I really thought an excellent argument.  I
20 will get you a decision worst case by end of August.  I have
21 something and I can't promise you anything faster than that,
22 but I always guarantee that.  And then depending on how it
23 comes out, we'll convene then if I don't grant the motion
24 across the board to set a trial date.  We'll have a telephone
25 call and set a trial date.

**A-1112**

```
          176JFROM                    Motions
 1                I think I would rather not set a trial date now
 2        because if I had to set a trial date now, I would have to give
 3        you a trial date in like February, whereas my instinct is that
 4        there will be a lot of cases present on the trial calendar that
 5        will settle between now and then, and no one should infer
 6        anything about what I am saying right now as to whether I will
 7        or will not grant the motion in whole or in part or whatever.
 8        I really haven't decided.  Thanks again and this matter is
 9        adjourned.
10                (Court adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

# 11-4791-cv

## United States Court of Appeals

### for the

### Second Circuit

BURTON T. FRIED,

*Plaintiff-Appellant,*

— v. —

LVI SERVICES, INC., aka LVi SERVICES, INC., LVI PARENT CORP.,
CODE HENNESSY SIMMONS LLC, dba CHS PRIVATE EQUITY V LP,
APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official capacity and in his
individual capacity, BRIAN SIMMONS, in his official capacity and in his individual
capacity, RAJAY BAGARIA, in his official capacity and in his individual capacity,
GERALD J. GIRARDI, in his official capacity and in his individual capacity,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

THOMPSON WIGDOR LLP
*Attorneys for Plaintiff-Appellant*
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.................................................1

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE...........................................................3

STATEMENT OF FACTS ...............................................................4

    Scott State's Pre-Hire Inquiries Regarding Mr. Fried .....................8

    The Hiring Of Scott State .............................................................9

    The October 19, 2010 Age Comment............................................9

    State's October 19, 2010 Email ..................................................10

    Mr. Fried's First Complaints of Discrimination...........................10

    The November 4, 2010 Board Meeting ........................................10

    The November 5, 2010 Email.......................................................11

    Mr. Fried's Termination .............................................................11

SUMMARY OF ARGUMENT .........................................................14

ARGUMENT ...............................................................................17

    I.     STANDARD OF REVIEW ...........................................17

    II.    THE DISTRICT , WHICH ANALYZED MR. FRIED'S ADEA
           RETALIATION CLAIM UNDER THE INCORRECT
           STANDARD, ERRED IN GRANTING SUMMARY
           JUDGMENT ..........................................................19

i

III.    THE DISTRICT COURT, WHICH FAILED TO EXAMINE MR. FRIED'S ADEA DISCRIMINATION CLAIM UNDER THE TOTALITY OF THE CIRCUMSTANCES AND INCCORECTLY CONSTRUED STATE'S DISCRIMINATORY REMARK AS "STRAY," ERRED IN GRANTING SUMMARY JUDGMENT ...........................................26

        A. Mr. Fried Established A *Prima Facie* Case Of Age Discrimination ...................................................28

        B. A Myriad Of Issues Of Material Fact Exist As To Whether Defendants' Proffered Reason For Mr. Fried's Termination Was Pretextual ................................30

            1.    The Remark Was Made By A Decisionmaker......................................................36

            2.    The Remark Was Made Close In Time To Mr. Fried's Termination.............................................36

            3.    A Reasonable Juror Could View The Remark As Discriminatory.....................................................37

            4.    The Remark Was Related To The Decision Making Process ....................................................38

IV.    THE DISTRICT COURT ERRED IN HOLDING THAT THE NYCHRL WAS INAPPLICABLE TO MR. FRIED'S DISCRIMINATION AND RETALIATION CLAIMS .....................43

CONCLUSION ......................................................................48

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................49

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abdu-Brisson v. Delta Air Lines, Inc.,*
    239 F.3d 456, 468 ...............................................................................34, 42

*Abreu v. Suffolk County Police Dept.,*
    03 CV 5927 (JFB)(WDW), 2007 WL 608331 (E.D.N.Y. Feb. 23, 2007) ....33

*Carlton v. Mystic Trans., Inc.,*
    202 F.3d 129 (2d Cir. 2000) ...........................................................34

*Bickerstaff v. Vassar Coll.,*
    196 F.3d 435 (2d Cir. 1999) ...........................................................18

*Danzer v. Norden Sys., Inc.,*
    151 F.3d 50 (2d Cir. 1998) .......................................................34, 35

*Diaz v. Jiten Hotel Mgmt., Inc.,*
    762 F. Supp. 2d 319 (D. Mass. 2011)............................................37

*Eastway Constr. Corp. v. City of New York,*
    762 F.2d 243 (2d Cir. 1985) ...........................................................17

*Gallo v. Prudential Res. Serv.,*
    22 F.3d 1219 (2d Cir. 1994) .....................................................17, 18

*Giarratano v. Edison Hotel,*
    No. 08-CV-1849 (SAS), 2009 WL 464441, (S.D.N.Y. Feb. 24, 2009)........39

*Gipson v. Wells Fargo N.A.,*
    460 F.Supp.2d 15 (D.D.C. 2006)....................................................37

*Gorzynski v. JetBlue Airways Corp.,*
    596 F.3d 93 (2d Cir. 2010) ......................................................27, 28

*Graham v. Long Island R.R.,*
    230 F.3d 34 (2d Cir.2000) ............................................................18



*Gross v. FBL Fin. Servs., Inc.,*
    129 S.Ct. 2343 ..............................................................................*passim*

*Henry v. Wyeth Pharmaceuticals, Inc.,*
    616 F.3d 134 (2d Cir. 2010) ........................................................35

*Heyman v. Commerce & Indus. Ins. Co.,*
    524 F.2d 1317 (2d Cir. 1975) ......................................................17

*Hofmann v. Dist. Council 37*, No. 99-CV-8636 (KMW), 2004 WL 1936242, at *10
(S.D.N.Y. Aug. 31, 2004) *report and recommendation adopted as modified*, No.
99-CV-8636 (GEL), 2006 WL 3476747 (S.D.N.Y. Nov. 30, 2006)......................41

*Joseph v. Marco Polo Network, Inc.,*
    No. 09-CV-1597 (DLC), 2010 WL 4513298, (S.D.N.Y. Nov. 10, 2010) ....29

*Kirsch v. Fleet Street, Ltd.,*
    148 F.3d 149 (2d Cir. 1998) ........................................................37

*Liebowitz v. Cornell University,*
    584 F.3d 487 (2d Cir. 2009) ........................................................27

*Mattera v. JPMorgan Chase Corp.,*
    740 F.Supp.2d 561 (S.D.N.Y. 2010) ......................................20, 30

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)..............................................................19, 27

*Meiri v. Dacon,*
    759 F.2d 989 (2d Cir. 1985) ........................................................18

*Montana v. First Fed. Sav. & Loan Ass'n,*
    869 F.2d 100 (2d Cir. 1989) ........................................................18

*Morris v. Lindau,*
    196 F.3d 102 (2d Cir. 1999) ........................................................25

*Morris v. New York City Dept. of Sanitation,*
    No. 99-CV-4376 (WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) .........41


*O'Reilly v. Marina Dodge, Inc.*,
        No. 10-CV-2977, 2011 WL 1897489 (2d Cir. May 19, 2011) .............39, 42

*Ostrowski v. Atl. Mut. Ins. Cos.*,
        968 F.2d 171 (2d Cir. 1992) .........................................................................36

*Patrick v. LeFevre*,
        745 F.2d 153 (2d Cir. 1984) .........................................................................18

*Pilgrim v. Luther*,
        571 F.3d 201 (2d Cir. 2009) .........................................................................17

*Raskin v. The Wyatt Co.*,
        125 F.3d 55 (2d Cir. 1997) ......................................................................41, 42

*Reed v. A.W. Lawrence & Co.*,
        95 F.3d 1170 (2d Cir. 1996) ....................................................................19, 20

*Rose v. New York City Bd. of Educ.*,
        257 F.3d 156 (2d Cir. 2001) .........................................................................36

*Schreiber v. Worldco, LLC*,
        324 F.Supp.2d 512 (S.D.N.Y. 2004) ......................................................33, 40

*Sciola v. Quattro Piu, Inc.*,
        361 F. Supp. 2d 61 (E.D.N.Y. 2005) .............................................................40

*Shapiro v. New York City Dept. of Educ.*,
        561 F. Supp. 2d 413 (S.D.N.Y. 2008) ...........................................................41

*Shelley v. Geren*,
        10-35014 (9th Cir. Jan. 12, 2012)................................................................28

*Shub v. Westchester Community College*,
        556 F.Supp.2d 227 (S.D.N.Y. 2008) ................................................23, 24, 25

*Sousa v. Roque*,
        578 F.3d 164 (2d Cir. 2009) .........................................................................17

v



*Terry v. Ashcroft,*
    336 F.3d 128 (2d Cir. 2003) ....................................................19, 22, 23, 24

*Tomassi v. Insignia Financial Group, Inc.*
    478 F.3d 111 (2d Cir. 2007) ..................................................................*passim*

*Velasquez v. Gates,*
    No. 08-CV-2215 (CLP), 2011 WL 2181625, (E.D.N.Y. June 3, 2011) .......42

*Velez v. McHugh,*
    No. 09-CV-0925 (GAY), 2011 WL 778693, (S.D.N.Y. Mar. 2, 2011)........18

**STATE CASES**

*Hoffman v. Parade Publis.,*
    15 N.Y.3d 285 (2010).................................................................................43

*Williams v. N.Y. City Hous. Auth.,*
    61 A.D.3d 62 (1st Dep't 2009).................................................................47

**STATUTES**

28 U.S.C. §1291 ...................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. §1367 ...................................................................................................1

29 U.S.C. §§ 621 *et seq* .......................................................................................1

29 U.S.C. §623(a)(1)...........................................................................................21

29 U.S.C. §623(d) ...............................................................................................21

42 U.S.C. §2000e-2(a) ........................................................................................21

42 U.S.C. §2000e-3(a) ........................................................................................21

42 U.S.C. §2000e-2(m)........................................................................................21

vi

Fed. R. App. P. 4(a) ....................................................................................1

Fed. R. Civ. P. 56(c)..................................................................................17

Local Law No. 85 [2005] of City of NY [Restoration Act] ....................................47

New York Administrative Code §§ 8-101 *et seq*........................................................1

## STATEMENT OF JURISDICTION

The United States District Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Plaintiff-Appellant Burton T. Fried ("Mr. Fried") alleged that Defendants-Appellees LVI Services, Inc. and LVI Parent Corp. violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621 *et seq.* ("ADEA").   Specifically, Mr. Fried alleges that: (1) he was discriminated against on the basis of his age; and (2) retaliated against for complaining about being discriminated against.  Pursuant to 28 U.S.C. §1367, the District Court has supplemental jurisdiction over Mr. Fried's related claims against Defendants-Appellees LVI Services, Inc. and LVI Parent Corp., Scott E. State ("State"), Brian Simmons ("Simmons"), Rajay Bagaria ("Bagaria") and Gerald J. Girardi ("Girardi") (collectively "Defendants") under the New York City Human Rights Law, New York Administrative Code §§8-101 *et seq.* ("NYCHRL").

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 because this is an appeal from an Order entered on September 2, 2011 and from an Opinion and Order entered on October 4, 2011 granting Defendants' motion for summary judgment in part and denying it in part, that were made final by the Order entered on October 27, 2011, which dismissed Plaintiff's sole remaining claim with prejudice.  On November 14, 2011, Mr. Fried timely filed a Notice of Appeal pursuant to Fed. R. App. P. 4(a).

1

## STATEMENT OF THE ISSUES

1.    Whether the District Court, in failing to examine the totality of the circumstances and view all evidence in the light most favorable to Mr. Fried, erred in holding that Mr. Fried did not raise a triable issue of material fact as to whether Defendants' proffered reason for his termination was a mere pretext for unlawful discrimination in violation of ADEA.

2.    Whether the District Court applied the wrong standard to Mr. Fried's retaliation claim under the ADEA, and as a result, did not determine whether Mr. Fried's complaint(s) of age discrimination was a motivating factor in Defendants' decision to terminate his employment in violation of the ADEA.

3.    Whether the District Court, even if it applied the correct standard for retaliation under the ADEA, in failing to examine the totality of the circumstances and view all evidence in the light most favorable to Mr. Fried, erred in holding that Mr. Fried did not raise a triable issue of material fact as to whether Defendants' proffered reason for his termination was a mere pretext for retaliation in violation of ADEA.

4.    Whether the District Court erred in holding that, despite the impact Mr. Fried's termination had in New York City, the NYCHRL did not apply to his age discrimination and retaliation claims.

2

## STATEMENT OF THE CASE

Mr. Fried commenced this action on December 13, 2010, by filing a Complaint in the United States District Court for the Southern District of New York alleging discrimination and retaliation in violation of the ADEA and the NYCHRL, as well as other common law claims.  On February 3, 2011, Mr. Fried filed an Amended Complaint.  On April 1, 2011, the District Court issued an Order dismissing all claims against Defendants Apollo Investment Corp., and Code Hennessey Simmons LLC d/b/a CHS Private Equity V LP.  The District Court also dismissed Mr. Fried's common law claims against all Defendants.  On May 23, 2011, the District Court issued and Opinion and Order regarding its April 1, 2011 decision.  The remaining Defendants filed their Answer on April 18, 2011.

After the close of discovery, on June 10, 2011, the remaining Defendants filed a motion for summary judgment.  On June 20, 2011, Mr. Fried filed his opposition to the motion.  On June 27, 2011, Defendants filed their reply.  On September 2, 2011, the District Court issued an Order granting Defendants' motion for summary judgment in part and denying it in part.  On October 4, 2011, the District Court issued and Opinion and Order regarding its September 2, 2011 decision.  On October 27, 2011, the District Court entered an Order dismissing Mr. Fried's only remaining claim with prejudice.  On November 14, 2011, Mr. Fried timely filed a Notice of Appeal.

## <u>STATEMENT OF FACTS</u>

Defendant LVI Parent Corp. ("Parent") maintains its principal place of business in New York City and is the parent and sole shareholder of Defendant LVI Services, Inc. ("LVI"). (A-284, A-369, A-385, A-410).    Parent is approximately 95% owned by: Apollo Investment Corp. ("Apollo"), CHS Private Equity V LP ("CHS"), and Falcon Investment Advisors ("Falcon"). (A-383-84). The Board of Directors of Parent (the "Board") is currently comprised of: Bagaria and Girardi from Apollo, Simmons and Robert Hogan ("Hogan") from CHS, John Schnabel ("Schnabel") from Falcon, State, Richard Ferruci and Robert Buck. (A-384).  While employed by LVI, Mr. Fried was Chairman of the Board. (A-384, A-426).

LVI is an environmental remediation and demolition company that maintains its principal place of business in New York City (the "New York City Office"). (A-284, A-370, A-386).   Along with all of its subsidiaries, LVI is comprised of approximately 20 offices across the United States and has thousands of employees. (A-454-55, A-459).

Mr. Fried, who has been referred to as the "founder" of LVI, was born on February 26, 1940. (A-473, A-476, A-487).  Hired in 1986, he was the General Counsel of LVI until he became its President and Chief Executive Officer in 1989.

4

(A-496-97).  As President and CEO, Mr. Fried initially worked out of the New York City Office. (A-389).

In or around September 2003, LVI opened a satellite office to the New York City Office in Westport, Connecticut ("Westport Office"). (A-497).  Because Mr. Fried lived in Westport, he decided to work out of the Westport Office two to three days a week and work out of the New York City Office two to three days a week. (A-389-90, A-498-500).   Between November 2005 and July 2006, Mr. Fried worked out of the Westport Office three days a week and out of the New York City Office two days a week. (A-532).

Because LVI became the dominant leader in its industry while Mr. Fried was President and CEO, Mr. Fried, in 2005, recommended to the then current owner of LVI that it find a President and CEO with experience managing a billion-dollar company. (A-501-02).  However, Mr. Fried had no intention of retiring once a new President and CEO was hired, and decided to continue working for LVI as an employee with the job title of Chairman and to continue serving as Chairman of the Board.  (A-503-05, A-514, A-531).

In or around July 2006, Robert McNamara ("McNamara") was hired by LVI as its President and CEO and Mr. Fried became Chairman of LVI. (A-388, A-535). In connection with his new role, Mr. Fried envisioned working four days each week. (A-509-10).  However, after his first week as Chairman, he reverted back to

working at least five days a week. (A-509-10).  As Chairman under McNamara, Mr. Fried was responsible for, among other things, strategic growth, legal matters and sales. (A-440, A-531).  As Chairman, Mr. Fried did a good job. (A-427-28, A-440).

While Mr. Fried was Chairman under McNamara, he was based in the Westport Office. (A-532).  Despite the location of his office, he still worked in New York City for LVI. (A-389-90, A-538-40).  For example, he worked out of the New York City office on occasion and attended numerous meetings concerning LVI business in New York City. (A-389-90, A-540).  He also called and/or emailed, almost daily, personnel in the New York City Office about projects in New York City and/or about issues involving the operations of the New York City Office. (A-540).  When Mr. Fried was not in New York City working, or communicating with LVI personnel in New York City concerning LVI business in New York City, he was drafting and reviewing paperwork involving LVI projects in New York City. (A-540).

In early 2010, McNamara resigned, and Mr. Fried was asked by Simmons to be the interim President and CEO of LVI until McNamara's replacement could be found. (A-412, A-460-61, A-508-09, A-531).  Not only did Mr. Fried agree to serve in this capacity, but he also continued to serve as Chairman of LVI and intended to continue as Chairman after a new President and CEO was found. (A-

391, A-441, A-443-44, A-531). While interim President and CEO, Mr. Fried did a good job. (A-391, A-428, A-462). In fact, just six months prior to his termination, he was specifically told by Simmons that he was "earning every penny" of his salary, and five months prior to his termination, Bagaria and Girardi also commended Mr. Fried's performance by writing that "we are fortunate to have Burt Fried as interim CEO who had done a good job stabilizing the situation." (A-544, A-558).

While Mr. Fried was interim President and CEO, and later as Chairman, LVI was conducting a substantial amount of business in New York City. (A-441-43, A-540-42). For example, it was performing work at: (a) Madison Square Garden in connection with a $27.5 million contract; (b) 130 Liberty Street in connection with an approximately $30 million contract; (c) Hudson Yards in connection with a $10 million contract; and (d) Yankee Stadium in connection with a $3 million contract. (A-441-42). The former two contracts, which Mr. Fried played a role in securing, were two of the biggest contracts that LVI had at the time. (A-442-43).

While he was interim President and CEO, Mr. Fried, who was still based in the Westport Office, continued to work in New York City for LVI. (A-433, A-466, A-540-42). For example, he worked out of the New York City Office on occasion and continued to attend numerous meetings concerning LVI business in New York City, including four meetings in connection with the Madison Square Garden

project. (A-433, A-442-43, A-466, A-540-42). He also continued to call and/or email, almost daily, personnel in the New York City Office about projects in New York City and/or about issues involving the operations of the New York City Office. (A-392, A-466, A-542). He also, on a weekly basis, participated in conference calls to New York City to discuss issues concerning a project in New York City. (A-542).

### Scott State's Pre-Hire Inquiries Regarding Mr. Fried

In or around August 2010, State, who was 47 years old at the time, was introduced to Mr. Fried as a candidate for President and CEO of LVI. (A-285, A-511-12). On September 14, 2010, before State was even hired, he inquired about how Mr. Fried could be removed as Chairman of the Board. (A-565-66).

Again, before he was hired, State asked John Leonard ("Leonard"), the Chief Operating Officer of LVI, if Mr. Fried, who was 70 years old at the time, was going to retire. (A-444-45, A-483-84). Mr. Leonard said no. (A-444-45, A-485, A-569). In fact, Mr. Fried had often told Mr. Leonard that he intended to die in his chair. (A-443).

On September 19, 2010, before being hired and despite already being told by Leonard that Mr. Fried had no intention of retiring, State wrote the following in the body of a lengthier email to Hogan:

- In the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and

8

offer to support the business under a consulting agreement in any way the new CEO sees fit.  Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do.  That is not a healthy situation for Burt or LVI.  (A-485, A-569).

## The Hiring Of Scott State

On approximately September 28, 2010, State was hired by LVI as its President and CEO. (A-287, A-482).  Upon State's hire, Mr. Fried assumed his prior title and job duties of Chairman of LVI. (A-371, A-531, A-572).  As Chairman, Mr. Fried continued to do a good job. (A-446).  During this time, Mr. Fried, who was still based in the Westport Office, continued to work in New York City for LVI. (A-465, A-542).  For example, he continued to attend meetings concerning LVI business in New York City. (A-465, A-499-500, A-542).

## The October 19, 2010 Age Comment

On October 19, 2010, Mr. Fried met with State in New York City to discuss Mr. Fried's job duties. (A-515, A-575).  During the meeting, State told Mr. Fried that he was going to take away all of his duties and give them to others (who were younger than Mr. Fried by decades) (A-285, A-393, A-446-47, A-476-77, A-516-18, A-692-96).  When Mr. Fried asked State why he was doing this, Mr. State admitted:

- ■ "Burt, you're 71 years of age, how much longer do you expect to work?"

9

Case: 11-4791   Document: 41   Page: 18   02/27/2012   536335   57

(A-447, A-518).  State made this comment despite knowing that Mr. Fried wanted to "remain active forever" and had no intention of retiring. (A-443-45, A-485, A-569, A-688).  In response to State's ageist remark, Mr. Fried told State that he was 70 years old and that he intended to work for LVI for many years to come. (A-516-17).  Despite Mr. Fried's response, State decided to reassign his duties. (A-393, A-517).

**State's October 19, 2010 Email**

After he met with Mr. Fried, that same day State emailed Simmons and wrote the following sentence in reference to Mr. Fried:

- "I was clear with him that it was my objective to have him truly retire and be just an on call resource."

(A-575).

**Mr. Fried's First Complaints of Discrimination**

After this meeting and prior to the end of October 2010, Mr. Fried spoke to Bagaria, Simmons and Schnabel, and told them that State wanted to reassign all of his duties and complained about the comment State made. (A-373, A-463-64, A-518-24).

**The November 4, 2010 Board Meeting**

On November 4, 2010, the Board held a quarterly meeting in New York City which Mr. Fried attended. (A-578).  At the end of the meeting, the Board discussed Mr. Fried's future role at LVI. (A-579).  During this meeting, Mr. Fried calmly

told the Board that State reassigned all of his duties to others and also told them the age-related comment State made. (A-374, A-414, A-467, A-588-90). He also told the Board that State's actions constituted age discrimination. (A-374, A-430, A-589-90). At the conclusion of the meeting, no decision regarding Mr. Fried's continued employment was made. (A-374-75, A-415). Instead, the Board decided to have Schnabel reach out to Mr. Fried and State to broker a resolution. (A-374). Further, the Board decided not to investigate Mr. Fried's complaint of age discrimination, even though Jeffrey Smith, Esq., a partner at Sidley Austin (the same firm representing Defendants) and LVI's outside counsel, was present at the Board meeting. (A-385, A-416, A-585-87, A-591-92, A-681, A-683).

**The November 5, 2010 Email**

On November 5, 2010, State emailed his personal friend, who he was communicating with about LVI business, and wrote the following sentence in reference to Mr. Fried:

- In a battle with founder about his need to retire but Board gets it and is working to exit him with some respect.

(A-473, A-487).

**Mr. Fried's Termination**

On November 15, 2010, Mr. Fried's attorneys hand delivered a letter to State's attention at the New York City Office to address the discriminatory conduct about which he previously complained. (A-395, A-595-98). On November 16,

11

2010, a majority of the Board members (Girardi, Simmons, Hogan, Schnabel and State) discussed the November 15 letter. (A-417-19, A-468, A-601). The Board members, including State, decided to ignore the November 15 letter and send a letter in response. (A-418-19, A-601, A-603). The letter in response to Mr. Fried's decision to hire counsel to pursue his age discrimination claims, which was sent to Mr. Fried on November 16, 2010, terminated Mr. Fried's employment as Chairman of LVI. (A-603-05). The decision to terminate Mr. Fried was made by State. (A-614, A-633, A-647, A-662). Prior to State's hire, the Board never considered firing Mr. Fried. (A-372-73, A-413).

The November 16 letter also advised Mr. Fried that he could continue to be Chairman of the Board and offered him the opportunity to work for LVI as a consultant on an hourly basis. (A-604-05). However, this arrangement was contingent on Mr. Fried agreeing not to sue LVI for age discrimination and retaliation. (A-605-06). Moreover, Mr. Fried was not guaranteed a minimum number of hours, could have been terminated at any time upon 30-days notice, and was only guaranteed $37,500. (A-605). Mr. Fried declined the "offer." (A-289, A-684).

After he was fired, Mr. Fried's job duties were mostly reassigned to Tom Cullen who was 35, Gregory DiCarlo who was 44, David Pearson who was 44, Frank Aiello who was 45, John Leonard who was 46, State who was 47, Mark

Canessa who was 48, Kamal Sookram who was 53, and Joseph Annarumma who was 57. (A-285, A-393, A-446-47, A-476-77, A-692-96).   At the time of his termination, Defendants admitted that Mr. Fried, who had worked for LVI for 24 years and was 70 years of age, had the ability to perform a valuable role with LVI. (Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment p.1).

## SUMMARY OF THE ARGUMENT

Mr. Fried, who was 70 years old at all relevant times, commenced this action pursuant to the ADEA and the NYCHRL after he was terminated by Defendants because of his age and was retaliated against after complaining about being discriminated against because of his age.

With respect to his retaliation claim, Mr. Fried first complained of age discrimination as early as October 19, 2010. He again complained of age discrimination on November 4, 2010. After no investigation or corrective action was taken in response to these complaints, Mr. Fried's attorneys sent the President and CEO of LVI a letter memorializing Mr. Fried's complaints of age discrimination. In response to the letter, after 24 years of outstanding service, Mr. Fried was terminated the next day.

The District Court erred in granting summary judgment on Mr. Fried's ADEA retaliation claim because it analyzed his claim under the incorrect standard, *i.e.*, "but-for" v. "motivating factor." Nevertheless, under either standard, a genuine issue of material fact exists as to whether Mr. Fried was terminated in response to his attorneys' letter in light of the documentary evidence and an admission by a board member of Parent that the letter terminating Mr. Fried's employment was sent in response to his attorneys' letter.

With respect to his discrimination claim, on October 19, 2010, approximately 3 weeks after State was hired, State met with Mr. Fried and told Mr. Fried that he was reassigning all of his duties. When Mr. Fried asked why, State responded as follows: "Burt, you're 71 years of age, how much longer do you expect to work?" Additionally, despite knowing that Mr. Fried had no intention of retiring, State admittedly made it his objective to have Mr. Fried retire. When Mr. Fried would not voluntarily leave the company he was with for 24 years, State terminated him despite there being no issue with Mr. Fried's work performance.

The District Court erred in granting summary judgment on Mr. Fried's ADEA discrimination claim because, instead of requiring him to raise a genuine issue of material fact as to whether his termination was pretextual, it required him to "demonstrate" and "prove" on summary judgment that "but-for" his age, he would not have been terminated. In any event, a genuine issue of material fact exists as to whether Mr. Fried was terminated because of his age. Additionally, the District Court erred in grating summary judgment because it did not view the evidence in the light most favorable to Mr. Fried or examine the facts presented in support of Mr. Fried's discrimination claim under the totality of the circumstances. There is also a genuine issue of material fact as to whether State's October 19, 2010 ageist comment was a "stray" remark.

With respect to Mr. Fried's retaliation and discrimination claims under the NYCHRL, the District Court erred in holding that the NYCHRL did not apply to his claims because Mr. Fried's termination had a significant and definite impact on New York City.

# ARGUMENT

## I.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. <u>See</u> <u>Sousa v. Roque</u>, 578 F.3d 164, 169 (2d Cir. 2009); <u>Pilgrim v. Luther</u>, 571 F.3d 201, 204 (2d Cir. 2009).

Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden is upon the moving party to demonstrate that no genuine issue regarding any material fact exists. <u>See</u> <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1320 (2d Cir. 1975).  In considering that, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. <u>See</u> <u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243, 249 (2d Cir. 1985).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." <u>Gallo v. Prudential Res. Serv.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

With respect to employment discrimination cases, it is well-settled that "[c]aution should be exercised in addressing summary judgment motions . . . where intent and state of mind are at issue because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" Velez v. McHugh, No. 09-CV-0925 (GAY), 2011 WL 778693, at *2 (S.D.N.Y. Mar. 2, 2011) (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000)); see Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo v. Prudential Res. Serv., 22 F.3d 1219, 1224 (2d Cir. 1994); see Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) ("as discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.") (internal quotation omitted).

## II.

## THE DISTRICT COURT, WHICH ANALYZED MR. FRIED'S ADEA RETALIATION CLAIM UNDER THE INCORRECT STANDARD, ERRED IN GRANTING SUMMARY JUDGMENT

Mr. Fried alleges that he was terminated in retaliation for complaining about age discrimination in violation of the ADEA. (A-49, A-51). The District Court erred in granting summary judgment on Mr. Fried's retaliation claim for two reasons. First, the District Court incorrectly analyzed Mr. Fried's ADEA retaliation claim under the Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343 (2009), "but for" standard when it should have analyzed his claim under the "motivating factor" standard. (SPA-29, SPA-31). Second, even if the District Court applied the correct standard, which it did not, its one sentence analysis in the Opinion and Order, despite acknowledging that the retaliation claim was a "closer question" than Mr. Fried's ADEA discrimination claim, completely failed to grasp, let alone examine Girardi's admission that Mr. Fried's termination was in response to his counsel's letter outlining Mr. Fried's claims of age discrimination. (SPA-29, SPA-31).

Retaliation claims under the ADEA are analyzed using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003). Under this framework, Mr. Fried must first establish a *prima facie* case of retaliation. See Reed v. A.W. Lawrence & Co.,

19

95 F.3d 1170, 1178 (2d Cir. 1996). If he establishes a *prima facie* case, Defendants must articulate a legitimate nonretaliatory reason for terminating Mr. Fried. Id. at 1181. Should they satisfy that requirement, the burden shifts to Mr. Fried to raise a triable issue of material fact as to whether the defendant's proffered reason for the adverse action was a mere pretext for unlawful retaliation. Id.

In this case, the District Court correctly held that Mr. Fried established a *prima facie* case of retaliation because he complained of age discrimination as early as October 19, 2010 to members of the Board and was terminated less than a month later. (SPA-29-31). The District Court also found that Defendants articulated a legitimate nonretaliatory reason for terminating Mr. Fried. (SPA-23, SPA-31). However, the District Court analyzed the final prong of Mr. Fried's ADEA retaliation claim under the wrong standard because it required him to meet the heightened "but for" standard instead of the lower, and correct, "motivating factor" standard. (SPA-29, SPA-31).

The Supreme Court in Gross did not address whether a plaintiff is required to meet the "but-for" standard for ADEA retaliation claims because Gross was a disparate treatment case. 129 S. Ct. at 2350-51. The Second Circuit has also not resolved the issue since Gross was decided. See Mattera v. JPMorgan Chase Corp., 740 F.Supp.2d 561, n.13 (S.D.N.Y. 2010). Therefore, in the absence of controlling

20

authority, Mr. Fried was only required to establish that an issue of fact existed as to whether his complaint(s) of age discrimination was a motivating factor in the decision to terminate him. See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007). Given the language of Title VII (and its amendments), the ADEA, and Gross, this is the only logical conclusion. In holding that a plaintiff asserting disparate treatment claims under the ADEA must meet the "but for" standard at trial, the Supreme Court in Gross focused on the language of the 1991 amendments to Title VII, 42 U.S.C. §2000e-2(m), that specified that in establishing "an unlawful employment practice" (not defined as retaliation), the "motivating factor" standard is utilized. Compare 42 U.S.C. §2000e-2(a) to 42 U.S.C. §2000e-3(a). Noting that the ADEA had a similar definition which included the phrase "because of" as Title VII's pre-1991 amendment (compare 29 U.S.C. §623(a)(1) with 42 U.S.C. §2000e-2(a)), the court concluded that because Congress did not amend the ADEA to include the motivating factor language, it demonstrated the congressional intent to hold a plaintiff to a higher standard ("because of" or "but for") at trial under the ADEA.

This analysis, as examined under Gross, does not, however, apply in the context of retaliation claims, as Congress did not amend the definition of retaliation in either Title VII or the ADEA. See 29 U.S.C. §623(d) and 42 U.S.C. §2000e-3(a). Thus, given the almost identical language of both Title VII and the

ADEA as it relates to claims of retaliation, and because <u>Gross</u> and the Title VII amendments only applied to the underlying claims of discrimination, the motivating factor test should be utilized in analyzing Mr. Fried's claims of retaliation under the ADEA. <u>See</u> <u>Terry</u>, 336 F.3d at 141.

Regardless of whether this Court analyzes Mr. Fried's ADEA retaliation claim under the "motivating factor" standard or the <u>Gross</u> standard, material issues of fact exist as to whether Mr. Fried's complaints of discrimination, including the November 15 letter complaining about age discrimination, was a motivating factor in the decision to fire him or whether Defendants' proffered reason for his termination was pretextual.    In this case, Mr. Fried's earliest complaint of discrimination occurred sometime between October 19, 2010 and October 30, 2010, when he contacted multiple members of the Board to oppose State's decision to reassign his job duties because of his age. (A-373, A-463-64, A-518-24). Regardless of which date is used as the operative date of Mr. Fried's first complaint, it is undisputed that he was terminated less than a month after he complained of age discrimination. (A-604-05).    Further, the Board never contemplated firing Mr. Fried until after he complained. (A-372-73, A-413). When coupled with the questionable grounds of Mr. Fried's termination, an issue of fact exists as to whether Mr. Fried was terminated for engaging in protected activity.

Moreover, Girardi testified at deposition that in response to Mr. Fried's November 15 complaint of age discrimination, the Board sent a letter to him the next day that terminated his employment. (A-418-19, A-601, A-603-05). This admission is damning to Defendants. In fact, to make matters worse for Defendants, the retaliatory animus was also documented by Girardi who wrote, in his contemporaneous notes on November 16, the following: "Burt- sent pre-emptive letter; ignore and send good faith letter offer to Burt Fried." (A-601). The "good faith letter offer" referenced by Girardi in his notes that was sent to Mr. Fried terminated his employment without reason after 24 years. (A-603-08). Viewing the evidence in a light most favorable to Mr. Fried and drawing all inferences in his favor, a reasonable interpretation of Girardi's admission and notes is that the reason Mr. Fried was fired is because he complained about age discrimination. See, e.g., Shub v. Westchester Community College, 556 F.Supp.2d 227 (S.D.N.Y. 2008). Not only did the District Court examine this issue under the wrong standard, it completely neglected to address any of this evidence in its one sentence conclusory "analysis" in the Opinion and Order.

Terry v. Ashcroft is instructive. 336 F.3d 128. There, the Second Circuit reversed the lower court's grant of summary judgment on the plaintiff's retaliation claim based on his non-promotion. In Terry, prior to his application to fill Vacancy 93-01, the plaintiff filed a complaint with the EEO regarding his

23

unsuccessful application for a promotion to a Vacancy 92-59. Id. at 141.

Candidates for Vacancy 92-59 were listed on a memorandum that contained a note

beside the plaintiff's name that read "Pending Complaint," and a note beside

another applicant's name that read "EEO Activity." The Second Circuit found that:

> [t]he presence of such notations is evidence from which a
> reasonable trier-of-fact could infer that [the plaintiff's]
> "Pending Complaint" was a motivating factor in the
> promotion decision, particularly when coupled with
> evidence that other INS employees who reported problems
> experienced retaliation.

Id. at 142. The Court went on to hold that:

> the wholly unexplained presence of the notations "EEO
> action" and "pending complaint" on the list of candidates is
> sufficient – especially given the evidence of a pattern of
> retaliatory action in the agency – to create a genuine issue
> of material fact regarding the pretextual nature of
> defendants' rationale.

Id.

Also, in Shub, 556 F.Supp.2d 227, the Southern District of New York

denied the defendants' motion for summary judgment as to the plaintiff's ADEA

retaliation claim.    In Shub, the plaintiff, a former associate professor at

Westchester Community College, claimed that the defendants did not hire him for

the Fall 2006 semester and subsequent semesters in retaliation for him filing a

Charge of Discrimination under the ADEA with the Equal Employment

Opportunity Commission. Id. at 257.  At deposition, when the plaintiff's supervisor

was asked why he decided not to hire the plaintiff after the Spring 2006 semester,

he replied: "Well, we had a suit pending against us and I just didn't know how to

proceed after that." Id.  The court held:

> A reasonable interpretation of [the supervisor's] statement
> could be that one reason behind the decision not to hire
> plaintiff for the Fall 2006 semester was because he filed the
> EEOC charge.  Although a plaintiff may not rely on
> conclusory assertions of retaliatory motive, "but must offer
> instead some tangible proof to demonstrate that [his]
> version of what occurred was not imaginary," plaintiff has
> offered "some tangible proof to demonstrate that one
> reason defendants did not hire him was because he filed the
> EEOC charge."

Id. at 257-58 (quoting Morris v. Lindau, 196 F.3d 102, 111 (2d Cir. 1999)).

Combined with the close proximity (3 months) of time between the plaintiff's

filing of the charge and the decision not to hire him, the court held that a material

issue of fact existed as to whether the plaintiff's EEOC charge was a motivating

factor in the defendant's decision. Id. at 258.

    The facts pertaining to Defendants' proffer of a nonretaliatory reason for Mr.

Fried's termination are in clear dispute.  The admission that the November 16

termination letter was sent in response to Mr. Fried's November 15 complaint of

discrimination, coupled with all of the other evidence detailed above, raises issues

of fact for a jury to decide.  Accordingly, the District Court's grant of summary

judgment on Mr. Fried's ADEA retaliation claim should be reversed.

## III.

## THE DISTRICT COURT, WHICH FAILED TO EXAMINE MR. FRIED'S ADEA DISCRIMINATION CLAIM UNDER THE TOTALITY OF THE CIRCUMSTANCES AND INCORRECTLY CONSTRUED STATE'S DISCRIMINATORY REMARK AS "STRAY," ERRED IN GRANTING SUMMARY JUDGMENT

Mr. Fried also alleges that he was stripped of his job duties and terminated because of his age in violation of the ADEA. (A-48, A-50). The District Court erred in granting summary judgment on Mr. Fried's discrimination claim because the record demonstrates that genuine issues of material fact exist regarding whether the reason for Mr. Fried's termination was pretextual.

The Opinion and Order dismissing Mr. Fried's ADEA claim reads more of advocacy to justify its decision rather than an analysis of whether, viewing the evidence in a light most favorable to Mr. Fried and examining the totality of circumstances, Mr. Fried raised a triable issue of material fact as to whether Defendants' proffered reason for his termination was a mere pretext for unlawful discrimination. In its failure to adhere to this standard, the District Court's opinion is rife with instances in which Mr. Fried was held to a higher standard. Rather than reviewing all of the evidence set forth by Mr. Fried cumulatively, including the direct and indirect evidence supporting his *prima facie* case (which Defendants did not contest he established), and in the light most favorable to Mr. Fried, the opinion examines each piece of evidence in isolation. The District Court's opinion

also incorrectly concluded that Mr. State's discriminatory comment was "stray," despite Second Circuit authority to the contrary. (SPA-24-25). Further, the opinion also incorrectly held that Mr. Fried must "demonstrate" and "prove" that age was the "but for" cause of the challenged employment actions rather than using the correct standard, namely, whether there is a genuine issue of material fact as to whether Defendants' purported reason for the adverse actions was a pretext for unlawful discrimination. (SPA-23-24).

Similar to Mr. Fried's ADEA retaliation claim, an ADEA discrimination claim is also analyzed using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010). As set forth above, under McDonnell Douglas, Mr. Fried must first establish a *prima facie* case of age discrimination. Id. If he does, Defendants bear the burden to "articulate some legitimate, nondiscriminatory reason for the [adverse act]." Liebowitz v. Cornell University, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). Should Defendants satisfy that requirement, the burden shifts to Mr. Fried to raise a triable issue of material fact as to whether Defendants' proffered reason for the adverse actions was a mere pretext for unlawful discrimination. See Id. at 499, 503-506.[1]

---

[1]    It is important to note that the holding of Gross was in the context of a trial and not on summary judgment. Thus, the appropriate standard using the McDonnell Douglas burden-shifting analysis in the context of summary judgment is not that Mr. Fried must raise a genuine

A-1148

## A.    Mr. Fried Established A *Prima Facie* Case Of Age Discrimination

Defendants did not contest that Plaintiff satisfied his burden of establishing a *prima facie* case of discrimination. (SPA-22).  In any event, in order to establish a *prima facie* case under the ADEA, the plaintiff "must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Gorzynski, 596 F.3d at 106-107.  In this case, it is undisputed that at all relevant times, Mr. Fried was 70 years old. (A-476).  It is also undisputed that Mr. Fried, as a 24 year employee of LVI, including 20 as its President and CEO and/or Chairman, was qualified to hold the Chairman position at the time his job duties were reassigned and at the time he was fired. (A-391, A-427-28, A-440, A-446, A-462, A-496-97, A-538, A-544, A-558).   It is also undisputed that Mr. Fried was fired effective November 30, 2010 from LVI. (A-604-05).

With respect to the fourth prong, it is also undisputed that:

- ■ Mr. Fried worked at LVI for 24 years before State was hired. (A-538).  At all times, Mr. Fried's work performance was good. (A-427-28, A-440, A-446, A-462, A-544, A-558). In fact, a few months before State was hired, Mr. Fried was told by Simmons, he was "earning every penny" of his salary (A-544), and Bagaria and Girardi said that Apollo was "fortunate to have Burt Fried as interim CEO." (A-558);

---

issue of material fact that age was the "but for" reason for termination.  Rather, Mr. Fried only has to raise a genuine issue of material fact that Defendants' proffered reason for his termination was pretextual. See Shelley v. Geren, 10-35014 (9th Cir. Jan. 12, 2012).

- On September 19, 2010, before State was hired, State emailed Hogan and wrote that "[i]n the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit. Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do. That is not a healthy situation for Burt or LVI." (A-485, A-569);

- On October 19, 2010, when Mr. Fried asked State why he was reassigning his job duties to other employees, State said, "Burt you're 71 years of age, how much longer do you expect to work?" (A-447, A-516-18);

- After meeting with Mr. Fried on October 19, 2010, State wrote to Simmons, "I was clear with [Mr. Fried] that it was my objective to have him truly retire and be just an on call resource." (A-575);

- On November 5, 2010, State emailed his friend and told him that he was "[i]n a battle with [Mr. Fried] about his need to retire but Board gets it and is working to exit him with some respect." (A-473, A-487);

- State, who is 23 years younger than Mr. Fried, made the decision to fire him less than a month after State age-related comment to Mr. Fried. (A-285, A-614, A-633, A-647, A-662); and

- After he was fired, Mr. Fried's job duties were reassigned to employees that ranged from 13 to 35 years younger than him. (A-285, A-393, A-446-47, A-476-77, A-692-96).

In light of this evidence, an issue of fact exists as to whether Mr. Fried's termination occurred under circumstances giving rise to an inference of discrimination. See Joseph v. Marco Polo Network, Inc., No. 09-CV-1597 (DLC), 2010 WL 4513298, at *10 (S.D.N.Y. Nov. 10, 2010) ("For the purposes of assessing the plaintiffs' *prima facie* case, the plaintiffs' evidence of [their

supervisor's] explicit age-related comments in connection with the performance of the plaintiffs' professional duties is sufficient."); <u>Mattera</u>, 740 F. Supp. 2d at 573 ("The Second Circuit has continuously held that an inference of discrimination arises . . . when an older qualified employee is replaced by someone younger.") (collecting cases).

Based upon the fact that Defendants did not challenge that Mr. Fried met his initial burden, the District Court only addressed whether Defendants articulated a legitimate nondiscriminatory reason for Mr. Fried's termination, and whether, albeit incorrectly, Mr. Fried "demonstrated" or "proved" that his age was the "but-for" cause of his termination, rather than whether Mr. Fried, in viewing the evidence in a light most favorable to him and under the totality of the circumstances, raised a genuine issue of material fact that Defendants' proffered reason for the adverse actions was pretextual.

**B.    A Myriad Of Issues Of Material Fact Exist As To Whether Defendants' <u>Proffered Reason For Mr. Fried's Termination Was Pretextual</u>**

The District Court, which acted as judge and jury, erred in holding that Mr. Fried failed to demonstrate issues of fact that Defendants' proffered reason for his termination was pretextual. (SPA-24). The District Court clearly failed to examine all of the facts and the totality of circumstances.

It must be kept in mind that at the age of 70, Mr. Fried had already worked at LVI for 24 years and helped grow LVI into one of the biggest and most

successful companies in its industry. It must also be noted that Mr. Fried was performing his job well at all times.

This is not a case in which Mr. Fried was part of a large scale reduction-in-force, or where his performance was problematic or in which documented deficiencies were noted. According to Defendants, Mr. Fried was terminated "to ensure that the new CEO and President, Scott E. State, would have the freedom to manage the Company as he saw fit." (SPA-22). Defendants' proffered excuse for Mr. Fried's termination is weak. It should be noted that when McNamara was CEO and President of LVI, Mr. Fried worked as Chairman under McNamara without issue. (A-688). In fact, as Chairman, his work performance was good. (A-427-28, A-440). There was absolutely no legitimate reason for Defendants to believe that he could not have similarly worked as Chairman under State. In light of all of the evidence, the veracity of Defendants' reason is highly suspect. At the very least, there exists a multitude of genuine issues of material fact as to whether this stated reason is pretextual.

With these facts in mind, even before Mr. Fried could have possibly interfered with State's management of LVI, State was hell-bent on terminating Mr. Fried because of his age. In fact, before State even started working at LVI, he wrote to Hogan inquiring about how to remove Mr. Fried as Chairman of the Board, a position that had no direct impact State's day-to-day management of LVI.

31

(A-565-66).  State also wrote to Hogan that "in the best case scenario, Burt will decide to retire at some date certain from LVI upon a new CEO being named . . . ." (A-485, A-569).  Moreover, State received assurances from Mr. Fried that he would give State independence to run LVI and that he would not interfere with State. (A-698, A-700).  Tellingly, Defendants do not even claim that Mr. Fried actually interfered with State's management of LVI, and did not demonstrate that there was any danger that Mr. Fried would interfere with State, or meddle in any other way with the management of LVI.  In fact, when Mr. Fried was Chairman under McNamara, there is no evidence he interfered with McNamara's management of LVI.

Furthermore, while Mr. Fried was interim President and CEO, he did a good job.  (A-391, A-428, A-462)  Simmons told him that he was "earning every penny" of his salary and Bagaria and Girardi wrote that "we are fortunate to have Burt Fried as interim CEO who had done a good job stabilizing the situation." (A-544, A-558).  And while he was Chairman after State was hired, as always, Mr. Fried continued to do a good job. (A-446).

Importantly, on October 19, 2010, when Mr. Fried met face-to-face with State, State told Mr. Fried that he was going to be reassigning Mr. Fried's duties to other employees. (A-518).  When Mr. Fried asked State why he was reassigning his job duties to other employees, State unabashedly said, "Burt, you're 71 years of

age, how much longer to do expect to work?" (A-447, A-518)  This admission that Mr. Fried's duties were being assigned because of his age is a rare instance of direct evidence of age discrimination. See Abreu v. Suffolk County Police Dept., 03 CV 5927 (JFB)(WDW), 2007 WL 608331, at *14 (E.D.N.Y. Feb. 23, 2007) ("Verbal comments may constitute direct evidence of retaliation when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action."); Schreiber v. Worldco, LLC, 324 F.Supp.2d 512, 518 (S.D.N.Y. 2004) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.").  Based on this evidence alone, a reasonable jury could easily find that Defendants' reason for firing Mr. Fried at the age of 70 was pretextual.

However, the District Court mistakenly found that State's discriminatory statement (which the court incorrectly concluded that Mr. Fried's "case hinges almost exclusively") was a "stray remark." (SPA-24-25).  It is unclear how this discriminatory remark referencing Mr. Fried's age in connection with his continued employment can be deemed "stray" when the word "retire" was used on at least 3 separate occasions in reference to Mr. Fried, despite State knowing that Mr. Fried had no intention of retiring. (A-444-45, A-473, A-483-85, A-569, A-

A-1154

575).  This Court's ruling in Tomassi bears out the District Court's mistake. 478
F.3d 111.  The District Court was required to consider "all of the evidence in the
light most favorable to the plaintiff to determine whether it could support a
reasonable finding in the plaintiff's favor."  Id. at 115 (emphasis added).  Instead,
the District Court decontextualized State's comment - not taking into account the
totality of the circumstances - and incorrectly viewed it in a vacuum. See Carlton v.
Mystic Trans., Inc., 202 F.3d 129, 136 (2d Cir. 2000) ("Although evidence of one
stray comment by itself is usually not sufficient proof to show age discrimination,
that stray comment may 'bear a more ominous significance' when considered
within the totality of the circumstances." (quoting Danzer v. Norden Sys., Inc., 151
F.3d 50, 56 (2d Cir. 1998).

   The categorization of a remark as "stray" must follow a holistic examination
of the evidence. See Id. at 115-16 (Purpose of describing remarks as "stray" "was
to recognize that all comments pertaining to a protected class are not equally
probative of discrimination and to explain in generalized terms why the evidence
in the particular case was not sufficient.  We did not mean to suggest that remarks
should first be categorized either as stray or not stray and then disregarded if they
fall into the stray category."); see also Abdu-Brisson v. Delta Air Lines, Inc., 239
F.3d 456, 468 (2d Cir. 2001) (management representative's numerous comments
about the age of the pilot force, when "viewed against the background of

34

[defendants'] all-consuming interest in the age and projected retirement rates" of pilots, "inescapably" led to the conclusion that defendant airline's "actions may indeed have been motivated by age-based animus"); Danzer, 151 F.3d at 56 ("[W]hen . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."). The District Court should have considered whether all the evidence "in the aggregate raises a triable question" as to whether Defendants' proffered reason for Mr. Fried's termination was pretextual. Tomassi, 478 F.3d at 115-16.

In Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134 (2d Cir. 2010), this Court described the proper approach for applying the "stray remarks" analysis to individual cases. "In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Id. at 149. Examining these four factors, it is clear that State's remark was probative of age discrimination on his part.

35

### 1.    The Remark Was Made By A Decisionmaker

The reference to Mr. Fried's age (not to mention the use of the word "retire" on at least 3 separate occasions) was made by the very same person who decided to terminate Mr. Fried.  It was not a "remote and oblique" remark by someone other than the person who made the decision to fire Mr. Fried, but the very person responsible for firing Mr. Fried.  See Tomassi, 478 F.3d at 115 (describing remarks as "stray" when they are "made by someone other than the person who made the decision adversely affecting the plaintiff" because they "may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark," and finding that since the remarks were made by the person who decided to terminate plaintiff, they could not be characterized as "stray"); see also Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992) (describing remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process"); cf. Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (contrasting "the stray remarks of a colleague" with "comments made directly to" the plaintiff by someone with "enormous influence over the decision-making process").

### 2.    The Remark Was Made Close In Time To Mr. Fried's Termination

The remark was made by State less than one month before Mr. Fried's termination, and during a discussion in which State told Mr. Fried that he was

36

going to take away all of his duties and give them to others who were younger than Mr. Fried by decades.[2] See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 162-63 (2d Cir. 1998) (rejecting the label "stray" where decision-makers uttered age-related remarks near the time of plaintiff's discharge).

> 3.    A Reasonable Juror Could View The Remark As Discriminatory

A reasonable juror could view the remark as discriminatory since it was made in response to Mr. Fried's inquiry about his future at LVI to explain why his duties were going to be redistributed.  In no uncertain terms, State responded that his duties would be redistributed because of his age. See Gipson v. Wells Fargo N.A., 460 F.Supp.2d 15, 27 (D.D.C. 2006) ("Since there is a genuine issue as to any meaning in [the Area Manager's] comment, and since the meaning in that comment is material to the outcome of the case, the question must be presented to the jury for final resolution."); see also Tomassi, 478 F.3d at 113 (reversing grant of summary judgment where a sixty-three year old employee testified that the employer had said when discharging her that "I figure[d] . . . you probably didn't want to work long hours any more and you would be happier doing something part-time"); Diaz v. Jiten Hotel Mgmt., Inc., 762 F. Supp. 2d 319, 337 (D. Mass. 2011) ("The use of . . . ageist offensive language . . . is highly probative.  What we

---

[2]    State also used the word "retire" in reference to Mr. Fried on at least 3 occasions within 2 months of his decision to terminate Mr. Fried.

say in the workplace may well reflect what motivates us, and could well affect how welcoming the environment is.").

###### 4.    The Remark Was Related To The Decision-Making Process

The context in which the remark was made shows that it was clearly related to the decision-making process.  That context includes, for example, that despite being aware that Mr. Fried had no intention of retiring:

- On September 19, 2010, before State was even hired, State emailed Hogan and wrote that "[i]n the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit.  Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do.  That is not a healthy situation for Burt or LVI." (A-485, A-569);

- On October 19, 2010, directly after the meeting with Mr. Fried where State stripped him of his job duties because of his age, State wrote to Simmons that during the meeting with Mr. Fried, he was clear that it was his "objective to have [Mr. Fried] truly retire." (A-575);

- On November 5, 2010, State emailed his friend and told him that he was "[i]n a battle with [Mr. Fried] about his need to retire but Board gets it and is working to exit him with some respect." (A-473, A-487).

The District Court clearly did not view Mr. State's repeated use of the word "retire" in the light most favorable to Mr. Fried.  The District Court also failed to appreciate this Court's edict that while "[i]t is perfectly possible that the defendant's explanation is the correct one . . . it is our obligation at this stage to interpret ambiguities in the evidence in the light most favorable to the Plaintiff." Tomassi, 478 F.3d at 116.  State insisted on pushing the concept of Mr. Fried's

38

retirement on Mr. Fried and others, although State was fully aware that Mr. Fried had no intention of retiring. Whether State's choice of words evinces a desire to remove Mr. Fried because of his age, especially when coupled with all of the other genuine issues of material fact, is a classic question for the jury. See Giarratano v. Edison Hotel, No. 08-CV-1849 (SAS), 2009 WL 464441, at *6 (S.D.N.Y. Feb. 24, 2009) (finding that the question of whether the use of the word "retirement" referred to plaintiff's age was a question to be resolved by the jury); see also O'Reilly v. Marina Dodge, Inc., No. 10-CV-2977, 2011 WL 1897489, at *2 (2d Cir. May 19, 2011) ("Where, as here, the asserted nondiscriminatory explanations relate to and purport to justify allegedly age-related comments, a jury may consider the pretextual nature of the explanations in determining whether the comments are ageist and whether the adverse action would not have occurred but for the plaintiff's age.").

The District Court's conclusion that State's remarks were "isolated" and "stray" ignores that Mr. State used the word "retire" on at least 3 occasions. (SPA-25). Moreover, the District Court's conclusion that "the single, isolated mention of Fried's age, . . . cannot, standing alone, create an issue of material fact . . ." fails to examine the facts in the light most favorable to Mr. Fried and in the context of State's repeated use of the word "retire," and in conjunction with all of the other facts, including the facts supporting Mr. Fried's *prima facie* case. (SPA-25).

Furthermore, the District Court's misinterpretation that Mr. Fried somehow admitted that State "qualified" the age-based remark by asking "what if you get hit by a bus," demonstrates how far the District Court was willing to go to justify its dismissal of Mr. Fried's claims. (SPA-25).  At no time did Mr. Fried admit that State "qualified" his ageist remark.  To the contrary, while Mr. Fried admitted that State made the comment "what if you get hit by a bus," Mr. Fried understood that to mean that he should retire because of his age and enjoy life now because he could die at some point in the future. (A-516-17).  Drawing all reasonable inferences in his favor, a jury could likewise interpret that statement the same way.

This case closely mirrors Sciola v. Quattro Piu, Inc., 361 F. Supp. 2d 61 (E.D.N.Y. 2005), where the court denied summary judgment on the plaintiff's age discrimination claim.  In Sciola, although the plaintiff's general manager was aware he had no intention of retiring, the general manager made the following age-based comments to the plaintiff: (1) "why are you still working?" (2) "I would retire if I was you;" and (3) "Why don't you retire, you are sixty-three years old?" Id. at 63-64.  The court held that given the timing of the comments - within two years of the adverse action - a reasonable person could view the circumstances "as discriminatory as the speaker's opinion is that once an arbitrary age is reached, an individual should retire." Id. at 68; see also Schreiber v. Worldco LLC, 324 F. Supp. 2d 512, 522-23 (S.D.N.Y. 2004) (denying summary judgment where

decision-makers made multiple age-based comments in the context of the plaintiff's employment three or four months before the plaintiff left the defendant); Hofmann v. Dist. Council 37, No. 99-CV-8636 (KMW), 2004 WL 1936242, at *10 (S.D.N.Y. Aug. 31, 2004) *report and recommendation adopted as modified*, No. 99-CV-8636 (GEL), 2006 WL 3476747 (S.D.N.Y. Nov. 30, 2006) (denying summary judgment where decision-makers told the plaintiffs that they should retire and that it would be a good idea to consider retirement); Morris v. New York City Dept. of Sanitation, No. 99-CV-4376 (WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) (denying summary judgment where the plaintiff was told multiple times that he should retire and that he was not in the defendant's future plans).

When looking at the totality of the circumstances, which the District Court clearly did not do here, State's comment clearly "bear[s] a more ominous significance." Shapiro v. New York City Dept. of Educ., 561 F. Supp. 2d 413, 424 (S.D.N.Y. 2008) ("[w]hile it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia of discrimination are properly presented . . . the jury has a right to conclude that they bear a more ominous significance") (quoting Abdu-Brisson, 239 F.3d at 468)). The District Court's reliance on Raskin v. The Wyatt Co., 125 F.3d 55 (2d Cir. 1997), is completely misplaced. (SPA-27). Putting aside all of the other evidence in this case, including the repeated use of the word

41

"retire," the comment made to Raskin, while he was seeking a new position, was a simple question in October 1991 as to whether he had an "interest in a career change notwithstanding the possibility that [he] would have the option of taking early retirement. Id. at 64. In addition, after the comment inquiring about Raskin's interest in the early retirement program, the conversation turned to issues regarding his performance and poor relationship with other employees. Id. at 63. Finally, despite his declaration in opposition to summary judgment, Raskin testified at his deposition that he had a subsequent conversation with the individual who made the remark in December 1991 and could not recall what was discussed. Id. Thus, there were inconsistencies in the plaintiff's account, a break in time from when the alleged comment was made, and none of the many other facts that are contained within the record in this case. Taken as a whole, an issue of fact exists as to whether Defendants' proffered reason for Mr. Fried's termination was pretextual. See O'Reilly, 2011 WL 1897489, at *4 (finding that where the plaintiff was subjected to ageist jokes, replaced by a younger employee, and demonstrated that an issue of fact existed as to whether the defendant's justification for his termination was pretextual, a reasonable jury could conclude that age was the but for cause of the plaintiff's termination); Velasquez v. Gates, No. 08-CV-2215 (CLP), 2011 WL 2181625, at *14 (E.D.N.Y. June 3, 2011) (denying summary judgment where the defendant made comments to the plaintiff regarding the speed

at which she worked and evidence showed that the defendant's non-discriminatory reason was false).

Accordingly, viewing the facts in the light most favorable to Mr. Fried, drawing all reasonable inferences in his favor, and viewing the totality of the circumstances, an issue of fact exists as to whether Defendants' decision to terminate Mr. Fried's employment, after such a long and distinguished career, was pretextual. There is little doubt that a rational jury will infer from all of the evidence that Mr. Fried was ultimately terminated because of his age.

## IV.

## THE DISTRICT COURT ERRED IN HOLDING THAT THE NYCHRL WAS INAPPLICABLE TO MR. FRIED'S DISCRIMINATION AND RETALIATION CLAIMS

Mr. Fried also alleges that he was stripped of his duties and terminated because of his age, and retaliated against for complaining about age discrimination, in violation of the NYCHRL. (A-50-51).

Although Mr. Fried lived in Connecticut and physically maintained an office there, the New York Court of Appeals has held that the NYCHRL applies to non-residents if the discriminatory conduct had an impact within New York City. Hoffman v. Parade Publications., 15 N.Y.3d 285, 289 (2010). The decision to terminate Mr. Fried undoubtedly had an impact in New York City.

43

From 1986 through September 2003, Mr. Fried worked exclusively in the New York City Office. (A-389-90, A-496-97). From September 2003 through July 2006, Mr. Fried split his time almost evenly between the New York City Office and the Westport Office. (A-389-90, A-497-500, A-532). From July 2006 until May 2010, although Mr. Fried used the Westport Office as his base, he continued to work in New York City for LVI and its subsidiaries by generating business, overseeing projects, and attending meetings. (A-538-40). Additionally, even when Mr. Fried was not physically working in New York City, he called and/or emailed LVI personnel in the New York City Office almost daily about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters. (A-540).

From May 2010 until his unlawful termination approximately six months later, Mr. Fried continued to work in New York City for LVI and its subsidiaries. (A-540). For example, Mr. Fried attended:

- A meeting in New York City with Turner Construction Company ("Turner"), Madison Square Garden officials and their consultants in connection with a project involving the renovation of Madison Square Garden ("MSG Project") to discuss scope of work and contract issues.

- A meeting in New York City with Turner, MSG Project officials and their consultants to discuss pricing of the MSG Project.

- A meeting in New York City in connection with the MSG Project with Turner, MSG Project officials and their consultants to answer questions

regarding the historical integrity and current business practices of LVI and its subsidiaries.

- A meeting in New York City with Turner in connection with the MSG Project to sign the contract for the project. As a result of Mr. Fried's efforts, LVI and/or its subsidiaries employ up to approximately 700 workers in connection with the $27.5 million MSG Project.

- A meeting in New York City with attorneys from Sidley Austin LLP, and other parties with their attorney, regarding a dispute about the obligation of LVI to pay the balance of a purchase price for a company that an LVI subsidiary purchased.

- A meeting in New York City with Russell Reynolds Associates to discuss the search for a President and CEO for LVI.

- A meeting in New York City with American International Group to discuss with its insurance and surety executives the status of the recapitalization and loan restructuring, and current financial results of LVI.

- Multiple meetings in New York City with Avisco, Inc. to negotiate a strategic alliance between LVI and Avisco, Inc. in order to secure projects.

- A meeting in New York City with Helix Enterprises to negotiate a strategic alliance between LVI and Helix Enterprises in order to secure projects.

- A meeting in New York City with a consultant to discuss how LVI could secure projects in Haiti.

- A meeting in New York City with a New York based building owner to secure a multi-million dollar project for an LVI subsidiary. The subsidiary was subsequently awarded the project.

- Multiple meetings in New York City to interview candidates for the LVI President and CEO position.

- A meeting in New York City with an owner of an environmental management firm to discuss potential business opportunities for LVI.

- A meeting in New York City with representatives of DEME to discuss a potential strategic alliance in order to secure projects.

- A meeting in New York City with candidates for New York City based management positions within the LVI organization.

- A meeting in New York City with State to discuss Mr. Fried's future role at LVI

- A meeting in New York City of the Board of LVI.

(A-450-42). Additionally, Mr. Fried called and/or emailed LVI personnel in the New York City Office almost daily about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters. (A-542). Mr. Fried functioned essentially as a telecommuter through his constant communications with LVI's New York City clients, his contacts, and with LVI's New York City employees.

Moreover, State's discriminatory reassignment of Mr. Fried's job duties occurred in New York City, and Mr. Fried opposed this action at a Board meeting in New York City. Also, Mr. Fried was paid by the New York City Office from LVI's New York City controlled bank account. (A-542). The decision to reassign Mr. Fried's job duties, and eventually terminate him impacted New York City by preventing Mr. Fried from: (1) working on multi-million dollar projects he helped secure in New York City which created hundreds of job in New York City; (2)

traveling to meet with LVI clients and potential clients in New York City; and (3) overseeing employees in the New York City Office.  As such, the NYCHRL applies to Mr. Fried.

The District Court's finding that the NYCHRL did not apply to Mr. Fried's claims cuts directly against the public policy expressed in the statute.  The New York City Council amended the NYCHRL in 2005 because the statute had "been construed too narrowly to ensure protection of the civil rights of all persons covered by the law." Local Law No. 85 [2005] of City of NY [Restoration Act]; see also Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 66-69 (1st Dep't 2009) ("[t]he independent analysis [of NYCHRL claims] must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's 'uniquely broad and remedial' purposes").  The District Court's decision accomplished exactly what the Local Civil Rights Restoration Act sought to prevent, namely, the narrowing of the statute's protections.  Accordingly, the District Court erred in holding that the NYCHRL did not apply to Mr. Fried's discrimination and retaliation claims.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff-Appellant Burton T. Fried respectfully requests that this Court reverse the District Court's grant of summary judgment and remand this case to the District Court for further proceedings, and grant such other and further relief that this Court deems just and proper.

Dated:  February 27, 2012
        New York, New York

                         Respectfully submitted,

                         THOMPSON WIGDOR LLP


            By:    _____s/_____
                         Douglas H. Wigdor
                         Shaffin A. Datoo

                         85 Fifth Avenue
                         New York, New York 10003
                         Telephone:  (212) 257-6800
                         Facsimile:  (212) 257-6845
                         dwigdor@thompsonwigdor.com
                         sdatoo@thompsonwigdor.com

                         Attorneys for Plaintiff-Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because this brief contains 11,151 words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this
brief has been prepared in a proportionally spaced typeface using Microsoft®
Office Word 2003 in Times New Roman font using a 14-point font size.

Dated:  February 27, 2012
        New York, New York


                              Respectfully submitted,

                              THOMPSON WIGDOR LLP


                    By:  _____s/_____
                              Douglas H. Wigdor
                              Shaffin A. Datoo

                              85 Fifth Avenue
                              New York, New York 10003
                              Telephone:  (212) 257-6800
                              Facsimile:  (212) 257-6845
                              dwigdor@thompsonwigdor.com
                              sdatoo@thompsonwigdor.com

                              Attorneys for Plaintiff-Appellant

49

# 11-4791-cv

## United States Court of Appeals

*for the*

## Second Circuit

BURTON T. FRIED,

*Plaintiff-Appellant,*

— v. —

LVI SERVICES, INC., AKA LVI SERVICES, INC., LVI PARENT CORP.,
CODE HENNESSY SIMMONS LLC, DBA CHS PRIVATE EQUITY V LP,
APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official capacity and
in his individual capacity, BRIAN SIMMONS, in his official capacity and in his
individual capacity, RAJAY BAGARIA, in his official capacity and in his
individual capacity, GERALD J. GIRARDI, in his official capacity and in his
individual capacity,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JACKSON LEWIS LLP
*Attorneys for Defendants-Appellees*
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee, LVI Services Inc. ("LVI"), is a privately held corporation organized under the laws of the state of Delaware. Its sole corporate parent is LVI Parent Corporation and no publicly held corporation has an interest of 10% or more in LVI Services Inc.

Defendant-Appellee, LVI Parent Corporation ("LVI Parent") is a privately held corporation organized under the laws of the state of Delaware and has no corporate parent. Apollo Investment Corp., a publicly held corporation, holds approximately 34% interest in LVI Parent and no other publicly held corporation owns a 10% or more interest in LVI Parent.

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF AUTHORITIES .......................................................................... iii - viii

STATEMENT OF THE ISSUES................................................................................1

PRELIMINARY STATEMENT ..............................................................................2

STATEMENT OF THE FACTS ..............................................................................4

   I.     BACKGROUND................................................................................4

   II.    THE SALE OF LVI TO CHS .........................................................5

   III.   SCOTT STATE'S HIRE AS PRESIDENT AND CEO OF LVI ................6

   IV.   SCOTT STATE'S TRANSITION TO CEO OF LVI ...............................8

   V.    OCTOBER 19, 2010 MEETING ....................................................9

   VI.   THE NOVEMBER 4, 2010 BOARD MEETING........................................11

SUMMARY OF ARGUMENT .............................................................................13

ARGUMENT .........................................................................................................14

   I.     STANDARD OF REVIEW ......................................................14

   II.    THE COURT PROPERLY CONCLUDED THAT FRIED FAILED
         TO PROVE THAT HE WAS TERMINATED BECAUSE OF HIS
         DISCRIMINATION COMPLAINT............................................................17

     A. The Court Used the Proper Standard for Evaluating Fried's Retaliation
        Claim ................................................................................................17

     B. The Court Meticulously Considered the Undisputed Facts on the
        Record in Determining that Fried Had Failed to Prove that Defendants'
        Reasons for His Termination Were Pretextual ............................................21

   III.   THE COURT PROPERLY DISMISSED FRIED'S ADEA
         DISCRIMINATION CLAIM ....................................................................26

i

A.  The Court Used the Proper Standard in Evaluating Fried's
    Discrimination Claim ................................................................................26

B.  The Court Considered All of the Evidence in Finding That Fried
    Failed to Prove That Age Was the "But For" Reason for His
    Termination .................................................................................................30

    1.  The Self-Serving Evidence Presented by Fried Mitigates
        Against a Finding of Age Discrimination .................................................31

    2.  There is Ample Evidence of Fried's Interference .....................................32

    3.  The Reassignment of Fried's Job Duties...................................................34

    4.  State's Inquiries About Fried's Retirement...............................................36

IV.  THE DISTRICT COURT CORRECTLY HELD THAT THE
     NEW YORK CITY HUMAN RIGHTS LAW IS INAPPLICABLE
     TO FRIED'S DISCRIMINATION AND RETALIATION CLAIMS .......43

CONCLUSION ......................................................................................................47

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................48

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Abdu-Brisson v. Delta Air Lines, Inc.,
    239 F.3d 456 (2d Cir. 2001) ........................................................................15, 42

Barton v. Zimmer, Inc.,
    662 F.3d 448 (7th Cir. 2011) ...........................................................16, 17, 18, 19

Bogdan v. N.Y. City Transit Auth.,
    No. 02 Civ. 9587, 2005 U.S. Dist. LEXIS 9317 (S.D.N.Y. May 17, 2005) ......20

Boston v. McFadden Pub., Inc.,
    No. 09 Civ. 457, 2010 WL 3785541 (S.D.N.Y. Sept. 29, 2010).......................39

Boy Scouts of Am. v. Wyman,
    335 F.3d 80 (2d Cir. 2003) ...............................................................................15

Brierly v. Deer Park Union Free Sen. Dist.,
    359 F. Supp. 2d 275 (E.D.N.Y. 2005) ...............................................................20

Cai v. Wyeth Pharms.,
    09 Civ. 5333 (GBD), 2012 U.S. Dist. LEXIS 38484
    (S.D.N.Y. Mar. 19, 2012) ..................................................................................27

Cardo v. Arlington Cent. Sch. Dist.,
    11-580-CV, 2012 U.S. App. LEXIS 6263 (2d Cir. Mar. 28, 2012) ...................27

Carlton v. Mystic Transp.,
    202 F.3d 129 (2d Cir. 2000) ..............................................................................42

Casper v. Lew Lieberbaum & Co., Inc.,
    No. 97 Civ. 3016, 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998) .......................44

Colon v. Trump Int'l Hotel,
    10 Civ. 4794 (JGK), 2011 U.S. Dist. LEXIS 140606
    (S.D.N.Y. Dec. 6, 2011) ....................................................................................27

Danzer v. Norden Sys.,
    151 F.3d 50 (2d Cir. 1998) ................................................................................42

iii


**Page(s)**

Deebs v. ALSTOM Transp., Inc.,
    550 F. Supp. 2d 385 (W.D.N.Y. 2008) .................................................. 35

Diaz v. Jiten Hotel Mgmt.,
    762 F. Supp. 2d 319 (D. Mass. 2011) ........................................... 42, 43

Dister v. The Cont'l Grp., Inc.,
    859 F.2d 1108 (2d Cir. 1988) .................................................. 14

Farina v. Branford Bd. of Educ.,
    09-CV-49 (JCH), 2010 U.S. Dist. LEXIS 99730
    (D. Conn. Sept. 22, 2010) .................................................. 17, 18

Gallo v. Prudential Residential Servs.,
    22 F.3d 1219 (2d Cir. 1994) .................................................. 15

Garrett v. Garden City Hotel, Inc.,
    No. 05-CV-0962 (JFB) (AKT), 2007 U.S. Dist. LEXIS 31106
    (E.D.N.Y. April 19, 2007) .................................................. 31

German v. Cornell Univ.,
    No. 03 Civ. 9766(DAB), 2005 WL 2030355 (S.D.N.Y. Aug. 17, 2005) ........... 44

Getler v. Cornell Weill Univ. Med. Coll. Dept. of Surgery,
    No. 05 Civ. 8550(CLB), 2007 WL 38276 (S.D.N.Y. Jan. 3, 2007) .................. 39

Giarratano v. Edison Hotel,
    No. 08 Civ. 1849(SAS), 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009) .............. 41

Gipson v. Wells Fargo N.A.,
    460 F. Supp. 2d 15 (D.D.C. 2006) .................................................. 42

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010) .................................................. 16, 27

Gross v. FBL Fin. Servs. Inc.,
    557 U.S. 167, 129 S. Ct. 2423 (2009) .................................................. *passim*

Henry v. Wyeth Pharms., Inc.,
    616 F.3d 134 (2d Cir. 2010) .................................................. 42


**Page(s)**

Hoffman v. Parade Publ'ns,
    15 N.Y.3d 285 (2010) ................................................................45, 46

Hofmann v. Dist. Council 37,
    No. 99Civ.8636(KMW)(JCF), 2004 WL 1936242
    (S.D.N.Y. Aug. 31, 2004) ..............................................................41

Holowecki v. Federal Express Corp.,
    382 Fed. Appx. 42 (2d Cir. 2010)..............................................16, 27

James v. N.Y. Racing Ass'n,
    233 F.3d 149 (2d Cir. 2000) ..............................................................29

Kirsch v. Fleet Street, Ltd.,
    148 F.3d 149 (2d Cir. 1998) ..............................................................42

Liebowitz v. Cornell Univ.,
    584 F.3d 487 (2d Cir. 2009) ..............................................................26

Lightfoot v. Union Carbide Corp.,
    92 Civ. 6411 (RPP), 1994 U.S. Dist. LEXIS 6191
    (S.D.N.Y. May 12, 1994)...........................................................45, 46

Manzer v. Diamond Shamrock Chems. Co.,
    29 F.3d 1078 (6th Cir. 1994) ..............................................................31

Mattera v. JP Morgan Chase Corp.,
    740 F. Supp. 2d 561 (S.D.N.Y. 2010) ................................................18

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973).............................................................15, 16, 27

Meiri v. Dacon,
    759 F.2d 989, 994 (2d Cir. 1985) ......................................................14

Meloff v. New York Life Ins. Co.,
    51 F.3d 372 (2d Cir. 1995) ................................................................15

Mereish v. Walker,
    359 F.3d 330 (4th Cir. 2004) ..............................................................39

**Page(s)**

Morris v. N.Y.C. Dep't. of Sanitation,
    No. 99 CV 4376(WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) ...............41

O'Reilly v. Marina Dodge, Inc.,
    435 Fed. Appx. 8, 2011 U.S. Dist. LEXIS 61521 (2d Cir. 2011) ...............27, 41

Phillips v. Centrix Inc.,
    354 Fed. Appx. 527, 2009 U.S. App. LEXIS 26045 (2d Cir. 2009) .................27

Rasic v. City of Northlake,
    Case No. 08 C 104, 2009 U.S. Dist. LEXIS 88651 (N.D. Ill. Sept. 25,
    2009) .........................................................................................................17, 18

Raskin v. Wyatt Co.,
    125 F.3d 55 (2d Cir. 1997) ..........................................................................39, 40

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)..............................................................................28, 29, 30

Saenger v. Montefiore Med. Ctr.,
    706 F. Supp. 2d 494 (S.D.N.Y. 2010) ..................................................................32

Salvatore v. KLM Dutch Airlines,
    No. 98 Civ. 2450, 1999 WL 796172 (S.D.N.Y. Sept. 30, 1999)........................44

Schnabel v. Abramson,
    232 F.3d 83 (2d Cir. 2000) ..................................................................................29

Schreiber v. Worldco LLC,
    324 F. Supp. 2d 512 (S.D.N.Y. 2004) ...........................................................41, 42

Sciola v. Quattro Piu, Inc.,
    361 F. Supp. 2d 61 (E.D.N.Y. 2005) ...................................................................41

Shapiro v. N.Y.C. Dep't. of Educ.,
    561 F. Supp 2d 413 (S.D.N.Y. 2008) ...........................................................41, 42

Shub v. Westchester Cmty. Coll.,
    556 F. Supp. 2d 227 (S.D.N.Y. 2008) .................................................................25

vi

**Page(s)**

Spahr v. Am. Dental Ctrs.,
   03 Civ. 4954 (DRH) (ARL), 2006 U.S. Dist. LEXIS 14581
   (E.D.N.Y. Mar. 14, 2006) ...........................................................39

St. Mary's Honor Center v. Hicks,
   509 U.S. 502, 113 S. Ct. 2742 (1993)........................................29

Suttell v. Mfrs. Hanover Trust Co.,
   793 F. Supp. 70 (S.D.N.Y. 1992) ..............................................35

Taylor v. Johnson Controls, Inc.,
   09CV414TSL-FKB, 2011 U.S. Dist. LEXIS 2671
   (S.D. Miss. Jan. 11, 2011)..........................................16, 17, 18

Terry v. Ashcroft,
   336 F.3d 128 (2d Cir. 2003) ......................................................25

Timbie v. Eli Lilly & Co.,
   429 Fed. Appx. 20, 2011 U.S. App. LEXIS 13486 (2d Cir. 2011) ....................27

Tomassi v. Insignia Fin. Group,
   478 F.3d 111 (2d Cir. 2007) ................................................32, 42

Velasquez v. Gates,
   No. 08 CV 2215(CLP), 2011 WL 2181625 (E.D.N.Y, June 3, 2011) ...............42

Vesprini v. Shaw Contract Flooring Servs.,
   315 F.3d 37 (1st Cir. 2002) .......................................................39

Zelnik v. Fashion Inst. of Tech.,
   464 F.3d 217 (2d Cir. 2006) ......................................................14

### OTHER AUTHORITIES

Age Discrimination in Employment Act .........................................*passim*

Fed. R. App. P. 32(a)(5).............................................................53

Fed. R. App. P. 32(a)(6).............................................................53

Fed. R. App. P. 32 (a)(7)(B) ......................................................53

Fed. R. App. P. 32(a)(7)(B)(iii) ..................................................................53

New York City Human Rights Law..................................................*passim*

N.Y.C. Admin. Code § 2-201 ....................................................................44

## STATEMENT OF THE ISSUES

1.      Did the District Court correctly grant summary judgment dismissing Burton Fried's discrimination claim under the Age Discrimination in Employment Act ("ADEA"), where Defendants have offered a legitimate, nondiscriminatory reason for their actions and Fried has failed to meet his burden of demonstrating that there is a genuine issue of material fact as to whether age is the "but for" reason for his termination?

2.      Did the District Court correctly grant summary judgment dismissing Fried's retaliation claim, where he failed to present any evidence to prove that the reason articulated by Defendants for terminating his employment with LVI and offering him a consultancy agreement was not the true reason, but was pretext for retaliation?

3.      Did the District Court correctly grant summary judgment dismissing Fried's New York City Human Rights Law ("NYCHRL") claims where Fried is a non-resident of New York City and his job duties were primarily performed in LVI's Westport, Connecticut office?

## PRELIMINARY STATEMENT

This action arises from Fried's refusal to honor his own offer to make way for the new CEO of LVI.  In September 2010, Fried, the Chairman and interim CEO of Defendant LVI, persuaded Defendant Scott State to take the permanent CEO position by making him an "offer he could not refuse": Fried would "remain at LVI until [State], the Board or I decide it's time for me to leave . . . . [State] will be in charge and get all the room he wants from me."  Less than a month after becoming CEO, State took Fried up on his offer, and asked him to limit his activities on behalf of LVI to those customarily exercised by a Chairman.   In response, Fried cried discrimination, and embarked on a campaign against LVI and its Board that continues to this day.

As set forth below, the District Court, in its lengthy, well-reasoned opinion, found that Fried failed to adduce sufficient evidence that the Board's decision to offer Fried a consulting arrangement in lieu of employment by LVI was motivated by discriminatory animus.  Instead, the District Court found that the undisputed evidence showed that Fried had the abilities to perform a valuable role with LVI, as evidenced by the fact that the very same Board that voted to reduce his role within LVI had only months earlier tapped him to fill the interim CEO role while a permanent candidate was sought.  As the extensive record evidence indicates, it was not his age but, rather, his refusal to relinquish control of the reins of

2

management to State that prompted Fried's dismissal. As Fried testified at his deposition: "[T]he CEO role, by its title . . . should have the day-to-day and final decisions in the operations of the business, and the chairman should be a person who supports the actions of the CEO and in any way that the CEO seeks that advice and counsel." (A-99-100.) Fried failed to follow his own advice and posed an ultimatum to the Board and to State that he, not they, would determine his role going forward with LVI, creating the rift that led to his termination.

Fried's Appellate Brief ("Appellant's Brief") largely ignores the substantial undisputed evidence in the record and, rather, largely cherry-picks "sound bites" from documents to cobble together the unsubstantiated and unlikely story that Scott State, before even considering accepting the position of CEO, embarked on a nefarious campaign to terminate Fried's relationship with LVI solely because of his age. This fiction is belied by the record evidence that shows extensive efforts by State and the Board of Directors of LVI Parent to convince Fried to abide by his often-repeated promise that he would step away from his involvement in the day-to-day management of LVI and amply documents Fried's stubborn refusal to allow State to run the company as he saw fit.

Unlike Fried, the District Court examined all of the undisputed evidence on the record and, even giving Fried the benefit of every inference, found that Fried had failed to prove that the Board's ultimate reason for terminating his

employment – to ensure that State could run LVI unimpeded – was unworthy of credence and that age was, in fact, the "but for" reason for his termination. The District Court similarly found that Fried failed to prove that the Board's decision to terminate his employment and offer him a consultancy was motivated by his complaint of discrimination. No amount of twisting or torturing of the record can turn a decision to hold a recalcitrant Chairman to the bargain he made into an act solely motivated by ageist animus. The District Court's decision was fully supported by the record and should be upheld by this Court.

## STATEMENT OF THE FACTS

### I.    BACKGROUND

LVI is an environmental remediation company specializing in, among other things, asbestos abatement, demolition, emergency/disaster response such as the response to Hurricane Katrina, and biological and chemical decontamination. (A-30; A-33.) Fried began his employment with LVI in 1986, and subsequently held various positions including General Counsel, President and CEO, interim President and CEO, and Chairman. (A-32.) Although LVI's corporate office is in New York City, for the last seven years prior to his departure from LVI, Fried worked out of a satellite office in Westport, Connecticut that LVI leased exclusively for his personal convenience. (A-32 at ¶27; A-92-94.)

## II.   <u>THE SALE OF LVI TO CHS</u>

In or about November 2005, LVI was purchased by CHS.  As a condition of the sale, and at Fried's insistence, LVI agreed that Fried would be replaced as LVI's President and CEO, and Fried expressed to the Board his wish to relinquish all day-to-day operational responsibilities to the new CEO.  (A-33 at ¶ 30; A-95-96; A-100; A-120.)   This new arrangement was documented in an agreement between Fried and LVI dated November 16, 2005 (the "November Agreement").  Pursuant to the November Agreement, Fried was charged with hiring his replacement as President and CEO.  Thereafter, in his new role as Chairman, Fried would have primary responsibility for "strategic growth," at the direction of the new CEO.  (A-98-100; A-133.)   Significantly, Fried's employment under the November Agreement was at-will, and LVI retained at all times the discretion to alter Fried's duties and responsibilities and to terminate Fried's employment without notice or reason.  (A-101-102; A-133.)

Due in large part to Fried's efforts, in June 2006, LVI hired Robert McNamara as its new President and CEO.  (A-33 at ¶ 32.)  As contemplated by the November Agreement, Fried thereupon resigned from his position as President and CEO and assumed the position of Chairman.  (A-33-34 at ¶¶ 31-32; A-97.)  In addition to his position as Chairman of LVI, Fried retained at all times the position

of Chairman of the Board of Directors of LVI Parent, from which he resigned on November 30, 2010.  (A-246.)

## III.    SCOTT STATE'S HIRE AS PRESIDENT AND CEO OF LVI

In or about April 2010, McNamara abruptly resigned as President and CEO. As a result, the Board of Directors asked Fried, who by then was 70 years old, to accept the position of interim President and CEO until a replacement for McNamara could be found.  (A-35 at ¶ 37; A-103-105.)  As in 2005, Fried insisted on a prompt search for a new President and CEO to assume the day-to-day management of the business.  (A-35 at ¶ 38; A-106.)  LVI retained an executive search firm, Russell Reynolds, to work with Fried to identify qualified candidates for the position.  (A-35 at ¶ 39.)  Fried, who had known State for a number of years, identified him as a candidate for the position and introduced him to LVI and the Board.  (A-33 at ¶ 30; A-107-108.)  State was one of three finalists for the job and ultimately became the choice of Fried and LVI's management.  (A-36 at ¶ 42; A-110-111.)   The Board was equally impressed by State and, upon Fried's recommendation, offered him the position of President and CEO.  (A-36 at ¶ 42; A-109-110.)

The offer to State was made on September 8, 2010 and negotiations thereafter ensued.  As part of these negotiations, and as a condition for accepting the CEO position, State insisted that he be guaranteed the discretion to run the

6

business as he saw fit.   State had become increasingly suspicious of Fried's representation that he would step away from the management of LVI through his conversations with senior management who maintained that Fried had no intention to retire and planned to continue an active role in LVI's management.  (A-569.)  In an email to Fried dated September 21, 2010, Board member Simmons asked Fried to have a conversation with State to assure him that he would have authority as CEO to align his team and manage the business without Fried's interference.  (A-137.)   Simmons added: "I think it will be very important for him to hear unambiguously from you that he is in charge and you will give him the room he needs."  (Id.)  Fried responded to Simmons:  "I will repeat my offer to Scott.  I am prepared to remain at LVI until he, the Board or I decide it's time for me to leave . . . an offer he can't refuse . . . . He will be in charge and get all the room he wants from me."  (Id.)  On September 22, Fried again emailed Simmons to tell him that he had spoken with State and that State "now ha[d] no concern about [Fried's] support in his role as CEO."   (A-139.)  With assurances from both the Board and Fried that he could manage the business without interference from Fried, State accepted the offer of employment on September 23, 2010 and assumed the CEO role seven days later on October 1, 2010.  (A-36 at ¶ 43; A-143-144.)

## IV.    SCOTT STATE'S TRANSITION TO CEO OF LVI

State hit the ground running at LVI – meeting and soliciting advice from key LVI management, visiting LVI's many offices, and making the types of decisions he believed necessary to help turnaround what, at that time, was a struggling business.  (A-248-249.)   During this transition period, State began to notice reluctance on Fried's part to relinquish his interim CEO responsibilities, as he had previously assured State he would do.  In addition, State had concerns about Fried's insistence that State confer with him prior to making certain decisions.  (A-148-149.)  State's concerns were heightened after Fried sent State a number of emails criticizing him for failing to consult with Fried on various issues such as the suspension of the search for a Chief Information Officer and a meeting with an overseas client.  (A-172-174; A-175-182.)  Out of frustration, on October 3, 2010, State forwarded one of Fried's acerbic emails to LVI Board member, Robert Hogan, stating that he feared a similar reaction every time he made a decision without consulting Fried – "exactly the issue [he] had prior to accepting the job." (A-184.)  On October 5, 2010, State promised Hogan he would "lay the ground work for an orderly transition" with Fried and that he intended "to have him available as needed for consultation or special assignments."  (A-187.)

On or about October 5, 2010, State and Fried agreed to meet on October 19, 2010 to discuss transition issues, including Fried's future duties as Chairman.  (A-

190.)    On October 14, 2010, Fried sent State an unsolicited email listing responsibilities he purportedly had handled as Chairman under McNamara.  (A-111-112; A-192-193.)  To State's surprise, the expansive list included day-to-day operational responsibilities that State envisioned would be performed by him, such as the development and implementation of new business initiatives, the negotiations of company acquisitions and the management of major client relations.  (A-192-193.)  The list also included responsibilities that State believed could be performed by LVI's General Counsel, Gregory DiCarlo (such as selection of outside counsel and management of LVI litigation and legal matters) and by other members of LVI management and staff (such as review of LVI offers of employment and monitoring of employee air travel).  (Id.; A-150-153.)  State shared the list of responsibilities with members of LVI's Board and sought input on how best to handle Fried's expectations regarding his role, which State considered an issue for the Board to determine.  (A-195-196.)

## V.    OCTOBER 19, 2010 MEETING

On October 19, 2010, State met with Fried to discuss, among other transition items, Fried's proposed responsibilities as LVI Chairman.  (A-37 at ¶ 44; A-111-112.)  At the meeting, State explained that he believed most of the duties on Fried's list would be more appropriately handled by either him or other LVI management and staff members.  (A-37 at ¶ 45; A-113-115; A-156.)    State

explained that the duties and responsibilities of LVI's Chairman should be those traditionally delegated to the role. (A-156-157.) Notwithstanding his prior assurances to State that State "will be in charge and get all the room he wants from me" Fried opposed the restructuring of his role. (A-198.) State reminded Fried of his prior assurances, and as a reminder that transition planning was important, asked Fried: "Burt, you're 71 years of age, how long do you expect to work . . . what if you get hit by a bus, . . . the company has to plan for the future."[1] (A-61-62; A-114-115; A-157-158.) Despite State's overtures, and despite his own prior assurances, Fried refused to discuss any transition of his role.

After the meeting, State, concerned with Fried's refusal to relinquish any of his day-to-day responsibilities at LVI, asked Simmons and other Board members to intervene. (A-198-199.) On October 28, 2010, at Simmons's request, Fried sent him the list of responsibilities prepared for Fried's meeting with State to distribute to the Board. (A-201-202.) On November 2, 2010, Simmons, on behalf of the Board, responded to Fried's list of responsibilities, telling Fried that the list was "much more expansive that what he had envisioned" and "[not] consistent with the sentiments [Fried] had expressed to [him]" when State was hired. (A-37 at ¶ 49; A-204.) Simmons expressed his opinion of the need to transition all of Fried's

---

[1] State testified that this comment echoed a similar statement Fried made to him in a telephone conversation prior to the meeting. (A-154-155.) It is worth noting that age has never been a sensitive subject for Fried until now. Over the years on countless occasions he has made light of his age and the prospect of retirement. (A-208; A-211.) His attributing discriminatory motives to a similarly off-hand comment by State is not credible.

10

A-1190

day-to-day activities to State and other members of the management team. (A-204.) Simmons wrote: "It is my hope that you continue as Chairman of the board in a non-executive capacity and act as on call resource for Scott." (Id.) He further proposed that he "replace [Fried's] existing employment arrangement with a consulting agreement." (Id.)

## VI.    THE NOVEMBER 4, 2010 BOARD MEETING

On November 4, 2010, LVI Parent held a regular board meeting to discuss a number of pending business matters. (A-116.) At the conclusion of the meeting, the Board went into a closed session and LVI management – except State – left the meeting. (A-38 at ¶ 51; A-117-118.) Thereafter, in a 30 minute speech, Fried heatedly objected to any restructuring of his role and complained of State's alleged comment at their October 19, 2010 meeting. (A-71-75.) Fried and State were then asked to leave the meeting and the Board discussed how best to resolve the issue, concluding that John Schnabel, a member of the Board and longtime ally of Fried, would contact Fried to resolve what the Board viewed as a political skirmish. (A-119; A-213; A-221-223.) Unfortunately, Schnabel was unable to broker an agreement with Fried, leaving the Board no choice but to proceed with the plan outlined in Simmons's November 2, 2010 email. (A-224-227.)

Pursuant to that plan, the Board proposed that Fried would transition from his role as an employee of LVI to the dual role of non-executive Chairman of the

11

Board of LVI Parent and of consultant. (A-232.) Under the proposal, Fried's employment as Chairman of LVI would end, and he would be formally offered a consulting agreement pursuant to which he would be paid an annual retainer of $150,000, plus $250 per hour for time spent in his consulting role. (A-232.) This amount was intended to compensate Fried at the same level as he was previously compensated as an LVI employee. (A-228-229.) Fried's initial assignment would include overseeing several litigation matters. (A-232.)

On November 15, 2010, however, before the Board could make its formal offer of a consulting agreement to Fried, Fried sent a letter through his attorney to State threatening to sue LVI and demanding, among other things, that he be reinstated with his former responsibilities. (A-238-243.) State, who was traveling at the time, did not receive the letter until November 16, 2010. On November 16, 2010, the Board sent the consultancy agreement to Fried. (A-159-162.) Fried rejected LVI's offer and resigned his position on the Board effective November 30, 2010. (A-246.) LVI, as planned, terminated Fried's employment with LVI on November 30, 2010, but continued to offer Fried the consultancy arrangement through counsel. (A-19 at ¶ 3.) Fried rejected LVI's offer. (A-19-20 at ¶ 4.)

12

## SUMMARY OF ARGUMENT

On appeal, Fried fails to provide any valid reason to overturn the District Court's decision granting Defendants' Motion for Summary Judgment. The District Court, using the pre-<u>Gross</u> burden-shifting standard found that Fried failed to raise an issue of fact that Defendants' reasons for terminating Fried's employment and offering, in its stead, a consultant agreement, were pretext for retaliation. Other than the temporal proximity between his complaint of age discrimination and the termination of his employment, Fried has failed to set forth evidence that Defendants' articulated reason for his termination – to ensure that State could run LVI as he saw fit – was false. In fact, the undisputed evidence manifests that the decision to terminate Fried's employment and offer him a consultancy was considered and communicated to Fried before LVI's receipt of Fried's demand letter threatening a lawsuit and that, instead of retaliating against Fried because of the letter, the Board chose to ignore it and proceed with the plan to offer him the consultancy.

Similarly, Fried failed to meet his burden of showing that age was the "but for" reason for his termination, as required under <u>Gross v. FBL Fin. Servs. Inc.</u>, 557 U.S. 167, 176, 129 S. Ct. 2423, 2350 (2009). The District Court correctly found that State's purported comment requesting clarification on the timing of his retirement was not enough, under the law, to meet Fried's burden of raising

13

sufficient evidence from which a reasonable jury could conclude by a preponderance of the evidence that age was the "but for" cause of his termination. In making this determination, the District Court carefully considered all of the record evidence and, placing State's comment in its proper context, found that Fried was terminated because of conflicting visions over his role as Chairman of LVI, and not because of his age.

Finally, the District Court was correct in applying the prevailing law in this Circuit and finding that Fried could not avail himself of the protections of the NYCHRL because he both resided and worked in Connecticut at all times relevant to his claims.

## ARGUMENT

### I.  STANDARD OF REVIEW

The grant of summary judgment is subject to <u>de novo</u> review by this Court, and may therefore be affirmed upon any grounds supported in the record.  <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 224 (2d Cir. 2006).  In the context of discrimination actions, this Court has held that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  <u>Dister v. The Cont'l Grp., Inc.</u>, 859 F.2d 1108, 1114 (2d Cir. 1988), <u>quoting</u> <u>Meiri v. Dacon</u>, 759 F.2d 989, 994 (2d Cir. 1985), <u>cert. denied</u>, 474 U.S. 829 (1985).

14

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the opposing party, there is no genuine issue of material fact. Boy Scouts of Am. v. Wyman, 335 F.3d 80, 88 (2d Cir. 2003). While a case in which the issue turns on the intent of one party requires that a trial court be cautious about granting summary judgment, Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994), when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the court may conclude that no material issues of fact exist and it may grant summary judgment to the employer. See Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995). As this Court has stated, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

In Gross, the Supreme Court held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." 557 U.S. at 168, 129 S. Ct. at 2345. Thus, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but for' cause of the employer's adverse action." Id. Although the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of [McDonnell

15

Douglas] . . . is appropriate in the ADEA context," id. at 175 n.2, 129 S. Ct. at 2349 n.2, New York courts have continued to apply a modified version of the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to cases brought under the ADEA. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010). Specifically, a plaintiff bringing a case under the ADEA must first establish a *prima facie* claim of discrimination by showing that: (1) he was within the protected age group; (2) he was qualified for the position; (3) he experienced an adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of employment discrimination. Id. at 107. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason for [the adverse act]." Id. at 106, citing McDonnell Douglas Corp., 411 U.S. at 802. After the defendant satisfies the requirement, the burden then shifts to the plaintiff to demonstrate that age was the "but for" cause of the challenged adverse employment action. Id. at 106; Holowecki v. Federal Express Corp., 382 Fed. Appx. 42, 45 (2d Cir. 2010).

Although the Second Circuit has not spoken, as yet, as to whether Gross's "but for" causation standard applies to cases of retaliation brought under the ADEA, courts that have considered the issue have overwhelmingly held that it does. See, e.g., Barton v. Zimmer, Inc., 662 F.3d 448 (7th Cir. 2011); Taylor v.

Johnson Controls, Inc., 09CV414TSL-FKB, 2011 U.S. Dist. LEXIS 2671, at *8

(S.D. Miss. Jan. 11, 2011); Farina v. Branford Bd. of Educ., 09-CV-49 (JCH),

2010 U.S. Dist. LEXIS 99730, at *27 (D. Conn. Sept. 22, 2010), aff'd, 2011 U.S.

App. LEXIS 23169 (2d Cir. Nov. 18, 2011); Rasic v. City of Northlake, Case No.

08 C 104, 2009 U.S. Dist. LEXIS 88651, at *55 (N.D. Ill. Sept. 25, 2009).

## II.   THE COURT PROPERLY CONCLUDED THAT FRIED FAILED TO PROVE THAT HE WAS TERMINATED BECAUSE OF HIS DISCRIMINATION COMPLAINT

In his Brief, Fried maintains that the District Court incorrectly applied

Gross's "but for" standard to Fried's ADEA retaliation claim and failed to consider

a Board member's testimony and notes relating to the offer of a consultancy to

Fried.  (Appellant's Brief at 19.)  Contrary to Fried's contention, the District Court

was careful not only to clearly set forth the accurate standard for evaluating claims

of retaliation under the post-Gross ADEA construct, but also to consider (and

ultimately reject) Fried's inconclusive and unsupported evidence of retaliation.

### A.   The Court Used the Proper Standard for Evaluating Fried's Retaliation Claim

Fried correctly states that the Supreme Court did not address whether the

"but for" standard applied to Gross's age discrimination claim would be similarly

applicable to retaliation claims under the ADEA and that this Circuit has not

definitively spoken on the issue.  (Appellant's Brief at 21.)  However, the majority

of courts who have addressed the issue, as recognized by the case cited by Fried,

17

Mattera v. JP Morgan Chase Corp., overwhelmingly have held that, as the same "because of" language is found in both the discrimination and retaliation provisions of the ADEA, the "but for" construct announced by Gross should apply to both.  See Mattera, 740 F. Supp. 2d 561, 578 n. 13 (S.D.N.Y. 2010) (citing cases).

In Gross, the Court found that, as a matter of textual analysis, the "because of" language of the discrimination provision of the ADEA requires a plaintiff to prove that "age was the 'but for' cause of the employer's adverse decision." Gross, 557 U.S. at 176, 129 S. Ct. at 2350.  The Court then held that since Congress amended both Title VII and the ADEA in 1991 and did not change the "because of" language of the ADEA discrimination provision, while changing the discrimination provision of Title VII, it intended to retain the higher "but for" burden for claims brought under the ADEA.  Id. at 167-168, 129 S. Ct. at 2345.  As the retaliation provision of the ADEA contains the same "because of" language as the discrimination provision, also unchanged by Congress in 1991, the majority of courts that have considered the issue have held that the "but for" standard announced in Gross applies to both the discrimination and the retaliation provisions of the statute.  See Barton v. Zimmer, Inc., 662 F.3d 448 (7th Cir. 2011).  See also Taylor, 2011 U.S. Dist. LEXIS 2671, at *8; Farina, 2010 U.S. Dist. LEXIS 99730, at *27; Rasic, 2009 U.S. Dist. LEXIS 88651, at *55.

18

In <u>Barton</u>, as an example, the court applied the "but for" standard to the plaintiff's ADEA retaliation claim, reasoning that, as the ADEA's anti-retaliation provision employs similar language as the discrimination provision, prohibiting retaliation "because" an employee exercises protected rights, the ADEA's "but for" causation should apply both to discrimination and retaliation claims.  <u>Barton</u>, 662 F.3d at 455-56 & n. 3.  If the District Court had used the "but for" causation in evaluating Fried's ADEA retaliation claim (which, as set forth below, it did not), it would have evaluated the claim in accordance with both the logical interpretation of <u>Gross</u> and the current weight of federal case law.

Contrary to Fried's contention, however, instead of ignoring the proper post-<u>Gross</u> standard, the Court took pains to carefully consider the pre-<u>Gross</u> evidentiary burden-shifting framework in evaluating Fried's retaliation claim.  Drawing all reasonable inferences in favor of Fried, the Court concluded that Fried had set forth a <u>prima facie</u> claim of retaliation.  (SPA-31.)  The Court then moved on to the remaining proof burdens and concluded that Fried had been unsuccessful in proving that Defendants' reasons for terminating his employment and offering him a consultancy – to ensure that the new CEO and President would have the freedom to manage the company as he saw fit – was pretextual.  (SPA-31.)  The District Court did not apply <u>Gross</u>'s "but for" standard, as Fried claims, but, rather, described Fried's final burden as requiring him to demonstrate that Defendants'

19

legitimate reason for the adverse employment action was pretextual. (SPA-31.)
Relying on its thorough analysis of the termination decision in the context of the
discrimination claim, the District Court justly found that Fried had failed to set
forth evidence that Defendants' decision to terminate his employment and offer
him a consultancy was pretext for retaliation. (Id.) Fried's claim that the District
Court applied the wrong standard in evaluating his retaliation claim finds no basis
in the District Court's opinion.

As with a claim of discrimination, to establish pretext by circumstantial
evidence (as Fried must) an employee must show: "such weakness,
implausibilities, inconsistencies, incoherencies, or contradiction in the employer's
proffered legitimate reason for its action that a reasonable fact finder could find the
reason unworthy of credence." Bogdan v. N.Y. City Transit Auth., No. 02 Civ.
9587, 2005 U.S. Dist. LEXIS 9317, at *25 (S.D.N.Y. May 17, 2005) (quoting
Brierly v. Deer Park Union Free Sen. Dist., 359 F. Supp. 2d 275, 291 (E.D.N.Y.
2005). The District Court correctly found that there was no evidence of such
deficiencies in Defendants' explanation for their decision to terminate Fried's
employment. Although Fried may disagree with the outcome of the Board's
decision, he presented no evidence that would lead a rational person to believe that
the decision was pretext for retaliation.

20

**B.** **The Court Meticulously Considered the Undisputed Facts on the Record in Determining that Fried Had Failed to Prove that Defendants' Reasons for His Termination Were Pretextual**

After mischaracterizing the Court's analysis of his retaliation claim, Fried next falsely accuses the Court of not having considered the "material issues of fact" as to whether Fried's complaint of discrimination was a motivating factor in the decision to fire him. Specifically, Fried accuses the District Court of having "completely failed to grasp" a purported admission by Board member Gerald Girardi. (Appellant's Brief at 19.)

As is patently clear from the Opinion, the District Court devoted twenty pages to the careful examination of the material facts leading up to Board's decision to offer Fried a consultancy on November 30, 2010. It is undisputed that both the Board and State had decided, with Fried's blessing, to remove him from the day-to-day running of the company even before State accepted the position as CEO in September 2010. This agreement was a condition of State's acceptance, as manifested by the direct communications between State, the Board and Fried, contained in the record. On September 14, 2010, State, as part of his due diligence in accepting LVI's offer, obtained details as to the requirements for transition of Fried from the position of Chairman of the Board of LVI Parent and explained both his concern and his intentions to Hogan in an email dated September 19, 2010:

> I would like Burt's commitment not to challenge those decisions if they are made as this would likely result in an immediate division of the management team.
>
> In the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit. Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do. This is not a healthy situation for Burt or LVI.

(A-569.) So concerned was State with Fried's possible future interference with his mandate to run LVI as he saw fit, that he insisted, as a condition of his hire, on receiving reaffirmation from Fried that he intended to step away from the management of LVI. In an email to Hogan, in preparation for his discussion with State regarding Fried's transition away from the management of LVI, Fried stated:

> I will repeat my offer to Scott. I am prepared to remain at LVI until he, the Board or I decide it is time for me to leave . . . an offer he can't refuse. Ask you to recall that one of the purposes of my working in Westport was to get out of the way of the new CEO at the NY Corporate office.
>
> Trust you have no problem with my planned reply . . . He will be in charge and get all the room he wants from me.

(A-137.)

It was, therefore, expressly stated well before the meeting of October 19, 2010 that State and the Board (and seemingly Fried as well) had decided that Fried would relinquish the reins of management and assume an advisory position serving at the pleasure of State and the Board. Fried's baseless and unsupported

22

contention that the Board never contemplated firing him until the complaint of age discrimination is simply semantic wordplay.   As consistently set forth in the record, the Board had all intention that Fried resign from his active involvement in the day-to-day management of LVI – an intention that they thought Fried supported, even before State was hired and months before the meeting of October 19, 2010.

Fried's purportedly pivotal piece of evidence that Defendants retaliated against him is Gerald Girardi's testimony and notes taken during a telephone call with the Board on November 16, 2010.  (Appellant's Brief at 23.)   Girardi's testimony and notes, in fact, indicate only that, despite the receipt of Fried's counsel's letter of November 15, 2010, the Board was prepared to move forward with presenting the offer of consultancy to Fried, as had been planned well before the arrival of the letter.  Girardi's very words "ignore pre-emptive letter" are clear evidence that the Board was willing to overlook Fried's attorney's combative missive and move forward with a plan that would have allowed him to continue to play a role at LVI.  Girardi testified:

> Q.  Okay. And why did you – why did the board ignore the letter?
>
> A.  We wanted to keep Burt on – Burt on as a chairman, and so we sent him an offer to enter into a consultancy agreement I believe shortly after this call.

(A-419 at p. 90.)

23

The offer of a consultancy, contemplated even before State's hire and communicated to Fried by Simmons on November 2, 2010, was circulated for the Board's comment at least by November 11, 2010, four days before the receipt of Fried's counsel's letter.  (A-703.)  Rather than it solely containing the terms of Fried's termination, Simmons's letter explained Fried's role going forward, that he would continue in his role of Chairman of the Board of Directors of LVI Parent and continue his relationship with LVI Services on a consultant basis, with his first assignment to be his continued support on a number of ongoing litigations.  (A-604.)  For his work as a consultant, Fried was offered an annual retainer of $150,000 plus an hourly rate of $250.00 for time spent working on LVI's behalf. (A-604.)  Simmons testified that this pay structure was intended to keep Fried at approximately the same level of compensation that he had as Chairman of LVI. (A-228-229.)  Considering Girardi's notes in the context of the undisputed facts, there is no other rational way to interpret Girardi's phrase "Burt - sent pre-emptive letter. *Ignore* and send good faith letter offer to Burt Fried" other than on its face value, that the Board would ignore Fried's litigious overture and move forward with the offer of consultancy that had been contemplated and communicated to Fried before the arrival of the demand letter.  The District Court accorded the notes their rational meaning and discounted them as evidence of retaliation.

24

In the cases cited by Fried in his Brief, unlike the case here, the plaintiffs produced direct evidence that their complaints of discrimination were the cause of the defendants' adverse actions. In Shub v. Westchester Cmty. Coll., 556 F. Supp. 2d 227 (S.D.N.Y. 2008), recons. denied, 06 Civ. 8324 (WCC), 2008 U.S. Dist. LEXIS 35662 (S.D.N.Y. Apr. 22, 2008), the decision maker, during his deposition, was directly asked why he decided not to hire the plaintiff for a teaching position. He responded "Well, we had a suit pending against us and I just didn't know how to proceed after that." Id. at 257. When asked if there was any other reason, he replied: "Not that I recall." Id. Similarly, in Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) the plaintiff presented testimony about other employees who had faced retaliation when they complained about unlawful discrimination and taped statements from the plaintiff's supervisor that he was concerned about retaliation if he testified on the plaintiff's behalf. Id. at 141. In addition, the plaintiff produced a memorandum listing candidates for promotion with the notations "Pending Complaint" next to his name and "EEO Activity" next to the name of another employee. Id. Unlike Girardi's testimony and notes, the unambiguous comments made by the defendants in Shub and Terry could only be interpreted as evidence that the plaintiffs were subjected to adverse actions because of their complaints. There is no such evidence here.

As the Court below soundly determined, Fried's support for his retaliation claim boils down to the temporal proximity between his complaint and Simmons's proposal of November 16, 2010, which terminated his role as an LVI employee and offered him, instead, a consultancy agreement.  In addition to the insufficiency of this temporal proximity alone to defeat Defendants' motion for summary judgment, the proximity is totally undermined by the fact that the decision to ask Fried to assume a consultant role was considered by State and the members of the Board even before State accepted the position of CEO and President.  (A-568-569.)

III.   **THE COURT PROPERLY DISMISSED FRIED'S ADEA DISCRIMINATION CLAIM**

    A.   **The Court Used the Proper Standard in Evaluating Fried's Discrimination Claim**

In setting forth the burden-shifting framework used to analyze ADEA cases post-<u>Gross</u>, Fried blatantly misstates the third prong of the framework that sets out the plaintiff's burden after the defendant has set forth a legitimate nondiscriminatory reason for the adverse act.  Fried states "the burden shifts to Mr. Fried to raise a triable issue of material fact as to whether Defendants' proffered reason for the adverse action was a mere pretext for unlawful discrimination." (Appellant's Brief at 27, citing the pre-<u>Gross</u> decision, <u>Liebowitz v. Cornell Univ.</u>, 584 F.3d 487, 499 (2d Cir. 2009).)  Fried then attempts to justify his misstatement in a footnote, explaining that, as <u>Gross</u> was decided in the context of a trial, its "but

for" standard does not apply in the context of summary judgment. (Appellant's Brief at 27, n. 1.) As support for this unfounded proposition, Fried cites a single non-binding case out of the United States Court of Appeals for the Ninth Circuit. Id.

Fried's disingenuous proffer is directly contradicted not only by the prevailing law in this Circuit, but by his own opposition to the summary judgment brief filed before the District Court. The standard this Circuit has consistently used in evaluating post-Gross ADEA cases in the summary judgment context is that, in order for the plaintiff to satisfy his burden in the final stage of the McDonnell Douglas analysis, the plaintiff must "offer evidence that age discrimination was the "but for" cause of the challenged actions." Gorzynski, 596 F.3d at 107. See also, Cardo v. Arlington Cent. Sch. Dist., 11-580-CV, 2012 U.S. App. LEXIS 6263, at *3 (2d Cir. Mar. 28, 2012); Timbie v. Eli Lilly & Co., 429 Fed. Appx. 20, 10-3130-CV, 2011 U.S. App. LEXIS 13486, at *4 (2d Cir. 2011); O'Reilly v. Marina Dodge, Inc., 435 Fed. Appx. 8, 10-2471-CV, 2011 U.S. Dist. LEXIS 61521 (2d Cir. 2011); Holowecki, 382 Fed. Appx. at 45; Phillips v. Centrix Inc., 354 Fed. Appx. 527, 2009 U.S. App. LEXIS 26045, at *2 (2d Cir. 2009); Cai v. Wyeth Pharms., 09 Civ. 5333 (GBD), 2012 U.S. Dist. LEXIS 38484, at *17 (S.D.N.Y. Mar. 19, 2012); Colon v. Trump Int'l Hotel, 10 Civ. 4794 (JGK), 2011 U.S. Dist. LEXIS 140606, at *12 (S.D.N.Y. Dec. 6, 2011).

Not only has this standard been overwhelmingly adopted by this Circuit, but Fried expressly used this standard in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (the "Opp. MOL").  Citing <u>Gross</u>, Fried stated: "Now, the burden shifts back to Mr. Fried to establish that his age was the but for cause of the employer's adverse action."  (Opp. MOL at 12.)  Similarly, in its Amicus Brief, the EEOC correctly states: "The Supreme Court clarified in Gross that, in the ADEA context, this means that in order to establish liability '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but for' cause of the challenged decision.'" (EEOC Brief at 20) (citations omitted). As such, Fried's baseless and unsupported contention that the District Court applied the wrong standard in evaluating Fried's discrimination claim should be discounted.

Although the EEOC cites the correct standard for the evaluation of the last prong in a post-<u>Gross</u> age discrimination case (EEOC Brief at 20), it takes issue with the District Court's statement of the last prong of the retaliation proof burden under <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097 (2000).  (EEOC Brief at 29-34.)  The EEOC has read <u>Reeves</u> too narrowly.  In <u>Reeves</u>, a pre-<u>Gross</u> ADEA retaliation claim, the Supreme Court clarified that, once the employer sets forth a legitimate non-discriminatory reason for its decision, the plaintiff "must be afforded the opportunity to prove by a

28

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 143 (citations omitted). The Court explained:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "it is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination."

Id. at 146-47 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 & 524, 113 S. Ct. 2742, 2756 & 2762 (1993)).

In short, Reeves simply stands for the proposition that a prima facie claim plus sufficient evidence to reject the employer's explanation "*may* permit a finding of liability." Reeves, 530 U.S. at 149, 120 S. Ct. at 2109. See also James v. N.Y. Racing Ass'n, 233 F.3d 149, 155 (2d Cir. 2000) (reasoning that Reeves held that "a prima facie case prior to the employer's proffer of a reason, coupled with the error or falsity of the employer's proffered reason may – *or may not* – be sufficient to show illegal discrimination.") (emphasis added) (citations omitted); Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (holding that "Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff'") (quoting Reeves, 530 U.S. at 142, 120 S. Ct. 2105).

Even assuming, without conceding, that the Reeves burden-shifting standard is still applicable after Gross, the District Court, in fact, was careful to apply the Reeves standard in finding that Fried had failed to demonstrate that Defendants' proffered reason was false and that the real reason for his termination was unlawful discrimination. (SPA-23.) The District Court found: "[T]he undisputed evidence in the record, which has been recounted at length above, amply supports defendants' contention that Fried was fired because of conflicting visions concerning the proper role of LVI's chairman." (Id.) As such, both Fried's and the EEOC's contentions that the District Court erred in applying the prevailing standards for evaluating discrimination claims under the ADEA should be discounted.

**B.    The Court Considered All of the Evidence in Finding That Fried Failed to Prove That Age Was the "But For" Reason for His Termination**

In addition to attempting to confuse the well-established standard for evaluating discrimination cases under the ADEA in the wake of Gross, Fried inaccurately minimizes the Court's thorough twenty-page analysis of the material facts as "advocacy to justify its decision." In fact, the Court conducted a detailed factual analysis of the evidence viewed in a light most favorable to Fried before

30

finding that Fried had failed to prove that Defendants' reason for his termination – to ensure that the new CEO, Scott State, could run the Company as he saw fit – was pretextual and that age was the "but-for" reason for Fried's termination.

1.    <u>**The Self-Serving Evidence Presented by Fried Mitigates Against a Finding of Age Discrimination**</u>

In an attempt to blur the undisputed record evidence substantiating Fried's dramatic turn-about with respect to his agreement to surrender control of LVI's management to State, Fried attempts to reinterpret that evidence to suit his needs. Fried's first category of evidence consists of a number of self-serving statements that support his contention that he did a good job as Chairman under McNamara and as interim CEO. These laudatory statements are not disputed by Defendants because they actually support Defendants' legitimate non-discriminatory reason for his termination – that Fried was, in fact, viewed by the Board not as a declining old man, but as a formidable roadblock to State's mandate to lead LVI.

Initially, Fried's performance has never been cited as a reason for his termination. As such, his good performance as the CEO of LVI and as the Chairman under McNamara is of no consequence. Indeed, the mere fact that an employee receives positive reviews prior to discharge is not evidence of pretext. See Garrett v. Garden City Hotel, Inc., No. 05-CV-0962 (JFB) (AKT), 2007 U.S. Dist. LEXIS 31106, at *45-46 (E.D.N.Y. April 19, 2007); see also Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084-1085 (6th Cir. 1994).

31

Second, the fact that Fried was asked to assume the interim post of President and CEO at the age of 70, upon McNamara's departure, and that he received praise from the Board in that role is a clear indication that the Board did not view him as incapacitated because of his age. "[I]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age . . . . [T]he ADEA was prompted by [the] concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 510 (S.D.N.Y. 2010) (citation omitted). See also Tomassi v. Insignia Fin. Group, 478 F.3d 111, 116 (2d Cir. 2007) ("[t]he relevance of discrimination-related remarks does not depend on their offensiveness but rather on their tendency to show that the decision-maker was motivated by assumptions and attitudes relating to the protected class"). Fried's evidence underscores the fact that Defendants knew that he had the ability to perform a valuable role for LVI and that, ultimately, it was not his age, but, rather his refusal to relinquish control of the reins of management to State that prompted his dismissal.

### 2.    There is Ample Evidence of Fried's Interference

Fried's second attempt at proving pretext is the blatantly false statement that "Defendants do not even allege that Mr. Fried actually interfered with State." (Appellant's Brief at 32.) Contrary to Fried's unfounded contention, the record is

32

replete with undisputed evidence that Fried began a campaign of interference from State's earliest days at LVI.[2]    Specifically, during the transition period, Fried repeatedly demanded that State confer with him prior to making decisions, leading State to protest to the Board that this was "exactly the issue I had prior to accepting the job." (A-184.) Shortly after State's hire, on October 3, 2010, Fried fired off an email objecting to State's decision to suspend the search for a CIO. (A-173.) Fried wrote: "Believe it appropriate that you receive my views on all CEO transitional issues including a HR and CIO position before you reach a decision to suspend recruitment efforts that I initiated." (A-173.) Ten days later, on October 13, 2010, Fried took issue with State's decision to reconsider a trip to London for a potential business opportunity.    Fried admonished: "To refuse my advice, knowledge and input as architect of this relationship . . . and to terminate my continued involvement with Squibb will undermine the LVI/Squibb relationship that has been developing between Les and me.......very sensitive since the damage caused by Bob McNamara." (A-176.) Critically, Fried communicated his intent to continue to involve himself with LVI's management by presenting State with a list of responsibilities he proposed to perform, ranging from the development and implementation of business initiatives to tasks as mundane as the monitoring of all

---

[2] The EEOC, in its brief, concedes to the existence of evidence that, in the early weeks of State's employment, "emails in the record reflect that State and Fried disagreed over Fried's continuing role at LVI, with Fried expressing the belief that his input should be sought on various issues and State insisting to Fried and other Board members that Fried's input was unnecessary. (EEOC Brief at 8.)

employee air travel. (A-193.) State's email to Simmons and Hogan, dated October 14, 2010, forwarding the list of responsibilities sent by Fried, fully explains the reasons that ultimately led to the decision to terminate Fried's employment with LVI:

> I have been going back and forth with Burt on who does what at LVI. He has been pretty unhappy that I do not seek his counsel on almost everything and has expressed that view to me and a number of other members of the senior management, all of whom seem to be looking for new leadership and a new direction. . . .
>
> . . . .
>
> . . . . Here is my dilemma, after review of this list there is really only one bullet that pertains to the discussion I had with him 10 minutes earlier yet he somehow believes his view of his duties is consistent with my view. I can't be more clear than I have been and I don't see spending $1MM/yr to have Burt reviewing air travel and BS administrative items.

(A-195.) It was precisely Fried's blind refusal to accept a role as envisioned by the new CEO and Board that led to the decision to terminate his employment with LVI and to offer him a consultancy. Defendants, therefore, have set forth sufficient evidence of Fried's interference with State's management of LVI, in contravention of the promises he repeatedly made to Defendants, to support the Board's reason for deciding to offer him a consultancy.

### 3. The Reassignment of Fried's Job Duties

Fried also maintains that the reassignment of his job duties to employees that ranged from 13 to 35 years younger than him is evidence of age discrimination.

34

(Appellant's Brief at 29.)   Initially, with the exception of one manager, the job duties on the list proposed to State by Fried were ultimately assumed by individuals over the age of 40, including State, who was 47 at the time.[3] Moreover, the reassignment of a terminated employee's duties to younger employees is not itself indicative of age discrimination.   See Deebs v. ALSTOM Transp., Inc., 550 F. Supp. 2d 385, 390-91 (W.D.N.Y. 2008) ("reassignment of [the plaintiff's duties] to other, younger employees does not dictate a finding that other employees were hired into the [plaintiff's] position, or that the position was effectively reinstated at any relevant time following [the plaintiff's] discharge") aff'd, 346 Fed. Appx. 654 (2d Cir. 2009); Suttell v. Mfrs. Hanover Trust Co., 793 F. Supp. 70, 73 (S.D.N.Y. 1992) (reassigning the plaintiff's duties to younger employees after his job was eliminated did not mean that the plaintiff was "replaced" by a younger employee for the purposes of his age discrimination claim).   LVI did not replace Fried's Chairman position and the unsurprising fact that the duties Fried purportedly performed under McNamara were ultimately transitioned to other LVI managers, most of whom were in the ADEA protected age category, is not indicative of age discrimination.

---

[3] As the Court noted, Fried's duties were mostly reassigned to Tom Cullen, age 35; Gregory DiCarlo, age 44; David Pearson, age 44; Frank Aiello, age 45; John Leonard, age 46; State, age 47; Mark Canessa, age 48; Kamal Sookram, age 53 and Joseph Annarumma, age 57. (SPA-18; Appellant's Brief at 12-13.)

### 4.    State's Inquiries About Fried's Retirement

Fried's next silo of "evidence" consists of email communications from State asking for assurance that Fried was willing and able to step away, or retire, from the management of LVI and assume an advisory role at the will of the CEO. Rather than ignoring these statements, the District Court did an admirable job of putting these statements into a rational context based on the undisputed record evidence.   Based on the record facts, the District Court concluded that State's inquiries about Fried's future retirement, including his comment in the October 19, 2010 meeting, were "stray comments" because, rather than evidencing animosity toward age, they were reasonable inquiries into Fried's intent to release the reins of management to State.

Fried's agreement to step down, or effectively retire, from his interim leadership position as President and CEO had, in fact, been a condition of the sale of LVI to CHS as far back as 2005.  (A-97; A-33 at ¶ 30; A-95-96; A-100; A-123.) Fried had been actively seeking a successor as President and CEO prior to the equity stake purchase by CHS and, upon the purchase, Simmons, a managing partner of CHS, asked Fried to continue the search.  (A-33 at ¶ 30; A-96-97.)

In reliance on this agreement, State entertained the offer from Fried and the Board of Directors to accept the position as President and CEO of LVI. (A-143.) During these employment negotiations, State sought reassurance from the Board,

36

and ultimately from Fried himself, that Fried intended to retire from his leadership role, especially in light of State's conversations with LVI senior management who inferred that Fried would never retire from his role at LVI.   In an email to Hogan and Simmons dated September 14, 2010, State, as part of his due diligence, sought clarification from the Board as to the provisions for removal of Fried from his position as Chairman of the Board, in the event such a transition would need to be contemplated at a future date.  (A-565-566.)  Several days later, on September 19, 2010, after his conversations with senior team members which appeared to contradict the Board's representations regarding Fried's retirement from day-to-day management responsibilities, State expressed to Hogan his concern with being able to lead LVI with a "single vision," confirming  his understanding that Fried would "retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit."  (A-568-569.)   In light of his concern that Fried would "never retire," State asked for a meeting with Fried to clarify their working relationship. (Id.)  Upon hearing of Scott's concerns from Simmons, Fried unambiguously wrote "I will repeat my offer to Scott. I am prepared to remain at LVI until he, the Board or I decide it's time for me to leave. . . an offer he can't refuse . . . ." (A-137.) Reassured by this confirmation, State accepted the position of President and CEO.

After his hire, State was immediately confronted with Fried's intent to continue to play a pivotal role in the management of LVI and with a comprehensive list of responsibilities sent by Fried that he intended to continue to perform. (A-173-188; A-192-193.) At a meeting on October 19, 2010, in reference to the laundry list of ongoing responsibilities that State had fully intended to pass on to his senior managers, State purportedly asked Fried the baffled and exasperated question "Burt, you're 71 years of age, how long do you expect to work . . . what if you get hit by a bus, . . . the company has to plan for the future." (A-61-62; A-114-115; A-157-158.) Fried's dramatic reversal prompted State to seek additional clarification from the Board regarding Fried's retirement plans, including an email to Simmons relating State's comment to Fried that "it was his objective to have him truly retire and be just an on call resource." (A-575.) Finally, State commented to a friend that he was "[i]n a battle with [Fried] about his need to retire but the Board gets it, and is working to exit him with some respect." (A-473.)

Rather than evidencing a nefarious plot to discriminate against Fried on the basis of his age, State's pre and post-hire inquiries regarding Fried's retirement constitute nothing more than requests for clarification of how long Fried intended to retain his operational responsibilities at LVI. As the District Court concluded, citing numerous cases from this Circuit: "courts have consistently held that

38

remarks relating to retirement or transition planning are insufficient to defeat a motion for summary judgment in an ADEA case." See Boston v. McFadden Pub., Inc., No. 09 Civ. 457(RJH), 2010 WL 3785541, at *11 (S.D.N.Y. Sept. 29, 2010) ("even if plaintiff was asked about his retirement plans, inquiries about retirement plans do [ ] not necessarily show animosity toward age"); Vesprini v. Shaw Contract Flooring Servs., 315 F.3d 37, 42 (1st Cir. 2002) (comment that the time had come for the plaintiff to "step back and let the young stallions run the [day-to-day] business" not sufficient to constitute direct evidence of age-based animus"); Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) ("ambiguous remarks referring to the process of generational change create no triable issue of age discrimination") (citing cases); Getler v. Cornell Weill Univ. Med. Coll. Dept. of Surgery, No. 05 Civ. 8550, 2007 WL 38276, at *11 (S.D.N.Y. Jan. 3, 2007) ("inquiries about retirement plans do not necessarily show animosity toward age"). This is particularly so where the plaintiff was the first to raise the topic of retirement, as Fried had with his repeated reassurances that he would leave when asked. See McFadden Pub., Inc., 2010 WL 3785541, at *11; Spahr v. Am. Dental Ctrs., 03 Civ. 4954 (DRH) (ARL), 2006 U.S. Dist. LEXIS 14581, at *12 (E.D.N.Y. Mar. 14, 2006).

Contrary to the assertions of Fried and the EEOC, Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997) is entirely on point. In Raskin, the Second Circuit affirmed

39

the grant of summary judgment to the employer in an age discrimination claim where the primary evidence in support of Raskin's claim was a statement by his supervisor that Raskin might not be interested in a manager position because of his age and a reference to his eligibility for early retirement. Id. at 63. Even under the higher pre-Gross standard, the Second Circuit found that Raskin's supervisor had a legitimate reason to confirm Raskin's interest in a career change in light of his having an option of taking early retirement and that the inquiry, arising in a conversation about Raskin's application for a manager position, failed to support an inference that age played a role in the defendant's decision not to offer Raskin the position. Id. The Court concluded: "The ADEA does not make all discussions of age taboo." Id. Like that of Raskin's supervisor, State's inquiry into Fried's intentions to step down from his active role at LVI, when placed in proper context, was not a statement implying that Fried should retire because of his age, but, rather, a logical question to a person who had previously made numerous statements that he was ready to hand over the reins of management.

The cases cited by Fried and in the Amicus Curiae Brief of the Equal Employment Opportunity Commission (the "EEOC Brief") dealing with retirement related comments are clearly distinguishable from the undisputed facts of this matter. These cases involve discriminatory comments, unlike State's, that evidence preconceptions of the infirmities of old age and that are coupled with

40

additional indices of discriminatory conduct or situations.   See <u>Giarratano v.</u> <u>Edison Hotel</u>, No. 08 Civ. 1849(SAS), 2009 WL 464441 (S.D.N.Y. Feb. 24, 2009) (in addition to a purportedly ageist comment, the plaintiff set forth evidence that the defendant's legitimate business reason for the adverse action was pretextual); <u>O'Reilly</u>, 435 Fed. Appx. 8, 2011 U.S. Dist. LEXIS 61521 (negative comments regarding infirmities of old age including plaintiff's memory, speech ticks and the shape of his bald head); <u>Sciola v. Quattro Piu, Inc.</u>, 361 F. Supp. 2d 61 (E.D.N.Y. 2005) (repeated unprompted references to retirement and comments plus discrepancies in reason for termination, including differing accounts to the plaintiff's performance and lack of documents to justify termination for bad performance); <u>Schreiber v. Worldco LLC</u>, 324 F. Supp. 2d 512 (S.D.N.Y. 2004) (plaintiff alleged multiple statements from numerous management members directly denigrating his age); <u>Hofmann v. Dist. Council 37</u>, No. 99Civ.8636(KMW)(JCF), 2004 WL 1936242 (S.D.N.Y. Aug. 31, 2004) (comments that plaintiff was having "senior moments," was "too old to work" and "too old to learn" in addition to suggestion that he should retire); <u>Morris v. N.Y.C. Dep't. of Sanitation</u>, No. 99 CV 4376(WK), 2003 WL 1739009 (S.D.N.Y. Apr. 2, 2003) (same); <u>Shapiro v. N.Y.C. Dep't. of Educ.</u>, 561 F. Supp 2d 413 (S.D.N.Y. 2008) (unprompted comments that the plaintiff should retire, comments that his teaching style was "antiquated" and "outdated," supervisor's references to his

desire to have a staff of "young teachers," statistical evidence of disparate treatment of older teachers and defendant's failure to articulate a legitimate business reasons for the adverse actions); Velasquez v. Gates, No. 08 CV 2215(CLP), 2011 WL 2181625 (E.D.N.Y, June 3, 2011) (summary judgment denied where employee who was terminated for poor performance raised evidence that reason for termination was pretextual where defendant had never been warned or counseled about her performance); Carlton v. Mystic Transp., 202 F.3d 129 (2d Cir. 2000) (unprompted suggestion of retirement plus conflicting explanations for termination and lack of negative performance warnings); Schreiber, 324 F. Supp. 2d 512 (statements that plaintiff was not asked to join a group because the supervisor did not want older people in the group and that "older people do not have the same energy level as younger persons" and retort to plaintiff's question of "How am I doing?" with "Pretty good except for your age.").[4]

_____

[4] The other cases cited in Appellant's Brief relating to "stray comments" in general are equally inapplicable or, in some cases, supportive of Defendants' position. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("overwhelming" evidence of defendant's interest with age and projected retirement age of pilots); Danzer v. Norden Sys., 151 F.3d 50 (2d Cir. 1998) (multiple examples of bias including requests for age of the sales force in addition to ageist comments); Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 150 (2d Cir. 2010) (finding exclusion of evidence of a supervisor's "tar baby" remark and references to "voodoo" in a race discrimination case to be harmless); Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111 (2d Cir. 2007) (monthly unprompted comments about retirement and suggestion that she work with seniors since she "got along better" with them); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 154 (2d Cir. 1998) (remark about company being interested in "younger vision, new younger blood" and comment to plaintiff of "You better watch your ass. If you look around, you see all young people"); Gipson v. Wells Fargo N.A., 460 F. Supp. 2d 15, 27 (D.D.C. 2006) (heavy evidence of pretext including plaintiff's superior qualifications and evidence of highly subjective criteria in failure to promote case); Diaz v. Jiten Hotel Mgmt., 762 F. Supp. 2d 319, 321 (D. Mass. 2011)

In this case, other than the legitimate inquiries about retirement, Fried has failed to set forth any evidence that would meet his burden of proving that Defendants' reasons for terminating his employment and offering him a consultancy was pretextual and that age was the "but for" reason for these actions. Other than clearly misleading statements in his brief, such as declaring that there is no evidence on the record of Fried's interference, and misstating the law, Fried has failed to prove that the reason for his termination – to ensure that State had an unencumbered opportunity to turn LVI around – masked a discriminatory motive. He has similarly failed to prove, as he must post-Gross, that, if not for his age, he would never have been terminated.   As such, the Court's decision to grant Defendants' motion for summary judgment on the ADEA discrimination claim was entirely proper.

## IV.   THE DISTRICT COURT CORRECTLY HELD THAT THE NEW YORK CITY HUMAN RIGHTS LAW IS INAPPLICABLE TO FRIED'S DISCRIMINATION AND RETALIATION CLAIMS

The District Court correctly held that the NYCHRL is inapplicable to Fried's claims and properly granted LVI's motion for summary judgment with respect to all of his claims brought pursuant to the NYCHRL.

---

(use of highly offensive ageist language, including calling the plaintiff an "old lady," an "old pumpkin" and an "old hankie" and evidence of similar comments to other older employees plus alleged freeze on raises found to be patently false and evidence of management's drafting of false reports to get rid of older worker).

The NYCHRL expressly limits the applicability of its protections to acts that occur within the boundaries of New York City.  See N.Y.C. Admin. Code § 2-201. See also Casper v. Lew Lieberbaum & Co., Inc., No. 97 Civ. 3016(JGK), 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998).   Indeed, courts in New York have consistently held that, under the NYCHRL, in order to merit protection, the "impact" of an adverse decision on the plaintiff's employment must be in New York City.   See Salvatore v. KLM Dutch Airlines, No. 98 Civ. 2450, 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999); Casper, 1998 WL 150993, at *4.

Fried's novel argument – that he merits the protection of the NYCHRL because New York City was impacted by his termination – is not only self-aggrandizing, but wholly unsupported.  Even if, in fact, New York City had been financially impacted by Fried's termination, the "impact" requirement of the NYCHRL refers to the impact on the employee, not the impact on the City.  See German v. Cornell Univ., No. 03 Civ. 9766(DAB), 2005 WL 2030355, at *5 (S.D.N.Y. Aug. 17, 2005) (dismissing plaintiff's NYCHRL claim even when decision to pressure him to retire was made in New York City because "plaintiff still only felt the impact of that discrimination in his place of occupation, Long Island, not New York City"); Casper 1998 WL 150993, at *4 (finding the NYCHRL inapplicable to an employee who worked in Garden City, Long Island, even though the defendant had an office in New York City).  Moreover, Fried's

44

reliance on <u>Hoffman v. Parade Publ'ns</u>, 15 N.Y.3d 285 (2010), is puzzling since the District Court relied on <u>Hoffman</u> in finding the NYCHRL inapplicable to Fried's claims.  In <u>Hoffman</u>, the Court of Appeals rejected plaintiff's claim and held that the NYCHRL protects only those who felt the impact of an adverse decision in New York City – namely those who "work in the city." <u>Id.</u> at 291.  It is undisputed that Fried neither lived nor worked in New York City, but rather resided and worked in Westport, Connecticut.  The decision to terminate Fried impacted his employment where he worked – Westport, Connecticut.  The "impact" to New York City from the loss of his attendance at meetings there, is entirely irrelevant under the law.[5]

    <u>Lightfoot v. Union Carbide Corp.</u>, No. 92 Civ. 6411, 1994 U.S. Dist. LEXIS 6191 (S.D.N.Y. May 12, 1994) is precisely on point.  In <u>Lightfoot</u>, the plaintiff, like Fried, transferred from the defendant's New York City office to its Danbury, Connecticut headquarters. <u>Id.</u> at *2.  Unlike Fried, Lightfoot continued to reside in New York City after relocating his office to Connecticut. <u>Id.</u>  Lightfoot brought an age discrimination claim under the NYCHRL contending that, because the defendant had an office in New York City and he occasionally did work from his residence in the City, he should be afforded the protections of the NYCHRL. <u>Id.</u>,

---

[5] Although Fried categorizes his contacts with New York City to be substantial he admittedly only attended seventeen meetings in the City in the last six months of his employment. (Appellant's Brief at 44-45.)

at *17.  The Court concluded that the scope of the NYCHRL did not extend to Connecticut, the place where the plaintiff suffered the impact of the purportedly discriminatory decisions.  Id.  Fried, like Lightfoot, by his own admission, worked predominantly out of LVI's Westport, Connecticut office where he was impacted by the decisions made by Defendants relating to his employment, and, as such, he is outside the protections of the NYCHRL.

As an additional argument, Fried maintains that the District Court's finding "cuts directly against the public policy expressed in the statute." (Appellant's Brief at 47.)  However, the District Court, in reliance on the Court of Appeal's holding in Hoffman, aptly made the following observation: "[the goal of the impact requirement] would be completely undermined if courts were required to conduct a fact-intensive analysis of the amount of contact a particular individual maintained with New York City even where it was undisputed that the individual did not work in New York City . . . [t]his is especially true in today's increased globalized society in which business is often conducted over large distances."  (SPA-36.) Rather than supporting public policy, Fried's reading of the impact requirement of the NYCHRL would make it virtually impossible to draw a clean line between those employees who merit the protections of the NYCHRL and those who do not, thereby undermining the simplicity and predictability the Hoffman decision espoused.  Under New York law, therefore, there is no legal basis to hold that

46

Fried should be protected under the NYCHRL – a statute that expressly reserves its protections to those individuals who work in New York City.

Because Fried failed to demonstrate that the alleged discriminatory and/or retaliatory conduct had an "impact" on his employment within New York City, he cannot state any claim under the NYCHRL, and this Court should affirm the District Court's dismissal of his claim.

## CONCLUSION

For all the foregoing reasons, the District Court properly granted Defendants' Motion for Summary Judgment. Defendants respectfully request that the District Court's decision be affirmed and Fried's appeal dismissed.

Dated:      New York, New York
            May 29, 2012

                        Respectfully submitted,

                        JACKSON LEWIS LLP


                        s/ Joanne Seltzer
                        Joanne Seltzer
                        Jillian L. Hunt
                        666 Third Ave., 29th Floor
                        New York, New York 10017
                        212-545-4000
                        joanne.seltzer@jacksonlewis.com
                        jillian.hunt@jacksonlewis.com

47

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,588 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of  Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman.

Dated:        New York, New York
              May 29, 2012

                                      Respectfully submitted,

                                      JACKSON LEWIS LLP


                                      s/ Joanne Seltzer
                                      Joanne Seltzer
                                      Jillian L. Hunt
                                      666 Third Ave., 29th Floor
                                      New York, New York 10017
                                      212-545-4000
                                      joanne.seltzer@jacksonlewis.com
                                      jillian.hunt@jacksonlewis.com

48

# 11-4791-cv

## United States Court of Appeals
### for the
### Second Circuit

BURTON T. FRIED,

*Plaintiff-Appellant,*

– v. –

LVI SERVICES, INC., aka LVi SERVICES, INC., LVI PARENT CORP.,
CODE HENNESSY SIMMONS LLC, dba CHS PRIVATE EQUITY V LP,
APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official capacity and in his
individual capacity, BRIAN SIMMONS, in his official capacity and in his individual
capacity, RAJAY BAGARIA, in his official capacity and in his individual capacity,
GERALD J. GIRARDI, in his official capacity and in his individual capacity,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

THOMPSON WIGDOR LLP
*Attorneys for Plaintiff-Appellant*
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800


# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

ARGUMENT ....................................................................................1

I.   IN SUPPORT OF THEIR FICTIONALIZED ACCOUNT OF THE
     FACTS, DEFENDANTS MAKE NUMEROUS ALLEGATIONS
     THAT ARE NOT SUPPORTED BY THE RECORD ............................1

II.  DESPITE CLEAR EVIDENCE OF RETALIATION, THE
     DISTRICT COURT, WHICH IMPROPERLY ENGAGED IN
     ISSUE-RESOLUTION, ERRED IN GRANTING SUMMARY
     JUDGMENT BECAUSE GENUINE ISSUES OF MATERIAL
     FACT EXIST AS TO WHETHER MR. FRIED WAS
     TERMINATED BECAUSE HE COMPLAINED OF AGE
     DISCRIMINATION................................................................4

     A. The District Court Incorrectly Analyzed Mr. Fried's ADEA
        Retaliation Claim Under The *Gross* "But For" Causation
        Standard.................................................................5

     B. Viewing The Record Evidence As A Whole And Applying The
        Correct Standard To Mr. Fried's Retaliation Claim, Issues Of Fact
        Exist As To Whether He Was Terminated For Complaining About
        Discrimination .......................................................9

III. THE DISTRICT COURT, WHICH FAILED TO VIEW THE
     RECORD EVIDENCE AS A WHOLE AND IMPROPERLY
     ENGAGED IN ISSUE-RESOLUTION, ERRED IN GRANTING
     SUMMARY JUDGMENT BECAUSE GENUINE ISSUES OF
     MATERIAL FACT EXIST AS TO WHETHER MR. FRIED
     WAS TERMINATED BECAUSE OF HIS AGE ...................................14

     A. This Court Should Follow The Ninth Circuit And Not Analyze
        ADEA Discrimination Claims Under The *Gross* "But For"
        Standard For The Purposes Of Summary Judgment..........................15

     B. Viewing The Record Evidence As A Whole, Issues Of Fact Exist
        As To Whether Mr. Fried Was Terminated Because Of His Age ......17

i

IV.    THE DISTRICT COURT ERRED IN HOLDING THAT THE
       NYCHRL WAS INAPPLICABLE TO MR. FRIED'S CLAIMS
       BECAUSE THE UNLAWFUL DISCRIMINATORY AND
       RETALIATORY CONDUCT HAD AN IMPACT IN NEW
       YORK CITY............................................................................................22

CONCLUSION ......................................................................................................25

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................26

## TABLE OF AUTHORITIES

### CASES

*Alam v. HSBC Bank USA, N.A.*,
    382 Fed.Appx. 74 (2d Cir. 2010)........................................................5

*Byrnie v. Town of Cromwell*,
    243 F.3d 93 (2d Cir. 2001) ...........................................................12

*Casper v. Lew Lieberbaum* & Co., Inc.,
    No. 97 Civ. 3016, 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998)..................22

*Clark v. Allen & Overy LLP*,
    35 Misc.3d 1229(A) (N.Y. Sup. Ct. 2012) ...................................23

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) ...........................................15

*Collins v. Connecticut Job Corps*,
    684 F.Supp.2d 232 (D.Conn. 2010) .............................................12

*Cosgrove v. Sears, Roebuck & Co.*,
    9 F.3d 1033 (2d Cir. 1993) ......................................................6, 8

*Cronin v. Aetna Life Ins. Co.*,
    46 F.3d 196 (2d Cir. 1995) .......................................................8

*Germano v. Cornell Univ.*,
    No. 03 Civ. 9766, 2005 WL 2030355 (S.D.N.Y. Aug. 17, 2005)................22

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167, 174 L.Ed.2d 119, 129 S.Ct. 2343 (2009) .........................5, 16

*Hoffman v. Parade Publications*,
    15 N.Y.3d 285 (2010)............................................................22

*James v. New York Racing Ass'n*,
    233 F.3d 149 (2d Cir. 2000) .....................................................12

*Kessler v. Westchester Cnty. Dept. of Soc. Servs.,*
    461 F.3d 199 (2d Cir. 2006) ........................................................6, 8

*Leibowitz v. Cornell Univ.,*
    584 F.3d 487 (2d Cir. 2009) ...........................................................16

*Lightfoot v. Union Carbide Corp.,*
    No. 92 Civ. 6411, 1994 WL 184670 (S.D.N.Y. May 12, 1994) ..................22

*Meiri v. Dacon,*
    759 F.2d 989 (2d Cir. 1985) ...........................................................21

*Murphy v. PricewaterhouseCoopers, LLP,*
    813 F.Supp.2d 45 (D.D.C. 2011)....................................................22

*Nieves v. Angelo, Gordon & Co.,*
    341 Fed.Appx. 676 (2d Cir. 2009)................................................5, 6

*O'Connor v. Consolidated Coin Caterers Corp.,*
    517 U.S. 308 (1996)....................................................................19

*O'Reilly v. Marina Dodge, Inc.,*
    No. 10-CV-2977, 2011 WL 1897489 (2d Cir. May 19, 2011) ....................21

*Padilla v. Metro-North Commuter R.R.,*
    92 F.3d 117 (2d Cir. 1996) .........................................................8, 12

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989)....................................................................12

*Regan v. Benchmark Co. LLC,*
    11 Civ. 4511(CM), 2012 WL 692056 (S.D.N.Y. Mar. 1, 2012)...................23

*Rodriguez v. City of New York,*
    644 F.Supp.2d 168 (E.D.N.Y. 2008)..............................................11

*Salvatore v. KLM Dutch Airlines,*
    No. 98 Civ. 2450, 1999 WL 796172 (S.D.N.Y. Sept. 30, 1999) ..................22

*Shelley v. Geren,*
    666 F.3d 599 (9th Cir. 2012) .................................................................15, 16

*Tarshis v. Riese Organization,*
    211 F.3d 30 (2d Cir. 2000) ..................................................................15, 19

*Terry v. Ashcroft,*
    336 F.3d 128 (2d Cir. 2003) ....................................................................6, 8

*White v. Connecticut, Dep't of Corrections,*
    3:08 CV 1168 (CFD), 2010 WL 3447505 (D. Conn. Aug. 24, 2010) ..........11

*Witkowich v. U.S. Marshals Service,*
    424 Fed.Appx. 20 (2d Cir. 2011).................................................................5

**STATUTES**

29 U.S.C. §623(d) .............................................................................................6

42 U.S.C. §2000e-(3)(a)....................................................................................6

# ARGUMENT

## I.

## IN SUPPORT OF THEIR FICTIONALIZED ACCOUNT OF THE FACTS, DEFENDANTS MAKE NUMEROUS ALLEGATIONS THAT ARE NOT SUPPORTED BY THE RECORD

In a contrived effort solely designed to conceal the true reason(s) for Mr. Fried's termination, Defendants make several insincere assertions in their brief that are either not supported by the record or do not contain a citation to the record.[1]

For example, in their Preliminary Statement, Defendants falsely state that:

(1)  "Less than a month after becoming CEO, State took Fried up on his offer, and asked him to limit his activities on behalf of LVI to those customarily exercised by a Chairman." (Def. Brief p. 2).

• There is nothing in the record to support this false assertion. The record evidence demonstrates that on October 19, 2010, Mr. State decided to strip Mr. Fried of all his duties and reassign them to younger employees. (A-393; A-447; A-476-77; A-515-16). Prior to this discriminatory act, Mr. State never spoke to Mr. Fried about limiting his activities to those customarily exercised by a Chairman.

(2)  "Instead, the District Court found that the undisputed evidence showed that Fried had the abilities to perform a valuable role with LVI, as evidenced by the fact that the very same Board that voted to reduce [Mr. Fried's] role within LVI had only months earlier tapped him to fill the interim CEO role while a permanent candidate was sought." (Def. Brief p. 2).

---

[1]    The Brief for Defendants-Appellees is cited to herein as "(Def. Brief p. _)."

- There is nothing in the record to support the false assertion that the Board of LVI Parent Corp. (the "Board") voted to reduce Mr. Fried's role within LVI Services, Inc. ("LVI"). The record evidence demonstrates that Mr. State, not the Board, made the discriminatory decision to strip Mr. Fried of all his job duties. (A-515-16). Moreover, even assuming the Board voted to reduce Mr. Fried's role within LVI, which it did not, there is nothing in the record to support the false assertion that it was the same Board that previously "tapped him to fill the interim CEO role while a permanent candidate was sought." The record evidence demonstrates that Mr. State, Mr. Simmons and Mr. Bagaria were not members of the Board when Mr. Fried was named interim CEO. (A-371; A-410).

(3) "As the extensive record evidence indicates, it was not his age but, his refusal to relinquish control of the reins of management to State that prompted Fried's dismissal." (Def. Brief p. 2-3).

- There is nothing in the record to support this false assertion. As set forth above, the record evidence demonstrates that on October 19, 2010, Mr. State stripped Mr. Fried of all his duties and reassigned them to younger employees. (A-447; A-476-77; A-515-16).

(4) "Fried failed to follow his own advice and posed an ultimatum to the Board and to State that he, not they, would determine his role going forward with LVI, creating the rift that led to his termination." (Def. Brief p. 3).

- There is nothing in the record to support this false assertion. The record evidence demonstrates that Mr. Fried met with Mr. State on October 19, 2010, so Mr. State could determine Mr. Fried's job duties. (A-111-12).

Defendants' campaign of misdirection also seeps into their Statement of

Facts. For example, Defendants state that:

(1)   "Although LVI's corporate office is in New York City, for the last seven years prior to his departure from LVI, Fried worked out of a satellite office in Westport, Connecticut that LVI leased exclusively for his personal convenience." (Def. Brief p. 4).

2

- The record evidence, which clarifies this half-truth, demonstrates that from September 2003 through July 2006, Mr. Fried worked almost equally out of LVI's New York City office and its Westport, Connecticut office. (A-389-90; A-497-500; A-532).

(2) "The offer to State was made on September 8, 2010 and negotiations thereafter ensued." (Def. Brief p. 6).

- There is no citation to the record to support this statement.

(3) "As part of these negotiations, and as a condition for accepting the CEO position, State insisted that he be guaranteed the discretion to run the business as he saw fit." (Def. Brief. p. 6-7).

- There is no citation to the record to support this statement.

(4) "During this transition period, State began to notice reluctance on Fried's part to relinquish his interim CEO responsibilities, as he had previously assured State he would do." (Def. Brief p. 8).

- There is no citation to the record to support this statement.

(5) "In addition, State had concerns about Fried's insistence that State confer with him prior to making certain decisions." (Def. Brief. p. 8).

- The record evidence cited by Defendants does not support their statement that Mr. Fried insisted that Mr. State confer with him prior to making a decision. (A-148-49; A-576).

(6) "On October 19, 2010, State met with Fried to discuss, among other transition items, Fried's proposed responsibilities as LVI Chairman." (Def. Brief p. 9).

- The record evidence, which clarifies this half-truth, demonstrates that Mr. Fried did not propose that he continue performing the duties listed in the email he sent to Mr. State. Contrary to Defendants' consistent misrepresentation of the facts, the list of duties Mr. Fried sent to Mr. State was a list of duties he performed when he was Chairman under Mr. McNamara. (A-111-12).

(7)    "Despite State's overtures, and despite his own prior assurances, Fried refused to discuss any transition of his role." (Def. Brief. p. 10).

●    There is no citation to the record to support this statement.

Defendants' need to resort to trickery in an attempt to win affirmance is telling of the true strength of their arguments.    Accordingly, this Court should disregard all of Defendants' unsupported statements, as well as those that do not contain a citation to the record.

## II.

### DESPITE CLEAR EVIDENCE OF RETALIATION, THE DISTRICT COURT, WHICH IMPROPERLY ENGAGED IN ISSUE-RESOLUTION, ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER MR. FRIED WAS TERMINATED BECAUSE HE COMPLAINED OF AGE DISCRIMINATION

Mr. Fried was retaliated against after complaining of age discrimination because, after 24 years of loyal service, he was terminated less than a month after he first complained, and the day after his attorneys sent a letter to Mr. State outlining his allegations of discrimination.    Contrary to Defendants' contention, Mr. Fried's retaliation claim is based upon much more than temporal proximity alone.    It is also based upon, among other things, the deposition testimony and contemporaneous notes of a Board member, who admitted that in response to Mr. Fried's attorneys' letter, Defendants sent a letter to Mr. Fried terminating his employment.

4

Although the District Court correctly held that Mr. Fried established a *prima facie* case of retaliation, it erred in granting summary judgment because: (1) it incorrectly analyzed Mr. Fried's ADEA retaliation claim under the Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 174 L.Ed.2d 119, 129 S.Ct. 2343 (2009), "but for" causation standard; and (2) regardless of which standard the District Court applied, given the record evidence which demonstrates that in response to Mr. Fried's attorneys' letter, Defendants sent a letter to Mr. Fried terminating his employment, issues of fact exist as to whether Mr. Fried was terminated in retaliation for his complaints of age discrimination.

**A.    The District Court Incorrectly Analyzed Mr. Fried's ADEA Retaliation Claim Under The *Gross* "But For" Causation Standard**

Although Defendants contend that the District Court did not analyze Mr. Fried's ADEA retaliation claim under the Gross "but for" causation standard, they go on to claim that even if the District Court did, it would have been proper to do so.   Defendants could not be more wrong since, post-Gross, this Circuit has correctly not applied the heightened standard to ADEA retaliation claims. See, e.g., Witkowich v. U.S. Marshals Service, 424 Fed.Appx. 20 (2d Cir. 2011); Alam v. HSBC Bank USA, N.A., 382 Fed.Appx. 74 (2d Cir. 2010); Nieves v. Angelo, Gordon & Co., 341 Fed.Appx. 676 (2d Cir. 2009).

In support of their unconvincing position, Defendants argue that since the ADEA's discrimination and retaliation provisions contain similar "because of"

5

language, the "because of" language in the later provision should be interpreted the same way as the <u>Gross</u> Court interpreted the "because of" language in the former provision; thus, requiring "but for" causation. However, as set forth on pages 20-22 in Mr. Fried's brief, the retaliation provisions of Title VII and the ADEA are nearly identical. <u>Compare</u> 42 U.S.C. §2000e-(3)(a) <u>with</u> 29 U.S.C. §623(d). As a result, this Circuit has held both before and after <u>Gross</u>, that the same standards and burdens apply to retaliation claims under the ADEA and Title VII. <u>See</u> <u>Nieves</u>, 341 Fed.Appx. at 679; <u>Kessler v. Westchester Cnty. Dept. of Soc. Servs.</u>, 461 F.3d 199, 205 (2d Cir. 2006). A violation of Title VII's retaliation provision occurs when "a retaliatory motive plays a part in adverse employment actions towards an employee, whether or not it was the sole cause." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141-42 (2d Cir. 2003) (citing <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993). Thus, because this Court does not interpret Title VII's retaliation provision to require a showing of "but for" causation, the <u>Gross</u> interpretation of the "because of" language to the ADEA's retaliation provision is inapplicable. Accordingly, since neither the Supreme Court nor the Second Circuit has squarely addressed this issue post-<u>Gross</u>, the pre-<u>Gross</u> interpretation of the ADEA's retaliation provision, which does not require a showing of "but for" causation, is the appropriate standard.

Despite the fact that the <u>Gross</u> "but for" causation standard is not applicable to ADEA retaliation claims, the District Court's Opinion and Order indicates that the District Court did indeed apply this incorrect standard to Mr. Fried's retaliation claim.   In analyzing Mr. Fried's retaliation claim under the third-part of the <u>McDonnell Douglas</u> burden-shifting framework, the District Court specifically held that "[f]or the reasons already <u>limned</u> <u>above</u>, plaintiff's claim of retaliation fails with respect to the  . . . decision to fire Fried." (Emphasis added). (SPA-31). The only reasons "limned above" in the Opinion and Order concerned Mr. Fried's purported inability to demonstrate that "but-for" his age, Defendants would not have terminated him. (SPA-20-29).

Furthermore, when analyzing Mr. Fried's ADEA discrimination claim under the third-part of the <u>McDonnell Douglas</u> burden-shifting framework, the District Court used the words "pretext" or "pretextual" in reference to Mr. Fried's ultimate burden of demonstrating "but for" causation. (SPA-23-28).   Similarly, when analyzing Mr. Fried's ADEA retaliation claim under the third-part of the <u>McDonnell Douglas</u> burden-shifting framework, the District Court used the same words to describe Mr. Fried's ultimate burden. (SPA-29-31).  This, too, indicates that the District Court applied the "but for" standard to Mr. Fried's retaliation claim.   Finally, the fact that the District Court did not evaluate Mr. Fried's retaliation claim under the applicable "motivating factor" standard (or even

acknowledge its existence) is further evidence that the District Court applied the "but for" standard.

It is clear that the District Court mistakenly analyzed Mr. Fried's ADEA retaliation claim under the wrong standard and not under the applicable "motivating factor" standard. See Terry, 336 F.3d at 140-41 (noting that the ADEA is "violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'") (quoting Cosgrove, 9 F.3d at 1039)); Kessler, 308 Fed.Appx. at 530 ("it is well established that a plaintiff in a retaliation case does not bear the burden of proving that the defendant's explanation for the challenged employment decision is pretext . . . .") (internal citations omitted)); Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 122-23 (2d Cir. 1996) (with respect to an ADEA retaliation claim, this Court noted that "'[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.") (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)).

**B.    Viewing The Record Evidence As A Whole And Applying The Correct Standard To Mr. Fried's Retaliation Claim, Issues Of Fact Exist As To Whether He Was Terminated For Complaining About Discrimination**

The District Court correctly held that Mr. Fried established a *prima facie* case of retaliation because he: (1) complained of age discrimination as early as October 19, 2010 to several members of the Board; (2) complained of age discrimination again on November 4, 2010 during a Board meeting; (3) complained of age discrimination one final time on November 15, 2010 through his attorneys who wrote a letter, which was addressed to State and discussed by certain members of the Board, outlining his allegations of discrimination; and (4) was terminated less than a month after he first complained of age discrimination, and the day after he last complained. (SPA-29-31).  Despite the District Court's holding on this point, Defendants attempt to re-litigate the issue of causation even though the District Court held that "because Fried has produced evidence suggesting that he engaged in protected activity before defendants contemplated . . . offering Fried the consulting agreement, defendants' argument in this regard is unpersuasive." (SPA-31).

First, Defendants contend that no causal connection existed between Mr. Fried's complaints of discrimination and the decision to terminate his employment because they contemplated offering him a consulting agreement on September 19, 2010.  Defendants premise their groundless contention on a September 19, 2010

9

email from Mr. State, who had not yet accepted LVI's offer of employment, to Mr. Hogan, a member of the Board. This email, however, does not support Defendants' contention, as it merely states Mr. State's hope that Mr. Fried would continue to support LVI under a consulting agreement <u>after</u> he retired. (A-568-69). Contrary to Defendants' contention, nothing in this email could remotely be construed as LVI contemplating offering Mr. Fried a consulting agreement and terminating his employment prior to his complaints of discrimination. In fact, it is undisputed that prior to September 23, 2010 (the date Mr. State allegedly accepted LVI's offer), the Board never contemplated terminating Mr. Fried's employment. (A-372-73; A-416).

Second, Defendants contend that no causal connection existed between Mr. Fried's November 4, 2010 and November 15, 2010 complaints of discrimination and the decision to terminate his employment because they contemplated offering him a consulting agreement on November 2, 2010. Defendants premise their baseless argument on a November 2, 2010 email from Mr. Simmons, a member of the Board, to Mr. Fried. Likewise, this email does not support Defendants' contention because the email is based on Mr. Simmons' "opinion" and "thoughts" about Mr. Fried's continued role at LVI. (A-204-05). Given that Mr. Simmons also wrote that this issue could be discussed during the November 4, 2010 Board meeting, nothing in this email could reasonably be construed as LVI contemplating

offering Mr. Fried a consulting agreement and terminating his employment. (A-204-05). In fact, it is undisputed that prior to November 4, 2010, the Board never contemplated terminating Mr. Fried's employment. (A-374-75; A-415-16).

Finally, Defendants maintain that no causal connection exists between Mr. Fried's November 15, 2010 complaint of discrimination and the decision to terminate his employment because they contemplated offering him a consulting agreement on November 11, 2010. Defendants again premise their untenable argument on a November 11, 2010 email that contained an unsigned <u>draft</u> letter offering Mr. Fried a consulting agreement and terminating his employment. (A-705). However, neither the letter nor its contents were disclosed to Mr. Fried prior to November 16, 2010, when a final version of the letter was sent to Mr. Fried the day after he complained about discrimination. (A-603-04). To the extent Defendants considered terminating Mr. Fried's employment prior to his November 15, 2010 complaint of discrimination, but did not do so until thereafter, a causal connection still exists. <u>See</u>, <u>e.g.</u>, <u>Rodriguez v. City of New York</u>, 644 F.Supp.2d 168, 193 (E.D.N.Y. 2008) (causal connection established where recommendation to terminate was made three weeks before the protected activity because final decision was not made until after the protected activity); <u>White v. Connecticut, Dep't of Corrections</u>, 3:08 CV 1168 (CFD), 2010 WL 3447505, *10 (D. Conn.

Aug. 24, 2010) (causal connection established where final decision to terminate was made after protected activity).

Despite Mr. Fried's substantial evidence of retaliation, Defendants also contend that the District Court correctly found that Mr. Fried failed to establish that their reason for terminating him was a "pretext" for retaliation. Mr. Fried need not prove that Defendants' "proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Padilla, 92 F.3d at 122 (quoting Cronin, 46 F.3d at 203) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 247, 249 (1989))); see Collins v. Connecticut Job Corps, 684 F.Supp.2d 232, 256 (D.Conn. 2010) ("At the third stage of the *McDonnell Douglas* test, 'the governing standards is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited [retaliation] occurred.'") (quoting James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000)). When reviewing the totality of the circumstances, issues of fact exist as to whether Mr. Fried's age was a motivating factor in the decision to terminate and/or whether Defendants' articulated reason for terminating Mr. Fried was false.

A fair conclusion can be drawn "from the perspective of the entire record" that Defendants terminated Mr. Fried in retaliation for his complaints. Id. (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 105 (2d Cir. 2001)). In this case, in

12

addition to the fact that Mr. Fried, after 24 years of loyal service, was terminated less than one month after he first complained of age discrimination, Girardi testified at deposition that in response to Mr. Fried's November 15 written complaint of age discrimination, the Board sent him a letter the next day terminating his employment. (A-418-19; A-604).

This retaliatory act was documented by Girardi who wrote, in his contemporaneous notes, the following: "Burt – sent pre-emptive letter; ignore and send good faith letter offer to Burt Fried." (A-601). The "good faith letter offer" referenced by Girardi was the letter that terminated Mr. Fried's employment. (A-604). A reasonable jury relying on Girardi's notes alone could easily infer that Mr. Fried's complaint was a motivating factor in the decision to terminate.

Accordingly, viewing the facts in a light most favorable to Mr. Fried, material issues of fact exist as to the veracity of Defendants' reason for terminating Mr. Fried, and whether Mr. Fried's complaints of discrimination, including the November 15 letter complaining of age discrimination, were a motivating factor in the decision to terminate.

### III.

### THE DISTRICT COURT, WHICH FAILED TO VIEW THE RECORD EVIDENCE AS A WHOLE AND IMPROPERLY ENGAGED IN ISSUE-RESOLUTION, ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER MR. FRIED WAS TERMINATED BECAUSE OF HIS AGE

Defendants discriminated against Mr. Fried by terminating his employment because of his age less than one month after Mr. Fried made it crystal clear to Mr. State that he had no intention of retiring from the company he founded and spent 24 years building. Thereafter, Mr. State made it his goal to put Mr. Fried out to pasture as evidenced by his emails which state "I was clear with [Mr. Fried] that it was my objective to have him truly retire and be just an on call resource" and that he was "[i]n a battle with [Mr. Fried] about his need to retire but Board gets it and is working to exit him with some respect." (A-473; A-487; A-575). Mr. State, who is 23 years younger than Mr. Fried, decided to terminate Mr. Fried under the guise of needing to be able to manage LVI without interference from Mr. Fried. This reason, however, is clearly false as there is no record evidence that Mr. Fried interfered with Mr. State's management of LVI. In fact, after October 19, 2010, Mr. Fried could not have interfered because Mr. State stripped him of his job duties. Although the record is clear that Mr. Fried was terminated because of his age, at the very least, issues of fact exist as to whether Mr. Fried would not have been terminated "but for" his age.

14

A.    **This Court Should Follow The Ninth Circuit And Not Analyze ADEA Discrimination Claims Under The *Gross* "But For" Standard For The Purposes Of Summary Judgment**

In <u>Shelley v. Geren</u>, 666 F.3d 599 (9th Cir. 2012), which, as Defendants know, was decided after Mr. Fried submitted his opposition to their summary judgment motion, the Ninth Circuit held that in the context of a motion for summary judgment, the <u>Gross</u> "but for" standard does not apply when analyzing ADEA disparate treatment claims.  Mr. Fried contends that the rationale of this well-thought and well-reasoned opinion should be followed by this Circuit.  Unsurprisingly, Defendants contend the opposite.

Prior to <u>Gross</u>, both the Second Circuit and the Ninth Circuit applied the <u>McDonnell Douglas</u> burden-shifting framework when analyzing motions for summary judgment on ADEA claims, and required a plaintiff to show that discrimination was the real reason for the employment action by, among other things, showing that discrimination was a motivating factor in the employment decision. <u>See</u>, <u>e.g.</u>, <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1281 (9th Cir. 2000); <u>Tarshis v. Riese Organization</u>, 211 F.3d 30, 36 (2d Cir. 2000).  Because <u>Gross</u> involved a case that had already progressed to trial, the Supreme Court did not address the evidentiary framework applicable to a motion for summary judgment.   In fact, the Supreme Court specifically noted that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas*

15

utilized in Title VII cases is appropriate in the ADEA context." Gross, 129 S.Ct. at

2349, n.2.  Since Gross, the Second Circuit has continued to utilize the McDonnell

Douglas framework to decide motions for summary judgment in ADEA cases. See,

e.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009).[2]  The Shelley

Court joined the Second Circuit in this practice but held "that nothing in *Gross*

overruled our cases utilizing this framework to decide summary judgment motions

in ADEA cases.  The *McDonnell Douglas* test is used on summary judgment, not

at trial." Shelley, 666 F.3d at 607.  Thus, the Ninth Circuit stated that:

> to survive summary judgment on his claim for a violation of
> the ADEA under the disparate treatment theory of liability,
> Shelley must first establish a prima facie case of age
> discrimination.  If he is successful, the burden of production
> shifts to the [defendant] to articulate a legitimate non-
> discriminatory reason for its adverse employment action.  It
> is then Shelley's task to demonstrate that there is a material
> genuine issue of fact as to whether the employer's purported
> reason is pretext for age discrimination.  At trial, he must
> carry the burden to prove that age was the "but for" cause of
> his non-selection.

(Internal citations omitted). Id. at 608.

Accordingly, this Court should follow the Ninth Circuit's rationale in

Shelley, and decline to apply the Gross "but for" standard in connection with

resolving summary judgment motions involving ADEA discrimination claims.

---

[2]        In their brief, Defendants mistakenly claim that Leibowitz v. Cornell Univ., is a pre-
Gross decision.  Gross was decided on June 18, 2009, and Leibowitz was decided on October 23,
2009.  In fact, Leibowitz even cites to Gross.  See Leibowitz, 584 F.3d at 504.  Instead of
accusing Defendants of trying to mislead this Court, Mr. Fried, unlike Defendants, will take the
high road and assume that Defendants did not look before leaping.

**B.    Viewing The Record Evidence As A Whole, Issues Of Fact Exist As To Whether Mr. Fried Was Terminated Because Of His Age**

Despite Mr. Fried's substantial evidence of retaliation, Defendants contend that the District Court correctly found that Mr. Fried failed to establish that "but for" his age, he would not have been terminated.  However, when reviewing the totality of the circumstances, which the District Court failed to do, issues of fact exist as to whether Mr. Fried would have been terminated "but for" his age.

Defendants contend that because the Board viewed Mr. Fried as a good performer, and because he was asked to serve as interim President and CEO at the age of 70, this evidence cuts against a finding of age discrimination because the Board did not view Mr. Fried as "incapacitated because of his age."  This contention is wholly without merit.  First, Mr. State did not view Mr. Fried as a good performer. (A-482).  Second, Mr. State was not part of the Board when Mr. Fried was asked to serve as interim President and CEO. (A-371).  Since Mr. State, not the Board, made the decision to terminate Mr. Fried, the Board's view of Mr. Fried is not relevant. (A-614; A-633; A-647; A-662).  It is Mr. State's view of Mr. Fried that matters, and he viewed Mr. Fried as a 71 year old "senior [person]" who needed to retire, despite not wanting to do so. (A-516; A-576).

Defendants also contend that Mr. Fried was terminated because he refused "to relinquish control of the reins of management to State."  There is absolutely no record evidence to support this bald assertion, especially since Mr. State stripped

17

Mr. Fried of all his job duties. (A-516-18). And, prior to that date, the record evidence demonstrates that after Mr. State was hired by LVI, Mr. Fried relinquished the President and CEO title to him and returned to perform his Chairman duties -- the same Chairman duties he performed while Chairman under Mr. McNamara. (A-371; A-572).

Defendants also contend that "the record is replete with undisputed evidence that Fried began a campaign of interference from State's earliest days at LVI." Mr. Fried disputes this alleged "undisputed evidence." For example, Defendants argue that Mr. Fried interfered with Mr. State's ability to manage LVI because he "repeatedly demanded that State confer with him prior to making a decision." This is a gross mischaracterization of the record. Mr. Fried did not "demand" that Mr. State confer with him about anything, as evidenced by the emails Defendants cite. (A-173-74; A-176-82; A-576). Defendants also argue that Mr. Fried interfered with Mr. State's ability to manage LVI because he "communicated his intent to continue to involve himself with LVI's management by presenting State with a list of responsibilities he proposed to perform . . . ." This is another mischaracterization of the record. The list of responsibilities Mr. Fried emailed to Mr. State was a list of job duties he performed as Chairman under Mr. McNamara, and he sent it to Mr. State in preparation for the October 19, 2010 meeting which was to discuss Mr. Fried's job duties going forward. (A-111-12).

18

Defendants also contend that because Mr. Fried's job duties were reassigned to employees over the age of 40, with the exception of one manager, this evidence cuts against a finding of age discrimination even though these employees were 13 to 26 years younger. The fact that Mr. Fried's job duties were reassigned to employees within his protected class is not a relevant consideration. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) (reversing summary judgment for a defendant which had successfully argued below that the plaintiff, a member of the protected age class, could not state an ADEA claim because his successor was a member of the protected age class). The relevant consideration is the difference in age. See Tarshis, 211 F.3d at 39 (stating that an inference of discrimination may be based upon an age difference of as little as eight years).

Defendants mistakenly contend that the District Court correctly concluded that Mr. State's numerous email communications regarding his desire that Mr. Fried retire constituted "stray comments." Contrary to Defendants' contention, the District Court did not classify the contents of these emails as "stray comments." (SPA-24-25). The District Court did, however, incorrectly find that these communications were legitimate inquiries concerning retirement or transition planning. (SPA-25-26). The District Court completely missed the mark because it is undisputed that Mr. State was fully aware at the time he sent these emails that

19

Mr. Fried had no intention of retiring. (A-444; A-485; A-569).  Furthermore, the content of these emails certainly do not indicate that Mr. State was inquiring into Mr. Fried's retirement plans.  For example:

- On September 19, 2010, before Mr. State was hired, Mr. State emailed Mr. Hogan and wrote that "[i]n the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit.  Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do.  That is not a healthy situation for Burt or LVI." (A-485; A-569).

- After meeting with Mr. Fried on October 19, 2010, Mr. State wrote to Mr. Simmons, "I was clear with [Mr. Fried] that it was my objective to have him truly retire and be just an on call resource." (A-575).

- On November 5, 2010, Mr. State emailed his friend and told him that he was "[i]n a battle with [Mr. Fried] about his need to retire but Board gets it and is working to exit him with some respect." (A-473; A-487).

These emails cannot reasonably be interpreted as legitimate inquiries by Mr. State into Mr. Fried's retirement plans, especially since Mr. State knew that Mr. Fried had no intention of retiring.  When combined with his October 19, 2010 ageist remark ("Burt, you're 71 years of age, how much longer do you expect to work?"), these emails can only be viewed as evidence of Mr. State's discriminatory animus toward Mr. Fried because of his desire to force him to retire because of his age.

By creating an elaborate fiction, Defendants attempt to place these emails in context by essentially claiming that Mr. State used the word "retire" in reference to

20

when Mr. Fried would step down from his leadership role and/or his day-to-day activities. Defendants are trying to fit a square peg into a round hole. Their disingenuous attempt to contextualize Mr. State's ageist comments in his emails is belied by Mr. State's own deposition testimony in which he testified that he used the word "retirement" in reference to when Mr. Fried would step away from the company. (A-484). By improperly resolving this factual issue of Mr. State's intent, the District Court erred by making a credibility determination regarding Mr. State's state of mind. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (summary judgment is "inappropriate where an individual's intent and state of mind are implicated."); O'Reilly v. Marina Dodge, Inc., No. 10-CV-2977, 2011 WL 1897489, at *2 (2d Cir. May 19, 2011) ("Where, as here, the asserted nondiscriminatory explanations relate to and purport to justify allegedly age-related comments, a jury may consider the pretextual nature of the explanations in determining whether the comments are ageist and whether the adverse action would not have occurred but for the plaintiff's age.").

Accordingly, viewing the facts in a light most favorable to Mr. Fried, material issues of fact exist as to the veracity of Defendants' reason for terminating Mr. Fried, and whether "but for" his age, Mr. Fried would not have been terminated.

21

## IV.

## THE DISTRICT COURT ERRED IN HOLDING THAT THE NYCHRL WAS INAPPLICABLE TO MR. FRIED'S CLAIMS BECAUSE THE UNLAWFUL DISCRIMINATORY AND RETALIATORY CONDUCT HAD AN IMPACT IN NEW YORK CITY

Following the incorrect lead of the District Court, Defendants contend that the NYCHRL is not applicable to Mr. Fried's claims because the decision to terminate did not <u>impact him</u> in New York City. Defendants' contention is a blatant misstatement of the applicable law because Mr. Fried is only required to demonstrate that the unlawful conduct had an impact in New York City.

<u>Hoffman v. Parade Publications</u>, 15 N.Y.3d 285 (2010), governs because Mr. Fried is a nonresident of New York City. Thus, all of the unreported cases cited by Defendants (<u>Lightfoot v. Union Carbide Corp.</u>, No. 92 Civ. 6411, 1994 WL 184670 (S.D.N.Y. May 12, 1994), <u>Casper v. Lew Lieberbaum</u> & Co., Inc., No. 97 Civ. 3016, 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998), <u>Salvatore v. KLM Dutch Airlines</u>, No. 98 Civ. 2450, 1999 WL 796172 (S.D.N.Y. Sept. 30, 1999) and <u>Germano v. Cornell Univ.</u>, No. 03 Civ. 9766, 2005 WL 2030355 (S.D.N.Y. Aug. 17, 2005)) are inapposite because they pre-date <u>Hoffman</u>. <u>Hoffman</u> clearly holds that nonresidents who suffer discrimination outside of New York City must plead and prove that the discriminatory conduct had an impact <u>in</u> New York City. 15 N.Y.3d at 289; <u>see</u> <u>Murphy v. PricewaterhouseCoopers, LLP</u>, 813 F.Supp.2d 45,

22

52 (D.D.C. 2011); <u>Clark v. Allen & Overy LLP</u>, 35 Misc.3d 1229(A), at *4 (N.Y. Sup. Ct. 2012).

The application of <u>Hoffman</u> to a strikingly similar case is best illustrated in <u>Regan v. Benchmark Co. LLC</u>, 11 Civ. 4511(CM), 2012 WL 692056, at *13-14 (S.D.N.Y. Mar. 1, 2012).[3]  In <u>Regan</u>, the plaintiff asserted claims for gender discrimination and retaliation under the NYCHRL while she lived and worked for the corporate defendant in New Jersey. <u>Id.</u> at *13.  The defendants argued that the plaintiff's NYCHRL claims did not allege discriminatory conduct with an impact in New York City because the plaintiff both lived and worked in New Jersey. <u>Id.</u> Correctly categorizing the defendants' argument that the unlawful conduct had no impact in New York City as meritless and disingenuous, Judge McMahon noted that after the plaintiff was transferred to the corporate defendant's New Jersey office, she remained affiliated with the corporate defendant's New York City office by continuing to service New York City-based clientele and remained under the management and supervision of the New York City office. <u>Id.</u> at *13-14. Taking all of this into account, the court properly held that:

> although Regan was physically working out of Jersey City, all other aspects of her employment connected her to [the corporate defendant's] New York City office.  As a result, the alleged discriminatory conduct . . . had an impact in New York City.

---

[3]    <u>Regan</u> was decided on March 1, 2012, three days after Mr. Fried filed his brief with this Court.

23

Id.

Similarly, Defendants' argument in this case should likewise be rejected as meritless and disingenuous.  As set forth in detail on pages 44-46 in Mr. Fried's brief, despite physically working in LVI's Connecticut office, all other aspects of his employment connected him to LVI's New York City office, which was the company's headquarters.  For example, in the six months prior to his unlawful termination, Mr. Fried: (1) worked in New York City by physically attending at least seventeen business meetings there -- some of which resulted in projects that employed hundreds of individuals in New York City (A-540-42); and (2) called and/or emailed personnel in the New York City office almost daily about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office (A-542).  Moreover, Mr. State discriminatorily stripped Mr. Fried of his job duties during a meeting between them in New York City, and Mr. Fried opposed this action at a Board meeting which was held in New York City. (A-374; A-515; A-578; A-589-90).  Accordingly, the discriminatory and retaliatory conduct had an impact in New York City.

## CONCLUSION

For the reasons set forth herein and in the Brief for Plaintiff-Appellant, Mr. Burton T. Fried respectfully requests that this Court reverse the District Court's grant of summary judgment and remand this case to the District Court for further proceedings, and grant such other and further relief that this Court deems just and proper.

Dated:  June 12, 2012
       New York, New York

                      Respectfully submitted,

                      THOMPSON WIGDOR LLP

        By:               /s/
                      Douglas H. Wigdor
                      Shaffin A. Datoo

                      85 Fifth Avenue
                      New York, New York 10003
                      Telephone:  (212) 257-6800
                      Facsimile:    (212) 257-6845
                      dwigdor@thompsonwigdor.com
                      sdatoo@thompsonwigdor.com

                      Attorneys for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because this brief contains 6,201 words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this
brief has been prepared in a proportionally spaced typeface using Microsoft®
Office Word 2003 in Times New Roman font using a 14-point font size.

Dated:  June 12, 2012
        New York, New York

                            Respectfully submitted,

                            THOMPSON WIGDOR LLP


                    By:     _____/s/_____
                            Douglas H. Wigdor
                            Shaffin A. Datoo

                            85 Fifth Avenue
                            New York, New York 10003
                            Telephone:  (212) 257-6800
                            Facsimile:   (212) 257-6845
                            dwigdor@thompsonwigdor.com
                            sdatoo@thompsonwigdor.com

                            Attorneys for Plaintiff-Appellant

26

1      UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

2                  SOUTHERN DISTRICT OF NEW YORK

3

4      _____

5      Fried                    )

6                               )    Docket #: 11-4791cv

7      v.                       )

8                               )    DC Docket #: 10-cv-9308

9      LVI Services, Inc.       )

10     _____)

11

12

13

14                      October 5, 2012

15

16

17

18

19

20

21

22

23

24

25

1          JUDGE RAGGI: The third member of our

2    panel, Judge Calabresi, was unable to get to New

3    York this afternoon. But he's participating by

4    telephone conference. Judge Calabresi, can you

5    hear me?

6          JUDGE CALABRESI: Yes, I can hear you

7    fine. I'm very sorry I couldn't be there. I had

8    one of those [UNINTEL] that made the travel

9    impossible. But I am here, and I hope, when I--if

10   I ask questions and I am butting in, because I

11   can't see, that you'll tell me--you'll [UNINTEL].

12   Thank you.

13         JUDGE RAGGI: Well, I doubt that, Judge.

14   But I will just say that speak right up if you

15   have something. And I'll ask counsel to just be

16   mindful of that and, you know, stop whatever

17   you're saying, listen to the question, and we'll

18   pick up that way. Okay?

19         JUDGE CALABRESI: Thank you very much.

20         JUDGE RAGGI: All right. I understand

21   everyone is here for the argument, so I won't

22   call attendance. If we could start with Fried v.

23   LVI Services?

24         DOUGLAS WIGDOR: Good afternoon, Your

25   Honors. My name is Douglas Wigdor. I represent

Page 3

1    the plaintiff appellant. Because the District

2    Court failed to view the evidence cumulatively

3    and in the light most favorable to Mr. Fried, the

4    decision below granting summary judgment should

5    be reversed.

6              JUDGE RAGGI: Right, now we would review

7    de novo in any event. Right?

8              DOUGLAS WIGDOR: That's correct, Your

9    Honor.

10             JUDGE RAGGI: So, why don't you tell us

11   why we should reach a different conclusion?

12             DOUGLAS WIGDOR: Your Honor, there are a

13   multitude of material issues of fact that exist

14   with respect to defendant's proffered reason for

15   Mr. Fried's termination. Their proffered

16   legitimate nondiscriminatory reason was that Mr.

17   State would have the freedom to manage the

18   company in the way he saw fit. That in and of

19   itself is a very weak legitimate

20   nondiscriminatory reason. And this is--

21             JUDGE RAGGI: And why do you say that?

22             DOUGLAS WIGDOR: This is not a reduction

23   in force, Your Honor. This is not having anything

24   to do with Mr. Fried's performance. There are at

25   least 12 material issues of fact that would

Page 4

1    warrant summary judgment being denied.

2              The first is that Mr. Fried was 70

3    years old at the time of his termination, by far

4    the oldest person at the company. The second is

5    that Mr. Fried worked at the company for

6    approximately 24 years, held the position of

7    general counsel, president, and CEO, and helped

8    grow this company into one of the most successful

9    companies in its field.

10             He also successfully--point three--he

11   also successfully worked for Mr. McNamara for

12   five years in the same position he would have

13   worked for Mr. State.

14             JUDGE CALABRESI: Yet, yet, counsel?

15             DOUGLAS WIGDOR: Yes?

16             JUDGE CALABRESI: [UNINTEL PHRASE] was

17   the case, [UNINTEL PHRASE] since he couldn't work

18   with Mr. Fried because he didn't like Mr. Fried

19   or because Mr. State thought that Mr. Fried was

20   [UNINTEL]? Then, however [UNPLEASANT?] that would

21   be, that would not be a discriminatory reason

22   under federal law [UNINTEL PHRASE]. Is that

23   correct?

24             DOUGLAS WIGDOR: I would agree with

25   that, Your Honor, but that is--there are genuine

1     issues of material fact that would undercut why

2     that was not the legitimate nondiscriminatory

3     reason. Mr. State himself, even before he was

4     hired and had the opportunity to work with Mr.

5     Fried, put in an email saying, quote, "In the

6     best-case scenario, Burt will decide to retire."

7     And then he goes on to say that, "Burt will never

8     retire, because he has no other interest and

9     nothing else to do."

10              JUDGE RAGGI: But let me follow up on

11    what you've just said in light of what Judge

12    Calabresi asked you. I mean, we are dealing here

13    with the former CEO of the company, and now the

14    new CEO of the company. Why aren't those

15    questions consistent with the new CEO wanting to

16    ensure that the old CEO isn't butting into the

17    management decisions that he now wants to--the

18    new CEO wants to make sure he can make without

19    any interference?

20              DOUGLAS WIGDOR: I'm not suggesting,

21    Judge Raggi, that the defendants have not put

22    forward a legitimate nondiscriminatory reason.

23    The question for this panel is whether we have

24    put forward facts that would show there is a

25    material issue of fact as to whether that

1   legitimate nondiscriminatory reason is pretext.

2            JUDGE CALABRESI: And one I--one of the

3   facts that you have shown, the remark about being

4   75--70, the talk of retirement, and the fact that

5   he then hired younger people for that position

6   and was willing to pay attention to them, but had

7   not been willing to pay attention to the

8   plaintiff.

9            Now, looked at in the aggregate--

10  because it would be incorrect, [UNINTEL PHRASE],

11  I think, argues, to look at them separately, in

12  the aggregate, is that enough to raise a jury

13  question with respect to whether this was a

14  discriminatory reason as, again, [UNINTEL] just--

15  [UNINTEL PHRASE].

16            DOUGLAS WIGDOR: I missed the last--

17            JUDGE RAGGI: Judge Calabresi, I think

18  you were breaking up at the end. Do you think we

19  could get you to repeat the question?

20            JUDGE CALABRESI: Yeah, just whether it

21  was enough, looked at in the aggregate, these

22  three sets of evidence, whether, taken together,

23  they are enough to go that--so that a jury could

24  find discrimination, or whether, even in the

25  aggregate, they only show--that they are not

1    enough to show discrimination, but that Mr. State

2    wanted his own people in there?

3                    DOUGLAS WIGDOR: Your Honor, that is

4    precisely the question. And I believe the

5    District Court erred because they actually

6    disaggregated the evidence and discounted--

7                    JUDGE CALABRESI: But Judge Raggi said

8    [UNINTEL] we looked at the notes. And I am quite

9    willing to [UNINTEL] that the District Court

10   disaggregated the evidence, and that we should

11   look beyond what the District Court did. But my

12   question is: when you look beyond what the

13   District Court did, and aggregate the evidence,

14   is that--

15                   DOUGLAS WIGDOR: And, Your Honor, I

16   would say most certainly yes. And the evidence in

17   this case, I believe, is much stronger than that

18   even in Tomassi or in Danzer.

19                   And the reason why I say that, Your

20   Honor, is, if we look at the October 19th

21   statement, which is only one of numerous pieces

22   of evidence, but even that statement alone, Mr.

23   Fried specifically asked Mr. State, "Why are you

24   taking away my job responsibilities?" And, for

25   that reason, Mr. State told him, "You are 71

1   years old." That was--

2                   JUDGE RAGGI: That's not the whole

3   statement.

4                   DOUGLAS WIGDOR: I was--

5                   JUDGE RAGGI: So why don't you read the

6   whole statement, if you want to--

7                   DOUGLAS WIGDOR: "You are 71 years old.

8   How long do you expect to continue working? What

9   if you were hit by a bus?" Now, interestingly,

10  Mr. State at his deposition does not even recall

11  making the latter part of what I just said, the

12  part about, "What if you were hit by a bus?"

13  Despite Mr. State not even recalling making that

14  part of the statement, the District Court said

15  that that somehow qualified the prior remark of,

16  "You are 71 years old. How long do you expect to

17  continue to work?"

18                  So, with that statement, with the prior

19  statement, a month prior, about Burt's need to

20  retire, even before he had an opportunity to work

21  with Burt, and then, subsequent to the October

22  19th meeting, telling a friend of his, who didn't

23  even work at the company, that he was in a battle

24  with the founder about his need to retire.

25                  And those comments, coupled with all of

1   the other evidence of his age, his high work

2   performance, the fact that he was earning every

3   penny of his work, the fact that Mr. State has a

4   major inconsistency in his testimony, in--

5               JUDGE CALABRESI: So, basically,

6   basically, your argument is that, while it is

7   certainly plausible for me to read this as a

8   situation in which he was fired because State

9   wanted to have his own people, a jury could also

10  read this to say that he was fired because of age

11  discrimination. That's your argument.

12              DOUGLAS WIGDOR: That is precisely our

13  argument. And that is ultimately for a jury to

14  decide, in my opinion. If I could just highlight

15  one other very important fact?

16              JUDGE RAGGI: Well, your time is

17  expired, and I know you want to save some

18  rebuttal. I want to ask you one question, to make

19  sure that we understand your position on it.

20              With respect to your argument that the

21  Supreme Court's Gross decision would only require

22  "but for" causation on the discrimination claim

23  but not the retaliation claim, I just wanted to

24  ask whether you're familiar with our decision in

25  [MATIMA?] v. [CHELI?], because in that case we

1  found that mixed motive analysis would not be

2  appropriate, even under Title VII, for

3  retaliation claims. Do you want to address that?

4           DOUGLAS WIGDOR: Your Honor, my

5  understanding--well, first of all, let me answer

6  the question precisely. My understanding is that

7  the law in this circuit is that a retaliation

8  claim is still looked at under the motivating

9  factor standard. So--

10          JUDGE RAGGI: Which case would you rely

11  on for that?

12          DOUGLAS WIGDOR: If I could look at our

13  briefs, Your Honor, and if I can find that--

14          JUDGE RAGGI: You can tell us in

15  rebuttal. I just want to make sure I understand

16  the position.

17          DOUGLAS WIGDOR: But--

18          JUDGE RAGGI: Okay.

19          DOUGLAS WIGDOR: Your Honor--on that

20  point, though, Your Honor, just so I'm clear, it

21  is our position that, regardless of whether the

22  Court were to look at the retaliation piece under

23  either the "but for" Gross standard or the

24  motivating factor standard, that we clearly had

25  enough evidence to meet either standard, and that

1   the District Court erred when it said that we had

2   to demonstrate that the reason was pretextual.

3                   JUDGE RAGGI: Thank you.

4                   JUDGE CALABRESI: If I may, if I may,

5   you sent in, in a 28J letter, Masel. And it is

6   certainly true that Masel, which I wrote, says

7   that the fact that a process was ongoing before

8   the act as to which there was possible

9   retaliation doesn't mean that that process didn't

10  affect the ultimate decision.

11                   But in that case, there was

12  considerable evidence of its affecting the

13  ultimate decision, while here there's no

14  indication whatever in the record, is there, that

15  anything was changed in what was done or even

16  that a decision was made formally, but everything

17  was already on the line before. So, quite apart

18  from the causation, I have trouble finding

19  evidence--from, you know, the standard [UNINTEL],

20  I have trouble finding any link.

21                   DOUGLAS WIGDOR: Your Honor, Mr. Fried

22  complained as early as October 19th. He

23  complained again on November 4th at the board

24  meeting.

25                   JUDGE RAGGI: And Judge Rakoff was

1    prepared to hold for purposes of this motion that

2    the first complaint was October 19th. I mean,

3    that's how he analyzed it.

4                    DOUGLAS WIGDOR: That's correct, Your

5    Honor. So, to my point to Judge Calabresi, is

6    that the protected activity that Mr. Fried had

7    engaged in was before any consideration of Mr.

8    Fried's termination. The first thing that the

9    defendants point to was a November 2nd email from

10   Mr. Simmons to Mr. Fried.

11                   JUDGE RAGGI: Right, but that's not the

12   analysis here. Okay, why don't we hear from your

13   adversary, and you'll make sure you tell us what

14   case you're relying on when you come up in

15   rebuttal, okay?

16                   DOUGLAS WIGDOR: Okay. Thank you, Your

17   Honor.

18                   JUDGE RAGGI: Thank you.

19                   WOMAN: [UNINTEL PHRASE] need to hear

20   from the EEOC next.

21                   JUDGE RAGGI: Oh, yes, the EEOC, I

22   apologize. I jumped right over the EEOC. I do

23   apologize.

24                   ELIZABETH FERRIN: May it please the

25   Court, my name is Elizabeth Ferrin, and I

1  represent the EEOC. The Commission filed a brief

2  as amicus curiae in this case, principally in

3  response to what we felt were two problematic

4  legal rulings by the District Court.

5           The first was its characterization of

6  Scott State's explicitly age-based remark to Mr.

7  Fried, which we just discussed, "Burt, you're 71

8  years of age. How long do you expect to work? And

9  what if you get hit by a bus? And we have to plan

10  for the future," as a stray remark that barely

11  counted, if at all, as evidence of age

12  discrimination.

13           The second problematic ruling was its

14  systematic disaggregation of the record evidence

15  into each of its component parts, which it held

16  alone could not establish pretext as a matter of

17  law, and the concluded that the record could not

18  as a whole sustain such a finding because none of

19  the parts could do so individually.

20           This Court has had many occasions to

21  address and clarify the concept of a stray remark

22  within the meaning of antidiscrimination law,

23  most importantly in the Tomassi decision in 2007,

24  which the District Court did not cite or address

25  at all here.

1        The Commission agrees with this Court's

2   observation in Tomassi that, for summary judgment

3   purposes, the issue is whether the plaintiff has

4   met his burden of proof based on all the evidence

5   in the record, not what labels, including stray

6   or not stray, might be attached to some of that

7   evidence.

8        JUDGE CALABRESI: Counsel?

9        ELIZABETH FERRIN: Yes, Your Honor?

10       JUDGE CALABRESI: Let's assume we agree

11  with you that the District Court both dismissed

12  the age statement, the 70 statement, as being a

13  stray remark, and that--and erred in doing so.

14  And let's assume we agree with you on the

15  question of whether--the matter that each remark

16  should be taken--each evidence could be taken

17  alone, but should be instead aggregated.

18       At that point, assuming we think--we

19  view the District Court erred in this, do we send

20  it back to the District Court? Or is it our job

21  then, applying the correct standard, to decide

22  the case ourselves as if we were the District

23  Court?

24       ELIZABETH FERRIN: The proper course,

25  Your Honor, would be to reverse the grant of

1    summary judgment and remand back to the District

2    Court for a jury trial, because the evidence in

3    the record, when analyzed properly, is sufficient

4    for a reasonable jury to find that Scott State

5    made the decision--

6              JUDGE CALABRESI: I see. So, then, you

7    are not just arguing that the District Court

8    erred and that we should correct that, because

9    that is something it would be very [TROUBLESOME?]

10   to do [UNINTEL]. You think that that [UNINTEL]

11   wrong in this particular case?

12             ELIZABETH FERRIN: To be clear, we're

13   arguing both. I mean, these rulings trouble us

14   because we see it not only here but in cases

15   across the country, and persistently in the

16   District Courts.

17             I mean, as I said before, this Court in

18   Danzer, in Tomassi, in Woroski--I mean, over and

19   over again, this Court has made these points

20   about the proper way to assess evidence in these

21   cases. And yet the problem seems to crop up again

22   and again. So, we are very concerned about the

23   state of the law--

24             JUDGE CALABRESI: [UNINTEL] understand

25   that you want us to make clear that the law is

1   the way you say it is, rather than the way

2   [UNINTEL] has said in the past that make it clear

3   that the District Court's--you say I'm not

4   following that. But then, if that--

5                    ELIZABETH FERRIN: Right.

6                    JUDGE CALABRESI: Do we have power to

7   move--apply the license ourselves? And, if we

8   have power, does that then come up in favor of

9   the plaintiff or in favor of the defendant?

10                   ELIZABETH FERRIN: Right. In our view,

11  as we said in our brief, Your Honor, it isn't as

12  if the plaintiff moved for summary judgment here,

13  and that's not the position that the Commission

14  has taken. But in our view, if you apply the

15  standards appropriately, the correct remedy here

16  is to reverse the--well, to vacate, really, the

17  grant of summary judgment and--

18                   JUDGE RAGGI: Well, that's because you

19  would have us make a separate finding that this

20  evidence is sufficient to allow a reasonable jury

21  to rule for the plaintiff.

22                   ELIZABETH FERRIN: Yes. Yes, exactly,

23  Your Honor, it's sufficient.

24                   JUDGE RAGGI: Okay. And I think what

25  Judge Calabresi is asking you is: should we make

1    that decision? Or should we tell the District

2    Court, "You've made an error," if we reach that

3    conclusion, "with respect to stray remarks, and

4    you've made an error in looking at this evidence

5    in isolation. Do it again"? I mean, or should we,

6    on de novo review, ourselves conclude that the

7    evidence is enough? What's the EEOC's position on

8    that question?

9                    ELIZABETH FERRIN: I get your point,

10   Your Honor.

11                   JUDGE RAGGI: Okay.

12                   ELIZABETH FERRIN: I think certainly to

13   do the latter, to make the determination here

14   that this record is sufficient on de novo review

15   to support the conclusion that a jury trial is

16   warranted is certainly within the scope of this

17   Court's authority and would be an appropriate

18   exercise of that authority, so.

19                   JUDGE RAGGI: May I ask you--

20                   ELIZABETH FERRIN: Sure.

21                   JUDGE RAGGI: To point me to where in

22   the District Court's opinion or decision you

23   think there's support for the conclusion that he

24   did not, in the end, analyze the evidence as a

25   whole?

Page 18

1          I mean, realistically, there's only one

2     way to talk about evidence, and that's each piece

3     in isolation, so it's not unusual for district

4     judges to say, "What's the value of this

5     evidence? What's the value of that evidence?" and

6     then to decide whether the whole can support a

7     finding favorable to the plaintiff. Where's your

8     conclusion that he failed to aggregate it?

9          ELIZABETH FERRIN: Sure. First of all,

10    on page 22 of the District Court's decision, the

11    District Court says that his case hinges almost

12    exclusively on the October 19th, 2010,

13    conversation, says that it's a stray remark, and

14    that that itself is not, alone, enough to carry

15    the case.

16          JUDGE RAGGI: Right, now--

17          ELIZABETH FERRIN: Correct.

18          JUDGE RAGGI: The district judge is

19    saying this at step three of McDonnell Douglas

20    analysis. He agrees that the evidence is enough

21    for a prima facie case. He's now analyzing

22    whether there's enough evidence--

23          ELIZABETH FERRIN: Mm hmm.

24          JUDGE RAGGI: That could permit a

25    reasonable jury to conclude that it's more likely

1    than not that the stated, proffered, legitimate

2    reason is a pretext, and that the real reason--

3                    ELIZABETH FERRIN: Mm hmm.

4                    JUDGE RAGGI: Is race discrimination--

5    I'm sorry, age discrimination.

6                    MAN: Age.

7                    ELIZABETH FERRIN: Mm hmm.

8                    JUDGE RAGGI: I misspoke.

9                    ELIZABETH FERRIN: Yes, Your Honor. But

10   there is a difference, and there is an important

11   difference, because you're right: it is

12   appropriate for a judge to go through each item

13   of evidence and assess whether it is appropriate

14   evidence to put on the summary judgment scales

15   and say, "Is this or is this not relevant

16   evidence of age discrimination?" That's not what

17   we have an issue with.

18                    But the phenomenon that occurred here--

19   and this Court actually spoke to this in Danzer

20   quite astutely--is to say, you know, this--so,

21   this is what the Court did at page 22 of its

22   decision, you know, in saying that this remark

23   alone doesn't prove anything.

24                    Then he proceeds to talk, on page 23 to

25   24 of his decision, about how remarks about

1    retirement don't prove anything in the context of

2    these age discrimination cases. Then again on

3    page 26, he says that Fried's remaining evidence

4    is solely that his duties were redistributed to

5    younger workers, which isn't even true. But then

6    he says that's insufficient as a matter of law to

7    show pretext.

8                       So, essentially--and, again, this is

9    not--this decision isn't an outlier. We see this

10   frequently, where you essentially have a court

11   saying, "Zero plus zero plus zero equals zero,"

12   when really it's more like, "A third plus a

13   quarter plus a half"--you know, whether you get

14   to one.

15                      JUDGE RAGGI: Right, but the district

16   judge, who's got years of experience and a very

17   respected reputation, talks about this in the

18   context of a factual record that he details quite

19   specifically. And he points out that this is a

20   record that has enormous evidence of the dispute

21   about job roles and responsibilities that existed

22   both before Mr. State was hired--

23                      ELIZABETH FERRIN: Mm hmm.

24                      JUDGE RAGGI: And within weeks of his

25   assuming the job. And it's in that context that

1    the District Court now weighs the evidence about

2    the age remark, which I think you'd agree is the

3    only evidence in which age is specifically

4    referenced in the factual record, then the

5    references to retirement and the reassignment of

6    job duties.

7                    Can you tell us how, even on de novo

8    review, we would be able to conclude that the

9    evidence favorable to Mr. Fried could

10   sufficiently outweigh this extensive documentary

11   record of disputes about job responsibilities and

12   job functions to permit a reasonable jury to

13   conclude that, but for his age, he wouldn't have

14   been fired?

15                   ELIZABETH FERRIN: I'd be glad to, Your

16   Honor. I mean, it's exactly as Judge Calabresi

17   said before. This is the legitimate

18   nondiscriminatory reason that the defendant has

19   proffered, and frankly a reasonable jury could

20   believe that. But it wouldn't have to, and here's

21   why.

22                   The evidence in the record consists of,

23   as you say, the one specifically age-related

24   reference at the October 19th meeting. The fact

25   that that age remark, the age-related remark, was

Page 22

1   made specifically in response to Mr. Fried's

2   question about why his job duties were being

3   reassigned--

4               If you think about the context of that

5   conversation, if the reason that they're

6   proffering for his being let go or, you know, his

7   duties being reassigned is that he can't work

8   with Mr. State, he's being obstreperous, he won't

9   get out of the way, the CEO wants to be left

10  alone to do his job, when he says, "I'm

11  reassigning your duties," and Mr. Fried says,

12  "Why?" all he had to say was, "You won't get out

13  of the way and let me do my work."

14              Instead, what does he say? He says,

15  "You're 71 and you might get hit by a bus." Now,

16  that's exactly the kind of evidence that a

17  reasonable jury is entitled to hear and entitled

18  to draw its on conclusions about why he gave that

19  answer.

20              JUDGE RAGGI: "You might get hit by a

21  bus" is not helpful to you, because a 35-year-old

22  could not get hit by a bus. I mean, the

23  conclusion that I think the district court was

24  reasonably drawn from that--the only conclusion

25  he thought was reasonably drawn from that--was:

Page 23

1    someone other than you has to be able to run this

2    company. And this was a statement--

3                    ELIZABETH FERRIN: Well--

4                    JUDGE RAGGI: I mean, I assume you saw

5    the 14-point duty list that Mr. Fried transmitted

6    to the people involved here. It basically left

7    nothing or anybody else to do, at least in a top

8    management position.

9                    ELIZABETH FERRIN: I did, Your Honor.

10   But, respectfully, Mr. State could also be hit by

11   a bus. I mean, truthfully, that remark is more

12   ambiguous than I believe the District Court gave

13   it credit for. It's really hard to know what that

14   means. "You're 71 years old. How long are you

15   going to work? You could get hit by a bus."

16                    JUDGE CALABRESI: There is nothing in

17   the record that suggests that people 71, or even

18   close to 80, get hit by buses more frequently

19   than people 55.

20                    ELIZABETH FERRIN: That's true, Your

21   Honor. It could be a reference to life being

22   short. Frankly, who knows what it really means?

23   But regardless, the fact remains that Mr. State

24   told Mr. Fried his job duties were being

25   reassigned. Mr. Fried asked why.

1            JUDGE RAGGI: But they're job duties

2     that were not part of his original contract.

3     They're job duties that he was insisting upon.

4     And I'm not sure you're able to say that those

5     would be job duties that anyone who had the role

6     of chairman would have. They were job duties that

7     he was insisting he be able to maintain as

8     chairman.

9            ELIZABETH FERRIN: Except he had already

10    done them under McNamara.

11           JUDGE RAGGI: Well, that--

12           ELIZABETH FERRIN: Now, again, that--

13           JUDGE RAGGI: I mean, but it's not clear

14    that that's the 14-point. But in any event, let

15    me let you finish your argument, because we've

16    kept you well past time.

17           ELIZABETH FERRIN: I mean, just to

18    finish the list of evidence, because that's not

19    all there is, I mean, I also think that the

20    timing of when Mr. State's campaign to remove Mr.

21    Fried began is significant.

22           Because, again, if the proffered reason

23    is, "He won't get out of my way; he insists on

24    all these duties; he, you know, won't let me do

25    my job," the campaign to remove him long before

1    Mr. State even took this job. So, a reasonable

2    jury could find that that's not consistent with,

3    "I can't work with him," if--

4                    JUDGE RAGGI: How could that be, when

5    you see the emails that, before he took the job,

6    what Mr. State was asking for was clarification

7    of their respective duties, and indeed a concern

8    that, if Mr. Fried was going to continue to

9    insist on playing a predominant role in

10   management, that Mr. Fried--Mr. State might not

11   take the job?

12                   And, as I recall, it's that Mr. State

13   assures him that he would only stay until such

14   time as Mr. State told him to leave, and that he

15   would--that is, Mr. State would be in charge and

16   get all the room State wants from Fried. That's

17   Fried's email to Hogan of September 21st, 2010.

18   And the reality is: he doesn't comply with that.

19                   ELIZABETH FERRIN: That's exactly right,

20   Your Honor, but that's the point.

21                   JUDGE RAGGI: So, when he doesn't comply

22   with what the pre-State-hire representation was,

23   how can we conclude that, but for his age, he

24   wouldn't have been terminated?

25                   ELIZABETH FERRIN: Because Mr. State is

Page 26

1    already campaigning to have him retire, even as

2    of receiving those assurances, before he ever

3    showed up.

4              JUDGE CALABRESI: I have another

5    question. And that is, assume that we agree with

6    you that it is important to make clear that

7    [REGULAR?] [UNINTEL PHRASE] and that the evidence

8    could be looked at [UNINTEL].

9              And assume that we are not completely

10   certain as to how it ought to come out on the

11   merit, aggregating all of these things and, under

12   the test you propose, how we permit it, even

13   though this is de novo--how we permit it to say,

14   "We remand to the District Court because of its

15   great expertise [UNINTEL PHRASE] set it off," so

16   that it can apply the correct test. I know that

17   we review de novo. But, if we want to, how do we

18   permit it not to decide and send it back?

19             ELIZABETH FERRIN: I believe you are. I

20   think that's certainly within your discretion, to

21   say that, you know, the legal standard that was

22   applied was inappropriate, and this is the legal

23   standard, and, you know, vacate and remand for

24   further consideration.

25             JUDGE RAGGI: Thank you very much.

Page 27

1          JUDGE CALABRESI: Thank you.

2          JUDGE RAGGI: Thank you. Now we will

3   hear from the other side.

4          JOANNE SELTZER: Good afternoon. I think I'd

5   like to begin by defending Judge Rakoff's

6   examination of the facts in total. He spent 20

7   pages of his opinion poring through the

8   undisputed record of--the undisputed facts on the

9   record, which you have rightfully said is

10  voluminous in this case.

11         And he took it back all the way to

12  2005,w hen Mr. Fried first decided to sell LVI to

13  the stakeholders, who are now being sued, along

14  with LVI. At that point in time, Mr. Fried

15  himself testifies that he wants to step down from

16  the day-to-day management of the company to

17  assume a secondary role or an advisory role. He

18  testifies to that himself at A95 through 97.

19         In the investment memo, which is back

20  in 2005, he's referred to as, "Retiring CEO Burt

21  Fried." So, the concept of retirement is not a

22  Scott State matter. It's something that had been

23  spoken about all the way back to 2005.

24         We have Mr. Fried, as you rightly said,

25  making reassurances to Mr. State. Why was Mr.

1    State concerned? He knew Mr. Fried. He knew him

2    for a number of years. He knew him to be the

3    formidable character that he is. And he realized

4    that it wasn't going to be quite so simple to

5    extricate these duties out of the hands of this

6    man.

7              So, he made his inquiries. That's what

8    these retirement inquiries are about. Is he

9    serious? Is he going to step away? Is he going to

10   let me run the company the way I see fit?

11             JUDGE CALABRESI: There's no doubt--

12   counsel?

13             JOANNE SELTZER: Yes?

14             JUDGE CALABRESI: There's no doubt that

15   one can read it that way. There's no doubt that

16   one can read it that way. But that isn't the

17   question before us. The question before us is:

18   did the way Judge Rakoff spoke about it suggest

19   an incorrect standard? And, if we look at it

20   under the correct standard, is it clear that a

21   jury couldn't find--couldn't find, [UNINTEL

22   PHRASE], that there was discrimination?

23             That's the question. [UNINTEL] plenty

24   [UNINTEL]. And you can, you know, say, "How would

25   you on a jury [UNINTEL]?" That's not the question

Page 29

1    before us.

2                    JOANNE SELTZER: If I may, if I might address

3    that, I think that what Mr.--what Judge Rakoff

4    did admirably, and that what this Court should

5    look at in terms of his decision, is taking the

6    one piece of quote/unquote evidence, this one

7    mention of age, and put it in this context of

8    going back to 2005 and moving forward to the

9    actual date.

10                   Mr. State's statement having to do with

11   being hit by a bus is not so difficult to

12   interpret. What he was talking about is

13   succession planning. What he was saying was,

14   "But, Burt, you told me you wanted to step away,

15   and you come in with these 15 job

16   responsibilities. When are you going to stop?

17   When are you going to step away as you promised

18   that you would?"

19                   And that's what Judge Rakoff--not every

20   statement of age, as you see from the law that's

21   been cited in our brief, is necessarily an ageist

22   statement. It has to be coupled with a hostility

23   towards age. It has to be coupled with words that

24   imply that there is a certain falli--

25                   JUDGE CALABRESI: What case do you cite

1    for that, that whether there's an age or a race

2    statement, it has to be coupled with animus? I

3    don't know of any state that says that.

4                    JOANNE SELTZER: There are cases that talk

5    about retirement. There are cases that talk

6    about--

7                    JUDGE CALABRESI: I understand that they

8    talk about retirement. But when somebody makes a

9    specifically age statement, or a specifically

10   race statement, why should then here have to be

11   animus? A person may be perfectly sweet about

12   people who are 70 but [UNINTEL] retire. I just

13   think you have a very strong case, but I wouldn't

14   go down that [UNINTEL].

15                   JOANNE SELTZER: Well--

16                   JUDGE RAGGI: But you're referring to

17   Judge Rakoff's reference to Raskin.

18                   JOANNE SELTZER: Right.

19                   JUDGE RAGGI: At page 25 of his opinion,

20   he cites it for the proposition that the ADA does

21   not make all discussions of age taboo.

22                   JOANNE SELTZER: That's correct.

23                   JUDGE RAGGI: But that requires you to

24   look at it in the context in which the age was

25   discussed.

1          JOANNE SELTZER: I think it would be valuable

2    to take a look at a case like the Tomassi case,

3    because I don't agree with the EEOC that Judge

4    Rakoff ignored the question of age when it came

5    to this inquiry, but actually put it in the

6    proper context.

7          If you look at Tomassi, you've got a

8    situation where a supervisor, once a month, over

9    a period of two years, made statements about the

10   patient's need to retire because he needed to

11   take time to rest, because he was unable to keep

12   up with his work, because he had all of these

13   supposed disabilities having to do with age.

14         JUDGE RAGGI: So you're saying there are

15   some preconceptions regarding age that are--that

16   there's no evidence here that reflected such

17   preconceptions? Is that right?

18         JOANNE SELTZER: Absolutely.

19         JUDGE RAGGI: So, why isn't it a

20   question for the jury? You know, we have some

21   evidence. We have a mention of age. We have

22   repeated mentions of retirement, which are

23   ambiguous, which by themselves might not

24   constitute a basis on which to find age

25   discrimination.

Page 32

1          But, you know, enough ambiguity here

2     about whether it was mere seniority and prolonged

3     presence versus age. Why isn't that appropriate

4     to go to the jury ultimately?

5          JOANNE SELTZER: Because I think, in order to

6     bring a case to the jury, there has to be a

7     material issue of fact. And I think that there's

8     enough on the record here that indicates that the

9     reason for his being terminated or being offered

10    this agreement had nothing to do with his age,

11    and certainly it was not the "but for" reason for

12    his termination. It had to do with his failure to

13    relinquish the reins of management to Mr. State.

14          And, if I could just go back to this

15    point, because I think it's a--

16          JUDGE RAGGI: So, is your position that

17    there--

18          JOANNE SELTZER: Yes?

19          JUDGE RAGGI: It cannot be disputed that

20    there was a disagreement about job functions and

21    job roles, because that's all documented. And so,

22    now we get into whether or not the inferences to

23    be drawn from the age remarks are that they

24    didn't care about the job dispute; but for his

25    age he would have--they would have somehow worked

Page 33

1    something out.

2                    And you're saying that the documentary

3    evidence of how the job dispute escalated

4    precludes any reasonable jury from concluding

5    that, but for his age, they would have tolerated

6    what you're arguing is in essence

7    insubordination?

8                    JOANNE SELTZER: What I'm saying is that, if

9    you were to take Mr. Fried and make him a 35-

10   year-old man, as opposed to a 70-year-old man,

11   and put exactly the scenario that you have here,

12   you would have exactly the same result. What you

13   had here was an individual who was getting in the

14   way of a person who was hired to do the job that

15   he had agreed to relinquish.

16                   So, there is no--there's absolutely no

17   evidence on the record--when Mr. Fried was 70

18   years old, they offered him the opportunity of

19   being the interim CEO.

20                   JUDGE CALABRESI: But why, as opposing

21   counsel said, when he was asked about that,

22   didn't Mr. State say, "You're in the way; why

23   are--when are you going to retire?" or rather

24   than, "You're 70"?

25                   JOANNE SELTZER: I think that the mere mention

Page 34

1   of Mr. Fried's age--which, by the way, if you

2   look in the record, Mr. Fried mentioned on a

3   number of occasions in emails--I don't think that

4   that in itself is enough to catapult this case to

5   a jury against--look, ultimately, what the

6   plaintiff has to prove in an age discrimination

7   case under Gross is that, except for his age,

8   this would not have happened.

9                    JUDGE RAGGI: And what about the

10  retaliation claim that your opposition has made?

11                   JOANNE SELTZER: In the retaliation claim,

12  post-Gross particularly, what you have here, even

13  though I could certainly stand here and argue

14  that I agree that the "but for" should be applied

15  to the retaliation as well--in fact, there are

16  cases now that are applying the "but for"

17  standard to Title VII retaliation claims, because

18  that motivating language is nonexistent in any of

19  the other "because of." So, there's a lot of

20  courts that have actually imported the "but for"

21  standard to everything other than a Title VII

22  discrimination claim.

23                    But, putting that aside, Judge Rakoff

24  used the right pre-Gross standard for

25  retaliation, which is that the burden is on the

1    plaintiff to show that the reason that was

2    articulated was pretext for discrimination. And

3    there is just nothing on the record at this point

4    that would show that that is the case.

5                    The case--the reason is backed by

6    tremendous amounts of evidence. There is no

7    indication at all that anybody, either on the

8    board or Mr. State himself, thought that he was

9    incapable of doing any job. In fact, they offered

10   him a role that they thought would be a very good

11   role for him at LVI that he refused to take. He

12   wanted to still be involved in monitoring

13   employee air travel, which is something that--

14                   And, by the way, Judge Calabresi,

15   there's one thing that I wanted to correct. Mr.

16   State did not hire new people. What he did was he

17   took Mr. Fried's responsibilities and passed them

18   down to the members--the existing members of LVI

19   management, many of whom were actually outside--

20   in the protected category of the Age

21   Discrimination in Employment Act.

22                   So, the 13 points of evidence that Mr.

23   Wigdor has brought you here are Mr. Fried's

24   performance, which is not in question, because

25   they never said that Mr. Fried had problems with

Page 36

1   his performance. Number two, his shifting the

2   responsibilities to member of management, many of

3   whom were over the age of 40.

4                    And this one mention of age, 71, which

5   Mr. State did say, which had nothing to do with

6   Mr. Fried's age. It had to do with the fact that

7   he had said he was going to retire. He was going

8   to step away from the management. And it was a

9   point of fact. But that in itself cannot

10  overturn--the articulated decision that's well

11  founded on the record that the reason why Mr.

12  Fried was terminated from his position was

13  because he wouldn't accept the role that Mr.

14  State wanted him to play.

15                   JUDGE RAGGI: Thank you.

16                   JOANNE SELTZER: Thank you.

17                   JOHN FOGERTY: Mr. Wigdor?

18                   DOUGLAS WIGDOR: Thank you. I have a

19  couple of points I want to address to your

20  question as well, and I also want to address

21  Hoffman, because we haven't spoken about the New

22  York City administrative code.

23                   But it's disingenuous, I believe, to

24  say that Mr. Fried was offered a new position at

25  the end of the day. What he was offered was, in

1   exchange for a release of his age claims, which--

2                   JUDGE RAGGI: Here, let me ask you about

3   where we are in the status of this case. The

4   District Court was prepared to recognize that you

5   had adduced enough evidence to make out a prima

6   facie case. And, indeed, I would think in part

7   that that is informed by all of the evidence

8   you've been pointing us to. There was an age-

9   based remark. And so, that fact, put together

10  with the timing and all, gets you past the prima

11  facie case.

12                  Now they had the burden of articulating

13  a nondiscriminatory reason. You've conceded that

14  it is a nondiscriminatory reason. You have to

15  show it's pretextual. Usually that's by showing

16  it's false. You're not trying to argue that it's

17  false. You're almost arguing to us that it wasn't

18  the real reason. Well, what is the evidence that

19  it wasn't the real reason?

20                  DOUGLAS WIGDOR: The--

21                  JUDGE RAGGI: I mean, you're not able to

22  show that it was false or that someone wouldn't

23  legitimately have been concerned about that. And

24  I ask this because it seems to me that you may be

25  trying to avoid your "but for" responsibility on

1    the discriminatory discharge by arguing, "Well,

2    if we can show that age--if we can show age in

3    any respect crossed anybody's mind, we're

4    entitled to go to a jury." But I'm not sure

5    that's your burden at the third step of analysis.

6                    DOUGLAS WIGDOR: Your Honor, the reason

7    why I believe we have done that is because the

8    evidence in the record is that the board never

9    contemplated terminating Mr. Fried until November

10    4th, at the earliest. And prior to that, Mr.

11    Fried had complained about age discrimination.

12    After they--

13                    JUDGE RAGGI: Right, but he had also

14    sent a 14-point memo that basically tried to

15    reserve to himself jobs that would go to a CEO,

16    not someone whose contract provided that his

17    portfolio would be strategic planning. I mean,

18    it's very hard for you to argue that monitoring

19    all air travel by company employees is part of

20    strategic planning, or that overseeing all legal

21    work, when they've just hired a new legal

22    counsel, is part of strategic planning.

23                    So, I think it's hard for you to say

24    that, well, they didn't think about firing him,

25    without acknowledging that he had basically set

Page 39

1   forth the conditions that he wanted to work

2   under.

3                    DOUGLAS WIGDOR: Your Honor, with all

4   due respect, I disagree. And the reason why I

5   disagree--first of all, they just admitted before

6   this Court that Mr. Fried's performance was not

7   in question. The second thing is--

8                    JUDGE RAGGI: His ability to perform as

9   chairman was not in question. His ability to

10  perform the job of chairman as his contract

11  provided, namely strategic planning, was not in

12  question. But he wouldn't limit himself to that.

13                   DOUGLAS WIGDOR: Well--

14                   JUDGE RAGGI: That's their argument of

15  what their reason for terminating him is.

16                   DOUGLAS WIGDOR: [APPOLI?] just said

17  before, Your Honor, that his performance was not

18  in question. But--

19                   JUDGE RAGGI: All right, and I'm

20  suggesting to you that I've read the record and I

21  understood what that was a shorthand for.

22                   DOUGLAS WIGDOR: But--

23                   JUDGE RAGGI: Answer my question about

24  how you're showing that the reason they've given

25  is a pretext. I mean, I understand you want to

1    say that there's another reason that might have

2    informed it. But isn't your burden heavier than

3    that?

4                    DOUGLAS WIGDOR: I understand the

5    question, Your Honor. There are two other

6    reasons. The first reason, Your Honor, is that

7    Mr. State has a major inconsistency in his

8    testimony. In response to the interrogatories at

9    A614, Mr. State admitted that he made the

10   decision to terminate Mr. Fried. In his

11   deposition, at A162, he testified that he did not

12   make the decision to terminate Mr. Fried.

13                   The District Court did not even raise

14   that in its 21 pages of its analysis of fact.

15                   JUDGE RAGGI: How does that help you?

16   Help me out.

17                   DOUGLAS WIGDOR: Because you have

18   somebody now who is trying to distance themselves

19   from the decision to terminate, because he knows

20   that he's made an age-based remark about Mr.

21   Fried being 70.

22                   JUDGE RAGGI: Correct. But--

23                   DOUGLAS WIGDOR: And he's trying--

24                   JUDGE RAGGI: But am I also right that

25   he didn't have the authority to make this

1   termination by himself? He may have decided this

2   is what should have been done and recommended

3   that to the board, but in the end it had to be

4   the board that terminated Mr. Fried.

5           DOUGLAS WIGDOR: That's not what the

6   response to his interrogatory said.

7           JUDGE RAGGI: But that is the fact of

8   how this both happened and how it had to happen,

9   given the fact that Mr. Fried was the chairman.

10          DOUGLAS WIGDOR: I--

11          JUDGE RAGGI: I've seen the email that

12  explains how Mr. Fried would have to be removed

13  as chairman.

14          DOUGLAS WIGDOR: I think the record is

15  unclear, Your Honor--

16          JUDGE CALABRESI: Excuse me. Excuse me,

17  counsel. Do I understand your argument to be that

18  Mr. State, because he changed his story, a jury

19  could think that he changed his story not because

20  it described the actual way in which firing at

21  your new job could take place, but that you're

22  [UNINTEL] that he changed his story in order to

23  avoid the age discrimination remark? Is that your

24  argument?

25          DOUGLAS WIGDOR: Precisely, Your Honor.

Page 42

1           JUDGE CALABRESI: Okay.

2           DOUGLAS WIGDOR: And there's a third--

3           JUDGE RAGGI: But you're well past your

4    time, so why don't you finish up with the

5    question I asked you, and then we'll give you a

6    moment on the New York State law?

7           DOUGLAS WIGDOR: Thank you, Your Honor.

8    It's at page five, our support of our reply

9    brief, Your Honor, in the subparagraph A.

10          JUDGE RAGGI: The case?

11          DOUGLAS WIGDOR: The case is--I'm going

12   to probably mispronounce it, but [WICTECAWYCZ?]

13   v. U.S. Marshall Services, Alam v. HSBC Bank, and

14   Nieves v. Gordon and company.

15          JUDGE RAGGI: I'm sorry, let me just get

16   that in front of me so that I am sure to note it.

17   Thank you.

18          DOUGLAS WIGDOR: May I just make--there

19   was the third reason, to answer your question

20   about the retaliation, before I move on to the

21   New York City? Can I just state what that was,

22   Your Honor?

23          JUDGE RAGGI: Counsel, you're well past

24   your time.

25          DOUGLAS WIGDOR: Okay.

**A-1302**

Page 43

1              JUDGE RAGGI: Very quickly.

2              DOUGLAS WIGDOR: Just the third thing

3    was that the--at A601, where it said--after we

4    sent our letter, where they said to ignore the

5    letter and send the termination letter, a

6    termination letter that had never been agreed

7    upon until we had sent our letter outlining Mr.

8    Fried's claims. If I--

9              JUDGE 3: It was a termination letter,

10   but it was also offering the consulting

11   arrangement, right? And it included the release.

12   And they called it, like, a good faith letter.

13   Right?

14             DOUGLAS WIGDOR: They did. It--

15             JUDGE 3: I mean, it seemed to me that

16   the text of that letter was somewhat ambiguous.

17             DOUGLAS WIGDOR: It was very different

18   than the draft, Your Honor. The draft did not

19   include a release. And it also had a 30-day

20   provision that they could have fired him on 30

21   days' notice. So, essentially, if he signed that,

22   he would have released his age claims. And then

23   in 30 days they could have fired him and he would

24   have had no claims.

25             JUDGE 3: But nonetheless, it reflected

Page 44

1    a desire to have an ongoing relationship, albeit

2    on a more limited basis than your client was

3    looking for. Isn't that right?

4                    DOUGLAS WIGDOR: It is, but they could

5    have done it without a release of his age claims.

6    So, if I may just address very briefly the city

7    claims, Your Honors, because--

8                    JUDGE RAGGI: One sentence, because you

9    have a New York Court of Appeals decision

10   [UNINTEL].

11                   DOUGLAS WIGDOR: Hoffman's been

12   misinterpreted, Your Honor, by the District

13   Court. In Hoffman--the two reasons why is that,

14   in Hoffman, they said that, if the nonresident

15   works in New York City, the New York City

16   administrative code applies. There's no doubt. In

17   Hoffman, the plaintiff in that case had no

18   relationship to New York at all. She was in

19   Atlanta. The only thing that she tried to suggest

20   was that the termination decision was made in New

21   York.

22                   Now, the Hoffman case went on to say,

23   if you don't work in New York City, that the

24   employee must demonstrate that the discriminatory

25   treatment has an impact in New York City. What

Page 45

1    the District Court said is that Mr. Fried had to

2    feel the impact in New York City. And that's not

3    what Hoffman says. Hoffman says that the impact

4    of the decision needs to be in New York City. And

5    the case--

6                    JUDGE CALABRESI: Counsel?

7                    DOUGLAS WIGDOR: Yes?

8                    JUDGE CALABRESI: If we decide against

9    you on the federal claims, are you suggesting

10   that New York law is [UNINTEL] unclear on this

11   issue, that it is an abuse of discretion to try

12   to [GUIDE IT?] by the District Court rather than

13   to dismiss without prejudice?

14                   DOUGLAS WIGDOR: Could you ask that one

15   more time, Your Honor? I'm sorry.

16                   JUDGE CALABRESI: If we decide against

17   you on your federal claim, so there is no federal

18   claim to which the state claim is pended, then it

19   normally is a matter of discretion on whether

20   courts decide a state claim or dismiss it without

21   prejudice.

22                   Are you arguing that New York law is

23   sufficiently unclear on this so that, if we

24   decide against you on the federal claim, it would

25   be an abuse of discretion to decide the state

Page 46

1    claim as it was decided rather than dismissing it

2    without prejudice so that you could raise, in

3    state court, a state claim?

4                    DOUGLAS WIGDOR: I understand, Your

5    Honor. I think my argument, Your Honor, is I

6    don't believe it's unclear, actually. I think

7    Hoffman is clear. And Judge McMahon, in Regan v.

8    Benchmark, was very clear in her decision. That

9    said just what I'm saying, that the impact

10   doesn't need to be felt by the plaintiff in New

11   York; it's just the impact of the decision.

12                   So, I believe Hoffman is clear. But if

13   this Court were to conclude for some reason that

14   Hoffman is not clear in that regard, then, yes,

15   Your Honor, I would agree with you that the

16   District Court would have abused its discretion

17   and should not have dismissed the state law

18   claim.

19                   JUDGE RAGGI: May I just ask you about

20   that? Because I'm looking at Hoffman. And when

21   the Court of Appeals says that there has to be an

22   impact within the city, the case they cite for it

23   is Shaw v. Wilco, a first department case. And

24   the parenthetical way that they describe Shaw is,

25   even if termination decision was made in the

1    city, its impact on the plaintiff was felt

2    outside the city.

3                    And so, to that extent, the Hoffman

4    court does seem to link impact to the plaintiff.

5    So, why don't you tell me--you just said Hoffman

6    is clear. And I'm not seeing where Hoffman is

7    clear in rejecting the impact on the plaintiff,

8    in light of what I just cited to you.

9                    DOUGLAS WIGDOR: Your Honor, the reason

10   is because Hoffman makes clear that the New York

11   City Administrative Code does apply to non-

12   residents working outside of New York. So--

13                   JUDGE RAGGI: Right, but they impose

14   this impact requirement, and then they cite a

15   case that looks to where the impact was felt on

16   the plaintiff.

17                   DOUGLAS WIGDOR: So, if Your Honor's--

18                   JUDGE RAGGI: Where is there anything in

19   Hoffman that says an impact to something other

20   than the plaintiff is enough to support this?

21   Because you said that's clear, and I'm not seeing

22   it.

23                   DOUGLAS WIGDOR: The reason why I say

24   that's clear, Your Honor, is because, if it were

25   interpreted in any other way, then a nonresident

A-1307

Page 48

1   who's not working in New York could never have a

2   New York City Administrative Code claim, because

3   there never would be an impact in New York to

4   somebody who lives and works outside of New York.

5             JUDGE RAGGI: Well, it's an impact on

6   the plaintiff could be felt. Okay. Never mind. I

7   think I understand your argument. We'll take this

8   case under advisement.

9             DOUGLAS WIGDOR: Thank you, Your Honor.

10            JUDGE RAGGI: Thank you very much.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Gotham Transcription states that the preceding

2    transcript was created by one of its employees

3    using standard electronic transcription equipment

4    and is a true and accurate record of the audio on

5    the provided media to the best of that employee's

6    ability.  The media from which we worked was

7    provided to us. We can make no statement as to

8    its authenticity.

9

10                    Attested to by:

11

12

13                    Sonya Ledanski Hyde

14

15

16

17

18

19

20

21

22

23

24

25



# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE
EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER").  A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at
the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New
York, on the 15th day of October, two thousand twelve.

PRESENT:   GUIDO CALABRESI,
                      REENA RAGGI,
                      SUSAN L. CARNEY
                            *Circuit Judges.*
-----------------------------------------------------------------------
BURTON T. FRIED,
                      *Petitioner-Appellant,*

                  v.                                          No. 11-4791-cv

LVI Services, Inc., AKA LVi Services, Inc., LVI Parent
Corp., Code Hennessy Simmons LLC, DBA CHS Private
Equity V LP, Apollo Investment Corp., Scott E. State,
in his official capacity and in his individual capacity,
Brian Simmons, in his official capacity and in his
individual capacity, Rajay Bagaria, in his official
capacity and in his individual capacity, Gerald J. Girardi,
in his official capacity and in his individual capacity,
                            *Respondent-Appellees.*
-----------------------------------------------------------------------

MANDATE ISSUED ON 12/26/2012

APPEARING FOR APPELLANT:        DOUGLAS H. WIGDOR (Shaffin A. Datoo, *on the brief*), Thompson Wigdor LLP, New York, New York.

APPEARING FOR APPELLEE:         JOANNE SELTZER, (Jillian L. Hunt, *on the brief*), Jackson Lewis LLP, New York, New York.

APPEARING FOR AMICUS CURIAE:    ELIZABETH E. THERAN, Attorney (P. David Lopez, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, *on the brief*), *for* Equal Employment Opportunity Commission, Washington, D.C.

Appeal from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment entered on October 4, 2011, is AFFIRMED.

Burton T. Fried appeals from an award of summary judgment in favor of his former employer LVI Services, Inc. ("LVI"), as well as certain identified LVI Board members, officers, and related entities on Fried's claims of age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL"). We review an award of summary judgment de novo, viewing the record evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. See Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d

2

Cir. 2012).  We assume the parties' familiarity with the facts and the record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

1.    ADEA Claims

Fried contends that the district court erred at the third step of the familiar McDonnell-Douglas burden-shifting framework, which governs ADEA discrimination claims, see Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010), in two respects:  (1) by categorically concluding that "stray remarks" of age bias cannot raise an issue of material fact as to pretext; and (2) by failing to consider whether the totality of the evidence, rather than each piece of evidence individually, would permit a reasonable jury to find the alleged discrimination.

On review of the district court's detailed 35-page opinion, we are not convinced that it committed either of these errors.  We need not pursue that point, however, because on de novo review, we also conclude that Fried failed to carry his burden at the third step of analysis.

In Henry v. Wyeth Pharmaceuticals, 616 F.3d 134 (2d Cir. 2010), we identified four non-dispositive factors appropriately considered in deciding what weight to accord isolated remarks suggestive of discriminatory bias: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror

3

could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Id. at 149.  Here, the remark in question—a query to Fried: "Burt, you're 71 years of age, how long do you expect to work? What if you're hit by a bus?"—was made by LVI's new CEO less than six weeks prior to Fried's termination as LVI Chairman.  The remark expressly referenced Fried's age in the context of disputing his claimed job duties.  These circumstances indicate that the statement can bear some weight in demonstrating discriminatory bias.

But Fried's burden at the third step of analysis required him to show more than possible age bias; he was required to adduce sufficient evidence to permit a reasonable jury to find that "but for" defendants' age bias, he would not have been terminated.  See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009).  The remark cannot bear that weight when considered against the overwhelming documentary evidence supporting LVI's articulated non-discriminatory reason for terminating Fried: the need to ensure that CEO State would be free to manage the company as he saw fit.  The same conclusion obtains even when, as we must, we consider the totality of the evidence that Fried points to as evidence of defendants' age bias.  Record evidence shows that, before State accepted the CEO position at LVI, Fried had provided written assurances to Board members that the new CEO would indeed be in charge of the company and that Fried would afford State "all the room he wants" to run LVI as he saw fit.  Instead, the evidence shows that, almost immediately after State

4

**A-1313**

assumed the CEO position, Fried attempted to arrogate to himself fifteen areas of responsibility that went well beyond the most liberal construction of "strategic growth," his designated area of responsibility as LVI Chairman. On this record, we are compelled to conclude, as the district court did, that no reasonable juror could find that LVI's non-discriminatory reason for terminating Fried was a pretext for age discrimination and that "but for" Fried's age, he would not have been terminated.

The record compels the same conclusion with respect to Fried's claim that he was terminated in retaliation for complaining of age discrimination. In urging otherwise, Fried urges us to read <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, to require but-for causation only for ADEA claims of disparate treatment, not for ADEA retaliation claims. The conclusion is by no means obvious because the same word—"because"— relied on by <u>Gross</u> to support the conclusion that but-for causation is necessary to an ADEA disparate treatment claim, <u>see id.</u> at 176, is also found in the statute's retaliation provision, <u>see</u> 29 U.S.C. § 623(d). We need not, however, reach the question of whether the Supreme Court's reasoning in <u>Gross</u> would allow us to draw the distinction Fried proposes. Under either the but-for test or the motivating factor analysis that Fried prefers, the evidence in the record is insufficient to permit a jury to find that Fried was terminated "because" of his complaints of age discrimination. <u>See</u> 29 U.S.C. § 623(d).

5

Accordingly, we affirm the award of summary judgment to defendants on both Fried's ADEA discrimination and his ADEA retaliation claims.

2    NYCHRL Claims

Fried, who at all times relevant to his complaint lived and worked in Connecticut, also claims age discrimination and retaliation in violation of the NYCHRL.  He argues that the district court erred in ruling that this claim was foreclosed by Hoffman v. Parade Publ'ns, 15 N.Y.3d 285, 907 N.Y.S.2d 145 (2010).  Fried submits that he satisfied Hoffman's "impact requirement," id. at 290, 907 N.Y.S.2d at 148, because he frequently communicated with LVI's New York headquarters and attended meetings in New York City regarding local projects, and because State's decision to reassign his work duties was made in New York. Hoffman, however, found similar assertions insufficient to satisfy the impact requirement. See id. at 288, 907 N.Y.S.2d at 146 (noting plaintiff's assertions that he attended quarterly meetings in New York City, that he was managed from New York City, and that the decision to terminate him was made in New York City).  Indeed, in Hoffman, the New York Court of Appeals emphasized that, to make the NYCHRL "simple for courts to apply and litigants to follow, lead[ing] to predictable results," it confined the protections of that law "to those who are meant to be protected—those who work in the city."  Id. at 291, 907 N.Y.S.2d at 148.  Because Fried did not "work in the city," summary judgment was properly granted for defendants on his NYCHRL claim.

6

3.   <u>Conclusion</u>

    We have considered Fried's remaining arguments on appeal and conclude that they are without merit.  Accordingly, the judgment of the district court is AFFIRMED.

                    FOR THE COURT:

                    CATHERINE O'HAGAN WOLFE, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit